## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ELISA W., by her next friend, Elizabeth
Barricelli; ALEXANDRIA R., by her next friend,
Alison Max Rothschild; THIERRY E., by his next
friend, Amy Mulzer; AYANNA J., by her next
friend, Meyghan McCrea; OLIVIA and ANA-
MARIA R., by their next friend, Dawn Cardi;
XAVION M., by his next friend, Michael B.
Mushlin; DAMEON C., by his next friend,
Reverend Doctor Gwendolyn Hadley-Hall;
TYRONE M., by his next friend, Bishop Lillian
Robinson-Wiltshire; and BRITTNEY W., by her
next friend, Liza Camellerie, individually and on
behalf of a class of all others similarly situated,
and LETITIA JAMES, the Public Advocate for
the City of New York,

                                        Plaintiffs,

                    -against-

THE CITY OF NEW YORK; the NEW YORK
CITY ADMINISTRATION FOR CHILDREN'S
SERVICES; GLADYS CARRIÓN, Commissioner
of the New York City Administration for
Children's Services, in her official capacity; the
STATE OF NEW YORK; the NEW YORK
STATE OFFICE OF CHILDREN AND FAMILY
SERVICES; and SHEILA J. POOLE, Acting
Commissioner of the New York State Office of
Children and Family Services, in her official
capacity,

                                        Defendants.

15 Civ. _____

**CLASS ACTION COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

PARTIES ...............................................................................................................5

    I.    The Named Plaintiff Children.............................................................5

    II.    The Public Advocate for the City of New York .....................................36

    III.    Defendants .....................................................................................39

JURISDICTION AND VENUE .................................................................................41

CLASS ACTION ALLEGATIONS ..............................................................................41

STRUCTURE OF THE NEW YORK CITY CHILD WELFARE SYSTEM...............................45

FACTUAL ALLEGATIONS REGARDING SYSTEMIC DEFICIENCIES
PLAGUING NEW YORK CITY'S FOSTER CARE SYSTEM AND
RESULTING HARM TO PLAINTIFF CHILDREN ........................................................56

    I.    DEFENDANTS ARE CAUSING IRREPARABLE HARM TO
        CHILDREN IN ACS CUSTODY. ....................................................59

        A.    Defendants Fail To Protect Children in ACS Custody from
            Maltreatment. .................................................................59

        B.    Defendants Fail To Provide Children in ACS Custody with
            Permanent Homes and Families Within a Reasonable Time...................60

        C.    Defendants Fail To Provide Foster Placements and Services
            that Ensure the Well-Being of Children in ACS Custody. .......................65

    II.    DEFENDANTS HAVE FAILED TO REMEDY THE SYSTEMIC
        DEFICIENCIES PLAGUING NEW YORK CITY'S CHILD
        WELFARE SYSTEM ....................................................................70

        A.    City Defendants Fail To Exercise Adequate and
            Meaningful Oversight over Contract Agencies. .........................71

        B.    Defendants Fail To Ensure an Adequately Staffed and
            Appropriately Trained Child Welfare Workforce....................73

        C.    Defendants' Processes for Making Foster Placements in
            New York City Are Deficient. .............................................77

        D.    ACS Fails To Ensure that Meaningful Case Plans and
            Service Plans for Foster Children Are Developed and
            Implemented. .................................................................80

        E.    Defendants Fail To Ensure Timely Adjudication of Family
            Court Proceedings Involving Children in Foster Care..............................89

CAUSES OF ACTION ............................................................................................93

FIRST CAUSE OF ACTION ....................................................................................93

SECOND CAUSE OF ACTION .................................................................................94

THIRD CAUSE OF ACTION ........................................................................................95

FOURTH CAUSE OF ACTION ...................................................................................97

FIFTH CAUSE OF ACTION .........................................................................................99

PRAYER FOR RELIEF ...............................................................................................101

## PRELIMINARY STATEMENT

1.       Foster care is supposed to be safe and temporary.  For children in New York

City's foster care system, it is neither.  Children in New York City's foster care system are in one

of the most dangerous foster care systems in the country, and they spend longer in foster care

than do foster children almost anywhere else in the country.  The emotional damage—and, far

too often, abuse—suffered by these children at the hands of a system designed to keep them safe

is unacceptable.  That the responsible state and city officials have known about these problems

and done nothing to fix them is inexcusable.

2.       Ten named plaintiffs, all children in foster care in New York City, bring this

lawsuit as a civil rights action on behalf of all children who are now or will be in the foster care

custody of the Commissioner of New York City's Administration for Children's Services

("ACS") ("Plaintiff Children").  They seek both declaratory and injunctive relief against the city

and state agencies and officials responsible for violating their rights under the United States

Constitution, federal law, and New York state law and regulations.  Plaintiff Letitia James, as

Public Advocate for the City of New York, who has received myriad constituent complaints

concerning foster care, brings this lawsuit seeking injunctive and declaratory relief against the

City Defendants to ensure that ACS promptly remedies the systemic failures that have been

plaguing New York City's foster care system for too long.

3.       Defendants are the City of New York ("City"), ACS, Gladys Carrión,

Commissioner of ACS, in her official capacity (collectively, "City Defendants"); the State of

New York, the New York State Office of Children and Family Services ("OCFS"), and Sheila J.

Poole, Acting Commissioner of OCFS, in her official capacity (collectively, "State Defendants").

4.      Through a pattern and practice of long-standing and well-documented action and inaction, Defendants—who are responsible for protecting New York City's foster children—fail to keep these children safe.  And, instead of ensuring that New York City's foster children grow up in safe, permanent families, Defendants' policies and customs cause far too many children to grow up in the custody of the state, without a home or family to call their own:

     a.     New York City children make up the majority of children in foster care in New York State, which has one of the worst rates of maltreatment in foster care of any jurisdiction in this country.

     b.     Children in foster care in New York City spend two times as much time in state custody as children in the rest of New York State, and over double the amount of time in state custody as children in the rest of the nation.

     c.     It takes longer to return New York City children in foster care to their parents than in the rest of New York State and the rest of the nation.  The most recent federal data available shows that New York City performs worse on this measure than all but five other states and territories.

     d.     It takes longer for a foster child to be adopted in New York City than anywhere else in the country.  New York City has performed worse on this measure than every state since at least 2007.

     e.     Many children who are without a permanent home never get adopted at all and leave the foster care system only when they get too old to stay in it any longer.  Approximately 1,000 children "age out" of the foster care system each year, often winding up homeless and without any adult with whom they have a permanent connection.

5.      New York City's child welfare system is causing devastating, ongoing and long-lasting harm to New York City children in its care:

a.      Children who are separated from their parents to whom they could be returned weep at the end of visits with their parents but continue to live in foster care well beyond the time they could be returned home.

b.      Parents whose children are removed because they need services are unable to gain access to the right services and thus are unable to regain custody of their children.

c.      Children who cannot be safely returned to their parents languish in foster care, many moving from place to place, growing older and more damaged by their experiences, not knowing to which adults to form attachments, or trusting no adults at all.

d.      Children traumatized by the disruptions in their young lives do not know where they will be living from one month to the next, or whether there are any adults on whom they can rely.  Often by the time a decision is made about what the plan should be for their future, they are irreparably damaged by their experiences in foster care.

6.      These consequences are the result of systemic deficiencies in which:

a.      The state agency, OCFS, is responsible for foster care across New York State and for ensuring that federal foster care funds are spent as required by the governing federal statutes and state statutes and regulations

consistent with federal law, but neither monitors nor enforces those laws and regulations.

b.      The city agency, ACS, in whose legal custody all foster children are placed, delegates its responsibility for the day-to-day care of these children by contract to 29 agencies (the "Contract Agencies"), paying hundreds of millions of dollars to the Contract Agencies for foster care services but failing to ensure they meet minimum professional standards or provide adequate and meaningful oversight to ensure compliance with federal and state law and the applicable contracts.

c.      The damage that is being done to children in foster care in New York City as a direct result of these structural failures in the New York City child welfare system is both avoidable and a violation of these children's statutory and constitutional rights.

7.      The illegal conduct of which Plaintiffs complain has plagued New York City's foster care system for far too long—a fact well known to Defendants, all of whom have been in a position to change it.

8.      Plaintiffs seek a ruling from this Court that the structural deficiencies and long-standing actions and inactions described in this complaint violate the statutory and constitutional rights of all children dependent on the New York City foster care system for their safety, their well-being and their futures.  They seek an equitable injunction against the responsible city and state officials and agencies named as Defendants in this lawsuit, directing that appropriate relief be granted so that New York City's foster children are no longer irreparably harmed by the

4

system that is supposed to protect them.  These children have a right to a safe and nurturing childhood.  Plaintiffs ask this Court to protect that right.

**PARTIES**

I.   **The Named Plaintiff Children**

**Elisa W.**

9.      Plaintiff Elisa W. is a 16 year old girl in the twelfth grade.  ACS removed her from her biological mother when she was approximately four years old.  She has been in ACS custody for the past 12 years—over two thirds of her life.

10.     Plaintiff Elisa W. appears through her next friend, Elizabeth Barricelli.  Ms. Barricelli has been an elementary school teacher for over 30 years and currently teaches elementary school science at a public school in Brooklyn.  Ms. Barricelli taught Elisa W. from 2006 to 2010 when Elisa W. was in elementary school and they recently reconnected.  Ms. Barricelli is familiar with Elisa W.'s background and education.  Ms. Barricelli is truly dedicated to Elisa W.'s best interests.

11.     ACS removed Plaintiff Elisa W. from her biological mother when she was four years old because of allegations of physical abuse.  At the time, Elisa W.'s biological mother was approximately 19 years old and living in a mother-child foster placement in New York City.

12.     Over the past 12 years, ACS has shuffled Plaintiff Elisa W. through so many foster placements that she is unable to account for all of them—a direct result of ACS's failure to ensure an appropriate foster placement that could meet her needs.  In the last two years alone, Elisa W. has been in four foster placements.  Elisa W. has attended at least seven schools over the course of her young life.

13.     Plaintiff Elisa W. has a reported history of physical and suspected sexual abuse while in ACS custody.

14.     In the first foster placement Plaintiff Elisa W. can remember, she was sexually abused by the nephew of her then-foster mother.  She was just six years old at the time.  She did not report the incident to anyone because she did not want to get in trouble.  At this same placement, Elisa W. was subjected to other physical, psychological and emotional abuse, including being forced by her then-foster mother to sleep in a bug-infested bedroom and being forced to walk around the foster home naked after bathing.  Once, Plaintiff Elisa W.'s then-foster mother beat her and denied her food as punishment for purportedly telling her biological mother that she was being beaten by her foster mother; however, the allegation had been made by the foster mother's own daughter pretending to be Elisa W.  Upon information and belief, Elisa W.'s then-foster mother would allow family members with violent criminal records in the home.  Elisa W. reports feeling like "just a total stranger" in this foster placement.

15.     In approximately 2006, Elisa W. was placed in another foster placement, and again suffered severe physical, psychological and emotional abuse, including sexual abuse by multiple relatives of her then-foster mother.  Elisa W.'s teachers made multiple reports of physical abuse to her caseworker, including when Elisa W.'s then-foster mother punched her in the face.  Upon information and belief, neither the Contract Agency nor ACS took any action in response to these reports.  Her then-foster mother neglected Elisa W., who often went to school unkempt and underfed; her teacher at the time, her next friend Ms. Barricelli, often had to buy Elisa W. snacks during the school day and maintained a clean uniform at school for her.  Plaintiff Elisa W. remained in this abusive foster placement for five years—a direct result of ACS's failure to ensure that the Contract Agency to which ACS had delegated day-to-day care of this

young girl was keeping her safe.  On April 28, 2014, Plaintiff Elisa W. was assigned to a different Contract Agency when it was determined she needed "therapeutic foster placements". Although Plaintiff Elisa W. is from New York City, the Contract Agency first placed her in a home in Suffolk County and then in a home in Nassau County.  However, at the time—and to this day—the only person Elisa W. considers a friend lives in New York City.

16.     As a result of the great emotional damage Elisa W. has suffered while in ACS custody for the past 12 years, this young girl has suffered and continues to suffer from a variety of mental health problems.  Her diagnoses include depression, bipolar disorder and post-traumatic stress disorder.  She has been on anti-depressants and mood stabilizers since she was 11 years old.  In July 2014, Elisa W. requested she be placed in a mental health facility because of her mental health concerns.  Elisa W. remained there for two months.  Since her hospitalization, she has been placed on heavy doses of psychotropic medication; she reports that, as a result, she can barely string a sentence together and no longer looks people in the eye because she gets nervous.

17.     In addition to failing to keep Plaintiff Elisa W. free from physical, psychological and emotional harm while in its custody, ACS has also failed to take reasonable and appropriate steps consistent with professional standards to place Elisa W. in a permanent home.  Twice, Plaintiff Elisa W.'s biological mother conditionally surrendered her parental rights so Elisa W. could be adopted.  Neither adoption was ever finalized.  In approximately 2010, Plaintiff Elisa W.'s aunt expressed interest in adopting Elisa W.  This adoption was not finalized.  In 2012, after Plaintiff Elisa W. already had been in foster care for approximately eight years, her biological mother's parental rights were terminated.  Although her aunt has been considered as an adoptive resource since then, the Contract Agency, ACS and Plaintiff Elisa W.'s law guardian

have not taken steps to pursue this possibility or sought out other non-relative adoption possibilities for Plaintiff Elisa W. to finally have a permanent home and family to call her own. Indeed, Elisa W. fears that she will "age out" of foster care—where she has spent the last 12 years being abused, neglected and shuffled from place to place—and return to living with her biological mother.  Elisa W. fears that if this happens she will be unable to attend college.

18.      Plaintiff Elisa W. describes her stay in foster care by noting that when she was younger she did well in school and had an extensive vocabulary, but now, as a result of her experiences in foster care and medication regimen, she has difficulty concentrating.  She expresses great frustration that the Contract Agency and ACS are unresponsive to her requests for driving lessons and a state identification card—normal requests for a 16 year old girl.  For the 12 years Elisa W. has been in foster care, the Contract Agency, ACS and Plaintiff Elisa W.'s law guardian have been making decisions about her life but, as she puts it—"no one ever asks me what I want".

19.      During the 12 years that Plaintiff Elisa W. has been in the custody of ACS, Defendants repeatedly have violated her constitutional, statutory and contractual rights by failing to protect her from physical, psychological and emotional harm; by failing to provide services to ensure her physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable her to be safely returned to her biological mother or, if that were not possible within a reasonable period of time, to place her in a permanent home.  ACS has further failed to exercise meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, this child. As a direct result of Defendants' actions and inactions, Elisa W. has suffered and continues to suffer

irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of a child being harmed while in foster care, of not knowing where she will grow up and of believing that there is no family she can call her own.  Because of Defendants' actions and inactions, Plaintiff Elisa W. is being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

**Alexandria R.**

20.     Plaintiff Alexandria R. is a 12 year old girl in the fifth grade.  ACS removed her from her biological mother's home on August 9, 2007.  Plaintiff Alexandria R.'s permanency goal currently is to be returned to her parent.  She has been in the custody of ACS for the past eight years—over two thirds of her life.

21.     Plaintiff Alexandria R. appears through her next friend, Alison Max Rothschild. Ms. Rothschild is the director of a private school in New York City.  Ms. Rothschild knows Alexandria R. and her current foster parents, and is familiar with her background including her education.  Ms. Rothschild is truly dedicated to Alexandria R.'s best interests.

22.     Upon information and belief, this is Plaintiff Alexandria R.'s second time in foster care.  Upon information and belief, ACS removed her from her biological mother a few months after she was born, placed her in a kinship foster placement with her maternal great-grandmother for three and a half years and returned her to her biological mother for a few months—only to remove her and again place her in foster care in 2007.

23.     Plaintiff Alexandria R. is not the only child that ACS has removed from her biological mother and placed into foster care.  Plaintiff Alexandria R. has six siblings:  (1) a 15 year old sister, Andrea R.; (2) a 13 year old brother, Kavon L.; (3) an 11 year old brother, Russell

W.; (4) a nine year old brother, Anton W.; (5) a seven year old sister, Naomi M.W.; and (6) a 20 month old sister, Raquel W.  All of her siblings are currently in foster care.

24.     In 2006, ACS opened a preventive services case involving Plaintiff Alexandria R.'s biological mother because then six year old Andrea R. had jumped out of a second floor window after being locked in her bedroom.  In August 2007, ACS removed Plaintiff Alexandria R. and her then-living siblings from their home and placed them in ACS custody because their biological mother's boyfriend was physically abusing Alexandria R.'s brother, Kavon L.  Now seven year old Naomi M.W. was born five months later and ACS took custody of her at birth. On or about May 13, 2015, ACS removed Plaintiff Alexandria R.'s youngest sister, 22 month old Raquel W., from their biological mother due to allegations of neglect.

25.     From 2007 to 2011, between the time she was four and eight years old, ACS bounced Plaintiff Alexandria R. from placement to placement due to its failure to ensure an appropriate foster placement that could meet her needs.  During her first four years in ACS custody, ACS placed Plaintiff Alexandria R. in approximately eight different foster homes and with two different Contract Agencies.  When she was approximately eight years old, Plaintiff Alexandria R. spent approximately six months in the mental health unit of a residential treatment facility.  Her then-foster parents dropped her off, telling her they would return the next morning to pick her up, and never returned.  As a result, Plaintiff Alexandria R. suffered severe emotional trauma, compounding the emotional harm she was already experiencing from being moved from place to place.

26.     ACS moved Plaintiff Alexandria R. to her current foster placement on November 11, 2011, when she was eight years old.  She has now lived there for over three and a half years. At 12 years old, this is the longest she has ever lived in one place—a direct result of ACS's

failure to develop and implement an appropriate case plan and provide appropriate services consistent with professional standards to enable this young girl to be safely returned to her biological mother or, if that were not possible within a reasonable period of time, to ensure that she can grow up in a permanent family.

27.     Plaintiff Alexandria R. has a reported history of physical and suspected sexual abuse.  Upon information and belief, the physical and suspected sexual abuse has taken place while Plaintiff Alexandria R. has been in ACS custody, and includes  physical abuse by her biological mother during an unsupervised visit at her then-foster home.

28.     As a result of the great emotional damage Alexandria R. has suffered while in ACS custody for the past eight years, this young girl has suffered and continues to suffer from a variety of mental health problems.  Her diagnoses over the past eight years have only grown more serious during her time in foster care and have included adjustment disorder (2007), adjustment disorder with mixed disturbance emotions and conduct (*i.e.*, mood and behavioral problems) (2009), disorder of childhood (2009) and post-traumatic stress disorder (2014 to present).  She also suffers from learning disabilities and is behind her peers in school.

29.     Since being placed in ACS custody, Plaintiff Alexandria R. has suffered severe emotional and behavioral problems, including physical aggression toward herself and others. She has an extreme distrust of people she views as "in the system", including her doctors and therapists.  She also has difficulty controlling her emotions.  As recently as late 2014, Plaintiff Alexandria R. became highly emotional and distraught, including hysterically crying and becoming physically aggressive, when her biological mother missed a family therapy appointment.

11

30.     In addition to failing to keep Plaintiff Alexandria R. free from physical, psychological and emotional harm while in its custody, ACS has also failed to take reasonable and appropriate steps consistent with professional standards to place Alexandria R. in a permanent home.  In approximately 2012, after she already had been in foster care for over four years, Plaintiff Alexandria R.'s permanency goal was changed to adoption and the Contract Agency to which ACS has delegated day-to-day responsibility for this child told this nine year old girl that she would be adopted by her foster parents.  However, the adoption did not take place, even though her foster parents remain interested in adopting her, and this has created serious additional damage to Alexandria R.'s emotional state.  She is now angry and does not understand why her foster parents have not been able to adopt her yet.

31.     In July 2013, Plaintiff Alexandria R.'s permanency goal was changed from adoption to return to parent.  Upon information and belief, this is because ACS attorneys failed to take necessary steps to obtain the termination of her biological mother's parental rights.

32.     After already languishing in foster care for almost eight years, and with none of her siblings currently living with her or her biological mother, Plaintiff Alexandria R.'s permanency goal currently is to be returned to her parent.  Plaintiff Alexandria R. reportedly lives in fear that she will be moved yet again by ACS and has been deeply harmed by the continuing uncertainty about where and how she will grow up.

33.     During the almost eight years that Plaintiff Alexandria R. has been in the custody of ACS, Defendants repeatedly have violated her constitutional, statutory and contractual rights by failing to protect her from physical, psychological and emotional harm; by failing to provide services to ensure her physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a

12

meaningful, timely and appropriate plan to enable her to be safely returned to her biological

mother or, if that were not possible within a reasonable period of time, to place her in a

permanent home.  ACS has further failed to exercise adequate and meaningful oversight over the

Contract Agencies to which ACS has delegated the day-to-day care of, and case planning

responsibility for, this child.  As a direct result of Defendants' actions and inactions, Alexandria

R. has suffered and continues to suffer irreparable harm and continues to be subjected to the

lasting emotional damage that is a consequence of a child being harmed while in foster care, of

not knowing where she will grow up and of believing that there is no family she can call her

own.  Because of Defendants' actions and inactions, Plaintiff Alexandria R. is being deprived of

the opportunity for a childhood that is reasonably free from harm and that provides the

opportunity for stability and healthy development.

### Thierry E.

34.    Plaintiff Thierry E. is a three year old boy.  ACS removed him from his biological

mother on September 27, 2013.  His permanency goal currently is to be returned to his parent.

He has been in ACS custody for the past 21 months—nearly half his life.

35.    Plaintiff Thierry E. appears through his next friend, Amy Mulzer.  Ms. Mulzer is

an Acting Assistant Professor of Lawyering at New York University School of Law.  The

primary focus of her research includes:  Adoption, Child Welfare, Family Law, Parental Rights

and Poverty Law.  Prior to joining the lawyering faculty at NYU, Ms. Mulzer spent five years

representing low-income parents whose children were in foster care or at risk of being placed in

foster care, first as a staff attorney at Brooklyn Defender Services and then as an appellate

attorney on the assigned counsel panel for the Appellate Division, Second Department.  Ms.

Mulzer is truly dedicated to Thierry E.'s best interests.

13

36.     On or about August 15, 2013, Thierry E.'s mother, who has been a public school teacher for the past 11 years, called Safe Horizon, a domestic violence hotline, to request information about how she could remove Thierry E.'s biological father from her home.  Safe Horizon reported the call to the Statewide Central Register of Child Abuse and Maltreatment and ACS opened an investigation.  There was not and never has been any allegation that anyone abused Thierry E. or that his mother failed to provide him with appropriate, loving care.  On September 23, 2013, Thierry E.'s mother obtained an order of protection from the Family Court against Thierry E.'s father.  In her petition, she alleged that Thierry E.'s father had held a knife to her throat threatening to kill her, strangled her at least three times, punched her in the face and threw household furniture at her.  Thierry E.'s mother has not been in a relationship with Thierry E.'s father since September 2013 and does not intend to re-enter a relationship with him.

37.     ACS removed Plaintiff Thierry E. from his home on September 27, 2013, while his mother was at work, without taking necessary steps or making reasonable efforts to determine whether Thierry E. could remain safely at home with his mother.  His father was no longer living in the house.

38.     The Contract Agency to which ACS had delegated the day-to-day care of, and case planning responsibility for, Plaintiff Thierry E. first moved him to a foster placement far away from his mother's home and required visits to take place at the Contract Agency's office in the Bronx, even though he and his mother had lived in Manhattan.  Moreover, the foster mother spoke only Spanish and Thierry E., then two years old, did not speak any Spanish.  As a result, Thierry E.'s language and speech development was severely stunted.  Thierry E.'s mother had him evaluated in March 2014 and the speech therapist recommended speech therapy twice a week, but the Contract Agency refused to provide this service.

39.     On May 13, 2014, during a visit at the Contract Agency, Plaintiff Thierry E.'s mother noticed a severe rash while changing his diaper and reported this and other concerns to the Family Court.  On June 21, 2014, the Family Court ordered that Thierry E. be transferred to a new Contract Agency.  Thierry E. was moved to a second foster placement two days later.

40.     Plaintiff Thierry E. has now been in foster care for 21 months—nearly half his life.  This is a direct result of ACS's failure to develop and implement an appropriate case plan and provide appropriate services consistent with professional standards to enable this young boy to be returned to his mother or, if that were not possible within a reasonable period of time, to ensure that he would grow up in a permanent family.

41.     Plaintiff Thierry E. has suffered emotional harm as a result of spending nearly half his life in ACS custody without a permanent family.  All indications are that he misses his mother very much.  At the end of his twice weekly visits with his mother, he cries uncontrollably.  When his mother expressed concern at this behavior, Thierry E.'s therapist told her that he had to "get used to it" because this was "his life now".

42.     ACS continues to fail to ensure that Plaintiff Thierry E. is receiving appropriate services.  Although Thierry E. currently receives therapy, Thierry E.'s mother has expressed concerns that the therapy being provided by the Contract Agency is focused on normalizing Thierry E.'s separation from his mother rather than trying to help him prepare to be returned to her care—even though his permanency goal remains to be returned to his parent.

43.     In addition to failing to keep Plaintiff Thierry E. free from emotional harm while in its custody, ACS has also failed to take reasonable and appropriate steps consistent with professional standards to place Thierry E. in a permanent home.

44.     Although ACS removed Plaintiff Thierry E. from his home over 20 months ago, there has been no fact-finding hearing or disposition of ACS's neglect petition against Thierry E.'s biological mother.  The fact-finding hearing has been postponed several times.

45.     Plaintiff Thierry E. had his first permanency hearing in December 2014—after he had already been in ACS custody for over a year.

46.     Plaintiff Thierry E.'s permanency goal remains to be returned to his parent.  His biological mother wants nothing more than to finally bring her son home.  She has completed parenting classes, domestic violence counseling and mental health evaluations in accordance with the two different Contract Agencies' instructions.  In documents filed with the Family Court, the Contract Agency has stated that Thierry E.'s mother "comes prepared to her visits with activities to do with her son and also tries to reinforce parenting skills that will help her son's vocabulary and pronunciation."

47.     Since his removal over 21 months ago, ACS has made no effort to ensure that this little boy is returned to the mother he misses, and that his permanency goal—reunification with his biological mother—is implemented as soon as possible.

48.     During the nearly two years that Plaintiff Thierry E. has been in the custody of ACS, Defendants repeatedly have violated his constitutional, statutory and contractual rights by failing to protect him from psychological and emotional harm; by failing to provide services to ensure his physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable him to be safely returned to his mother or, if that were not possible within a reasonable period of time, to place him in a permanent home.  ACS has further failed to exercise adequate and meaningful oversight over the Contract Agencies to which ACS

16

has delegated the day-to-day care of, and case planning responsibility for, this child.  As a direct result of Defendants' actions and inactions, Thierry E. has suffered and continues to suffer irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of a child being harmed while in foster care, of not knowing where he will grow up and of believing that there is no family he can call his own.  Because of Defendants' actions and inactions, Plaintiff Thierry E. is being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

### Ayanna J.

49.     Plaintiff Ayanna J. is a two and a half year old girl.  ACS removed her from her biological mother on November 2, 2012—three days after she was born.  Her permanency goal currently is adoption.  She has been in ACS custody for the past two and a half years—virtually her entire life.

50.     Plaintiff Ayanna J. appears through her next friend, Meyghan McCrea.  Meyghan McCrea is an attorney in private practice in New York City.  She was previously employed as a Family Court Legal Services Attorney for ACS.  Ms. McCrea has known Ayanna J. since March 2013 and has had regular contact with her since that time.  Ms. McCrea has met Ayanna J.'s current foster parent and babysitter.  Ms. McCrea is truly dedicated to Ayanna J.'s best interests.

51.     Plaintiff Ayanna J. has two siblings:  (1) a nine year old sister, Alyssa L., and (2) a sister, Angela L., who was beaten to death by her biological mother's boyfriend in March 2010, when she was 19 months old.  Documents filed with the Family Court allege that, given Angela L.'s extensive injuries, Plaintiff's biological mother knew or should have known about the ongoing abuse that her daughter suffered.  These documents also allege that Plaintiff Ayanna J.'s

17

biological mother delayed seeking medical care for Angela L., lied to hospital staff about the source of the child's injuries and instructed her other daughter, Alyssa L., who was then three and a half years old, to lie about what had occurred.

52.     The day after Angela L. died, ACS filed a petition against Ayanna J.'s biological mother alleging severe and repeated abuse.  In October 2012, the Family Court made a finding of abuse against Ayanna J.'s biological mother.  On appeal in June 2014, the New York State Appellate Division found that Ayanna J.'s biological mother "severely abused [Angela L.] and derivatively severely abused the subject child [Alyssa L.]".

53.     Plaintiff Ayanna J. was born after her sister Angela L. died.  Due to the prior finding of abuse against her biological mother, ACS placed Plaintiff Ayanna J. in custody and in her current foster placement on November 2, 2012—three days after she was born.  In March 2013, the Family Court made a finding of derivative abuse as to Ayanna J. and on September 30, 2014, the Family Court amended its finding to severe abuse as to Ayanna J. based on the Appellate Division's June 2014 finding.

54.     Since being placed in foster care two and a half years ago, Plaintiff Ayanna J. has had approximately eight caseworkers at the Contract Agency to which ACS has delegated her day-to-day care.

55.     While in the custody of ACS, Plaintiff Ayanna J. has had supervised visits with her biological mother and father at the Contract Agency.  During one such visit in September 2013, Plaintiff Ayanna J.'s biological father became angry and began screaming at Ayanna J.'s biological mother in front of Ayanna J., who was not even two years old at the time.  Upon information and belief, at least one Contract Agency visit was discontinued because Ayanna J.'s biological parents were fighting.  Ayanna J.'s biological father has not visited Plaintiff Ayanna J.

since April 2014.  Upon information and belief, visits at Ayanna J.'s biological mother's home were suspended after she threatened to physically assault a caseworker.  Ayanna J. continues to have supervised visits with her biological mother twice per week at the Contract Agency. During one such visit in July 2014, Ayanna J.'s biological mother allowed her biological father to speak with Plaintiff Ayanna J. over the phone despite such contact being prohibited.

56.     Plaintiff Ayanna J. has languished in the custody of ACS for the past two and a half years—a direct result of ACS's failure to develop and implement an appropriate case plan and provide appropriate services consistent with professional standards to enable this young girl to be safely returned to her mother or, if that were not possible within a reasonable period of time, to ensure that she can grow up in a permanent family.

57.     As a result of her continued placement in ACS custody, Plaintiff Ayanna J. has suffered great emotional harm.  In 2013, Ayanna J. cried hysterically during supervised visits with her biological mother at the Contract Agency.  Now that she is older, Ayanna J. expresses the desire to not attend visits with her biological mother, will not leave her babysitter to visit with her biological mother, or will ask for her babysitter in the middle of a visit with her biological mother.  These visits have caused and continue to cause great stress, confusion and psychological harm to this young child.

58.     In addition to failing to keep Plaintiff Ayanna J. free from emotional harm while in its custody, ACS has also failed to take reasonable and appropriate steps consistent with reasonable professional standards to place Ayanna J. in a permanent home.

59.     On April 9, 2014, Plaintiff Ayanna J.'s permanency goal was changed from return to parent to adoption.  Her current foster parent has indicated a willingness to adopt her.

19

60.     A petition for termination of parental rights ("TPR") was filed on April 28, 2014, after Plaintiff Ayanna J. already had been in foster care for almost one and a half years.  The TPR proceedings were adjourned repeatedly due to ACS's failure to ensure that all parties were prepared for court on scheduled hearing dates to resolve the permanency issues in this case.  On April 27, 2015, almost a year after the TPR petition was filed, the assigned New York Family Court judge heard one day of testimony related to the TPR proceeding and continued the case until mid-June 2015.  The next day, that Family Court judge was reassigned to another court.  On June 22, 2015, Plaintiff Ayanna J.'s TPR proceeding was re-assigned to a new New York Family Court judge, who declared a mistrial and postponed a new trial until October 2015.

61.     After languishing in foster care for two and a half years, Plaintiff Ayanna J.'s permanency goal remains to be adopted.

62.     During the two and a half years that Plaintiff Ayanna J.  has been in the custody of ACS, Defendants repeatedly have violated her constitutional, statutory and contractual rights by failing to protect her from psychological and emotional harm; by failing to provide services to ensure her physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable her to be safely returned to her biological mother or, if that were not possible within a reasonable period of time, to place her in a permanent home.  ACS has further failed to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, this child. As a direct result of Defendants' actions and inactions, Ayanna J. has suffered and continues to suffer irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of a child being harmed while in foster care, of not knowing where she will grow

up and of believing that there is no family she can call her own.  Because of Defendants' actions and inactions, Plaintiff Ayanna J. is being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

**Olivia R. and Ana-Maria R.**

63.    Plaintiff Olivia R. is a five year old girl in the first grade, and Plaintiff Ana-Maria R. is a four year old girl in pre-kindergarten.  ACS removed them from their biological mother's home on June 8, 2011.  The permanency goal for both children currently is adoption.  They have been in ACS custody for more than four years.

64.    Plaintiffs Olivia and Ana-Maria R. appear through their next friend, Dawn Cardi.  Ms. Cardi is an attorney in private practice in New York City, specializing in criminal and family law.  She is appointed and has served as a certified Law Guardian in the First Department of the Appellate Division, representing children in complex family law proceedings.  She is truly dedicated to Olivia and Ana-Maria R.'s best interests.

65.    Upon information and belief, this is Plaintiffs Olivia and Ana-Maria R.'s second time in ACS custody.  Upon information and belief, ACS removed Plaintiffs Olivia and Ana-Maria R. from their biological parents in January 2011, they spent a few months in a foster placement and then ACS returned them home.  On June 8, 2011, when Olivia R. was two years old and Ana-Maria R. was eight months old, ACS again removed the girls from their home and placed them into ACS custody, reportedly due to domestic violence between their biological parents and their biological mother's alcohol and drug use.

66.     The Contract Agency to which ACS delegated the day-to-day care of, and case planning responsibility for, Plaintiffs Olivia and Ana-Maria R. initially placed them in a non-kinship foster placement—the third place they had been moved to in six months.

67.     In March 2012, the Contract Agency returned Olivia and Ana-Maria R. to their biological mother on a trial discharge.  In June 2012, their biological mother dropped them off at the foster home where they had been living and did not return to pick them up.  She did not visit the children again until July 24, 2012.

68.     ACS has allowed Plaintiffs Olivia and Ana-Maria R. to be bounced in and out of foster care for almost the entirety of their young lives, and they now have been in ACS custody for the past four years—a direct result of ACS's failure to develop and implement an appropriate case plan and provide appropriate services consistent with professional standards to enable these young girls to be safely returned to their biological mother or, if that were not possible within a reasonable period of time, to ensure that they can grow up in a permanent family.

69.     Plaintiffs Olivia and Ana-Maria R. have suffered physical and emotional abuse while in ACS custody.  In October 2013, Plaintiff Olivia R., who was four years old at the time, was sexually abused by her biological mother's friend during an unsupervised visit.  Plaintiff Ana-Maria R. was present during that abuse.  Although the Contract Agency was made aware of this abuse at that time, upon information and belief, neither the Contract Agency nor ACS took any action in response to the report.  More recently, Plaintiff Olivia R. reported the incident to her therapist, who (as a mandated reporter) informed the Statewide Central Register of Child Abuse and Maltreatment and the police, and an investigation is underway.  Plaintiffs Olivia and Ana-Maria R.'s biological mother has not visited with the children since November 26, 2014.

22

70.     As a result of the emotional harm they have suffered while in ACS custody for the past four years, Plaintiffs Olivia and Ana-Maria R. have suffered and continue to suffer from a variety of mental health problems.  Olivia R.'s diagnoses include Attention Deficit Hyperactivity Disorder, Developmental Coordination Disorder and Disruptive Behavior Disorder.  She is in a special education setting at school.  Ana-Maria R.'s diagnoses include Attention Deficit Hyperactivity Disorder, Anger Management, and Conduct Disorder.  She is being evaluated for placement in a special education setting at school.

71.     Since being placed in ACS custody, Plaintiffs Olivia and Ana-Maria R. have suffered severe emotional and behavioral problems.  Olivia R. has developed serious trust issues and she wets the bed before any visit with her biological mother.  Ana-Maria R. demonstrates severe hyperactivity and aggression.  At school, she often would hit her teacher, tear things off the wall or break other items.  In January 2015, her pre-kindergarten program would not allow her to attend classes until she was medicated for these behavioral problems.  She did not start receiving medication until June 2015.

72.     ACS has failed to ensure that Plaintiffs Olivia and Ana-Maria R. are provided with the necessary and appropriate services to ensure their physical, psychological and emotional well-being.  One of their caseworkers recommended that the girls enroll in Bridges to Health Program ("B2H")—a Medicaid waiver program that provides support for children in foster care who are medically fragile, have a developmental disability or are severely emotionally disturbed.  Upon information and belief, when their foster mother initially requested these services, the Contract Agency declined to submit the request because an agency caseworker said "that's a lot of paperwork".  Upon information and belief, Plaintiffs Olivia and Ana-Maria R. still do not have B2H services.

23

73.     In addition to failing to keep Plaintiffs Olivia and Ana-Maria R. free from physical, psychological and emotional harm while in its custody, ACS also has failed to take reasonable and appropriate steps consistent with reasonable professional standards to place Plaintiffs Olivia and Ana-Maria R. in a permanent home.

74.     Plaintiffs Olivia and Ana-Maria R.'s permanency goal was not changed from return to parent to adoption until March 1, 2014—after they had been in ACS custody for almost three years.  Olivia and Ana-Maria R.'s current foster mother has indicated a willingness to adopt them.  TPR petitions were filed approximately eight months later in November 2014. Upon information and belief, on May 28, 2015, the judge made an oral statement that parental rights would be terminated; however, because none of the attorneys present had drafted a proposed order, that ruling has not been finalized and Olivia and Ana-Maria R. are not yet freed for adoption.

75.     During the four years that Plaintiffs Olivia and Ana-Maria R. have been in the custody of ACS, Defendants repeatedly have violated their constitutional, statutory and contractual rights by failing to protect them from physical, psychological and emotional harm; by failing to provide services to ensure their physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable them to be safely returned to their biological mother or, if that were not possible within a reasonable period of time, to place them in a permanent home.  ACS has further failed to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, these children.  As a direct result of Defendants' actions and inactions, Plaintiffs Olivia and Ana-Maria R. have suffered and continue to suffer irreparable

harm and continue to be subjected to the lasting emotional damage that is a consequence of children being harmed while in foster care, of not knowing where they will grow up and of believing that there is no family they can call their own.  Because of Defendants' actions and inactions, Plaintiffs Olivia and Ana-Maria R. are being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

### Xavion M.

76.     Plaintiff Xavion M. is a five year old boy in the first grade.  ACS removed him from his biological mother due to an allegation of neglect 15 days after he was born.  Plaintiff Xavion M.'s permanency goal currently is adoption.  He has been in ACS custody for over five years—nearly his entire life.

77.     Plaintiff Xavion M. appears through his next friend, Michael B. Mushlin.  Mr. Mushlin is a Law Professor at Pace University School of Law in New York City, where he has taught for the last 30 years.  His scholarship has included maltreatment of children in foster care.  Previously, he worked as a public interest and civil rights lawyer for 15 years as a staff attorney with Harlem Assertion of Rights, Inc., as a staff attorney and Project Director of the Prisoners Rights Project of the Legal Aid Society, and as Associate Director of the Children's Rights Project of the American Civil Liberties Union.  He is truly dedicated to Xavion M.'s best interests.

78.     Plaintiff Xavion M. is not the only child that ACS has removed from his biological mother and placed into foster care.  Plaintiff Xavion M. has two siblings:  (1) a 12 year old brother, Vincent D., and (2) an 11 year old sister, Zahara D.  Plaintiff Xavion M.'s siblings have been in ACS custody for the past six years.  Upon information and belief, at least

one Family Court judge has referred to these two children as "unadoptable" and their permanency goals remain that they be returned to their parent.

79.    The Contract Agency to which ACS delegated the day-to-day care of, and case planning responsibility for, this young boy first placed Plaintiff Xavion M. with a fictive kin foster parent, who was a friend of his biological mother.  On December 21, 2011, when Xavion M. was just two years old, he was moved to a second, non-kinship, foster placement.  When he arrived, he was anemic and malnourished.  He has resided in this foster placement for well over three years—a direct result of ACS's failure to develop and implement an appropriate case plan and provide appropriate services consistent with professional standards to enable this young boy to be safely returned to his biological mother or, if that were not possible within a reasonable period of time, to ensure that he can grow up in a permanent family.

80.    Since being placed in foster care over five years ago, Plaintiff Xavion M. has had approximately four caseworkers at the Contract Agency to which ACS has delegated his care and case planning.

81.    Plaintiff Xavion M., who has been in ACS custody for over five years, has weekly supervised visits with his biological mother and older siblings.  Upon information and belief, Plaintiff Xavion M.'s brother hit and kicked him during a recent visit.

82.    The Contract Agency to which ACS has delegated the day-to-day care of, and case planning responsibility for, this boy has not provided Plaintiff Xavion M. with necessary services for his physical and emotional well-being.  Although his teacher recommended that an Individualized Education Program be written for him, Xavion M. has not received the evaluation necessary because his biological mother refuses to give consent.

83.     As a result of the over five years that Plaintiff Xavion M. has spent in ACS custody, Xavion M. has suffered severe emotional damage.  He has started to exhibit increased behavioral problems, including becoming aggressive and violent at home and at school; he also is having difficulty concentrating at school. At five years old, he will only sleep in the same bed as his foster mother and will not sleep through the night.

84.     In addition to failing to keep Plaintiff Xavion M. free from physical, psychological and emotional harm while in its custody, ACS has also failed to take reasonable and appropriate steps consistent with reasonable professional standards to place Xavion M. in a permanent home.

85.     On July 21, 2014—after Plaintiff Xavion M. had been in foster care for almost five years—Xavion's permanency goal was changed from return to parent to adoption.  This goal change occurred only after the Family Court judge handling Xavion M. and his siblings' case instructed Xavion M.'s caseworkers at the Contract Agency to file a petition to terminate the parental rights of Xavion M.'s biological mother and begin adoption proceedings.  Xavion M.'s current foster mother has indicated a willingness to adopt.  Almost a year later, no TPR petition has been filed.

86.     Despite the court's instruction, the Contract Agency plans to return Xavion M. to his biological mother after first returning Xavion M.'s older siblings to his mother on a trial basis.  Indeed, papers filed in Family Court in March 2015 state that the "Agency is working with [biological mother] for reunification".  At a family team conference on June 24, 2015, the Contract Agency said it will pursue granting Xavion M.'s biological mother unsupervised visits despite the fact that Xavion M.'s therapist has stated that Xavion M. is not ready for this and that Xavion M.'s permanency goal is adoption.  The long-standing inconsistency in planning for this

child's future is increasing the insecurity and emotional damage this child is experiencing in foster care.

87.     During the over five years that Plaintiff Xavion M. has been in the custody of ACS, Defendants repeatedly have violated his constitutional, statutory and contractual rights by failing to protect him from physical, psychological and emotional harm; by failing to provide services to ensure his physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable him to be safely returned to his biological mother or, if that were not possible within a reasonable period of time, to place him in a permanent home.  ACS has further failed to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, this child.  As a direct result of Defendants' actions and inactions, Xavion M. has suffered and continues to suffer irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of a child being harmed while in foster care, of not knowing where he will grow up and of believing that there is no family he can call his own. Because of Defendants' actions and inactions, Plaintiff Xavion M. is being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

**Dameon C.**

88.     Plaintiff Dameon C. is a four year old boy with special needs.  ACS removed him from his biological mother, who was then incarcerated, nine days after he was born.  His permanency goal currently is adoption.  He has been in ACS custody for over four years—nearly his entire life.

28

89.     Plaintiff Dameon C. appears through his next friend, Reverend Doctor Gwendolyn Hadley-Hall.  Reverend Doctor Hadley-Hall is an associate pastor at Christ Temple United Baptist Church in Brooklyn.  Prior to entering the ministry, Reverend Doctor Hadley-Hall was a teacher at public elementary schools in New York City for 30 years.  She is truly dedicated to Dameon C.'s best interests.

90.     The Contract Agency to which ACS delegated the day-to-day care of, and case planning responsibility for, this boy first placed Plaintiff Dameon C. in a foster placement.

91.     On Christmas Eve 2011, when Plaintiff Dameon C. was nine months old, he was returned to his mother on a trial basis when she was released from jail.  They were placed in a mother-child drug and alcohol rehabilitation center.  His former foster parent would often take Dameon C. for two to three weeks at a time with his biological mother's consent because Dameon C.'s behavior deteriorated drastically when he was moved to his mother's care.  He began banging his head, which he continues to do now at age four.  In July 2012, his biological mother was expelled from the rehabilitation center and Dameon C. was returned to his former foster placement, where he remains to this day.  He has been in foster care virtually his entire life—a direct result of ACS's failure to develop and implement an appropriate case plan and provide appropriate services consistent with professional standards to enable this young boy to be safely returned to his biological mother or, if that were not possible within a reasonable period of time, to ensure that he can grow up in a permanent family.

92.     While in ACS custody, Plaintiff Dameon C. has had regular visits with his biological mother.  In February 2014, when Dameon was almost three years old, his mother kicked him during the first unsupervised overnight visit at her drug treatment facility.  Although she is still permitted to have supervised visits with him, she did not have contact with Dameon C.

29

between December 2014 and April 23, 2015, at which time she began attending supervised visits with Dameon C. again.  However, in recent weeks, Dameon C.'s biological mother has disappeared from her drug treatment program and has not attended visits with him or contacted him since.

93.     In addition to failing to keep Plaintiff Dameon C. safe from physical abuse and emotional damage, ACS has also failed to ensure that he is provided with necessary services to ensure his physical, psychological and emotional well-being.  Although he has been diagnosed with Attention Deficit Hyperactivity Disorder and Oppositional Defiant Disorder, he was placed on the waiting list for B2H.

94.     ACS also has failed to take reasonable and appropriate steps to place Plaintiff Dameon C. in a permanent home.  Dameon C.'s permanency goal was not changed to adoption until November 3, 2014—after he had already been in ACS custody for over three and a half years.  A TPR petition was filed thereafter.  Plaintiff Dameon C.'s next court date had been scheduled for June 2, 2015, but has been postponed until November 2015.

95.     During the over four years that Plaintiff Dameon C. has been in the custody of ACS, Defendants repeatedly have violated his constitutional, statutory and contractual rights by failing to protect him from physical, psychological and emotional harm; by failing to provide services to ensure his physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable him to be safely returned to his biological mother or, if that were not possible within a reasonable period of time, to place him in a permanent home.  ACS has further failed to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning

responsibility for, this child. As a direct result of Defendants' actions and inactions, Dameon C. has suffered and continues to suffer irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of a child being harmed while in foster care, of not knowing where he will grow up and of believing that there is no family he can call his own. Because of Defendants' actions and inactions, Plaintiff Dameon C. is being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

### Tyrone M.

96.     Plaintiff Tyrone M. is a seven year old boy with special needs. ACS removed him from his biological mother 12 days after he was born. His permanency goal currently is adoption. He has been in ACS custody for over seven years—nearly his entire life.

97.     Plaintiff Tyrone M. appears through his next friend, Bishop Lillian Robinson-Wiltshire. Bishop Robinson-Wiltshire is the Senior Pastor and Overseer of Cathedral of Christ Community Ministries in Brooklyn. Prior to entering the ministry 30 years ago, Bishop Robinson-Wiltshire was a family counselor and worked with families dealing with abuse and neglect. Bishop Robinson-Wiltshire has also served as a foster parent to older children. She is truly dedicated to Tyrone M.'s best interests.

98.     Twelve days after he was born, ACS removed Plaintiff Tyrone M. from his biological mother when she tested positive for cocaine after giving birth to him.

99.     The Contract Agency to which ACS delegated the day-to-day care of, and case planning responsibility for, this young boy first placed Plaintiff Tyrone M. in a kinship foster placement with his aunt. On June 23, 2014, ACS removed him from his aunt's home after she failed a random drug screening. The Contract Agency then placed him in a non-kinship foster

placement where he currently resides.  Plaintiff Tyrone M. has now spent his entire life in ACS custody—a direct result of ACS's failure to develop and implement an appropriate case plan and provide appropriate services consistent with professional standards to enable this young boy to be safely returned to his biological mother or, if that were not possible within a reasonable period of time, to ensure that he can grow up in a permanent family.

100.    ACS also has also failed to keep Plaintiff Tyrone M. free from physical, psychological, and emotional harm while in its custody.  When he arrived at his current foster placement, his health and behavior indicated severe neglect.  He suffered from severe dental problems.  He went to sleep in his clothing every night because in his previous foster placement he had not been provided with such basic care as being taught to undress or change into pajamas before bed.

101.    As a result of the emotional harm he has suffered while in ACS custody for the past seven years, Plaintiff Tyrone M. suffered and continues to suffer from a variety of mental health problems.  His diagnoses include Pervasive Developmental Disorder, Developmental Coordination Disorder, Communication Disorder and Attention Deficit Hyperactivity Disorder. Tyrone M. also exhibits severe behavioral problems and often becomes violent at school and throws chairs or pencils.  As a result, his school has barred him from eating in the lunchroom with other students and from attending school-sponsored field trips.

102.    ACS has also failed to ensure that Plaintiff Tyrone M. is provided with the necessary services to ensure his physical and emotional well-being.  For example, although his Individualized Education Program states that he is required to receive psychological counseling outside of school, upon information and belief, it has taken the Contract Agency over a year to even begin the process for getting Tyrone M. mental health services.

103.    In addition to failing to keep Plaintiff Tyrone M. physically free from harm while in its custody, ACS has also failed to take reasonable and appropriate steps consistent with reasonable professional standards to place Plaintiff Tyrone M. in a permanent home.

104.    After almost seven years in foster care, his biological mother recently voluntarily surrendered her parental rights.  Although he is now free to be adopted, it is not clear that he will be adopted by his current foster parent and, upon information and belief, the Contract Agency, ACS and Plaintiff Tyrone M.'s law guardian have not sought out other adoption possibilities for Plaintiff Tyrone M. to have a permanent home and family to call his own.

105.    During the over seven years that Plaintiff Tyrone M. has been in the custody of ACS, Defendants repeatedly have violated his constitutional, statutory and contractual rights by failing to protect him from physical, psychological and emotional harm; by failing to provide services to ensure his physical, psychological and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable him to be safely returned to his biological mother or, if that were not possible within a reasonable period of time, to place him in a permanent home.  ACS has further failed to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, this child.  As a direct result of Defendants' actions and inactions, Tyrone M. has suffered and continues to suffer irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of a child being harmed while in foster care, of not knowing where he will grow up and of believing that there is no family he can call his own. Because of Defendants' actions and inactions, Plaintiff Tyrone M. is being deprived of the

opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

**Brittney W.**

106.    Plaintiff Brittney W. is a six year old girl with special needs.  ACS removed her from her biological mother and placed her into ACS custody on May 10, 2011.  Her permanency goal currently is to be returned to her parent.  She has been in ACS custody for over four years— most of her life.

107.    Plaintiff Brittney W. appears through her next friend, Liza Camellerie.  Ms. Camellerie is an attorney in private practice in New York City.  She currently serves on the assigned panel for Family Court in Manhattan, representing children and parents in Article 10 cases, among others.  She also spent six years as a Family Court Legal Services ("FCLS") Attorney for ACS, four of which were spent as a supervisor to 25 to 30 other FCLS attorneys. Ms. Camellerie is truly dedicated to Brittney W.'s best interests.

108.    Shortly after Plaintiff Brittney W. was born, a report was called in to the Statewide Central Register of Child Abuse and Maltreatment alleging that her biological mother's own mental incapacity and developmental delays prevented her from caring for her infant daughter.  Brittney W. was placed into voluntary kinship care with her biological mother's niece by agreement with ACS.

109.    On May 10, 2011, when Plaintiff Brittney W. was two years old, ACS remanded her into custody because her mother's niece could no longer care for Brittney W.

110.    The Contract Agency to which ACS delegated the day-to-day care of, and case planning responsibility for, this young girl then placed Plaintiff Brittney W. in a non-kinship foster placement.  She has been residing in this foster placement for over four years—a direct

result of ACS's failure to develop and implement an appropriate case plan and provide

appropriate services consistent with professional standards to enable this young girl to be safely

returned to her mother or, if that were not possible within a reasonable period of time, to ensure

that she can grow up in a permanent family.

111.    After over four years in foster care, Plaintiff Brittney W.'s permanency goal is to

be returned to her parent.  Upon information and belief, Plaintiff Brittney W.'s lawyer does not

think that her biological mother's mental incapacities allow her to provide appropriate care for

Brittney W.  Upon information and belief, the Contract Agency to which ACS has delegated the

care and case planning responsibility for this child has taken the position that Brittney W.'s

biological mother can provide care if she has 24-hour medical support.  Upon information and

belief, because Brittney's W.'s doctor reports that there is no reason why 24-hour support is

medically necessary, the Contract Agency is trying to arrange for Brittany W.'s biological

mother to have medical and other support during daytime hours.  Brittney W.'s current foster

mother has indicated a willingness to adopt.  No TPR petition has been filed.

112.    During the four years that Plaintiff Brittney W. has been in the custody of ACS,

Defendants repeatedly have violated her constitutional, statutory and contractual rights by failing

to protect her from physical, psychological and emotional harm; by failing to provide services to

ensure her physical, psychological and emotional well-being; by failing to ensure the provision

of appropriate foster care placements consistent with professional standards or of a meaningful,

timely and appropriate plan to enable her to be safely returned to her biological mother or, if that

were not possible within a reasonable period of time, to place her in a permanent home.  ACS

has further failed to exercise adequate and meaningful oversight over the Contract Agencies to

which ACS has delegated the day-to-day care of, and case planning responsibility for, this child.

35

As a direct result of defendants' actions and inactions, Brittney W. has suffered and continues to suffer irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of a child being harmed while in foster care, of not knowing where she will grow up and of believing that there is no family she can call her own.  Because of Defendants' actions and inactions, Plaintiff Brittney W. is being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

***

113.    All of Defendants' actions and inactions as described herein substantially depart from accepted professional judgment and constitute deliberate indifference to the harms, risk of harms and violations of legal rights suffered by the Named Plaintiff Children.

## II.    The Public Advocate for the City of New York

114.    Plaintiff Letitia James is the Public Advocate for the City of New York (the "Public Advocate").  In this capacity, the Public Advocate ensures that the city government serves its citizens by exercising oversight of city agencies, investigating citizen complaints regarding city services, and making proposals or seeking relief to address perceived shortcomings or failures.

115.    Just two months into her tenure, the Public Advocate introduced a law, Int. 0104-2014, that would require ACS to report information related to youth in the foster care system on an annual basis.  This law ensures that the City monitors which supports and resources these young adults use and identifies ongoing educational barriers they experience and problems they might encounter with homelessness or law enforcement.  In September 2014, the Office of the Public Advocate issued a policy report concerning youth "aging out" of the foster care system.

36

The report provided recommendations to improve data collection, access to housing, and coordination of services for young people aging out of the system.  On September 30, 2014, Int. 0104-2014 was signed into law.

116.    On an ongoing basis, the Office of the Public Advocate Constituent Affairs Department ("the Constituent Affairs Department") receives complaints from constituents in all five boroughs alleging deficiencies and lapses in responsibilities by both ACS and Contract Agencies.  Constituent complaints alleged, for instance, failure to investigate allegations of abuse of children in ACS custody, failure to initiate timely TPR proceedings, failure to follow proper procedures when removing children from their family home or foster home, failure to provide required services for both biological parents and foster children, failure to honor ACS vouchers and potentially retaliatory practices against those who complained directly to ACS or Contract Agencies.  In total, the Constituent Affairs Department has received 259 complaints regarding ACS since January 1, 2014.

117.    As a result of ongoing complaints, the Public Advocate identified ACS as an agency whose practices warrant investigation.

118.    Upon learning that New York City keeps children in foster care longer than almost every jurisdiction in the country, the Office of the Public Advocate began to examine obstacles to permanency and established a hotline to hear directly from foster children and their advocates about their experiences.

119.    In November 2014, the Office of the Public Advocate requested a copy of all contracts ACS holds with individual Contract Agencies; on November 17, 2014, ACS responded with electronic copies of all the contracts it has with the 29 Contract Agencies.  On or about February 6, 2015, the Office requested all data collected by ACS used to produce "Scorecard"

evaluations (*see infra* ¶¶ 214–17) of the Contract Agencies from 2012 to 2014, in addition to the Scorecard evaluations themselves and any related documentation.  After receiving no response, the Office of the Public Advocate repeated the request on February 27, 2015.  A meeting was held on March 11, 2015, at which the document request was made for a third time and denied by ACS.

120.    On or about April 1, 2015, the Office of the Public Advocate sent a letter to ACS threatening legal action if they did not comply with the data request and also requested access to ACS's Legal Tracking System in order to investigate constituent complaints concerning significant delays and inefficiencies occurring in Family Court proceedings in which ACS is involved.  Following this correspondence, ACS provided Scorecard evaluations, but did not provide the underlying data used to produce them, or the other requested information.

121.    Also in April 2015, the Office of the Public Advocate launched a multilingual hotline to learn first-hand from children and their advocates about the current barriers to receiving better services while in foster care and obtaining a safe and permanent home. Participants in the hotline were asked to complete a survey.  The survey's questions varied based on the type of respondent—typically a child, birth parent or foster parent—and asked about the child's trajectory in foster care, permanency planning, services provided and cases of maltreatment in care.

122.    Combining anecdotal reports from the hotline and publicly available data, the Office of the Public Advocate identified several deficiencies including, but not limited to, ACS removal of children without proper court process, failure to identify and provide adequate services for parents of children in care and subsequent delays in reunification, failure to place children appropriately and thus creating instability, failure of ACS and the Contract Agencies to

38

be prepared for court dates, failure of ACS to recruit, train and support adoptive placements, failure to engage in concurrent planning, failure to protect children from maltreatment and failure to provide adequate health and mental health services to children in care.  Those deficiencies and recommendations for addressing them were cited in a report that was issued on July 2, 2015.

### III.   Defendants

123.   Defendant City of New York ("City") was, and is, a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain and ultimately is responsible for the New York City Administration for Children's Services, which acts as its agent in the area of protecting the safety and welfare of children in the City.  The City assumes the risks incidental to the maintenance of the New York City Administration for Children's Services and its employment of attorneys, caseworkers and others.

124.   Defendant New York City Administration for Children's Services ("ACS") was, and is, a municipal agency of the City responsible for protecting the safety and welfare of all children in New York City.  At all times relevant hereto, the officials, agents and employees of ACS were acting under the color of state law in the course and scope of their duties and functions as agents, servants, employees and officials of ACS and otherwise performed and engaged in conduct incidental to the performance of their lawful duties.  The officials, agents and employees were acting for, and on behalf of, ACS at all times relevant herein with the power and authority vested in them as agents and employees of ACS and the City and incidental to their lawful pursuit of their duties as officials, employees and agents of ACS.

125.   Defendant Gladys Carrión is Commissioner of ACS and is sued solely in her official capacity.  She is responsible for ACS's policies, practices and operations, and for ensuring that ACS and the private agencies with which it contracts comply with all applicable

federal and state laws, pursuant to the Charter of the City of New York, Chapter 24-B §§ 615 and

617.  All children in foster care in New York City are in the custody of Defendant Carrión, and

she is responsible for ensuring their health, safety and well-being, including, but not limited to,

their freedom from maltreatment while in state custody and their placement in a permanent home

within a reasonable period of time.

126.    Defendant State of New York ("State") was, and is, a governmental entity.  It is

authorized by law to maintain and is ultimately responsible for the New York State Office of

Children and Family Services, which acts as its agent in the area of foster care, adoption and

adoption assistance for children in New York State.  The State assumes the risks incidental to the

maintenance of the New York State Office of Children and Family Services.

127.    Defendant New York State Office of Children and Family Services ("OCFS")

was, and is, an agency of the State responsible for programs involving foster care, adoption and

adoption assistance for children in New York State.  At all times relevant hereto, the officials,

agents and employees of OCFS were acting under the color of state law in the course and scope

of their duties and functions as agents, servants, employees and officials of OCFS and otherwise

performed and engaged in conduct incidental to the performance of their lawful duties.  The

officials, agents and employees were acting for, and on behalf of, OCFS at all times relevant

herein with the power and authority vested in them as agents and employees of OCFS and the

State and incidental to their lawful pursuit of their duties as officials, employees and agents of

OCFS.

128.    Defendant Sheila J. Poole is Acting Commissioner of OCFS and is sued solely in

her official capacity.  She is responsible for the policies, practices and operation of OCFS, for

ensuring OCFS's compliance with all applicable federal and state law, pursuant to New York

State Social Services Law §§ 11 and 17, and for providing oversight to all social services districts in the state.

## JURISDICTION AND VENUE

129.    This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.  The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).  The Court may exercise supplemental jurisdiction over the claims based on New York law pursuant to 28 U.S.C. § 1367(a).

130.    This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2002 and Rule 57 of the Federal Rules of Civil Procedure.

131.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because the claims arise in this district.  Although OCFS and ACS are responsible for children from all five boroughs of New York City, including those in the Eastern District of New York, the Commissioner of ACS has custody of all Plaintiff Children, and ACS's administrative and managerial functions are operated out of its headquarters, which is located in the Southern District of New York.

## CLASS ACTION ALLEGATIONS

132.    This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

133.    The general class is defined as all children who are now or will be in the foster care custody of the Commissioner of New York City's Administration for Children's Services ("Plaintiff Children" or the "Class").

134.    The Class is sufficiently numerous to make joinder impracticable.  As of April 2015, there were  approximately 11,137 children in the foster care custody of the Commissioner of ACS.

135.    The questions of fact and law raised by Named Plaintiff Children's claims are common to and typical of those of each putative member of the Class whom they seek to represent.  The Named Plaintiff Children and Plaintiff Children rely on Defendants for foster care services in New York City and wholly depend on the State and City Defendants for provision of those services.  Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and constitute deliberate indifference to the harm, risk of harm and violations of legal rights suffered by the Named Plaintiff Children and Plaintiff Children.

136.    Questions of fact common to the Class include:

a.    whether State and City Defendants fail to protect Plaintiff Children from physical, psychological and emotional harm;

b.    whether State and City Defendants fail to ensure meaningful case plans to enable Plaintiff Children to be safely returned to their parents or, if that were not possible within a reasonable period of time, to place them in permanent homes;

c.    whether State and City Defendants fail to provide foster care placements and services that ensure Plaintiff Children's well-being; and

d.    whether ACS fails to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, Plaintiff Children.

137.    Questions of law common to the Class include:

a.    whether Defendants' long-standing and well-documented actions and inactions violate Plaintiff Children's substantive rights under the due process clause of the Fourteenth Amendment to the United States Constitution;

b.    whether Defendants' long-standing and well-documented actions and inactions violate Plaintiff Children's right to a permanent home and family under the First, Ninth and Fourteenth Amendments to the United States Constitution;

c.    whether Defendants' long-standing and well-documented actions and inactions violate Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997;

d.    whether Defendants' long-standing and well-documented actions and inactions violate Plaintiff Children's rights under New York State Social Services Law and regulations adopted pursuant thereto; and

e.    whether City Defendants' actions and inactions violate Plaintiff Children's rights as third party beneficiaries to the contracts between the City Defendants and the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, Plaintiff Children.

138.    The violations of law and resulting harms averred by Named Plaintiffs are typical of the legal violations and harms and/or risk of harms experienced by all Plaintiff Children in the Class.

139.    Named Plaintiffs will fairly and adequately protect the interests of the Class that they seek to represent.  Named Plaintiffs and Plaintiff Children are represented by the following attorneys who are competent and experienced in class action litigation, child welfare litigation and complex civil litigation:

     a.    Marcia Robinson Lowry, an attorney with A Better Childhood, Inc., a non-profit legal advocacy organization, who has substantial experience and expertise in federal child welfare class actions nationally; and

     b.    Attorneys from Cravath, Swaine & Moore LLP, including attorney Julie A. North, a Member of the Firm, who has significant experience in complex litigation in state and federal courts throughout the United States.

Plaintiff Children's attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class through trial and any appeals. Each Named Plaintiff appears by a next friend pursuant to Federal Rule of Civil Procedure 17(c), and each next friend is sufficiently familiar with the facts of the child's situation and dedicated to the child's best interests to fairly and adequately represent the child's best interests in this litigation.

140.    Defendants have acted or failed to act on grounds generally applicable to all members of the Class, necessitating class-wide declaratory and injunctive relief.  Counsel for Plaintiff Children know of no conflict among the Class members.

## STRUCTURE OF THE NEW YORK CITY CHILD WELFARE SYSTEM

141.    Children in foster care in New York City are in the legal custody of the Commissioner of ACS (currently, Defendant Carrión) ("ACS custody").  At all times, ACS maintains legal custody and legal responsibility for all children in foster care in New York City.

142.    Pursuant to its Charter, the City of New York and Defendant Carrión, as Commissioner of ACS, are responsible for ensuring that ACS complies with federal and state law.

143.    New York State provides funding to New York City that is spent on child welfare services, and, through OCFS, is responsible for overseeing ACS and ensuring that ACS complies with all applicable federal and state laws.  OCFS is also responsible for ensuring that ACS complies with all elements of the state plans (which OCFS signs as a condition of receiving child welfare funds from the United States Department of Health and Human Services) that document how the state will comply with certain core policies and procedures intended to, among other things, either enable children in foster care to be reunited with their families and/or ensure timely efforts to find a permanent home for children who cannot be reunited with their families.

144.    Pursuant to the Constitution and federal and state statutory law, ACS, as the custodian of children in foster care in New York City, is required to:

        a.    Protect each child in foster care from physical, psychological and emotional harm, U.S. Const. amend. XIV;

        b.    Provide to each child in foster care the services necessary to ensure his or her physical, psychological and emotional well-being, U.S. Const. amend. XIV;

45

c.  Provide to each child in foster care conditions, treatment and care consistent with the purpose and assumptions of custody, U.S. Const. amend. XIV;

d.  Ensure that each child in foster care is not maintained in custody longer than is necessary to accomplish the purpose of custody, U.S. Const. amend. XIV;

e.  Provide each child in foster care with a permanent home and family within a reasonable period of time, U.S. Const. amends. I, IX, XIV;

f.  Place each child in foster care in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

g.  Provide for each child in foster care a written case plan that includes a plan to provide safe, appropriate and stable foster care placements and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

h.  Provide for each child in foster care a written case plan that ensures that the child receives safe and proper care while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

i.  Provide for each child in foster care a written case plan that ensures the provision of services to facilitate reunification or, where that is not possible, a permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

j.  Provide for each child in foster care, where reunification is not possible or appropriate, a written case plan that ensures the location of an adoptive or

other permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

k.    Provide for each child in foster care a written case plan that ensures the educational stability of the child while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

l.    Maintain a case review system in which each child in foster care has a case plan designed to achieve safe, appropriate and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

m.    Maintain a case review system in which the status of each child in foster care is reviewed every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan and the projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C);

n.    Maintain a case review system that ensures that for each child that has been in foster care for 15 of the most recent 22 months, ACS files a petition to terminate the parental rights of the child's parents and concurrently identifies, recruits, processes and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interest of the child, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675 (5)(E);

o.    Provide to each child in foster care quality services to protect his or her safety and health, 42 U.S.C. § 671(a)(22);

47

p.      Timely create meaningful and appropriate Family Assessment and Service

Plans, New York State Social Services Law § 409-e;

q.      Timely plan and complete meaningful and appropriate Family Assessment

and Service Plan reviews, New York State Social Services Law § 409-e

and N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12;

r.      Place each child in a foster placement that meets standards for continuity

and appropriate level of placement, N.Y. Comp. Codes R. & Regs. tit. 18,

§ 430.11;

s.      File a petition to terminate parental rights for each child who has been in

foster care for 15 out of the most recent 22 months or, where applicable,

appropriately document an exception, New York State Social Services

Law § 384-b, N.Y. Comp. Codes R. & Regs. tit. 18, §§ 430.12 and 431.9;

and

t.      Provide each child in foster care who has been freed for adoption with

meaningful and appropriate adoption services, including evaluation of the

child's placement and pre-placement needs, recruitment of and a home

study for prospective adoptive parents, placement planning, supervision

and post-adoption services, New York State Social Services Law §§ 372-b,

372-e and N.Y. Comp. Codes R. & Regs. tit. 18, § 421.8.

145.    By contract, ACS has delegated the care of the City's children in foster care to

agencies ("Contract Agencies").  ACS currently has entered into valid and enforceable contracts

with 29 Contract Agencies.  The contracts into which ACS has entered with each of the Contract

Agencies (referred to herein as the "Agreements") require the Contract Agencies to comply with

48

all applicable ACS policies, as well as state and federal law.  The Agreements also require the Contract Agencies to provide comprehensive foster care services as defined in the Agreements.[1]

146.    Regardless of the terms of the Agreements, by law, ACS at all times maintains legal custody of and legal responsibility for all children in foster care in New York City. However, ACS has failed and continues to fail to ensure the protection of Plaintiff Children's rights under federal and state constitutional and statutory law.

147.    Children in New York City enter foster care in one of two ways—they can be voluntarily placed into foster care by their parents,[2] or they can be removed from their parents by ACS.  Most children in foster care in New York City have been removed from their parents. When children are removed from their parents, the removal is either (a) pursuant to a Family Court finding that the child is in danger of abuse or neglect if left with his or her parents or (b) on an emergency basis, subject to a later finding by the Family Court that the child would have been in danger of abuse or neglect if he or she had been left with his or her legal parents.  In both cases, the Family Court must hold a fact-finding hearing to determine whether the child was in danger of being abused or neglected if left with his or her parents.  After the fact-finding hearing, the Family Court holds a disposition hearing to determine whether the child can safely be returned home or should remain in foster care pending the completion of certain actions (*e.g.*, treatment for drug or alcohol addiction, anger management classes, etc.).

---

[1] Each Agreement between the Contract Agency and ACS is for a particular set of foster placement services. Therefore, one Contract Agency may have multiple Agreements with ACS, each for a different type of placement. Appendix A lists, to the best of our information and belief, the Agreements which were current as of November 2014 (*see* ¶ 119) and that are still in force today.

[2] Unless otherwise specified, the term "parents" as used herein refers to the person(s) who have legal custody or legal responsibility for the child prior to his or her entry into foster care, and may include biological parents, grandparents, adoptive parents or other legal guardians.

148.    Once a child enters foster care, ACS "places" the child with a Contract Agency, to which ACS delegates the day-to-day care of, and case planning responsibility for, the child. Upon information and belief, placement with a Contract Agency is determined largely by which Contract Agency has availability when placement is sought, not by a determination of the child's health, safety or permanency needs, or of the ability of a potential available placement to meet those needs.

149.    The Contract Agency with which the child has been placed then assigns the child a foster placement, which can be either a traditional home-like setting or residential facility.[3] Upon information and belief, foster placements are determined largely by availability at the time the placement is sought, not by a determination of the child's health, safety or permanency needs, or of the ability of a potential available placement to meet those needs.

150.    Once a child is placed with a Contract Agency, caseworkers employed by that Contract Agency are responsible for generating and recommending a case plan for the child.

151.    Pursuant to federal and state law, ACS is required to ensure that a case plan meeting statutory criteria and professional standards is prepared for each child in foster care.  In New York, these case plans are referred to as Family Assessment and Service Plans ("FASP"). Each child's FASP must describe, among other things, the child's physical and mental health needs, the child's permanency goal, the services necessary to meet the child's physical and mental needs as identified in the case plan and the services necessary to help the child achieve his or her permanency goal as identified in the case plan.

---

[3] Residential facilities include boarding homes, group homes, group residences, and institutions or residential treatment facilities.  Residential facilities are the most restrictive settings, usually intended for the placement of older children with severe clinical, medical, mental and/or behavioral problems.

152.    Pursuant to state and federal law, ACS also is responsible for ensuring that each child's case plan is implemented, and for providing each child in its custody with the services necessary to meet the child's physical and mental needs as identified in the case plan and the services necessary to help the child achieve his or her permanency goal as identified in the case plan.

153.    ACS delegates the preparation of such case plans and the provision of such services to the Contract Agency with which the child has been placed.  However, ACS fails to ensure that the Contract Agencies prepare meaningful and appropriate FASPs for each child in ACS custody, as required by state law.  ACS also fails to ensure that the Contract Agencies provide the services necessary to meet both the child's physical and mental needs and to help the child achieve his or her permanency goal (as identified in the case plan), as required by law.

154.    Foster care is intended to be temporary—a short-term placement until a child can be safely reunified with his or her parents or, where that is not possible, placed into another stable, permanent home.

155.    Accordingly, federal and state law require ACS to ensure that each child in foster care has a "permanency goal" and that reasonable efforts are made to reach each child's established permanency goal within a reasonable period of time.  There are five possible permanency goals:  (1) return to parent; (2) adoption; (3) legal guardianship or kinship guardianship; (4) placement with a relative; and (5) another planned permanent living arrangement ("APPLA"), the permanency goal given to children who will "age out" of the foster care system.

156.    ACS delegates case planning responsibility, including assigning permanency goals and making reasonable efforts toward permanency goals, to the Contract Agency with

which each child in ACS custody has been placed.  However, ACS fails to ensure that the

Contract Agencies engage in meaningful and appropriate permanency planning, as required by

federal and state law.

157.    Federal law requires ACS to ensure that caseworkers engage in concurrent

planning, so that each child in ACS custody has a primary permanency goal and a secondary

permanency goal, both of which the caseworker must work toward simultaneously.  For

example, if a child's primary permanency goal is "return to parent" and the secondary

permanency goal is "adoption", concurrent planning requires simultaneous provision of

necessary services so that the child can be returned home safely and recruitment of potential

adoptive parents in the event the child is unable to be returned home safely.  The purpose of

concurrent planning is to limit the harm caused to the child by a lengthy stay in foster care by

ensuring that the child is placed into a permanent home within a reasonable period of time.

158.    ACS delegates case planning responsibility, including engaging in concurrent

planning, to the Contract Agency with which each child in ACS custody has been placed.

However, ACS fails to ensure that the Contract Agencies engage in meaningful and appropriate

concurrent planning, as required by federal law.

159.    Federal and state law require ACS to ensure that a child's case plan is periodically

reviewed to ensure that the child's permanency goal is appropriate and that progress is being

made toward safely returning the child to his or her parent or, if that were not possible within a

reasonable period of time, placing the child in a permanent home.  By state statute, an initial

FASP review must be held between 60 and 90 days after the child is placed in foster care, and

subsequent FASP reviews must be held no less than every six months thereafter.  ACS must

ensure that the caseworker and all relevant persons, including, but not limited to, the parents of

the child, relatives, the foster parent and the child, if old enough, participate in the FASP reviews.  However, ACS fails to ensure that meaningful and appropriate FASP reviews occur as required by state law.

160.    By state statute, a permanency hearing must be held in the Family Court within eight months of a child's removal from his or her parents and every six months thereafter, and that permanency hearing must be completed within 30 days.  The purpose of permanency hearings is to provide each child in ACS custody with timely judicial review of the child's permanency goal and whether progress has been made toward achieving that goal.

161.    Because ACS fails to ensure that all parties are prepared for court and that Contract Agencies submit necessary paperwork in a timely fashion, such permanency hearings often are not completed within the time period required by state law.  In many if not most instances, the permanency hearings are held before the Family Court has even made a determination about whether the parent from whom the child was removed has in fact neglected or abused the child.

162.    Federal and state law provide that ACS must, after a child is removed from his or her parents, make a reasonable effort to preserve family relationships, which includes providing services to the child's parents.  Federal law and policy dictate that the preferred course of action is to reunify the child with his or her parents.

163.    ACS has delegated its responsibility to make reasonable efforts to reunify each child in its custody with his or her parents to the Contract Agency with which the child has been placed.  However, ACS fails to ensure that reasonable efforts are being made or that necessary services are being provided to enable children in ACS custody to be returned home within a reasonable period of time, as required by federal and state law.

164.    Even while efforts are being made to reunify a child with his or her parents, federal law and professional standards also require ACS to ensure that concurrent planning—*i.e.*, to pursue another permanency option for the child in the event that the child cannot safely be returned to his or her parents (*see supra* ¶ 157)—occurs.  That means that ACS should not wait months or years until reunification efforts have failed to begin alternative permanency planning, including identifying other potential permanent homes for the child.

165.    Federal and state law require ACS to determine within a reasonable period of time whether or not a child in foster care can be safely and appropriately returned to his or her parents, and if not, to initiate a petition to terminate parental rights so that the child is legally available to be adopted.  ACS has delegated the responsibility for making that determination to the Contract Agency with which each child in ACS custody has been placed.  However, ACS fails to ensure that the Contract Agency makes that determination within a reasonable time, as required by federal and state law.

166.    Under federal and state law, ACS must file a petition to terminate parental rights ("TPR") when a child has been in foster care for 15 of the previous 22 months, subject to certain exceptions that must be documented.  Under state law, ACS must file a TPR petition (a) within 30 days of establishing a primary permanency goal of "adoption"; (b) within 60 days of completing a FASP that documents abandonment or permanent neglect of a child; and (c) within 60 days of a judicial determination that a child was abandoned.  ACS has delegated its responsibility to file TPR petitions to the Contract Agency with which each child in its custody has been placed.  However, ACS fails to ensure that TPR petitions are filed within the time periods required by federal and state law.

167.    Once parental rights have been terminated and a child in ACS custody is considered "freed" for adoption, state statutory law and regulations require ACS to take a number of additional steps to place that child into a permanent home, including (a) timely acting on applications by persons looking to adopt children; (b) initiating and completing adoption studies (evaluations of an applicant's ability to be an adoptive parent) within certain time periods; (c) placing children in adoptive homes within certain time periods; and (d) finalizing adoptions within certain time periods.  However, as the concept of concurrent planning (*see supra* ¶ 157) makes clear, ACS should have been identifying other potential permanent homes for the child well before the child is freed for adoption.  ACS has delegated these responsibilities to the Contract Agency with which each child in its custody has been placed; however, ACS fails to ensure that the necessary and appropriate steps are taken to develop an appropriate pool of adoptive families and to place children who have been freed for adoption into adoptive homes, as required by state law.

168.    Although ACS has delegated the provision of comprehensive foster care services in New York City to 29 Contract Agencies, that delegation does not and cannot supplant ACS's responsibilities to Plaintiff Children under federal and state law.  ACS has legal custody of all children in foster care in New York City.  ACS accordingly has legal responsibility for ensuring that the rights of all children in foster care in New York City are protected—which ACS has failed, and continues to fail, to do.

55

**FACTUAL ALLEGATIONS REGARDING SYSTEMIC DEFICIENCIES
PLAGUING NEW YORK CITY'S FOSTER CARE SYSTEM AND
RESULTING HARM TO PLAINTIFF CHILDREN**

169.    The experiences and current situations of the Named Plaintiff Children as described above are neither unusual nor aberrational.  Rather, they are merely examples that are far too typical of the irreparable harm being suffered by all children in ACS custody.

170.    Defendants are harming Plaintiff Children by:

      a.      failing to protect Plaintiff Children from physical, psychological and emotional harm;

      b.      failing to ensure the development and implementation of meaningful case plans to enable Plaintiff Children to be safely returned to their parents or, if that were not possible within a reasonable period of time, to place them in permanent homes; and

      c.      failing to provide foster care placements and services to ensure Plaintiff Children's well-being.

171.    These harms are a direct result of Defendants' long-standing and well documented actions and inactions and Defendants' failure to remedy structural and systemic deficiencies that have plagued New York City's foster care system for years:

      a.      ACS fails to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, Plaintiff Children.

b.   ACS fails to ensure that Contract Agency caseworkers are assigned caseloads and receive appropriate training consistent with professional standards.

c.   ACS fails to provide a system for making foster placements consistent with federal and state law and minimum professional standards.

d.   ACS fails to ensure case and service plans are developed and implemented consistent with federal and state law and minimum professional standards.

e.   ACS fails to take all necessary and available action to ensure timely adjudication of family court proceedings involving children in ACS custody consistent with federal and state law and minimum professional standards.

All of Defendants' actions and inactions as described herein substantially depart from accepted professional judgment and constitute deliberate indifference to the harm, risk of harm and violations of legal rights suffered by Plaintiff Children.

172.   Put simply, as a result of Defendants' failures, caseworkers employed by the Contract Agencies to which ACS has delegated the care of Plaintiff Children often are inexperienced, undertrained, under-supervised, overworked and underpaid; case planning often is sloppy and ineffective; there are not enough suitable and appropriate foster and pre-adoptive placements to meet Plaintiff Children's needs; and a lack of urgency and accountability pervades New York City's foster care system.

173.   Defendants have long been aware of these systemic failures and the resulting harm to the vulnerable children in ACS custody.  Since 2000, OCFS has undergone two federal performance audits of the New York State child welfare system, known as Child and Family

Services Reviews ("CFSR").  These reviews are conducted by the United States Department of Health and Human Services to assess the performance of child welfare systems across the country, including the outcomes achieved for children, to identify areas in which systemic improvement is required to assure appropriate outcomes for children, and to implement corrective actions where outcomes for children are found to be deficient.  States are evaluated on seven outcome indicators of safety, permanency and well-being—the unequivocal goals of all foster care systems pursuant to federal statutory law—and on seven systemic factors that affect the state's capacity to deliver foster care services effectively.

174.    The two federal audits completed to date revealed myriad areas in which the New York State foster care system was causing harm to the children in its care, and that New York State's foster care system was getting worse.  The first CFSR audit, which was published in 2002, found that New York State failed to conform to federal expectations in five of the seven safety, permanency and well-being indicators, and in three of the seven systemic factors.  Seven years later, New York State performed worse.  During the second CFSR audit, which was published in 2009, the federal government determined that New York State failed to conform to federal expectations in all seven safety, permanency and well-being indicators, and in five of the seven systemic factors.  New York State's CFSR results are heavily influenced by New York City's child welfare system, which accounted for well over 60% of children in foster care in New York State in both 2002 and 2009.

175.    Notwithstanding having had 13 years to improve performance since the first CFSR audit of New York State, Defendants continue to place New York City children in ACS custody at significant risk of harm.  The most recent federal data available shows that children in

New York State spend longer in foster care and are more likely to be maltreated while in foster care than children in virtually all other states.

176.    Defendants are not acting with sufficient urgency to address these known failures or to meet their legal obligations to protect the children in New York City's foster care system.

**I.      DEFENDANTS ARE CAUSING IRREPARABLE HARM TO CHILDREN IN ACS CUSTODY.**

A.      Defendants Fail To Protect Children in ACS Custody from Maltreatment.

177.    Maltreatment of children in foster care is a significant problem in New York City.

178.    New York City currently accounts for almost 60% of children in foster care in New York State, which lags far behind the nation with respect to the protection of children in foster care.

179.    Based on the most recent federal data available, New York State ranks 46th out of 48 states and territories for instances of substantiated or indicated maltreatment of children while in foster care.  Put simply, children in New York are more likely to be harmed while under the state's protection than children in virtually every other state.

180.    New York State has had a high rate of maltreatment in foster care for years.  In both the 2002 and 2009 CFSRs, the federal government found that New York State did not meet the national standard for the rate of maltreatment in foster care.  Based on the most recent federal data available, New York State did not meet the national standard for 2013.

181.    Upon information and belief, the high rate of maltreatment in care in New York State is largely driven by maltreatment of children in ACS custody in New York City, which accounts for the majority of children in foster care in New York State.

182.    All investigations of maltreatment, including those pertaining to children in foster care custody, begin with a call to the Statewide Central Register of Child Abuse and

59

Maltreatment ("SCR").  According to ACS, in 2014, SCR received 1,987 reports of maltreatment of children in ACS custody (*i.e.*, children in foster care in New York City).  ACS's Office of Special Investigation investigates reports of maltreatment made to the SCR, including those for children already in foster care; a report of maltreatment is "substantiated" when sufficient evidence is found to support a determination that a child was in fact maltreated.  Of the 1,987 reports of maltreatment in foster care received by SCR in 2014, 28% were substantiated.  The Children's Bureau of the federal government does not publish comparable data.

183.    The high rate of maltreatment of children in ACS custody is a direct result of Defendants' long-standing and well-documented actions and inactions and Defendants' failure to remedy structural and systemic deficiencies that have plagued New York City's foster care system for years.  ACS's failure to ensure that Plaintiff Children are protected from maltreatment substantially departs from accepted professional judgment and demonstrates a deliberate indifference to the risk of harm to Plaintiff Children.

B.    Defendants Fail To Provide Children in ACS Custody with Permanent Homes and Families Within a Reasonable Time.

184.    Foster care is intended to be temporary.  Children who do not grow up in stable family environments are less likely to complete their education, to form healthy relationships or to be otherwise prepared to live healthy, satisfying adult lives.  Accordingly, federal and state law and professional standards dictate that foster children should be placed in permanent homes as quickly as is safely possible, whether with their parents, another relative or an adoptive family.

185.    But ACS allows Plaintiff Children to languish for years in foster care without permanent homes or families to call their own.  Indeed, the most recent federal data available shows that New York City lags far behind the rest of New York State and the nation as a whole

in placing children in foster care custody in permanent homes.  As a result, children spend longer in foster care custody in New York City than virtually everywhere else in the nation.

          1.     <u>Defendants Fail To Ensure Children Are Timely and Safely Reunified with Their Parents.</u>

186.    Federal and state law provide that ACS must, in the first instance, make reasonable efforts to preserve a child's relationship with his or her family.  After a child is removed from home due to allegations of abuse or neglect, federal and state law and policy dictate that the preferred course of action is to reunify the child with his or her parents.  Reunification, however, is only appropriate where the reason for removal has been addressed through appropriate services to the family so that the child's safety is assured.  As a result, ACS must ensure the provision of appropriate and effective services[4] so that children in ACS custody can safely return home.

187.    ACS fails to ensure that children in ACS custody are safely returned to their parents within a reasonable period of time.

        a.     It takes longer to return children in foster care to their parents in New York City than in the rest of New York State and the rest of the nation as a whole.  The most recent federal data available shows that children in New York City had spent a median of over a year—12.6 months—in foster care before being reunified with their parents, while children in the rest of New York State spent a median of 10.8 months, and children in the rest of the nation spent a median of 8.6 months in foster care prior to reunification.

---

[4] Necessary reunification services, which should be established and set forth in the child's case plan, may include psychological evaluations and/or care, substance abuse treatment, parenting classes or assistance, or assistance with accessing adequate housing.

b.      New York City takes longer to return children in foster care to their parents than all but five other states and territories.  Based on the most recent available federal data comparing the median number of days children spent in foster care prior to being returned to their parents, New York City ranks 48th of 53 jurisdictions.

188.    ACS also fails to ensure that children are <u>safely</u> returned to their parents. Children who are eventually reunified with their legal parents too often re-enter foster care due to further abuse or neglect.  In 2014, 13.9% of foster care placements in New York City were of children who had been in foster care within the previous three years.  Failed reunifications cause harm to children both as a result of additional maltreatment—in the worst cases, severe injury or even death—and the trauma that accompanies repeated family separation.

2.      <u>Defendants Fail To Ensure a Timely Permanent Home for Children in ACS Custody when Reunification Is Not Possible.</u>

189.    When a child cannot be returned safely to his or her parents, federal and state law require ACS to promptly find children in its custody alternative permanent homes, typically through adoption or kinship guardianship.

190.    However, ACS fails to secure timely adoptions for too many children in its custody who cannot safely be returned to their parents.  Instead, these children languish in ACS custody for years without a permanent home or family to call their own.

a.      For children who cannot be safely returned to their parents, it takes longer to be adopted in New York City than in the rest of New York State.  It also takes longer to be adopted in New York City than in *every other state in the nation*.

62

b.      Children who were adopted in New York City in 2013 spent a median of 55.8 months—over 4.5 years—in foster care prior to adoption.  In contrast, children in the rest of New York State spent almost two years less time—a median of 32.6 months—in foster care prior to being adopted, and children in the rest of the nation spent less than half that amount of time—a median of 26.9 months—in foster care prior to being adopted.

c.      Based on the most recent available federal data comparing the median number of days children spent in foster care prior to being adopted, New York City *ranks dead last*—a fact that has been true since at least 2007.

191.    The City Defendants are well aware that it takes over 4.5 years for a child to be adopted in New York City.  The City has published that fact for the past five years in its Mayor's Management Reports.

### 3.  Defendants' Failure To Provide Children in ACS Custody Permanent Homes Within a Reasonable Period of Time Causes Irreparable Harm.

192.    Research has shown that permanent homes and families are critical to ensuring a child's healthy development and continue to confer benefits that contribute to the child's success throughout life.  Being placed with a permanent family helps infants with brain development; young children with self esteem, healthy attachment and behavior regulation; and adolescents with independence and healthy boundary-setting.  Parental support and a stable, familiar environment also help children cope after traumatic experiences.

193.    Conversely, research has shown that children suffer when they grow up in state custody without the protective effects of a permanent home and family.  Each year,

approximately 1,000 young people "age out" of New York City's foster care system, the vast majority on their own with virtually no safety net.  These children suffer irreparable harm. Research has shown that children who "age out" of foster care are more likely than their peers to be unemployed, homeless and incarcerated as adults; are more likely to have drug dependence and post-traumatic stress disorder; and are less likely to have graduated high school, attended college, or to have a savings or checking account.

194.    Too frequently, caseworkers push children to accept the permanency goal of APPLA—the goal given to children who will "age out" of the foster care system—at young ages, often failing to explore other options, such as adoption or placement with a relative.  ACS allows too many children who cannot safely be returned home to be deemed "unadoptable" without making reasonable efforts to search for or secure permanent homes for those children.  ACS also fails to explore alternative permanency options for older teens who may express that they do not want to be adopted but who would nevertheless benefit from a permanent and stable adult connection.

195.    Defendants have long been aware of the harm children suffer when they do not grow up in a permanent home or have a permanent family.  In February 2011, Defendant OCFS sent ACS and the Contract Agencies an informational letter stating that "children who have a significant connection to an adult generally fare better" and that "[s]tudies of youth who leave foster care without a safe, permanent family reveal consistently negative life outcomes." However, Defendants have made no meaningful efforts to improve permanency for Plaintiff Children.

196.    ACS's failure to provide Plaintiff Children with permanent homes within a reasonable period of time is a direct result of Defendants' long-standing and well-documented

actions and inactions and Defendants' failure to remedy structural and systemic deficiencies that have plagued New York City's foster care system for years. ACS's failure to ensure that Plaintiff Children are placed in permanent homes within a reasonable period of time substantially departs from accepted professional judgment and demonstrates a deliberate indifference to the risk of harm to Plaintiff Children.

      C.     Defendants Fail To Provide Foster Placements and Services that Ensure the Well-Being of Children in ACS Custody.

197. Federal and state law and professional standards require ACS to ensure foster care services are provided in a manner that ensures the well-being of each child in ACS custody.

198. Federal and state law and professional standards require ACS to ensure that each child in ACS custody is placed in the most appropriate, least restrictive placement available. The abrupt and overwhelming change of being removed from his or her parents and placed into ACS custody can further traumatize a child. In the process of initial placement, children are removed, often abruptly, from familiar surroundings and lose everything known and comforting. Research has shown that change of this magnitude has a detrimental effect on brain and neurological function and other negative physiological effects.[5] Accordingly, foster placements should be based on an assessment of the individual child's needs and should promote stability and continuity by placing children with relatives, keeping children in their communities and schools, and keeping siblings together whenever possible.

---

[5] This is one reason why children, especially very young children, often regress in their development and behaviors (*e.g.*, toilet training, talking, etc.) after being removed from their parents. Separation from family, and the resulting attachment disruption, may intensify these negative physiological effects and is particularly devastating for younger children.

199.    Instead, ACS further harms Plaintiff Children by putting them in inappropriate
foster placements ill-equipped to meet their needs, which results in far too many children being
shuffled from foster placement to foster placement:

a.      In December 2011, ACS published data stating that 14% of children then
in ACS custody had experienced more than six transfers while in foster
care; and additional 16% had been shuffled from between three and five
placements.

b.      More recently, in July 2015, the Public Advocate published a report,
finding that 26% of the foster children surveyed had experienced five or
more transfers while in ACS custody.

200.    Being shuffled from foster placement to foster placement negatively affects a
child's well-being.  Children may be dropped off at a new place with no explanation for where
they are going and why.  This degree of turbulence can lead to emotional trauma and attachment
disorders, and causes children to lose all sense of stability and security.  Frequent moves may
result in children losing contact with siblings, other family members, friends and adults in their
community who may have been involved in their lives.

201.    Multiple placements can also cause educational interruptions and compromise the
child's ability to finish school.  Federal statutory law and reasonable professional standards
require ACS to make reasonable efforts to keep children in the same school whenever possible.

202.    As a result, for too many children in ACS custody, moving foster placements
means changing schools, losing teachers and friends.  In 2009, Children's Rights, a national
advocacy organization for abused and neglected children, ACS and the Legal Aid Society
Juvenile Rights Practice conducted a study of children in New York City's foster care system

(referred to herein as "The Long Road Home Study").[6]   The Long Road Home Study found that 30% of children studied had experienced at least one school transfer within the past year and that children who had experienced more than one placement move in a one-year period were significantly more likely to have experienced a school transfer as well.

203.    The failure to provide educational stability—like the failure to provide placement stability—further damages children in ACS custody.  School is often the one place where children who are being abused or neglected at home feel safe, so changing schools can be traumatic.  Research has also shown that children in foster care have lower standardized test scores, poorer academic performance and higher rates of grade retention, absenteeism, tardiness, truancy and dropout than their peers.  According to data from the New York City Department of Education, foster youth in 8th grade score significantly lower than their peers in English and math.

204.    Federal and state law also require ACS to ensure that all children in its legal custody receive the necessary services to ensure their well-being.  This includes adequate medical, dental and mental health assessments and follow-up care; educational assessments and services; independent living services; substance abuse treatment; or family planning services, as needed.

205.    However, ACS fails to ensure that all children in its custody are provided with these essential services to ensure their well-being:

        a.    New York City fails to meet the national standard for providing adequate medical, dental and mental health care.  In the 2009 CFSR, for example,

---

[6] The results of this study were published in a November 2009 report entitled "The Long Road Home:  A Study of Children Stranded in New York City Foster Care".

the federal government determined that only 73% of children in New York

City received adequate services to meet their physical and mental health

needs—well below the national benchmark of 95%.

b.      The Long Road Home Study found that ACS failed to ensure the provision

of necessary mental health services for a substantial number of children in

its custody—16% of children studied who needed a mental health

assessment, 19% of children studied who needed individual therapy and

11% of children studied who needed psychotropic medication had not

received those critical mental health services within the past year.  The

study also found that many children who needed the B2H Medicaid

waiver program did not receive it because caseworkers failed to make

timely referrals or because there were not enough slots in the program.

206.    These services are critical to the well-being of children in ACS custody, who are

particularly vulnerable to irreparable physical, psychological and emotional damage from ACS's

failure to provide necessary services.  Children in foster care custody often have experienced

severe and chronic trauma, including physical or sexual abuse, neglect and domestic or

community violence, as well as other stressors such as extreme poverty or parental substance

abuse.  Research has shown that children exposed to repeated traumatic stress or pervasive

neglect, including children removed from their home due to abuse or neglect, manifest increased

physical, psychological and emotional problems later in life.  Being placed in and left to languish

in foster care without a permanent home or family further compounds these problems.

207.    According to the National Child Traumatic Stress Network, exposure to trauma

derails development in children of all ages.  Young children (five and younger) may experience

sensitivity to noise, avoidance of contact, heightened startle response, confusion about what is

dangerous and who to go to for protection, and fear of being separated from familiar people and

places.  School-aged children (ages six to 12) may exhibit emotional swings, learning problems,

specific anxieties and fears, attention seeking behavior and reversion to younger behaviors.

Adolescents (13 to 21) may have difficulty imagining or planning for the future, over- or under-

estimate danger, display inappropriate aggression, and engage in reckless and/or self-destructive

behaviors.

208.    Accordingly, it is critical that all children in ACS custody are properly assessed

and receive necessary services as soon as possible to facilitate their recovery from the trauma

they already have experienced.  However, ACS fails to ensure that all children in its custody are

provided with these critical services within a reasonable period of time.

209.    ACS also fails to ensure that the quality of services being provided to Plaintiff

Children is consistent with professional standards.  Upon information and belief, many Contract

Agencies do not directly provide services; instead, they refer foster children to other service

providers with which the City contracts.  However, upon information and belief, the City

Defendants do not exercise adequate and meaningful oversight over these service providers.

Upon information and belief, most mental health services provided to children in ACS custody

are ineffective and of poor quality, but ACS continues to renew contracts with these substandard

service providers while the few quality service providers have lengthy waiting lists.

210.    ACS's failure to provide Plaintiff Children with appropriate foster care

placements consistent with professional standards and services to ensure their physical,

psychological and emotional well-being is a direct result of Defendants' long-standing and well-

documented actions and inactions and Defendants' failure to remedy structural and systemic

deficiencies that have plagued New York City's foster care system for years.  These failures substantially depart from accepted professional judgment and demonstrate a deliberate indifference to the risk of harm to Plaintiff Children.

## II.   DEFENDANTS HAVE FAILED TO REMEDY THE SYSTEMIC DEFICIENCIES PLAGUING NEW YORK CITY'S CHILD WELFARE SYSTEM

211.   The harms described in ¶¶ 177–210 are a direct result of Defendants' long-standing and well-documented actions and inactions and Defendants' failure to remedy structural and systemic deficiencies that have plagued New York City's foster care system for years, including:

    a.    the City Defendants' failure to exercise adequate and meaningful oversight over the Contract Agencies to which ACS has delegated the day-to-day care of, and case planning responsibility for, Plaintiff Children to ensure foster care services are provided consistent with federal and state law and minimum professional standards;

    b.    ACS's failure to ensure that Contract Agency caseworkers are assigned caseloads and receive appropriate training consistent with professional standards;

    c.    ACS's failure to provide a system for making foster placements consistent with federal and state law and minimum professional standards;

    d.    ACS's failure to ensure case and service plans are developed and implemented consistent with federal and state law and minimum professional standards; and

      e.      ACS's failure to take all necessary and available action to ensure timely adjudication of family court proceedings involving children in ACS custody consistent with federal and state law and minimum professional standards.

These failures substantially depart from accepted professional judgment and demonstrate a deliberate indifference to the harm, risk of harm and violations of rights suffered by Plaintiff Children.

      A.      City Defendants Fail To Exercise Adequate and Meaningful Oversight over Contract Agencies.

212.     By contract, ACS delegates its responsibility to provide children in its custody with foster care services to Contract Agencies.  However, ACS at all times maintains legal custody of and legal responsibility for all children in foster care in New York City.  ACS thus has an obligation to Plaintiff Children to ensure that Contract Agencies are providing foster care services consistent with all applicable law and professional standards.  ACS fails to do so.

213.     Instead, ACS does not meaningfully supervise Contract Agencies or hold them accountable for underperformance.  As a result, ACS shirks its legal obligations to Plaintiff Children while the City pays millions of dollars to Contract Agencies for the provision of foster care services without ensuring that those services are adequately provided to Plaintiff Children.

214.     Under the Agreements, ACS is expressly required to supervise, monitor, audit and review the activities of the Contract Agencies.  Currently, ACS conducts an annual evaluation, called "Scorecard", of each Contract Agency to evaluate process, practice and outcome indicators in safety, permanency and well-being.  According to ACS's 2014 Scorecard Methodology, the Scorecard evaluation involves reviewing a combination of case-specific and

aggregate data.  Each Contract Agency then receives a letter grade (from A to F) indicating its performance for safety, for permanency and for well-being.

215.    The Scorecard evaluations are flawed and ineffective for at least the following reasons:

a.      ACS fails to measure several key performance metrics.  For example, ACS has failed to develop Scorecard measures to evaluate whether Contract Agencies are successfully engaging in concurrent planning and whether Contract Agencies are making efforts to recruit non-kinship foster parents and adoptive parents.

b.      Upon information and belief, the results of the Scorecard evaluations do not accurately reflect each Contract Agency's performance in providing foster care services to children in ACS custody.

c.      ACS's performance standards are simply too low—upon information and belief, the majority of Contract Agencies receive "passing" grades even though New York City has one of the worst foster care systems in the nation.

216.    ACS also fails to hold Contract Agencies accountable for underperformance on the Scorecard evaluations.  According to ACS's 2014 Scorecard Methodology, ACS's Agency Program Assistance team ("APA") analyzes the Scorecard data to identify areas of strength and weakness for each Contract Agency and works collaboratively with each Contract Agency and with ACS to improve performance.  APA sets benchmarks throughout the year for each Contract Agency; however these benchmarks are *relative* and set by taking into account the Contract Agency's current performance, ACS standards and system-wide performance.

217.    When performance is "considerably or persistently poor", APA can use "accountability mechanisms" in order to drive performance.  However, ACS does not adequately use its accountability mechanisms to ensure appropriate performance of the Contract Agencies. ACS's failure to make Scorecard data publicly available further decreases accountability.

218.    As a direct result of ACS's failure to meaningfully oversee the Contract Agencies, Plaintiff Children suffer irreparable harm because there simply are no consequences for the failure to protect them from physical, psychological and emotional harm; the failure to enable them to be safely returned to their parents or, if that were not possible within a reasonable period of time, to place them in permanent homes; and the failure to provide them with appropriate foster placements and necessary services to ensure their well-being.

B.    Defendants Fail To Ensure an Adequately Staffed and Appropriately Trained Child Welfare Workforce.

219.    No foster care system can effectively perform its basic functions absent a well-trained, experienced and adequately staffed workforce.  In New York City, ACS has delegated its obligation to care for the children in state custody to Contract Agencies, who in turn employ the caseworkers that directly interact with children in foster care and their families.  However, ACS fails to ensure that these caseworkers are adequately trained, supervised and staffed, consistent with professional standards.

1.    Defendants Fail To Ensure Caseworkers Are Adequately Trained and Supervised.

220.    Caseworkers must be fluent in governing policy and procedure and familiar with current best practices.  Consistent with professional standards, a foster care system should require pre-service training, which must be completed before caseworkers can carry an active caseload, and mandatory annual in-service training designed to refresh caseworkers in basic

73

policy and procedure and to teach advances in policy and in the field.  In addition, it is critical to ensure appropriate supervision.

221.    ACS fails to ensure that Contract Agency caseworkers receive adequate training or supervision.  In 2009, the Long Road Home Study, which was performed in conjunction with ACS, found that a substantial proportion of caseworkers had not received any training before being given responsibility for a caseload of foster children.  That same study also found that the quality of caseworker supervision at Contract Agencies was questionable.

2.   Caseworkers Carry Unmanageable Caseloads.

222.    Child welfare research has shown that high caseworker caseloads negatively impact children in foster care.  Caseworkers with high caseloads have less time to interact with children, families and service providers and provide meaningful and appropriate case plans, necessary services, and timely casework and decision-making.  It is therefore critical that caseworkers have manageable caseloads.

223.    However, in New York City, ACS fails to ensure that all Contract Agency caseworkers carry caseloads consistent with professional standards.

224.    The Child Welfare League of America ("CWLA"), a coalition of private and public agencies that develops child welfare policies and promotes sound child welfare practice, has established nationally recognized standards for caseworker caseloads.  The standards governing foster care caseworkers limit caseloads to between 12 and 15 children per worker. The Council on Accreditation ("COA"), an accrediting body that partners with human service organizations to improve child welfare service delivery outcomes, recommends that caseloads for foster care caseworkers be limited to between eight and 15 children per worker, depending on the needs of the children.

225.     Upon information and belief, ACS fails to ensure that Contract Agencies comply with these caseload standards, and many caseworkers' caseloads in New York City exceed this standard by a wide margin.  The Long Road Home Study found that caseworker caseloads exceed recommended sizes.  Similarly, at a briefing in January 2013, a member of ACS's senior management under the previous administration stated that caseloads could range from 16 to 24 children, noting that this was far too high.

226.     Excessive caseloads overburden caseworkers and prevent them from performing casework consistent with federal and state law and professional standards.

227.     High caseloads also contribute to burnout and turnover among caseworkers. Research has shown that Contract Agency caseworker turnover is associated with children experiencing multiple placements, receiving fewer services, staying in foster care longer and failing to achieve permanency.  When a case changes hands from caseworker to caseworker, relationships are severed and valuable information is lost.  ACS does not publish system-wide data regarding foster care caseworker turnover; upon information and belief, ACS does not collect such data.  In 2006, the Council of Family and Child Caring Agencies reported Contract Agency caseworker turnover rates of 40%.  In 2009, the Long Road Home Study reported that caseworker turnover is a major barrier to permanency.  Upon information and belief, high foster care caseworker turnover rates persist.

3.   Defendants Fail To Ensure Regular Caseworker Visits To Children in Foster Homes or Congregate Care.

228.     Caseworkers must have regular face-to-face contact with children in foster care, parents, and foster parents or child care workers.  The primary purpose of these contacts is to ensure the safety and well-being of the children, to engage families in planning for their children, to assess the strengths and needs of all family members and caregivers, and to address the needs

of all family members and caregivers in order to move children out of foster care and into permanent homes.

229.    COA recommends that caseworkers meet separately with children, parents and foster parents at least once a month.  ACS policy requires a minimum of monthly contact between caseworkers and children in foster care.

230.    However, ACS fails to ensure that caseworkers are making sufficient contacts with children, parents and foster parents to ensure the safety and well-being of children in ACS custody.  The Long Road Home Study, which was prepared in conjunction with ACS in 2009, found that caseworkers did not maintain adequate contact with children, parents and foster parents.

231.    Moreover, upon information and belief, ACS fails to ensure that Contract Agencies make unannounced visits to ensure that children in ACS custody are protected from maltreatment.  Upon information and belief, ACS also fails to ensure that visits with children take place privately and out of the presence of the child's caretaker.

232.    ACS's failure to ensure that Contract Agency caseworkers maintain contact with key persons to ensure the safety and well-being of children in its care substantially departs from reasonable professional standards and demonstrates a deliberate indifference to the risk of harm to Plaintiff Children.

233.    As a direct result of ACS's failure to ensure that caseworkers maintain regular contact with children, parents and foster parents, Plaintiff Children frequently suffer harm because their assigned caseworkers are unable to meaningfully assess the child's safety and well-being and to provide necessary services to place the child into a permanent home.  ACS's failure to ensure that Contract Agency caseworkers make sufficient contacts with the children in ACS

custody substantially departs from accepted professional judgment and demonstrates a deliberate indifference to the risk of harm to Plaintiff Children.

***

234.    As a direct result of Defendants' failure to ensure that the first point of contact for all Plaintiff Children—the Contract Agency caseworkers—are trained, supervised, staffed and performing visits consistent with professional standards, Plaintiff Children frequently suffer harm because their assigned caseworkers are ill-prepared to make the judgments necessary to promote their safety, permanency and well-being, unable to meaningfully address their complex and varied needs and unable to meaningfully assess the child's safety and well-being or provide necessary services.  ACS's failures as described above substantially depart from accepted professional judgment and demonstrate a deliberate indifference to the harm, risk of harm and violations of legal rights suffered by Plaintiff Children.

C.    Defendants' Processes for Making Foster Placements in New York City Are Deficient.

235.    When ACS removes a child from his or her parents, ACS is obligated to provide a safe temporary home for that child until he or she is discharged from foster care.  Federal and state law require ACS to ensure that each child in ACS custody is placed in the most appropriate, least restrictive placement available.  Professional standards dictate that foster placements be based on an assessment of the individual child's needs and promote stability and continuity by placing children with relatives, keeping children in their communities and schools, and keeping siblings together whenever possible.

236.    In order to meet the needs of a large and diverse foster care population, ACS must ensure the recruitment and maintenance of a sufficient number of homes to accommodate the

number of children currently in custody and additional children as they enter the system on an ongoing basis.  In addition, a sufficient array of placement types must be available to meet children's needs.  The types of placements will range from "basic" foster homes that provide ordinary parental care to children without heightened therapeutic needs, to more "therapeutic", "intensive" or "specialized" foster homes that receive additional training and support for the care of more high-needs children, to more highly structured or "restrictive" group homes and residential programs suitable for children who cannot yet thrive in a family setting.  In addition, placements may vary in terms of their likelihood to develop into permanent or adoptive homes if the child cannot safely be returned to his parents.

237.    Placement in a stable and appropriate foster home can be critical to a child's chances of securing a permanent home because a child who cannot safely be returned to his parent is most likely to be adopted by kin or a foster parent.

238.    However, ACS fails to ensure that Contract Agencies recruit and retain an adequate number and variety of placements to meet Plaintiff Children's needs.  In particular, ACS fails to ensure that a sufficient number of pre-adoptive homes are recruited and retained, particularly for children who cannot safely be returned to their parents but who are "hard to place" into adoptive homes, such as adolescents, children with health or behavioral problems and large sibling groups.

239.    Pursuant to the Agreements, the City pays each Contract Agency per diem payments for every day a child is in foster care, thus incentivizing Contract Agencies to keep children in care longer.  As a result, Contract Agencies may not pursue adoptive resources with urgency or offer sufficient resources for persons who are interested in adopting foster children.  Upon information and belief, Contract Agencies often tell individuals interested in adoption that

they are "in the business of fostering, not adoption"—even though ACS has delegated to them *both* the care of children who safely can be returned to their parents *and* the care of children in need of adoption and waiting desperately for a permanent home and family to call their own.

240.    The City and State Defendants have long been aware of, and have failed to fix, this systemic failure.  Indeed, Defendant Carrión recently admitted that ACS "really need[s] to do a better job of publicizing . . . we need to do more to get the message out that these children are waiting and that they need adoptive homes."  However, the City Defendants have recently taken actions that will make these problems worse—by defunding the only two voluntary service providers whose sole mission was to find adoptive homes for older and "hard to place" children in foster care.  During a March 2015 City Council meeting, Commissioner Carrión stated that the defunding of these two agencies "wasn't a great loss".

241.    ACS also lacks an effective system for appropriately matching Plaintiff Children with the most appropriate foster placement to meet their needs.  Upon information and belief, ACS does not assess a child's safety, health or permanency needs prior to placing the child with a Contract Agency.  Instead, ACS makes a blind placement decision based on which Contract Agency has availability at the time the placement is sought.  Upon information and belief, the Contract Agency does not assess a child's safety, health or permanency needs prior to placing the child into a foster placement.  Instead, the Contract Agency makes the determination based on which foster placement has availability at the time the placement is sought.

242.    Put simply, ACS fails to ensure that the children in its custody who cannot, or who are least likely to, return home safely are placed in pre-adoptive foster placements that are more likely to turn into permanent adoptive homes.  Instead, ACS places the child with whatever Contract Agency has availability at the time the placement is sought.

79

243.    Moreover, ACS also fails to ensure that children who are unlikely to be safely returned to their parents and who will not be adopted by kin or their current foster parent are quickly placed with Contract Agencies capable of individually recruiting adoptive parents.

244.    As a direct result of these failures, Plaintiff Children frequently are harmed because they are not placed in the best foster home to meet their safety and permanency needs. ACS's failure to recruit and retain a sufficient number of foster homes and to match children in its custody with foster placements that meet their needs substantially departs from accepted professional judgment and demonstrates a deliberate indifference to the harm, risk of harm and violations of rights suffered by Plaintiff Children.

D.    ACS Fails To Ensure that Meaningful Case Plans and Service Plans for Foster Children Are Developed and Implemented.

245.    Federal and state law require caseworkers to establish a permanency goal and to develop a strategic plan for achieving that goal.  This includes establishing a permanency goal, engaging in concurrent planning, developing and implementing service plans to promote reunification, and recruiting and securing an alternative permanent home for children who cannot be safely returned home.

246.    According to OCFS's own standards, caseworkers in New York State should establish a child's permanency goal within 30 days of the child entering the foster care system. However, by OCFS's own measure, nearly one-third of children entering foster care for the first time do not have a documented permanency goal within 90 days of admission.

247.    Federal and state law and policy require caseworkers in New York City to conduct concurrent permanency planning as soon as a child is taken into foster care, so that there is a primary permanency plan and a secondary permanency plan that caseworkers pursue simultaneously.  ACS fails to ensure that concurrent planning occurs.  Upon information and

belief, caseworkers do not begin to engage in non-reunification permanency planning until long after it becomes clear that the child's parents will not be able to safely care for the child.

248.    As a direct result of these systemic deficiencies, New York City's foster children stay in the system for far too long.  This is no secret to ACS.  ACS has been aware of rampant case planning deficiencies in New York City for years.

a.    In the 2002 and 2009 CFSRs, the federal government concluded that appropriate permanency goals were not established in a timely manner for children in foster care in New York State.

b.    Similarly, the Long Road Home Study, which was prepared in conjunction with ACS in 2009, found that children in ACS custody spent a long time in foster care before their permanency goal was changed to adoption, alternative permanency options were not adequately explored and concurrent planning was not sufficiently documented.

249.    As a direct result of Defendants' failures (as described in this section) to ensure the provision of meaningful and appropriate case plans, Plaintiff Children frequently grow up in ACS custody without a permanent home or family to call their own.  ACS's failure to ensure that meaningful and appropriate case planning occurs substantially departs from accepted professional judgment and demonstrates a deliberate indifference to the harms, risk of harms, and violations of legal rights being suffered by Plaintiff Children.

1.    ACS Fails To Ensure Services Are Provided To Sustain Family Ties and Support Reunification When It Is Safely Possible.

250.    After a child is removed from home due to abuse or neglect, federal and state law and policy dictate that the preferred course of action is to reunify the child with his or her

81

parents.  Reunification, however, is only appropriate where the reason for removal has been addressed through appropriate services to the family so that the child's safety is assured. However, ACS fails to ensure the provision of meaningful case planning and effective services to support reunification:

    a.    ACS often fails to ensure that Contract Agencies involve parents in case planning and service planning for their children.  In the 2009 CFSR, the federal government found that ACS had adequately assured family involvement in case and services planning in only 45% of cases—well below the national standard of 95%.

    b.    ACS fails to ensure that the reunification services required are adequately tailored to ensure that the child in ACS custody can safely be returned home.  Often the services Contract Agencies require and refer parents to do not correspond to the conduct that led to the removal of the child from the home in the first place.  For example, most parents are required to attend standardized anger management or parenting classes even though neither of those classes offer the particularized support that a parent may need.  Upon information and belief, Contract Agencies do not evaluate services to determine if services better suited to a parent's needs are available or, if they do, it is not until after the parent has completed standardized classes.  Upon information and belief, Family Court judges are often reluctant to return children to their parents where the issue giving rise to the initial removal has not been addressed.

c.      ACS fails to ensure that required services are evidence-based and represent recent innovations in the field.  For example, required mental health services often do not incorporate trauma-based practice or cognitive behavioral therapy.

d.       ACS fails to ensure that required services accomplish the purpose they purport to—ensuring children in ACS custody can be returned home within a reasonable period of time.  Upon information and belief, neither ACS nor the Contract Agencies perform regular evaluations of what services correspond to successful reunifications.

e.      ACS fails to ensure efficiency and coordination among multiple service providers, fails to ensure that required services are not duplicative of one another and fails to consider whether it is logistically possible for parents to comply with service plans (while also potentially searching for housing or employment, or working)—all of which delays children in foster care being returned to their parents.

f.      ACS fails to ensure services are available to parents so that children in ACS custody can be returned home within a reasonable period of time. Contract Agencies frequently require parents to take a certain action or to obtain a certain service so that the child in foster care can return home, but that same parent is not provided with critical assistance in taking that action or obtaining that service.  For example, many parents are required to obtain permanent housing before their children in ACS custody can be returned.  However, ACS fails to provide assistance with completing

applications for public housing or expediting those applications.  When mental health services are required, parents find they have no access to mental health services in their community or are unable to afford the appropriate services.

g.  ACS also fails to ensure alternative services are available to parents so that children in ACS custody can be returned home within a reasonable period of time.  Upon information and belief, if suitable group classes do not exist, Contract Agencies do not seek out alternative arrangements, such as therapy or counseling, to meet a parent's needs more quickly.

251.  ACS's failure to ensure that reunification services are appropriately tailored, effective and sufficiently available prevents or delays reunification, even though many parents could resume custody of their children if the proper services were provided consistent with federal and state law and professional standards.

252.  These systemic failures have long been known to ACS.  In 2003, the New York City Child Welfare Advisory Panel noted that ACS failed to ensure that parents knew how to get information about services or other issues, or whether or not someone from ACS or the Contract Agency was responsible for ensuring the service plan would be carried out and that services would be provided.  The Long Road Home Study, which was conducted in 2009 in conjunction with ACS, found that substantial numbers of parents did not receive necessary reunification services due to both parents' lack of participation and casework failures.

253.  ACS has failed to address these problems and children in ACS custody have suffered as a direct result.

2.   <u>ACS Fails To Ensure Timely Adoptions.</u>

254.    When a child has been in foster care for 15 of the last 22 months, federal and state law require ACS to file a petition to terminate parental rights unless certain compelling circumstances exist and are documented.  ACS has delegated its responsibility to timely file TPR petitions to the Contract Agencies.  However, ACS fails to ensure that TPR petitions are timely filed consistent with federal and state law.

255.    Defendants are well aware of this failure.  In December 2011, ACS reported that New York City was failing to meet federal and state law standards for the overwhelming majority of children in ACS custody.  For FY 2010—the most recent 12-month period for which this data is available—ACS reported that 94.9% of children who had been in ACS custody for the past 18 months did not have a TPR petition filed.

256.    ACS's failure to file TPR petitions in accordance with the time periods set by federal and state law is not a new problem.  In the 2002 CFSR, the federal government reported that in New York State, caseworker turnover, staffing shortages, transfer of cases and caseworkers' lack of familiarity with cases slowed down the TPR process.  In the 2002 CFSR Report, the federal government also reported that delays in Family Court, including "lengthy adjournments", "w[ere] seen as the greatest barrier" to the timely termination of parental rights.  In the 2009 CFSR, the federal government concluded that New York State met federal requirements regarding timely termination of parental rights in only 62% of cases reviewed—far less than the 90% required to meet the national standard—and was not consistent in documenting compelling reasons when a termination of parental rights petition was not filed.  Upon information and belief, the CFSR results for New York State are heavily influenced by New York City's child welfare system, which accounted for over 60% of children in foster care in New York State in both 2002 and 2009.

257.    Once both parents' rights have been either voluntarily surrendered or terminated, a child is considered "freed" or legally available to be adopted into a permanent home and family.  New York State regulations require that a child be freed for adoption within 12 months of his or her permanency goal changing to adoption.

258.    However, ACS fails to ensure that children in its custody are freed for adoption within a reasonable time period.  In New York City, it takes longer for a child in foster care to be freed for adoption than anywhere else in the country.  Based on the most recent federal data available, it takes nearly two times longer to be freed for adoption in New York City than in the rest of New York State (42.2 months versus 22.1 months), and 2.5 times longer to be freed for adoption in New York City than in the rest of the nation (42.2 months versus 16.8 months).

259.    ACS also fails to act on applications from potential adoptive families within the time periods set by state law.

260.    When a foster parent or other person wants to adopt a child in foster care in New York City, he or she must submit an application.  By state law, an adoption application must be acted upon within six months and such action must be sufficiently documented.

261.    Then a potential adoptive parent must undergo an adoption study during which his or her fitness to be an adoptive parent is assessed.  Completion of adoption studies are subject to strict timelines under state law.  Priority for completion of an adoption study is determined by the characteristics of the child that the applicant seeks to adopt.  Those who seek to adopt children with the age, racial and other characteristics of the highest proportion of children waiting to be adopted are given first priority.  Second priority is given to those who seek to adopt photo-listed children.  All other applicants are given third priority.  For applicants with first priority, an adoption study should be offered within 30 days.  An adoption study must be

completed within four months of initiation, subject to appropriate documentation of an exception.

262.    When a foster parent applies to adopt a child, the adoption study must be completed within two months of application when the child is legally free for adoption or within four months of application when the child is not legally free for adoption.

263.    Pursuant to state law, ACS must place a child who has been legally freed for adoption in an adoptive home within six months, or document an appropriate exception.  State law also requires that adoptions be finalized within 12 months of the child placement in an adoptive home.

264.    Upon information and belief, ACS fails to ensure that Contract Agencies comply with the timelines set by state law for conducting adoption studies and acting on adoption applications.

265.    Upon information and belief, ACS fails to ensure that applications to become an adoptive parent are acted upon within six months as required by state law.

266.    Upon information and belief, ACS fails to ensure that Contract Agencies offer to complete adoption studies within six months.

267.    Upon information and belief, ACS fails to ensure that Contract Agencies offer to initiate adoption studies for those with first priority within 30 days.

268.    Upon information and belief, ACS fails to ensure that Contract Agencies complete adoption studies within four months of beginning the study or that an exception is appropriately documented.

269.    Upon information and belief, ACS fails to ensure that Contract Agencies complete adoption studies within two months of an application by a foster parent to adopt a child who is legally freed for adoption.

270.    Upon information and belief, ACS fails to ensure that Contract Agencies complete adoption studies within four months of an application by a foster parent to adopt a child who is not legally freed for adoption.

271.    Upon information and belief, ACS fails to ensure that Contract Agencies place children who have been legally freed for adoption into adoptive homes within six months, or that an exception is appropriately documented.

272.    ACS fails to ensure that children in its custody have finalized adoptions within 12 months of the child being placed in an adoptive home, as required by state law.  In September 2012, ACS reported that 72% of children did not have finalized adoptions within 12 months of being placed in an adoptive home.[7]

273.    Defendants' failures to ensure that Contract Agencies process adoption applications, conduct adoption studies, place children in adoptive homes and finalize adoptions within the time periods set by state law further delays providing these children in ACS custody—who likely have already been in foster care for many months or even years—with a permanent home and family.

---

[7] 517 of the 1,825 children (28%) in adoptive placements on March 31, 2011 were adopted within 12 months of being adoptively placed.

E.      Defendants Fail To Ensure Timely Adjudication of Family Court Proceedings
        Involving Children in Foster Care.

274.    Defendants' failure to ensure that Family Court proceedings are adjudicated in a
timely fashion consistent with state law contributes significantly to the length of time New York
City children spend in foster care without permanent homes and families.

275.    State law requires that a child who is placed into foster care have a permanency
hearing within eight months of being placed into foster care and every six months thereafter.
That hearing must be completed within 30 days.  The purpose of permanency hearings is to
monitor the child's safety and well-being, the family's progress, and efforts to return the child
home or to find the child another permanent home.  Upon information and belief, Defendants fail
to ensure that all children in ACS custody receive timely permanency hearings as required by
state law.

276.    The Long Road Home Study, which was prepared in 2009 in conjunction with
ACS, detailed the following findings with respect to delays in Family Court proceedings
involving children in ACS custody:

    a.      The length of time between a child's entry into foster care and the Family
            Court's completion of the fact-finding and disposition hearings was
            extremely long for many children;

    b.      Many children in ACS custody do not receive timely permanency hearings
            as required by state law;

    c.      The most common reasons for permanency hearing delays were that the
            Contract Agency had not submitted the permanency hearing report on
            time, that the Family Court did not have sufficient time for the hearing,
            that Contract Agency caseworkers were not present, that the permanency

hearing report did not sufficiently address the issues in the case, and that

ACS caseworkers were not present; and

d.      Termination of parental rights proceedings were extremely delayed for

most children.

Additionally, the study noted that the number of adjournments and the length of time between

adjournments of all types of Family Court proceedings contribute to children's lengthy stays in

foster care in New York City.  The published study stated:

> "[T]he Court gives ACS and the [Contract Agencies] many
> chances (and multiple hearing adjournments) to present evidence
> and provide necessary services to parents, even after they have
> been slow and negligent in doing so."

Finally, the study found that a lack of accountability in Family Court proceedings contributes to

delays in placing children in ACS custody into permanent homes and families, stating:

> "The Court's decision-making is hampered by poor-quality
> casework by ACS and the [Contract Agencies].  The Court
> depends on ACS and the [Contract Agencies] to provide
> appropriate services to children and families and to inform the
> Court's decision-making through assessments of the children's
> progress toward permanency . . . [J]udges and referees expressed
> frustration with the quality of the agencies' case practices – and the
> fact that many caseworkers seem to see their role as only
> documenting parents' attendance at services rather than providing
> the Court with clinical assessments of parents' progress.  In
> addition . . . the parties infrequently make applications or motions
> to the Court for relief to address pressing issues and try to move
> cases forward."

277.    In 2010, the New York County Lawyers' Association Task Force on the Family

Court released a report recognizing two causes for delay in Family Court:  (1) a shortage of

Family Court judges and (2) a culture of delay.  The Task Force made a number of

recommendations to minimize delay and enhance the effectiveness of litigation, including:

a.      scheduling trials where a child has been removed within 45 days of the
        first appearance;

b.      requiring compliance with timely production and filing of documents, as
        well as attendance at status and trial conferences;

c.      scheduling times certain for trial conferences;

d.      holding trials in block times on consecutive days;

e.      refraining from adjourning trials for more than 30 days, and then only for
        good cause shown; and

f.      disciplining attorneys and other personnel who are unprepared, late or fail
        to appear.

278.    Defendants' failure to ensure that ACS and Contract Agency attorneys and
caseworkers are appropriately staffed with caseloads consistent with professional standards and
given necessary support further contributes to delays in Family Court proceedings.

279.    Upon information and belief, delays continue to plague the vast majority of
Family Court proceedings involving children in ACS custody in New York City.

280.    Defendants' failures result in delays in Family Court proceedings involving
children in ACS custody in New York City and include:

a.      the State's failure to ensure adequate judicial resources are devoted to
        Family Court in New York City;

b.      the State's failure to provide Family Court judges in New York City with
        sufficient resources, including referees or law clerks with social work
        experience;

c.    Defendants' failure to ensure that ACS and Contract Agency attorneys and caseworkers have caseloads consistent with professional standards;

d.    ACS's failure to ensure that attorneys and caseworkers appear at all Family Court proceedings prepared;

e.    ACS's failure to ensure that attorneys and caseworkers do not request adjournments absent good cause shown;

f.    ACS's failure to ensure that necessary paperwork is prepared in accordance with reasonable professional standards and submitted to the Family Court in a timely fashion; and

g.    ACS's failure to ensure that caseworkers are trained to give the Court detailed assessments of children and parents' progress in accordance with reasonable professional standards.

281.    A three- or six-month adjournment is a long time to a child in ACS custody who is struggling with the uncertainty and emotional harm of not knowing if or when he or she will be moved again and of not having a permanent home and family to call his or her own. Defendants have an obligation to ensure that all service providers, including caseworkers and attorneys, recognize the urgency of Family Court proceedings for Plaintiff Children, who are languishing in ACS custody.

282.    As a direct result of Defendants' failure to ensure that all reasonable efforts are made to ensure the timely adjudication of Family Court proceedings involving children in its custody, Plaintiff Children suffer harm by being forced to grow up in ACS custody rather than in a permanent home.  Defendants' failures substantially depart from reasonable professional

standards and demonstrate a deliberate indifference to the harms, risk of harms and violations of legal rights suffered by Plaintiff Children.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Substantive Due Process under the U.S. Constitution)**
**(Asserted by the Named Plaintiff Children and Plaintiff Children against Defendants)**

283.    Each of the foregoing allegations is incorporated as if fully set forth herein.

284.    A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care to and to protect from harm a child it has taken into its foster care custody.

285.    The foregoing actions and inactions of Defendants City of New York, ACS, Gladys Carrión, in her official capacity, State of New York, OCFS and Sheila J. Poole, in her official capacity, constitute a policy, pattern, practice or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all Named Plaintiff Children and Plaintiff Children.  As a result, all Named Plaintiff Children and Plaintiff Children have been, and are at risk of being, deprived of substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution.

286.    These substantive due process rights include, but are not limited to:

a.    the right to freedom from maltreatment while in foster care;

b.    the right to protection from unnecessary intrusions into the child's emotional well-being while in government custody;

93

c.     the right to services necessary to prevent unreasonable and unnecessary intrusions into the child's emotional well-being while in government custody;

d.     the right to conditions and duration of foster care reasonably related to the purpose of government custody;

e.     the right to treatment and care consistent with the purpose and assumptions of government custody; and

f.     the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody.

## SECOND CAUSE OF ACTION

**(First, Ninth and Fourteenth Amendments to the U.S. Constitution)**
**(Asserted by the Named Plaintiff Children and Plaintiff Children against Defendants)**

287.    Each of the foregoing allegations is incorporated as if fully set forth herein.

288.    The foregoing actions and inactions of Defendants City of New York, ACS, Gladys Carrión, in her official capacity, State of New York, OCFS and Sheila J. Poole, in her official capacity constitute a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to Plaintiffs' constitutional rights. As a result, all Named Plaintiff Children and Plaintiff Children have been, and are at risk of being, deprived of the right to a permanent home and family derived from the First Amendment right of association, the Ninth Amendment's reservation of rights to the people and the Fourteenth Amendment's substantive due process protections.

## THIRD CAUSE OF ACTION

**(The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*)**
**(Asserted by the Named Plaintiff Children and Plaintiff Children against the State**
**Defendants and City Defendants and by the Public Advocate against the City Defendants)**

289.    Each of the foregoing allegations is incorporated as if fully set forth herein.

290.    The foregoing actions and inactions of Defendants City of New York, ACS, Gladys Carrión, in her official capacity, State of New York, OCFS and Sheila J. Poole, in her official capacity, constitute a policy, pattern, practice or custom of depriving the Named Plaintiff Children and Plaintiff Children of the rights conferred upon them by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, to:

    a.    placement in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

    b.    a written case plan that includes a plan to provide safe, appropriate and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

    c.    a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

    d.    a written case plan that ensures provision of services to parents, children and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

    e.    a written case plan, where appropriate, that ensures the location of an adoptive or other permanent home for the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

     f.      a written case plan that ensures the educational stability of the child while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

     g.     a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

     h.     a case review system in which the status of the child is reviewed no less frequently than every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, continuing necessity and appropriateness of the placement, extent of compliance with the permanency plan and projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C);

     i.      a case review system that ensures that for each child that has been in foster care for 15 of the most recent 22 months, the state files a petition to terminate the parental rights of the child's parents and, concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reason for determining that filing such a petition would not be in the best interests of the child, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675 (5)(E); and

     j.      receive quality services to protect each child's safety and health, 42 U.S.C. § 671(a)(22).

291.    As a direct result of the City Defendants' failure to comply with the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act

of 1997, the Office of the Public Advocate has been forced to expend resources investigating and responding to complaints.  The Defendants' continued failure to adhere to the provisions of the law will result in the expenditure of similar resources in the future.

## FOURTH CAUSE OF ACTION

**(New York State Social Services Law)**
**(Asserted by the Named Plaintiff Children, Plaintiff Children and the Public Advocate against the City Defendants)**

292.    Each of the foregoing allegations is incorporated as if fully set forth herein.

293.    The foregoing actions and inactions of Defendants City of New York, ACS, Gladys Carrión, in her official capacity, State of New York, OCFS and Sheila J. Poole, in her official capacity, constitute a deprivation of rights conferred on the Named Plaintiff Children and Plaintiff Children by provisions of the New York State Social Services Law and regulations adopted thereto, including:

a.    provision of various adoption services, such as evaluation of a child's placement needs and pre-placement needs, recruitment of a home study for prospective adoptive parents, placement planning and supervision, as required under New York State Social Services Law § 372-b;

b.    timely action on adoption applications and documentation of all action taken on such, as required under New York State Social Services Law § 372-e;

c.    furnishing adoptive parent applicants with reasons for agency failure to act on applications and denial of applications, as required under New York State Social Services Law § 372-e;

d.      termination of parental rights for children in foster care for 15 out of the
most recent 22 months and, where applicable, appropriate documentation
of exceptions, as required under
New York State Social Services Law § 384-b;

e.      timely completion of adoption home studies, as required under
18 N.Y. Comp. Codes R. & Regs. tit. 18, §§ 421.14, 421.15 and 421.19;

f.      timely and complete preparation and amendment of the FASP, as required
under New York State Social Services Law § 409-e and
18 N.Y. Comp. Codes R. & Regs. tit. 18, §§ 428.6 and 428.7;

g.      placement in a foster placement that meets standards for continuity and
appropriate level of placement, as required under
18 N.Y. Comp. R. & Regs. tit. 18, § 430.11;

h.      timely implementation of the FASP and timely occurrence and completion
of FASP reviews, as required under
18 N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12;

i.      timely initiation of proceedings to terminate parental rights, as required
under 18 N.Y. Comp. Codes R. & Regs. tit. 18, §§ 430.12 and 431.9;

j.      timely placement in adoptive homes, as required under
18 N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12; and

k.      timely completion of adoptions of children who are legally free for
adoption, as required under
18 N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12.

294.     As a direct result of the City Defendants' failure to comply with New York State Social Services Law and regulations adopted thereto, the Office of the Public Advocate has been forced to expend resources investigating and responding to complaints.  The Defendants' continued failure to adhere to the provisions of the law will result in the expenditure of similar resources in the future.

## FIFTH CAUSE OF ACTION

**(Common Law Contract)**
**(Asserted by the Named Plaintiff Children, Plaintiff Children and the Public Advocate against the City Defendants)**

295.     Each of the foregoing allegations is incorporated as if fully set forth herein.

296.     The Agreements for the purchase of foster care services between ACS and the Contract Agencies constitute valid, binding and enforceable contracts.[8]

297.     The Public Advocate is a member of New York's City Council (the "Council").  Charter of the City of New York, Chapter 2 § 22.  The Council is charged with reviewing "on a regular and continuous basis the activities of the agencies of the city, including their service goals and performance and management efficiency."  Charter of the City of New York, Chapter 2 § 29(a)(2).  Further, the Council is charged with overseeing "patterns of contractual spending by city agencies" and "procedures for evaluating contractor performance."  Charter of the City of New York, Chapter 2 § 30(2), (4).

298.     Under the terms of the Agreements, ACS pays hundreds of millions of dollars to Contract Agencies that agree to "provide comprehensive family foster care services as set forth

---

[8] To the best of our information and belief, the Agreements, which are listed in Appendix A, were current as of November 2014 (*see* ¶ 119) and are still in force today.  Attached hereto as Exhibit 1 is a copy of an excerpt of one such Agreement between ACS and a Contract Agency, which has been modified to include the relevant portion of the Agreement.  The Agreements are substantively identical from Contract Agency to Contract Agency, with the exception of the contracting parties and the contract amount.

in this Agreement, the Law, court orders and mandates, ACS Policies, the Fiscal Manual"[9] and several appendices to each Agreement.  Agreement for the Purchase of Regular Family Foster Care Services Part II, Section 2.01(A) (General Requirements).

299.    Under the terms of the Agreement—and by law—the management and supervisory staff of ACS, on behalf of the Commissioner of ACS, "has the ultimate responsibility for the protection and preservation of the welfare of each child receiving services", and "has the ultimate authority for making all decisions relative to the welfare of such child". Agreement for the Purchase of Regular Family Foster Care Services Part II, Section 4.01(A) (Responsibility and Authority of ACS and Procedure for Final Decisions on Issues Related to Services Provided to the Client).

300.    City Defendants have breached and failed to enforce the Agreements, which were intended for the benefit of the Named Plaintiff Children and Plaintiff Children, and over which the Public Advocate has oversight.

301.    The Agreements state that "ACS and the Contractor agree that the fundamental purpose of [the] Agreement is to provide the best available services, care and treatment to Foster Children who are entrusted to the Contractors care, and further ensure that the health, welfare and fundamental rights of the Foster Children shall be the guiding principle for all decisions which affect their lives".  Agreement for the Purchase of Regular Family Foster Care Services Part II, Section 4.01(B) (Responsibility and Authority of ACS and Procedure for Final Decisions on Issues Related to Services Provided to the Client).

302.    As a direct and causal result of City Defendants' breach of the Agreements, the Named Plaintiff Children and Plaintiff Children have been harmed.

_____

[9] This language may differ to account for the type of foster placement services provided for in the Agreement but, in substance, the provisions are identical.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Children respectfully request that this Honorable Court:

a. Assert jurisdiction over this action;

b. Order that Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c. Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

  1. Defendants' violation of Plaintiff Children's right to be free from harm under the Fourteenth Amendment to the United States Constitution;

  2. Defendants' violation of Plaintiff Children's rights under the First, Ninth and Fourteenth Amendments to the United States Constitution;

  3. Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Action of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 *et seq.*;

  4. City Defendants' violation of Plaintiff Children's rights under New York Social Services Law and regulations adopted thereto; and

  5. City Defendants' violation of Plaintiff Children's rights under the Agreements with the Contract Agencies.

d.      Permanently enjoin Defendants from subjecting Plaintiff Children to

practices that violate their rights, including:

1.      Enjoin City Defendants from placing children with Contract

Agencies that do not maintain caseloads for all workers providing

direct supervision and planning for children that conform to

accepted professional standards, as developed by either the COA

and/or the CWLA, or a workload analysis conducted by ACS.

Require that ACS independently and periodically verify that every

Contract Agency meets and maintains the applicable caseload

standards and its verification process and that the results shall be

public information.

2.      Require City Defendants to develop a process for matching

children with Contract Agencies that takes into account the child's

need for permanence, the child's service needs, and the Agency's

demonstrated ability to provide timely permanence for children,

and timely and necessary individualized services for children and

families based on timelines set by ACS in accordance with federal

and state law and accepted professional standards.  Require that

ACS independently and periodically verify that each Contract

Agency meets and maintains the applicable standards set by ACS

and its verification process and that the results shall be public

information.

3.   Enjoin ACS from placing children in Contract Agencies that do not ensure that all workers receive training that OCFS and ACS shall approve and certify as meeting accepted professional training standards.  Require that ACS independently and periodically verify that the approved training is being provided to all workers, and their verification process and that the results shall be public information.

4.   Enjoin ACS from placing children in any Contract Agency unless at least 90% of the case plans for children currently placed with the Agency (a) meet federal requirements (as set forth in 42 U.S.C. §§ 671(a)(16), 675(1)) and accepted professional standards as set by COA and/or CWLA, (b) are created in a timely fashion pursuant to applicable regulations and (c) are implemented consistent with professional standards.  Require that ACS independently and periodically verify that each Contract Agency with which ACS places children meets such standards, and their verification process and that the results shall be public information.

5.   Enjoin ACS from placing children with any Contract Agency unless the Agency has demonstrated, and ACS has ascertained, that it conducts permanency planning, including concurrent planning, that it has the resources to provide individualized and effective reunification services and that it has the resources to develop and implement individualized adoptive recruitment for

children whose permanency goal is adoption.  Require that, in conducting this assessment, ACS be guided by timelines to achieve permanency goals set by ACS in accordance with federal and state law and accepted professional standards.  Require that ACS independently and periodically verify that each Contract Agency with which it places children shall meet these standards, and rank the agencies in their effectiveness in doing so.  Require that their verification process and the results, including the Contract Agency rankings, shall be public information.

6.      Require that ACS develop and fund post-permanency services of sufficient duration to provide all possible support for the successful reunification, guardianship or adoption of foster children.

7.      Require that ACS ensure that its attorneys and attorneys employed by the Contract Agencies take all reasonable steps necessary (including not seeking adjournments except in extraordinary circumstances) to proceed to the adjudication and disposition in Article 10 proceedings within three months and, when a termination of parental rights process is necessary, to proceed to a disposition of that proceeding within four months of the petition being filed.  Require that ACS collect and maintain detailed information on this, which shall be public record.

8.      Require that City and State Defendants regularly collect and independently verify the information necessary to determine the

Contract Agencies' compliance with the provisions of the state statutes and regulations enumerated in paragraph 293 above and provide public reports of each Agency's compliance with each of these requirements.  Require that the Defendants require corrective action of any Contract Agency failing to achieve at least 75% compliance with these requirements for two continuous six-month periods, and shall terminate the contract of any Agency that fails to achieve at least 75% compliance for a two-year period.

9.      Require that OCFS conduct annual case record reviews of a statistically significant sample of children in ACS custody to measure the degree to which children in ACS custody are receiving timely permanence, as required by state and federal law, and the degree to which they are being maltreated in care; issue annual public reports on the findings of these case record reviews; and require corrective action when necessary.

10.     The Court shall appoint a Special Master either with special expertise in the areas covered by the Remedial Order, or who shall appoint an Expert Panel to report to the Special Master, to determine whether the standards developed by Defendants comport with acceptable professional standards, and to monitor and report on Defendants' compliance with their obligations as contained in the Court's Order.  Plaintiffs shall have the right to enforce the provisions of the Court Order entered pursuant to Federal Rule of

Civil Procedure 65(d), and the Court shall have continuing jurisdiction to oversee compliance with that Order.

e.  Award Plaintiff Children the reasonable costs and expenses incurred in the prosecutions of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h).

f.  Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm while in Defendants' custody in foster care.

Dated:  New York, NY
        July 8, 2015

Respectfully submitted,

by

_____
Marcia Robinson Lowry

A Better Childhood, Inc.
1095 Hardscrabble Road
Chappaqua, NY 10514
(844) 422-2425
mlowry@abetterchildhood.org

CRAVATH, SWAINE & MOORE LLP

_____
/s/ Julie A. North
Julie A. North
Nicole M. Peles

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
jnorth@cravath.com

*Attorneys for Plaintiffs Elisa W., by her next
friend, Elizabeth Barricelli; Alexandria R.,
by her next friend, Alison Max Rothschild;
Thierry E., by his next friend, Amy Mulzer;
Ayanna J., by her next friend, Meyghan
McCrea; Olivia and Ana-Maria R., by their
next friend, Dawn Cardi; Xavion M., by his
next friend, Michael B. Mushlin; Dameon C.,
by his next friend, Reverend Doctor
Gwendolyn Hadley-Hall; Tyrone M., by his
next friend, Bishop Lillian Robinson-
Wiltshire; and Brittney W., by her next
friend, Liza Camellerie, individually and on
behalf of a class of all others similarly
situated,*

107

_____
                Jennifer Levy

Public Advocate for the City of New York
1 Centre Street, 15th Floor
New York, NY 10007
(212) 669-2175
jlevy@pubadvocate.nyc.org

*Attorney for Plaintiff Letitia James, Public
Advocate for the City of New York.*