# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELISA W., by her next friend, Elizabeth Barricelli, *et al.*,

                Plaintiffs,

-against-

THE CITY OF NEW YORK, *et al.*

                Defendants.

No. 15-cv-5273 (LTS) (HBP)

### EXPERT DECLARATION OF PROFESSOR CHRISTINE GOTTTLIEB IN SUPPORT OF BROOKLYN DEFENDER SERVICES, THE BRONX DEFENDERS, CENTER FOR FAMILY REPRESENTATION INC., AND NEIGHBORHOOD DEFENDER SERVICE OF HARLEM'S MOTION TO INTERVENE AND <u>OBJECTION TO THE PROPOSED SETTLEMENT</u>

Christine Gottlieb hereby declares, pursuant to 28 U.S.C. § 1746:

1. I am an Adjunct Professor at the New York University School of Law and the Co-Director of the New York University School of Law Family Defense Clinic. I have been retained as an expert on behalf of the Bronx Defenders, the Brooklyn Defender Services, the Center for Family Representation, and the Neighborhood Defender Service of Harlem (collectively, the "Parent Advocates"). I respectfully submit this Expert Declaration in support of the Parent Advocates' Motion to Intervene and Objection to the Proposed Settlement.

2. I am familiar with the Complaint and Consent Decree filed in this action.[1] If called to testify as a witness regarding the following, I could and would do so under oath.

---

[1] All references in this declaration to the "Complaint" or "Consent Decree" are intended to refer to the Amended Complaint (ECF No. 91) and Amended Consent Decree (ECF No. 151).

1

## EDUCATION & PROFESSIONAL BACKGROUND

3.  I attended and graduated from the University of Chicago in 1994, where I earned a Bachelor of Arts in Philosophy. Following graduation, I enrolled in the New York University School of Law, and I graduated *cum laude* with a Juris Doctor in 1997.

4.  Following my graduation from the New York University School of Law, and a clerkship with the United States Court of Appeals for the Fifth Circuit, I joined The Legal Aid Society's Juvenile Rights Division, where I represented children of all ages and specialized in child protection cases. During my time at The Legal Aid Society, I represented over 500 children and teens who were in, at or at risk of placement in, foster care in New York City.

5.  I began teaching at the New York University School of Law in 2002, first as a Fellow and then as an Adjunct Professor. I have taught the New York University School of Law's Family Defense Clinic, the Advanced Family Defense Clinic, and a clinic focused on New York's Statewide Central Register of Child Abuse and Maltreatment. Presently, I serve as the Co-Director, with Martin Guggenheim, of the New York University School of Law Family Defense Clinic. In 2015, I received the New York University Dr. Martin Luther King, Jr. Faculty Award.

6.  Established in 1990, the New York University School of Law Family Defense Clinic ("the Clinic") was the first law school clinic in the country to train students to represent parents in child welfare proceedings. The Clinic pioneered a model of representation in which lawyers and social workers collaborate on interdisciplinary teams to protect family integrity and help families access services that keep children safe and out of foster care.

7.  The Clinic offers a year-long course that provides law and graduate-level social work students with the opportunity to learn about the New York City child welfare

2

system,[2] and work alongside practitioners who advocate for parental rights in New York Family Courts. I supervise students on child abuse and neglect cases, termination of parental rights proceedings, and cases involving records in the New York Statewide Central Register of Child Abuse and Maltreatment. In addition to supervising student cases, I also directly represent parents and foster parents in these proceedings.

8. In my role as Clinic Co-Director, I regularly draft and consult on appeals of child abuse and neglect matters and amicus briefs in cases with the potential to significantly affect children's and parents' rights. I also regularly train lawyers in New York City and at national conferences on child welfare law and practice. I consult with and provide litigation support to public interest organizations and law firms providing pro bono counsel to families involved with the child welfare system.

9. Additionally, I write in the field of child welfare law. My law review articles in the field include, "Reflections on Judging Mothering," 39 University of Baltimore Law Review 371 (2010); "Family Values: How Children's Lawyers Can Help Their Clients by Advocating for Parents," 58 Juvenile and Family Court Journal 17 (2007) (with Erik S. Pitchal); "Children's Attorneys' Obligation to Turn to Parents to Assess Best Interests," 6 Nev. L. J. 1263 (2006); and "Justice Denied: Delay in Resolving Child Protection Cases in New York," 12 Virginia Journal of Social Policy and the Law 546 (2005) (with Martin Guggenheim).

10. My writing on issues related to child welfare also has been published by *The New York Times* website, the *New York Law Journal*, and *USA Today*.

---

[2] I define the New York City child welfare system as the group of services, managed by the New York City Administration for Children's Services ("ACS") and overseen by the Office of Children and Family Services ("OCFS"), designed to promote the well-being of children by ensuring their safety, securing permanent homes, and strengthening families to care for their children successfully. *See* Child Welfare Information Gateway, Factsheet (February 2013), *available at* https://www.childwelfare.gov/pubpdfs/cpswork.pdf.

11. I currently serve on the New York City Bar Association Council on Children and the Steering Committee of the American Bar Association National Project to Improve Representation for Parents, and I have served on numerous interagency committees and task forces that work collaboratively to improve child welfare practice in New York City.

12. My seventeen years as a practitioner representing parents and children involved in the child welfare system, and my ten years as a professor and Co-Director of the Family Defense Clinic at New York University School of Law, have provided me with an extensive opportunity to study the New York City child welfare system.

13. In this declaration, I will address relevant child welfare demographics; the New York City child welfare system; and my concerns with the Consent Decree.

**RELEVANT DEMOGRAPHICS OF CHILD WELFARE**

14. A commonly held misconception perpetuated over the past several decades is that most children who are placed in foster care are removed from their families because of allegations of abuse. However, during this same time period, numerous studies have concluded, contrary to this widely held misconception, that the primary reason children are removed from their parents and placed in foster care is not abuse, but rather poverty.[3]

15. At least one study found that during the 1980s and early 1990s, "inadequacy of income" increased the odds for foster care placement "more than 120 times."[4] In other words, children living in poverty are many times more likely to be placed in foster care

---

[3] *See* Leroy H. Pelton, The Continuing Role of Material Factors in Child Maltreatment and Placement, Child Abuse & Neglect, August 2014 (noting that "[c]hildren in foster care have been and continue to be placed there from predominantly impoverished families."); *see also,* Dorothy Roberts, Shattered Bonds: The Color of Child Welfare, 27 (2002) (noting that "[p]overty—not the type or severity of maltreatment—is the single most important predictor of placement in foster care and the amount of time spent there."); Martin Guggenheim, What's Wrong With Children's Rights, 192-93 (2005) (noting that "a very small percentage of children in foster have suffered serious forms of maltreatment.").

4

than children from middle class or affluent backgrounds. Based on my own observations, I believe that poverty is presently one of the most significant factors that determine a child's likelihood of being placed in foster care.

16.     Furthermore, in the overwhelming majority of cases in which children are removed from their parents, the children can be safely returned if the family receives social services such as housing assistance, mental health treatment, substance abuse counseling, and other supportive services.

17.     Race is also a key factor in determining which children are removed from their families and placed in foster care. It is well-documented that minority children enter foster care at vastly disproportionate rates compared to white children, and also remain in foster care longer – even though data does not show that minority children are abused or neglected at greater rates.[5]

18.     Recent research has shown that black children who are removed from their homes stay in foster care, on average, nine months longer than do white children.[6] Relatedly, black families are less likely to receive family preservation services and their children are more likely to be removed than white children in similar situations.[7]

---

[4] Duncan Lindsey, The Welfare of Children, 151-53 (2d ed. 1994) (finding "an unstable income source represented the highest predictor of removal.").

[5] See Roberts, Shattered Bonds: The Color of Child Welfare, 16-20, 49 (noting that "[o]nce Black children enter the foster care system, they remain there longer, are moved more often, and receive less desirable placement than white children.").

[6] United States Government Accountability Office, African American Children in Foster Care: Additional HHS Assistance Needed to Help States Reduce the Proportion in Care, 4 (July 2007) available at http://www.gao.gov/new.items/d07816.pdf.

[7] Id. at 20-22.

5

19. Racial disproportionality is seen in foster care nationally,[8] but is particularly extreme in New York City, where at least 27% of children are white, but only about 4% of children in foster care are reported to be white.[9] Black children are fourteen times more likely to be placed in foster care in New York City than white children.[10]

## THE NEW YORK CITY CHILD WELFARE SYSTEM

20. New York City's child welfare agency, the Bureau of Child Welfare, was established in the late 1960s under the administration of Mayor John Lindsay, with a mandate to manage the City's child welfare services. Over the next thirty years, the organization's name changed several times, until 1995 when it was given its present name, the Administration for Children's Services ("ACS"). In 1998, New York State merged several agencies to create the Office of Children and Family Services ("OCFS"), which has a mandate to supervise ACS and other city child welfare systems throughout the state.

21. In 1992, there were approximately 49,000 children in foster care in New York City.[11] Today, there are fewer than 10,000—a nearly 80% decline.[12] This reduction represents one of the greatest decreases a foster care population has ever seen without a

---

[8] *See* The AFCARS Report, 2 (July 2015) (indicating that, "Black or African American" comprise 24% percent of the national foster care population); *available at* http://www.acf.hhs.gov/sites/default/files/cb/afcarsreport22.pdf.

[9] NYS Office of Children & Family Services, Race and Ethnicity: Path Through the Child Welfare System, 3 (2007) (containing bar chats indicating the racial composition of New York City foster care); *see also*, Roberts, The Color of Child Welfare, at 9 (remarking that "[t]he racial imbalance in New York City's foster care population is truly mind-boggling").

[10] *Id.*

[11] New York City Commission for the Foster Care of Children, Report, 94 *available at* http://www.nyc.gov/html/rabrc/downloads/pdf/acs_report.pdf.

[12] New York City Administration for Children's Services, Website, *available at* http://www1.nyc.gov/site/acs/about/data-policy.page.

corresponding increase in the rate of child-abuse-related fatalities.[13] The significant reduction in the number of children in New York City foster care is the result of a number of factors, including a commitment to provide families with preventive services to avoid the need for foster care altogether.[14] By aspiring to offer preventive services when possible, rather than summarily and unnecessarily separating children from their families, New York City has set its policy objective as avoiding the trauma of separation whenever possible.

22. For perspective, it is important to understand that family preservation and reunification was not always the prevailing goal in New York, and it is presently not the prevailing goal in other jurisdictions.

23. In 1979, New York passed the groundbreaking Child Welfare Reform Act of 1979, which required that preventive services be used to keep children from entering foster care whenever possible and to speed family reunification when foster care was necessary. This was New York's deliberate legislative response to widely discussed recognition at the time that too many children were entering foster care and then were staying in foster care too long (this was often referred to as "foster care limbo" or "foster care drift"). New York put significant resources into funding these mandates. New York's efforts became the model for the federal Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), which also attempted to shift funding from foster care to preventive and reunification services.

24. Many experts have noted that historically child welfare policy in the United States moves back and forth on a pendulum from more to less supportive of families. The

---

[13] *See* Rachel Blustain, The Limits of Protection: Can Mayor's Push Reduce Child Abuse Deaths?, Dec. 16, 2014, http://citylimits.org/2014/12/16/limits-of-protection-can-mayors-push-reduce-child-abuse-deaths/ (noting New York City's "historic trend of reducing the number of children placed in foster care each year.").

[14] Vera Institute of Justice, Innovations in NYC Health and Human Services Policy, 4 (Jan. 2014), *available at* http://www.nyc.gov/html/ceo/downloads/pdf/policybriefs/child-welfare-brief.pdf.

7

passage of the Adoption and Safe Families Act of 1997 ("ASFA") represented a swing of the pendulum away from emphasizing family preservation at the federal level, establishing for the first time mandates that agencies consider terminating parental rights when a child has been in foster care for 15 out of 22 months. Following passage of ASFA, many jurisdictions increased their rate of parental terminations. However, New York has remained committed to family reunification as the primary goal for children in foster care.

    25. Indeed, New York City has made a considered policy choice to prefer to keep children in foster care longer where that allows them to safely return home. This policy choice is explicitly incorporated in New York law, which states:

> it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home of its birth parent, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered . . . [T]he state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home.

SSL 384-b(1)(a)(ii-iii)(Statement of legislative findings and intent for New York's termination of parental rights statute).

    26. Additionally, this policy choice is clearly reflected in the fact that New York City has rejected the trend seen in other jurisdictions of establishing causes of action to terminate parental rights based solely on length of stay in foster care. As New York's highest court has explained, New York has deliberately chosen a different substantive path than many states with regard to the preferred course for children who need to enter the foster care system. Writing at a time when model laws were proposed to accelerate the termination of rights of parents whose children were in foster care, the Court of Appeals explained:

> Several model statutes would authorize termination of parental rights based on a child's absence from the biological home for a substantial period, with the period

8

> depending on the child's age. Such provisions were based on the notion, in circulation prior to and during the formulation of our current parental termination statute, that once a child under the age of three has been in the continuous care of the same adult for a year, it is unreasonable to presume that the child's ties with biological parents are more significant than ties with long-term caretakers (*See*, Taub, Assessing the Impact of Goldstein, Freud and Solnit's Proposals: An Introductory Overview, 12 NYU Rev.L. & Soc. Change 485, 490). Our Legislature did not recognize prolonged separation as an additional ground for termination of parental rights.

*Matter of Michael B.*, 80 N.Y.2d 299, 310 n. 2 (1992).

As Judge Kaye wrote for the Court: in New York "[p]arental rights may be terminated only upon clear and convincing proof of abandonment, inability to care for the child due to mental illness or retardation, permanent neglect, or severe or repeated child abuse." *Id.* at 310.

27. This policy choice has been actively pursued by the last three mayoral administrations.

28. As a result of this considered policy choice, the families whose children enter foster care in New York City present more challenging casework needs, on average, than those in jurisdictions that have made different policy choices. Simply put, New York avoids putting children in foster care who might go into foster care briefly in other jurisdictions. This results in making New York City's average length of stay in foster care higher because it is generally more successful at preventing foster care placement in the first place. The children who are in foster care in New York City are more often those whose families require time, resources, and support in order for their children to be able to return home safely.

29. In implementing its child welfare system, however, New York City continues to struggle in certain areas. I have read the Declaration of Lauren Shapiro in support of Parent Advocates' Motion to Intervene and Objection to the Proposed Settlement (the "Shapiro Declaration"). I believe that paragraphs 12 and 13 of the Shapiro Declaration

9

accurately describe many ways that the New York City child welfare system fails parents and their children.

30. Many child welfare experts would agree that the next steps for continued progress in the New York City child welfare system will require sophisticated improvements in the management and frontline work of the agencies responsible for administering foster care, as well as additional material resources.

## THE PROBLEMS WITH THE CONSENT DECREE

31. I also share Ms. Shapiro's concerns about the detrimental impact of the Consent Decree (*see* Shapiro Declaration, ¶ 15), and believe it will not result in the necessary improvements to the New York City child welfare system.

32. The Consent Decree contains few specific provisions and is devoid of a specific mandate as to what the appointed Monitor and Research Expert will focus their work on. As a result, as an advocate for children and families and a professor with expertise in family law, it is difficult (if not impossible) to predict how the proposed settlement will be implemented and what policies it will seek to promote.

33. The Consent Decree does not contain specific provisions relating to a number of issues that many experts view as the most important to the New York City child welfare system.

34. First, the Consent Decree does not prioritize family reunification as the preferable outcome for children. New York, with good reason, has determined as a matter of law and policy that family reunification is better for children, whenever safely possible, than adoption. The most important issue facing ACS is the number of children currently in foster care who do not need to be there and the obstacles and unnecessary delays associated with reuniting

them with their families. The Consent Decree does not address how these issues will be managed.

35. The pleadings filed by Plaintiffs in the lawsuit raise concerns on this subject as well. The metrics highlighted in the Complaint suggest a preference for adoption even where family reunification could be safely achieved. For example, ¶¶ 313 - 340 of the Complaint discuss ACS's obligation under state and federal law to consider termination of parental rights when a child has been in foster care for 15 of the last 22 months. In condemnation of ACS's efforts, the Complaint notes that "[f]or FY 2010... ACS reported that 94.9% of children who had been in ACS custody for the past 18 months did not have a TPR petition filed. ACS's failure to file TPR petitions in accordance with the time periods set by federal and state law is not a new problem." ¶¶ 313-314.

36. Contrary to the language in the Complaint, the statute requires that ACS *either* file a TPR or indicate why it has not made such a filing. There are numerous compelling reasons why an agency would not—and should not—file a TPR despite the fact that a child has been in foster care for 15 out of 22 months.

37. One such reason would be that a parent has not received a referral for services that are required for reunification with his or her child. For example, where a parent's homelessness is cited as the reason for a child's separation from his or her family, a parent may have to wait a long time to obtain housing to be in a position to be reunited with his or her child. This is a problem that should be addressed by providing better services to parents, not by terminating their rights.

38. Another reason a TPR may not be appropriate is that parents who could safely reunify with their children if provided appropriate mental health or drug treatment

11

programs, may not have been referred to such programs until many months (or years) after their children went into foster care. These parents may be successfully engaging in treatment programs, but need more time to progress in treatment to be ready to reunify with their children.

39. Notably, some children who are technically counted as part of the foster care population in New York City are already home with and being cared for by their parents on a "trial discharge" status, which allows ACS to continue to supervise the families while the parents complete services. In other jurisdictions, these children would not be counted as part of the foster care population. It is difficult to imagine any expert would suggest ACS should be moving to terminate these parents' rights.

40. Additionally, the Consent Decree's emphasis on "permanency" can be understood as prioritizing adoption over family reunification. The Consent Decree references permanency in several places. For example, in section 6.1.1, addressing the "Hiring of a Monitor," the Consent Decree reads, "[t]he Commissioner of OCFS will retain . . . an individual to review and evaluate alleged systemic issues within the foster care system in New York City that reflect widespread and/or ongoing substantial noncompliance with . . . policies relating to the safety, permanency and well-being of foster children (the Monitor)." This same language appears in section 6.2.1 addressing the Monitor's Duties: "[t]he Monitor will observe, review, report findings, and make recommendations regarding the safety, permanency and well-being of foster children in the foster care system in New York City."[15]

41. It is broadly understood in the field of child welfare that "permanency" is a watchword for those who believe child welfare policy should be aimed more aggressively at adoption. This view can be contrasted with New York City's policy, which focuses on keeping

12

children with their families and working hard to reunify children who have been removed from their families. Emphasizing permanency as one of the few specific metrics in the Consent Decree would appear to promote a policy preference New York has purposely rejected. (*See supra* ¶¶ 24-28.)

42. The Consent Decree also fails to prioritize any individual policies that would help to facilitate family reunification or reduce the trauma to children of family separation. Most notably, the Consent Decree is silent on family visitation for children in foster care.

43. Recent research has shown that children who have regular, frequent contact with their families while in foster care are more likely to eventually be reunited with their family and tend to require shorter stays in out-of-home care.[16] Visitation also reduces the trauma of children in foster care and improves child wellbeing.[17]

44. In addition to failing to explicitly prioritize family reunification consistent with New York City's considered policy decision over the past two decades, the Consent Decree fails to include any provision that would involve parents in decisions related to their children. Section 7.4.6 of the Consent Decree provides that where the appointed Research Expert concludes as part of its review of a particular child's case that ACS is in "substantial non-

---

[15] Similar references are made to the Research Expert's appointment and duties (*e.g.*, § 7.1.1.).
[16] *See* Weintraub, Amber, Information Packet: Parent-Child Visiting, 3 (National Resource Center for Family-Centered Practice and Permanency Planning, 2008), *available at* http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/information_packets/Parent-Child_Visiting.pdf; *See also* Sonya J. Leathers, Parental Visiting and Family Reunification: Could Inclusive Practice Make a Difference?, Child Welfare 81(4), 606-609 (June 2002) (finding a correlation between visitation and the duration of time spent in foster care).
[17] *See, e.g.*, National Resource Center for Family-Centered Practice and Permanency Planning, Programs that Provide Services to Support Family Visiting of Children in Foster Care, 1, *available at* http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/PHProgramsvisiting.pdf (noting that "[v]isiting is essential to maintaining parent-child and other family attachments as well as to reducing the sense of abandonment that children experience at placement").

compliance" with the law, ACS, overseen by OCFS, will develop a corrective action plan for the child. There is no accompanying provision acknowledging any role for the child's parents in that planning.

45. By requiring ACS and OCFS to develop corrective action plans for individual families based on an expert's report, the Consent Decree will circumvent the right of parents to be at the table when decisions are made about their children. Exclusion from this decision-making, where, among other things, the parties decide whether to attempt to reunify the child with his or her parents, or, alternatively, to pursue adoption or other permanency goals, significantly limits a parent's ability to protect his or her right to custody of his or her child.

46. Furthermore, this approach is directly at odds with New York City's development over the last decade of a case conferencing model that prioritizes engaging families in case decision-making. New York's conferencing model is based on broadly accepted best practices in the field of child welfare.

47. The Consent Decree also fails to recognize the importance of relative placement (*i.e.* kinship foster care) when a child must be removed from his or her immediate family, even though research shows that relative placement is of critical importance.[18] This raises concerns that relative placement will not be a focus of the Monitor or Research Expert's mandate—which remains undefined.

48. While the primary goal of foster care should be the eventual reunification of a child with his or her parents, in the interim it is much better for children, both in the short and long term, to be with relatives, as opposed to non-relatives.

---

[18] *See, e.g.*, Center for Law and Policy, Is Kinship Care Good for Kids?, *available at*, http://www.clasp.org/resources-and-publications/files/0347.pdf (noting, *inter alia*, that "[c]hildren in kinship care experience greater stability.").

49. At least one recent study found that children who leave their homes because of maltreatment have fewer behavioral problems three years later if they are placed with relatives than if they are placed in non-kinship foster care.[19] Research has also shown that children in relative care are more likely to remain stable in school, report liking who they live with, and (where reunification is not possible) wanting their placement to become permanent.[20]

50. Crucially, research also shows that children in relative foster care have fewer placement moves than children in non-relative foster care.[21]

51. For all these reasons, the Consent Decree, which contains little if any information about how the Monitor or Research Expert will carry out their roles, does not address some of the key issues with foster care in New York City.

52. In addition the Consent Decree contains provisions that may well be harmful to foster children and their families.

53. The Consent Decree will necessarily divert substantial resources from a severely-resource strapped system. It has been widely noted that caseworkers—unquestionably the most important players to any systemic improvement of foster care—already spend far too great a percentage of their time meeting requirements to document their case activities. A report commissioned by the Office of Children and Family Services estimated that caseworkers in New York State spend approximately 31% of their time on documentation requirements, substantially more time than they spend with the children and families they serve.[22]

---

[19] Rubin, D.M., Impact of Kinship Care on Behavioral Well-Being for Children in Out-of-Home Care, 550-556 (2008).
[20] Center for Law and Policy, Is Kinship Care Good for Kids?, 1, *available at*, http://www.clasp.org/resources-and-publications/files/0347.pdf.
[21] *Id.*
[22] New York State Office of Children & Family Services, New York State Child Welfare Workload Study, xiii, 4-21, *available at* http://www.ocfs.state.ny.us/main/reports/WorkloadStudy.pdf.

54. To require additional documentation for the proposed Monitor and Research Expert, and to require ACS management and staff to coordinate the collection of information for the expert and then respond to the unspecified requirements of the Monitor and Research Expert will divert limited resources from current reform priorities.

55. I reserve the right to make additional observations about the adequacy of the Consent Decree after the settling parties file their motion for approval.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       June 20, 2016

_____
Christine Gottlieb