**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELISA W., by her next friend, Elizabeth Barricelli, *et al.*, | |
| Plaintiffs, | 15 Civ. 5273 (LTS) (HBP) |
| -against- | |
| THE CITY OF NEW YORK, *et al.*, | |
| Defendants. | |

**THE PARENT ADVOCATE INTERVENORS' MEMORANDUM OF LAW IN**
**OPPOSITION TO THE MOTION FOR FINAL APPROVAL OF SETTLEMENT**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212.373.3000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ......................................................................................................... 3

I.  THE SETTLEMENT DOES NOT  SATISFY THE *GRINNELL* FACTORS......... 4

    A.  The Reaction to the Settlement Is Strongly Negative ..................................... 4

    B.  The Settling Parties Lacked an Adequate Appreciation of the Merits......... 5

    C.  The Consent Decree Does Not Compensate Settlement Class
       Members for the Rights They Are Giving Up..................................... 8

         1.  Plaintiffs Wrongly Argue that Because the Proposed
            Settlement Is with OCFS, Rather than ACS, the Absence of
            Substantive Reforms in the Consent Decree Is Justified ..................... 8

         2.  Contrary to Plaintiffs' Arguments, the Terms of the Settlement
            Are Too Vague to Justify Approval ...................................... 15

         3.  Plaintiffs Wrongly Argue that the Covenant Not to Sue Is
            Limited in Scope and Duration ......................................... 17

         4.  Plaintiffs' Fail to Demonstrate that the Consent Decree  Will
            Protect Parents' Rights ................................................. 20

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000)........................................................4

*Authors Guild* v. *Google Inc.*,
  770 F. Supp. 2d 666 (S.D.N.Y. 2011)......................................................4

*City of Detroit* v. *Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)....................................................................4

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)..................................................................4, 5

*Maley* v. *Del Global Tech. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................................7

*Marisol A.* v. *Giuliani*,
  185 F.R.D. 152 (S.D.N.Y. 1999) ...............................................10, 11, 18

*Martens* v. *Smith Barney, Inc.*,
  181 F.R.D. 243 (S.D.N.Y. 1998) ..........................................................16

*Mill* v. *Capital One, N.A.*,
  No. 14-cv-1937, 2015 WL 5730008 (S.D.N.Y. Sep. 30, 2015) ..............7

*Plummer* v. *Chem. Bank*,
  668 F.2d 654 (2d Cir. 1982)....................................................................7

*Prasker* v. *Asia Five Eight LLC*,
  No. 08-cv-5811, 2010 WL 476009 (S.D.N.Y. Jan. 6, 2010) ..................7

*Romer* v. *Leary*,
  425 F.2d 186 (2d Cir. 1970)..................................................................18

*In re Traffic Exec. Ass'n E. R.R.*,
  627 F.2d 631 (2d Cir. 1980)....................................................................4

*Wilson* v. *Direct Buy, Inc.*,
  No. 3:09-cv-590, 2011 WL 2050537 (D. Conn. May 16, 2011) .........3, 4

*Yoshioka* v. *Charles Schwab Corp.*,
  No. 11-cv-1625, 2011 WL 6748984 (N.D. Cal. Dec. 22, 2011)........15, 16

**Statutes, Rules, and Regulations**

18 NYCRR 428 ........................................................................................................9

42 U.S.C. § 1983 ...................................................................................................18

N.Y. SSL 20(3)(d) ..................................................................................................9

N.Y. SSL 34(3)(f) ..................................................................................................9

**Other Authorities**

Settlement Agreement, *Charlie H.* v. *Whitman*,
    No. 99-cv-3678 (D.N.J. Sept. 2, 2003), ECF No. 199 .........................................10

Settlement Agreement *David C.* v. *Huntsman*,
    No. 2:93-cv-00206-TC (D. Utah. May 11, 2007), ECF No. 580 ...........................10

Settlement Agreement *Juan F.* v. *Malloy*,
    No. 2:89-cv-00859-SRU (D. Conn. Jan. 7, 1991) ...............................................19

Settlement Agreement, *Katie A.* v. *Bonta*,
    No. 02-cv-05662 (C.D. Cal. Dec. 5, 2011) .........................................................11

Settlement Agreement, *Marisol A.* v. *Giuliani*,
    No. 95-cv-10533 (S.D.N.Y. Dec. 2, 1998), ECF No. 311 ....................................18

Settlement Agreement, *Marisol A.* v. *Giuliani*,
    No. 95-cv-10533 (S.D.N.Y. Dec. 2, 1998), ECF No. 312 ...............................11, 13

Settlement Agreement, *Kenny A. ex rel. Winn* v. *Perdue*,
    No. 1:02-cv-1686 (N.D. Ga. July 5, 2005), ECF No. 439 ...............................11, 12

Intervenors the Brooklyn Defender Services, The Bronx Defenders, Center for Family Representation Inc., and Neighborhood Defender Service of Harlem (collectively, the "Parent Advocates") respectfully submit this memorandum of law in opposition to the motion for final approval ("Approval Motion") of the proposed settlement ("Proposed Settlement") described in the Amended Consent Decree, dated April 15, 2016 (the "Consent Decree").

## PRELIMINARY STATEMENT

The Approval Motion demonstrates unequivocally why the Proposed Settlement fails the *Grinnell* test and is not fair, reasonable, or adequate.

*First*, the Approval Motion confirms the weak evidentiary record supporting the settlement.  The Approval Motion reveals that OCFS contacted Plaintiffs about settlement within 24 hours after the lawsuit was filed, and a settlement in principle was reached only 12 days later.  Further, the Motion confirms that no discovery has been exchanged among the settling parties, either to explore the strength of the claims or the viability of any remedies.  Strikingly, Plaintiffs have not submitted *any* evidence in support of the Proposed Settlement from an independent expert on the foster care system.  It is unclear whether any such expert was even retained.  This is not a record that supports the Proposed Settlement.

*Second,* the Approval Motion does not dispute the vagueness concern raised by the Parent Advocates' Objection, namely, that the Consent Decree does not identify the specific substantive areas that the Monitor and Research Expert purportedly will address.  In fact, like the Consent Decree itself, the Approval Motion identifies no substantive reforms, systemic changes, or detailed goals and objectives that the Proposed Settlement will achieve.  Former ACS Commissioner John Mattingly, who has extensive experience with child welfare reform efforts, states in his declaration that over his long career he has not previously encountered a consent

decree "as devoid of substantive terms as what the Plaintiffs have submitted to the Court for approval."

Instead, the settling parties submit declarations that focus only on process, such as how the Monitor will be selected or the types of data that will be available to the Research Expert. The Court, class members, and their parents remain in the dark about the Consent Decree's aims. While Plaintiffs promise that these aims will be illuminated *after* final approval, this effectively makes it impossible to address the fairness and adequacy of the Proposed Settlement *now*—as the Court is required to do through the Fairness Hearing process. As described in the Declaration of former ACS Commissioner John Mattingly, dated July 22, 2016, the vagueness of the settlement raises significant obstacles to its effectiveness as well as practical concerns. And, as explained in the Supplemental Declaration of family law expert Professor Christine Gottlieb, dated July 22, 2016, the Proposed Settlement may jeopardize the opportunity for parents meaningfully to participate in the foster care planning for their children.

*Third,* with respect to the very limited nature of the remedies obtained for the class under the Proposed Settlement, Plaintiffs argue that the limited remedies are appropriately tailored to OCFS's limited oversight responsibilities over New York City's child welfare system. This argument, however, is flatly contradicted by Plaintiffs' own position in this litigation. Plaintiffs allege that OCFS is ultimately responsible for New York City foster children, and that OCFS has the power to require ACS to adopt operational changes. In fact, it is ACS—not OCFS—that is required to retain the Research Expert, upon OCFS's direction, under the Consent Decree. The settling parties should not now be heard to claim that OCFS's role is limited to mere oversight, when it has the power to direct substantive reforms. Moreover, when compared to other child welfare settlements with oversight entities, including the prior settlement with

OCFS in the *Marisol* case, this Proposed Settlement with OCFS is lacking in detail and substance.

*Finally,* the settling parties admit that the Consent Decree contains a seven-year covenant not to sue, and cannot identify *any* other settlement that contained a similar provision. The Approval Motion notes that other child welfare consent decrees (and their covenants not to sue), although initially set to expire in two to three years, have been *extended* beyond seven years by court order. This misses the point: in this Proposed Settlement, the Consent Decree will run for seven years *without any Court oversight over the continuing duration of the settlement.* Plaintiffs have identified no settlement (and the Parent Advocates are aware of none) where the Court approved a covenant not to sue that would run automatically for seven years.

For these reasons and the reasons articulated in the Parent Advocates' Objection (ECF No. 221), the Consent Decree is not fair, reasonable, and adequate, and the Parent Advocates respectfully request that the Court deny the Approval Motion.

## ARGUMENT

Plaintiffs admit that they must satisfy the *Grinnell* factors, but assert that the Settlement is entitled to a presumption of fairness because the negotiations were conducted at arm's length. (Pls. Mem. in Supp. of the Mot. for Final Approval of Settlement at 11-14 (hereafter "Pls. Mem.").) But where, as here, less than two weeks elapsed between the filing of the Complaint and reaching a settlement in principle (*compare* Decl. of Julie A. North in Supp. of the Mot. for Final Approval of Settlement ¶ 10 (Complaint filed on July 8, 2015) *with* ¶ 13 (settlement in principle reached on July 20, 2015), ECF No. 225 (hereafter "North Decl."))—and the parties did not conduct discovery—no presumption of fairness should apply. *See Wilson* v. *Direct Buy, Inc.*, No. 3:09-cv-590, 2011 WL 2050537, at *5 (D. Conn. May 16, 2011) ("In light

of this limited discovery, the court will not grant this Settlement Agreement the presumption of fairness that might normally adhere when settlement comes later in the case.").[1]

In any event, irrespective of whether a presumption of fairness applies, the Proposed Settlement does not satisfy the rigorous standard established by *City of Detroit* v. *Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) and its progeny.  In fact, while this Proposed Settlement is defective for numerous reasons, a settlement may be rejected even where only a few factors weigh against approval.  *See Authors Guild* v. *Google Inc.*, 770 F. Supp. 2d 666, 674 (S.D.N.Y. 2011) (rejecting class settlement where "[o]nly two of the *Grinnell* factors weigh[ed] against approval of the settlement").

## I.
## THE SETTLEMENT DOES NOT
## SATISFY THE *GRINNELL* FACTORS

### A.    The Reaction to the Settlement Is Strongly Negative

Plaintiffs argue that the reaction of the class (the second *Grinnell* factor) supports the Proposed Settlement because no settlement class member objected to the Consent Decree. (Pls. Mem. at 15-16.)[2]  This argument is without merit because the organizations that represent

---

[1]    Plaintiffs rely on *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164 (S.D.N.Y. 2000), but in that case, "while no formal discovery was conducted . . . , plaintiffs were afforded several opportunities to extensively review records provided by the [defendant] Banks," including "[v]oluminous amounts of archived documents" numbering in the thousands of pages and three depositions. *Id.* at 174.  By contrast, the settling parties here did not conduct even confirmatory discovery and are relying largely on public information.  (*See infra* § I.B.)

[2]    The Second Circuit has recognized that a low response rate is standard and its importance should not be exaggerated.  *See In re Traffic Exec. Ass'n E. R.R.*, 627 F.2d 631 (2d Cir. 1980) ("A substantial lack of response from absentee class members appears to be the norm rather than the exception."); *see also Wilson* v. *DirectBuy, Inc.,* No. 3:09-cv-590, 2011 WL 2050537, at *8 (D. Conn. May 16, 2011) ("[T]he court does not believe that an inference of approval by way of silence is warranted, in light of the fact, *inter alia*, that notice of class action was sent simultaneously with notice of settlement.").  Leading treatises and other circuits echo these sentiments. *See, e.g.,* Manual For Complex Litig. (4th) § 21.62 (stating that in certain situations "the paucity of objections may reflect apathy rather than satisfaction" with a class action settlement); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) (recognizing that "[e]ven where there are no incentives or informational barriers to class opposition, the inference of approval drawn from silence may be unwarranted," and that "a combination of observations about the practical realities of class actions has led a number of courts

these children's interests, as well as the organizations that represent their parents, have filed ardent objections to the settlement.  These objections are entitled to substantial weight as "placeholder[s] for many absent class members' objections" and weigh heavily against the fairness of the settlement.  (*See* Parent Advocates' Objection to the Proposed Class Action Settlement with OCFS at 24 (citing cases where non-class member attorneys general objections stood in for class member objections), ECF No. 221 (hereafter ("Obj.").)  Moreover, the settlement class is comprised entirely of children in foster care who surely "may not fully appreciate the size of their potential claims." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995).

### B.  The Settling Parties Lacked an Adequate Appreciation of the Merits

Next, Plaintiffs argue that the settlement is fair, reasonable, and adequate because the settling parties had an appreciation for the merits of the case before entering into the Proposed Settlement.  (Pls. Mem. at 16-17.)  Plaintiffs claim that they, the Public Advocate, and OCFS each had "knowledge of the New York City foster care system and its problems before negotiating the proposed Consent Decree."  (*Id.*)  This argument suffers from numerous flaws.

As noted above, given the extremely condensed 12-day period during which the settlement was negotiated, there is ample reason to question the thoroughness of the evidentiary evaluation that took place.  *See In re GMC Pick-Up Truck*, 55 F.3d at 814 ("[T]he inchoate stage of case development reduces our confidence that the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action."); *see also* North Decl. ¶ 10 (complaint filed on July 8, 2015), ¶ 13 (settlement in principle reached on July 20, 2015).

---

to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement").

During this time, Plaintiffs do not claim to have conducted any discovery, taken any depositions, performed any interviews, or reviewed any OCFS documents.

To the extent that the parties investigated the claims prior to the settlement in principle, the evidence is also very thin. While Ms. Lowry has lengthy experience with class action child welfare reform, her declaration fails to explain the factual and evidentiary support for the Proposed Settlement, stating only that through her "experience in handling comparable cases, [she is] familiar with the strengths and weaknesses of the class's position, both legally and factually." (Decl. of Marcia Robinson Lowry in Supp. of Mot. for Final Approval ¶ 5, ECF No. 226.) Further, while Plaintiffs identify various meetings that they had with "stakeholders relating to all aspects of the New York City child welfare system," they do not explain what they learned during those meetings—particularly about the functioning of OCFS, its "oversight" of ACS, or the effectiveness of the proposed remedies—that supports the Proposed Settlement. (Pls. Mem. at 16-17.) And OCFS's affidavits in support of the settlement do not—and cannot— demonstrate that the Public Advocate and Plaintiffs who represent the putative class had adequate information to assess the strengths and weaknesses of the class claims they seek to settle. (*See* Pls. Mem. at 16-17; *see also* Decl. of Lee Dorrance Prochera in Supp. of Prelim. Approval of the Proposed Consent Decree ¶ 22 (Deputy General Counsel with OCFS), ECF No. 113-1 (hereafter "Prochera Prelim. Approval Decl."); Suppl. Decl. of Lee Dorrance Prochera in Supp. of Final Approval of the Proposed Consent Decree ¶¶ 13-19, ECF No. 225-3 (hereafter "Prochera Suppl. Decl."); Decl. of Rebeca Ann Colman in Supp. of Final Approval of the Proposed Consent Decree ¶¶ 18-20 (Director of the Bureau of Research, Evaluation and

Performance Analytics in the Division of Strategic Planning and Policy Development within OCFSs), ECF No. 225-2 (hereafter "Colman Decl.").)[3]

This passing familiarity with the facts underlying this lawsuit stands in stark contrast to that of the Parent Advocates and Children Advocates who are objecting to the Consent Decree. Unlike the Public Advocate, the Named Plaintiffs and their counsel, the Parent Advocates and Children Advocates live on the front lines of New York City's child welfare system, and they interact with parents, children, and the Family Court on a daily basis. (*See* Parent Advocates' Mem. of Law in Supp. of Intervention at 2-6, ECF No. 182; Children's Advocates' Mem. of Law in Supp. of Intervention at 1-8, ECF No. 188.)

Plaintiffs marshal several cases in support of the proposition that "parties need not have engaged in *extensive* discovery in order to have Consent Decree approved." (Pls. Mem. at 16 (emphasis added).) Those cases are inapposite because the discovery record developed in all of those cases was more extensive than in the present matter.[4] Further, in those cases, the courts evaluated the exchange of information to determine whether the parties had an appreciation of the merits of the case, and in each case, the court found that the parties had such an appreciation. There is no substantive basis to draw that conclusion here. *See Plummer* v. *Chem. Bank*, 668

---

[3]    The Public Advocate also claims to have met with various stakeholders prior to filing this action. (Decl. of Jennifer Levy in Supp. of the Mot. for Final Approval of Settlement ¶¶ 6-13, ECF No. 225-5.)

[4]    In *Mill* v. *Capital One, N.A.*, No. 14-cv-1937, 2015 WL 5730008 (S.D.N.Y. Sep. 30, 2015), counsel conducted interviews, reviewed documents, and, crucially, "exchanged data to weigh the strengths and weaknesses of their claims, including through defendant's production of personnel documents relating to several of the plaintiffs and opt-in plaintiffs." *Id.* at *5. In *Prasker* v. *Asia Five Eight LLC*, No. 08-cv-5811, 2010 WL 476009 (S.D.N.Y. Jan. 6, 2010), the court observed that "[t]he parties have completed enough discovery to recommend settlement. . . . Here, through an informal exchange of information, Plaintiffs obtained sufficient discovery. The parties' full-day mediation session allowed them to further explore the claims and defenses." *Id.* at *5. In *Maley* v. *Del Global Technologies Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002), "settlement was reached after almost one year and following numerous appearances before the Court, interviews with former employees. . . review of documents and the full briefing by the parties of multiple defendants' motions to dismiss . . . . Plaintiffs conducted an intensive and extensive investigation into the alleged wrongdoing of the Defendants. Confirmatory discovery[,] which included the production of tens of thousands of pages of documents, [and] interviews . . . further reinforced the conclusion that the Settlement reached was fair, reasonable, and adequate." *Id.* at 363-64.

F.2d 654, 658 (2d Cir. 1982) ("[T]he district court properly exercised its discretion in requiring additional evidentiary support" for the settlement).

C.     **The Consent Decree Does Not Compensate Settlement Class Members for the Rights They Are Giving Up**

Grouping together several *Grinnell* factors, Plaintiffs argue that "[i]n weighing the risks of litigation and the relief offered by the proposed Consent Decree, the relief granted is sufficiently favorable to Plaintiff Children that it should be approved." (Pls. Mem. at 17-18.)  To the contrary, as the Parent Advocates' Objection demonstrated, the bargain struck in the Consent Decree is not fair, reasonable, or adequate for settlement class members because: (i) it fails to provide meaningful benefits to the settlement class or even address the problems identified by Plaintiffs themselves (Obj. at 13-18); (ii) the Monitor's and Research Expert's roles are troublingly ill-defined (Obj. at 10-13); and (iii) the Consent Decree contains broad releases and an unprecedented covenant not to sue that would unfairly bind class members and hamstring any future reform efforts for seven years (Obj. at 18-22).  Plaintiffs' responses to these points are wholly unpersuasive for the reasons below.

1.     Plaintiffs Wrongly Argue that Because the Proposed Settlement Is with OCFS, Rather than ACS, the Absence of Substantive Reforms in the Consent Decree Is Justified

Plaintiffs ask the Court to overlook the weakness in the Consent Decree because the next settlement or judgment, with ACS, will be better.  (*See* Pls. Mem. at 3-4.)  In the eyes of Plaintiffs, the currently proposed "Consent Decree is tailored to the *oversight* role of State Defendants" and any "desire for a detailed operational remedy is not an appropriate remedy against State Defendants because it is City Defendants who are responsible for the *operation* of the New York City foster care system." (Pls. Mem. at 20 (emphasis added).)  This argument is without merit.

The line between oversight and operation is imaginary—at least where OCFS is concerned.  OCFS is an overseeing agency *with the authority to compel ACS to make operational changes*.  N.Y. SSL 20(3)(d), 34(3)(f); 18 NYCRR 428; *see also* Prochera Prelim. Approval Decl. ¶ 11 ("Just like every other local department of social services, ACS must first obtain OCFS approval for how it administers New York City's foster care system including seeking OCFS approval of any rules, regulations and procedures developed by ACS"), ¶ 12 ("It is also standard practice for OCFS to require local departments of social services including ACS to develop corrective action plans to address findings of significant failures to comply with federal and State statutes, regulations and policies as a result . . . of OCFS' other general oversight activities."); Am. Compl. ¶ 201 (describing OCFS's obligations), ECF No. 91.  Although Plaintiffs downplay this authority (Velez Decl. ¶ 9; Prochera Suppl. Decl. ¶ 2), the Consent Decree recognizes—indeed, depends upon—this authority and provides that OCFS will require ACS to retain a Research Expert, review the Monitor's reports, determine when ACS is in substantial noncompliance, require ACS to design a corrective action plan, and "have the power and duty to approve, modify, oversee, review and monitor the development and implementation of any plan for corrective action that ACS adopts or is directed to adopt."  (Consent Decree §§ 6.5, 7.2; *see also* Pls. Mem. at 24 ("OCFS has the authority to approve or disapprove ACS's plan for delivering services to New York City's foster children.").)

Because OCFS has both an "oversight" and "operational" role, the absence of concrete, substantive provisions in the Consent Decree is insufficient, inadequate, and yet another sign that the settlement is premature.  (*See* Obj. at 13-21.)  Moreover, this inadequacy is also apparent when compared to other child welfare consent decrees across the country.  Typically, child welfare consent decrees provide specific plans for child welfare reform,

mandates for specific state actors to create and implement plans for child welfare reform, and/or

guidelines for addressing changes to identifiable areas within the foster care system. (*See, e.g.*,

Settlement Agreement § III.A-F, *David C.* v. *Huntsman*, No. 2:93-cv-00206-TC (D. Utah. May

11, 2007), ECF No. 580 (requiring reform to foster care system, including on case reviews,

training of staff, and limitations to caseworker caseloads); Settlement Agreement § 3(c), *Charlie

H.* v. *Whitman*, No. 99-cv-3678 (D.N.J. Sept. 2, 2003), ECF No. 199 (requiring reform to the

foster care system, including on the availability of services to avert placement, caseworkers

caseloads, training and supervision of staff, and the recruitment, training, and retention of

families); *see also infra* at 11-12.) By contrast, this Consent Decree omits any provisions for

substantive reform and instead simply provides for two oversight positions with no detail about

what they will accomplish, how they will do it, or how they will be funded. (*See* Obj. at 16-17;

*see also* Consent Decree §§ 6-7.)

Plaintiffs dismiss such "comparisons to other states" as "fail[ing] to distinguish or

address the fact that the vast majority of the states involved in such litigation have child welfare

systems where the state directly administers and operates the foster care system." (Pls. Mem. at

20 n.16.) But, as discussed above, given OCFS's authority to direct how ACS "administers and

operates the foster care system" through the use of corrective action plans, this supposed

distinction is irrelevant.

But even if it were relevant, if we measure the Consent Decree *only* against

consent decrees involving child welfare *oversight* agencies, the Proposed Settlement would still

be wanting when compared to such settlements. For instance, the settlement between the

plaintiffs and OCFS in *Marisol A.* v. *Giuliani*, 185 F.R.D. 152 (S.D.N.Y. 1999) included

significantly more reform than that here. (*See* Obj. at 16.) OCFS established a new regional

office in New York City with specific staffing requirements and functional responsibilities, improved the State's child abuse/neglect hotline, including by conducting a review and evaluation of its policies regarding educational neglect, clarified domestic violence policies, spot checked telephone calls to ensure they were being handled properly, developed and implemented an advertising program for the hotline, "continu[ed] to make reasonable efforts towards the goal of answering all calls within one minute," made reasonable efforts to develop and implement a state-wide computer system to collect child welfare information, assisted with improving ACS's training curriculum for caseworkers and supervisors, and undertook case record reviews covering nine specific areas of the City's foster care program.  (Obj. at 16 (citing *Marisol A.*, 185 F.R.D. at 159-60); Settlement Agreement §§ I, IV–X, XII, *Marisol A.* v. *Giuliani*, No. 95-cv-10533 (S.D.N.Y. Dec. 2, 1998), ECF No. 312.)  These reforms are significantly more detailed and substantive than what this Consent Decree provides:  a Monitor and Research Expert with unspecified goals and objectives.

Similarly, in *Katie A. v. Bonta*, Los Angeles county and the State of California settled separately claims brought against them by a class of California children who were either in foster care or at imminent risk of being placed into foster care, and who needed individualized mental health services.  Settlement Agreement ¶ 3, *Katie A.* v. *Bonta*, No. 02-cv-05662 (C.D. Cal. Dec. 5, 2011).[5]  Although the State was the "oversight" agency, the State settlement was detailed and substantive.  The State settlement required the State to provide educational guidance on mental health issues to staff, to improve data collection and sharing capabilities between the states and the counties, and to amend the California state Medicaid Plan to be consistent with new mandates imposed by the agreement.  *Id*. at ¶ 20(c), (f), (h).  So too in *Kenny A. ex rel. Winn*

---

[5]   This settlement agreement can be found on the California Department of Health Services website, available at http://www.dhcs.ca.gov/Documents/KatieASettlementAgreement.pdf (last accessed July 22, 2016).

v. *Perdue*, where the State of Georgia settled foster care claims with a class of children in the custody of the State who had open cases in the defendant DeKalb and Fulton counties who were alleged or adjudicated deprived.  Consent Decree § 2(D), *Kenny A. ex rel. Winn* v. *Perdue*, No. 1:02-cv-1686 (N.D. Ga. July 5, 2005), ECF No. 439.  Again, the settlement included substantive, detailed, and specific reforms, including mandating specific changes to the foster care system, such as setting training and caseload requirements for caseworkers, establishing management and planning protocols to include the provision of mental, dental, and physical health services to children.  *Id*. §§ 4(F)(1), 6, 10.

Without the kind of detailed goals or reforms that are absent here, the Consent Decree has little hope of success.  As described in the Declaration of John Mattingly, such detailed goals and targeted reforms help to hold accountable the parties and other stakeholders, to ensure that the Consent Decree achieves its stated purpose.  (Expert Decl. of Dr. John Mattingly in Supp. of the Parent Advocates' Opp'n to the Mot. for Final Approval of Settlement ¶¶ 16-20 (hereafter "Mattingly Decl.").)  Without these accountability measures, the Consent Decree simply does not have the tools needed to ensure that all of the moving parts involved in the foster care system are working together for the benefit of children and families.  (*Id*. ¶ 16(b).)

Moreover, the challenges of implementing effective child welfare reform are immense, and a poorly developed reform plan may create unintended and problematic incentives for front line child welfare agency staff.  (Suppl. Expert Decl. of Professor Christine Gottlieb in Supp. of the Parent Advocates' Opp'n to the Mot. for Final Approval of Settlement ¶¶ 17-19 (hereafter "Gottlieb Suppl. Decl.").)  For instance, a consent decree that overly relies on blunt metrics may incentivize front line staff to pursue certain outcome targets at the cost of a more

12

nuanced decision-making that would lead to better outcomes for children and their parents.  (*Id.* ¶¶ 18-19.)

These shortcomings are all the more concerning given the overwhelming feeling of *déjà vu*.  Over 15 years ago, the *Marisol A.* settlement established an OCFS office in New York City to "monitor[] and supervis[e] New York City's child welfare system," including "the operations and practices of ACS."  Settlement Agreement § I, *Marisol A.* v. *Giuliani*, No. 95-cv-10533 (S.D.N.Y. Dec. 2, 1998), ECF No. 312.  Not only does this Consent Decree purport to do the same thing the OCFS New York City office is already supposed to be doing (but in exchange for a broad release and covenant not to sue), but the Monitor is even expected to work out of that same office.  (*See* Consent Decree § 6.2.1 ("The Monitor will observe, review, report findings, and make recommendations regarding the safety, permanency and well-being of foster children in the foster care system in New York City."); Velez Decl. ¶ 30 ("[T]he Monitor will physically work out of OCFS's New York Regional Office.").)  Without evidence showing that the oversight positions in the Proposed Settlement will avoid the pitfalls that kept OCFS's New York City office from preventing the problems identified in the Amended Complaint, it is unlikely that the Consent Decree will benefit settlement class members or their parents.  (*See* Mattingly Decl. ¶¶ 13-14.)

Not only does the Consent Decree fail to provide adequate benefits, but it risks "divert[ing] millions of dollars" from the child welfare system "to plaintiffs' attorneys and court-appointed monitors."  (Decl. of Charles J. Hamilton in Supp. of the Parent Advocates' Opposition to Final Approval of the Settlement, Ex. A, John Bursch & Maura Corrigan, Am. Enter. Inst., *Rethinking Consent Decrees: How Federal-Court Decrees in Child Welfare Can Harm Those They Are Supposed to Help and Upset the Federal-State Balance*, p. 10 (June 2016)

(hereafter "Rethinking Consent Decrees").)  If the Consent Decree is approved, then the State will need to spend significant sums over several years (or longer) on salaries for the Monitor and Research Expert.  (*See* Gottlieb Suppl. Decl. ¶¶ 20-25.)  In addition, in order to adequately review the long list of information, reports, and data described in the Velez Declaration (at ¶¶ 23-24) and to comply with the protocol evaluations described in the Colman Declaration (at ¶¶ 8-9), the Monitor and Research Expert will need substantial resources, likely including experienced staff members.  The sums needed to fund these positions are a diversion of limited resources away from other reform efforts that could improve outcomes for children and families.  (*See* Rethinking Consent Decrees at 10.)

Plaintiffs argue that these fears are groundless and that there is nothing in the Consent Decree that would allow a departure from the existing budgetary scheme.  (Prochera Suppl. Decl. ¶ 12.)  But the funding for these positions must come from somewhere.  Further, this Consent Decree, if approved by the Court, will be the basis for the state legislature—to whom the settling parties have punted the issue of funding (*Id*.)—to allocate funding to OCFS and ACS.  (Gottlieb Suppl. Decl. ¶¶ 20-25.)  Plaintiffs have not provided any assurance that the funding will not simply be diverted from other areas of New York's child welfare system.  (*Id*.)

In addition, consent decrees also often "divert substantial resources from a severely resource-strapped system" (Expert Decl. of Professor Christine Gottlieb in Support of Parent Advocates' Mot. to Intervene and Objection to the Proposed Settlement ¶ 53, ECF No. 222-1) through "the hidden cost of completing paperwork necessary to show compliance with the consent decree and the cost to caseworker morale, effectiveness, and turnover, of spending time filling out forms rather than caring for children."  (Rethinking Consent Decrees at 10.)  This Consent Decree, which empowers the Monitor and Research Expert to obtain information from

ACS in order to support their "assessment of the foster care system in New York City," will be

no exception.  (Consent Decree § 6.2.1.)  The burden of complying with the Monitor and

Research Experts' requests will fall primarily on case workers and other front line staff, further

limiting the time available for working with and improving outcomes for children and families.

     In short, the Consent Decree is atypical in its failure to supply substance and

detail, and would impose serious costs on New York City's child welfare system.[6]

     2.     Contrary to Plaintiffs' Arguments, the Terms of the Settlement Are Too
              <u>Vague to Justify Approval</u>

     Plaintiffs argue that the roles of the Monitor and Research Expert are sufficiently

well-defined because "there are processes in place to define th[e]se roles" at some point in the

future.  (Pls. Mem. at 20.)  Not only does this argument acknowledge the fundamental problem

with the Consent Decree—that the settling parties rushed to settlement too quickly without

adequately filling in the details or considering the substance of the necessary reforms—but it also

misunderstands the Parent Advocates' Objection.

     The class and their parents have a right to know the Monitor's and Research

Expert's roles *before* the settlement is approved.  *See Yoshioka* v. *Charles Schwab Corp*., No.

11-cv-1625, 2011 WL 6748984, at *9 (N.D. Cal. Dec. 22, 2011) (rejecting settlement where "the

parties offer very little in the way of assurances that the settlement will actually have its intended

effect").  Similarly, where, as here, the Consent Decree provides no judicial role in approving the

Monitor's review criteria or the Research Expert's research protocols (*see* Consent Decree §§

6.2.2 (giving OCFS approval authority), 7.3.2 (same), 13 (Court retains jurisdiction over Consent

---

[6]    Even if Plaintiffs were correct and this Consent Decree should be limited to OCFS's oversight responsibilities, then the Consent Decree's release should likewise be limited such that settlement class members dismiss their claims against OCFS only to the extent those claims involve the oversight capacities of OCFS.  The same limitation should apply to the covenant not to sue.

Decree solely "for the purpose of deciding motions regarding enforcing any specific provisions")), "[t]he [C]ourt's fiduciary duty to unnamed class members [should] prevent[] it from risking an end to its settlement review before a centerpiece of that settlement is meaningfully well-defined." *Martens* v. *Smith Barney, Inc.*, 181 F.R.D. 243, 268-69 (S.D.N.Y. 1998).

Having "processes in place to define" the Monitor's and Research Expert's roles in the future does not help settlement class members or the Court with their immediate task of assessing whether the Consent Decree is in their interests or whether it adequately compensates settlement class members for releasing their claims. (Pls. Mem. at 20.) To do that, the Consent Decree must spell out the Monitor and Research Expert's goals and objectives *before* it is approved. *See Yoshioka*, 2011 WL 6748984, at *11 (rejecting settlement where "the effectiveness of the relief offered is uncertain at best"). Without these key details filled in, "[t]his uncertain value of the settlement makes the release given in exchange therefor problematic," *id*. at *11, and the Court cannot "declare its duty to evaluate the settlement complete before the parties more meaningfully clarify what it does." *Martens*, 181 F.R.D. at 269.

Despite 192 pages of declarations attached to Plaintiffs' motion, the Parent Advocates and the Court are still in the dark about key details of the Proposed Settlement. The Velez Declaration section entitled "Responsibilities of the Monitor" (at ¶¶ 22-29) primarily describes the types of material to which the Monitor may have access. (*See also* Velez Decl. ¶ 34 (stating only that the Monitor will review "system-wide information and data").) Although it eventually (and briefly) discusses the areas the Monitor will investigate, it simply repeats the barebones description already in the Consent Decree. (*Compare* Velez Decl. ¶ 25 *with* Consent

Decree § 6.2.1.)  The declarations' discussions of the Research Expert suffer from the same omissions and generalities.  (*See* Velez Decl. ¶¶ 36-45; Colman Decl. ¶¶ 7-9.)  The Velez Declaration also provides that OCFS will convene a steering committee to handle OCFS's obligations under the Consent Decree, but again, it offers no specifics about what areas OCFS will focus on or goals it will pursue.  (*See* Velez Decl. ¶ 33.)

> In short, despite several opportunities, Plaintiffs have not provided specific information sufficient to give settlement class members, their parents or the Court any confidence that the settlement is fair, reasonable, and adequate.

> 3.      Plaintiffs Wrongly Argue that the Covenant Not to Sue Is Limited in Scope and Duration

In their Objection, the Parent Advocates demonstrated that the Consent Decree's seven-year covenant not to sue is unprecedented, "would hamstring any future reform effort for seven years," and should not be approved by this Court.  (Obj. at 13.)  Plaintiffs attempt to justify the covenant not to sue by claiming that it is limited both in scope and duration.  (Pls. Mem. at 21.)  They are wrong on both counts.

First, Plaintiffs claim that the covenant not to sue is innocuous because it is "limited and only prevents class members from suing State Defendants . . . for injunctive relief arising from claims similar to those in the Amended Complaint."  (Pls. Mem. at 21.)  Given the breadth of the allegations in the Complaint, however, the scope of the covenant is vast.  The covenant not to sue places beyond the reach of litigation a large swath of reform-oriented lawsuits for the better part of a decade, including, for example, reform efforts that would target caseloads and training requirements for caseworkers, appropriate standards for foster care placements, the development and implementation of case services and plans, and policies to make sure that "all necessary and available action to ensure timely adjudication of family court proceedings" is

17

common practice.  (*See* Am. Compl. ¶ 229; *see also* Rethinking Consent Decrees at 8, 12 (stating that one of the problems with consent decrees is that they enact rigid guidelines and freeze those guidelines in place during the life of the settlement, thereby preventing the adoption of state of the art child welfare practices as they are developed).)

Plaintiffs also argue that "[t]he language in the covenant not to sue is not exceptional and is in fact similar to the language approved in the *Marisol A.* settlement."  (Pls. Mem. at 26.) A comparison to *Marisol,* however, actually underscores the problem with the present covenant. Although the language of the covenants not to sue may be similar, the seven-year duration here is more than three times longer than the two-year covenant that the court approved in *Marisol*. Not only will this prevent other litigation-based reform efforts for seven years, but a seven-year covenant not to sue is also far more likely than a two-year covenant to result in claims being barred by the applicable statute of limitations (including, for example, claims based upon 42 U.S.C. § 1983, which are governed by a 3-year statute of limitations).[7]  *See Romer* v. *Leary*, 425 F.2d 186, 187 (2d Cir. 1970).

It bears noting as well that the settlement class members in *Marisol* were much better situated to weigh the sacrifices they were making.  The *Marisol* State settlement agreement benefitted from "[e]xtensive discovery," including "over 200 deposition days, over 100,000 pages of documents . . . , and the exchange of extensive expert reports."  *Marisol A.* v. *Giuliani*, 185 F.R.D. 152, 163 (S.D.N.Y. 1999).  Nothing like that has been conducted here.  (*See supra* § I.B.)  As such, *Marisol* offers no support to Plaintiffs.

---

[7]  The *Marisol* City settlement—entered simultaneously with the *Marisol* State settlement – included a covenant not to sue that also differed from the covenant not to sue here in that it effectively stayed claims during the pendency of the settlement.  In particular, "nothing in [the covenant not to sue] shall prevent Plaintiffs in any action for systemic declaratory, injunctive or other form of equitable relief brought after December 15, 2000, and based on claims arising after December 15, 2000, from offering into evidence facts, events, actions or omissions which may have occurred prior to December 15, 2000."  Settlement Agreement § J.42(c), *Marisol A.* v. *Giuliani*, No. 95-cv-10533 (S.D.N.Y. Dec. 2, 1998), ECF No. 311.

Second, Plaintiffs argue that "[t]he length of the covenant not to sue is reasonable" since it "is tied to the duration of the proposed Consent Decree" and because  other consent decrees' covenants not to sue have lasted longer than the seven-year duration here due to court-ordered extensions.  (Pls. Mem. at 21-22, 22 n.18.)  These arguments miss the mark.

Although the Consent Decree (and its covenant not to sue) lasts seven years, the Monitor's and Research Expert's terms may be limited to three and two years, respectively.  And while the parties may agree to renew the terms (*see* Velez Decl. ¶¶ 20-21), the Consent Decree does not require them to do so.  (*See* Consent Decree § 6.6.1.)

Moreover, there is a monumental difference between a settlement with a covenant not to sue that lasts seven years as a fixed term of the settlement, and a covenant not to sue that is extended by a court—following proper review and having taken into account the rights of all affected parties.  That is what happened in the cases cited by Plaintiffs for the notion that a seven-year covenant not to sue is not extraordinary.  (Pls. Mem. at 22 n.18.)  Unlike here, the settling parties in those settlements did not simply agree to a seven-year covenant not to sue and hope for the best.  Rather, they negotiated settlements that would have expired after a few years unless a court determined it was appropriate to extend them based on a fair hearing and assessment of the factual circumstances justifying the extension, with due consideration to the interests of the settlement class members.  This significant protection and oversight is missing here.[8]

---

[8] Plaintiffs also point out that other consent decrees have been in effect for longer than seven years.  For instance, Plaintiffs claim that the Connecticut settlement in *Juan F.* v. *Malloy*, No. 2:89-cv-00859-SRU (D. Conn. Jan. 7, 1991) has been in effect for 25 years.  (Pls. Mem. at 22 n.18.)  Any argument that would purport to justify a quarter century covenant not to sue should be dismissed out of hand.

4.      Plaintiffs' Fail to Demonstrate that the Consent Decree
        Will Protect Parents' Rights

In their final point responding to the Parent Advocates' Objection, Plaintiffs dismiss the concern that the Consent Decree may result in the exclusion of parents and their advocates from key parts of the case planning process.  Plaintiffs argue that because state and federal law require engagement of parents in case planning, the parents and the Parent Advocates have no reason to worry and, in fact, that the Consent Decree may help secure additional protection of those rights.  (Pls. Mem. at 22-23.)  This response fails to address the Parent Advocates' concerns.

As an initial matter, the premise of this argument—namely, that the Parent Advocates need not worry because the State will not violate the law—is undercut by the existence of this lawsuit and the serious allegations that it raises.  Further, this argument misses the critical point that state and federal law provide substantial discretion to the executive branch agencies that implement them.  The Consent Decree is likely to significantly affect how that discretion is exercised and may well undercut New York's considered policy choice to pursue family reunification wherever safely possible.  (Gottlieb Suppl. Decl. ¶¶ 5-16, 26-31.)  Without more information about the specific goals and priorities of the Consent Decree, neither Parent Advocates nor the Court can meaningfully assess how it will affect their rights and their children's wellbeing.  Even assuming, *arguendo,* OCFS's compliance with the law, that will not entirely protect parents from the concerns raised in the Parent Advocates' Objection.  (*Id*.)

## CONCLUSION

For the reasons stated, the Consent Decree is not fair, reasonable, and adequate under Rule 23 of the Federal Rules of Civil Procedure, and the settling parties' Approval Motion should be denied.  The Parent Advocates and/or their counsel also request the opportunity to

attend and participate in the August 5, 2016 Fairness Hearing at which the Court will hear argument on the Approval Motion.

Dated:  New York, New York
        July 22, 2016

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:    /s/ Audra J. Soloway
       Audra J. Soloway
       Daniel H. Levi
       Luke X. Flynn-Fitzsimmons
       Charles J. Hamilton
       Chand Edwards-Balfour

       1285 Avenue of the Americas
       New York, NY 10019-6064
       Main: 212.373.3000
       Fax: 212.757.3990
       asoloway@paulweiss.com
       dlevi@paulweiss.com
       lflynn-fitzsimmons@paulweiss.com
       chamilton@paulweiss.com
       cedwards-balfour@paulweiss.com

       *Counsel for the Parent Advocates*