UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ELISA W., by her next friend, Elizabeth
Barricelli, et al.

                              Plaintiffs,                           No. 15 CV 5273-LTS-HBP

      -against-

THE CITY OF NEW YORK, et al.,

                              Defendants.
--------------------------------------------------------x

MEMORANDUM OPINION & ORDER

On July 8, 2015, the named plaintiff children ("Named Plaintiff Children") and New York City Public Advocate Letitia James ("James" and, together with the Named Plaintiff Children, "Plaintiffs") filed the instant action, on behalf of themselves and a purported class of plaintiffs, asserting claims under the First, Ninth, and Fourteenth Amendments to the United States Constitution, the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq. (the "AACWA") (pursuant to 42 U.S.C. § 1983), New York State Social Services Law and common law contract law against the City of New York (the "City"), the New York City Administration for Children's Services ("ACS"), ACS Commissioner Gladys Carrion ("Carrion" and, together with the City and ACS, the "City Defendants"),[1] the New York State Office of Children and Family Services ("OCFS") and OCFS Acting Commissioner Sheila J. Poole ("Poole" and, together with OCFS, the "State Defendants"),[2] stemming from alleged deficiencies

---

[1]    Carrion is sued in her official capacity as ACS Commissioner only.  (See Docket Entry Nos. 1 ("Complaint") and 91 ("Amended Complaint").)

[2]    Poole is sued in her official capacity as OCFS Acting Commissioner only.  (See Complaint; Amended Complaint.)

in New York City's foster care system.  (See generally Complaint; Amended Complaint.)

Plaintiffs filed the Amended Complaint on December 29, 2015.  The Court has jurisdiction of

this action pursuant to 28 U.S.C. § 1331.

Plaintiffs now move, pursuant to Federal Rule of Civil Procedure 23, for final

approval of the proposed Consent Decree agreed to between the Plaintiffs and the State

Defendants in this action.  (See Docket Entry No. 150-1 (the "Consent Decree").)  Final approval

is opposed by the City Defendants, as well as by two separate groups of intervenors: the Parent

Advocates (comprised of The Bronx Defenders, The Brooklyn Defender Service, The Center for

Family Representation, and Neighborhood Defender Service of Harlem) and the Children's

Advocates (comprised of Lawyers for Children, The Children's Law Center of New York, and

The Legal Aid Society).[3]  A fairness hearing regarding the proposed settlement was held on

August 5, 2016.  Two parents of children in foster care filed written objections and were given

the opportunity to speak at the hearing as well; one parent appeared and spoke.

The Court has carefully considered the parties' voluminous submissions, as well

as the arguments proffered at the August 5, 2016, fairness hearing.  For the reasons set forth

below, Plaintiffs' motion for final approval of the settlement is denied, and the conditional

certification of the Plaintiff class is vacated.

---

[3]     On July 12, 2016, the Court granted both the Parent Advocates' and the Children's Advocates' unopposed motions to intervene in this action for the limited purpose of objecting to the proposed settlement.  (See Docket Entry No. 216.)

BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and provides only a brief procedural background.

Plaintiffs filed the initial Complaint in this action on July 8, 2015, asserting various causes of action against Defendants stemming from alleged deficiencies in the New York City foster care system.  (See generally Complaint.)

One day later, on July 9, 2015, the State Defendants contacted the Plaintiffs seeking to discuss a potential settlement.  (Docket Entry No. 225, Declaration of Julie A. North in Support of the Motion for Final Approval ("North Decl."), at ¶ 11.)  Plaintiffs and the State Defendants thereafter discussed a settlement by phone, and then in three days of in-person meetings.  (North Decl., at ¶¶ 12-13.)  An agreement in principle was reached on July 20, 2015, twelve days after the Complaint was filed.  (North Decl., at ¶ 13.)  The parties continued negotiating the specifics of a settlement through September 2015.  (Id.)

On October 22, 2015, Plaintiffs and State Defendants filed the proposed Consent Decree with the Court, purporting to settle Plaintiffs' claims against the State Defendants.  (See generally Docket Entry No. 50.)  Plaintiffs represent that the Consent Decree was negotiated over the course of several months by counsel for the Named Plaintiff Children and the Public Advocate, based on the Public Advocate's investigation of the child welfare system in New York City and the State Defendants' understanding of extensive public reporting on the state of the New York City foster care system.  (See Docket Entry No. 224, Memorandum of Law in Support of the Motion for Final Approval of Settlement ("Pl. Memo"), at p. 19.)  Plaintiffs further represent that the Consent Decree is the "product of months of robust arm's length negotiations" between the Plaintiffs and State Defendants and that, over the course of these

several months, the parties exchanged numerous drafts of the proposed agreement and engaged

in multiple conferences, both telephonic and in person, before filing the proposed Consent

Decree.  (See Docket Entry No. 226, Declaration of Marcia Robinson Lowry in Support of the

Motion for Final Approval ("Lowry Decl."), at ¶ 4; see also North Decl., at ¶¶ 11-15.)

After the proposed Consent Decree was filed, the Court entered an order directing

the parties to commence motion practice, pursuant to Federal Rule of Civil Procedure 23(e),

requesting Court approval of the Consent Decree.  (Docket Entry No. 51.)

In early December 2015, before the commencement of the motion practice, the

City Defendants informed Plaintiffs of their intention to file a motion to dismiss the Complaint.

(See Docket Entry No. 80.)  In response, Plaintiffs proposed to amend the Complaint to address

the issues the City Defendants indicated they planned to raise (see id.), and filed an Amended

Complaint on December 29, 2015.  (Docket Entry No. 91.)

The Amended Complaint alleges, on behalf of a purported class of approximately

10,295 children in the New York City foster care system, that the system: (i) fails to exercise

sufficient oversight over contract agencies to which the City has delegated care of the purported

class of children to ensure that they comply with federal and state law, ACS policies, and the

terms of contracts with the City; (ii) fails to ensure that caseworkers are assigned manageable

caseloads or receive appropriate training and supervision; (iii) fails to develop and implement a

process for placing children into foster placements that matches children's needs; (iv) fails to

ensure that adequate case plans are timely developed and implemented; (v) fails to ensure that

children in foster care are timely placed in stable permanent homes; and (vi) fails to take

reasonable steps to ensure timely adjudication of family court proceedings involving children in

ACS custody.  (See generally Amended Complaint.)  As against the State Defendants, the

Named Plaintiff Children, on behalf of a putative class, assert claims for violation of substantive

due process under the Fourteenth Amendment, violation of a right to permanent home and

family derived from the First, Ninth, and Fourteenth Amendments, and violations of the

AACWA.  Plaintiff James joins the Named Plaintiff Children in asserting the AACWA claim

against the State Defendants.  As against the City Defendants, the Named Plaintiff Children, on

behalf of a putative class, allege the same claims brought against the State Defendants as well as

claims under the New York State Social Services Law and for breach of contract based on the

contracts between the City and the contract agencies described above.  (See generally Complaint

¶¶ 341-358.)

On January 20, 2016, the Plaintiffs and State Defendants filed their joint motion

for preliminary approval of the settlement (Docket Entry No. 95), which was opposed by the

City Defendants (Docket Entry No. 106).  On April 5, 2016, the Court held a hearing on

Plaintiffs' and State Defendants' joint motion for preliminary approval.  Following several

Court-directed adjustments to the Consent Decree and settlement notice materials, the Court

entered an order on April 22, 2016, preliminarily approving the settlement and conditionally

certifying a settlement class consisting of all children who are, or will be, in foster care custody

of the Commissioner of ACS during the duration of the Consent Decree.  (Docket Entry No.

154.)  That order set a May 13, 2016, deadline for publication of notice to settlement class

members; a June 21, 2016, deadline for objections to the Consent Decree; and a July 15, 2016,

deadline for filing of a motion for final approval of the settlement.  (See id.)  The order also

scheduled a fairness hearing for August 5, 2016, at 10:30 a.m., for final evaluation of the

Consent Decree.  (Id.)

Plaintiffs filed their motion for final approval of the settlement on July 15, 2016.

(Docket Entry No. 223.)  In response, the Court has received: the Parent Advocates' objections to the proposed settlement from (Docket Entry No. 221); the Parent Advocates' opposition to final approval of the proposed settlement (Docket Entry No. 234); the Children's Advocates' objections to the proposed settlement (Docket Entry No. 187); the City Defendants' opposition to final approval of the proposed settlement (Docket Entry No. 231); and letters of objection from two parents of putative class members.

The Proposed Consent Decree

   The proposed Consent Decree purports to secure relief from the State Defendants for the putative class primarily through the creation of two oversight positions: a Monitor (see Consent Decree § 6) and a Research Expert (see Consent Decree § 7).  The Monitor, who would be retained by the Commissioner of OCFS, with input from Plaintiff Children's counsel and the Public Advocate, would be tasked with reviewing and evaluating unspecified alleged systemic issues affecting New York City's foster care system that reflect widespread and ongoing noncompliance with federal and state statutes, regulations and policies.  (See Consent Decree §§ 6.1 & 6.2.)  The Commissioner of OCFS would develop the criteria by which the Monitor reviews and evaluates systemic issues within the foster care system, and the Monitor would report his or her findings and make recommendations regarding the safety, permanency and well-being of foster children in New York City.  (See Consent Decree § 6.2.)  The Monitor would be granted necessary resources, as well as access to records and data on foster care programs as determined by the Commissioner of OCFS, and would prepare quarterly reports outlining his or her activities, findings and recommendations for improvements to the City's foster care system.  (See Consent Decree § 6.4.)  These quarterly reports would be reviewed by

the Commissioner of OCFS in conjunction with ACS in order to determine what actions may be needed to address issues raised in the reports, and ACS would thereafter be directed to prepare corrective action plans for the Commissioner's approval.  (See Consent Decree § 6.5.)  The Monitor is proposed to serve an initial term of three years, and is to be reviewed at that time by the parties, and further reviewed every two years thereafter.  (See Consent Decree § 6.6)

The Research Expert is to be retained by ACS at the direction and approval of the Commissioner of OCFS, with input from counsel for the Plaintiff Children and the Public Advocate.  (See Consent Decree §§ 7.1 & 7.2.)  The Research Expert would be charged with conducting reviews of case records of children in the custody of ACS in order to determine compliance with relevant federal and state laws, regulations and policies related to the well-being of children.  (See Consent Decree § 7.3.)  The Research Expert's proposed research protocols and methodology (which are as yet entirely unspecified) would be subject to approval by the Commissioner of OCFS, who would consider recommended changes from Plaintiff Children's counsel and the Public Advocate.  (See id.)  The Research Expert would be responsible for producing two types of reports: (1) reports on individual cases where voluntary agencies and/or ACS have violated federal or state statutes, regulations or policies, in which the Research Expert would recommend corrective action and conduct follow-up reviews; and (2) bi-annual aggregate reports summarizing the major results of all case records reviewed over the preceding 6-month period.  (See Consent Decree §§ 7.4 & 7.5.)  The Research Expert is to serve an initial term of two years, and is to be reviewed at that time by the parties, and further reviewed every two years thereafter.  (See Consent Decree § 7.6.)

In consideration for this relief, the Consent Decree includes a broad claim release, which provides that the Plaintiff Children and Public Advocate will withdraw with prejudice all

claims and remedies sought in Amended Complaint, and release any claims relating to or arising

from any claims raised in Amended Complaint, as against the State Defendants.  (See Consent

Decree § 10.1.)  The Consent Decree also contains a covenant not to sue as against the State

Defendants, which precludes all suits for injunctive or declaratory relief for the life of the

agreement – seven years – based on facts or causes of action set out in the Amended Complaint.

(See Consent Decree § 10.2.[4])

Objections to the Proposed Consent Decree

Both the Parent Advocate Intervenors and the Children's Advocate Intervenors

have submitted objections to the proposed Consent Decree, highlighting numerous perceived

deficiencies in the settlement terms.  The concerns of both groups of intervenors generally

overlap.  The intervenors argue that the relief provided in the Consent Decree is inadequate in

that: the roles and objectives of the Research Expert and Monitor are vague and ill-defined; the

remedies conferred by the Consent Decree do not address the alleged civil rights violations

identified in the Amended Complaint; the additional oversight provided by the Monitor and

Research Expert is duplicative of the work of OCFS's New York City Regional Office

("NYCRO"); the settlement precludes the possibility of litigation to reform harmful practices

carried out by the State Defendants; and the parents of children in foster care may be precluded

from participation in important decision-making with respect to their children's placement.  (See

---

[4]     The covenant not to sue does not cover individual actions against the State
Defendants for damages or injunctive relief, or class-wide or systemic claims
against the State Defendants that do not relate factually or legally to the claims
raised in the Amended Complaint against the State Defendants.  (See Consent
Decree § 10.3.)  It is difficult to conceive of a systemic claim regarding foster
care that would not relate factually or legally to the claims raised in the Amended
Complaint.

generally Docket Entry Nos. 187 & 221.)  The intervenors also take issue with the fact that the

Consent Decree was agreed to prior to the exchange of discovery in this case.  Perhaps most

notably, the intervenors protest the seven-year duration of the Consent Decree and covenant not

to sue, arguing that the length of the agreement is unprecedented and unjustified, that the terms

of the release and covenant are overly broad and that the covenant will strip the Plaintiffs of a

crucial tool for pursuing systemic change for an extraordinary period of time.  (See generally id.)

    The Court has also received objections from two non-class member parents of

children who are in foster care.  One argues that: counsel for the Named Plaintiff Children have

not kept the children or their parents sufficiently informed about this case; the lawsuit does not

adequately address the treatment of children in foster care system, including the high level of

abuse that these children allegedly endure; and that the lawsuit is a front for the passage of

"shady money."  This parent also objects to the fact that the suit does not seek any monetary

relief.[5]  The other parental objection submitted asserts generally that the parent was not kept

abreast of developments in the suit; that ACS keeps children in foster care for excessive periods

of time in order to make money; and that she has been retaliated against in response to her

advocacy for changes in the City's foster care system.  (See Docket Entry No. 255.)  Both non-

class member parent objectors were permitted an opportunity to speak at the August 5, 2016,

fairness hearing.  One parent spoke regarding issues relating to the particulars of her son's foster

care case, her opposition to the manner in which this lawsuit has been structured and conducted,

and systemic issues.  The other parent was not present at the hearing.

---

[5]  This parent's objection was filed under seal as authorized by an Order of this
Court.  (Docket entry no. 257.)

<u>D</u>ISCUSSION

<u>Legal Standard for Settlement Approval</u>

Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or

defenses of a certified class may be settled . . . only with the court's approval."  <u>See</u> Fed. R. Civ.

P. 23(e).  The Court may only approve a settlement upon finding that its terms are "fair,

reasonable, and adequate."  <u>See</u> <u>id.</u>  This determination falls squarely within the trial court's

discretion.  <u>See</u> <u>Kelen v. World Fin. Network Nat. Bank</u>, 302 F.R.D. 56, 68 (S.D.N.Y. 2014) ("It

is within a trial court's discretion to approve a proposed class action settlement."); <u>Maywalt v.</u>

<u>Paker & Parsley Petroleum Co.</u>, 67 F.3d 1072, 1078 (2d Cir. 1995) ("The ultimate responsibility

to ensure that the interests of class members are not subordinated to the interests of either the

class representatives or class counsel rests with the district court.").

A district court examining a proposed class action settlement must examine "both

the settlement's terms and the negotiating process leading to the settlement."  <u>Wal-Mart Stores,</u>

<u>Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 116 (2d Cir. 2005).  A court must first "review the

negotiating process leading up to the settlement for procedural fairness, to ensure that the

settlement resulted from an arm's-length, good faith negotiation between experienced and skilled

litigators."  <u>Charron v. Wiener</u>, 731 F.3d 241, 247 (2d Cir. 2013).  A presumption of procedural

fairness attaches to settlements that are negotiated at arm's length by experienced counsel.  <u>See,</u>

<u>e.g.</u>, <u>In re Austrian and German Holocaust Litig.</u>, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000).

Once the court has determined whether the settlement was negotiated in a procedurally fair

manner, it moves on to evaluate the settlement's substantive terms in light of the nine factors set

out by the Second Circuit in <u>City of Detroit v. Grinnell Corporation</u>, 495 F.2d 448 (2d Cir.

1974).[6]  See Charron, 731 F.3d at 247.

Courts evaluating class action settlements must remain "mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'"  Wal-Mart, 396 F.3d at 116 (quoting In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998)). Moreover, the adequacy of a settlement should not be judged "in comparison with the possible recovery in the best of all possible worlds."  Meredith Corp. v. SESAC, LLC, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015).  Rather, a court need only determine that a settlement falls within a "range of reasonableness."  Id. at 666.  "Due to the presumption in favor of settlement, [a]bsent fraud or collusion, courts should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement."  Peoples v. Annucci, No. 11 CV 2694-SAS, 2016 WL 1464613, at *10 (S.D.N.Y. Apr. 14, 2016) (internal quotation marks and citation omitted).  Nevertheless, while a district court must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case," it must also "eschew any rubber stamp approval in favor of an independent evaluation" of the settlement's fairness.  See Grinnell, 495 F.2d at 463.

---

[6]  The nine Grinnell factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  See Grinnell, 495 F.2d at 463.

Where, as here, the settlement calls solely for injunctive relief, the final three Grinnell factors are not at issue, and the fifth factor is evaluated in light of the likelihood of establishing remedies rather than damages.  See Ingles v. Toro, 438 F. Supp. 2d 203, 211 (S.D.N.Y. 2006) (Chin, J.); Marisol A. v. Giuliani, 185 F.R.D. 152, 162 (S.D.N.Y.1999).

Procedural Fairness

As previously noted, courts must evaluate the procedural fairness of the negotiation of the settlement in conjunction with reviewing the agreement's substantive terms. Charron, 731 F.3d at 247.  In assessing procedural fairness, "a proposed settlement is presumed fair, reasonable, and adequate if it culminates from "arm's-length negotiations between experienced, capable counsel after meaningful discovery."  Blessing v. Sirius XM Radio Inc., 570 F. App'x 1 (2d Cir. 2012) (emphasis added); see also Lizondro-Garcia v. Kefi LLC, 300 F.R.D. 169, 178 (S.D.N.Y. 2014).

Plaintiffs assert that, because the Consent Decree was negotiated at arm's length by experienced counsel, it is entitled to a presumption of fairness.  See In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d at 173-74.  Plaintiffs proffer that both Julie North and Marcia Robinson Lowry are experienced and capable litigators in the areas of class action and children's rights litigation, respectively.  (North Decl., at ¶ 9; Lowry Decl., at ¶ 2.)  Plaintiffs further represent that the proposed Consent Decree is the product of months of "robust arm's length negotiations" and that, over the course of several weeks beginning in July 2015, counsel for the Named Plaintiff Children, the Public Advocate and the State Defendants engaged in a series of meetings, calls and debates concerning a potential settlement.  (Lowry Decl., at ¶ 4; North Decl., at ¶¶ 11-15.)  Nevertheless, the record before the Court makes it clear that the contours of the settlement were agreed to in principle a mere week after the Complaint was filed, and that the parties have not engaged in "meaningful discovery" beyond a purported investigation into the state of New York City's child welfare system and an examination of city, state and federal public reports detailing the failings of the child welfare system in New York

City.[7]  In particular, and as Plaintiffs' counsel acknowledged at the fairness hearing, there has

been no investigation focused on the State Defendants' alleged non-compliance with legal

provisions governing its role in the child welfare system.  Plaintiffs do not demonstrate how their

purported pre-litigation investigation connected meaningfully to the Named Plaintiff Children or

to the specific allegations regarding State agency violations that are contained within the

Amended Complaint.  In the absence of any "meaningful discovery"[8] into the merits of the

claims asserted against the settling defendants by the Named Plaintiff Children, the settlement is

not entitled to a presumption of procedural fairness.

          The cases cited by Plaintiffs for the proposition that courts routinely approve

settlements in which limited or no formal discovery has been conducted are inapposite.  The

court in Handschu v. Special Servs. Div., 605 F. Supp. 1384 (S.D.N.Y. 1985) did recognize that

discovery need not be "formal discovery under the Federal Rules of Civil Procedure," but further

noted that counsel must be able to demonstrate access to "sufficient information regarding the

facts of their case."  Id. at 1394 (emphasis added).  While Plaintiffs purport to have assessed

publicly available information regarding the New York City foster care system, they have made

no showing that they investigated the particular circumstances of the Named Plaintiff Children,

---

[7]      Plaintiffs proffer that the facts in the Amended Complaint were well known to the State Defendants in light of their responsibility in overseeing ACS.  However, as the City Defendants point out, State Defendants did not seek input from ACS in contextualizing these facts, nor do the State Defendants appear to admit that these facts establish violations of federal law.

[8]      As the Children's Advocates point out, the paucity of the record here is particularly apparent when compared with that in another class action targeting New York City's child welfare system, Marisol A. v. Giuliani, where "[e]xtensive discovery had been conducted, including over 200 deposition days, over 100,000 pages of documents provided by the City and State, and the exchange of extensive expert reports."  185 F.R.D. at 163.

the State's compliance with the Constitution and federal and state law, or the allegations of abuse and systemic deficiencies in the Amended Complaint.  In re Nissan Radiator/Transmission Cooler Litigation, No. 10CV7493-VB, 2013 WL 4080946 (S.D.N.Y. May 30, 2013), the court noted that "[the] plaintiffs conducted an investigation prior to commencing the action, retained experts, and engaged in confirmatory discovery in support of the proposed settlement."  Id. at *5.  That level of discovery clearly exceeds the efforts Plaintiffs represent they have undertaken here.  And in Van Oss v. New York, No. 10CV7524-SAS, 2012 WL 2550959 (S.D.N.Y. July 2, 2012), the court recognized that "although there ha[d] been no formal discovery, plaintiffs' counsel ha[d] done an adequate factual investigation to be thoroughly apprised of the merits of the case."  Id. at *1.  Here, however, while Plaintiffs assert that they have investigated the general state of affairs of the New York City foster care system, they have failed to proffer anything indicative of an investigation into the merits of the Named Plaintiff Children's – or the putative class members' – claims against the State Defendants.

The Children's Advocates, Parents' Advocates and City Defendants all point to the thin evidentiary record in this case as a factor undermining the settlement's procedural fairness, arguing persuasively that the Plaintiffs and State Defendants could not possibly have developed a proper appreciation for the strengths and weaknesses of the plaintiff children's claims against the State Defendants – and, in turn, the propriety of the proposed remedies – before entering into the settlement.  See, e.g., In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liability Litig., 55 F.3d 768, 814 (3d Cir. 1995) ("The inchoate stage of case development reduces our confidence that the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action.").  Although none of the parties opposing settlement have proffered affirmative evidence indicating collusive activity, the near-

total abandonment of the settling parties' obligation to assess the merits of the Named Plaintiff

Children's claims leads the Court to conclude that the Consent Decree is not entitled to a

presumption of procedural fairness, and that the proponents have failed to establish that it was

developed under conditions that were procedurally fair to the putative class.

Application of the Grinnell Factors

       *1. Complexity, Expense, and Duration of the Litigation*

       This case fits squarely within the common understanding that class actions are

"inherently complex" and therefore benefit from settlement, which "avoids the costs, delays, and

multitude of other problems" associated with complex litigation.  In re Austrian and German

Bank Holocaust Litig., 80 F. Supp. 2d at 174.  However, here, the Plaintiffs' agreement will

terminate this litigation only as to the State Defendants, and the litigation will remain ongoing as

to the City Defendants.  Plaintiffs characterize this settlement as the first of two steps, and

recognize that there will be a continuing need to litigate against the City Defendants.  (See Pl.

Memo at 4.)  Plaintiffs assert that actively pursuing this litigation against both sets of defendants

would be more complex and expensive, but many of the examples of costs that Plaintiffs claim

would be mitigated by the settlement – fact discovery, expert discovery, briefing, and

presentation of evidence as to both the 19 Named Plaintiff Children and the broader class of

thousands of children – will be required in order to effectively continue this litigation against the

City Defendants.  As such, this factor is at best neutral with regards to the Consent Decree.

       *2. Reaction of the Class to the Proposed Settlement*

       The "reaction of the class to the settlement" is one of the most significant factors

courts consider when weighing the fairness of a proposed settlement.  See Grinnell, 495 F.2d at

463.  No objections by class members to the Consent Decree have been received.  This fact is

neither surprising nor particularly significant here, because the class is composed entirely of

minor children who are in the foster care system, individuals who are both uniquely vulnerable

and, because of their age and dependence on others, generally ill-suited to appreciate the stakes

of litigation involving their interests and to be effective advocates on their own behalf.  Such

factors are particularly significant where, as here, the proposed settlement is with defendants

who are not directly involved in the individual plaintiffs' day to day custody issues and would

have no immediate impact on the individual plaintiffs' circumstances.  The Court concludes that

the objections to the Consent Decree by the Children's Advocates and the Parent Advocates are

significant for purposes of this factor of the Grinnell analysis, as these organizations are well

suited to advocate on behalf of many of those whose interests would be affected by the Consent

Decree.

   The response by the intervenor organizations is starkly negative.  Both argue that

the Consent Decree has no provisions to provide meaningful, concrete benefits to the class; that

the Consent Decree is entirely vague about the roles, responsibilities, and authority of the

Monitor and Research Expert; and that the Consent Decree's seven-year term is an

unprecedented waiver that would significantly stymie future efforts at reforming the foster care

system in New York.  As discussed in detail below, the Court finds many of the intervenors'

arguments persuasive.

   First, the intervenors argue that the Consent Decree does not provide concrete

benefits to the class.  Plaintiffs walk an unusual line in defending the fact that the Consent

Decree calls only for the creation of two temporary oversight roles and itself provides no

substantive changes to the foster care system.  Although Plaintiffs recognize that the State has

ultimate authority over the foster care system, they repeatedly characterize the State's role as one of oversight, and argue that the Consent Decree will strengthen the State's oversight capacity. Plaintiff's argument is, however, undermined by its own premise: if the State-level oversight roles are to be meaningful at all, the State must be able to compel ACS to make operational changes; if the State has this power, describing its role as merely one of oversight is a mischaracterization.  By contrast, prior settlements with OCFS, like the one in Marisol A., contained significant and detailed requirements.

Even if the Court were to conclude that the Monitor and Research Expert structure contemplated by the Consent Decree were adequate in theory, the wholesale lack of specificity within the Consent Decree as to the goals, objectives, and responsibilities of these two new officials raises significant questions as to the reasonableness of the settlement.  See Martens v. Smith Barney, Inc., 181 F.R.D. 243, 269 (S.D.N.Y. 1998) (noting that the Court cannot "declare its duty to evaluate the settlement complete before the parties more meaningfully clarify what it does").  The absence of specificity with respect to problems to be studied and goals to be achieved is particularly striking given the extent to which the Complaint identifies numerous alleged systemic problems.  The Consent Decree leaves it to the Monitor and Research Expert to recommend areas of attention and goals to the Commissioner of the OCFS, and gives the OCFS final say over what problems will be recognized at all and what, if anything, is to be done about them.  The covenant not to sue provisions of the Consent Decree would insulate the OCFS from any systemic challenge to its actions across a broad swath of foster care and adoption issues for seven years.  The Plaintiffs assert that the Consent Decree has specific provisions about how the goals and objectives of the Monitor and Research Expert will be defined, but this procedural specificity is no substitute for concrete commitments as to issues to

be addressed and remedial actions to be taken, in the absence of which the Court's ability to determine whether the creation of these offices constitutes adequate compensation for the release and protection from future litigation is limited at best.

Finally, the intervenors argue that the seven-year covenant not to sue is unprecedented in its duration. Plaintiffs have proffered no example of a similarly long waiver; each of their examples of consent decrees whose ultimate term was similarly lengthy involved a significantly shorter term that was extended by order of the overseeing court. None of those courts approved a seven-year fixed term of release. Such a lengthy term, especially where the covenant would bar any systemic claims similar to the sweeping allegations raised by Plaintiffs in their Complaint, would be questionable even if the consideration provided by the settlement were clearly and effectively addressed to identified problems. On the current record, where the only undertakings by the settling defendants are to hire unspecified individuals to identify as yet unspecified problems in another agency and make recommendations that the released and protected parties are not bound to follow, the Court concludes that the intervenors' concerns are well founded.

The Court therefore concludes that the reaction of the class weighs heavily against approval of the proposed Consent Decree.

### 3. Stage of the Proceedings and Discovery Completed

As discussed above in relation to procedural fairness, the record before the Court indicates that this settlement was sought and negotiated at an extremely early stage in the proceedings – before discovery had even commenced, let alone before significant discovery had been exchanged. The State Defendants reached out to Plaintiffs' counsel regarding settlement only one day after the Complaint was filed in this action. (North Decl., at ¶¶ 10-11.) A

settlement was discussed over the following week, with an agreement in principle reached twelve days after the Complaint was filed.  (North Decl., at ¶¶ 10-13.)  In a case of this complexity – with a 111-page Complaint asserting five causes of action under the Constitution and various statutes – resolution of all issues within twelve days (even if negotiation of the precise language of that resolution took longer) is difficult, if not impossible, to square with a conclusion that both parties fully appreciated the strengths and weaknesses of their litigation positions prior to reaching a settlement.  See In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d at 173 ("The parties have less information on the relative strengths and weaknesses of claims when a settlement is arrived at early in the life of a case. Therefore, members of the settlement class and the Court may be hindered in their ability to determine the fairness of the settlement.").  The stage of the litigation at which settlement was reached weighs against approval of the proposed Consent Decree.

Similarly, the record indicates that discovery was not exchanged between the settling parties prior to settlement.  Although Plaintiffs' counsel represent that they spent considerable time investigating the facts underlying the Complaint prior to filing that document, there is no indication that they participated in the kind of "sufficiently adversarial" pretrial discovery that would demonstrate that the Plaintiffs attempted "to ferret out facts helpful to the prosecution of the suit."  Id. at 176 (quoting Martens, 181 F.R.D. at 263.)

Accordingly, the Court concludes that this factor weighs against approval of the proposed Consent Decree.

### 4.  Risks of Establishing Liability and Damages, and Maintaining the Class

The parties have discussed the remaining Grinnell factors in combination, and the Court adopts that grouping for ease of analysis.  When considering the fifth factor, the court may

consider how the relief granted by the settlement compares to the scope of relief potentially available after trial.  Cf. Ingles, 438 F. Supp. 2d at 214 (approving settlement where the court found that it would be "difficult to imagine that the Court would have imposed, following trial, significantly more extensive and detailed relief").  Here, given the State Defendants' admitted power to both oversee and direct action by the New York City foster care authorities, the absence of specificity as to issues or corrective actions in the Consent Decree suggests strongly that more specific and robust remedies would be feasible were Plaintiffs to prevail at trial.

Plaintiffs highlight generally the uncertainty of litigation and the possibility that they will not prevail either on a class certification motion or at trial.  The intervenors and the City Defendants do not meaningfully contest this point, but argue that these factors do not overcome the significant problems with the settlement process and the Consent Decree itself.  Plaintiffs would still, in any event, be required to establish liability and the propriety of class action proceedings as against the City Defendants.  Thus, although the risks of proceeding against two groups of defendants is greater than proceeding against only one, the Court concludes that this factor does not weigh strongly either for or against approval of the settlement.

*Summary*

As discussed above, the Consent Decree is not entitled to a presumption of fairness.  The Grinnell factors generally weigh against approval of the settlement, or are relatively neutral.  The failure of the Consent Decree to identify concrete issues, much less remedial measures and goals; the proponents' failure to demonstrate that the parties had the requisite understanding of the facts and the strengths and weaknesses of the Plaintiffs' claims of legal noncompliance by the State; and the extraordinary length of time for which the parties propose to bar further systemic litigation all render the Consent Decree patently unfair and

unreasonable as a settlement of Plaintiffs' claims against the State Defendants.

The motion for final approval of the Consent Decree is therefore denied and the conditional certification of the Plaintiff class is vacated.[9]

CONCLUSION

Plaintiffs' motion for approval of the proposed Consent Decree is denied and the conditional certification of the Plaintiff class is vacated.  This Memorandum Opinion and Order resolves Docket Entry No. 223.

A pretrial conference in this matter will be held on October 13, 2016, at 2:00 p.m. The parties must submit an updated joint preliminary pre-trial statement in accordance with the Initial Conference Order (docket entry no. 32) in advance of that conference.  This case remains referred to Magistrate Judge Pitman for general pre-trial management.

SO ORDERED.

Dated: New York, New York
       August 12, 2016

                                    /s/ Laura Taylor Swain
                                  LAURA TAYLOR SWAIN
                                  United States District Judge

_____

[9]      Given this conclusion, the Court need not address the other issues raised by the City Defendants.