**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELISA W., *et al.*,

                                                    Plaintiffs,

                    -against-

THE CITY OF NEW YORK, *et al.*,

                                                    Defendants.

15 Civ. 5273 (LTS) (HBP)

MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'
RENEWED MOTION FOR CLASS
CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 5

    A.    Permanency:  Its Importance and the Time Frames Within Which It Is Supposed To Be Obtained ........................................................ 7

    B.    Improved Outcomes for Children—The System Through Which ACS Provides Foster Care to Children in Its Custody ................................. 11

    C.    ACS's Oversight Mechanisms Are Deficient and Ineffective. ............. 13

    D.    ACS Fails To Ensure that Caseworkers Receive Adequate and Appropriate Training. ......................................................................... 20

    E.    Case Practice Departures ..................................................................... 23

    F.    ACS's Failure To Adequately Oversee and Monitor Contract Agencies Has Resulted in Abysmal Permanency Rates and Alarmingly High Maltreatment Rates. ........................................................................... 32

    G.    OCFS Has Long Been Aware of ACS's Failings. ................................ 40

    H.    OCFS's Oversight Mechanisms Are Inadequate and Ineffective. ........ 42

LEGAL STANDARD ......................................................................................... 46

ARGUMENT ...................................................................................................... 48

I.     PLAINTIFF CHILDREN MEET RULE 23(a)'S REQUIREMENTS ............ 48

    A.    Numerosity ........................................................................................ 48

    B.    Commonality ..................................................................................... 49

    C.    Typicality .......................................................................................... 54

    D.    Adequacy of Representation ............................................................... 56

II.    PLAINTIFF CHILDREN SATISFY REQUIREMENTS OF RULE 23(b) .... 57

III.   CLASS COUNSEL SATISFY REQUIREMENTS OF RULE 23(g) ............. 58

CONCLUSION ................................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957 (9th Cir. 2019) .................................................. passim

*Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) ......................................................47

*D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010) ............................................47

*Elkind v. Revlon Consumer Prods. Corp.*, No. CV 14-2484 (JS)(AKT), 2017 WL 9480894 (E.D.N.Y. Mar. 9, 2017) ............................................................................................49

*Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353 (E.D.N.Y. 2009) ....................................................57

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015) .......................................................49

*M.D. ex rel. Stukenberg v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013), *rev'd in part on other grounds*, *M.D. ex rel. Stuckenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018) .......................................................................................................................................47

*Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997).............................................................................................. passim

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ...........................................................................49

*Richards v. New York*, 433 F. Supp.2d 404 (S.D.N.Y. 2006).......................................................12

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993).........................................................................57

*Toney-Dick v. Doar*, No. 12 Civ. 9162 (KBF), 2013 WL 5295221 (S.D.N.Y. Sept. 16, 2013) ....................................................................................................................... passim

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................46, 49, 58

**Statutes & Rules**

45 CFR § 1355 ...............................................................................................................................33

42 U.S.C. § 671(a)(10)...................................................................................................................23

42 U.S.C. § 671(a)(15)(B)..............................................................................................................28

42 U.S.C. § 671(a)(16)...........................................................................................................9, 26, 29

42 U.S.C. § 675(1) .........................................................................................................................9

42 U.S.C. § 675(1)(A).............................................................................................................26, 29

42 U.S.C. § 675(1)(B) ...................................................................................................26, 29

42 U.S.C. § 675(1)(C) ...................................................................................................26, 29

42 U.S.C. § 675(5)(A) ...................................................................................................26, 29

42 U.S.C. § 675(5)(E) ........................................................................................................35

42 U.S.C. § 675(5)(E)(i) ....................................................................................................10

42 U.S.C. § 675(5)(E)(ii) ...................................................................................................10

42 U.S.C. § 675(5)(E)(iii) ..................................................................................................10

42 U.S.C. § 675(5)(F) ..........................................................................................................7

Adoption and Safe Families Act, Pub. L. No. 105-89, 111 Stat. 2115 .............................8

Charter of the City of New York, Chapter 24-B § 615 .....................................................11

Charter of the City of New York, Chapter 24-B § 617......................................................11

Fed. R. Civ. P. 23(a) .................................................................................................. passim

Fed. R. Civ. P. 23(a)(1)......................................................................................................48

Fed. R. Civ. P. 23(a)(2)......................................................................................................49

Fed. R. Civ. P. 23(a)(3)......................................................................................................54

Fed. R. Civ. P. 23(a)(4)................................................................................................56, 57

Fed. R. Civ. P. 23(b) ....................................................................................................46, 57

Fed. R. Civ. P. 23(b)(2).............................................................................................. passim

Fed. R. Civ. P. 23(g)(1)(A)................................................................................................58

N.Y. Comp. Codes R. & Regs. tit. 18, § 430.11 ..............................................................23

N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12 ........................................................26, 29

N.Y. Fam. Ct. Act § 1089 .................................................................................................28

N.Y. Fam. Ct. Act § 1089(a)(3) ..........................................................................................9

N.Y. Fam. Ct. Act § 1089(b) ..............................................................................................9

N.Y. Fam. Ct. Act § 1089(d)(1)-(2)....................................................................................9

N.Y. Fam. Ct. Act § 1089(d)(2)(iii) ................................................................................9

N.Y. Soc. Serv. Law § 153-K(4)(e)(i)-(iv) ....................................................................11

N.Y. Soc. Serv. Law § 383-c ..........................................................................................11

N.Y. Soc. Serv. Law § 384-b(iii) ....................................................................................28

N.Y. Soc. Serv. Law § 384-b(3)(l)(i) ........................................................................10, 35

N.Y. Soc. Serv. Law § 409-e .....................................................................................26, 29

U.S. Const. amend. XIV ............................................................................................53, 54

<u>**CITATION CONVENTIONS AND GLOSSARY**</u>

<u>**People/Entities/Terms**</u>

"ACS":  New York City's Administration for Children's Services, the New York City agency in whose custody Named Plaintiff Children were placed and whom OCFS is responsible for overseeing

"City Defendant":  The City of New York

"Contract Agencies":  the private agencies with which ACS enters into contracts for the provision of foster care services (a full list of foster care Contract Agencies is provided below)

"IOC":  Improved Outcomes for Children, the system implemented by ACS in 2009, under which ACS delegates the day-to-day care of children in its custody to Contract Agencies

"Named Plaintiff Children":  Named Plaintiffs in *Elisa W. v. City of New York, et al.*, *i.e.*, *Elisa W., Alexandria R., Thierry E., Lucas T., Ximena T., Jose T.C. and Valentina T.C., Ayanna J., Olivia and Ana-Maria R., Xavion M., Dameon C., Tyrone M., Brittney W., Mikayla G., Myls J. and Malik M. and Emmanuel S. and Matthew V.*

"LTG":  Leadership Transformation Group, the organization, headed by Patricia Beresford, that was retained by ACS in 2014 to conduct an assessment of IOC

"NYCRO":  New York City Regional Office, the OCFS office responsible for the oversight and monitoring of child welfare, runaway homeless youth, domestic violence and preventive services in New York City[a]

"OCFS":  New York State Office of Children and Family Services, the New York State agency that oversees ACS

"State Defendant":  Sheila J. Poole, Acting Commissioner of OCFS

<u>**Contract Agencies**</u>
(Contract Agencies that care or cared for a Named Plaintiff Child are reflected in bold)

Abbott House

**Cardinal McCloskey:  Cardinal McCloskey Community Services**

**Catholic Guardian Services**

Cayuga Centers

---

[a] *See* Fuchs Tr. 21:7-15 (Ex. 7).

**Children's Village:  The Children's Village**

Children's Aid

**Coalition for Hispanic Family Services**

Forestdale

Good Shepherd Services

**Graham Windham**

**HeartShare St. Vincent's Services**

Inwood House[b]

Jewish Board:  Jewish Board of Family and Children's Services

JCCA:  Jewish Child Care Association of New York

Lutheran Social Services:  Lutheran Social Services of New York

**Little Flower:  Little Flower Children and Family Services of New York**

Martin de Porres:  Martin de Porres Group Homes

MercyFirst

**NAC:  New Alternatives for Children**

New York Foundling

OHEL:  OHEL Children's Home & Family Services

St. Dominic's:  Saint Dominic's Family Services

**Rising Ground (formally Leake & Watts)[c][d]**

---

[b]  As of December 31, 2016, Inwood House merged with Children's Village.  Press Release, The Children's Village, Inwood House Merges with The Children's Village (January 2017), https://childrensvillage.org/2017/01/inwood-house-merges-with-the-childrens-village/ (Ex. 112).

[c]  As of August 16, 2018, Edwin Gould Services for Children and Families became a subsidiary of Rising Ground.  Press Release, Rising Ground, Rising Ground & Edwin Gould – A New Day (August 16, 2018), https://www.risingground.org/edwingould (Ex. 118).

[d]  As of April 24, 2018, Leake & Watts changed its name to Rising Ground.  Press Release, Rising Ground, After 187 Years, Leake & Watts Rebrands and Changes its Name to Rising

St. John's:  Saint John's Residence for Boys[e]

**SCO:  SCO Family of Services**

**Seamen's Society:  Seamen's Society for Children & Families**

Sheltering Arms:  Sheltering Arms Children and Family Services

## Expert Reports Submitted in This Action

"Ayanna Report":  Dr. Caroline Long Burry's Case File Report of Ayanna J., dated July 19, 2019 (App. B to Ex. 1)

"Brodzinsky Report":  Expert Report of Dr. David Brodzinsky, dated July 23, 2019 (Ex. 2)

"Burry Exec. Summary":  Executive Summary of Dr. Caroline Long Burry, dated July 19, 2019 (Ex. 1)

"Emmanuel and Matthew Report":  Gary Stauffer's Case File Report of Emmanuel S. and Matthew V., dated July 19, 2019 (App. F to Ex. 1)

"Myls and Malik Report":  Gary Stauffer's Case File Report of Myls J. and Malik M., dated July 19, 2019 (App. E to Ex. 1)

"T.C. Children Report":  Dr. Kathleen Coulborn Faller's Case File Report of Lucas T., Ximena T., Jose T.C. and Valentina T.C., dated July 19, 2019 (App. C to Ex. 1)

"Thierry Report":  Dr. Caroline Long Burry's Case File Report of Thierry E., dated July 19, 2019 (App. A to Ex. 1)

"Tyrone Report":  Dr. Robert Ortega's Case File Report of Tyrone M., dated July 19, 2019 (App. D to Ex. 1)

## Public Reports

"2019 Preliminary Mayor's Management Report":  Bill de Blasio, Preliminary Mayor's Management Report (Feb. 2019), https://www1.nyc.gov/assets/operations/downloads/pdf/pmmr2019/2019_pmmr.pdf (Ex. 120)

---

Ground (April 24, 2018), https://www.prweb.com/releases/2018/04/prweb15431189.htm (Ex. 116).

[e] Saint John's Residence for Boys is an affiliate of Little Flower Children and Family Services of New York.  White Tr. 46:4-13 (Ex. 22).

"Arizona 2015 CFSR Final Report": U.S. Dep't of Health & Human Servs., Child & Family Services Reviews:  Arizona Final Report (2015) (Ex. 106)

"March 2018 State Comptroller Report":  N.Y. State Office of the Comptroller, Health and Safety of Children in Foster Care (Mar. 2018), https://osc.state.ny.us/audits/allaudits/093018/sga-2018-16n2.pdf (Ex. 115)

"May 2016 DOI Report":  N.Y.C. Dep't of Investigation, Report on ACS Policy and Practice Violations Identified in Three Child Welfare Cases and Related Analysis of Certain Systemic Data (Apr. 2016) (Ex. 108)

"May 2019 City Comptroller Report":  N.Y.C. Office of the Comptroller, Audit Report on the Oversight of the Administration for Children's Services' Certification Process for Foster Parents (May 3, 2019) (Ex. 121)

"New York 2016 CFSR Final Report":  U.S. Dep't of Health & Human Servs., Child & Family Services Reviews:  New York Final Report (2016) (Ex. 107)

"October 2018 DOI Report":  N.Y.C. Dep't of Investigation, Review of ACS' Systemic Safety Accountability Mechanisms for Foster Care Providers (Oct. 2018) (Ex. 119)

## <u>Depositions</u>

"Ali Tr.":  Deposition of Beverly Ali, Assistant Commissioner of Family Team Conferencing (ACS), dated March 25, 2019 (Ex. 4)

"Farber Tr.":  Deposition of Julie Farber, Deputy Commissioner of Family Permanency Services (ACS), dated March 28, 2019 (Ex. 6)

"Fuchs Tr.":  Deposition of Ronni Fuchs, Regional Director, New York City Regional Office (OCFS), dated April 2, 2019 (Ex. 7)

"Ghartey Ogundimu Tr.":  Deposition of Lisa Ghartey Ogundimu, Acting Deputy Commissioner of Child Welfare and Community Services (OCFS), dated April 15, 2019 (Ex. 8)

"Hallock Tr.":  Deposition of Renee Hallock, Associate Commissioner, Office of Prevention, Permanency and Program Support, Child Welfare and Community Services (OCFS), dated April 12, 2019 (Ex. 10)

"Nish Tr.":  Deposition of David Nish, Associate Commissioner of Training and Workforce Development (ACS), dated May 15, 2019 (Ex. 16)

"Poole Tr.":  Deposition of Shelia Poole, Acting Commissioner (OCFS), dated May 6, 2019 (Ex. 18)

"Sputz Tr.":  Deposition of Alan Sputz, Deputy Commissioner of Family Court Legal Services (ACS), dated March 26, 2019 (Ex. 20)

"Velez Tr.":  Deposition of Laura Velez, former Deputy Commissioner, Child Welfare and Community Services (OCFS), dated April 29, 2019 (Ex. 21)

"White Tr.":  Deposition of Andrew White, Deputy Commissioner of Policy, Planning and Measurement (ACS), dated April 3, 2019 (Ex. 22)

"Children's Village 30(b)(6) Pogue Tr.":  Deposition of Daniela Pogue, Director of Adoption and Foster Care (Children's Village), dated November 6, 2018 (Ex. 17)

"Cardinal McCloskey 30(b)(6) Erazo Tr.":  Deposition of Audrey Erazo, Senior Vice President of Children and Family Services (Cardinal McCloskey), dated October 30, 2018 (Ex. 5)

"Catholic Guardian Services 30(b)(6) McCabe Tr.":  Deposition of Ann McCabe, Assistant Executive Director for Child Welfare Services (Catholic Guardian Services), dated October 29, 2018 (Ex. 13)

"Coalition for Hispanic Family Services 30(b)(6) Munoz Tr.":  Deposition of Alexandria Munoz, Director of Foster Care and Adoptions (Coalition for Hispanic Family Services), dated November 15, 2018 (Ex. 15)

"Edwin Gould 30(b)(6) McLeod Tr.":  Deposition of Nardine McLeod, Director of Quality Management (Edwin Gould), dated August 30, 2018 (Ex. 14)

"Graham Windham 30(b)(6) Harry Tr.":  Deposition of Lavern Harry, Vice President of Foster Care, Adoption and Preventative Services Programs (Graham Windham), dated October 31, 2018 (Ex. 12)

"HeartShare St. Vincent's Services 30(b)(6) Gonzalez Tr.":  Deposition of Shanna Gonzalez, Vice President of Foster Care (HeartShare St. Vincent's Services), dated November 9, 2018 (Ex. 9)

"Little Flower 30(b)(6) Hammons Tr.":  Deposition of Corinne Hammons, Chief Executive Officer (Little Flower), dated November 7, 2018 (Ex. 11)

"NAC 30(b)(6) Riccobono Tr.":  Deposition of Carla Riccobono, Assistant Director of Foster Care and Adoption (NAC), dated September 27, 2018 (Ex. 19)

"Seamen's Society 30(b)(6) Wilkerson Tr.":  Deposition of Lyschel Wilkerson, Director of Foster Care Services (Seamen's Society), dated November 1, 2018 (Ex. 23)

"SCO 30(b)(6) Abreu-Rosano Tr.":  Deposition of Karen Abreu-Rosano, Assistant Director of Program Services (SCO), dated October 17, 2018 (Ex. 3)

## PRELIMINARY STATEMENT

*"Real problems with IOC -- no accountability, no oversight of agencies, no outcomes, on and on. Concern that agencies are in it for the $. ACS goes from initiative to initiative without paying attention to fundamentals or deepening the work."* STATE_0000183909, -910 (Ex. 94).[1]

So wrote Gladys Carrión, then-Commissioner of ACS, and former commissioner of OCFS (the New York state agency that oversees ACS), in January 2014 about Improved Outcomes for Children ("IOC"), the system through which New York City has provided foster care services to children in its custody since 2009. Under IOC, ACS delegates the day-to-day care of children in its custody to private agencies with which it enters into contracts for the provision of foster care services ("Contract Agencies"). Ms. Carrión's comments on the "[r]eal problems with IOC" were shared with, among others, State Defendant Sheila Poole—Ms. Carrión's successor at OCFS. Raymond Toomer, then-head of OCFS's New York City Regional Office, agreed with her assessment. STATE_0000183909, -909 (Ex. 94) ("[M]y initial reaction is that the Commissioner's assessment is accurate. . . . As far as IOC, as you know, we have not seen any significant changes in the data since the inception (other than the general decrease in foster care census). It is debatable whether this decrease is the result of IOC.").

A few months later, ACS retained Patricia Beresford, an expert in foster care, and her organization, LTG, to conduct an assessment of IOC. After reviewing an initial draft of this assessment, Ms. Carrión concluded that "IOC is broken" in an email to OCFS leadership. STATE_0000021664 (Ex. 88). Ms. Beresford's final report concluded that IOC had failed to achieve its goal of sustaining major improvements in children's safety, permanency and well-being, and that ACS's monitoring and program functions needed to be reworked. *See generally*

---

[1] Citations to "Ex." refer to Exhibits to the Declaration of Julie A. North in Support of Named Plaintiff Children's Renewed Motion for Class Certification.

NYC_00408786 (Ex. 40).  Notably, Ms. Carrión, Mr. Toomer and Ms. Beresford all came to

these conclusions in 2014, the year before Plaintiffs filed this lawsuit which, consistent with the

observations of Ms. Carrión and Ms. Beresford, alleges that ACS fails to adequately monitor and

oversee the Contract Agencies.

Just months after this lawsuit was filed, Julie Farber, ACS's Deputy

Commissioner of Family Permanency Services, similarly concluded that IOC had serious

shortcomings, stating "ACS is effectively at 'arm's length' from casework", NYC_00469050,

057 (Ex. 41), that "the capacity of ACS to provide truly robust support to the [Contract

Agencies] in order to accelerate permanency for children in foster care" is "missing",

NYC_00523165, -165 (Ex. 45), and that ACS units responsible for providing support to Contract

Agencies are "understaffed (or lack the right staff) and need additional/different resources" to

provide necessary support.  NYC_00598525, -527 (Ex. 49); *see also* Farber Tr. 171:12-25

(Ex. 6) (testifying regarding same).

The views expressed by ACS and OCFS leadership are consistent with reports by

the New York City Department of Investigation ("DOI"), State and City Comptrollers and the

Suffolk County Grand Jury that have been released since the filing of this lawsuit.

- In a 2016 report, the DOI assessed ACS and the foster care and preventive services Contract Agencies after "the deaths of two children and the near-death of a third child" and concluded that "the number and nature of the violations and other deficiencies" it found "raise serious concerns regarding ACS and [the Contract Agencies'] ability to consistently comply with legal obligations and ACS policy and practice requirements."  *See* May 2016 DOI Report at 29 (Ex. 108).

- In a 2017 Suffolk County Supreme Court Special Grand Jury Report concerning certain placements made by one of ACS's largest Contract Agencies, the Jury found that "by delegating" case management, "ACS virtually divested itself of direct responsibility for its foster care function". January 2017 Suffolk County Grand Jury Report at 31 (Ex. 109).

2

- In a 2018 report, the State Comptroller reviewed a sample of foster children's case files and found that:  (1) ACS lacked controls to ensure Contract Agencies "complied with their contractual obligation to conduct visits and record them timely"; (2) ACS had "not established a standard for how timely progress notes should be entered in [the state system of record]"; and (3) "[i]nitial and comprehensive follow-up [Family Assessment and Service Plans], which assess the functions and needs of foster children and their foster families, were often completed late." March 2018 State Comptroller Report at 1-2 (Ex. 115).

- In a 2018 report, the DOI found that ACS failed to ensure the Contract Agencies promptly addressed "serious safety concerns for children in foster care" to prevent risk of harm to children in ACS's care.  October 2018 DOI Report at 1-2 (Ex. 119).

- In a May 2019 report, the City Comptroller concluded that "ACS does not have adequate oversight over the foster care certification process performed by its [Contract Agencies]."  May 2019 City Comptroller Report at 2 (Ex. 121).

Federal data corroborates these findings.  In all three of the federal audits of state child welfare systems by the United States Department of Health and Human Services ("DHHS"), New York State failed to meet the federal standards for both (1) outcomes measuring safety, permanency and well-being of children in foster care; and (2) systemic factors measuring the effectiveness of, *inter alia*, the state's child welfare information system and case review system.  In 2015, the year this lawsuit was filed, New York State ranked 48th in permanency outcomes for children who had been in foster care for two years.  NYC_00534844, -844 (Ex. 47).  And, according to the most recent data from DHHS, New York State ranked last among all reporting states for maltreatment of children in foster care.  DHHS Child Welfare Outcomes Report Data, Outcomes 1 and 2, https://cwoutcomes.acf.hhs.gov/cwodatasite/recurrence/index (Ex. 110).

Defendants have known of ACS's failure to oversee its Contract Agencies effectively for years and that none of its initiatives or reforms have fixed its "broken" model.  As

a result of this failure in oversight, Named Plaintiff Children have suffered or are at risk of suffering violations of their legal rights at the hands of Defendants, who, through long-standing and well-documented policies, action and inaction, operate and oversee a structurally deficient foster care system that fails to keep children safe and causes too many children to grow up in the custody of the state without a home or family to call their own.

Accordingly, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, Named Plaintiff Children submit this renewed motion for class certification seeking certification of one putative class of children who are now or will be in the foster care custody of the Commissioner of ACS (collectively, "Plaintiff Children" or the "Class").  Class certification is proper under Rule 23(a) because (1) the ~8,300 children in ACS custody far surpass the numerosity threshold, *infra* at 48-49; (2) Defendants' failure to oversee and monitor New York City's foster care system gives rise to several common questions of fact and law, *infra* at 49-54; (3) Plaintiffs' claims are all traceable to Defendants' failures and are typical of the class, *infra* at 54-56; and (4) the 19 Named Plaintiff Children fairly and adequately protect the interests of children who are now or will be in foster care in New York City, *infra* at 56-57.  Moreover, because Defendants' failure to adequately monitor and oversee New York City's foster care system is generally applicable to the class and Plaintiffs seek relief that will benefit the class as a whole, class certification is appropriate under Rule 23(b)(2).  *Infra* at 57-58.

Plaintiffs also seek certification of two subclasses consisting of:  (1) all children who have been in ACS custody for more than two years and whose cases require "special scrutiny" pursuant to ACS policy, NYC_00218423, -484-485 (Ex. 31) ("Special Scrutiny Subclass"); and (2) all children for whom Contract Agencies failed to assess and document compelling reasons every three months to justify the decision not to file a termination of parental

4

rights ("TPR") petition after the children had been in care for 15 of the prior 22 months, a

violation of ACS policy and the law ("Compelling Reasons Subclass").  Finally, Named Plaintiff

Children seek an order appointing undersigned counsel to represent the Class.

## STATEMENT OF FACTS

Plaintiffs filed an amended motion for class certification on December 28, 2015.

Pls.' Notice of Am. Mot. for Class Certification, ECF No. 87.  That motion was denied on

September 27, 2016, "without prejudice to renewal on an evidentiary record that demonstrates

satisfaction of the requirements of Rules 23(a) and 23(b)(2)".  Mem. Order, ECF No. 282.  Since

then, Plaintiffs have engaged in extensive discovery.  City Defendant has produced over one

million pages, including the case files of each of the 19 Named Plaintiff Children.  State

Defendant has produced over 260,000 pages.  Plaintiffs have taken 13 depositions of current and

former employees of ACS and OCFS, and depositions of a representative from each of the 11

Contract Agencies that have or had a Named Plaintiff Child in their care.  Plaintiffs also retained

social work experts from the University of Maryland and the University of Michigan who

reviewed the Named Plaintiff Children's files and observed a multitude of common policy and

practice departures across each of the Named Plaintiff Children's files. *See generally* Ex. 1.

The evidentiary record leaves no doubt that:  (1) ACS has failed to adequately

supervise and monitor the Contract Agencies to which it has delegated the day-to-day

responsibility for ensuring that the children in its custody are safe and obtain permanency within

the time frames required by ACS policy and the law; (2) OCFS has failed to adequately oversee

ACS; and (3) these failures have resulted in policy and practice departures common to every

Named Plaintiff Child, causing them irreparable harm.

Named Plaintiff Children's case records are replete with evidence of common

policy and practice departures, including:  (1) failure to ensure that the children's background,

risk factors and characteristics and the characteristics of individual foster homes are taken into account in placing a child; (2) failure to ensure that the Contract Agencies engaged in concurrent planning; (3) failure to ensure that services for birth parents (which support reunification) were adequately monitored; (4) failure to ensure adequate and timely documentation in case records; (5) failure to ensure that special scrutiny was given to children in care longer than two years; and (6) failure to ensure adequate steps were taken to ensure permanency. *See generally* Burry Exec. Summary (Ex. 1); Thierry Report (App. A to Ex. 1); Ayanna Report (App. B to Ex. 1); T.C. Children Report (App. C to Ex. 1); Tyrone Report (App. D to Ex. 1); Myls and Malik Report (App. E to Ex. 1); Emmanuel and Matthew Report (App. F to Ex. 1).

The case records demonstrate that 15 Named Plaintiffs, Elisa W., Alexandria R., Ana-Maria R. and Olivia R., Ayanna J., Brittney W., Dameon C., Emmanuel S. and Matthew V., Mikayla G., Myls J. and Malik M., Thierry E., Tyrone M. and Xavion M., are adequate representatives for the Special Scrutiny Subclass because they were all in foster care for more than two years when the Amended Complaint was filed and did not receive Special Scrutiny as required by ACS Policy. Burry Exec. Summary at 18-19, 19 n.48 (Ex. 1); Thierry Report at A-52 (App. A to Ex. 1); Ayanna Report at B-42 (App. B to Ex. 1); T.C. Children Report at C-61 (App. C to Ex. 1); Tyrone Report at D-68 (App. D to Ex. 1); Myls and Malik Report at E-46 (App. E to Ex. 1); Emmanuel and Matthew Report at F-30-F-31 (App. F to Ex. 1).

The case records also demonstrate that 14 Named Plaintiffs, Ana-Maria R. and Olivia R., Brittney W., Dameon C., Emmanuel S. and Matthew V., Myls J., the T.C. Children, Thierry E., Tyrone M. and Xavion M., are adequate representatives for the Compelling Reasons Subclass because they were all in foster care for more than 17 months, and compelling reasons

that a TPR petition was not filed on their behalf were not documented every three months after they had been in foster care for 15 of the last 22 months.[2]  *See* App. 1.

We begin with a discussion of permanency, *infra* Section A.  Next, we describe ACS's foster care system and its delegation of the day-to-day care to Contract Agencies and describe ACS's inadequate and ineffective oversight mechanisms, *infra* Sections B and C.  We then show that ACS's failure to oversee and monitor its Contract Agencies has resulted in inadequately trained caseworkers, *infra* Section D, and a myriad of case practice departures, *infra* Section E.  Next, we show that ACS's failed oversight has resulted in abysmal permanency rates and alarmingly high maltreatment rates, *infra* Section F.  Finally, we show that OCFS has long been aware of ACS's failings, *infra* Section G, and that OCFS's oversight mechanisms are inadequate and ineffective, *infra* Section H.

### A. Permanency:  Its Importance and the Time Frames Within Which It Is Supposed To Be Obtained

#### 1. The Importance of Permanency

Permanency is a core principle in child welfare.  Indeed, a major goal of IOC "is to achieve the most sound and timely decisions regarding . . . permanency." NYC_01106530, -544 (Ex. 68).  The law (which ACS policy tracks) requires that permanency planning be provided to children within specified time frames.

---

[2] The timeliness of TPR petitions is often calculated using a time frame of 17 months because, for the purposes of the Adoption and Safe Families Act ("ASFA"), the start date for a child's time in foster care is either "the date of the first judicial finding that the child has been subjected to child abuse or neglect", or "the date that is 60 days after the date on which the child is removed from the home", whichever comes first.  *See* 42 U.S.C. § 675(5)(F).  In New York, the start date is usually 60 days after removal.  However, according to ACS policy, a TPR petition must be filed (absent compelling reasons) "15 months after placement", not 17 months. NYC_00216470, -482-483 (Ex. 29).

Permanency, in the context of child welfare, has three components:  (1) Legal permanence, which affirms the authority and responsibility of a child's biological or adoptive parents (or other caregivers) to make all relevant decisions and take all appropriate actions in raising a child; (2) Residential permanence, which emphasizes the importance of care in a stable, designated home; and (3) Psychological permanence, which prioritizes maintaining a child's sense of connection to significant attachment figures and supports a child's sense of connection, continuity, nurturance, security, trust and safety in the child's relationships with caregivers. Brodzinsky Report at 3 (Ex. 2).  All three components of permanency are necessary to promote a child's long-term well-being.  *Id*.  Long-term foster care—even if in a single, supportive foster home—is not, and does not provide, permanency.  *Id*. at 7-8.

Long-term foster care "is associated with higher rates of placement disruption [(*i.e.*, multiple placements)], relationship discontinuity, increased mental health problems, and the lack of lifelong family connections".  *Id*. at 5.  The lack of a stable, permanent home during critical periods of emotional growth and psychological development can leave children with lifelong trauma.  *Id*. at 5-7.  The longer children remain in foster care, the greater the likelihood that they will age out of the system, *id*. at 8-9, which occurs at age 21 in New York City.  Aging out of foster care results in "poor outcomes" such as "[h]omelessness, unemployment, incarceration [and] poor health".  Farber Tr. 26:11-25 (Ex. 6).

## 2.     Required Timeframes in Achieving Permanency

In 1997, Congress passed the Adoption and Safe Families Act ("ASFA") to address the concern that too many children were growing up in foster care.  Adoption and Safe Families Act, Pub. L. No. 105-89, 111 Stat. 2115 (1997); *see also* Karen Spar, Cong. Research Serv., RL30759, Child Welfare: Implementation of the Adoption and Safe Families Act (2004) ("CRS Report") (Ex. 105).  ASFA sets out mandatory timeframes for permanency planning; one

of ASFA's "primary goals" was to ensure that all necessary legal procedures occur expeditiously, so that children who can be reunited with their families spend less time in foster care, and "children who cannot safely return to their families can more quickly move to adoption or another permanent placement."  CRS Report at 4-8, 15 (Ex. 105).

ASFA requires that (1) a written permanency plan be maintained for each child, 42 U.S.C. §§ 671(a)(16), 675(1);[3] (2) permanency hearings be held every six months, *id.* § 675(5)(B); and (3) a termination of parental rights ("TPR") petition be filed if a child has been in care for 15 of the past 22 months, unless there are compelling reasons why terminating parental rights is not in the best interest of the child, *id.* 675(5)(E).  ACS policy tracks federal and state law regarding the timeline to file a TPR petition.  *See* NYC_00216470, -483-485 (Ex. 29).  In New York, all permanency planning activities must be maintained in CONNECTIONS, the state's system for casework documentation.  *Id.* at -475.

In New York City, permanency hearings are supposed to be scheduled approximately every six months while a child remains in care.  N.Y. Fam. Ct. Act § 1089(a)(3). Following the hearings, the court either enters an order directing the child to be reunited with his or her birth parents or guardian or, when reunification is not appropriate, determines whether the child's permanency goal should be modified.  *Id.* § 1089(d)(1)-(2).  If the child is not going to be reunited with his or her birth parents, the court also determines whether reasonable efforts have been made to effectuate the child's permanency plan.  *Id.* § 1089(d)(2)(iii).  At least 14 days before each permanency hearing, a permanency hearing report must be submitted to the court to provide an update on the status of the child's case.  *Id.* § 1089(b).

---

[3] Children in foster care receive one of five possible permanency goals:  return to parent, adoption, placement with a relative (kinship guardianship), referral for legal guardianship or Another Planned Permanent Living Arrangement ("APPLA").  NYC_00216470, -473 (Ex. 29).

ACS's Division of Family Court Legal Services ("FCLS") represents ACS in permanency hearings in Family Court.  NYC_01152900, -905 (Ex. 75).  Every child in foster care is assigned to an attorney in FCLS, who is responsible for filing permanency hearing reports, which are prepared by the Contract Agency caseworkers.  NYC_00216470, -481 (Ex. 29).  Timely submission of permanency hearing reports is important, as late permanency hearing reports "affect[] the ability to have a quality permanency hearing."  NYC_00510045, -048-049 (Ex. 43); *see also* Sputz Tr. 139:10-21 (Ex. 20).

If a child's permanency goal is adoption, the child must be legally freed before he or she can be adopted.  If a parent does not agree to voluntarily surrender his or her parental rights, a TPR petition must be filed.  Federal and state law require that TPR petitions be filed if a child has been in ACS custody "for 15 of the most recent 22 months" unless ACS "has documented in the case plan . . . a compelling reason for determining that filing such a petition would not be in the best interests of the child."[4]  42 U.S.C. § 675(5)(E)(ii); *see also* N.Y. Soc. Serv. Law ("NYSSL") § 384-b(3)(l)(i).   ACS policy lists the compelling reasons "that, if documented and substantiated, can be utilized as a reason not to file a TPR petition."[5]  NYC_00216470, -484-485 (Ex. 29).  Compelling reasons must be assessed and documented every three months per ACS policy.  *Id.* at -486.

---

[4] Other exceptions to this requirement include situations where the child is being cared for by a relative or where there has been a failure to timely provide services to the family of the child in accordance with the case plan.  *See, e.g.*, 42 U.S.C. § 675(5)(E)(i), (iii).

[5] The compelling reasons listed in the policy are:  (1) the foster care placement is due to a Person in Need of Supervision or juvenile delinquency case and the appropriate permanency goal based on specific facts is either return to parent or APPLA; (2) adoption is not the appropriate permanency goal; (3) the child is at least 14 years old and will not consent to adoption; (4) a determination after legal consultation that there are insufficient grounds for filing a TPR petition; and (5) the child is in ACS custody as the result of an abuse or neglect case that is still pending.  NYC_00216470, -485 (Ex. 29).

B.     **Improved Outcomes for Children—The System Through Which ACS Provides Foster Care to Children in Its Custody**

IOC, the system through which ACS provides foster care services to children in its custody, was implemented in 2009, NYC_01106530, -532 (Ex. 68); it was heralded as "a new way of doing business", STATE_0000077809, -818 (Ex. 91), because under IOC, ACS delegates the day-to-day care of, and case management responsibilities for, children in its custody to Contract Agencies, NYC_01106530, -532 (Ex. 68).  Importantly, children in foster care remain in the custody of the Commissioner of ACS, and ACS remains responsible for ensuring the safety, timely permanency and well-being of the children.  *See* NYSSL §§ 383-c (2018), 384 (2018), 371(10)(a) (2012); the Charter of the City of New York, Chapter 24-B §§ 615, 617 (2019).

1.     **The IOC Re-Approval Process**

Because ACS delegates case management to its Contract Agencies as part of IOC, ACS needs a waiver—from OCFS and the New York State Division of Budget—of state laws in order to operate IOC.  *See* NYSSL §§ 153-K(4)(e)(i)-(iv) (2018).  ACS has submitted requests for reauthorization of IOC to OCFS since 2008.  *See, e.g.*, NYC_00512621 (Ex. 44); NYC_01155035 (Ex. 82).  These requests include narratives of IOC's strengths and weaknesses and various performance metrics.  *See id.*  OCFS advises ACS by letter whether, and for what time period, reauthorization for IOC has been granted.  *See, e.g.*, STATE_0000007995 (Ex. 87).  Before this lawsuit, OCFS had reapproved IOC whenever asked, and had never considered not reapproving IOC.  Fuchs Tr. 44:9-13 (Ex. 7).

Since, and in part because of, the filing of this lawsuit, ACS has been operating IOC with only an "informal approval" from OCFS, with no official waiver.  *See* NYC_00653113, -113-115 (Ex. 54); Velez Tr. 105:4-107:10 (Ex. 21).  In June 2017, many

months after this Court declined to approve State Defendant and Named Plaintiff Children's

settlement, Mem. Op. & Order, Aug. 12, 2016, ECF No. 259, OCFS told ACS to submit another

reauthorization request.  Velez Tr. 107:3-108:7 (Ex. 21).[6]  ACS submitted a re-approval request

in August 2017, NYC_01106530, -530 (Ex. 68), and a revised re-approval request in November

2018 based on OCFS feedback, which is awaiting approval from the State Division of Budget,

*see generally* NYC_01155035 (Ex. 82); Velez Tr. 85:22-86:8 (Ex. 21).

### 2.      The 2011 Foster Care Quality Assurance Standards

Under IOC, ACS enters into a contract with each Contract Agency that will

provide foster care services to children in ACS custody.  Critically, each contract incorporates

the 2011 Foster Care Quality Assurance Standards ("QAS"), which sets out the policies and laws

with which the Contract Agencies are required to comply.  *E.g.*, NYC_00143688, -699 (Ex. 27).

Children in ACS's care are third-party beneficiaries of these contracts.  *Richards v. New York*,

433 F. Supp.2d 404, 430 (S.D.N.Y. 2006).

The QAS incorporates by reference federal, state and city law, and requires

Contract Agencies to, among other things:  (1) consider the child's background, risk factors and

characteristics at intake or in evaluating a foster home, matching and making a placement, *see*

NYC_00218423, -462 (Ex. 31); (2) engage in concurrent planning, *id*. at -485; (3) provide and

monitor adequate services, *id.* at -430, 511-516; (4) provide complete and timely documentation

in the case record, *id.* at -532; (5) ensure that cases of children in care longer than two years

---

[6] From July 2015 to early 2017, OCFS considered (in connection with settling this lawsuit) adding another level of oversight to ACS.  Velez Tr. 106:7-109:6 (Ex. 21).  During this time, OCFS also met with ACS leadership to work on improving ACS outcomes.  *Id.* at 105:11-106:5.

receive special scrutiny by the Contract Agency's Foster Care Director at quarterly Family Team Conferences, *id*. at -484-485; and (6) ensure timely permanency, *id.* at -495.[7]

### C. ACS's Oversight Mechanisms Are Deficient and Ineffective.

IOC has two key mechanisms by which ACS is supposed to oversee and monitor its Contract Agencies:  (1) Family Team Conferences and (2) a monitoring and performance measurement system known as Provider Agency Measurement System ("PAMS"). NYC_00905494, -497 (Ex. 62); *see also* Farber Tr. 36:17-37:2 (Ex. 6); White Tr. 239:25-240:13 (Ex. 22).  ACS is also supposed to monitor and oversee the Contract Agencies through its audit of the foster home certification process performed by the Contract Agencies ("Foster Parent Training and Certification Records Audit").  Farber Tr. 41:8-13 (Ex. 6).

As we show below, none of these oversight mechanisms is working.

### 1. Family Team Conferences

Family Team Conferences ("FTC") are decision-making meetings held at critical intervals in a child's case, NYC_00905494, -498, -522 (Ex. 62), and were meant to be both the "centerpiece" of IOC, NYC_00512621, -635 (Ex. 44), and a "core strategy in the effort to quickly engage families in the case planning process and improve outcomes around safety, permanency and well-being",  NYC_00408449, -457 (Ex. 39).  Required attendees of FTCs vary depending on the type of FTC but generally include the Contract Agency caseworker and supervisor, the birth parents, the child (if over 10 years old) and social workers affiliated with the child's or parents' attorneys.  NYC_01153061, -071-076 (Ex. 79); *see generally* NYC_00905494

---

[7] The QAS also requires Contract Agencies to ensure that caseworkers receive adequate and appropriate training, NYC_00218423, -523-24 (Ex. 31), and protect children from increased risk of being subject to maltreatment, *id*. at -436.

(Ex. 62).  Depending on the type of FTC, a facilitator from either ACS or the Contract Agency is also required to attend.  NYC_00905494, at -498-499, -508 (Ex. 62).

The 2014 report by LTG (referenced earlier) found that FTCs were not functioning as an oversight mechanism because ACS was not present at most FTCs and did not have a "mechanism for knowing what has occurred and poor follow-up, [which] most certainly feeds into the perception that ACS has abdicated its responsibility to the children of NYC." NYC_00408786, -821 (Ex. 40).  The report also said that FCLS was concerned that agency facilitators did not have the appropriate safety focus and that "ACS facilitators will 'rubberstamp' an agencies' conference plan recommendation."  *Id.* at -817.

Today, FTCs are still not functioning as an oversight mechanism; they do not occur when they should and are not attended by the right people.  The record reflects a long history of ACS facilitators failing to attend required FTCs and of FTC cancellations.[8]

A review of Named Plaintiff Children's case files from June 16, 2008 to April 22, 2019 reveals that ACS facilitators only attended 33.5% of the FTCs that they were required to attend.[9]  For each Named Plaintiff Child, at least 30% of his or her FTCs did not have a required ACS facilitator.  For the majority of Named Plaintiff Children, ACS facilitators did not attend over 60% of the conferences they were required to attend.  *See* App. 2.

---

[8] ACS acknowledged in its 2016 IOC Re-Approval Report that ACS facilitators' attendance at required FTCs was low, that there was inconsistent ACS facilitator training and that there was a lack of clarity as to the role of ACS facilitators.  NYC_00230135, -152-153 (Ex. 34).

[9] Plaintiffs identified 231 FTCs in Named Plaintiff Children's case files.  Plaintiffs eliminated 21 FTCs in which the reports did not list either a date, conference type or participants, leaving 210 FTCs for analysis.  According to the applicable ACS policy at the time of these conferences, *see generally* NYC_00905494 (Ex. 62); NYC_00217065 (Ex. 30); STATE_0000089604 (Ex. 92), ACS should have facilitated 176 of the 210 FTCs.  ACS facilitators attended just 59 of those conferences, which means ACS did not facilitate 117 conferences that it was supposed to facilitate.  App. 2.

Since 2016, it has been more typical for ACS to cancel foster care FTCs instead of simply missing them. Indeed, in both 2017 and 2018, over 30% of foster care FTCs were canceled. *See* NYC_01153059 (Ex. 77); NYC_01153060 (Ex. 78). More recent data from early 2019 does not show any material change. *See* NYC_01153058 (Ex. 76). Canceling FTCs harms children in care by delaying the child's path towards permanency. Ali Tr. 70:16-23 (Ex. 4); Children's Village 30(b)(6) Pogue Tr. 58:12-59:18 (Ex. 17).[10]

As noted above, Contract Agencies are responsible for facilitating several FTCs. ACS facilitators or representatives are not required to attend them, and they do not. Ali Tr. 77:18-78:4 (Ex. 4). ACS is nonetheless supposed to monitor Contract Agency-facilitated FTCs, which is the responsibility of Beverly Ali, Assistant Commissioner of FTCs. Farber Tr. 199:12-200:8 (Ex. 6). Ms. Ali testified, however, that she did not know: (1) whether ACS tracks if Contract Agencies actually facilitate the FTCs they are supposed to facilitate, Ali Tr. 77:17-21 (Ex. 4); (2) how Contract Agency facilitators were assigned to facilitate FTCs, *id.* at 43:18-44:19; (3) how many Contract Agency facilitators there are in total, *id.* at 55:15-17; (4) if ACS monitors the credentials of Contract Agency facilitators, *id.* at 57:12-14; (5) how Contract Agencies notify families of FTCs and whether ACS monitors Contract Agencies' notification to families, *id.* at 59:25-60:9; (6) how Contract Agency-facilitated FTCs are initiated, *id.* at 159:16-21; (7) if Contract Agencies have training policies or requirements for facilitators, *id.* at 90:4-7, 91:9-12; (8) whether ACS reviews Contract Agencies' training policies or requirements for

---

[10] During monthly meetings between 2015 and 2019, OCFS communicated to ACS its concerns about ACS's participation in FTCs, FTC timeliness and participation by children and their families after reviewing ACS facilitator participation data and identifying conferences that ACS should have, but did not, facilitate. Velez Tr. 98:14-100:22 (Ex. 21); *see also* NYC_01134449, -449 (Ex. 71) ("Goals: ACS attendance at required conferences to be at least 75%, as it is currently 25%. . . . Rate of conferences cancelled and rescheduled to be under 25% as it is currently about 40%.").

facilitators, *id.* at 90:8-10; and (9) if ACS tracks Contract Agency facilitator training attendance, *id.* at 91:6-8.

Monthly debriefing meetings held at ACS offices, *id.* at 92:16-18, are one of the ways ACS is supposed to monitor and oversee Contract Agencies' facilitation of FTCs. Although agency attendance at these meetings is mandatory, Contract Agency representatives frequently do not attend. *Id.* at 101:11-16; *see also* NYC_01143984, -987 (Ex. 74). ACS does nothing to enforce agency attendance and there are no consequences when agencies do not attend. Ali Tr. 101:17-102:24 (Ex. 4). In fact, several Contract Agencies were not even aware of the existence of the monthly debriefings. *See, e.g.*, NAC 30(b)(6) Riccobono Tr. 160:4-17, 162:2-9 (Ex. 19); SCO 30(b)(6) Abreu-Rosano Tr. 137:9-139:4 (Ex. 3); Graham Windham 30(b)(6) Harry Tr. 192:12-18 (Ex. 12).

## 2.     PAMS

PAMS is the second IOC mechanism through which ACS is supposed to monitor and oversee the Contract Agencies. NYC_01106530, -532, -546-552 (Ex. 68); White Tr. 46:21-47:24 (Ex. 22). PAMS is used to conduct a review of documented casework practice at the Contract Agencies. This review is conducted by PAMS reviewers (ACS employees), who review a statistically valid sample of cases for an eight-month period across all of the Contract Agencies to evaluate compliance with ACS policies and to assess case practice quality. NYC_01106530, -546 (Ex. 68); *see generally* STATE_0000197978 (Ex. 95).

PAMS results are fed into an annual Scorecard. NYC_00230135, -154-155 (Ex. 34). The Scorecard is designed to: (1) evaluate the quality and outcomes of case practice and services provided by foster care and residential programs; (2) hold Contract Agencies to "rigorous accountability standards"; and (3) allow ACS to implement quality improvement measures as needed. *Id.* at -154. Through the Scorecard, ACS provides each Contract Agency

16

with a numeric rating in three areas—safety, permanency and well-being.  *Id.* at -155.  ACS then ranks each Contract Agency's scores.  STATE_0000200872, -874 (Ex. 96).

PAMS results also inform the Collaborative Quality Improvement ("CoQI") program, which was implemented by ACS in 2015 to improve Contract Agency performance. NYC_01106530, -548 (Ex. 68).  Through CoQI, ACS aims to work collaboratively with the Contract Agencies to improve their performance.  If the data (from PAMS) regarding an agency's performance reflects performance gaps that cannot be addressed through the CoQI process, or if improvements are not achieved in a reasonable time period, ACS can place a Contract Agency on Heightened Monitoring Status or Corrective Action Status, triggering increased ACS support and oversight.  *Id.* at -551.  ACS can also slow or close intake at a Contract Agency or even terminate a Contract Agency's contract if it is unable or unwilling to improve its poor performance.  White Tr. 185:12-186:2 (Ex. 22).  ACS's PAMS-related oversight mechanisms are inadequate.

*First*, the methodology underlying the PAMS case review process is inadequate. Some cases are looked at and evaluated by only one reviewer, *id.* at 155:15-156:4, who completes two case reviews of eight months of a case file in one day, *see* STATE_0000200872, -896-897 (Ex. 96); White Tr. 144:25-147:4 (Ex. 22).  PAMS reviewers only review that which is documented in CONNECTIONS,  STATE_0000200872, -896-897 (Ex. 96), which has significant problems.  Tardy casework documentation in CONNECTIONS is a chronic problem at the Contract Agencies.  *See generally* March 2018 Comptroller Report.  As a result, PAMS reviewers often do not have complete documentation for their review.  In addition, CONNECTIONS includes only electronic documents—hard-copy documents cannot be scanned into CONNECTIONS.  Hallock Tr. 153:10-154:15 (Ex. 10).  Court Action Summaries,

which summarize every court proceeding in a case, are not on CONNECTIONS, SCO 30(b)(6) Abreu-Rosano Tr. at 223:7-19 (Ex. 3), and thus not part of the PAMS review, *see* White Tr. 133:16-134:9 (Ex. 22).  This lack of hard-copy documentation compromises the quality of the case review:  "You can't get mental health information in there, you can't get education information . . . there have been some concerns that that doesn't always allow for . . . someone to see the full picture."  Fuchs Tr. 191:13-192:5 (Ex. 7).  Moreover, the CONNECTIONS system is cumbersome and outdated, often resulting in incorrect data.  *See* March 2018 State Comptroller Report, 1-2 (Ex. 115); *see also* White Tr. 109:14-110:10 (Ex. 22).

*Second*, the Scorecard methodology is flawed.  There is no set minimum requirement for Scorecard performance, nor does ACS designate a failing score.  October 2018 DOI Report at 8 (Ex. 119).  As a result, poorly performing Contract Agencies still have ACS's "stamp of approval", White Tr. 59:4-10 (Ex. 22), and do not have any incentive to meaningfully improve the safety, permanency and well-being of children in their care.  ACS sets no baseline score for the Contract Agencies.  October 2018 DOI Report at 8-9 (Ex. 119).

*Third*, CoQI falls short.  CoQI includes monthly safety checks and quarterly performance meetings between ACS and the Contract Agency that occur in an annual cycle.  NYC_01106530, -548 (Ex. 68); *see also* White Tr. 159:9-14 (Ex. 22).  At the first quarterly meeting of the cycle, the agency and ACS select "one key priority area" to be the agency's focus for improvement for the year.  NYC_01106530, -550 (Ex. 68).  Because Contract Agencies only focus on one priority in any given year, ACS can ignore the other deficiencies in the Contract Agency's performance.[11]  *See* October 2018 DOI Report at 11 (Ex. 119).

---

[11] For example, in 2016, Catholic Guardian Services ranked 19th out of 22 Contract Agencies in permanency,  NYC_01069277, -283 (Ex. 64), but its CoQI priority was "improving

In October 2018, the New York City Department of Investigation found that "[CoQI] is complicated, time-consuming, and not always in line with available provider resources and capacities.  In addition, some provider staff involved in the CoQI process do not have a clear understanding of the process."  October 2018 DOI Report at 11 (Ex. 119).  Not surprisingly, CoQI has not led to meaningful improvements in performance across the Contract Agencies because "ACS fail[s] to require that providers meet their CoQI performance targets".  October 2018 DOI Report at 11 (Ex. 119).

ACS rarely avails itself of tools at its disposal—such as Heightened Monitoring Status, Corrective Action Status, slowing or closing intake or terminating a Contract Agency's contract—to improve Contract Agency performance.  In fact, some Contract Agencies testified that ACS imposes no consequences for poor performance.  *See* HeartShare St. Vincent's Services 30(b)(6) Gonzalez Tr. 171:9-15 (Ex. 9); Seamen's Society 30(b)(6) Wilkerson Tr. 86:14-24 (Ex. 23).  Further, the October 2018 DOI report concluded that ACS "did not [impose] adequate and timely consequences for performance issues", October 2018 DOI Report at 2 (Ex. 119), and "typically took no action when a provider failed to meet its [CoQI performance] targets", *id.* at 11.  ACS has not terminated a contract for poor performance in five years.  *See* White Tr. 199:2-11 (Ex. 22); NYC_00640622, -622 (Ex. 53).

### 3.    Foster Home Certification Audit

ACS also says it monitors and oversees its Contract Agencies by auditing the foster home certification process performed by the Contract Agencies.  STATE_0000200872, -879, -918 (Ex. 96).  Recently, the City Comptroller audited ACS's oversight of the foster home

---

engagement practices of case[workers] to help case progression", NYC_00228933, -934 (Ex. 33)—not sufficiently addressing its abysmal permanency ranking.

certification process and concluded that it was inadequate. *See generally* May 2019 City

Comptroller Report (Ex. 121). Of the 110 foster home files that the Office of the Comptroller

audited, 81% "were missing evidence of one or more of the prerequisites required for"

certification. *Id.* at 2. The Comptroller also found serious deficiencies in ACS's audit as a

whole. The Comptroller found that of the 37 homes that ACS deemed compliant with

certification requirements, 24% were actually non-compliant. *Id.* And even homes ACS deemed

non-compliant had already been certified for between 90 to 484 days before ACS's audit. *Id.*

*     *     *

In sum, ACS's purported oversight mechanisms fail to ensure that ACS maintains

adequate oversight over the Contract Agencies. This failure in oversight and monitoring has led

to inadequately trained Contract Agency caseworkers, *see infra* SOF Section D, whose case

practice fails to comply with ACS policies as well as state and federal law, *see infra* SOF

Section E. These case practice departures, as discussed above, are common across all of the

Named Plaintiff Children's case files. *See generally* Ex 1.

**D.     ACS Fails To Ensure that Caseworkers Receive Adequate and Appropriate Training.**

ACS does not impose any robust training requirements for Contract Agency

caseworkers and does not maintain any oversight mechanism to ensure that Contract Agency

caseworkers are adequately trained. In addition, caseworkers struggle with high caseloads,

which causes harm to the children in their care.

ACS does not mandate a training policy or curriculum for foster care caseworkers

or supervisors. Nish Tr. 22:19-23:5; 35:20-23 (Ex. 16). There is also no minimum number of

training hours required for foster care caseworkers. *Id.* at 22:9-23:8. Instead, ACS merely

requires that Contract Agencies "continually assess the training needs of the Provider Staff . . .

[and] ensure that its staff receives appropriate training." NYC_00218423, -523-524 (Ex. 31). To that end, Contract Agencies are required to have an annual training plan. *Id*. at -524. But, ACS fails to ensure that its Contract Agencies comply with this requirement. White Tr. 263:23-265:8 (Ex. 22). Notably, ACS internal documents note there is "[n]o standard of training for foster care agencies", NYC_01099783, -793 (Ex. 67), and that caseworkers were "overwhelmed" and "need more training", NYC_00528985, -986 (Ex. 46).

ACS does not have a systematic mechanism for approving or monitoring whatever training a Contract Agency does provide. Nish Tr. 43:21-44:11 (Ex. 16); White Tr. 263:23-265:8 (Ex. 22). This lack of oversight results in a patchwork of different training across Contract Agencies. Some agencies have dedicated trainers. *E.g.*, SCO 30(b)(6) Abreu-Rosano Tr. 164:12-165:2 (Ex. 3). Other agencies' trainings are run by a mix of in-house staff, Cardinal McCloskey 30(b)(6) Erazo Tr. 21:5-8 (Ex. 5), supervisors, *e.g.*, Edwin Gould 30(b)(6) McLeod Tr. 31:12-25 (Ex. 14), or by external consultants, Cardinal McCloskey 30(b)(6) Erazo Tr. 21:5-8 (Ex. 5). And some Contract Agencies have neither a training department nor dedicated training staff. Edwin Gould 30(b)(6) McLeod Tr. 31:12-25 (Ex. 14).

ACS does not have a policy addressing how much training, if any, a new Contract Agency caseworker must have before taking on cases. Nish Tr. 24:19-22 (Ex. 16). This too is left to the Contract Agencies, which means that newly hired Contract Agency caseworkers can receive a full caseload (12 cases) after just two weeks of training. *E.g.*, Catholic Guardian Services 30(b)(6) McCabe Tr. 35:25-36:11 (Ex. 13). At some Contract Agencies, caseworkers can be assigned cases before they have completed their assigned training. *E.g.*, Edwin Gould 30(b)(6) McLeod Tr. 29:9-23 (Ex. 14); SCO 30(b)(6) Abreu-Rosano Tr. 161:21-164:11 (Ex. 3).

21

ACS recognizes that the lack of caseworker training at Contract Agencies is unacceptable.  ACS's Associate Commissioner of Training and Workforce Development testified that "people should be trained adequately before they even pick up a case and I know that the – that is not necessarily how the system has worked for, you know a variety of reasons, so it is definitely a goal."  Nish Tr. 68:3-14 (Ex. 16).

Compounding this lack of training is the fact that ACS only mandates that Contract Agency caseworkers have a bachelor's degree.  *See* NYC_00408786, -822 (Ex. 40). Some Contract Agencies do not require the degree be in any particular subject nor do they require that caseworkers have any prior child welfare experience.  *E.g.*, Edwin Gould 30(b)(6) McLeod Tr. 32:9-24 (Ex. 14); SCO 30(b)(6) Abreu-Rosano Tr. 170:6-10, 225:8-10 (Ex. 3).

High caseloads are another serious problem for Contract Agency caseworkers.  In 2015, ACS established caseload limits of 12 cases per foster care caseworker, but Contract Agencies struggle to comply with this limit.  STATE_0000263313, -315 (Ex. 101).  Although ACS showcases its "[l]ow [c]aseloads", claiming caseloads average between 10 to 12 children per caseworker, *see* FY2018 Foster Care Strategic Blueprint Status Report at 9 (Ex. 114), only providing averages is misleading.  Indeed, caseworker compliance rates (*i.e.*, the percentage of caseworkers with 12 cases or fewer) are poor.  For example, a recent ACS report states that as of April 10, 2019, only 72% of caseworker caseloads were in compliance.  NYC_01155085, -085 (Ex. 83).  Many Contract Agencies struggle to maintain caseworker caseloads at 12 or fewer. *See e.g.*, Catholic Guardian Services 30(b)(6) McCabe Tr. 66:16-24 (Ex. 13); Graham Windham 30(b)(6) Harry Tr. 86:23-87:7, 104:18-24 (Ex. 12).

Caseworkers with high caseloads have less time to interact with children and families and to provide appropriate case plans and services.  *See* NYC_01140160, -186 (Ex. 72).

Reduced caseloads also reduce "feelings of burnout . . . thereby reducing . . . turnover." NYC_01140160, -186 (Ex. 72).[12]  Caseworker turnover leads to worse outcomes for children, including delayed permanency.  *See* NYC_00399970, -970 (Ex. 38) ("Workforce turnover . . . result[s] in inconsistent and fragmented services to children, youth and families, and overall poor permanency outcomes for youth in care.").  When a child's case moves from caseworker to caseworker, relationships are severed and valuable information is lost.  *See* New Jersey Department of Children and Families Workforce Report, 2016-2017 Updates at 13 (Ex. 111).

### E.   Case Practice Departures

ACS's oversight and monitoring failures, including its failure to ensure that Contract Agency caseworkers are adequately trained, have resulted in numerous case practice departures across all of ACS's Contract Agencies.

#### 1.   Placement

ACS says that the "most significant therapeutic decision is the home we choose for a child".  NYC_00476436, -440 (Ex. 42).  ACS policy and federal and state law require that ACS ensure that each child in its custody is placed in the most appropriate, least restrictive placement available.  *See* 42 U.S.C. § 671(a)(10); N.Y. Comp. Codes R. & Regs. tit. 18, § 430.11; NYC_00218423, -461-462 (Ex. 31).  This requires that a foster placement be based on an assessment of the child's needs, and promote stability and continuity by placing children with relatives, keeping children in their communities and schools and keeping siblings together whenever possible.  N.Y. Comp. Codes R. & Regs. titl. 18, § 430.11.

---

[12] In a never-ending cycle, high turnover often leads to higher caseloads.  NYC_00755719, -719 (Ex. 58).  The lack of training discussed above only compounds these problems.  *See* NYC_00658328, -345 (Ex. 55); Nish Tr. 74:16-24 (Ex. 16).

Once a child is placed in foster care, ACS assigns the child to one of its Contract Agencies, who is then responsible for placing the child in a foster home.  NYC_00218423, -459-460 (Ex. 31).  Despite recognizing the importance of a child's placement, ACS does not have a process for matching a child's needs with a particular Contract Agency; nor does ACS ensure that its Contract Agencies have a process for matching children with appropriate families. *See* NYC_00619358, -359-360 (Ex. 51).

When ACS contacts Contract Agencies with child referrals, it frequently does not provide the Contract Agency with sufficient information to determine whether it has an appropriate foster home for the child.  This leads to children being placed in inappropriate homes.  *E.g.*, Coalition for Hispanic Services 30(b)(6) Munoz Tr. 32:22-36:3 (Ex. 15); Graham Windham 30(b)(6) Harry Tr. 47:23-48:11, 50:10-51:12, 60:19-23 (Ex. 12); *see also* NYC_00665755, -755 (Ex. 56).

Information about what language a child speaks, for example, is sometimes unavailable.  Cardinal McCloskey 30(b)(6) Erazo Tr. 28:4-11, 30:2-6 (Ex. 5); Coalition for Hispanic Family Services 30(b)(6) Munoz Tr. 32:22-36:3 (Ex. 15).  One Contract Agency representative recalled five instances where ACS did not know what language the child spoke upon referral to the agency—the child was subsequently placed in a home where he or she did not speak the language and had to be removed and re-placed in another foster home.  Graham Windham 30(b)(6) Harry Tr. 53:13-54:8 (Ex. 12).  ACS also frequently fails to provide agencies with other fundamental information including the child's service providers, *e.g.*, NAC 30(b)(6) Riccobono Tr. 45:3-6 (Ex. 19); medical information, Little Flower 30(b)(6) Hammons Tr. 49:8-25, 55:5-16, 56:18-57:3 (Ex. 11); behavioral needs, Graham Windham 30(b)(6) Harry Tr. 51:7-9 (Ex. 12); birth parents' location, HeartShare St. Vincent's Services 30(b)(6) Gonzalez Tr.

81:20-82:12 (Ex. 9); and information on visitation orders, Graham Windham 30(b)(6) Harry Tr. 51:13-15 (Ex. 12).

ACS has known about its need for a placement process for years.  A 2011 ACS internal document stated:  "We learnt that blanket referrals are made without accurate and up-to-date information on the availability and compatibility of the placement".  NYC_00677272, -272 (Ex. 57).  ACS made this same observation in 2012, 2014, and 2016.  *See* NYC_00842274, -276 (Ex. 59); NYC_00587902, -902 (Ex. 48); NYC_00638264, -265 (Ex. 52); NYC_00228773 (Ex. 32).  In 2017, "ACS executives deem[ed] it imperative" that the current process be changed as it "too often leads to mismatches between child need and the capabilities of the placement resource which in turn leads to unproductive foster care stays and the need to re-place children." STATE_0000100090, -094 (Ex. 93).

Today, ACS still does not have an adequate placement matching system.  ACS's Deputy Commissioner of Family Permanency Services testified that ACS plans to update its current "glitchy" placement system with a new placement module by September 2019.  Farber Tr. 111:16-112:22 (Ex. 6).  The planned roll-out of this new system is delayed.[13]

Inappropriate placements cause harm to children, and ACS knows it:  "It is clear to both ACS and agencies that the current way we place children in foster care isn't working . . . often leading to increased behavioral problems, early cognitive disruptions, inability to cope with stress and trauma, higher rates of delinquency, lower academic achievement, and greater need for mental health services."  NYC_00228773 (Ex. 32).  "[M]ore than one-third of children placed in

---

[13] On June 5, 2018, OCFS issued an administrative directive introducing the "new Placement module".  It states that the Placement module will be released in four phases.  Phase 1 (which only involves the Contract Agencies entering data into CONNECTIONS) was released in June 2018 and Phase 2 is "anticipated to be released later in 2018".  As of January 2019, Phase 2 had not yet been rolled out.  Velez Tr. 67:11-19 (Ex. 21).

ACS custody are replaced within the first three months of placement, and many more will be replaced more than one time." *Id.* Experts in child welfare also emphasize the importance of placement stability, finding that "placement instability is associated with attachment disorders, impaired cognitive development, poor educational outcomes, mental health and behavioral problems, poor preparation for independent living, and negative adult outcomes." Supporting Lifelong Families:  Ensuring Long-Lasting Permanency and Well-Being, Casey Family Programs at 3 (April 2017) (Ex. 113).

Each of the 19 Named Plaintiff Children were placed with Contract Agencies and into foster homes without "any kind of 'matching process' that would ensure even a minimal level of compatibility conducive to a permanent, safe stay".  Burry Exec. Summary at 5-8, 8 n.12 (Ex. 1); Thierry Report at A-43 (App. A to Ex. 1); Ayanna Report at B-33-B-34 (App. B to Ex. 1); T.C. Children Report at C-47-C-49 (App. C to Ex. 1); Tyrone Report D-61 (App. D to Ex. 1); Myls and Malik Report at E-39-E-41 (App. E to Ex. 1); Emmanuel and Matthew Report at F-23-F-24 (App. F to Ex. 1).

### 2.    Case Planning

ACS is responsible for providing each child in its care with a written case plan, which includes a plan to ensure that the child receives safe and proper care, a service plan for the birth parents, child and foster parents and a plan to ensure permanency for the child.  *See* 42 U.S.C. § 675(1)(B).[14]  Adequate case planning requires, among other things:  (1) engaging in

---

[14] *See* 42 U.S.C. §§ 671(a)(16), 675(1)(A), 675(1)(B), 675(1)(C), 675(5)(A) (2019); N.Y. Soc. Serv. Law § 409-e; N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12 (2005) (together providing that children in foster care are entitled to written case plans—in New York, called Family Assessment and Service Plans ("FASP")—that must describe, among other things, the child's physical and mental health needs, the child's permanency goal, the services necessary to meet the child's physical and mental needs and the services necessary to help the child achieve his or her permanency goal).

concurrent planning; (2) assessing, planning for, and meeting the service needs of the parents of children in foster care; (3) logging necessary documentation in the case record; and (4) ensuring children who stay in foster care longer than two years receive "special scrutiny". *See* NYC_00218423, -430, -486, -484-85 (Ex. 31).

ACS fails to ensure that its Contract Agencies comply with these requirements, and each of the 19 Named Plaintiff Children's case records reflects ACS's failure.

### a. Concurrent Planning

"Concurrent planning requires a child's caseworker to be working toward a secondary permanency goal at the same time the caseworker is working toward a child's primary permanency goal; this ensures that a child reaches permanency quickly if the primary permanency goal is not achieved in the timeframe designated by law." Burry Exec. Summary at 9 (Ex. 1). ACS requires that Contract Agencies begin concurrent planning "when a child is first removed from his/her parent or relative's home"; documentation of concurrent planning is also required. NYC_00216470, -473 (Ex. 29); Farber Tr. 100:20-23, 101:11-17 (Ex. 6).

Failure to engage in concurrent planning contributes to delays in permanency. NYC_00216470, -478 (Ex. 29); *see also* NYC_01123577, -643 (Ex. 69). Simultaneous concurrent planning is important for timely permanency because if a child's primary goal becomes unobtainable, the Contract Agency can pivot to the concurrent plan without delay.

ACS fails to ensure that Contract Agencies engage in concurrent planning. Some Contract Agencies believe they do not have to engage in concurrent planning until after a child has been in care for 15 months, contrary to ACS policy. *See* Children's Village 30(b)(6) Pogue Tr. 49:20-52:12 (Ex. 17); Edwin Gould 30(b)(6) McLeod Tr. 105:24-106:15 (Ex. 14). None of the 19 Named Plaintiff Children files reflects appropriate concurrent planning. Burry Exec. Summary at 8-11, 11 n.26 (Ex. 1); Thierry Report at A-44-A-47 (App. A to Ex. 1); Ayanna

Report at B-34-B-35 (App. B to Ex. 1); T.C. Children Report at C-49-C-52 (App. C to Ex. 1);

Tyrone Report at D-62-D-64 (App. D to Ex. 1); Myls and Malik Report at E-41-E-42 (App. E to

Ex. 1); Emmanuel and Matthew Report at F-24-F-25 (App. F to Ex. 1).

### b.    Monitoring Services for Birth Parents and Caretakers

Federal, state and city law and ACS policy require that ACS make "reasonable

efforts" to reunify a child, 42 U.S.C. 671(a)(15)(B), with his or her birth family upon entry into

foster care, which includes "[p]roviding and/or linking families with services that support

reunification, including but not limited to substance abuse treatment, mental health services,

domestic violence services, housing referrals, counseling, and parenting skills training".

NYC_00216470, -474 (Ex. 29); N.Y. Soc. Serv. Law § 384-b(iii); N.Y. Fam. Ct. Act § 1089;

NYC_00218423, -511-516 (Ex. 31).

ACS does not ensure that services provided to birth parents are adequate or

monitored.  At the time of placement, Contract Agencies often do not receive information about

the location of existing service providers for the birth parents.  Graham Windham 30(b)(6) Harry

Tr. 60:16-23 (Ex. 12); NAC 30(b)(6) Riccobono Tr. 45:3-6 (Ex. 19).

Moreover, a 2016 internal ACS document noted that "[c]urrent Service Plan

creation and [implementation] is too often pro forma and not realistically tailored to the

challenges that are facing children and families. . . .  Once appropriate services have been

identified the inability to provide and/or inconsistency with which these services are

implemented often results in significant delays in moving toward reunification."

NYC_01095300, -302 (Ex. 65).  Another internal ACS document states there is a "need for

improvement" in the following areas:  "lack of follow through with collateral service providers,

monitoring to ensure that families' [sic] actually participated in service provision, that families'

28

needs were assessed for ongoing services and adjustments were made to the service plan as needed".  NYC_00230435, -437 (Ex. 35).

ACS's failure to ensure that adequate services were provided to birth parents and caretakers to support reunification is evident throughout all 19 Named Plaintiff Children's case files.  Burry Exec. Summary at 12-15, 14 n.38 (Ex. 1); Thierry Report at A-47-A-48 (App. A to Ex. 1); Ayanna Report at B-36-B-37 (App. B to Ex. 1); T.C. Children Report at C-52-C-59 (App. C to Ex. 1); Tyrone Report at D-64-D-65 (App. D to Ex. 1); Myls and Malik Report at E-42-E-43 (App. E to Ex. 1); Emmanuel and Matthew Report at F-25-F-28 (App. F to Ex. 1).

### c.    Documentation

ACS requires that all case planning be documented in CONNECTIONS, approved by the caseworker's supervisor and written in permanency hearing reports. NYC_00216470, -475 (Ex. 29).  In addition, Contract Agencies are required to "document *all* processes and activities regarding children/youth and families in their care in [CONNECTIONS]".  NYC_00218423, -546 (Ex. 31) (emphasis added).[15]

Documentation is an essential part of case practice, Farber Tr. 98:13-99:3 (Ex. 6); it allows caseworkers to document the status of a child's case, including what progress, if any, is being made towards permanency.  It also allows Contract Agency supervisors and ACS (through PAMS) to monitor case practice.  Hallock Tr. 91:14-23 (Ex. 10).

There is no uniform standard for documentation timeliness, resulting in confusion and inconsistency.  OCFS requires progress notes be entered "as contemporaneously as possible", a "recommend[ed]" 30 days or less.  March 2018 State Comptroller Report at 12

---

[15] Federal and state law also require written case plans that are timely and meaningful.  *See* 42 U.S.C. §§ 671(a)(16), 675(1)(A), 675(1)(B), 675(1)(C), 675(5)(A) (2019); N.Y. Soc. Serv. Law § 409-e (2010); N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12 (2005).

(Ex. 115).  NYCRO's Regional Director said "documentation should be within the first week or so after an event", Fuchs Tr. 64:10-16 (Ex. 7), and the former Deputy Commissioner of the Division of Child Welfare and Community Services at OCFS stated best practice was 14 days, Velez Tr. 113:4-22 (Ex. 21).  Whatever the standard, Contract Agencies fail to meet it.

Late documentation is rampant across the Contract Agencies.  In March 2018, a New York State Comptroller audit reported that "26 percent of progress notes for the first 90-day period and 21 percent of progress notes for the period after were entered more than 15 days after the contact visits".  March 2018 State Comptroller Report at 12 (Ex. 115).  When documentation occurs "long after the contact visit, there is an increased risk of inaccuracy".  *Id.*  But Contract Agency caseworkers and supervisors that care or cared for Named Plaintiff Children routinely entered documentation into CONNECTIONS in a manner that is anything but contemporaneous:

| Data on the Timeliness of Progress Notes in CONNECTIONS[16] | | | |
|---|---|---|---|
| Named Plaintiff Child(ren) | Entry after 30 days | Entry after 14 days | Entry after 7 days |
| *All Cases* | 15.1% | 28.9% | 40.8% |
| Alexandria R. | 20.8% | 33.3% | 44.8% |
| Ana-Maria R. and Olivia R. | 5.9% | 16.0% | 26.1% |
| Ayanna J. | 6.8% | 22.4% | 35.8% |
| Brittney W. | 31.7% | 42.6% | 51.7% |
| Dameon C. | 11.7% | 23.0% | 34.6% |
| Elisa W. | 27.1% | 38.6% | 47.9% |
| Emmanuel S. and Matthew V. | 11.5% | 27.8% | 40.8% |
| Mikayla G. | 2.3% | 10.3% | 24.3% |
| Myls J. and Malik M. | 2.1% | 11.1% | 23.6% |
| T.C. Children | 7.3% | 21.1% | 31.6% |
| Thierry E. | 11.4% | 37.2% | 53.0% |
| Tyrone M. | 19.0% | 36.1% | 49.2% |
| Xavion M. | 20.2% | 39.7% | 52.6% |

---

[16] Data pulled from App. 3.  All entries in the Named Plaintiff Children's case files from the 11 Contract Agencies with both event and entry dates were included in this analysis.  Entries with incomplete information (which are more likely to be noncompliant) were not included, nor were entries entered by ACS employees (*e.g.*, Division of Child Protection caseworkers).

ACS acknowledges that poor documentation is poor case practice.  Farber Tr. 98:24-99:3 (Ex. 6); White Tr. 135:21-136:5 (Ex. 22).  All 19 of the Named Plaintiff Children's case records demonstrate a failure to complete documentation adequately and timely.  Burry Exec. Summary at 16-18, 18 n.45 (Ex. 1); Thierry Report at A-48-A-52 (App. A to Ex. 1); Ayanna Report at B-38-B-41 (App. B to Ex. 1); T.C. Children Report at C-59-C-61 (App. C to Ex. 1); Tyrone Report at D-65-D-67 (App. D to Ex. 1); Myls and Malik Report at E-44-E-46 (App. E to Ex. 1); Emmanuel and Matthew Report at F-28-F-30 (App. F to Ex. 1).

### d.    Special Scrutiny

ACS mandates that children in care for two years or more receive "special scrutiny".  The QAS states:  "Children who stay in foster care longer than two (2) years are considered to have a long length of stay.  Their cases need special scrutiny by the [Contract Agency's] Foster Care Director at regular quarterly intervals at the FTCs.  [The Contract Agency] shall institute accountability mechanisms to track the lengths of stay of children on the caseload of each worker, supervisors and program director."  NYC_00218423, -484-485 (Ex. 31).

ACS considers "long-stayers" to be children in care for two years or longer because two years "in the life of a kid . . . is a significant amount of time, [] particularly for a very young child."  Farber Tr. 28:5-10 (Ex. 6).  "[A]bout half of the total NYC foster care population [] are long stayers" whose cases require special scrutiny.  FY2018 Strategic Blueprint Status Report at 20 (Ex. 114); *see also* White Tr. 282:25-283:9 (Ex. 22).

ACS fails to ensure that its Contract Agencies comply with this special scrutiny requirement.  Contract Agencies therefore largely ignore this special scrutiny requirement; nothing "special" is provided to children at the two-year mark.  *See, e.g.*, NAC 30(b)(6) Riccobono Tr. 80:22-81:7 (Ex. 19); SCO 30(b)(6) Abreu-Rosano Tr. 77:3-10 (Ex. 3).  In fact,

31

numerous Contract Agencies were unfamiliar with the requirement. *See, e.g.*, SCO 30(b)(6) Abreu-Rosano 70:8-12 (Ex. 3); Graham Windham 30(b)(6) Harry Tr. 78:3-11 (Ex. 12). Universally, the Contract Agencies testified that their respective Foster Care Directors do not always attend FTCs at regular quarterly intervals of children in care longer than two years, as ACS requires. *See, e.g.*, Edwin Gould 30(b)(6) McLeod Tr. 109:20-110:23 (Ex. 14); Children's Village 30(b)(6) Pogue Tr. 43:6-24 (Ex. 17).

Not a single Named Plaintiff Child who was in care for more than two years received the required special scrutiny. Burry Exec. Summary at 18-19, 19 n.48 (Ex. 1); Thierry Report at A-52 (App. A to Ex. 1); Ayanna Report at B-42 (App. B to Ex. 1); T.C. Children Report at C-61 (App. C to Ex. 1); Tyrone Report at D-68 (App. D to Ex. 1); Myls and Malik Report at E-46 (App. E to Ex. 1); Emmanuel and Matthew Report at F-30-F-31 (App. F to Ex. 1).

### F. ACS's Failure To Adequately Oversee and Monitor Contract Agencies Has Resulted in Abysmal Permanency Rates and Alarmingly High Maltreatment Rates.

As laid out above, ACS has failed to adequately monitor and oversee the Contract Agencies. As a direct consequence of these oversight and monitoring failures, ACS's permanency rates are unacceptably low and its maltreatment rates are unacceptably high.

#### 1. Permanency

As discussed in detail below, ACS (1) sets adoption targets that are well below federal permanency targets and imposes no consequences on Contract Agencies that fail to meet those targets; (2) fails to ensure that Contract Agencies attend permanency hearings and submit permanency hearing reports on time; and (3) fails to ensure that Contract Agencies file TPR petitions timely and document compelling reasons for not filing TPR petitions when a child has

been in care for 15 of the past 22 months, as required by law and ACS policy. As a result of these failures, New York City's foster care system has abysmally low permanency rates.

        *Permanency Targets.* ACS sets adoption targets for each Contract Agency, which serve as the agency's goal for the number of children that should be adopted in a given year. White Tr. 73:19-74:9 (Ex. 22). ACS sets these adoption targets based only on the number of children legally freed for adoption at the beginning of the fiscal year; that is, ACS's targets only ask the agencies to finalize adoptions for children who are already freed for adoption; children for whom a TPR petition has not been filed (or for whom a TPR petition is pending) are not factored into the target. *Id*. at 112:9-115:2, 184:18-185:11. ACS's adoption targets therefore are lower than the federal government's permanency targets, which include every child in care more than eight days and under the age of 18. *See* 45 CFR § 1355 (2014). New York struggles to meet federal permanency standards, performing near the bottom of states nationwide, *see infra* at 36, an inevitable outcome because ACS does not even require that its Contract Agencies attempt to meet the federal standards in the first place.

        Moreover, ACS's response to its Contract Agencies' failure to meet their targets has been to lower targets. *See* NYC_01158095 (Ex. 84); NYC_01154930, -932, -934, -936, -938, -942 (Ex. 81). But Contract Agencies have failed to meet these lower "targets" as well. NYC_01154930, -932, -934, -936, -938, -942 (Ex. 81). In FY2017, the Contract Agencies collectively only achieved 76% of their ACS-issued adoption targets and nearly half of the agencies failed to meet their ACS-issued adoption targets. NYC_01134168, -194, -208, -292, -306, -320 (Ex. 70). For FY2019, 18 agencies are not on track to meet their ACS-issued adoption targets. NYC_01158154, -155 (Ex. 85).

*Permanency Hearings*.  ACS fails to ensure that Contract Agencies attend permanency hearings and submit permanency hearing reports on time.  Late permanency hearing reports and unattended permanency hearings contribute to ACS's poor permanency outcomes.

Permanency hearings are frequently adjourned because Contract Agencies do not submit timely hearing reports or do not show up to hearings; as a result, a child may remain in foster care longer than he or she otherwise might have.  *See, e.g.*, NYC_00030593, -635, -637 (Ex. 25).  Data from 2015 showed that more than half of all Contract Agencies failed to achieve 70% in permanency hearing report timeliness.  NYC_00510045, -049 (Ex. 43).  More recent data shows a lack of improvement.  *See* NYC_01055788, -789 (Ex. 63); NYC_01142225, -233 (Ex. 73).  Of the 298 permanency hearings held in Named Plaintiff Children's cases for which Defendant has produced data,[17] the Contract Agency caseworker failed to attend 21.1%.  App. 4.  Every Named Plaintiff Child had a hearing for which her/his caseworker failed to attend; all but the T.C. Children experienced this multiple times.  *Id.*

*TPR Petitions*.  ACS fails to ensure that Contract Agencies timely file TPR petitions.  As ACS puts it:  "Contrary to popular belief, our biggest sources of delay system-wide are NOT court driven:  We file more slowly for TPRs.  Once a TPR is filed, we take longer to engage parents in TPRs."  NYC_00904599, -606 (Ex. 61); *see also* NAC 30(b)(6) Riccobono Tr. 139:14-19 (Ex. 19); Graham Windham 30(b)(6) Wilkerson Tr. 122:15-123:23 (Ex. 23); HeartShare St. Vincent's Services 30(b)(6) Gonzalez Tr. 189:21-190:5 (Ex. 9).

ACS also fails to ensure that Contract Agencies document compelling reasons for not filing TPR petitions when a child has been in care for 15 of the past 22 months, as required

---

[17] Permanency hearings for this analysis were identified by selecting all ACS summaries of court proceedings that include OCFS codes for permanency hearings.

by law and ACS policy, 42 U.S.C. § 675(5)(E); *see also* N.Y. Soc. Serv. Law § 384-b(3)(l)(i).

ACS policy requires both that compelling reasons justifying not filing a TPR petition be

documented in CONNECTIONS *and* that those compelling reasons be reassessed and re-

documented at least every three months (if not more frequently).  NYC_00216448, -463

(Ex. 28).  But a review of the case files of the 14 Named Plaintiff Children who are

representatives of the Compelling Reasons Subclass shows that not only were compelling

reasons not documented every three months, but in some cases, they were not documented at all.

*See* App. 1.[18]  When compelling reasons *were* documented, that documentation was often

insufficient or incorrectly reversed the standard.  *See, e.g.*, NYC_00899903, -915 (Ex. 60)

(listing as a "compelling" reason not to file a TPR that "parent is planing [sic] for her children's

return"); NYC_00046087, -7493 (Ex. 26) ("Agency continues to move forward with

reunification.  Although siblings are over their 39 months of their permanency plan, agency has

no compelling reason to TPR.").  As a result, not only is ACS failing to ensure that Contract

Agencies comply with ACS policy, but it also fails to ensure that Contract Agencies comply with

federal law, as documenting compelling reasons is an ASFA requirement.  *See supra* at 9.

Named Plaintiffs Children's cases are not anomalous.  A 2016 Department of

Investigations report found that:

> [T]he failure to timely file termination of parental rights petitions
> when there is no documented compelling reason not to do so is an
> overwhelming systemic problem and a violation of federal law.
> During the last three fiscal years, ACS' foster care [Contract
> Agencies] only filed petitions timely, using the 17-month
> timeframe, for approximately 18% of children for whom there was

---

[18] Appendix 1 includes every instance in the case record that could be construed as the documentation of a compelling reason not to file a TPR petition for members of the Compelling Reasons Subclass.  The Named Plaintiff Children do not concede that each entry in Appendix 1 is a Compelling Reason; however, for every Named Plaintiff Child in the subclass, there is at least one three-month period in which no compelling reasons were documented, if not more.

> no documented compelling reason not to file.  This means that for
> the 4,510 children and youth for whom there was no documented
> compelling reason to file, petitions were not timely filed for 3,732
> children and youth.

May 2016 DOI Report at 17-18 (Ex. 108).  Late permanency reports, unattended permanency

hearings and untimely TPR petitions all contribute to ACS's poor permanency outcomes.

New York State has one of the highest rates in the country of children spending

more than two years in care; in fact, nationally it ranks 48th on permanency outcomes after two

years.  *See* NYC_00534844, -844 (Ex. 47); STATE_0000051734, -736 (Ex. 89); Farber Tr.

30:16-31:13 (Ex. 6); Velez Tr. 67:20-68:7 (Ex. 21).  New York City contributes significantly to

the State's performance in this area, comprising approximately 68% of the State's total foster

care population in care for over 24 months.  *See* ACS Foster Care Strategic Blueprint FY2019-

FY2023 & Findings from the Rapid Permanency Reviews at 20 (Ex. 117).  Using the most recent

data available, New York City has been well below the national average for achieving

permanency for children in care for fewer than 12 months, between 12-23 months and over 24

months every year from 2013 to 2017.  STATE_0000263766, -766 (Ex. 102).

Further, New York City has historically struggled to meet the time frames set by

ASFA, taking "two years longer than the federal median" to achieve permanency for children in

ACS custody.  NYC_01099698, -699 (Ex. 66); *see also* Farber Tr. 30:16-31:13 (Ex. 6) .  The

average time to adoption in New York City is five years.  NYC_00613600 (Ex. 50).  As ACS

puts it:  "New York City has long failed to meet federal permanency standards . . . because of

practice at ACS and its [Contract Agencies]".  *Id.*[19]

---

[19] Recognizing ACS's abysmal permanency outcomes, in November 2016, Mayor de Blasio
signed into effect Local Law 143, which charged ACS with creating a five-year plan to address
barriers to permanency and required ACS to conduct a statistically significant case review of
children in care for two years or longer.  New York City Administration for Children's Services,

In all 19 Named Plaintiff Children's case records, ACS failed to ensure that Contract Agencies complied with ACS policies and the law by failing to take necessary actions toward achieving permanency. Burry Exec. Summary at 20-23, 23 n.58 (Ex. 1); Thierry Report at A-52-A-57 (App. A to Ex. 1); Ayanna Report at B-42-B-45 (App. B to Ex. 1); T.C. Children Report at C-61-C-64 (App. C to Ex. 1); Tyrone Report at D-68-D-71 (App. D to Ex. 1); Myls and Malik Report at E-46-E-49 (App. E to Ex. 1); Emmanuel and Matthew Report at F-31-F-33 (App. F to Ex. 1).

### 2. Maltreatment

ACS's failure to adequately oversee and monitor the Contract Agencies has also led to high maltreatment rates. ACS's "mission is to ensure the safety and well-being of New York City children." NYC_00218423, -436 (Ex. 31). One "[k]ey outcome[] that [is] especially important" is that children and youth "in care shall not experience additional maltreatment". *Id.* Yet, foster children in New York City are subjected to an unreasonably high risk of being maltreated while in ACS custody, as evidenced by an alarming rate of maltreatment-in-care— one that consistently exceeds the guidelines set by the federal government and the rate in almost every other state. *See supra* at 3.

---

ACS Foster Care Strategic Blueprint FY2019-FY2023 & Findings From the Rapid Permanency Reviews at 4 (Ex. 117). But the reviews and their results fall short.

ACS cherry-picked the cases to be reviewed, focusing only on those who it perceived as "close to permanency" and ignoring the rest. STATE_0000055524 (Ex. 90). Thus, when the reviews were conducted, there were approximately 5,036 long-stayers in ACS's care, ACS Foster Care Strategic Blueprint FY2019-FY2023 & Findings From the Rapid Permanency Reviews at 6 n.2 (Ex. 117), but only the 2,298 long-stayers who were deemed close to permanency were reviewed, *id.* at 24. Moreover, as of May 31, 2018, ACS failed to achieve permanency for half of all children reviewed through the Rapid Permanency Reviews. NYC_01154247, -249 (Ex. 80).

ACS's failure to protect children from the risk of maltreatment-in-care has been known for years, and remains today.  The 2014 LTG Report found that "[Contract Agency] staff do not pay consistent attention to the child protective monitoring role" in part because "IOC . . . was based on unrealistic assumptions about front line staff's capacity to utilize . . . safety and risk assessment skills".  *See* NYC_00408786, -791 (Ex. 40).  And, as recently as October 2018, the DOI found that "while ACS' evaluation process uncovered and documented serious safety concerns for children in foster care, ACS frequently failed to then ensure that [Contract Agencies] addressed those concerns."  October 2018 DOI Report at 1 (Ex. 119).[20]

Despite knowledge of this longstanding problem, ACS has failed to adequately address it.  Consistent with the DOI's finding that "low safety scores or performance that fell short of the federal maltreatment in care guideline did not trigger immediate formal or concrete steps to address those safety performance issues", October 2018 DOI Report at 8 (Ex.119), one Contract Agency acknowledged that ACS did not impose any consequences despite the agency's abysmal maltreatment-in-care score on the annual Scorecard, *see* Little Flower 30(b)(6) Hammons Tr. 202:16-24 (Ex. 11); NYC_01069277, -295 (Ex. 64).  ACS's failure to impose consequences for poor performance on safety and maltreatment is a recurring theme across Contract Agencies.  *See, e.g.*, HeartShare St. Vincent's Services 30(b)(6) Gonzalez Tr. 128:11-129:3 (Ex. 9); Seamen's Society 30(b)(6) Wilkerson Tr. 86:14-24 (Ex. 23).

---

[20] Several of Named Plaintiff Children suffered instances of maltreatment while in care. *See, e.g.*, NYC_00006428, -428 (Ex. 24) (Elisa's foster parent punched her in the eye and bruised her arm to discipline her); NYC_00256986, -987 (Ex. 36) (Alexandria's birth mother beat her with a belt buckle in the presence of her foster mother); NYC_00279767, -800 (Ex. 37) (Brittney's birth mother hit her with a toy during a family visit, bruising her face); Tyrone Report at D-42-D-44 (Ex. App. D to Ex. 1) (Tyrone's uncle choked his aunt in front of Tyrone and attempted to set fire to the apartment).

ACS's failure to ensure that Contract Agencies address safety concerns leads directly to New York City's high maltreatment-in-care rates, which are consistently well above the guideline set by the federal government.  *See* New York 2016 CFSR Final Report at A-7 (Ex. 107).  Based on federal data collected in 2016, New York State ranked *last* among the 45 states and territories that reported maltreatment-in-care information for 2012-2016.  *See* October 2018 DOI Report at 1 n.4 (Ex. 119).

New York City's rate of maltreatment-in-care was even higher than that of New York State, and has substantially surpassed the federal benchmark in every year from FY2013 through FY2016.  STATE_0000263120, -142 (Ex. 100).  Indeed, in federal FY2016, New York City's rate was more than *double* the federal standard and approximately *triple* the New York State target.  *See* NYC_00230135, -145 (Ex. 34) ("The NYS target for this [maltreatment in care] indicator is 5.9"); STATE_0000263120, -142 (Ex. 100) (showing New York City's maltreatment-in-care rate as 17.6 incidents per 100,000 days in care).

New York City's actual rate of maltreatment-in-care may well be even higher, due to factors such as potential underreporting of maltreatment-in-care, *see* FY2018 Foster Care Strategic Blueprint Status Report at 10 (Ex. 114) (attributing part of an "increase in reported maltreatment of children in foster care in FY 2018" to increased reporting following training), and child protective services investigations into foster parents that are wrongly determined to be unfounded, Velez Tr. 43:21-44:20 (Ex. 21).

This alarming rate of maltreatment is pervasive across ACS's Contract Agencies. An October 2018 DOI report following an investigation into Contract Agencies' Family Foster Care ("FFC") Programs—which account for approximately 75% of children in care—found that, in 2017, 21 out of 22 FFC agencies had maltreatment-in-care rates that were above the federal

guideline.  October 2018 DOI Report at 1, 5-6 (Ex. 119).  Moreover, of the 21 FFC agencies that exceeded the threshold, 19 had maltreatment-in-care rates that were more than *double* the federal guideline, and two of those 19 had maltreatment-in-care rates that were more than *four times* the federal guideline.  *Id.* at 5-6.  This alarming rate of maltreatment does not show signs of improving; the same investigation found that "82 percent of all FFC [Contract Agencies] . . . performed worse on maltreatment in care [in FY17] than in FY16."  *Id.* at 5.  According to the 2019 Preliminary Mayor's Management Report, data in FY2018 is even worse, and the rate of maltreatment for the first four months of FY2019 is *double* the rate of maltreatment in FY2016.  2019 Preliminary Mayor's Management Report at 182 (Ex. 120).[21] [22]

### G.    OCFS Has Long Been Aware of ACS's Failings.

Long before this lawsuit was filed, OCFS had ample knowledge of ACS's poor performance.  In May 2014, OCFS received a copy of the LTG Report, which concluded that IOC was failing in a number of respects and that IOC had not resulted in improvements on safety or well-being.  STATE_0000021664 (Ex. 88); NYC_00408786, -790-91 (Ex. 40).  As discussed

---

[21] Data from the 2019 Preliminary Mayor's Management Report cannot be easily compared to the data analyzed according to the federal standard, because, unlike the federal standard, the maltreatment rate for children in foster care included in the 2019 Preliminary Mayor's Management Report does not include maltreatment that occurs on trial discharge (maltreatment by the biological parent while the child is still in the custody of the Commissioner of ACS).  White Tr. 275:11-25 (Ex. 22).  Maltreatment on trial discharge accounts for approximately 75% of all maltreatment in foster care.  *Id*. at 282:15-22.

[22] The 2019 Preliminary Mayor's Management Report states that ACS "is taking immediate steps to raise safety standards".  Preliminary Mayor's Management Report at 180 (Ex. 120).  When asked what those steps are, ACS's Deputy Commissioner of Policy, Planning and Management testified that ACS "mandated the safety and risk training some time ago" and has created a "mandated safety assessment plan".  White Tr. 19:17-21, 278:21-279:5 (Ex. 22).  But safety and risk training is not actually mandated for *foster care* staff, *id*. at 279:6-9, ERRATA at 3 (Ex. 22) (clarifying that safety and risk training is not mandatory for foster care caseworkers), and the mandated safety assessment plan is part of CoQI, which was implemented in 2015, White Tr. 156:13-19 (Ex. 22).

above, this report led Ms. Carrión to declare that "IOC is broken". STATE_0000021664 (Ex. 88). There is nothing in the record that reflects any concern, let alone action, on the part of OCFS upon its receipt of the LTG Report.

A 2017 email exchange among OCFS leadership evidences OCFS's laissez-faire attitude towards ACS's failings: Laura Velez, the then-deputy commissioner of Child Welfare and Community Services (the OCFS division responsible for overseeing foster care), forwarded the 2014 LTG Report to several others at OCFS, including Ronni Fuchs, then-Acting Regional Director of NYCRO, asking Ms. Fuchs whether ACS had implemented any of the report's recommendations. STATE_0000254491, -491 (Ex. 99). Ms. Fuchs testified that the email was the first time she saw the final report, Fuchs Tr. 85:12-88:4 (Ex. 7), a remarkable fact given that her job was to oversee foster care in New York City. Also remarkable is that she testified that, with one exception, she did not know whether ACS had implemented any recommendations from the LTG Report. *Id.* at 83:19-84:21.

OCFS has had numerous indicators of ACS's failings in addition to what was laid out in the LTG Report.[23] As noted *supra* at 3, New York State has performed abysmally on all three federal audits—the Child and Family Services Review ("CFSR")—conducted by DHHS. In the most recent CFSR, published in 2016, New York failed to conform to federal expectations in six out of seven safety, permanency and well-being outcomes and six out of seven systemic

---

[23] The LTG Report made concerning findings about IOC, including that it was "based on unrealistic assumptions about front line staff's capacity to utilize engagement skills, safety and risk assessment skills, and critical thinking within the Family Team Conference and Case Management Delegation components of the model", NYC_00408786, -791 (Ex. 40), that FTCs were not achieving their intended purpose because of inadequate training, staff turnover and lack of quality supervision, *id.* at -822, and that caseworkers "often were unable to use critical and higher order thinking skills", *id.* at -797-798.

factors.[24]  New York 2016 CFSR Final Report at 3 (Ex. 107).  Because of its poor performance

in the 2016 CFSR, New York State was placed on a program improvement plan.  Hallock Tr.

53:3-6 (Ex. 10).

Acting Commissioner Poole's view of this audit is, at best, concerning.  She

testified that "to my knowledge, not one state has ever received a passing score on the CFSR, nor

has New York State.  So we have company in that respect."  Poole Tr. 32:12-15 (Ex. 18).  The

"everyone else has failed too" rationalization is cold comfort for the children who are entitled to,

and deserve, better care.  Moreover, while every state may fail, New York State ranks at the

bottom for both permanency outcomes and maltreatment-in-care metrics.  *See supra* at 3.

The reports outlined *supra* at 2-3 are further evidence that OCFS has long been

aware of ACS's failings.  In the face of this overwhelming evidence that IOC is failing, OCFS

fails to maintain adequate and effective oversight mechanisms over ACS.

**H.     OCFS's Oversight Mechanisms Are Inadequate and Ineffective.**

According to OCFS's Deputy Counsel, Lee Prochera, OCFS exercises its

oversight authority over ACS through:  (1) "the issuance and enforcement of regulations and

State policies"; (2) "regular and frequent interaction with all levels of ACS staff"; (3) "review

and approval of ACS policies and procedures"; (4) "review of child welfare case records"; and

(5) "review and investigation of complaints".  Supp. Decl. of L. Prochera in Support of Final

---

[24] In comparison to other states, New York's performance is at the bottom.  For example, New York failed to be in substantial conformity for six out of seven outcomes and six out of seven systemic factors.  New York 2016 CFSR Final Report at 3 (Ex. 107).  By comparison, while Arizona also failed to be in substantial conformity for six out of seven outcomes, it was in substantial conformity for four out of seven systemic factors.  Arizona 2015 CFSR Final Report at 3 (Ex. 106).  The Ninth Circuit recently affirmed the certification of a class against Arizona's child welfare system for claims similar to those made here.  *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 968 (9th Cir. 2019).

Approval of the Consent Decree ("Prochera Decl.") ¶ 4, ECF No. 225-3.  OCFS's supervisory

responsibilities also include certain monitoring of the Contract Agencies including:  (1) "case

reviews"; (2) "review and approval of policies and procedures"; (3) "inspections of the physical

plans of facilities"; and (4) "review and investigation of complaints".  *Id.*; *see also* Fuchs Tr.

146:20-147:3 (Ex. 7).  In addition, "[w]here violations of federal or state statutes or regulations

are found, OCFS requires ACS or the applicable [Contract] Agency to develop and implement

corrective action plans to rectify the violations".  Prochera Decl. ¶ 4.  These oversight

mechanisms are inadequate and ineffective.

   In concept, OCFS's Voluntary Agency Reviews ("VARs") assess various aspects

of each Contract Agency; they include a review of case records, an observation of the physical

plant, interviews with various staff and a review of personnel records.  Prochera Decl. ¶ 4;

STATE_0000001532, -535 (Ex. 86).  In practice, the VARs are conducted infrequently and in a

superficial manner.  OCFS conducts a VAR of each of ACS's Contract Agencies just once every

three years.  *Id.* at -532.  When conducted, VARs consist of a review of the lesser of either 10%

of the Contract Agency's foster child population or a review of 10 case files—"a very, very, very

tiny sample of cases".  *Id.* at -533; Catholic Guardian Services 30(b)(6) McCabe Tr. 166:20-

167:2 (Ex. 13).  The case file review is limited to reviewing only the previous year of case

practice.  STATE_0000001532, -534-535 (Ex. 86).  Notably, the reviewers are not required to,

and do not look at, the timeliness of documentation of caseworkers' notes or whether there is

documentation of supervision of the caseworker.  Fuchs Tr. 151:5-9, 19-22 (Ex. 7).

   OCFS's Quarterly Site Visits of ACS's Contract Agencies are likewise

inadequate.  OCFS has no requirements for what should occur during these Quarterly Site Visits.

Fuchs Tr. 147:23-148:5 (Ex. 7).  For example, OCFS might conduct a few case reviews before a

Quarterly Site Visit, but it might also conduct none. *Id.* at 150:3-150:7. Reports are generated after each visit, but the reports are routinely as short as one or two pages and, consequently, do not assess the agency or the care it provides in any detail. *See e.g.*, STATE_0000219388 (Ex. 98); STATE_0000219387 (Ex. 97).

"[R]egular and frequent interaction" with all levels of ACS staff is another means by which OCFS purports to exercise its oversight over ACS. Prochera Decl. ¶ 4. But, while the record reflects frequent interaction between OCFS and ACS at all levels, *see, e.g.*, Fuchs Tr. 104:18-105:10 (Ex. 7); Velez Tr. 86:19-88:4 (Ex. 21); Poole Tr. 107:21-109:8 (Ex. 18), there is no evidence that these interactions have given rise to any consideration (let alone direction) by OCFS to require ACS to ensure that IOC complies with federal and state laws.

Nor is there evidence that OCFS's review and approval of ACS policies is a meaningful oversight function. According to ACS, OCFS "can take a year" to approve an ACS policy, White Tr. 251:16-252:8 (Ex. 22); *see, e.g.*, Ali Tr. 36:6-16, 37:10-12 (Ex. 4), and on occasion, OCFS will require substantial revisions to an interim policy (*i.e.*, a policy that does not yet have OCFS approval) after it has been implemented, White Tr. 248:15-249:4, 253:15-254:5 (Ex. 22). Similarly, OCFS's ability to require corrective action, Prochera Decl. ¶ 4, or institute program improvement plans, Fuchs Tr. 132:17-21 (Ex. 7), has not resulted in any enhanced monitoring. OCFS has not, for example, increased the frequency of VARs for poor-performing agencies. *Id.* 134:24-135:4; Ghartey Ogundimu Tr. 56:23-57:12 (Ex. 8). In fact, if a Contract Agency does not complete the steps outlined in its program improvement plan, the timeframe for the program improvement plan is simply extended. Fuchs Tr. 133:23-134:13 (Ex. 7).

And, while OCFS could conduct unannounced visits to ACS's many underperforming Contract Agencies, the Regional Director of NYCRO could only think of two

44

agencies that received unannounced visits in her over five years at NYCRO; one in 2018 and one in 2019. *Id.* at 159:16-164:6 (Ex. 7). OCFS likewise has not increased its monitoring of Contract Agencies that ACS has placed on Heightened Monitoring Status or Corrective Action Status, *id.* at 176:3-176:10 (Ex. 7), or of Contract Agencies with poor Scorecard results, *id.* at 170:24-171:9.

Finally, while OCFS's oversight function also includes "setting and enforcing policies", *About the New York State Office of Children and Family Services (OCFS): Mission Statement*, https://ocfs.ny.gov/main/about/ (last visited July 30, 2019) (Ex. 103), its activity in this regard is seriously lacking. For example, notwithstanding evidence that Contract Agency caseworkers are not adequately trained, *supra* SOF Section D, OCFS has not mandated that ACS implement training requirements for its Contract Agencies caseworkers, Hallock Tr. 115:21-24 (Ex. 10); nor has OCFS mandated the time period within which caseworkers must document events in CONNECTIONS, even though untimely case record entries is a chronic problem, *see supra* SOF Section E.2.c.

\*     \*     \*

As laid out above, the record clearly demonstrates that the City Defendant operates an inadequate foster care system which: (1) fails to exercise adequate and meaningful oversight of the Contract Agencies, Am. Compl. ¶¶ 270-276; SOF Section C; (2) fails to ensure that caseworkers receive adequate and appropriate training, Am. Compl. ¶¶ 277-291; SOF Section D; (3) fails to consider the child's background, risk factors and characteristics in evaluating a foster home, matching and making a placement, Am. Compl. ¶¶ 293-302; SOF Section E.1; (4) fails to ensure adequate case plans are timely developed and implemented, Am. Compl. ¶¶ 303-311; SOF Section E.2; (5) fails to take steps to ensure timely permanency,

Am. Compl. ¶¶ 312-340; SOF Section F.1; and (6) fails to protect children from an increased risk of being subject to maltreatment, Am. Compl. ¶¶ 235-241; SOF Section F.2.  It also shows that State Defendant fails to effectively exercise adequate and meaningful oversight over ACS and the Contract Agencies.  As discussed further below, because these failures derive from Defendants' unitary course of conduct, these failures are common to, and typical of, the Class.

## **LEGAL STANDARD**

Class certification is appropriate when the putative class meets the requirements of Federal Rule of Civil Procedure 23(a) and at least one of the subsections of Federal Rule of Civil Procedure 23(b).  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 346 (2011).  Class certification is proper under Rule 23(a) if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *Wal-Mart*, 564 U.S. at 345.  Named Plaintiff Children seek certification under Rule 23(b)(2), which permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) "is designed to assist and is most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief", *Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662, 692 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997), and "is particularly suitable in actions involving civil rights", *Toney-Dick v. Doar*, No. 12 Civ. 9162 (KBF), 2013 WL 5295221, at *4 (S.D.N.Y. Sept. 16, 2013) (citing *Marisol*, 929 F. Supp. at 692).

Courts nationwide have certified classes of foster children in lawsuits that, like this one, challenge structural and systemic violations of those children's rights under federal

law.[25]  For instance, the Second Circuit in *Marisol A. ex rel. Forbes v. Giuliani*,  upheld the

certification of a class of "[a]ll children who are or will be in the custody of the New York City

Administration for Children's Services ('ACS'), and those children who . . . are or will be at risk

of neglect or abuse and whose status is or should be known to ACS."[26]  126 F.3d 372, 380 (2d

Cir. 1997).  More recently, in *B.K. ex rel. Tinsley v. Snyder*, the Ninth Circuit affirmed the

certification of a class of "all children who are or will be in the legal custody of [the Arizona

Department of Child Safety] due to a report or suspicion of abuse or neglect" and a subclass of

those children in non-kinship foster homes because "a state's policies and practices can expose

*all* persons within its custody to a substantial risk of harm".  922 F.3d 957, 968 (9th Cir. 2019)

(emphasis in original).

---

[25] *See D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1192-94 (10th Cir. 2010)
(affirming certification of class of children in the custody of the Oklahoma Department of
Human Services "due to a report or suspicion of abuse or neglect or who are or will be
adjudicated deprived due to abuse or neglect"); *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48,
54-56 (3d Cir. 1994) (reversing denial of certification of a class of abused or neglected children
in Philadelphia who "should be known to the Philadelphia Department of Human Services", and
all children in its custody); *M.D. ex rel. Stukenberg v. Perry*, 294 F.R.D. 7, 30, 66 (S.D. Tex.
2013), *rev'd in part on other grounds*, *M.D. ex rel. Stuckenberg v. Abbott*, 907 F.3d 237 (5th Cir.
2018) (certifying general class of "all children now, or in the future," in the custody of the Texas
Department of Family and Protective Services custody).

[26] Although the Second Circuit upheld the certification of the general class, it directed the
District Court to certify "subclasses as are necessary for the efficient and orderly administration
of this litigation".  *Marisol*, 126 F.3d at 378-80.  Subclasses were necessary because the *Marisol*
plaintiffs sought to certify a class consisting of both children in the custody of ACS and children
not in the custody of ACS but who ACS is or should be aware are at risk of neglect or abuse.  *Id.*
at 378-79.  Here, Named Plaintiff Children seek a class consisting only of children who are now
or will be in the foster care custody of ACS.  Am. Compl. ¶ 191.  One subclass that the District
Court certified in *Marisol* is very similar to the class that Named Plaintiff Children seek.
*Compare Marisol A. ex rel. Forbes v. Giuliani,* No. 95 Civ. 10533 (RJW), 1998 WL 199927, at
*3 (S.D.N.Y. Apr. 23, 1998) ("Children in the custody of [ACS]"), *with* Am. Compl. ¶ 191 ("all
children who are now or will be in the foster care custody of the Commissioner of [ACS]").

## ARGUMENT

Since the Court denied Plaintiffs' amended motion for class certification "without prejudice to renewal on an evidentiary record", Mem. Order, ECF No. 282, Plaintiffs have engaged in extensive discovery, *supra* at 5, and are, we submit, more than able to meet their burden demonstrating that each of the Rule 23(a) and 23(b)(2) requirements are met.

Accordingly, Named Plaintiff Children in this case seek certification under Rules 23(a) and 23(b)(2) of a class consisting of children "who are now or will be in the foster care custody of the Commissioner of New York City's Administration for Children's Services", Am. Compl. ¶ 191, and subclasses consisting of: (1) all children who have been in the custody of ACS for more than two years, whose cases are entitled to "special scrutiny" by the Contract Agencies according to ACS policy ("Special Scrutiny Subclass"); and (2) all children whose Contract Agencies failed to assess and document at least every three months compelling reasons justifying the decision to not file a TPR petition after the children had been in care for 15 of the prior 22 months, a violation of ACS policy and the law ("Compelling Reasons Subclass").

Because the Named Plaintiff Children have provided a sufficient evidentiary record to demonstrate that the proposed class and subclasses as defined meet the requirements of Rules 23(a) and 23(b)(2), the Court should grant Named Plaintiff Children's Motion and certify the Class, the Special Scrutiny Subclass and the Compelling Reasons Subclass.

## I.    PLAINTIFF CHILDREN MEET RULE 23(a)'S REQUIREMENTS

### A.    Numerosity

A class must be "so numerous that joinder of all members is impracticable". Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "numerosity is presumed at a level of 40 members. Plaintiffs need not set forth an exact class size to establish numerosity". *Toney-Dick*,

2013 WL 5295221, at *4 (citations omitted).  At ~8,300 members,[27] the numerosity requirement is easily satisfied here.  The class is incapable of specific enumeration because children may enter or exit foster care at any time; this state of flux within the child welfare system further makes joinder impracticable.  *See, e.g.*, *Marisol*, 126 F.3d at 376.

### B.     Commonality

Class members may sue as representative parties only if "there are questions of law or fact common to the class".  Fed. R. Civ. P. 23(a)(2).  Commonality is satisfied where a single issue of law or fact is common to the class.  *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (citing *Wal-Mart*, 564 U.S. at 359) ("[E]ven a single common question will do").  Commonality also requires that proceeding as a class action has the "capacity . . . to generate common answers apt to drive the resolution of the litigation".  *Wal-Mart*, 564 U.S. at 350 (internal citation omitted).  "The commonality requirement may be met where the individual circumstances of class members differ but their injuries derive from a unit[ar]y course of conduct by a single system."  *Elkind v. Revlon Consumer Prods. Corp.*, No. CV 14-2484 (JS)(AKT), 2017 WL 9480894 (E.D.N.Y. Mar. 9, 2017) (citations omitted).  Where a class seeks to enjoin certain policies or practices, the policies and practices act as "the glue that holds the class together", satisfying commonality because "either each of the policies and practices is unlawful as to every [class member] or it is not."  *B.K.*, 922 F.3d at 969 (quoting *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014)).[28]

---

[27] There were 8,310 children in foster care in New York City as of April 2019.  Data/Policy, NYC Admin. for Child. Services, http://www1.nyc.gov/site/acs/about/data-policy.page (last visited July 30, 2019) (Ex. 104).

[28] Recently, the Ninth Circuit upheld the certification of a class of "all children who are or will be in the legal custody of [the Arizona Department of Child Safety ("DCS")] due to a report or suspicion of abuse or neglect" based on the following support provided by plaintiffs:  (a) "raw data generated by DCS to show how DCS was failing to deliver timely health care to foster

There are distinct questions of fact and law common to the Class as to City and State Defendants.

### 1.        Common Questions of Fact and Law as to City Defendant:

As set forth below, Named Plaintiff Children present the following six questions of fact that are common to the Class as to City Defendant:

#### a.        Whether Defendant Effectively Exercises Adequate and Meaningful Oversight of the Contract Agencies

Each child in the Class is or will be in the same foster care system that suffers from ACS's oversight failures.  Whether Defendant effectively exercises adequate and meaningful oversight of the Contract Agencies is therefore a question that is common to the Class.  And, although not relevant for this inquiry, the record is clear that ACS does in fact fail to effectively oversee and monitor the Contract Agencies.  *See* SOF Section C.

#### b.        Whether Defendant Fails To Ensure that Caseworkers Receive Adequate and Appropriate Training

Each child in the Class is or will be assigned to a caseworker who ACS has failed to ensure received proper training.  Whether Defendant fails to ensure that caseworkers receive adequate and appropriate training is therefore a common question of fact.  And, although not relevant for this inquiry, the record demonstrates that ACS does not impose any robust training requirements for Contract Agency caseworkers and does not maintain any oversight mechanism to ensure that Contract Agency caseworkers are adequately trained.  *See* SOF Section D.

---

children"; (b) expert reports which "declared that Arizona's foster care system put children in grave risk of harm by failing to provide adequate care"; (c) "independent investigative reports"; (d) deposition testimony; (e) DCS policy and educational materials; and (f) "excerpts from the [named plaintiff's case file] that, if interpreted and credited as the plaintiffs contended, could tend to show she has been kept in inappropriate home settings and has serious unmet mental and physical healthcare needs." *B.K.*, 922 F.3d at 964.  Here, Plaintiffs have provided similar support (if not more).

   **c.**  **Whether Defendant Fails To Consider the Child's Background, Risk Factors and Characteristics in Evaluating a Foster Home, Matching and Making a Placement**

Each child in the Class is or will be subjected to ACS's placement process (or more accurately, the lack thereof). Whether Defendant fails to ensure that the child's background, risk factors and characteristics are considered at intake or in evaluating a foster home, matching and making a placement is therefore a question of fact that is common to the Class. Here again, although not relevant for the purposes of this inquiry, the record reflects that ACS does not have a system to ensure that a child is placed with a Contract Agency or in a foster home that meets the child's needs. *See* SOF Section E.1. Instead, ACS places children based on which Contract Agency has an available bed, often without having even basic information about a child. *See supra* at 23-25.

   **d.**  **Whether Defendant Fails To Ensure Adequate Case Plans Are Timely Developed and Implemented**

Each child in the Class is or will be in the same foster care system that suffers from ACS's failure to ensure that case plans are timely developed and implemented. These include ACS's failure to (a) ensure that the Contract Agencies engage in concurrent planning, (b) adequately monitor services for birth parents and caretakers and (c) ensure adequate and complete documentation in case records. And each child in the Special Scrutiny Subclass will be in the same foster care system that suffers from ACS's failure to ensure that children in foster care for more than two years receive "special scrutiny".

Questions of fact common to the class therefore include: (a) whether Defendant fails to ensure that the Contract Agencies engage in concurrent planning; (b) whether Defendant fails to ensure that the Contract Agencies adequately monitor services for birth parents and caretakers; and (c) whether Defendant fails to ensure adequate and timely documentation in case

51

records.  The record reflects that each of these case planning failures occurs in New York City as a direct result of ACS's lack of oversight.  *See* SOF Section E.2.

Similarly, whether Defendant fails to ensure that the Contract Agencies provide "special scrutiny" to children in foster care longer than two years is a question of fact that is common to the Special Scrutiny Subclass.  Here too, the record reflects that ACS fails to ensure that children in foster care for longer than two years receive "special scrutiny".  *See* SOF Section E.2.d.

### e.      Whether Defendant Fails To Take Steps To Ensure Timely Permanency

Each child in the Class is or will be in the same foster care system in which ACS fails to take steps to ensure permanency.  Whether Defendant fails to take steps to ensure timely permanency is therefore a common question of fact that is subject to class-wide resolution.  And, although not relevant for this inquiry, the record illustrates that, as a direct result of ACS's failures, New York City's permanency rates are abysmally low.  *See* SOF Section F.1.

Each child in the Compelling Reasons Subclass has suffered or will suffer from ACS's failure to ensure that the Contract Agencies document compelling reasons for failing to file a TPR petition when required to by ACS policy.  Whether Defendant fails to ensure documentation of compelling reasons not to file a TPR petition is therefore a question of fact that is common to the Compelling Reasons Subclass.  And the record reflects that ACS fails to ensure such documentation. *See supra* at 34-35.

### f.      Whether Defendant Fails To Protect Children in ACS Custody from an Increased Risk of Maltreatment

Each child in the Class is or will be subjected to an increased risk of maltreatment due to ACS's oversight failures.  Therefore, whether Defendant fails to protect children in ACS custody from this increased risk of maltreatment is a common question of fact.  And, although

not relevant for this inquiry, the record demonstrates that, as a direct result of ACS's failures, New York City's maltreatment rates are shockingly high.  *See* SOF Section F.2.

*        *        *

Because these six ACS failures are practices that are applied to each member of the Class, they act as "the glue that holds the class together".  *B.K.*, 922 F.3d at 969.

Questions of law common to the Class as to City Defendant include whether any of these six failures mean that children in the Class have been, and are at continuing risk of being, deprived of (1) their substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution; (2) their federal statutory right to a written case plan; (3) their federal statutory right to an appropriate case review system; (4) their state statutory right to timely, meaningful and appropriate case plans; (5) their state statutory right to placement in an appropriate foster placement; (6) their state statutory right to the timely filing of a petition to terminate parental rights or to documentation of a compelling reason not to do so; and (7) their contractual rights as third-party beneficiaries to the agreements between ACS and the Contract Agencies.  *See* Am. Compl. ¶¶ 341-58.

## 2.    Common Questions of Fact and Law as to State Defendant:

The common question of fact across the Class as to State Defendant is whether OCFS effectively exercises adequate and meaningful oversight over ACS and the Contract Agencies.  Each child in the Class is or will be in the same foster care system that suffers from OCFS's oversight failures.  Whether State Defendant effectively exercises adequate and meaningful oversight over ACS and the Contract Agencies is therefore a question that is common to the Class.  And, although not relevant for this inquiry, the record is clear that OCFS does in fact fail to effectively oversee and monitor the Contract Agencies.  *See* SOF Section H.

53

Because OCFS's oversight failures are a result of practices that are applied to each member of the Class, they act as "the glue that holds the class together." *B.K.*, 922 F.3d at 969.

Questions of law common to the Class as to State Defendant include whether OCFS's failure to effectively exercise adequate and meaningful oversight over ACS and the Contract Agencies means that children in the Class have been and are at continuing risk of being deprived of: (1) their substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution; (2) a written case plan in violation of ASFA; and (3) an appropriate case review system in violation of ASFA. *See* Am. Compl. ¶¶ 341-48.

*     *     *

The answer to these questions of law will help resolve in one stroke the constitutional, federal statutory, state statutory and contractual claims asserted by all members of the Class. Because there are questions of law and fact common to the Class, Named Plaintiff Children meet the commonality requirement of Rule 23(a).

## C.    Typicality

The Class also satisfies the typicality requirement of Rule 23(a)(3) because each class member's claim arises from the same course of conduct and "each class member makes similar legal arguments to prove the defendants' liability." *Marisol*, 126 F.3d at 376. Like commonality, typicality does not require that class representatives' claims be identical to those of their class. *See Toney-Dick*, 2013 WL 5295221, at *7 (citations omitted). Even in the context of foster care where children's particular circumstances differ, where, as here, a class representative claims that he or she is subject to policies and practices that apply equally to every member of the class, typicality is met. *B.K.*, 922 F.3d at 969-70.

Here, as to City Defendant, the "unlawful conduct [that] was directed at or affected" Named Plaintiff Children—that is, the six ACS failures identified above, *supra* at 50-

53—is the same unlawful conduct that has been "directed at or affected" all children in the Class. As a result, Named Plaintiff Children are typical of the Class. *Toney-Dick*, 2013 WL 5295221, at *7.[29]  Indeed, during their time in foster care, the care for Named Plaintiff Children was left in the hands of Contract Agencies that ACS did not adequately monitor.  SOF Section C.  Named Plaintiff Children were all at risk of being assigned to a caseworker who ACS did not ensure received adequate and appropriate training.  SOF Section D.  Named Plaintiff Children were all placed in foster homes without any consideration of their background, risk factors and characteristics, which is necessary to ensure an appropriate foster care placement.  SOF Section E.1.  All Named Plaintiff Children had (or continue to have) inadequate case plans which suffer from the same ACS failures, including a failure to ensure Contract Agencies engaged in concurrent planning, a failure to ensure services for birth parents and caretakers were adequately monitored, a failure to ensure complete and timely documentation in case files and a failure to ensure that children in care for longer than two years received special scrutiny.  SOF Section E.2.  All Named Plaintiff Children failed to receive timely permanency.  SOF Section F.1.  All Named Plaintiff Children were, and in some cases remain, at an increased risk of maltreatment, and several Named Plaintiff Children were maltreated while in care.  SOF Section F.2.  All Class members are at risk of suffering from these same failures.

As to State Defendant, Named Plaintiff Children's legal claims are typical of the Class because they arise from the same course of conduct—State Defendant's failure to exercise adequate and meaningful oversight over ACS and the Contract Agencies.  At all times while in foster care, Named Plaintiff Children were in the custody of ACS—the agency which OCFS has

---

[29] For this same reason, the claims of the Named Plaintiff Children that represent the Special Scrutiny Subclass and the Compelling Reasons Subclass are also typical of their respective subclasses.

failed to adequately oversee and monitor.  Because of OCFS's lax oversight, Named Plaintiff

Children were placed in the care of Contract Agencies that were inadequately monitored and thus

suffered, or were at risk of suffering, from ACS's numerous failures.  All Class members are at

risk of suffering from State Defendant's failure, and as such their claims arise from the same

course of conduct.

Accordingly, Named Plaintiff Children meet the typicality requirement of Rule

23(a).

### D.  Adequacy of Representation

Named Plaintiff Children "will fairly and adequately protect the interests of the

Class" as required by Rule 23(a)(4) because (1) the interests of Named Plaintiff Children are not

antagonistic to the rest of the Class, and (2) counsel for Named Plaintiff Children and the

proposed Class is qualified, experienced and able to conduct the litigation.  *See* Fed R. Civ. P.

23(a)(4); *Marisol*, 126 F.3d at 378.

Because Named Plaintiff Children seek structural and systemic reforms that will

provide the entire putative Class with the constitutional and statutory protections to which they

are legally entitled, *see* Am. Compl. at 119-24, the interests of Named Plaintiff Children are not

antagonistic to the rest of the Class.  *See Marisol*, 126 F.3d at 378 (finding Rule 23(a)(4)

satisfied where, as here, the named plaintiffs sought "broad based relief which would require the

child welfare system to dramatically improve the quality of all of its services, including proper

case management").  Nor is there any conflict between the proposed Class representatives; the

relief sought by each Named Plaintiff Child coincides with the relief sought for the Class as a

whole.  Am. Compl. at 119-24.  Moreover, because Named Plaintiff Children's legal claims arise

from conduct applicable to the entire Class, the proposed Class representatives "possess

sufficient interest to pursue the vigorous prosecution of their claims". *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 363 (E.D.N.Y. 2009) (quotations omitted).[30]

Counsel for Named Plaintiff Children will also adequately represent the Class, *see infra* Section III. Accordingly, Named Plaintiff Children meet the requirements of Rule 23(a)(4).

## II.   PLAINTIFF CHILDREN SATISFY REQUIREMENTS OF RULE 23(b)

In addition to satisfying Rule 23(a)'s requirements, the proposed Class meets the two criteria set forth in Rule 23(b)(2), which provides for class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). There is ample Second Circuit authority for certifying a Rule 23(b)(2) class in actions seeking to enjoin governmental actions and institutional policies that frustrate the rights of groups of vulnerable individuals. *See, e.g.*, *Robidoux v. Celani*, 987 F.2d 931, 939 (2d Cir. 1993) (delays in processing public assistance applications); *Marisol*, 126 F.3d at 375 (deprivation of constitutional and statutory rights of children in foster care or at risk of entering foster care); *Toney-Dick*, 2013 WL 5295221, at *11-*12 (denial of reasonable accommodations to disabled individuals who are or will be eligible for nutrition assistance program).

Where, as here, the relief requested involves a uniform group of remedies enjoining government actions and institutional policies, rather than "individualized determinations" with respect to particular plaintiffs, class certification under Rule 23(b)(2) is appropriate. *Toney-Dick*, 2013 WL 5295221, at *11; *B.K.*, 922 F.3d at 971 (upholding the

---

[30] For these same reason, the Named Plaintiff Children that represent the Special Scrutiny Subclass and the Compelling Reasons Subclass will also adequately represent their respective subclasses.

certification of a class of all children in foster care where "Rule 23(b)(2)'s requirements are

unquestionably satisfied when members of a putative class seek uniform injunctive or

declaratory relief from policies or practices that are generally applicable to the class as a whole")

(internal quotation marks and citation omitted).  Moreover, the Second Circuit takes an

expansive view with respect to the general applicability of the remedy:  "[R]elief to each

member of the class does not require that the relief to each member of the class be identical, only

that it be beneficial."  *Sykes*, 780 F.3d at 97 (citing *Wal-Mart*, 564 U.S. at 361).  If the injunctive

relief "sweeps broadly enough to benefit each class member", the class may be certified under

Rule 23(b)(2).  *Id*.

Plaintiff Children meet the standard of Rule 23(b)(2) because (1) Defendants have

acted or refused to act on grounds that apply generally to the class, and (2) final injunctive and

declaratory relief are appropriate for the class as a whole.  *First*, as described above, Defendant's

failures apply generally to the Class as a whole.  *See supra* Section I(B).  *Second*, Named

Plaintiff Children seek to remedy Defendants' failures through a uniform group of remedies that

is applicable to the Class as a whole.  *See* Am. Compl. at 119-124.

## III.    CLASS COUNSEL SATISFY REQUIREMENTS OF RULE 23(g)

Counsel for Named Plaintiff Children meet the requirements of Rule 23(g) and

request that they be appointed as class counsel in the event the Court certifies the Class.  When

appointing class counsel, the Court must consider:  "(i) the work counsel has done in identifying

or investigating potential claims in the action; (ii) counsel's experience in handling class actions,

other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge

of the applicable law; and (iv) the resources that counsel will commit to representing the class".

Fed. R. Civ. P. 23(g)(1)(A).  Named Plaintiff Children are represented by Marcia Robinson

Lowry, Executive Director of A Better Childhood, Inc., who has substantial experience and

expertise in federal child welfare class actions nationally, including serving as lead counsel for the class in *Marisol A. v. Giuliani*, No. 95 Civ. 10533 (RJW), Lowry Decl. ¶ 5, and attorneys from Cravath, Swaine & Moore LLP, including Julie A. North, a Member of the Firm, who has extensive experience in complex litigation in state and federal courts, North Decl. ¶¶ 4-5.

Prior to filing this action, Counsel conducted an in-depth investigation of New York City's child welfare system and spent many hours meeting with stakeholders, compiling and analyzing data and thoroughly researching all of Plaintiff Children's legal claims. Lowry Decl. ¶ 7; North Decl. ¶ 7. Since this action was filed, Counsel has conducted extensive document discovery and conducted depositions of the Contract Agencies that serve, or served, Named Plaintiff Children, as well as several employees of ACS and OCFS. *Id.* Counsel has also retained experts to opine on the significance of permanency in a child's development and to review the case records of Named Plaintiff Children. Counsel has committed and will continue to commit sufficient resources to prosecute this action in a thorough and expeditious manner. Their combined experience, knowledge, resources and dedication make them qualified to conduct this litigation.

## **CONCLUSION**

For the foregoing reasons, Named Plaintiff Children respectfully request that the Court grant the putative class representatives' renewed motion for class certification.

Dated:  July 30, 2019
New York, NY

Respectfully submitted,

By     *Marcia Robinson Lowry*

Marcia Robinson Lowry
Sarah W. Jaffe
A Better Childhood, Inc.
355 Lexington Avenue, Floor 16
New York, NY 10011
(646) 975-4456
mlowry@abetterchildhood.org
sjaffe@abetterchildhood.org

CRAVATH, SWAINE & MOORE LLP

*Julie A. North* /EW

Julie A. North
Gregg A. Fish
Max A. Winograd
Amanda S. Coleman
Eleanor J. G. Wasserman
Colleen M. Schmalberger
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
jnorth@cravath.com
gfish@cravath.com
mwinograd@cravath.com
acoleman@cravath.com
ewasserman@cravath.com
cschmalberger@cravath.com

*Attorneys for Plaintiffs Elisa W.; Alexandria R., by her next friend, Alison Max Rothschild; Thierry E., by his next friend, Amy Mulzer; Lucas T., Ximena T., Jose T.C. and Valentina T.C., by their next friend, Rachel Friedman; Ayanna J., by her next friend, Meyghan McCrea; Olivia and Ana-Maria R., by their next friend, Dawn Cardi; Xavion M., by his next friend, Michael B. Mushlin; Dameon C., by his next friend, Reverend Doctor Gwendolyn Hadley-Hall; Tyrone M., by his next friend, Bishop Lillian Robinson-Wiltshire; Brittney W., by her next friend, Yusuf El Ashmawy; Mikayla G., by her next friend, Amy Mulzer; Myls J. and Malik M., by their next friend, Elizabeth Hendrix; and Emmanuel S. and Matthew V., by their next friend, Samuel D. Perry, individually and on behalf of a class of all others similarly situated*