15 CV 5273 (KMW) (SLC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELISA W., *et al.*,

Plaintiffs,

-against-

THE CITY OF NEW YORK, *et al.*,

Defendants.

## CITY DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

*JAMES E. JOHNSON*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Rm. 2-178*
*New York, New York  10007*

*Of Counsel:  Jonathan Pines*
*Ian Forster*
*Sharon Sprayregen*
*Tel:       (917) 370-3015*
*Matter No.   2015-034233*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITES ................................................................................................iv

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS................................................................................................8

ARGUMENT

      POINT I

           PLAINTIFFS' COUNSEL FAIL TO
           DEMONSTRATE, BY A PREPONDERANCE OF
           THE EVIDENCE, THAT NAMED PLAINTIFFS,
           AND COUNSEL THEMSELVES, FAIRLY AND
           ADEQUATELY PROTECT THE INTERESTS OF
           THE CLASS, AS REQUIRED BY FED. R. CIV. P.
           23(a)(4) AND 23(g)..................................................................................9

      POINT II

           PLAINTIFFS HAVE FAILED TO SATISFY
           THEIR BURDEN UNDER RULE 23(a) OF THE
           FEDERAL RULES OF CIVIL PROCEDURE. .......................................18

          A.   Plaintiffs Do Not Satisfy the Preponderance of
               Evidence Standard Required by Fed. R. Civ. P.
               23(a)..................................................................................................18

          B.   Plaintiffs' Counsel Continue to Fail to
               Demonstrate, by a Preponderance of the
               Evidence, Sufficient Typicality as Between
               Named Plaintiffs and the Proposed Class
               Members as Required by Fed. R. Civ. P.
               23(a)(3)............................................................................................20

               1. Plaintiffs' counsel have failed to
                  acknowledge and correct for selection bias...................................20

          C.   Commonality: General Principles ......................................................25

          D.   Commonality Principles Applied: Plaintiffs'
               Proffered Common Questions Do Not Meet
               *Wal-Mart's* Requirement That They Generate

**Page**

Answers Sufficient to Drive the Resolution of the Litigation ......................................................34

1. Whether ACS Effectively Exercises Adequate and Meaningful Oversight of the Contract Agencies .......................................36

2. Whether ACS Fails to Ensure that Caseworkers Receive Adequate and Appropriate Training ......................................42

3. Whether ACS Fails to Consider the Child's Background, Risk Factors, and Characteristics in Evaluating a Foster Home, Matching and Making a Placement ...............45

4. Whether ACS Fails to Ensure Adequate Case Plans are Timely Developed and Implemented ...................................................48

   a. Concurrent Planning – Not Statutorily Required ...............................................48

   b. Ensuring that provider agencies adequately monitor services for birth parents and caretakers............................52

   c. Ensuring Timely Documentation: Not Statutorily Required................................53

   d. Ensuring Provider Agencies Apply "Special Scrutiny" to Children in Care More Than Two Years – Not Statutorily Required ...............................................54

5. Whether ACS Fails to Take Steps to Ensure Timely Permanency.......................................55

6. Whether ACS Fails to Protect Children in Care from an Increased Risk of Maltreatment ......................................................................61

**Page**

POINT III

      THE PROPOSED PLAINTIFF SUBCLASSES
      ARE NEITHER SUFFICENTLY DEFINED NOR
      SUFFICIENTLY COHESIVE TO MEET THE
      REQUIREMENTS OF RULE 23(B)(2)....................................................64

      A.  The "Special Scrutiny" Subclass, defined as all
           children who have been in ACS custody for
           more than two years and whose cases "require"
           special scrutiny, is grounded in a false premise
           that "special scrutiny" is an enforceable right....................................65

      B.  The "Compelling Reasons" Subclass is too
           vague and amorphous, and too riven by conflicts
           of interest, to warrant certification. ...................................................66

CONCLUSION ...........................................................................................................72

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                    **<u>Pages</u>**

*Aguilar v. Immigration & Customs Enforcement Div. of the United States Dep't of
    Homeland Sec.,*
    No. 07-CV-8224 (KBF), 2012 U.S. Dist. LEXIS 53367;
    2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012) .......................................................... 19, 33, 34

*Cleveland Board of Education v. LaFleur,*
    414 U.S. 632 (1974) ............................................................................................... 30

*Connick v. Thompson,*
    563 U.S. 51 (2011) ................................................................................................. 43

*Connor B. v. Patrick,*
    774 F.3d 45 (1st Cir. 2014), (D. Mass. 2013) .................. 34, 35, 36, 52, 53, 56, 60, 61, 67, 73

*Duran v. U.S. Bank Nat'l Ass'n,*
    325 P.3d 916 (2014) .............................................................................................. 21, 22

*General Telephone Co. of Southwest v. Falcon,*
    457 U.S. 147 (1982) .............................................................................................. 20, 24, 57

*Haddock v. Nationwide Fin. Svcs.,*
    293 F.R.D. 272 (D.CT 2013)................................................................................. 19

*Jamie S. v. Milwaukee Public Schools,*
    668 F.3d 481 (7th Cir. 2012)................................................................................. 27, 28, 29, 57

*Jermyn v. Best Buy Stores, L.P.,*
    276 F.R.D. 167 (S.D.N.Y. 2011) (McMahon, J.) ................................................. 31, 32

*In re Lamarcus E. (Jonathan E.),*
    934 N.Y.S.553 (3d Dep't 2011) ............................................................................ 11

*Marisol A. v. Giuliani,*
    126 F.2d 372 (2d Cir. 1997) ................................................................................. 20

*In re Mark T. v. Joyanna U.,*
    882 N.Y.S.2d 773 (3d Dept. 2009)....................................................................... 12

*Miles v. Bell,*
    621 F. Supp. 51 (D.CT 1985) ............................................................................... 53

*Monell v. NYC Dep't of Social Services,*
    436 U.S. 658 (1978) .............................................................................................. 23, 30

**Cases**                                                                            **Pages**

*Oklahoma City v. Tuttle*,
    471 U.S. 808 (1985) ........................................................................23, 30, 31, 43

*Estate of Puppolo v. Welch*,
    No. 14-cv-95, 2017 U.S. Dist. LEXIS 147312 (D. Vt. Sept. 12, 2017),
    *aff'd Puppolo v. Welch,* 771 F. App'x 64 (2d Cir. 2019) .......................................50

*Romano v. City of San Marcos*,
    No. 15-CV-839-RP, 2017 U.S. Dist. LEXIS 146775, 2017 WL 3996427
    (W.D.TX Sept. 11, 2017) ........................................................................................53

*In re Schenectady County Dep't of Social Services v. Joshua BB.*,
    92 N.Y.S.3d 430 (3d Dep't 2019) .........................................................................11

*Sherman v. Burwell*,
    15-CV-01468, 2016 U.S. Dist. LEXIS 103897 (D.Ct Aug. 8, 2016).....................31

*Taylor v. Zucker*,
    No. 14 CV 05317, 2015 U.S. Dist. LEXIS 98877 (S.D.N.Y. July 27, 2015)
    (McMahon, J.) ...................................................................................................19, 20

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2006) ..................................................................................19

*Wal-Mart v. Dukes*,
    564 U.S. 338 (2011) ...........................18, 19, 20, 23, 24, 26, 28, 31, 32, 36, 43, 44, 46, 49, 53

**Statutes**

7 N.Y.C.R.R. § 7.2(d)..................................................................................................11

18 N.Y.C.R.R. Part 436 ...............................................................................................62

42 U.S.C. § 671(a)(15)(B)(ii) ......................................................................................68

42 U.S.C. § 671(a)(16) .................................................................................................51

42 U.S.C. § 675(5)(B) and (E) .....................................................................................51

42 U.S.C. § 675(5)(D) ..................................................................................................68

42 U.S.C. § 675(5)(D)(i) ..............................................................................................71

42 U.S.C. § 675(5)(E)(iii) ............................................................................................54

FCA § 1055-b ...............................................................................................................62

**Statutes**                                                               **Pages**

FCA § 1089(a)(3) ...................................................................................... 53

FCA § 1089(d) ......................................................................................... 54

FCA § 1089-a .......................................................................................... 62

Fed. R. Civ. P. 23 .................................................................. 15, 19, 20, 28, 33

Fed. R. Civ. P. 23(a) .................................................................. 8, 18, 35, 66

Fed. R. Civ. P. 23(a)(2) ............................................................ 19, 26, 28, 29

Fed. R. Civ. P. 23(a)(3) ............................................................................. 20

Fed. R. Civ. P. 23(A)(4) .............................................................................. 9

Fed. R. Civ. P. 23(b)(2) .............................................................. 8, 19, 28, 66

Fed. R. Civ. P. 23(b)(3) ............................................................................. 22

Fed. R. Civ. P. 23(g) ............................................................................... 8, 9

Fed. R. Civ. P. 23(g)(4) ............................................................................. 15

N.Y. Soc. Serv. Law 131(3) ....................................................................... 13

N.Y. Soc. Serv. Law § 384-b ..................................................................... 13

N.Y. Soc. Serv. Law § 384-b (1)(a)(ii) ........................................................ 69

N.Y. Soc. Serv. Law § 384-b(3)(l)(1) .......................................................... 69

N.Y. Soc. Serv. Law § 384-b(3)(l)(ii) .......................................................... 70

N.Y. Soc. Serv. Law § 384-b(3)(l)(ii)(B) ..................................................... 71

N.Y. Soc. Serv. Law § 384-b, subd. 1(a)(ii)-(iv) ........................................... 13

N.Y. Soc. Serv. Law § 384-b, subd. 3(l)(i)(C) .............................................. 54

N.Y. Soc. Serv. Law § 458-b ..................................................................... 62

§ 1356.21(b)(4) ........................................................................................ 52

§ 1983 ..................................................................................................... 30

<u>**Other Authorities**</u>                                                                                    <u>**Pages**</u>

Herbert B. Newberg, William B. Rubenstein & Alba Conte, Newberg on Class
    Actions § 3:52. (5th ed. 2014) ................................................................................................ 16

Preliminary Statement

        This litigation was commenced in error.  Five years ago, Plaintiffs' counsel,
believing that a handful of anecdotes collected by then Public Advocate Letitia James from an
outreach to those "who have faced problems with the NYC foster care system"[1] yielded stories
"typical" of all children in New York City's foster care system, gathered up a dozen (later to
become nineteen) children in foster care associated with (but not the source of) those anecdotes
and rushed headlong into a lawsuit seeking to change virtually every aspect of that system.  Had
Plaintiffs' counsel taken the time to speak to the clients they purported to represent, or to consult
with advocates actually representing those children every day in New York's Family Courts, they
would have learned that their clients' actual experiences were far more nuanced and far less
common, one to another, than they alleged in a Complaint drafted without adequate pre-litigation
investigation; and that children selected only because of their association with dissatisfied adult
Family Court stakeholders could not possibly constitute a sample typical of the entire foster care
system.  In short, they would have heard a very different story, of case-distinguishing complexities
between one client and the next, and of remarkable, and documented, progress and innovation by
ACS, more in line with the (frankly remarkable) public rebuke from local advocates that greeted
this litigation at its inception:

_____

[1] *See* printout from Public Advocate's website, previously filed at Docket Entry ("DE") 208-2, appended
as an exhibit to the Declaration of Jonathan Pines, dated June 30, 2016 (DE 208) ("Pines Decl. I").  A total
of seventy-seven people responded to the Public Advocate's outreach efforts, from which Plaintiffs'
counsel ultimately selected nineteen children drawn from eleven families, to serve as Plaintiffs.  *See* excerpt
from Public Advocate "Policy Report: Foster Care Part II," dated July 2015, previously submitted at DE
208-3, at 6.  The selection process, such as it was, is described more fully in City Defendants' Memorandum
of Law in Opposition to Named Plaintiff Children's Motion for Class Certification, dated June 30, 2015
(DE 205) ("City's Mem."), annexed as an appendix to this memorandum, at 15-16.  The website page and
flyer are no longer available on the website of the current Public Advocate.

> Tamara Steckler, head attorney of the Juvenile Rights Practice of The Legal Aid Society, called the lawsuit "short-sighted." "This lawsuit is being brought by attorneys who have never represented clients in New York City's foster care system, yet purport to know how to fix it, at a time when foster care numbers are at an all-time low and collaboration is at an all-time high," Steckler said in a statement.

"Public Advocate Files Lawsuit Against City and State Foster Care Agencies," posted July 8, 2015 on Metro News website, https://www.metro.us/public-advocate-files-lawsuit-against-city-and-state-foster-care-agencies/ (last visited August 30, 2020) annexed to the Declaration of Jonathan Pines, dated August 31, 2020 ("Pines Decl. II"), as City's Ex. C.[2]

The extraordinary breach between Plaintiffs' counsel and local children's and parents' advocates from Day One of this lawsuit presaged the rough road ahead for Plaintiffs' counsel. Decisions of this Court early on in the litigation gave further support to the sense that Plaintiffs' counsel stumbled into this lawsuit not only in ignorance of but, to all appearances, utterly incurious or motivated to learn about the extraordinarily complex, tremendously innovative, and stakeholder-involved foster care system they had their sights set on taking over. Their first attempt to do so was through a hastily arranged settlement with State representatives, initiated within twenty-four hours of filing this lawsuit and months before Plaintiffs' counsel even disclosed to the Defendants (by Court order over Plaintiffs' counsel's opposition) the real names of the pseudonymous Plaintiff children. *See* DE 36, 38, 49.

By Memorandum Opinion and Order dated August 12, 2016, 2016 U.S. Dist. LEXIS 107093 (DE 259), this Court emphatically rejected Plaintiffs' counsel's proposed

---

[2] Ms. Steckler has since left The Legal Aid Society, succeeded in the position of Attorney-in-Charge of The Legal Aid Society's Juvenile Rights Practice by Dawne Mitchell. *See* https://www.legalaidnyc.org/about/leadership/ (last visited August 31, 2020).

settlement with the State (as to which local children's and parents' advocates both intervened to

join the City Defendant in vigorously opposing[3]).  This Court, noting that Plaintiffs' counsel "[did]

not demonstrate how their purported pre-litigation investigation connected meaningfully to the

Named Plaintiff Children …." (DE # 259 at 13, 2016 U.S. Dist. LEXIS 107093 at *22), went on

to explain more fully its concerns about the consequences of that lack of connection, finding, in

effect, that Plaintiffs' counsel were in such a rush to notch a political and public relations victory

that they forgot that they had real clients with real interests to whom they were ethically bound:

> The Children's Advocates, Parents' Advocates and City Defendants all point to the thin evidentiary record in this case as a factor undermining the settlement's procedural fairness, arguing persuasively that the Plaintiffs and State Defendants could not possibly have developed a proper appreciation for the strengths and weaknesses of the plaintiff children's claims against the State Defendants and, in turn, the propriety of the proposed remedies before entering into the settlement. … [T]he near-total abandonment of the settling parties' obligation to assess the merits of the Named Plaintiff Children's claims leads the Court to conclude that the Consent Decree is not entitled to a presumption of procedural fairness, and that the proponents have failed to establish that it was developed under conditions that were procedurally fair to the putative class.

---

[3] *See* Children's Advocates' submissions in opposition to the settlement (DE ## 180, 184, 185, 187, 188, and 202 (in addition to annexed exhibits); and Parents' Advocates' submissions in opposition (DE ## 181, 182, and 183).  These advocacy organizations, collectively representing, by far, the majority of stakeholders in Family Court, successfully moved to intervene for the express purpose of opposing the proposed settlement, arguing that it offered their clients no meaningful benefit.  Again, revealing a remarkable insensitivity to the children in whose name they purport to be prosecuting this action, Plaintiffs' counsel ignored the voluminous objections filed by those advocates representing the proposed settlement class (and their parents) in Family Court, suggesting to the Court that there had been silence from individual children objectors.  Pls' Memorandum of Law in Support of the Motion for Final Approval of the Settlement, Dkt. No. 224, at 15-16.  This Court disagreed:  "The Court concludes that the objections to the Consent Decree by the Children's Advocates and the Parent Advocates are significant for purposes of this factor of the *Grinnell* analysis, as these organizations are well suited to advocate on behalf of many of those whose interests would be affected by the Consent Decree."  DE 259 at 16, 2016 U.S. Dist. LEXIS 107093 at *27.

*Id*. at 14-15, 2016 U.S. Dist. LEXIS 107093 at *24-25.  The proposed settlement with the State –
by proposing to install roving monitors in State and City Defendants' offices to look for as-yet-
unidentified irregularities for an extendable term of seven years – might have effectively given
Plaintiffs' counsel their coveted role of commissioners-by-fiat, but it would have saddled their
clients with a corresponding seven-year release of claims against the State for no ascertainable
benefit to release-burdened members of the proposed settlement class.[4]  The Court rejected the
proposed settlement as "patently unfair and unreasonable."  *Id*. at 20-21, 2016 U.S. Dist. LEXIS
107093 at *34.

   Rejection of the settlement was followed in short order by this Court's equally
damning denial of class certification, again censuring Plaintiffs' counsel for their inadequate pre-
pleading factual investigation, and even questioning whether they were, in fact, representing the
individual children in whose names they purported to be prosecuting this lawsuit, or whether,
instead, they were echoing and advancing, unquestioningly, the potentially conflicting interests of
"other stakeholders":

> [City] Defendants have proffered evidence that calls into question the
> veracity of some of the factual allegations in the Amended Complaint
> and the degree to which those allegations reflect the perspective of the
> named Plaintiffs and those who have represented them in foster care

---

[4] The Court's assessment, finding that local-advocate intervenors did a far better job than Plaintiffs' counsel
did of speaking up for their clients' true interests, could not have been clearer, or more damning:

> Such a lengthy term, especially where the covenant [not to sue] would bar any systemic claims similar
> to the sweeping allegations raised by Plaintiffs in their Complaint, would be questionable even if
> the consideration provided by the settlement were clearly and effectively addressed to
> identified problems. On the current record, where the only undertakings by the settling defendants are
> to hire unspecified individuals to identify as yet unspecified problems in another agency [ACS] and
> make recommendations that the released and protected parties are not bound to follow, the Court
> concludes that the intervenors' concerns are well founded.

*Id*. at 18, 2016 U.S. Dist. LEXIS 107093 at *30.

proceedings, as opposed to the views of other stakeholders in Plaintiffs' particular foster care cases whose interests may not be entirely consonant with those of the named Plaintiff children. Defendants' evidence calls into question both the reliability of the specific factual assertions in the Amended Complaint and the consistency of Plaintiffs' broad assertions therein that problems (such as mental health issues, undue length of time in foster care, and lack of successful resolution of obstacles to family reunification) are attributable to faulty management and oversight of the foster care system and thus are central common factual issues that can be addressed with the sort of "one-stroke" determination that is contemplated by the class action mechanism.

Memorandum Order, dated September 27, 2016 (Dkt. 282) ("Class Cert. Mem. Order") at 2-3.

Notably, all of Judge Swain's above-stated questions can still be fairly posed to Plaintiffs' counsel today, with answers that remain fatal to their renewed class certification motion. Just as Judge Swain did when denying Plaintiffs' counsel's class certification motion four years ago, this Court has every reason to question "the consistency of Plaintiffs' broad assertions" that challenges like length of stay in care, among others, are credibly attributable to faulty management and oversight and capable of "one-stroke" remedy. *Id.* Now, as then, these challenges, among others, remain the focus of a complex network of judges, lawyers, families, children, and other foster care stakeholders not within ACS's control; and thus, as this Court correctly diagnosed, affect the progress of cases in multifarious ways that simply cannot "be addressed with the sort of 'one-stroke' determination that is contemplated by the class action mechanism." *Id*.

Now, four years after the Court's denial of their initial class certification motion, Plaintiffs' counsel return to this Court to seek certification of a Plaintiff class and, this time, two subclasses,[5] but continue to build their arguments upon insupportable assumptions, and

---

[5] Plaintiffs' counsel seek certification of a class of "children who are now or will be in the foster care custody of the Commissioner of ACS"; a sub-class of "all children who have been in ACS custody for more

uncorrected errors, specifically: the foundational assertion that the experiences of nineteen children, as described by unidentified adult stakeholders who "had problems with the NYC foster care system," can be credibly advanced as "typical" of the experiences of the 85,593 children who constituted the admission classes of those currently[6] in care, even though most children of those entry classes are long since out of the foster care system (*see* Wulczyn Rept., "Recap" section, at 5); that Plaintiffs' counsel's disagreements with case decisions in nineteen cases, or insistence on rigid adherence to best practices, even when not legally based, can somehow be transmuted into "common questions" sufficient to define and unite the proposed Class and Subclasses and move the litigation toward resolution; and that Plaintiffs' counsel, though not elected, appointed, or answerable to anyone, deserve to substitute their personal policy preferences for those of ACS Commissioner David Hansell and those he appointed or retained to exercise their own formidable expertise within the Executive branch of government, and whose work has achieved the remarkable successes described below and in the accompanying ACS declarations.

    To assist them in that effort, Plaintiffs' counsel have retained a team of nine social workers, including and headed by Caroline M. Long, Ph.D.[7] ("Long Team"), none of whom have ever been involved in New York Family Court practice or have any personal knowledge of or

_____

than two years and whose cases require 'special scrutiny' pursuant to ACS policy" ("Special Scrutiny Subclass"); and a sub-class of "all children for whom Contract Agencies failed to assess and document compelling reasons every three months to justify the decision not to file a termination of parental rights ('TPR') petition after the children had been in care for 15 of the past 22 months" ("Compelling Reasons Subclass").

[6] This number constitutes the total number of foster children who entered care in all of the admission years of the children in care on September 1, 2019 (*i.e.,* admission years 2001-2019). *See* Report of City Defendant's expert Fred Wulczyn, Ph.D., dated August 28, 2020 ("Wulczyn Rept.") at 3.

[7] Dr. Long identified herself as Caroline M. Burry at the time of the submission of the Long Team's Report.

experience with child welfare as practiced in this State; who assumed without questioning that aspirational agency standards constituted the baseline for assessing minimally adequate practice; and who professed to use a particular analytical methodology, Grounded Theory, that, in fact, they neither used nor appear to know anything about.[8]

What neither Plaintiffs' counsel nor their experts can possibly rebut – and what stands as an insurmountable barrier to Plaintiffs' counsel's claims of policies and practices so uniformly unlawful as to be common to and typical of the proposed Plaintiff Class and Subclasses are the ACS initiatives and well-documented results set forth in the accompanying Declarations of Julie Farber, ACS Deputy Commissioner for Family Permanency Services, dated August 31, 2020 ("Farber Decl."); and of Andrew White, ACS Deputy Commissioner for Policy, Planning and Measurement, dated August 31, 2020 ("White Decl."), submitted herewith.

For the reasons outlined above and for those and other reasons discussed more fully below, the Court should reject Plaintiffs' counsel's attempt (i) to claim that the experiences of a biased "sample" of nineteen children typify the experiences of the entire child welfare population; (ii) to convert their personal and ideological disagreements with child welfare practice in New York City into class-defining "common questions"; and (iii) to suggest that Plaintiffs' counsel, or indeed the Plaintiff children themselves, fairly and adequately represent the interests of the Plaintiff Class and Subclasses that they purport to represent.

---

[8] The Long Team's complete failure to apply Grounded Theory in their case review and in the resulting Long Report will be the subject of a *Daubert* motion by City Defendant, upon Defendant's receipt of documents responsive to document requests served upon Plaintiffs' counsel following Dr. Long's deposition on July 20, 2020.

## STATEMENT OF FACTS

The following documents will provide the Court with a roadmap into this years-long litigation:

- For an overview of New York City's foster care system and Family Court process, *see* City's Mem., DE 205, at 2-10 (appended hereto).

- For a discussion of class proponents' evidentiary burden under Fed. R. Civ. P. Rules 23(a), 23(b)(2), and 23(g), *see* City's Mem. at 10-34.

- For Judge Swain's denial of Plaintiffs' counsel's original motion for class certification, *see* Memorandum Order dated September 27, 2016 (DE 282) ("Class Cert. Mem. Order").

- For a discussion of current ACS policies and practices, as well as key ACS initiatives and documented results, including substantial increases in foster care and adoptive resource recruitment; streamlining of placement processes; training initiatives; enhanced supportive service for families planning for reunification; and the remarkable 38% reduction in the number of children in care more than two years between 2012 and 2018, *see* the Farber Decl.

- For a discussion of ACS's Improved Outcomes for Children, the State-approved program by which ACS delegates responsibility for day-to-day management of foster care to 26 non-profit agencies ("provider agencies") while retaining supervisory authority for performance standards and measures; and a description of ACS's rigorous and comprehensive provider agency monitoring and oversight processes, *see* the White Decl.

- For a discussion and rebuttal of case analyses prepared by the Long Team and included in a Report dated July 19, 2019 (DE 440-1) ("Long Rept."), and corrected version bearing the same date but submitted March 19, 2020 (DE 478) ("Corrected Long Rept.")[9], *see* the Report of Margaret A. Burt, dated August 31, 2020 ("Burt Rept.")[10].

- For a discussion of the weaknesses of Plaintiffs' counsel's typicality arguments from a statistical perspective, *see* the Wulczyn Rept.  Dr. Wulczyn is a Senior Research Fellow at the Chapin Hall Center for Children at the University of Chicago and special advisor to the United States Department of Health and

---

[9] Henceforth in this memorandum, all references to the Long Report will be to the Corrected Long Report (DE 478).

[10] Ms. Burt is a lawyer who has participated in drafting and providing training on virtually every piece of child welfare legislation passed in the State of New York for the last 20 years; has provided training to thousands of caseworkers in New York Practice for over 25 years, and to Family Court judges and court attorneys at both trial and appellate levels.  Burt Rept. at 1-2.

Human Services during the period when the Child and Family Services Reviews (CFSR) performance measures were being revised.

## ARGUMENT

### POINT I

**PLAINTIFFS' COUNSEL FAIL TO DEMONSTRATE, BY A PREPONDERANCE OF THE EVIDENCE, THAT NAMED PLAINTIFFS, AND COUNSEL THEMSELVES, FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF THE CLASS, AS REQUIRED BY FED. R. CIV. P. 23(a)(4) AND 23(g)[11]**

As noted above, Plaintiffs' counsel rushed into this litigation having failed to meet with their putative clients, learn their case facts, and ascertain their true interests; and, in the ensuing years, retained experts who have done little to cure these foundational cracks in this litigation. With an ignorance of their clients' stated interests that would be disqualifying in New York's courts, Plaintiffs' counsel have seemingly been motivated by an agenda-driven, rather than client-informed, strategy. They have identified purported problems – a purported delay in moving cases forward, or delays in permanency, or failure to identify reasons not to terminate parental rights, or failure to engage in concurrent planning (all discussed below) – that, in fact, are in many instances indicators of a system working, a system of zealous advocates and stakeholders endeavoring to resolve complex family circumstances and evolving, often divergent, interests, under the careful eye of a Family Court judge always seeking a resolution in the child's best interests. Absent any knowledge of their clients' expressed interests, Plaintiffs' counsel simply

---

[11] The City Defendant respectfully refers the Court to City's Mem. at 30-31 for a discussion of Plaintiffs failure to adequately represent the putative Plaintiff Class (and, by extension, the Subclasses not defined at that time); and to City's Mem. at 31-34 for a discussion of Plaintiffs' counsel's inability to fairly and adequately protect the interests of the Plaintiff Class (and, by extension, the since-proposed Subclasses).

cannot know whether what they call delay their clients might consider time desperately needed in order to attain successful, appropriate, and desired permanency.

In denying Plaintiffs' counsel's prior motion for class certification, this Court expressed concern about "the veracity of some of the factual allegations in the Amended Complaint and the degree to which those allegations reflect the perspective of the named Plaintiffs and those who have represented them in foster care proceedings, as opposed to the views of other stakeholders in Plaintiffs' particular foster care cases whose interests may not be entirely consonant with those of the named Plaintiff children."  Class Cert. Mem. Order at 2.

Remarkably, even after this Court questioned the veracity of the pleadings and the degree to which Plaintiffs' counsel truly spoke for the Plaintiff children, Plaintiffs' counsel never sought to correct any averments in the Amended Complaint in this action; nor, upon information and belief, did they once speak with their nineteen putative clients or meet with the attorneys for children ("AFC's") who represented those clients in Family Court to ascertain whether the named Plaintiffs had actually experienced the emotions expressly imputed to them in the Amended Complaint, or agreed with the goals Plaintiffs' counsel advanced in their names.

Plaintiffs' counsel's failures in this regard are significant, as they would have constituted grounds for disqualification had Plaintiffs' counsel advocated positions affecting those same clients in New York's Family Courts without consulting them.  Under New York's rules governing the representation of children in Family Court, "the attorney for the child must zealously advocate the *child's* position."  7 N.Y.C.R.R. § 7.2(d) (emphasis added).  Significantly, in New York, such advocacy does not permit a lawyer's divination of a child-client's "best interests"— permission Plaintiffs' counsel arrogate to themselves in this action—but requires of every AFC what is called "client-informed advocacy":

(1) In ascertaining the child's position, the attorney for the child must consult with and advise the child to the extent of and in a manner consistent with the child's capacities, and have a thorough knowledge of the child's circumstances.

(2) If the child is capable of knowing, voluntary and considered judgment, the attorney for the child should be directed by the wishes of the child, even if the attorney for the child believes that what the child wants is not in the child's best interests. The attorney should explain fully the options available to the child, and may recommend to the child a course of action that in the attorney's view would best promote the child's interests.

*Id*. at 7.2(d)(1), (2). New York courts are zealous in their enforcement of this obligation, even when the child is of pre-school age during the litigation. *See, e.g., In re Schenectady County Dep't of Social Services v. Joshua BB*., 92 N.Y.S.3d 430, 432 (3d Dep't 2019) (noting that "consultation with the child and subsequent communication of the child's position to Family Court are of the utmost importance"; and ruling that child was denied effective assistance of counsel where "[t]he record is bereft of evidence indicating that the AFC consulted with the child, who was from 4½ to 6 years old throughout the time of the litigation"); *see also In re Lamarcus E. (Jonathan E.)*, 934 N.Y.S.553, 555 (3d Dep't 2011) (relieving appellate counsel for failing to consult/advise nine-year-old client, finding that "[c]lient contact, absent extraordinary circumstances, is a significant component to the meaningful representation of a child").

In New York, an AFC's obligation for consultation is continuing and the failure to consult, disqualifying. Because children can be expected to change their minds as they grow, courts have even faulted appellate counsel for relying upon the interests of the child as expressed to trial counsel below, without continuing to consult the child for his possibly changing interests as the litigation proceeded to appeal. *See, e.g., In re Mark T. v. Joyanna U.,* 882 N.Y.S.2d 773, 776 (3d Dept. 2009) (relieving AFC for failure to consult; on appeal, child entitled "to have the opportunity to articulate a position which—with the passage of time—may have changed").

11

The City Defendant does not suggest that Plaintiffs' counsel in this action are bound by the provisions applicable to AFCs in Family Court. However, Plaintiffs' counsel, in urging, for example, that more Terminations of Parental Rights ("TPRs") be filed, and filed more quickly than the Family Court judges presiding over permanency hearings appear to think appropriate – are clearly advancing interests favoring TPRs and adoption over reunification. In so doing, they threaten to do substantial violence not only to the interests of putative absent class-members and their parents, but also to the contrary views and rulings of Family Court judges themselves, who often choose, consistent with New York's clear legislative preference and in the exercise of their discretion, reunification-favoring delay over Plaintiffs' counsel's adoption-favoring policy preferences.

In addition to advancing policy preferences at odds with a significant portion of their clients and other children in ACS's care, Plaintiffs' counsel's insistence on an aggressive, earliest-possible TPR-and-adoption regime is also at odds with New York's stated legislative preference for reunification if at all possible, with TPR as an absolute last resort. *See* "Statement of legislative findings and intent," N.Y. Soc. Svc. Law § 384-b, subd. 1(a)(ii)-(iv).[12]

---

[12]     1. Statement of legislative findings and intent.

   (a) The legislature recognizes that the health and safety of children is of paramount importance. To the extent it is consistent with the health and safety of the child, the legislature further hereby finds that:

      . . .

   (ii) it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home of its birth parent, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered;

   (iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home; and

But, perhaps most concerning, Plaintiffs' counsel's client-ignoring strategies are demonstrably contrary not only to the interests of putative absent class members, but also hostile to the interests of their own individual clients, the named Plaintiff children.  Plaintiffs have put forward Plaintiffs Ana-Maria R. and Olivia R., Brittney W., Dameon C., Emmanuel S. and Matthew V., Myls J., the T.C. Children, Thierry E., Tyrone M. and Xavion M. as representatives of the "Compelling Reasons" subclass – in other words, a proposed subclass purportedly injured because there was insufficient documentation of a statutorily authorized exception to the otherwise statutory obligation to file a TPR petition when a child has been in care for the last 15 of 22 months ("15/22 Rule").[13]  However, while Plaintiffs' counsel urge a "document or terminate parental rights" policy, it seems doubtful, at best, that these Subclass representatives, involuntarily drafted as they were into this lawsuit and, presumably, into Subclass representation, would have authorized their lawyers to urge such a position in their names:  Six of these children – Thierry E., Xavion M., and the four T.C. Children (Jose T.C., Lucas T., Valentina T.C. and Ximena T.) were ultimately reunited with their birth mothers.[14]  These permanency outcomes of reunification –

---

(iv) when it is clear that the birth parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child.

N.Y. Soc. Serv. Law § 384-b; *see also* Soc. Serv. Law 131(3) ("As far as possible families shall be kept together, they shall not be separated for reasons of poverty alone, and they shall be provided services to maintain and strengthen family life…").

[13] For an explanation of the provisions of the 15/22 Rule, including the many statutory exceptions to the TPR-filing requirement, *see* City's Mem. at 8-9; and this memorandum, below, at 68-72.

[14] Perhaps had they taken the time to meet with their clients, Plaintiffs' counsel would also have learned that at least two more of the children involuntarily pressed into service as Compelling Reasons Subclass representatives, Emmanuel S., Matthew V., and Tyrone M. had been placed in kinship care with relatives – a category of placement that is statutorily exempt from the 15/22 Rule and any TPR filing requirement. In other words, these three children never faced the prospect of a mandatory TPR filing, never needed to have a compelling reason noted in their case files, and therefore are not even appropriate *members,* let alone representatives of the Compelling Reasons Subclass.  See Burt Rept., App'x 1 at 4-5.  That neither

outcomes expressly favored by New York's Legislature – demonstrate not merely a legal conflict

of interest, but more fundamentally, a wrenching clash of goals as between Plaintiffs and Plaintiffs'

counsel, with counsel's pro-TPR agenda on the one hand and, on the other, Plaintiffs' deeply

personal stake in an altogether different permanency outcome.

Additionally, there is evidence demonstrating a similar conflict as between named

Plaintiffs and absent putative class members.  For a discussion of the contours of this conflict, *see*

City's Mem. at 15-17 & nn. 14-16, and City Exs. B (DE 208-2) and C (DE 208-3) annexed to

Pines Decl. I (DE 208).

To the extent any Plaintiffs might favor faster TPR filings – and Plaintiffs' counsel

have provided no evidence whatsoever that such named Plaintiffs exist – there is clear evidence

that a significant proportion of *absent* class members – as many as one-third or more – might well

disagree with Plaintiffs' counsel's (and any potentially similarly aligned named Plaintiffs')

demand for TPR at the earliest opportunity.  In 2017, of the 396 children for whom a TPR filing

appeared to be overdue, more than one-third (135 children) were discharged from care within the

next twenty-four months either to reunification (123 children) or to Kinship Guardianship (12

children).  *See* annexed Declaration of Allon Yaroni, dated August 28, 2020 ("Yaroni Decl."), at

¶ 5.  It would seem inconceivable that these children – possibly as many as one-third of absent

putative class members – would agree with Plaintiffs' counsel's strategy urging speed to TPR and

adoption over a longer road to reunification with family or relatives simply because a compelling

reason to defer a TPR filing is not documented in a case file.  Certainly, Plaintiffs' counsel have

---

Plaintiffs' counsel nor their experts, both of whom are presumed to know Plaintiffs' case facts, realized this mistake constitutes an extraordinary lapse in knowledge of the Plaintiff children's circumstances, legal status, and true interests.

provided this Court with no proof that any absent Class members would align themselves with Plaintiffs' counsel and such theoretical Plaintiffs as might choose speed to adoption over desired, even if delayed, reunification.

> As one commentator has observed:
>
> Adequacy of representation now appears … in two distinct places in Rule 23—in Rule 23(a)(4)'s requirement that the class representative adequately *protect* the interests of the class and in Rule 23(g)(4)'s requirement that class counsel adequately *represent* the interests of the class.   The recent emphasis on the latter requirement reflects the fact that the doctrine is beginning to catch up with the reality of class action practice: that the class's interests are truly in the hands of class counsel and that someone must ensure that class counsel adequately serves those interests.

Herbert B. Newberg, William B. Rubenstein & Alba Conte, Newberg on Class Actions § 3:52. (5th ed. 2014) ("Newberg") (emphasis in original).  Plaintiffs' counsel have not proved themselves capable of making that assurance to the Court.

Plaintiffs' counsel will likely counter that they only seek faster permanency, whether reunification or adoption, but that claim, made by strangers to New York's due process-intensive Family Court and appellate system, ignores the crucial role played by zealous advocates, often court-appointed, for all key stakeholders, and indeed, the deep involvement of the Family Court at every meaningful stage of a case.  In this context, speed for speed's sake, translated to harsh, inflexible decisions that don't give parents time to meaningfully benefit from offered supportive services; or deprive an ideal adoptive resource time to prepare for that adoption rather than be replaced, in the interest of speed, by a less optimal placement; or thwart a deeply involved Family Court judge in exercising needed discretion to move the case to permanency at the pace s/he deems fair, safe, and appropriate, is a recipe for broken families, broken adoptions, and failure. Such a speed-obsessed policy would force on all participants an inflexible, agenda-driven approach

to permanency, favored by Plaintiffs' counsel alone, that federal law does not require, State law affirmatively disfavors, and a substantial proportion of absent class members would likely strenuously oppose.

Given the extraordinary consequences of the relief Plaintiffs' counsel advocate, it should certainly continue to concern this Court that counsel never troubled to speak with any of their clients (some of whom are teens and older) about the goals of this litigation, and the consequences of the relief sought in the Plaintiff children's names.  (Significantly, throughout the entirety of this litigation, Plaintiffs' counsel have never filed a declaration from even one of the nineteen Plaintiff children evidencing even an awareness, let alone support, of this litigation's goals.[15])  It should also concern this Court, as it concerned Judge Swain four years ago (Class Cert. Mem. Order, DE 282, at 2), that Plaintiffs' counsel, in the absence of any meaningful input from their clients, are necessarily advancing their own personal policy preferences (or those of unidentified adult respondents to the former Public Advocate's flyer) over those possibly divergent interests of their clients, as described above.

In addition to the above grounds cited by this Court in denying class certification in 2016, the Court expressed concerns about "a dearth even of allegations [as opposed to supporting evidence] concerning case work and conditions at most of the separate third-party agencies with which New York City contracts to provide foster care…."  Mem. Order at 3.  Again, it is remarkable that Plaintiffs' counsel continue to disregard the Court's concerns about their failure to cover "most of the separate third-party [foster care] agencies," choosing not to add

---

[15] Similarly, upon information and belief, none of the next friends appointed by this Court have ever met with or heard from the children in whose behalf they appear about the goals of the litigation.

additional plaintiffs sufficient to adequately represent all twenty-six[16] ACS-contracted foster care agencies.  As discussed more fully below, Plaintiffs' counsel's ill-advised choice to seek classwide relief on behalf of nineteen putative class representatives (only one of whom remains in care[17]) whose interests appear in conflict with Plaintiffs' counsel's strategic choices and whose widely varying interest in speed to reunification or adoption raises serious concerns about conflicts of interest as among individual class members (or even Class representatives); whose collective experience involves only eleven of the twenty six agencies under contract with ACS to provide foster care services and, with one exception, who are not subject to ACS's current policies and practices, is fatal to any plausible claim of adequate representation in an action seeking only prospective injunctive relief.

---

[16] At the time of the prior class certification motion practice, there were 28 provider agencies under contract with ACS to provide foster care services.  Since then, two pairs of agencies have merged or affiliated – Little Flower Children's and Family Services of New York and St. John's Residence for Boys have affiliated; and Leake & Watts Services, Inc. and Edwin Gould Services for Children and Families have merged into a new organization, Rising Ground, resulting in the current total of 26 providers.

[17] Of the eighteen Plaintiffs no longer in care, eleven have been adopted by their foster parents (adoption dates follow names); six have been reunited with their birth mothers (dates of discharge/reunification follow names); and one, after signing out of care at age 18, voluntarily returned to care, only to be discharged from care by Family Court order after leaving foster care without permission:

Adopted:  ANA-MARIE R. & OLIVIA R (6/14/16); DAMEON C. (8/2/16); ALEXANDRIA R. (9/13/16); BRITTNEY W. (5/3/18); TYRONE M. (8/14/18); EMMANUEL S. & MATTHEW V. (10/17/18); MALIK M. & MYLS J. (11/15/18); MIKAYLA G. (11/22/19)

Reunited:  XAVION M. (3/31/16); THIERRY E. (8/16/18); JOSE T.C./LUCAS T./ VALENTINA T.C./XIMENA T. (9/13/19)

ELISA W.: Signed out of foster care upon reaching 18 on 9/3/16; voluntarily returned to care 3/26/18; placement terminated after leaving foster care without permission and discharged from care by Family Court 1/15/19.

Of the nineteen Plaintiffs, only AYANNA J. remains in care.  *See* Declaration of Nancy Thomson, Associate Commissioner for Family Court Legal Services, dated August 28, 2020, at ¶¶ 5-8.

## POINT II

## PLAINTIFFS HAVE FAILED TO SATISFY THEIR BURDEN UNDER RULE 23(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

### A.   Plaintiffs Do Not Satisfy the Preponderance of Evidence Standard Required by Fed. R. Civ. P. 23(a).

The Supreme Court described the purpose of Fed. R. Civ. P. 23(a) as follows: "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.  The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotations and citations omitted).  "Rule 23 does not set forth a mere pleading standard.  A party seeking class cert must affirmatively demonstrate his compliance with the rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." 564 U.S. at 350 (emphasis in original).  Not only must class proponents satisfy all of Rule 23's requirements, but they must do so by a preponderance of the evidence.  "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 546 F.3d 196, 202 (2d Cir. 2006).

The Court in *Wal-Mart* made clear that a trial court's review of a class proponent's proffer must be exacting:  "Certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Wal-Mart*, 564 U.S. at 350-351 (internal citation omitted).   As many courts have noted, *Wal-Mart* "upped the ante on 'commonality' under Rule 23(a)(2) and narrowed the application of Rule 23(b)(2)."  *Haddock v.*

*Nationwide Fin. Svcs.*, 293 F.R.D. 272, 279 (D.CT 2013).  Judge Katherine B. Forrest echoed that

observation:

> There can be little doubt that the Supreme Court accepted certiorari and decided [*Wal-Mart*] for a reason. It reiterates and reemphasizes the principles which must guide a district court's determination of class certification, and in particular, with respect to an injunctive class. It is possible that had the plaintiffs here moved for class certification prior to the issuance of *Wal-Mart*, and long before 2012, that the outcome here would be different. Nevertheless, *Wal-Mart* is controlling precedent, and five years have elapsed between when this case was filed and today. Those are important factors in this Court's decision.

*Aguilar v. Immigration & Customs Enforcement Div. of the United States Dep't of Homeland Sec.*,

No. 07-CV-8224 (KBF), 2012 U.S. Dist. LEXIS 53367 ; 2012 WL 1344417 (S.D.N.Y. Apr. 16,

2012); *see also Taylor v. Zucker*, No. 14 CV 05317, 2015 U.S. Dist. LEXIS 98877 (S.D.N.Y. July

27, 2015) (McMahon, J.) (finding negligible precedential import in *Marisol A. v. Giuliani*, 126

F.2d 372 (2d Cir. 1997), because decided pre-*Wal-Mart*).[18]

       *Wal-Mart* also made clear that "Rule 23 does not set forth a mere pleading standard.

A party seeking class certification must affirmatively demonstrate his compliance with the Rule—

that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common

questions of law or fact, etc."  564 U.S. at 350 (emphasis in original).  "[A]ctual, not presumed,

conformance with Rule 23(a) remains . . . indispensable." *General Telephone Co. of Southwest v.

Falcon*, 457 U.S. 147 (1982).  In order to engage in that analysis, "it may be necessary for the

---

[18] For a discussion of Chief Judge McMahon's remarkably apposite analysis in *Taylor v. Zucker*, finding that New York's reliance on 68 contractors to implement state policy, combined with counsel's failure to field sufficient numbers of plaintiffs to constitute a representative sample of all such contractors, precluded findings of commonality and typicality necessary to certify the proposed class, *see* City's Mem., DE 205, at 24-27.

court to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart,* 564 U.S. at 160.

Four years ago, this Court subjected Plaintiffs' counsel's class claims and supporting evidence to the rigorous analysis required by *Wal-Mart*, and found them patently insufficient.  Plaintiffs' counsel's second attempt is equally unavailing.

**B. Plaintiffs' Counsel Continue to Fail to Demonstrate, by a Preponderance of the Evidence, Sufficient Typicality as Between Named Plaintiffs and the Proposed Class Members as Required by Fed. R. Civ. P. 23(a)(3).[19]**

Plaintiffs' counsel's "method" of selecting the named Plaintiffs – by soliciting responses exclusively from "those dissatisfied with their experience with ACS" – was tainted from the outset by "selection bias" and "non-response bias," flaws that preclude any credible claim of Plaintiffs' typicality to the proposed Plaintiff Class or Subclasses.[20]

**1. Plaintiffs' counsel have failed to acknowledge and correct for selection bias.**

"Selection bias occurs when members of the population are chosen based on a nonrandom criterion or are selectively included or excluded from the sample group."  *Duran v. U.S. Bank Nat'l Ass'n*, 325 P.3d 916, 941 (2014).  It is hard to imagine a less randomly selected group of plaintiffs than the nineteen children selected here, all drawn from the Public Advocate's outreach to dissatisfied foster care stakeholders.  *Duran*, a decision from California's highest state

---

[19] City Defendant incorporates the Typicality argument set forth in the City's Mem., DE 205 (copy appended) at 27-29.

[20] For a fuller description of the flawed process by which Plaintiffs' cases were chosen by Plaintiffs' counsel, *see* City's Mem., DE 205, at 15-16.

court and one of the few cases discussing selection bias at length, explains that if a sample is biased from its inception, its utility is forever impaired:

> A sample that includes even a small number of interested parties can produce biased results. The impact of this error is magnified when the biased results are extrapolated to the entire population. Selection bias cannot be cured simply by increasing the size of the sample. "When a selection procedure is biased, taking a large sample does not help. This just repeats the basic mistake on a larger scale." (Freedman et al., Statistics (4th ed. 2007) p. 335.)

*Duran, id*, at 941.  Similarly, the court faulted the sample drawn in *Duran* for "non-response bias," a flaw arising when drawing a sample from people who elect to respond to a survey, as Plaintiffs' counsel did in this litigation:

> [N]onresponse bias can occur if a sample is chosen randomly from a group containing only survey respondents.  The potential for bias arises because those who do not respond have *no* probability of inclusion in the sample.  Thus, although the participants are randomly selected from among respondents, the sample will not reflect the characteristics of members of the population who chose not to respond to the survey.  (Phillips et al., *What's Good in Theory May Be Flawed in Practice: Potential Legal Consequences of Poor Implementation of a Theoretical Sample* (2012), 9 Hastings Bus. L.J. 77, 90-91.)

*Duran*, *id*. (emphasis in original).  While *Duran* involved the state equivalent of a Rule 23(b)(3) damages class, with arguably more rigorous requirements for random sampling, the court's analysis of the problems accruing from biased samples should clearly sound a cautionary alarm regarding reliability when similarly biased samples are used in (b)(2) injunctive class litigation.

Here, the Public Advocate's outreach efforts affirmatively screened out potential respondents who were *not* "dissatisfied with their experience with ACS" – in other words, all respondents who felt they were beneficially, fairly, or even neutrally treated by ACS had no chance of being included in the resulting sample.

Remarkably, Plaintiffs' counsel make no attempt whatsoever to defend Plaintiffs' typicality as mapped to the putative Class or Subclasses. Significantly, they retained no statistical or other expert to validate the randomness of their Plaintiff selection or the typicality of the resulting Plaintiff groups' claims.[21] Rather, they claim instead that, with a (b)(2) class, typicality is satisfied by the mere "claim," not even proof, "that [a plaintiff] is subject to policies and practices that apply equally to every member of the class." Pls' Mem. at 54. If so, of course, there is literally no employment case that could not be certified as a class, because every employee "is subject to policies and practices that apply equally to every member of the class." Clearly, Plaintiffs' counsel's conception of typicality cannot be squared with the case law, or, frankly, with the real world of corporations and governments, where employees, by definition, are subject to "policies and practices that apply equally to every member" of the organization. Plaintiffs' counsel must prove that the supposedly class-uniting "policy" is, in fact, unconstitutional. *See, e.g., Oklahoma City*, 471 U.S. at 823 ("some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter").

Most pointedly, Plaintiffs' counsel's conception of typicality cannot be squared with the Supreme Court's clear rejection of such over-generalized pleading and proof in *Wal-Mart*, a (b)(2) class action in which the Court faulted the plaintiffs insufficiently small and non-

---

[21] As the court observed in *Duran*, "class counsel are entitled to select named plaintiffs in a manner that enhances their position. But that tactical choice should not compromise the statistical approach required for random sampling." *Id.* at 941. Plaintiffs' counsel retained nine social workers to comb through Plaintiffs' case files to identify "practice departures." Those experts were not asked to validate the sample of Plaintiffs' cases they reviewed to make any findings as to typicality, nor did they attempt to account for possibly biased sampling in the nineteen cases they were tasked with reviewing. Long Tr. 158:8-16 (City's Ex. D). Plaintiffs' counsel offer nothing to assist this Court in analyzing typicality.

representative sampling of employees' experiences, and pointedly rejected discrimination claims made at Plaintiffs' counsel's suggested level of generality. *Wal-Mart*, 354 U.S. at 349-350 (counsel's reciting of questions like "Is that an unlawful employment practice" … is not sufficient to obtain class certification").

Plaintiffs, who came into foster care between 2002 and 2015, represent a staggeringly small 0.02% of the 85,593 children who came into care during the admission years represented by those children in care on September 1, 2019. *See* Wulczyn Rept. at 3. Compare that to the plaintiffs' evidence in *Wal-Mart*, where the Court deemed a far more representative sample to be completely inadequate:

> [R]espondents filed some 120 affidavits reporting experiences of discrimination .. relating to only some 235 out of Wal-Mart's 3,400 stores. More than half of these reports are concentrated in only six States..; half of all States have only one or two anecdotes; and 14 States have no anecdotes about Wal-Mart's operations at all. Even if every single one of these accounts is true, that would not demonstrate that the entire company "operate(s) under a general policy of discrimination."

*Wal-Mart,* 564 U.S. at 358 (citing *Falcon*, 457 U.S. at 159). As noted above, Plaintiffs collectively experienced care from 11 of 26 provider agencies, fewer than half of the agencies currently under contract with ACS to provide foster care services. Plaintiffs only represent eight entry years out of the nineteen years represented by children in care as of September 1, 2019. *See* Wulczyn Rept. at 3. Approximately 15%, or one in six, of those 85,593 children left care within 30 days of placement; one in four left care within 90 days. *Id*. at 3. Because of the selection bias that infected the choice of Plaintiffs from the start, no child who left care within 30 or 90 days of placement was included in counsel's selection of nineteen Plaintiffs – and, in all likelihood, no one associated with children who left care within those timeframes even responded to the Public Advocate's outreach.

City Defendant's expert Fred Wulczyn analyzed the number of Plaintiffs chosen by Plaintiffs' counsel as well as counsel's method of selection, and concluded that counsel cannot possibly prove typicality as between the nineteen Plaintiffs and the total population of children in care for which they are being offered.  His findings are summarized as follows:

- There were 8,850 children in care in New York City as of September 1, 2019 (defined for this purpose as "current population"), or 10.3% of all of the 85,539 children who entered care in the same years (2001-2019) as the current population ("total entry years cohort").  Of that 85,539-member cohort, 76,743 children are no longer in care.  Wulczyn Rept. at 3.

- Plaintiffs represent only eight of the nineteen entry years of children currently in care, and only 0.02% of the total entry years cohort of 85,539 children.  *Id.*

- Fifteen percent of the children in care between 2001 and 2018 left care within thirty days; twenty-five percent left care within 90 days.  *Id.* at 3.

- Choosing the federal permanency rate goal (40.5% within a year of entry) as an example, and using a 5% margin of error with a 95% confidence interval, Dr. Wulczyn found that Plaintiffs' counsel would have needed a sample of 369 children *randomly* selected from the 85,539-children in the total entry years cohort in order to credibly claim typicality between sample and universe. Using more rigorous parameters (2% error margin and 99% confidence interval) that he deemed advisable if attaching any significant consequences to the data, Plaintiffs' counsel would need a random sample of 3,819.  *Id.* at 5.

- Even applying the above metric to the smaller universe of 8,850 children in care on September 1, 2019, using the 5% error margin and 95% confidence interval, Plaintiffs' counsel would have needed to randomly draw 356 cases to credibly claim typicality.  The more rigorous parameters would require a random sample of 2,754.  *Id.*

Regarding Plaintiffs' counsel's small and skewed selection of nineteen Plaintiffs, Dr. Wulczyn concludes:

> The children in care on 9/1/2019 are themselves a subset (but by no means a random sample) of the 85,593 children with whom they entered care.  Of those 85,593 children, 76,743 were no longer in ACS's care as of 9/1/2019.  Thus, the claims made by the Plaintiffs fail to incorporate the experiences of children who left care.  This is a fundamental bias that renders generalization to the population of children who are likely to enter care impossible.  Specifically, the Plaintiffs have failed to acknowledge or account for the experiences of children who left care by excluding those children.  It is

> tantamount to saying once a child enters care, they won't leave, which is clearly not the case.

*Id*. at 5.  Finally, echoing arguments discussed below and developed more fully in the Burt Report, regarding the constellation of factors leading to any foster care outcome only some of which fall within ACS's ambit and the rest of which Plaintiffs' counsel ignore at the cost of statistical validity and sound logic, Dr. Wulczyn has this to say:

> Plaintiffs' reasoning is tied up in the following structure:
> > If it is raining, then the streets will be wet.
> > The streets are wet.
> > It is raining.
>
> Though this reasoning has its appeal, there is an obligation to explore whether other causal explanations account for the identified outcome.  To establish that a poorly run system accounts for the adverse outcomes requires a more comprehensive approach that includes a concerted effort to rule out the competing explanations. I find no evidence of that work having been done."

*Id*. at 6.  That work was not done; Plaintiffs' counsel's expert admitted as much.  Long Tr. 158:8-16 (City's Ex. D).

It is virtually impossible to make any reasonable inferences about the universe of children in care now or in the future from a sample this small, this distributed over various years of entry into care, and this tainted.  As a result, the Court should deny certification for Plaintiffs' counsel's failure to prove typicality by a preponderance of the evidence – a failing that is a sufficient basis, standing on its own, for denial of class certification.

## C.  Commonality:  General Principles

Commonality, one of the four prerequisites for class certification listed in Fed. R. Civ. P.  23(a)(2), requires that there be "questions of law or fact common to the class." The mere ability of a lawyer to frame a "common question" at some level of generality, at least post-*Wal-Mart*, "is not sufficient to obtain class certification.  Commonality requires the plaintiff

to demonstrate that the class members have suffered the same injury.  This does not mean merely that they have all suffered a violation of the same provision of law."  *Wal-Mart,* 564 U.S. at 350.  Rather, "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  The Court further explained that "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  564 U.S. at 350 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev 97, 132 (2009) (emphasis in original)).  As discussed below, the six common questions proffered by Plaintiffs' counsel are perfect examples of questions whose answers will not drive the resolution of the litigation, and only highlight dissimilarities within the proposed Class and Subclasses

Failing to subject a proponent's class allegations to the rigorous scrutiny mandated by *Wal-Mart* – and thereby failing to appreciate the dissimilarities within a proposed class that impede the generation of common answers – risks not only the erroneous certification of that class, but also the possible squandering of judicial time and resources on remedial orders issuing to a class that collapses when appropriate scrutiny is finally applied, even belatedly on appeal.

The decision of the Seventh Circuit in *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012) is instructive in that regard, involving commonality claims analogous to those asserted herein, and revealing the hazards of anything less than rigor in the commonality analysis.  In *Jamie S.*, seven students brought suit against city and state defendants – the Milwaukee Public Schools ("MPS") and the Wisconsin Department of Public Instruction ("DPI") – alleging

"widespread violations of the IDEA [Individuals with Disabilities Education Act] touching on nearly every aspect of MPS's implementation of the Act," resulting in "a long-running class-action lawsuit seeking structural reform of special education in the Milwaukee public school district." *Id.* at 484-485.   The district court rejected what the Circuit called the "plaintiffs' ambitious proposed class," but certified a class of special education-eligible students "who are, have been, or will be denied or delayed entry into or participation in the IEP process." *Id.* at 485.

After a bench trial resulting in liability findings against both the city and state defendants, "the court ordered a complex remedial scheme requiring MPS to set up a court-monitored system to identify disabled children who were delayed or denied entry into the IEP process, implement 'hybrid' IEP meetings, and craft compensatory-education remedies."  *Id* at 485.  Following the liability finding, the state defendant entered into a court-approved settlement with plaintiffs in which it agreed to hold the city defendant MPS to certain benchmarks. Milwaukee appealed not only the liability and remedial orders, but also the class certification decision underlying those orders, and even the court's approval of the separate state settlement. *Id.*

The Seventh Circuit began its review with an observation about the MPS special education system that could be applied to the claims presented in this action:  "Each step in the process is highly individualized because every child is unique." *Id.*  With that as its starting point, the Circuit rejected the lower court's finding of commonality and other Rule 23 factors, and upended the entire remedial scheme crafted by the court and the parties at the trial level, vacating the injunctive and remedial orders, as well as the class certification order and even the order approving the settlement reached between plaintiffs and the state defendant, because all were built

27

upon a class definition so structurally unsound as to collapse under belated but always mandatory rigorous scrutiny:

> Like the Title VII claims in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), the IDEA claims in this case are highly individualized and vastly diverse, making this case unsuitable for class-action treatment under Rule 23 of the Federal Rules of Civil Procedure. The class itself is fatally indefinite, the claims lack the commonality required by Rule 23(a)(2), and it's not possible to order final injunctive or corresponding declaratory relief on a class-wide basis, as required by Rule 23(b)(2). Because the class should not have been certified, the liability and remedial orders must be vacated as well.

*Id*. at 485-486.

The flaws proving fatal to the *Jamie S.* plaintiffs are exactly the flaws fatal to every one of the six common questions proffered by Plaintiffs' counsel here.  In *Jamie S.*, the Circuit found that, by identifying an allegedly objectionable end result of a special education process as the "common question," plaintiffs had glossed over the fact that getting to that result involved innumerable case-specific events, meaning that there was no single question capable of yielding a single answer central to all class members' claims:

> The plaintiffs identify the following common issue: "(A)ll potential class members have suffered as a result of MPS' failure to ensure their Child Find rights under IDEA and Wisconsin law." This completely misunderstands Rule 23(a)(2).  Whether MPS failed in its obligations under the IDEA and thereby deprived an eligible disabled child of a free appropriate public education is the bottom-line liability question in any individual plaintiff's IDEA claim. To bring individual IDEA claims together to litigate as a class, the plaintiffs must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims. That all the class members have "suffered" as a result of disparate individual IDEA child-find violations is not enough; it does not establish that the individual claims have any question of law or fact in common. The plaintiffs have identified no common factual or legal question that satisfies the Rule 23(a)(2) standard, and it is their burden to do so.

*Id*. at 497-498 (emphasis in original).

The Seventh Circuit could not have better described Plaintiffs' counsel's failure here.  Framed at a level of lawyerly generality, questions such as "whether Defendant fails to take steps to ensure timely permanency," Pls.' Mem. at 52, invite this Court to focus on an end result so as to divert attention from the fact that, in order to arrive at that result, an endless number of issues and interests involving numerous different stakeholders have to be weighed and resolved in potentially tens of thousands of different cases involving similar numbers of different families by different Family Court (and appellate) jurists in any of an endless number of possible ways.  Given that reality, the "whether" question about timely permanency is inextricably bound up in the much more nuanced, complex, and case-specific answers prompted by the much more relevant question "why?" – why each case takes the time it does, a commonality-defying question Plaintiffs' counsel know better than to ask.

A final point on general principles of commonality:  Common questions that purport to define a plaintiff class based upon a uniform "policy" can only succeed if, as a threshold matter, they can identify an actual unlawful policy applied to that class.  That threshold barrier of proof of such policy was addressed by the Supreme Court In *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), where the Supreme Court identified the problem confronting Plaintiffs' counsel in this litigation – the extremely high bar that must be surmounted to prove deliberate indifference for a constructive government "policy" only capable of being inferred, if at all, from individual cases.  The Court described the "wide difference" between a constructive policy (in *Oklahoma City,* a "failure to train" policy) and the policy at issue in the seminal case that defined "municipal policy" for § 1983 purposes, *Monell v. NYC Dep't of Social Services,* 436 U.S. 658 (1978), as follows:

> The "policy" of the New York City Department of Social Services
> that was challenged in *Monell* was a policy that by its terms

compelled pregnant employees to take mandatory leaves of absence before such leaves were required for medical reasons; this policy in and of itself violated the constitutional rights of pregnant employees by reason of our decision in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974). Obviously, it requires only one application of a policy such as this to satisfy fully *Monell's* requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.

Here, however, the [failure to train] "policy" that respondent seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*. To establish the constitutional violation in *Monell* no evidence was needed other than a statement of the policy by the municipal corporation, and its exercise; but the type of "policy" upon which respondent relies, and its causal relation to the alleged constitutional violation, are not susceptible to such easy proof.

*Oklahoma City*, 471 U.S. at 822-823.

While *Oklahoma City* addressed that problem in a non-class action context, courts have adopted that reasoning, and been equally skeptical "constructive policy" claims as the basis for commonality in class certification motions, and have found commonality-creating policies only where the claimed policy was clearly identifiable, non-discretionary, and unlawful. *See, e.g., Jermyn v. Best Buy Stores, L.P.,* 276 F.R.D. 167 (S.D.N.Y. 2011) (McMahon, J.) (existence of written "secret" policy of dishonoring valid price-matches contrary to advertised policy is common question that, if proven, will determine company's liability to consumer class); *see also Sherman v. Burwell*, 15-CV-01468, 2016 U.S. Dist. LEXIS 103897 (D.Ct Aug. 8, 2016) (existence of alleged "secret policy" mandating high Medicare denial rates regardless of claims' merits, if proven, sufficient to satisfy commonality for class of beneficiaries whose eligibility was denied, in whole or part, by such alleged policy). As Chief Judge Colleen McMahon explained in *Jermyn*, *Wal-Mart* held that, unless a policy effectively foreclosed any result other than the unlawful one suffered by a putative class representative, so that the representative's experience with the policy

reasonably stands for that of the entire represented class, the common question lacks the "glue" needed to hold all of the individual claims together:

> Without identifying some kind of corporate guidance that led to the local managers' discretion being exercised in a uniformly discriminatory way, the [*Wal-Mart]* Court reasoned, there was no common thread of liability that tied together each class member's distinct claim, and tied them all to Wal-Mart's corporate management.

*Jermyn*, 276 F.R.D. at 171 (citing *Wal-Mart*, 564 U.S. at 364). In upholding class certification in *Jermyn*, Judge McMahon distinguished the non-discretionary corporate policy of dishonoring valid price matches in that case from the discretionary decision-making at issue in *Wal*-Mart (and in every foster care case):

> [T]o the extent Plaintiffs here are required to identify a specific, illegal corporate policy rendering Defendant liable to all the class members, they have manifestly done so. Plaintiffs allege that Defendant communicated to local branches a corporate policy of denying valid price match requests, contrary to its advertised Price Match Guarantee. If that allegation were proved, it would render Defendant liable to every class member who suffered under the practice. Indeed, what Plaintiffs here allege is precisely what is missing in *Dukes,* [564 U.S. at 344] ("These plaintiffs . . . do not allege that Wal-Mart has any express corporate policy against the advancement of women."). Had the <u>Dukes</u> plaintiffs actually alleged a general, *non-discretionary* corporate policy disfavoring women and offered some proof that such a policy existed, then obviously the case could have and would have proceeded as a class action.

*Jermyn*, *id*. at 172 (emphasis added). Thus, in *Jermyn,* as distinguished from *Wal-Mart* and from the case at bar, plaintiffs were able to identify a *non-discretionary* policy that, if proven, successfully linked all class members to one another, and to the challenged, clearly unlawful policy. "Proving that theory, without more, establishes Defendant's liability to all of the class members." *Id*. at 173.

Significantly, in this litigation, Plaintiffs' counsel do not allege the existence of any non-discretionary policies that necessarily violate class members rights.  Instead, they allege, at most, *departures* from policy, by individual case planners, or provider agency personnel, at different points in different cases.  Such departures, even if proven – and, as discussed below, City Defendant disputes many of Plaintiffs' counsel's claims in this regard – are inherently case specific, and, almost by definition, not amenable to federal judicial remedy at a class-wide level.

In other words, Plaintiffs' claims in this action fall on the *Wal-Mart* side of the divide, seeking to infer a commonality-generating policy from hundreds and thousands of individual case decisions made not only by ACS employees, but by agency staff at twenty-six provider agencies, decisions often affected, and sometimes thwarted by other stakeholders in Family Court proceedings, and ultimately subject to the approval, modification, or disapproval of Family Court judges; and then, of course, subject to appellate review.  *See* Burt Rept. at 3-11, 18.

Plaintiffs' counsel's attempt to prove commonality faces another challenge: the fact that this case has not played out in a static system of policies and practices.  Rather, those policies and practices have changed over time.  As discussed more fully in the accompanying Declarations of Julie Farber and Andrew White, nearly all significant ACS metrics, which were improving even when Plaintiffs' counsel commenced this litigation in 2015, have continued to improve, significantly, in the five years since.

The problems facing plaintiffs seeking prospective injunctive relief for practices alleged to occur over time are highlighted in *Aguilar v. Immigrations and Customs Enforcement Div. of the United States Dep't of Homeland Security,* 07 Civ. 8224 (KBF), 2012 U.S. Dist. LEXIS 53367 (S.D.N.Y. Apr. 16, 2012) (Forrest, D.J.).  In *Aguilar*, twenty-one Latino plaintiffs living in New York City who had been subject to allegedly warrantless ICE home searches in 2007 sought

mandatory and prohibitory relief on behalf of a proposed class of all Latinos in New York City who had been or, in the future, would be subject to such ICE home searches. *Id*. at *10-11. Citing *Wal-Mart's* requirement of "rigorous analysis" of plaintiffs' claims under Rule 23, and noting that the proposed injunctive class was defined to reach future conduct, Judge Forrest found that evidence of policies allegedly applied to plaintiffs in 2007 would not suffice to establish commonality with future potential class members who might be subject to entirely different policies and practices:

> [T]he proposed class here consists not only of Latinos who were subject to the home raids that occurred in 2007, but extends to the present and includes all those Latinos in the New York area "who have been, or in the future will be, subject to a home raid operation." . . . Accordingly, whether there is substantial proof of a policy, pattern, or practice *in 2012* that could or would subject Latinos in 2012 and in the future to home raids that raise *the same* common constitutional and legal questions as the named plaintiffs (as to whom home raids occurred in 2007) is directly at issue.
>
> …
>
> The fact that the Latinos who were subject to raids in 2007 share common questions does not, however, automatically confer on Latinos in the New York area in 2012 and beyond the same potential commonality. As directed by the Supreme Court, this Court must undertake its own rigorous analysis of that question. Doing so requires that this Court ask, in a merits-like inquiry, whether plaintiffs have demonstrated by substantial evidence that the policies, patterns, and practices which were in existence in 2007 continue today, thereby subjecting Latinos today and into the future to the risk of similar constitutional and illegal misconduct. Had the issue of class certification been determined in 2008, this timing issue perhaps would not figure significantly in the Court's analysis. After the passage of more than five years, however, and in the context of a case that seeks to impose prohibitory and mandatory injunctive relief that would cover a huge class of all Latinos in the New York area into the future, the issue takes on great significance.

*Aguilar*, *id*. at *18-20 (emphasis in original).

The policies and agency performance at issue in the pending motion, and the sole Plaintiff still in care who is purportedly still litigating it, bear little resemblance to the policies in effect and the nineteen Plaintiffs in care when the litigation commenced in July 2015. Defendant does not remotely concede that its policies and practices in 2015 violated the Plaintiff children's rights; but Defendant does suggest that those policies and practices – and statements attributed to City and State administrators from five years ago identifying challenges then facing the foster care system in New York City – not only ebb in probative value, but verge on immateriality to prove violations of law common to a different foster care population, allegedly warranting prospective injunctive relief, five years later. *See, e.g., Connor B. v. Patrick*, 774 F.3d 45, 56 (1st Cir. 2014), *aff'g* 985 F. Supp. 2d 129 (D. Mass. 2013) (citing with approval district court's observation that foster care agency's prior performance below federal standards had to be viewed in context of more recent "active[] improv[ement]," and observing that Due Process Clause "does not require that the defendants instantly fix all deficiencies in the foster care system").[22]

### D. Commonality Principles Applied:  Plaintiffs' Proffered Common Questions Do Not Meet *Wal-Mart's* Requirement That They Generate Answers Sufficient to Drive the Resolution of the Litigation

"[Commonality] looks at the relationship among the class members generally, and [typicality] at the relationship between the proposed class representative and the rest of the class." Newberg, § 3:26. As a threshold matter, there appears to be a lack of commonality even as between Plaintiffs' counsel and their expert, Dr. Long, as to what the six common questions are. Plaintiffs' counsel proffer six questions in their "Commonality" discussion (Plfs.' Mem. at 49-53) only one

---

[22] While the court certified a plaintiff class in *Connor B.* (later dismissing all claims at the close of plaintiffs' case), all of the rulings cited in this memorandum are appropriate to the merits analysis at the class certification stage.

of which is identical to the six "themes" identified in the Long Report; two other questions put forward by Plaintiffs' counsel arguably overlap the Long Report's "themes" to a minor degree, and three questions are completely non-common. This lack of agreement as between Plaintiffs' counsel and Plaintiffs' expert makes it unclear which questions Plaintiffs' counsel proffer as common under Rule 23(a). Because Plaintiffs' counsel presumably control the litigation strategy for this motion, Defendant will address the six allegedly common questions identified in Plaintiffs' memorandum, demonstrating that Plaintiffs' counsel have failed to prove commonality by a preponderance of evidence. City Defendant's expert Margaret A. Burt, in her Report, addresses the themes identified in the Long Report. *See* Burt Rept. at 20-33.

Regarding Plaintiffs' counsel's proffered questions, the majority depend upon counsel's erroneous equating of agency best practices set forth in ACS's Quality Assurance Standards ("QAS") with legal mandates capable of defining the contours of and rights accruing to Plaintiff Classes and Subclasses. The remaining questions rely upon various federal standards that, like best practices, set aspirational standards intended to prompt rather than penalize the hard work of system improvement. *Connor B.,* 774 F.3d at 55 (approving trial court's refusal to constitutionalize aspirational best practices); *id*. at 56 n.11 ("the federal standards were intentionally set above the performance of most states – at the 75th percentile of states – specifically to push states to improve against that standard"). Answers to questions about whether ACS meets or exceeds these agency best practices and federal goals therefore will not, in the absence of proof of actual harm, generate the kind of answers that the Supreme Court has held must "drive the resolution of the litigation." *Wal-Mart,* 564 U.S. at 350.

1.  **Whether ACS Effectively Exercises Adequate and Meaningful Oversight of the Contract Agencies**[23]

There are few aspects of ACS's work less appropriate to squeeze into a "commonality" box than its oversight of the contract agencies.  While ACS centrally administers an extremely rigorous and intensive oversight process, the particular steps taken to address weaknesses or deficiencies in practice vary by the nature, scope, and scale of the performance issue, the particular population served by the agency, and other agency-specific factors.  As described more fully in the White Declaration, ACS administers a sophisticated, intensive, and individualized monitoring and oversight system for its foster care provider agencies that includes frequent, routinized accountability review of each provider agency's outcomes and performance data, including the following elements:

- Monthly Safety Checks to confirm that provider agency case planners have completed their required contacts with foster children and families;

- Monthly and quarterly reports to provider agencies showing their performance on key indicators tied to the Foster Care Strategic Blueprint,[24] including progress toward permanency, adoption and kinship targets, among others;

- Provider Agency Measurement System (PAMS), a semiannual case review audit of a statistically valid sample of cases from each provider agency using a well-tested

---

[23] Plaintiffs' experts did not identify this as one of the six "themes" identified in their review of the Plaintiffs' cases.

[24] The Foster Care Strategic Blueprint identifies ACS's key priorities and strategies for improving case practice and results for children and families.  ACS tracks these results internally, and regularly publicly reports them.  This information is utilized to continuously refine and improve ACS and foster care agency practices in order to improve services and outcomes for children and families. The first iteration of the Blueprint, released in 2016 and identifying goals and plans for 2016-2018. The Blueprint was updated in 2018 and builds on the 2016-2018 Blueprint to set forth goals and plans through 2023.  *See* Farber Decl. at ¶¶ 15-16 (addressing 2016 Blueprint); ¶ 74 (addressing 2018 Blueprint).

tool with more than 100 questions assessing compliance and quality of case practice (in FY 2019, the ACS PAMS team reviewed more than 1,700 foster care cases);

- Scorecard, an evaluation of agencies' programs, using outcome measures, practice measures and PAMS data, shared with each agency quarterly and shared publicly annually;

- Ongoing Collaborative Quality Improvement (CoQI), whereby each agency works, collaboratively, with ACS to establish annual improvement plans and targets based on PAMS, Scorecard, and other data; these plans and targets are reviewed at quarterly meetings between ACS and provider agency leadership;

- Agencies with persistent performance gaps are placed on Heightened Monitoring Status or Corrective Action Status, further described below; and

- Real-time corrective actions for investigations of reports to the Statewide Central Register of Child Abuse and Maltreatment (SCR) that find credible evidence of possible abuse or neglect in a foster home, or involving a child who is in foster care, also described below.

- SafeMeasures Dashboard, updated nightly, which provides ACS Division of Child Protection (DCP) staff at all levels with access to critical casework information, deadline tracking, and task completion information. SafeMeasures implementation with foster care provider agencies began in late 2019;

White Decl. at ¶¶ 13-27. ACS's oversight of its provider agencies includes rigorous, comprehensive, and granular review of each agency's performance, using data collected daily, weekly, monthly quarterly, and annually. Not only is ACS's oversight targeted to the specific performance challenges facing each agency, but its review of that data in order to set performance goals and targets is agency-collaborative and agency-specific; and, if goals are not met, ACS's response is, again, agency-specific. *Id*.

Findings from the PAMS reviews, as well as from outcomes data and critical incidents, can lead to more serious actions to hold provider agencies accountable, when standard monitoring and quality improvement efforts do not achieve desired results, or when a significant issue arises that necessitates immediately elevating the level of monitoring. In these situations,

ACS places agencies on either Heightened Monitoring Status (HMS) or Corrective Action Status (CAS).  White Decl. at ¶¶ 19-24.

ACS places an agency on HMS when there are concerning trends in performance identified through ongoing monitoring, those concerns are brought to an agency's attention with a warning, reassessment is done, but concerns are not resolved. When a provider agency is placed on HMS, ACS guides the provider through development of an improvement plan, followed by frequent calls and meetings with the agency leadership to support and assess progress or regression on status plans. Under both HMS and CAS, reassessment is completed at least every three months to determine if the agency can step down or needs to be moved up to a higher level of status, including probation (intake closed).  *Id.*

CAS is used for issues that arise following a critical incident or when a trend in practice is so concerning that heightened monitoring is not sufficient to address the concerns. Under CAS, intake closure is possible. ACS notifies the agency's Board of Directors, may request their participation in CAS meetings, and schedules bi-weekly calls with the agency leadership to support and assess progress or regression on status plans.  *Id.*

When on either status, the agency is removed from routine CoQI monitoring and is instead provided an increased level of oversight and monitoring to address the identified concerns. Providers on HMS or CAS receive targeted improvement plans and required benchmarks for improvement. ACS's Agency Program Assistance (APA) unit holds frequent calls and meetings with the providers to discuss progress on improvement plans and conducts regular quarterly reassessments of performance.  This continues until the provider is determined to have addressed all concerns raised by ACS, made the necessary changes in practice and protocols, and shown that

it can maintain these improvements sufficiently to be removed from status, which requires the Commissioner's approval.  *Id.*

Because of the rigorousness of ACS monitoring and oversight, ACS makes sure that each agency is not only held to account for performance shortcomings but also recognized when it achieves necessary performance improvements.  Collaboration, always the first option in the culture ACS has fostered with its providers, often yields the desired improvements.   For example, in FY16 and FY17, lower-performing agencies that were not placed on accountability status dramatically improved their safety measures through the regular Collaborative Quality Improvement ("CoQI") process in the following year.  *Id.* at ¶ 24.  CoQI has proven to be effective in improving practice by focusing providers' attention and planning on the most pressing concerns, most notably safety measures such as case contacts, risk assessment, and supervision.  *Id.*  In most cases, when agencies show poor performance on these metrics, they themselves identify necessary improvement efforts and address them within the regular CoQI cycle.  *Id.*

However, when collaboration proves unavailing, ACS will not hesitate to place agencies on accountability status.  For example, in 2018, ACS placed four foster care agencies on HMS that were lower-performing on key data metrics in both FY16 and FY17:  Sheltering Arms, Seamen's Society, Catholic Guardian and JCCA.   Sheltering Arms, Catholic Guardian and Seamen's Society each stepped down from HMS within six to eighteen months and returned to the routine monitoring process; JCCA remained on status for two years in order to fully adjust staffing, supervision and other protocols, at which point its improvements were clearly sustained.  *Id.* at ¶ 23.

Finally, when lesser measures prove inadequate, or where the severity of the performance failure warrants immediate measures, ACS has the authority to end contracts or

reduce intake for poor performance, an authority that ACS has, in fact, exercised.  *Id.* at ¶ 22.  In July 2014, for example, ACS revoked the foster care contract of Community Counseling and Mediation specifically for serious failures in the area of safety.  *Id*.

This robust, intensive system of performance monitoring and oversight does not remotely evidence systemic failure.  Plaintiffs' counsel may identify some agencies' performance in a given area as unacceptable; but, when assessing ACS oversight, the question is not whether an agency sometimes trails others in performance metrics.  Rather, the question, for purposes of this litigation, is whether Plaintiffs' counsel have credibly demonstrated, by a preponderance of the evidence, that ACS's monitoring and oversight of its provider agencies is so deficient as to constitute deliberate indifference causing identifiable harms common to the entire Plaintiff Class.  Plaintiffs' counsel cannot reasonably demand that the system be perfect; they can only reasonably demand that the system *work* – and, clearly, as documented, ACS's oversight efforts and initiatives work.

In fact, Casey Family Programs, a highly regarded national foundation focusing on foster care issues, praised ACS's safety practice and initiatives, following its assessment in May 2017.  *See* White Decl. at ¶ 15.  The Foundation noted that "in comparison to other systems around the country, ACS has significant strengths"[25] and specifically identified the CoQI model for foster care providers as "robust," noting that it "combines practice, process and outcome measures to evaluate overall agency- and program-level effectiveness, comparing like programs citywide." The

---

[25] Casey Family Programs (2017) "Assessment of New York City Administration for Children's Services Safety Practice and Initiatives" ("Casey Assessment") at 35, available at https://www1.nyc.gov/assets/acs/pdf/testimony/2017/NYCACSAssessmentReportMay2017.pdf (last visited August 28, 2020); discussed at White Decl., ¶15 n.5.

review characterized the process as "well documented, with clear descriptions of what is being measured and why" and noted that "ACS collaborates with its stakeholders to improve the process and publishes the results in a transparent manner annually. This annual document is supplemented by more frequent data provision to providers to allow for course corrections and improvements as needed."[26] The Casey review described the Scorecard as "innovative in several key ways," namely, that it is based its review on items that are most relevant to child and family outcomes; PAMS reviews are completed using a comprehensive tool on a robust sample of cases for every program; Scorecard emphasizes outcomes and separates "the important from the critical in a thoughtful way"; and CoQI "builds the data-analysis capacity of external providers by working on one key challenge at a time, using an accountable and structured process" that supplements traditional contractual performance accountability.[27] The use of focused goals, noted with approval by Casey, also squares with New York State guidance.  In strategy and planning worksheets disseminated by the New York State Office of Children and Family Services ("OCFS") to Local Districts of Social Services for improvement planning, OCFS advised that "it is important to focus on only a few strategies. Research shows that when you focus on too many strategies, it is difficult to accomplish all of them."  *See* White Decl. at ¶ 15.

          In light of overwhelming evidence of a system that is clearly working, and constantly undergoing internal review and improvement, Plaintiffs' counsel's disagreement with ACS monitoring is revealed to be grounded not in any constitutional or statutory shortcoming, but rather only in Plaintiffs' counsel's own views about how they might supervise agencies were they

---

[26] Casey Assessment, *id*. at 32.

[27] *Id*.

in positions of agency leadership.  However, even as litigants, Plaintiffs' counsel are poorly situated to inform the Court of the true nature of ACS oversight, given that their clients, when they were in care, represented less than half of the twenty-six provider agencies under ACS supervision, and given that, today, only one of their clients remains in care.

### 2.   Whether ACS Fails to Ensure that Caseworkers Receive Adequate and Appropriate Training[28]

The Supreme Court has noted that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  In that already parlous territory, Plaintiffs' counsel have staked a particularly tenuous claim.  Attempting to manufacture a training-related issue as the "glue," *Wal-Mart*, 564 U.S. at 352, holding their class claims together, Plaintiffs' counsel do *not* assert that all or any class members are or will be assigned to a poorly trained case planner and have been or will be harmed thereby; rather, they make the remarkable assertion that "[e]ach child in the Class is or will be assigned to a caseworker who *ACS has failed to ensure* received proper training."  Pls.' Mem. at 50.  A "failure to supervise training that itself may be sufficient" claim is one step removed, and many degrees more tenuous, than an inherently tenuous "failure to train" claim.  The critical pieces missing from Plaintiffs' counsel's "failure to supervise training" claim are their three-fold failures (a) to identify any specific problem in any agency's training curriculum, (b) to prove that any such (unidentified) failure resulted from a failure of ACS oversight, and (c) that the combination of (unidentified) curriculum lapses, combined with (unidentified) ACS oversight lapses actually caused an identifiable harm to any Plaintiff.  *Oklahoma City*, 471 U.S. at 822-823.

---

[28] Plaintiffs' experts did not identify this as one of the six "themes" identified in their review of the Plaintiffs' cases.

In other words, Plaintiffs' counsel are claiming grievance not by poorly trained case planners – because they know that they lack proof across twenty-six agencies and across all putative class members – but by potentially well trained case planners over whom ACS allegedly fails to exercise adequate oversight.  That Plaintiffs' counsel steer clear of a claim of inadequate training is hardly surprising, as ACS-mandated or -provided training is robust and, in many instances, at the cutting-edge of practice.

With regard to training and skills development, foster care agencies must ensure that staff receive topic-focused trainings that are required by the terms of their contracts with ACS.  Many courses are available through the ACS Workforce Institute, a partnership between ACS and City University of New York (CUNY) launched in 2016, which ACS funds with more than $18 million each year.  The Workforce Institute engages with community and educational experts to develop cutting-edge learning strategies for adult learners, with training sites in each of the five boroughs that serve all direct-service staff, supervisors and managers at ACS and its provider agencies.  For onboarding of direct service staff, agencies may also provide their own programs or may participate in a training offered by the Council of Family and Child Caring Agencies (COFCCA) and funded by OCFS.  Some of the larger organizations have their own onboarding and continuing education programs, while others depend more heavily on COFCCA and the Workforce Institute, *see* White Decl. at ¶¶ 45-47.  As the Supreme Court noted in *Wal-Mart,* such "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Wal-Mart*, 564 U.S. at 350.

In addition, all foster care direct service staff and supervisors are required to be trained, each year, on mandated reporting of abuse or maltreatment via an OCFS e-learn course or a vetted alternative, with completion tracked quarterly.  As of July 2019, all direct service staff

and supervisors in foster care agencies are required to take "Safety and Risk," a two-day intensive course run by the Workforce Institute, and all foster care supervisors are required to complete "Building Coaching Competencies," a two-day course to support and enhance supervisors' skills. An additional five-day supervisory core training, including simulation, is newly available as of 2019. A wide range of additional foundational practice courses and training on evidence-based models serving children and families in foster care is available through the Institute. *Id.*; Farber Decl. at ¶ 25.

If failure to train is among the "most tenuous" of claims, failure to supervise training on the strength of this record is tenuous to the point of frivolousness. *Wal-Mart* requires common questions whose answers drive the resolution of the litigation. Even if Plaintiffs' counsel were able to persuade this Court that "training oversight" was a question common to the class – a conclusion as to which all available evidence points the other way – an order requiring more oversight would confer no benefit on the putative Plaintiff class, absent a preponderance of evidence, neither provided by Plaintiffs' counsel nor possible to adduce on this record, that the training itself was inadequate and caused demonstrable harm to that Class.

Once again, Plaintiffs' counsel's training-based claims are more an expression of personal pique than of constitutional or statutory mandate. For example, as part of their training argument, counsel quibble with the fact that while ACS requires case planners have a bachelor's degree, "[s]ome Contract Agencies do not require the degree be in any particular subject…." Pls.' Mem. at 22.[29] This statement highlights two infirmities in Plaintiffs' counsel's attempt to convince

---

[29] In fact, the actual contractual education requirement for provider agency case planners is an MSW or equivalent human services graduate degree (preferred); or BA/BS/BSW with at least two years of documented relevant experience. White Decl. at ¶ 45.

this Court that training oversight failures constitute a question common to the class:   First, Plaintiffs' counsel fail to identify any constitutional or statutory requirement of specific educational credentials beyond those required by ACS contract, because there is none.   They simply do not like the lack of required post-baccalaureate degrees.   Second, and more importantly, counsel's acknowledgement that *some* agencies apply additional educational requirements that others do not, highlights an obstacle fatal to commonality: a concession that provider agencies operating under ACS contractual requirements exercise an entirely appropriate degree of autonomy in the interstices of those requirements that allows for inter-agency dissimilarity.   This discretionary variation, permitting agencies to tailor their practices to their own ACS-consonant policies and mission, introduces an altogether reasonable, indeed salutary, degree of agency-specific variation that renders Plaintiffs' counsel's training-commonality theory impossible to maintain; once again, dissimilarities that "impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350.   These inter-agency dissimilarities, coupled with the fact that Plaintiffs lack experience with more than half of provider agencies with which ACS contracts, do more than impede such answers; they preclude them altogether.

### 3.   Whether ACS Fails to Consider the Child's Background, Risk Factors, and Characteristics in Evaluating a Foster Home, Matching and Making a Placement

As with the prior questions regarding agency oversight and agency training, placement decisions are centrally managed by ACS, but involve ACS working with twenty-six provider agencies to have available as much information about the child and potential foster family as possible, in order to make placement matches that best meet the needs of children in foster care, and to do so as quickly as possible.   ACS works to collect as much information as possible about a child's characteristics and needs and to share this information with the contracted foster care

providers to inform placement matching.  The amount and type of information available can vary based on factors unique to each child and family, including the family's willingness to share information; the age or developmental level of the child (e.g., in terms of the child's ability or willingness to be interviewed); the existence of relatives and others who have knowledge that they are willing and able to provide about the child; the family's participation in the family team conference; the existence of school, mental health, and medical reports; and other factors. In some cases, parents may not want to share certain information or be unable to access it, and there is often a delay in obtaining it by ACS request or, in certain instances, even by judicial subpoena. In addition, ACS must balance the inherent tension between delaying a placement in order to collect more information and making a placement more quickly in an effort to reduce trauma to the child.

When children enter foster care, ACS Child and Family Specialists ("CFS"), who are licensed Master's level social workers and clinicians, interview the children.  The CFS also conducts family team conferences, where information is gathered directly from the family; confers with child protection staff who have conducted the investigation; and reviews all information that has been collected in the course of the investigation that led to the child's removal and any clinical/assessment documents that may be available/applicable. These documents include but are not limited to biopsychosocial reports, psychiatric evaluations, psychological assessments, IEPs and other educational records, medical records and reports from other facilities/institutions within and outside the child welfare system – hospitals, juvenile justice, mental health, drug rehabilitation, etc.  Based on this review, the CFS determines the level of care ("LOC") / program type that will most appropriately meet the child's needs.  Recently, ACS worked with OCFS (and provided 60% of the funding) to design and implement a new Placement Module in the State CONNECTIONS database that went live in October 2019.  This new module supports ACS's work to match children

with optimal foster care settings.  ACS and provider agency staff use the new module to more efficiently capture and review characteristics and needs of children and foster parents to better match them to one another, as well as automatically calculate travel distance of placement options to keep children close to family, school, and communities. Once potential matches are identified through the Placement Module, OPA staff communicates with foster care agency staff verbally and via email to further discuss the child's needs and the foster parents' capacities and preferences in order to determine which of these placements will be the best match.  In addition to considering factors such as keeping the child in his/her current school and close to where the child's parents live, other characteristics are also considered such as a foster parent's experience managing certain child behaviors or their connection to activities in which the child participates.  Through this process, ACS is able to identify foster homes within and/or across multiple foster care agencies that may be a good match, and then ultimately select the best match.  *See* Farber Decl., ¶¶ 26-38.

The Long Team faults ACS's oversight of the placement process based upon their disagreement with a handful of the nineteen Plaintiffs' placements; but the problems identified in that small handful of cases are so case-specific as to be useless as a measure of systemic performance.  The bias that pervades the Long Report is perhaps no better exemplified than by the Report's description of the placement of Plaintiff Ayanna J.  Plaintiffs' experts readily concede that Ayanna was placed with someone they themselves characterize as an "exceptionally strong foster parent" (Pls' Ex. 1 at B-8) but then dismiss that exemplary placement as nothing more than a "fortunate accident," *id.*, simply because "the case record does not indicate any diligence to match Ayanna with a particular foster placement."  *Id*.  When pressed on this point at deposition, Dr. Long admitted that there was, in fact, no legal requirement to document why a chosen placement was made over other potentially available placement options.  Long Tr. 114:24 – 115:3

(City's Ex. E).[30]   City Defendant's expert Margaret Burt concludes, more plausibly, that the placement exemplifies excellent casework practice.  *See* Burt Rept., App'x 3, at 8-9.

Plaintiffs' counsel, in fact, offer the Court no statistical evidence demonstrating either that placement decisions are inappropriate at a systemic level, or that ACS's supervision of placement decisions is in any way legally deficient.  At most, Plaintiffs' counsel seem to want this Court to federalize a requirement of detailed and time-consuming documentation and comparison of different placement options that is found nowhere in federal or state law.

### 4.   Whether ACS Fails to Ensure Adequate Case Plans are Timely Developed and Implemented[31]

While Plaintiffs' counsel have identified timely development of case plans as a question common to the Plaintiff Class and Subclasses, there is no specific requirement for case plan documentation under federal or State law, and the four constituent sub-elements they identify, in addition to lacking statutory timeframes, do not result in violations of identifiable rights, so that any answers to these constituent common questions cannot possibly "drive the resolution of the litigation."  *Wal-Mart,* 564 U.S. at 350.

### a.   Concurrent Planning – Not Statutorily Required

Plaintiffs' counsel, and their experts, repeatedly fault ACS for allegedly failing to engage in "concurrent planning" – planning for alternate permanency outcomes, typically, reunification and adoption – starting "as soon as the child enters foster care," Long Rept. at 8, for every case, as if concurrent planning were mandated by law.  As a threshold matter, the assertion

---

[30] References to "Long Tr." are to the deposition transcript of Caroline M. Long, dated July 20, 2020.

[31] Plaintiffs' experts did not identify this as one of the six "themes" identified in their review of the Plaintiffs' cases.

is factually incorrect, as evidenced by the cases of several Plaintiffs where concurrent planning occurred.  *See* Burt Rept., App'x 1 at 9; App'x 2 at 7-8; App'x 3 at 10-11

But putting aside the factual inaccuracy of the assertion, Plaintiffs' identification of whether concurrent planning occurs in all foster cases as a common question whose answer will advance the litigation is legally baseless.  In her Report, Dr. Long asserts, wrongly, that "the failure to engage in concurrent planning is a violation of federal and state law," citing the First, Ninth, and Fourteenth Amendments to the United States Constitution as well as federal and State statutory provisions.  Long Rept, Pls' Ex. 1, at 8 n.13; *see also* Burt Rept. at 11, 13.  When asked to explain the constitutional references in her Report, Dr. Long's non-answer made abundantly clear that she had no idea how lack of concurrent planning violated those constitutional provisions, offering, vaguely, that the First Amendment was implicated because "my understanding … was that the children had a right to receive concurrent planning as one of their rights as citizens."  Long Tr. 169:4-21 (City's Ex. F).  She was otherwise unable to explain the remaining constitutional references to the Ninth and Fourteenth Amendments she included in the footnote, offering, by way of explanation, only that the citations were provided by Plaintiffs' counsel.  *Id*.  Plaintiffs' counsel's use of Dr. Long as a conduit for legal arguments she is neither qualified to make nor prepared to defend is a clear breach of the line that should separate experts from advocates.  *See, e.g., Estate of Puppolo v. Welch*, No. 14-cv-95, 2017 U.S. Dist. LEXIS 147312 (D. Vt. Sept. 12, 2017) at *47-48, *aff'd Puppolo v. Welch,* 771 F. App'x 64 (2d Cir. 2019) (court rejects expert opinion where expert "merely made minor revisions to the expert witness opinion prepared for him by Plaintiff's counsel" and therefore acted "as merely a conduit for the opinions of Plaintiff and her counsel").

Perhaps even more concerning, though, is Dr. Long's lack of understanding of statutory provisions governing concurrent planning that she professed to be "very familiar with" and about which she "teach[es] regularly."  Long Tr., 24:3-7 (City's Ex. G).  For example, in support of her argument that "failure to engage in concurrent planning is a violation of federal and state law" (Long Rept, Pls' Ex. 1 at 8 n.13), Dr. Long cites 42 U.S.C. § 671(a)(16).  However, that provision only provides for the development of a case plan and case review system, with no mention of concurrent planning.  Dr. Long curiously does not cite the immediately preceding section, § 671(a)(15)(F), which makes clear the non-mandatory nature of concurrent planning, advising only that "reasonable efforts to place a child for adoption or with a legal guardian … *may be made* concurrently with reasonable efforts of the type described in subparagraph (B) [addressing efforts to "preserve and reunify families"]." *Id*. (emphasis added); *see also* Burt Rept. at 11.

Dr. Long's remaining citations to 42 U.S.C. § 675(5)(B) and (E) are equally inapposite and unavailing.  Subsection (5)(B) only requires the projection of a "likely date" for a stated (single) permanency goal and does not address concurrent planning; and subsection (5)(E) provides merely that, *at the time* a state files for TPR, it is "concurrently to identify, recruit, process, and approve a qualified family for adoption" – in other words, make efforts to achieve *the same* permanency goal as that to which the TPR is addressed – adoption – and do so concurrent with (in other words, at the same time as) the TPR filing.

Given that Plaintiffs' counsel appear to have supplied these legal citations to Dr. Long to include in her footnote 13, it is curious that they take care not to repeat Dr. Long's assertion of statutorily required concurrent planning in their Memorandum, instead, citing only the best practices set forth in the ACS Quality Assurance Standards as the source of this "requirement." This is no doubt because they recognize, as they must, that concurrent planning is no more than a

"best practice," not a mandate.  *See, e.g.,* United States Health and Human Services "Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews," Final Rule, 65 Fed. Reg. 4020, Vol. 65, No. 16 (Jan. 25, 2000) at "Comments to Section 1356.21(b)(4) Concurrent Planning" ("[C]oncurrent planning is an option for the State, and not a mandate."); *see also* "OCFS Foster Care Practice Guide for Caseworkers and Supervisors," Pub. 5202 (January 2019), at ch. 6, p. B-1 ("Use of concurrent planning is best practice and is not a mandate.").[32]

However, as the First Circuit noted in *Connor B. v. Patrick*, 774 F.3d 45 (1st Cir. 2014), *aff'g* 985 F. Supp. 2d 129 (D. MA 2013), a case brought by Plaintiffs' counsel Marcia Lowry seeking, unsuccessfully, to place Massachusetts's foster care system under a federal monitor, "aspirational" agency regulations neither can nor should be transformed into constitutional requirements:

> The plaintiffs have sought to take aspirational statutory, regulatory, and private standards as to a variety of topics within the overall complex of foster child care and convert each of them to constitutional requirements. The district court correctly rejected that attempt, as do we.

*Connor B.*, 774 F.3d at 55; *see also Miles v. Bell*, 621 F. Supp. 51, 60 (D.CT 1985) (best practices do not establish constitutional minima); *Romano v. City of San Marcos*, No. 15-CV-839-RP, 2017 U.S. Dist. LEXIS 146775, 2017 WL 3996427 (W.D.TX  Sept. 11, 2017) (same).   Clearly, Plaintiffs' counsel's proffered question whether, in each and every case, concurrent planning occurs "as soon as the child enters the foster care system" is based upon a false premise, and will not yield "common answers apt to drive the resolution of the litigation." *Wal*-Mart, 564 U.S. at 350.

---

[32] Available at https://ocfs.ny.gov/main/publications/Pub5202.pdf (last visited on August 28, 2020).

### b. Ensuring that provider agencies adequately monitor services for birth parents and caretakers

Plaintiffs' counsel correctly note, in connection with this proffered question, that federal and State law, as well as ACS policy, require that provider agencies make "reasonable efforts" to reunify a child with the child's birth family, including providing various services that support reunification. Pls' Mem. at 28. While Plaintiffs' counsel cite various internal ACS documents spurring agencies to make improvements in the provision of services – if anything, evidence that ACS is appropriately monitoring and pushing agencies to improve – they fail to note perhaps the most significant fact. Every six months, the Family Court judge assigned to each foster case holds a statutorily mandated permanency hearing to review the child's current permanency goal, the health and progress of the child, the services offered to the parents and their compliance therewith, and the recommended permanency plan, including whether it needs modification. New York Family Court Act ("FCA") § 1089(a)(3).[33] Among the findings the Family Court must make is a determination as to whether "reasonable efforts" have been made by ACS and the provider agency to implement the child's permanency plan, including through the provision of services to the child's family. FCA § 1089(d).

Significantly, Plaintiffs' counsel fail to note that, from 2012 through 2019, in every permanency hearing held every six months in each of the nineteen Plaintiff's cases, Family Court judges found that ACS and the provider agencies had, in fact, made such "Reasonable Efforts." *See* Yaroni Decl. at ¶¶ 10-12 and City Ex. "Yaroni-A." Moreover, ACS and its agencies received Reasonable Efforts findings in 99.1% of all foster care permanency proceedings during the same

---

[33] For a discussion of "reasonable efforts" findings in the broader context of the Family Court process, *see* City's Mem. at 7

time period. *Id.* at ¶ 13. To suggest, as Plaintiffs' counsel appear to do, that more or better services could have been provided to Plaintiffs and to absent class members they purport to represent, is to invite this Court to engage in an ill-advised and, if embodied in a federal remedial order, potentially chilling second-guessing of Family Court jurists who bring their own expertise to these complicated, highly fact-specific cases, and who are far closer to the children's and family's facts and circumstances than Plaintiffs' counsel, or indeed this Court, will ever be. [34]

### c.   Ensuring Timely Documentation:  Not Statutorily Required

While Plaintiffs' counsel are displeased with the promptness with which case progress notes are recorded by agency case planners, they cannot identify a statutory provision imposing any mandated timeframe for their entry, because no such provision exists. *See* Burt Rept. at 27. In place of an identified statutory requirement, Plaintiffs' counsel only locate an OCFS guidance suggesting that "progress notes be entered 'as contemporaneously as possible,' a 'recommend(ed)' 30 days or less," Pls' Mem. at 29; and then cite deposition testimony of a former OCFS official who offered her opinion that a best practice would be 14 days. *Id.* at 30. Then, marshalling evidence that does more harm than good to their argument, Plaintiffs' counsel cite a

---

[34] To the extent that Plaintiffs' experts suggest that ACS fails to provide services for birth parents and caretakers, Pls' Ex. 1 at 11-14 – a position not only opposed by City Defendant but conclusively refuted by the Family Courts' consistent "Reasonable Efforts" findings in all Plaintiffs' cases – that purported failure would constitute an independent basis, under federal and State law, for tolling the 15/22 Rule. *See* 42 U.S.C. § 675(5)(E)(iii); NY Soc. Serv. Law § 384-b, subd. 3(l)(i)(C) (both provisions defining as an exception to 15/22 TPR requirement the state's non-provision to parent of child such services as are necessary for reunification). Plaintiffs' counsel cannot have it both ways – claiming that ACS fails to provide parents with appropriate services and, at the same time, pushing for rigid enforcement of TPRs against those same parents. Assuming, arguendo, that Plaintiffs' counsel could advance these contrary arguments simultaneously, the only way to untangle them, consistent with the best interests of their putative clients, would be to engage in careful, case-specific sifting of the relevant facts to determine whether such services were, in fact, provided in each case where a TPR is allegedly overdue. City Defendant suggests those case-specific determinations are best left to the Family Court, which engages in that very review when making "reasonable efforts" determinations at each permanency hearing, every six months of every case's pendency in that court.

State Comptroller report finding that "26 percent of progress notes for the first 90-day period and 21 percent of progress notes for the period after were entered more than 15 days after the contact visits," *id*. – in other words, fell short of a 14-day "best practices" standard.

Significantly, Plaintiffs' counsel's own review of the Plaintiffs' cases demonstrate, if anything, reasonable compliance with the OCFS-recommended, but non-mandated, 30-day timeframe for progress note entries in CONNECTIONS:  As reported by Plaintiffs' counsel, in all of Plaintiffs' cases, "compliance" with this non-mandatory goal was achieved in 85% of progress notes entered, with six children's cases showing "timely" entries more than 90% of the time.  Ps' Mem. at 30 (table).  That a few Plaintiffs' cases demonstrated greater delays only suggests that timeliness of recordkeeping is a demonstrably case-specific rather than systemic issue.  And, again, the foster care agencies responsible for the nineteen Plaintiffs' care represent less than half of all provider agencies under contract with ACS to provide foster care services.  On this record, Plaintiffs' counsel cannot even establish a systemic failure to meet non-mandated OCFS guidance or best practices.[35]

### d.   Ensuring Provider Agencies Apply "Special Scrutiny" to Children in Care More Than Two Years – Not Statutorily Required

As with most of Plaintiffs' counsel's proffered common questions, the "special scrutiny" question is not grounded in any federal or state statutory requirement, as Plaintiffs' counsel concede.  *See* Pls.' Mem. at 31-32.  Rather, it is based exclusively upon the ACS-created QAS, which set forth aspirational goals set by ACS for its provider agencies.  Absent a statutory

---

[35] Moreover, as the court observed in *Connor B.*, "mere gaps in recordkeeping hardly constitute grave statutory error."  985 F. Supp. 2d at 166.

basis for "special scrutiny," any answer to the question, "was special scrutiny applied to the case

of a child (or an entire subclass of children) in care two years or more," would not yield answers

capable of driving the resolution of the litigation.  Thus, "special scrutiny" is valueless both as a

common question, and as a Subclass definition, inasmuch as answering that question or being

defined into that Subclass does nothing to advance the litigation or to clarify issues to be litigated.[36]

### 5.   Whether ACS Fails to Take Steps to Ensure Timely Permanency

This is precisely the kind of common question that "any competently crafted class

complaint" can raise, but at a level so broad and generalized as to be utterly useless to a court

seeking to scrutinize a class proponent's evidence.  *Wal-Mart*, 564 U.S. at 359; *Jamie S.*, 668 F.3d

at 497-498.   The Court in *Wal-Mart* offered the following examples of unhelpful "common

questions" much like this one:

> For example: Do all of us plaintiffs indeed work for Wal-Mart? Do
> our managers have discretion over pay? Is that an unlawful
> employment practice? What remedies should we get? Reciting these
> questions is not sufficient to obtain class certification. Commonality
> requires the plaintiff to demonstrate that the class members "have
> suffered the same injury." [Citation.]  This does not mean merely
> that they have all suffered a violation of the same provision of law.
> Title VII, for example, can be violated in many ways—by
> intentional discrimination, or by hiring and promotion criteria that
> result in disparate impact, and by the use of these practices on the
> part of many different superiors in a single company. Quite

---

[36] It should also be noted that, as a factual matter, Plaintiffs' counsel's depositions of provider agency representatives established that many agencies did, in fact, provide special scrutiny to children in care more than two years (and, in some cases, after less time in care), including some of the Plaintiffs' cases, even if not so labeled.  *See, e.g.,* **Catholic Guardian Society**: Berg-Appel Dep. Tr. 56:17-57:10 (City's Ex. H) (CGS provides special scrutiny to children in care two years and longer; meetings last day-and-a-half); **Children's Village:** Black Dep Tr. 20:4-21 (City's Ex. I) (Length of Stay Committee tracks children in care more than two years; Plaintiff Thierry E. was on that list); **Graham Windham**: Harry Dep. Tr.: 78:3-85:18 (City's Ex. J) (meetings every six months to track children in care six months or more); **Little Flower:** Hammons Dep. Tr. 95:11-15, 100:20-101:25 (City Ex. K) (not familiar with term "special scrutiny" before deposition, but agency does provide such scrutiny, looking very carefully at children in care two years and more).

> obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention--for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.* at 349-350 (citing *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 (1982)).

It is indisputable that there are delays in many foster children's path to permanency. Acknowledging that fact, however, does nothing to identify the complex network of reasons why those delays occur, nor does it come close to pointing this Court to any answer that can resolve an issue in "one stroke." *See Jamie S.*, 668 F.3d at 498 ("That all the class members have 'suffered' as a result of disparate individual IDEA child-find violations is not enough; it does not establish that the individual claims have any question of law or fact in common."). As but one example, New York is unusual among state court systems in not having timeframes within which neglect proceedings must be concluded and TPRs filed. In the assessment of City Defendant's expert Margaret Burt, this relatively unique aspect of New York Family Court practice constitutes perhaps "[t]he single most significant issue" in delaying cases' progress to disposition – a factor completely beyond ACS's control. *See* Burt Rept. at 15.

Plaintiffs' cases themselves illuminate a universe of factors delaying permanency, many of which are entirely outside the control of ACS or its provider agencies. For example, Plaintiff Thierry E.'s mother changed her Family Court lawyers at least five times, causing significant delays while newly retained counsel came up to speed on the case. *See* Burt Rept., App'x 2 at 5. In Ayanna J.'s case, the Family Court effectively halted the case's movement toward adoption while ACS successfully appealed the Family Court judge's refusal to find Ayanna J.'s

mother responsible for "derivative severe abuse" of Ayanna's sister based upon the mother's involvement in the death of another of Ayanna's sisters.  The precedent-setting achievement of that motion practice permitted ACS to dispense with an otherwise statutory obligation to engage in reasonable efforts toward reunification.  *See* Burt Rept at 3-11; App'x 1 at 3-4; App'x 2 at 3-6; App'x 3 at 5-7.

While the Long Team combed through the Plaintiffs' case files to extract every delay they could attribute to ACS or a provider agency, Dr. Long intentionally screened out of her team's review all delays attributable to factors other than ACS.  When asked to comment on the variety of non-ACS-related delays in permanency (Long Tr. 152:25 – 154:8) and to explain why, as but one example, her team did not give court-related delays the same weight given to ACS-related delays, Dr. Long admitted, "what I was asked to do was to look at case practice, and, as I've said out a couple of times, my charge is to see if it met the required standards.  And that wasn't case practice, that was the court."  Long Tr. 154:2-8.

However, "the court" plays a tremendous role in the time to permanency.  *See* Burt Rept. at 3-11; App'x 1 at 3-4; App'x 2 at 3-6; App'x 3 at 5-7.  As noted by the Intervenor Children's Advocates in opposing the proposed class settlement earlier in this litigation:

> [I]t is important to note that delays in the system are often caused by factors that are out of ACS' control.  For example, in New York City Family Courts, parents and children are each represented by their own counsel, and represented vigorously.  Many other jurisdictions lack such representation.  This essential protection of constitutional due process rights can make for protracted litigation in some instances.  Thus, even in cases where ACS is in compliance with statutory and regulatory mandates, the children may remain in foster care longer than in other jurisdictions because cases in New York City Family Courts are adversarial.  Where the parent or the child litigates against ACS, proceedings may take longer, and the Court's orders may alter the trajectory of the case.

Children's Advocates' Objections, DE # 187, at 5-6. And, at the end of each adversarial step, it is the Family Court, with benefit of full argument, that resolves the relevant issues regarding neglect or abuse, approves or modifies the permanency plan, and sets the next court dates for review of whether reasonable efforts have been made toward permanency, whether termination of parental rights should or should not be pursued (with or without concurrent planning for return to parent), in most instances based upon the then-current totality of often extremely complex circumstances.

Given the complexity of these cases, the number of interested (and legally represented) stakeholders, the inevitable delays that attend zealous advocacy in matters of obvious consequence to those stakeholders, and the deep involvement of the Family Court in all case milestones (*see, e.g.,* Burt Rept. at 3-11), it is virtually impossible to imagine any federal remedial order that could encompass every source of significant delay, viewed at the level of a class or subclass. Certainly, the answer to the question, did ACS play a role in delays to permanency could be answered in the affirmative – for example, when it pursued meritorious, indeed precedent-setting appellate litigation in Plaintiff Ayanna J.'s case (*see* Burt Rept., App'x 3 at 4, 6) – but the answer(s) to that question, whether in the affirmative or the negative, would not begin to advance the resolution of this litigation, but only invite further policy-level discussions.[37]

Two final points regarding time to permanency:

_____

[37] Indeed, those discussions were going forward at the time Plaintiffs' counsel intruded this litigation into the process. *See* Press Statement from The Legal Aid Society, issued on behalf of seven legal services agencies representing "the overwhelming majority of children and parents in New York City's child welfare system, dated October 21, 2015, opposing the proposed Plaintiff-State settlement then sub judice (DE 108-2). The Statement noted "the meaningful reform efforts underway now in partnership with ACS," observing that those collaborative discussions between ACS and the local advocate community were "at an all time high" when Plaintiffs' counsel chose to bring suit; finding it "particularly concerning that the plaintiffs and their counsel did not consult many advocacy groups like ours who have represented more than 6000 parents in family court since 2007 and worked on reform at the city, state and national levels" and protesting Plaintiffs' counsel's "ignoring the voice and perspective of parents and youth, and their advocates." *Id.*

*First:* While Plaintiffs' counsel note that "New York has one of the highest rates in the country of children spending more than two years in care," Pls.' Mem. at 36, ranking 48th out of 52 jurisdictions (the 50 states plus Washington, D.C. and Puerto Rico), they fail to factor in the role played in that metric by ACS's extremely robust preventive services initiatives. Preventive services, offered to families to provide supports in order to avoid the need for removal and placement of a child in care, have grown substantially in recent years, resulting in a deep reduction in the number of children in foster care.[38]

As a result of ACS's preventive services efforts, from 2006 to 2019, the number of children who entered foster care each year decreased by 51%, from 7,122 to 3,497. There was also a 54% decrease during that time period in children in foster care, from 16,870 to 7,709 in December 2019. In fact, the total foster care days for all New York City children in foster care decreased from 7,035,213 in 2006 to 3,953,425 in 2019. Also noteworthy, 1996 to 2017, the number of families receiving preventive services from ACS increased by 119%, from 8,902 to 19,494. During that same time period, the number of children in families receiving preventive services increased by 221%, from 13,856 to 44,445. Farber Decl. at ¶ 6.

Considering these remarkably positive trends year after year, it is impossible, and unfair, to compare length of stays for families whose children come into care in New York City when those families refuse to accept or fail to benefit from preventive services with length-of-stay metrics from jurisdictions offering more skeletal preventive services and showing correspondingly

---

[38] *See, e.g., Connor B.,* 774 F.3d at 56 n.13 (while plaintiffs view agency conduct exclusively "through the lens of their class, DCF [the State foster care agency] exercises its judgment to improve the system as a whole, which encompasses children far beyond the class. DCF's efforts to improve its screening process before children enter foster care custody … buttress the defendants' case").

greater numbers of short-stayers, and correspondingly lower length-of-stay averages as compared to New York City.[39]

*Second*:  To the extent Plaintiffs' counsel seek to allege that, as to those matters within its control, ACS has been deliberately indifferent to the putative Plaintiff Class or Subclasses for failing to take steps to ensure timely permanency, the claim is rendered insupportable by the tremendous strides ACS has made in reducing time to permanency among children in care in recent years:  Between 2012 and 2018, there was a 38% decrease in the number of children in care for 24 or more months, from 9,236 children in 2012 to 5,728 children in 2018, and between 2017 and 2019, that number dropped by 22%.  Farber Decl. at ¶ 8.

ACS initiatives that have helped reduce the time to permanency include:

- ACS and the contracted foster care agencies successfully increased the proportion of children in foster care placed with kin from 31% to 39%. Increasing kinship care is a key focus for ACS given that research shows that children fare best with kin (relatives, close family friends, or other people who are already in a child's life).

- An independent evaluation by Chapin Hall at the University of Chicago released in 2019 of a major ACS initiative found that ACS and its foster care agencies have reduced length of stay in foster care by 9%, on average.

- Since the KinGAP (kinship guardianship) program[40] was established, ACS has greatly increased the number of children exiting foster care to kinship

---

[39] Even were such inter-jurisdictional "ranking" feasible, a low rank would be of negligible value in defining acceptable versus actionable performance standards.  As the First Circuit concluded in *Connor B.*:  "We do not accept the argument that being in the bottom of a list of states, without more, provides strong evidence of a constitutional violation. Once a list is established, there is always someone at the bottom."  774 F.3d 45, 56 n.14.

[40] The Kinship Guardianship Assistance Program, commonly known as "KinGap," *see* FCA §§ 1055-b, 1089-a; Soc. Serv. Law § 458-b; 18 N.Y.C.R.R. Part 436, which went into effect in April 2011, provides financial assistance to qualified relative caregivers who assume guardianship of children formerly in their care as foster children.  Achieving permanency through KinGap is a lengthy process, as there are a number of requirements that must be met including that the court must have completed the fact-finding hearing on

guardianship. In FY 2019, 377 children reached permanency through KinGAP – a significant increase from FY 2013, when 119 children exited to KinGAP.

- From FY 2017 to FY 2019, ACS increased the number of newly certified foster homes by 50%.

*Id.* at ¶¶ 8-11.

As with virtually all of Plaintiffs' counsel's proffered questions, the answer to the purportedly common question of whether there are delays to permanency, and whether ACS plays a role in those delays, is nuanced and varies by case; and, more importantly, even when answered in the affirmative (*e.g.*, delay due to meritorious, and successful, appellate practice), does not necessarily indicate poor ACS or agency performance. Like all of Plaintiffs' counsel's common questions, the length-of-stay question, requiring as it does close analysis of the circumstances of each individual case, and yielding answers as variable as the cases from which they are derived, cannot credibly be characterized as sufficient to drive the resolution of the litigation.

### 6. Whether ACS Fails to Protect Children in Care from an Increased Risk of Maltreatment[41]

Maltreatment in care affects a small fraction (about 1.5%) of the number of children in foster homes, and nearly all of this is defined as neglect, not abuse.[42] Nonetheless, it is, of

---

the Article 10 petition. Nevertheless, the KinGap program affords families an important opportunity to have children cared for by relatives, with parents' retaining their parental rights.

[41] Plaintiffs' experts did not identify this as one of the six "themes" identified in their review of the Plaintiffs' cases.

[42] Regarding maltreatment in foster care more generally, the federal CFSR measure defines as "maltreatment in care" not only incidents occurring in the foster family, but also incidents that occur with the birth family during visits or on trial discharge. Using that CFSR definition, we found that in FY2018, more than two-thirds of "maltreatment in care" incidents occurred during court-authorized visiting and trial discharge, *i.e.*, with the birth family; of these, 85 percent were neglect rather than abuse charges. Excluding cases occurring with the birth family and outside the foster home, maltreatment in care affects about 1.5%

course, a matter of great concern to ACS. As an agency that is ever-attentive to the challenges of its child-protective mission, ACS has not sat idly by while maltreatment in care remains an ongoing challenge. Often, these incidents are related to difficulties foster parents experience with participating in necessary services for children with behavioral health challenges; ACS is working with foster care agencies to strengthen their support and communication with foster parents in this area. *See* Farber Decl. at ¶ 40; White Decl. at ¶ 30.

As with Plaintiffs' use of national length-of-stay metrics across jurisdictions that cannot reasonably be compared, Plaintiffs' counsel's attempt to rely upon national "ranking" in maltreatment in care is, at the very least, ill-informed, and, at worst, a cynical ploy effectively using New York's most-lenient-in-the-nation evidentiary standard against the City Defendant in this litigation.

As reported in the federal Children's Bureau's "Child Maltreatment 2018" publication, at Table C-1, [43] the legal standards for proving maltreatment used by the fifty states, Puerto Rico, and Washington, D.C., vary widely, with New York among those using the easiest standard for "indicating" a charge of abuse or maltreatment:

- 1 State:   Probable Cause
- 6 States:   Reasonable Cause
- 37 States and Puerto Rico:   Preponderance of the Evidence
- 6 States (incl. NY) and Washington, D.C:   Some Credible Evidence

---

of children in foster homes each year, the vast majority in the form of neglect findings which are frequently related to foster parents not engaging children in necessary services. A total of 13 maltreatment cases in FY17 had a foster parent as the unique perpetrator and included indicated abuse, or 0.01 percent of children in family foster care in 2017 for at least one day. *See* White Decl. at ¶ 30.

[43] Available at https://www.acf.hhs.gov/sites/default/files/cb/cm2018.pdf (last visited August 28, 2020).

White Decl. at ¶ 33.  Because New York requires only "some credible evidence" that child maltreatment may have occurred, it counts as "indicated" a maltreatment a report that, in the majority of other jurisdictions, would be deemed unsubstantiated.

Not surprisingly, then, if the "apples-to-oranges" problem of differing standards for indication is intentionally disregarded as Plaintiffs' counsel seek to do, New York City is pushed to the bottom of jurisdictions thanks to its overall indication rate of 37 percent in 2018 and 2019,[44] as compared to a national average indication rate of 17 percent.[45]  However, ignoring the differing standards and drawing that inter-jurisdictional comparison effectively penalizes New York for employing a standard that currently[46] resolves all doubt and ambiguity in favor of an "indicated" maltreatment finding.

In addition, consistent with that child protective goal, ACS has made significant efforts to encourage provider agency case planners to report all incidents of suspected abuse and neglect, including issuing policy guidance and providing training to agency staff to this effect.  *See* White Decl. at ¶ 36.  This may have contributed to recent increases in reported maltreatment in care rates in New York City. ACS takes every allegation of maltreatment in foster care extremely seriously. Reports to the New York Statewide Central Register of Child Abuse and Maltreatment ("SCR") are invaluable for the protection of child safety, and ACS does not wish to discourage providers from making these calls when appropriate.  Certainly, penalizing ACS for making every

---

[44] *See* White Decl. at ¶ 35 n.15 (citing FLASH Monthly Indicator Report, June 2020).

[45] *Id.* at n.16 (citing ACS Child Maltreatment data for federal FY 2018).

[46] In fact, beginning in 2022, New York State will join the majority of states using the preponderance-of-evidence standard for maltreatment investigations.  *See* White Decl. at ¶ 34.

effort to surface child neglect and abuse is irresponsible, counter-productive, and contrary to the best interests of the children Plaintiffs' counsel purport to represent.

To the extent that class certification analysis requires some degree of merits scrutiny, it is clear that the evidence does not remotely establish ACS's deliberate indifference to maltreatment in care. If Plaintiffs' counsel believe otherwise, they have produced no evidence even suggesting, let alone establishing, deliberate indifference; or that the challenge of maltreatment – a challenge that can present alongside family-specific stressors of poverty, incarceration, drug use, mental illness, homelessness, domestic violence, and a range of other factors – is a question common to a proposed Class or Subclass, the answers to which have any possibility of driving the resolution of this litigation in one stroke.

## POINT III

### THE PROPOSED PLAINTIFF SUBCLASSES ARE NEITHER SUFFICENTLY DEFINED NOR SUFFICIENTLY COHESIVE TO MEET THE REQUIREMENTS OF RULE 23(b)(2)

In denying Plaintiffs' counsel's first motion for class certification, this Court denied certification of "a broad unitary class of children who are or will be in foster care," and indicated that Plaintiffs' counsel could return to court only if they were able to fashion "appropriate subclasses," and do so "on an evidentiary record that satisfies the requirements of Rules 23(a) and 23(b)(2) as to the "broad Plaintiff class" and any such subclasses as they proposed. Class Cert. Denial, DE # 282, at 3. For the reasons discussed above, the proposed Plaintiff Class fails to address the infirmities of overbreadth and vagueness this Court noted four years ago. For those reasons and others discussed below, the proposed Plaintiff Subclasses fare no better.

**A. The "Special Scrutiny" Subclass, defined as all children who have been in ACS custody for more than two years and whose cases "require" special scrutiny, is grounded in a false premise that "special scrutiny" is an enforceable right.**

While Plaintiffs' counsel have attempted to address this Court's concerns about overbreadth of the "broad unitary class" by carving out a Special Scrutiny Subclass, in doing so they have only traded one problem for another. Because special scrutiny is only an agency best practice,[47] proof of membership in the subclass of children in care more than two years who allegedly were denied that best practice would yield absolutely no benefit to this Court in determining statutory liability or in fashioning relief. *Connor B.*, 774 F.3d at 55. The Court could not reasonably order the City Defendant to comply with an aspirational agency goal not otherwise statutorily mandated. And because Plaintiffs' counsel offer no evidence that the provision of special scrutiny would speed the time to permanency any more than the alleged withholding of such scrutiny would slow that time, they do not, as they cannot, show that membership in this Subclass will materially advance this litigation or yield any benefit to Subclass members in matters of proof. As with the entirety of this litigation, Plaintiffs' counsel are contouring this proposed Subclass not to any statutory right or violation, but rather to their own sense of how ACS should be run, even going so far as to invite this Court to approve a subclass, and presumably fashion a remedy, that effectively federalizes agency best practices. This Court should reject Plaintiffs' attempt to rewrite the laws to their liking, and deny certification of the proposed Special Scrutiny Subclass.

---

[47] *See* discussion of "special scrutiny" at Point II.D.4.d, above.

**B.   The "Compelling Reasons" Subclass is too vague and amorphous, and too riven by conflicts of interest, to warrant certification.**

Plaintiffs' counsel's proposed Compelling Reasons Subclass, and their desire to have New York courts rigidly adhere to counsel's preference for TPRs at the earliest possible time, reveal their true policy preference:  Either rush children into reunification even before supportive services have taken root and families are ready, and even if reunification at that hazardous pace is contrary to the wisdom of the Family Court judges presiding over those cases; or, if the various stakeholders and judges cannot reunify within Plaintiffs' counsel's desired timeframe, then rush to TPR and adoption.  *See* Advocates' Press Statement, DE 108-2:  "The Elisa W. litigation seeks to shift the focus of child welfare in New York City from reunification to decreasing stays in foster care through speeding up adoptions."

Plaintiffs' counsel will claim that they are only enforcing federal law, but that is simply untrue.  Federal law, specifically the Adoption and Safe Families Act ("ASFA"), reposes substantial discretion in the states to implement the 15/22 Rule, including allowing states to define "compelling reasons" constituting an exception to filing TPRs.  The ASFA provision establishing the 15/22 Rule identifies when a TPR must be filed, and when it need not be, as follows:

> [I]n the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months . . . the State shall file a petition to terminate the parental rights of the child's parents and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless—
>
> > (i)  at the option of the State, the child is being cared for by a relative;
> >
> > (ii)  a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or
> >
> > (iii)  the State has not provided to the family of the child, consistent with the time period in the State case plan, such

> services as the State deems necessary for the safe return of
> the child to the child's home, if reasonable efforts of the type
> described in section [42 U.S.C. § 671(a)(15)(B)(ii)] are
> required to be made with respect to the child[.]

42 U.S.C. § 675(5)(D). Thus, ASFA provides three exceptions to the 15/22 TPR filing requirement – "compelling reasons," plus two other categories separate from "compelling reasons: where the child is being cared for by relatives; and where there has been a failure to provide required services addressed to reunification.[48]

While the non-compelling-reason categories are reasonably straightforward and easily understood, the term "compelling reason" is not defined in the statute, leaving the states discretion to determine what constitutes a compelling reason to refrain from terminating parental rights.

Within the scope of that discretion accorded to the states, New York's legislature has expressed the State's clear preference for reunification over adoption, to the greatest extent possible, stating that "it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home of its birth parent, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered." N.Y. Soc. Serv. Law § 384-b (1)(a)(ii). Given this statement of legislative intent, it is not surprising that New York grafted an expansive, indeed open-ended, definition onto the federally undefined term "compelling reason," making clear that the term included, *but was not limited to*, the list of five reasons set forth therein:

---

[48] New York has enacted a state analog to this ASFA provision, adding a third category to the "compelling reasons"-plus-two provided in ASFA: an exception relating to a parent's incarceration or participation in substance abuse treatment program, or a history of either that contributed to the child being placed in care. N.Y. Soc. Serv. Law § 384-b(3)(l)(1).

(ii) For the purposes of this section, a compelling reason whereby a social services official is not required to file a petition for termination of parental rights in accordance with subparagraph (i) of this paragraph *includes, but is not limited to*, where:

(A) the child was placed into foster care pursuant to article three or seven of the family court act [relating to juvenile delinquency and persons in need of supervision, respectively] and a review of the specific facts and circumstances of the child's placement demonstrate that the appropriate permanency goal for the child is either (1) return to his or her parent or guardian or (2) discharge to independent living;

(B) the child has a permanency goal other than adoption;

(C) the child is fourteen years of age or older and will not consent to his or her adoption;

(D) there are insufficient grounds for filing a petition to terminate parental rights; or

(E) the child is the subject of a pending disposition under article ten of the family court act, except where such child is already in the custody of the commissioner of social services as a result of a proceeding other than the pending article ten proceeding, and a review of the specific facts and circumstances of the child's placement demonstrate that the appropriate permanency goal for the child is discharge to his or her parent or guardian.

N.Y. Soc. Serv. Law § 384-b(3)(l)(ii) (emphasis added).  Given that a "compelling reason" not to file a TPR in New York is not limited to the five reasons listed in the statute, it is virtually impossible, as Plaintiffs' counsel attempt to do, to determine whether a circumstance unique to the facts of a specific case will constitute, in any particular case, a compelling reason not to file a TPR. Such an outcome is clearly permitted by ASFA,[49] and even more emphatically favored by the State of New York.  That it is not favored by Plaintiffs' counsel is, frankly, of absolutely no moment.

---

[49] To the extent that Plaintiffs' counsel might argue that federal law requires a more rigidly time-based application of TPR filing deadlines, a recent pandemic-related guidance from HHS makes clear that that is not the case.  The letter sets out the federal exceptions to the 15/22 Rule, advising state and tribal child

Plaintiffs' counsel provide the Court with a nine-page single-spaced appendix listing instances where they found documentation of compelling reasons in Plaintiffs' case files, Pls' Appendix 1, DE # 440-1.  While they do not explain the process used to collect those nine pages of compelling reasons, presumably they conducted a search for the phrase "compelling reason" or for words associated with one of the enumerated (but not exclusive) State-defined compelling reasons.  What their search would not capture are other reasons for not filing TPRs authorized under New York's open-ended, non-exclusive list of circumstances that might constitute compelling reasons under State law.  And, even with their presumably limited word search method of identifying compelling reasons in the case files, the most damning statement Plaintiffs' counsel can marshal is that, "for all Plaintiffs, there is at least *one* three-month period in which no compelling reasons were documented …."  Pls.' MOL at 36 n.18.  This hardly constitutes the "glue" holding a subclass together.

Finally, regarding the Compelling Reasons Subclass, Plaintiffs' counsel cannot sustain the Subclass as a cohesive whole because members of that class are in inherent conflict with one another and with Plaintiffs' counsel about counsel's insistence that TPRs be filed at the earliest time permitted by law, rather than the latest time reasonably, and legally, extended to parents struggling to reunify their families.  In essence, Plaintiffs' counsel's personal preference can be summarized as "TPR unless…" while the policy of New York State and City is "TPR only

---

welfare agencies that "[t]he exceptions … allow the agency the flexibility to make life-changing TPR decisions on a *case-by-case basis that consider the totality of circumstances for each family*…."  Letter from the United States Health and Human Services Administration for Children and Families to State and Tribal Child Welfare Leaders, dated June 23, 2020 (emphasis added).  City's Ex. L.

if …" – and the State's "only if" includes an open-ended list of both identified and unidentified exceptions to the TPR requirement.[50]

      This is not a philosophical debate but a concrete, potentially life-altering conflict between different putative Compelling Reasons Subclass members potentially facing 15/22 TPR proceedings.  In 2017, of 396 children in ACS's care whose families fell into the 15/22 TPR category with no exceptions applicable, more than one-third  (135 children) were actually reunified with their families of origin or placed in Kinship Guardianship within 24 months of the TPR deadline would have insisted be brought down upon them, permanently severing the parent-child bond.[51]  *See* Yaroni Decl. at ¶ 5.  Significantly, both of these outcomes – reunification and Kinship Guardianship – do not entail the termination of parental rights, thereby preserving the parental relationship and advancing the State's stated goal of family preservation whenever possible and appropriate.  *Id.*, ¶¶ 5, 7.

      Were they to prevail, Plaintiffs' counsel's position on the 15/22 Rule would utterly disregard children's desire to be reunited with their families, even if not on Plaintiffs' counsel's schedule; parents' interests in having their children return to their care; and judges' interests in

---

[50] As noted above, Plaintiffs' counsel are so fervent in their desire to certify a Compelling Reasons Subclass that they dragooned three of their clients, Emmanuel S., Matthew V., and Tyrone M. – presumably, without their knowledge or consent – into being Compelling Reasons Subclass representatives, even though they were exempt from the need to demonstrate a compelling reason exception to the 15/22 Rule.  These three children – no longer in care – while in care, had been placed with kin so, as a result, fell under a different statutory exception to the TPR requirement, for which neither federal or State law requires the existence of compelling reasons.  *See* 42 U.S.C. § 675(5)(D)(i) (statutory exception separate from compelling reason exception eliminating TPR requirement when "the child is being cared for by a relative"); NY Soc. Serv. Law § 384-b(3)(l)(ii)(B) (statutory exception separate from compelling reason exception eliminating TPR requirement when "the child has a permanency goal other than adoption").

[51] While an exception may not have been identifiable in ACS's review, it is reasonable to assume that the Family Court judge responsible for the case's progress approved or allowed the non-filing of the TPR. Certainly, any judge believing that a TPR should be filed could direct ACS to do so.

exercising their expertise and judicial discretion to guide children and families through the challenges and frequent delays on the way to safe and appropriate permanency.  Were Plaintiffs' counsel to prevail in certifying a Compelling Reasons Subclass, a sizable number of the Subclass members, seemingly as many as one-third or more, would likely disagree with the harsh family-destructive view of the 15/22 Rule Plaintiffs' counsel would seek to have enforced in Plaintiffs' name.  Certainly, if asked – and, in fairness and equity, they should have been asked – many if not most putative Subclass members would likely choose reunification, even "delayed" reunification, over TPR and adoption – the outcome Plaintiffs' counsel clearly favor only because it pushes children out of care as quickly as possible.

As the First Circuit observed, the concerns animating the separation of powers doctrine suggest that courts should exercise their powers with appropriate deference to the other two branches of government, and should approach requests to authorize class-wide challenges to "an entire set of practices for care of foster children" with similar deference to the professionalism of those charged with responsibility for administering the systems under judicial review:

> There are good reasons class-wide challenges to a state agency's entire set of practices for care of foster children are difficult to bring successfully. As *Youngberg* [*v. Romeo*] states, "there certainly is no reason to think judges or juries are better qualified than appropriate professionals in" administering an institution. Judicial review is "limit(ed)," to prevent "interference by the federal judiciary with the internal operations of these institutions." [457 U.S. 307, 322 (1982)]. The presumptive correctness of the decisions of professionals is "necessary to enable institutions of this type … to continue to function."

*Connor B.*, 774 F.3d at 55.

Plaintiffs' counsel's second attempt at class certification should be denied.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' counsel's renewed motion for class certification should be denied, together with such further relief as this Court deems appropriate.

Dated:      New York, New York
August 31, 2020

**JAMES E. JOHNSON**
Corporation Counsel of the
  City of New York
Attorney for City Defendant
100 Church Street
New York, New York 10007
Phone: 917-370-3015

By:    <u>s/                           </u>
        Jonathan Pines
        Ian Forster
        Sharon Sprayregen
        Assistant Corporation Counsel