<u>**UNITED STATES DISTRICT COURT**</u>

ELISA W., by her next friend,
Elizabeth Barricelli, <u>et al.</u>,

                Plaintiffs,

         - against -

THE CITY OF NEW YORK, <u>et al.</u>,

                Defendants.

15 Civ. 5273 (KMW) (SLC)

**SOUTHERN DISTRICT OF NEW YORK**


**STATE DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**


NEW YORK STATE OFFICE OF
THE ATTORNEY GENERAL
<u>Attorney for State Defendant</u>
28 Liberty Street
New York, New York 10005


SAMANTHA L. BUCHALTER
Assistant Attorney General
  <u>of Counsel</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

RELEVANT BACKGROUND ..........................................................................................3

    A.  Overview of the New York State Foster Care System ........................................3
    B.  Statewide Regulations, Policies, and Procedure ................................................5
    C.  Approval and Supervision of IOC .....................................................................6
    D.  Communication with ACS; Review and Approval of ACS Policies; ACS Corrective Action and Program Improvement Plans ..........................................................8
    E.  Targeted Oversight of Contract Agencies ........................................................10
    F.  Maintenance and Improvement of CONNECTIONS .......................................11
    G.  The CFSR and Program Improvement Plan Process .......................................12

RELEVANT PROCEDURAL HISTORY ........................................................................13

STANDARD OF REVIEW ..............................................................................................15

ARGUMENT ...................................................................................................................17

POINT I: PLAINTIFFS CANNOT SATISFY THEIR BURDEN UNDER RULE 23(A) WITH RESPECT TO THE PROPOSED GENERAL CLASS ..............................................17

    A.  There Is No Commonality Among The Proposed General Class Members ......................18
    B.  There Is Insufficient Typicality Between Plaintiffs And The Proposed General Class Members ........................................................................................................23
    C.  Plaintiffs Do Not Adequately Represent The Proposed General Class ...........................26

POINT II: PLAINTIFFS CANNOT DEMONSTRATE THAT RULE 23(B)(2) IS APPLICABLE ..................................................................................................................27

POINT III: PLAINTIFFS CANNOT SHOW THAT THE PROPOSED SUBCLASSES MEET THE REQUIREMENTS OF RULE 23 ...........................................32

    A.  Plaintiffs Set Forth No Argument Or Evidence That The Proposed Subclasses Meet The Explicit Requirements Of Rule 23 ...................................................................32
    B.  The Proposed Subclasses Are Not Reasonably Ascertainable ...........................34

CONCLUSION .................................................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

Alemite Mfg. Corp. v. Staff,
  42 F.2d 832 (2d Cir.1930)...................................................................................29

Ault v. J.M. Smucker Co.,
  310 F.R.D. 59 (S.D.N.Y. 2015) .....................................................................35, 37

B.K. v. Snyder,
  922 F.3d 957 (9th Cir. 2019) (Arizona) .............................................................17

Baby Neal v. Casey,
  43 F.3d 48 (3d Cir. 1994) ...................................................................................17

Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,
  222 F.3d 52 (2d Cir. 2000)..................................................................................26

Berni v. Barilla S.p.A.,
  964 F.3d 141 (2d Cir. 2020).........................................................................27, 28

Billhofer v. Flamel Techs., S.A.,
  281 F.R.D. 150 (S.D.N.Y. 2012) ........................................................................26

Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,
  290 F.R.D. 409 (S.D.N.Y. 2012) ..................................................................24, 25

Burley v. City of N.Y.,
  No. 03 Civ. 735, 2005 WL 668789 (S.D.N.Y. Mar. 23, 2005) .............................16

Califano v. Yamasaki,
  442 U.S. 682 (1979)............................................................................................15

Caridad v. Metro-North Commuter R.R.,
  191 F.3d 283 (2d Cir. 1999).......................................................................... 23-24

Casale v. Kelly,
  257 F.R.D. 396 (S.D.N.Y. 2009) ........................................................................32

Charron v. Pinnacle Grp. N.Y. LLC,
  269 F.R.D. 221 (S.D.N.Y. 2010) ............................................................34, 35, 37

Civ. Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.,
  867 F.3d 1093 (9th Cir. 2017) ............................................................................28

Connor B. v. Patrick,
   774 F.3d 45 (1st Cir. 2014)........................................................................................31

Corsini v. Nast,
   613 Fed. Appx. 1 (2d Cir. 2015)................................................................................34

Davis v. Smith,
   607 F.2d 535 (2d Cir. 1978)........................................................................................32

de Lacour v. Colgate-Palmolive Co.,
   No. 16-CV-8364, 2019 WL 4359554, slip op. (S.D.N.Y. Sept. 12, 2019)...............17

Dodge v. Cnty. of Orange,
   208 F.R.D. 79 (S.D.N.Y. 2002) .................................................................................15

D.G. v. Devaughn,
   594 F.3d 1188 (10th Cir. 2010) ............................................................................16, 17

Eng-Hatcher v. Sprint Nextel Corp.,
   No. 07 Civ. 7350, 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) ......................35, 36

Flores v. Anjost Corp.,
   284 F.R.D. 112 (S.D.N.Y. 2012) ...............................................................................33

Galvan v. Levin,
   490 F.2d 1255 (2d Cir. 1973), cert. denied, 417 U.S. 936 (1974) ...........................32

Gen. Tele. Co. of Southwest v. Falcon,
   457 U.S. 147 (1982)................................................................................................33-34

Hirschfield v. Stone,
   193 F.R.D. 175 (S.D.N.Y. 2000) ...............................................................................26

In re Drexel Burnham Lambert,
   960 F.2d 285 (2d Cir. 1992)...........................................................................21, 23, 26

In re Frontier Ins. Grp., Inc. Sec. Litig.,
   172 F.R.D. 31 (E.D.N.Y. 1997) .................................................................................24

In re Initial Pub. Offerings Sec. Litig. ("In re IPO"),
   471 F.3d 24 (2d Cir. 2006)............................................................................15-16, 33, 34

In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("MTBE"),
   209 F.R.D. 323 (S.D.N.Y. 2002) .............................................................15, 16, 29, 30, 35

In re Petrobras Sec.,
   862 F.3d 250 (2d Cir. 2017), cert. dismissed, Petroleo Brasileiro S.A. v.
   Univs. Superannuation, 140 S.Ct. 338 (2019) ....................................................15, 36

In re Starbucks Emp. Gratuity Litig.,
    264 F.R.D. 67 (S.D.N.Y. 2009) ...........................................................27

Johnson v. Nextel Commc'ns Inc.,
    780 F.3d 128 (2d Cir. 2015)........................................................15, 18

Kiobel v. Royal Dutch Petroleum Co.,
    No. 02 Civ. 7618, 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) ....................35, 37

Levitt v. J.P. Morgan Sec. Inc.,
    710 F.3d 454 (2d Cir. 2013)........................................................16, 33

Leyse v. Lifetime Entm't Servs., LLC,
    679 Fed. Appx. 44 (2d Cir. 2017) ...........................................................37

Marisol A. v. Giuliani,
    126 F.3d 372 (2d Cir. 1997)................................................ 16-17, 23, 29

Myers v. Hertz Corp.,
    624 F.3d 537 (2d Cir. 2010)...........................................................17

M.D. v. Perry,
    294 F.R.D. 7 (S.D. Tex. 2013).........................................................17

Oakley v. Verizon Comms. Inc.,
    No. 09 Civ. 9175, 2012 WL 335657 (S.D.N.Y. Feb. 1, 2012) ................................34

Pecere v. Empire Blue Cross & Blue Shield,
    194 F.R.D. 66 (E.D.N.Y. 2000) ...........................................................16

Rambarran v. Dynamic Airways, LLC,
    No. 14-cv-10138, 2015 WL 4523222 (S.D.N.Y. July 27, 2015)...........................32

Reynolds v. Giuliani,
    506 F.3d 183 (2d Cir. 2007)....................................................3, 30, 31

Ruggles v. WellPoint, Inc.,
    272 F.R.D. 320 (N.D.N.Y. 2011)...........................................................23

Shahriar v. Smith & Wollensky Rest. Grp., Inc.,
    659 F.3d 234 (2d Cir. 2011)........................................................16, 34

Shayler v. Midtown Investigations, Ltd.,
    No. 12 Civ. 4685, 2013 WL 772818 (S.D.N.Y. Feb. 27, 2013) ............................25

Spagnola v. Chubb Corp.,
    264 F.R.D. 76 (S.D.N.Y. 2010) ......................................................35, 36

Stinson v. City of N.Y.,
    282 F.R.D. 360 (S.D.N.Y. 2012) ...........................................26

Stitsky v. U.S.,
    15-CV-7889, 2018 WL 10741470, slip op. (S.D.N.Y. Oct. 25, 2018) ...................................34

Taylor v. Zucker,
    No. 14-CV-5317, 2015 WL 4560739 (S.D.N.Y. July 27, 2015) ................................... passim

U.S. v. Yousef,
    327 F.3d 56 (2d Cir. 2003) .............................................34

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011) ................................................. passim

Welch v. United Parcel Serv., Inc.,
    871 F. Supp. 2d 164 (E.D.N.Y. 2012) ...............................28

Zivkovic v. Laura Christy LLC,
    329 F.R.D. 61 (S.D.N.Y. 2018) ...............................16, 33

**FEDERAL STATUTES**

42 U.S.C.
    § 675(5)(E)(ii) .........................................................36

Family First Prevention Services Act of 2018 ("FFPSA") ......................................6, 25

**FEDERAL REGULATIONS**

45 C.F.R.
    §§ 1355.50-59 .........................................................11

**FEDERAL RULES**

Fed. R. Civ. P. 23 ............................................... passim

Fed. R. Civ. P. 23(a) ............................................ passim

Fed. R. Civ. P. 23(a)(2) .............................................18, 23

Fed. R. Civ. P. 23(a)(3) ................................................23

Fed. R. Civ. P. 23(a)(4) ................................................26

Fed. R. Civ. P. 23(b) ...................................................15

Fed. R. Civ. P. 23(b)(2) ......................................... passim

**STATE STATUTES**

N.Y. Social Services Law ("S.S.L.")

§ 17(a) .................................................................................................................4
§ 17(b) .................................................................................................................4
§ 20(2)-(4) ...........................................................................................................4
§ 34(3)-(6) ...........................................................................................................4
§ 56 ......................................................................................................................4
§ 61 ......................................................................................................................4
§ 153-k(4) ............................................................................................................4
§ 383(2) ...............................................................................................................4
§ 384-b(3)(l)(ii) .................................................................................................36
§ 406 ....................................................................................................................4
§ 407 ....................................................................................................................4

**WEBSITE**

Child Welfare Services, Childwelfare.gov,
     https://www.childwelfare.gov/pubs/factsheets/services/ .......................................17

Defendant SHEILA J. POOLE ("State Defendant"), sued in her official capacity as Commissioner of the New York State Office of Children and Family Services ("OCFS"), respectfully submits this memorandum of law, together with the accompanying Declarations of Lisa Ghartey Ogundimu dated September 21, 2020 ("Ghartey Decl.") and Samantha L. Buchalter dated September 21, 2020 ("Buchalter Decl."), in opposition to Plaintiffs' Renewed Motion for Class Certification dated July 30, 2019, ECF Nos. 439-442, on the basis that Plaintiffs have failed to satisfy their burden for class certification of both the proposed general class and proposed subclasses under Fed. R. Civ. P. 23.

## PRELIMINARY STATEMENT

At the time that the operative complaint was filed in 2015, the nineteen named plaintiffs ("Plaintiffs") in this case were children in the New York City ("NYC") foster care system. See Am. Compl., ECF No. 91, ¶ 2. Plaintiffs now seek certification under Rule 23(b)(2) of a broad general class of "all children who are now or will be in the foster care custody of the Commissioner of [the NYC Administration for Children's Services]" (the "General Class"), as well as two subclasses (the "Subclasses"). See Memorandum of Law in Support of Plaintiffs' Renewed Motion for Class Certification dated July 30, 2019, ECF No. 440 ("Pl. Mem."), at 4.

The Honorable Laura Taylor Swain[1] previously rejected Plaintiffs' proposed General Class earlier in this litigation. See Memorandum Order dated September 27, 2016, ECF No. 282 ("Order Denying Class Cert."). In so doing, Judge Swain ruled that if Plaintiffs sought to renew their motion, they would have to furnish "an evidentiary record that demonstrates satisfaction of the requirements of Rules 23(a) and 23(b)(2) as to both the broad class and appropriate

---

[1] The case was transferred to this Court on July 22, 2020. See Notice of Case Reassignment, ECF Entry dated July 22, 2020.

1

subclasses." Id. at 4.  Plaintiffs have failed to satisfy this mandate.

The proposed General Class encompasses every single case of the thousands of children in the NYC foster care system.  That system is supervised by OCFS and administered by the NYC Administration for Children's Services ("ACS").  ACS contracts with 26 nonprofit agencies (the "Contract Agencies"), who are not parties to this litigation, to perform the day-to-day casework for children in foster care.[2]  The day-to-day foster care casework involves highly fact intensive, individualized determinations, and is affected by the actions and decisions of the children themselves, as well as additional non-parties such as the children's birth, foster, and adoptive parents or guardians, attorneys for the children and birth parents, service providers to the children and parents, and separate New York State entities such as the New York State Family Court system.

This all-encompassing proposed General Class simply cannot withstand the requisites of commonality, typicality, or adequacy of representation set forth by Rule 23(a).  See Point I, infra. Plaintiffs fail to affirmatively demonstrate that there is any "glue" holding together those multi-faceted individual decisions, let alone tying those decisions to State Defendant.  See Point I(A), infra.  Moreover, the overly broad proposed General Class purports to include children placed in congregate care, an institutional placement in which approximately 14 percent of children in the NYC foster care system are placed.[3]  However, none of the named Plaintiffs have been placed in congregate care.  The overbroad proposed General Class also includes children placed in all 26

---

[2]  Because of the multi-layered structure of NYC foster care and ACS's position with respect to Plaintiffs and the putative class members, and in furtherance of judicial economy and to avoid unnecessary repetition, State Defendant relies on, and incorporates by reference, the Opposition filed by Defendant City of New York ("City Defendant") as noted herein.  See City Defendant's Memorandum of Law in Opposition to Plaintiffs' Renewed Motion for Class Certification dated August 31, 2020, ECF No. 493 ("City Opp.").

[3]  See Ghartey Decl. ¶ 7, Ex. A.

Contract Agencies, though Plaintiffs have only been placed with 11 of those Contract Agencies. Plaintiffs are also not typical of the proposed General Class because of the ever-evolving nature of the NYC foster care system.  See Point I(B), infra.  In addition, because a successful outcome in a foster care case depends on uniquely individual factors and circumstances, there are conflicts among Plaintiffs and the putative class members.  See Point I(C), infra.

The individualized nature of the foster care system also precludes Plaintiffs from satisfying Rule 23(b)(2).  See Point II, infra.  There is no injunction or declaration that would target all of the putative class members' alleged injuries.  Even if such relief existed, it would not bind the other, non-party actors in the NYC foster care system.  Further, injunctive relief as against State Defendant is precluded by Reynolds v. Giuliani, 506 F.3d 183 (2d Cir. 2007), because Plaintiffs have not shown that OCFS knew of any systemic deficiencies and failed to act in response.

Plaintiffs, chastened by Judge Swain's prior decision, now attempt to salvage their expansive proposed General Class with the inclusion of proposed Subclasses.  See Point III, infra.  Yet Plaintiffs fail to meet their burden of demonstrating that either Subclass meets the specific requirements for certification under Rule 23.  See Point III(A), infra.  Further, the definitions of the Subclasses themselves preclude certification because membership in the Subclasses is not ascertainable.  See Point III(B), infra.  The Subclasses therefore cannot be certified, and Plaintiffs' motion must be denied in its entirety.

## RELEVANT BACKGROUND

### A.  Overview of the New York State Foster Care System

The New York State foster care system is State-supervised and locally-administered by 58 local departments of social services ("LDSSs")—the 57 counties outside of New York City

and ACS for the five counties in NYC—and the St. Regis Mohawk Tribe.  Ghartey Decl. ¶ 4;

Preliminary Joint Pre-Trial Statement, ECF No. 379 ("Pre-Trial Statement"), at 4 (Statement of

Material Uncontested or Admitted Facts).  The LDSS for the NYC foster care system is ACS,

and with the exception of certain adjudicated juvenile delinquents, children in NYC foster care

are placed in the custody of the Commissioner of ACS.  N.Y. Soc. Serv. Law ("N.Y. S.S.L.") §§

56, 61, 383(2); accord Ghartey Decl. ¶ 7; Pre-Trial Statement at 4. Generally, children in the

NYC foster care system may be placed in a family foster home, known as a "foster boarding

home," or in an institutional home, known generally as "congregate care."  See Ghartey Decl. ¶

7.

      Pursuant to New York Social Services Law § 153-k(4), and subject to OCFS approval,

ACS operates a managed care system called Improved Outcomes for Children ("IOC").  Id.; Pre-

Trial Statement at 4.  Under IOC, ACS delegates to Contract Agencies, also called "voluntary

agencies," certain case management activities, including the placement of children into foster

homes, casework contacts, and the provision of services to children and parents.  Ghartey Decl. ¶

7; Pre-Trial Statement at 4.  At present, ACS contracts with 26 Contract Agencies for the

provision of foster care services to children in ACS custody.  Ghartey Decl. ¶ 7; City Opp. at 8,

17.

      OCFS is responsible for supervising foster care in New York State, including NYC.  N.Y.

S.S.L. §§ 17(a), (b), 20(2)-(4), 34(3)-(6), 406, 407; accord Ghartey Decl. ¶ 4; Pre-Trial Statement

at 4.  Specifically, OCFS's Division of Child Welfare and Community Services ("CWCS")

supervises the foster care system, and the NYC Regional Office ("NYCRO") oversees and

provides administrative and technical support to ACS and the Contract Agencies.  Ghartey Decl.

¶¶ 4-6, 8.

OCFS exercises its responsibility for oversight of ACS in many ways.  As relevant to this litigation, and discussed more fully below, those ongoing and continuous oversight activities include: (1) issuance of new and amended Statewide regulations, policies, and procedures; (2) approval and supervision of ACS's IOC initiative; (3) regular and constant communication with ACS, review and approval of ACS policies, and ACS corrective actions and program improvement plans; (4) targeted direct oversight of the Contract Agencies; (5) maintenance and improvement of CONNECTIONS, which is the New York State Child Welfare Computer System, and regular monitoring based on the data input in that system; and (6) the Child and Family Services Review ("CFSR") process and development of Statewide CFSR Program Improvement Plans.

### B.  Statewide Regulations, Policies, and Procedures

OCFS has an extensive array of Statewide regulations, policies, and procedures that not only were produced to Plaintiffs but are also available publicly.[4]  See Ghartey Decl. ¶ 9 (citing OCFS's website that sets forth relevant Statewide legislation, regulations, policies, and procedures).  New and amended regulations, policies, and procedures are frequently issued.  See id.  For instance, OCFS is in the process of issuing an Informational Letter ("INF"), which is an external policy statement that clarifies or amplifies existing procedures. This INF will specify that with respect to monthly face-to-face casework contacts, caseworkers should document the

---

[4]  Despite this extensive body of policies, Plaintiffs take issue with OCFS's efforts in "setting and enforcing policies," solely because OCFS has not issued two specific policies that Plaintiffs and/or their counsel would like OCFS to issue.  See Pl. Mem. at 45.  This complaint demonstrates not that OCFS is a bad actor—and certainly not that certification is warranted here—but only that Plaintiffs' counsel disagrees with some of OCFS's policy decisions.  Cf. City Opp. at 6, 9-17, 66-71 (arguing that Plaintiffs' counsel are advancing their personal policy preferences).

contacts in CONNECTIONS within thirty days.[5]  See Ghartey Decl. ¶ 10.

In addition, OCFS has been developing policies and procedures to align with the Federal Family First Prevention Services Act of 2018 (the "FFPSA").  Id. ¶ 11.  One of these policies is the Kin-First Firewall, which OCFS is mandating each LDSS implement by the end of 2020.  Id. ¶ 12.  Based on the evidence that placing children with relatives has been shown to maintain family and cultural connections, preserve cultural identity, reduce trauma, and provide a more stable placement for children who must be placed out-of-home, the Kin-First Firewall establishes a second-level review during placement of a child in foster care to verify that  all viable relatives and significant adults in a child's life be examined as a potential resource to achieve a kinship placement before a non-kinship placement is made.  Id.

### C.  Approval and Supervision of IOC

The IOC system is subject to an extensive and rigorous approval process, and continuous and ongoing supervision by OCFS.[6]  Ghartey Decl. ¶¶ 13-17.  The IOC approval process

---

[5]  This INF obviates Plaintiffs' claim that "[t]here is no uniform standard for documentation timeliness, resulting in confusion and inconsistency."  Pl. Mem. at 29.  Further, Plaintiffs contradict that claim in their next sentence, acknowledging that "OCFS requires progress notes be entered 'as contemporaneously as possible[,'] a 'recommend[ed]' 30 days or less."  Id.; see also Deposition Transcript of Laura Velez, ECF No. 442-21 ("Velez Tr.") at 113:17-18 (stating that OCFS has "identified 30 days as . . . the outside of what contemporaneous would be"); City Opp. at 53-54 (addressing Plaintiffs' claims regarding timely documentation).

[6]  For their misleading and conclusory claim that "[b]efore this lawsuit, OCFS had reapproved IOC whenever asked, and had never considered not reapproving IOC," Plaintiffs cite only the deposition of Ronni Fuchs, now the Regional Director of NYCRO.  Pl. Mem. at 11.  Yet Ms. Fuchs's own testimony, and the record, demonstrate that IOC approval is not the undemanding process that Plaintiffs suggest.  See Ghartey Decl. ¶¶ 13-16; Deposition Transcript of Ronni Fuchs, ECF No. 442-7 ("Fuchs Tr.") at 40:8-44:4; Velez Tr. at 83:12-24; Letter dated June 9, 2015 from Commissioner Poole to Gladys Carrión, then-Commissioner of ACS, ECF No. 442-54 (setting forth extensive requirements for the continuance of IOC); 2017 IOC Approval Report, ECF No. 442-68.  Further, Plaintiffs overstate the testimony to which they cite: "Q: Has OCFS ever given consideration to declining to re-approve IOC? A: Not to my knowledge. Q: Why not? A: I don't know."  Fuchs Tr. at 44:9-13.

requires that ACS periodically submit a comprehensive report detailing current NYC preventive and foster care services, including but not limited to the reform initiatives and other programs ACS has developed and implemented, data collected by ACS and alignment with ACS IOC core indicators, proposed data targets and goals, strategies to meet the stated goals, and fiscal reporting (the "IOC Approval Report").  Ghartey Decl. ¶ 14; see, e.g., 2017 IOC Approval Report, ECF No. 442-68.  Following submission of an IOC Approval Report, OCFS and ACS engage in an iterative process, consisting of regular meetings, telephone calls, emails, and exchanges of drafts, during which the Report is reviewed and revised by both OCFS and ACS until OCFS is satisfied with its terms and approves the Report.  Ghartey Decl. ¶ 15; Fuchs Tr. at 40:8-44:4; Velez Tr. at 83:12-24.  The approval process involves the review and approval of various stakeholders within OCFS, including Commissioner Poole herself, as well as other State agencies, including the New York State Division of Budget.  Ghartey Decl. ¶ 16; Fuchs Tr. at 40:8-44:4; Velez Tr. at 83:12-24.

OCFS most recently approved IOC in May 2019 through April 30, 2021.  Ghartey Decl. ¶ 13, Ex. B.  Plaintiffs are incorrect in their claim that "[s]ince, and in part because of, the filing of this lawsuit, ACS has been operating IOC with only an 'informal approval' from OCFS, with no official waiver."  Pl. Mem. at 11 (citing Ms. Velez's testimony).  To the contrary, prior to the most recent approval, ACS operated under a previously-approved IOC plan that was extended through 2019.  See Ghartey Decl. ¶ 13; Velez Tr. at 85:5-6.  The earlier proposed settlement of this litigation—not the filing of the litigation—tied into the IOC approval process, because the contemplated settlement would have impacted what OCFS required of ACS under IOC.  Velez Tr. at 105:11-106:5, 106:13-107:2, 108:12-19, 109:3-6 (stating that the settlement envisioned the hiring of individuals who would provide additional oversight over ACS and IOC); see also Pl.

Mem. at 12 n.6 ("From July 2015 to early 2017, OCFS considered (in connection with settling this lawsuit) adding another level of oversight to ACS.").  Moreover, during that period, as always, OCFS and ACS undertook substantial activities with respect to IOC.  See Velez Tr. at 85:6-17, 85:22-86:8, 86:19-87:4, 87:11-14.

In addition to the approval process, OCFS supervises IOC as part of its regular oversight of ACS as well as targeted supervision of the goals and metrics of IOC.  See Ghartey Decl. ¶¶ 13, Ex. B, 17-20.

### D. Communication with ACS; Review and Approval of ACS Policies; ACS Corrective Action and Program Improvement Plans

As Plaintiffs acknowledge, "the record reflects frequent interaction between OCFS and ACS at all levels," another means by which OCFS oversees ACS and IOC.  Pl. Mem. at 44 (citing Fuchs Tr. 104:18-105:10; Velez Tr. 86:19-88:4; Poole Tr. 107:21-109:9).  OCFS regularly conducts in-person meetings, conference calls, and emails with ACS.  Ghartey Decl. ¶ 18; Fuchs Tr. 104:18-22, 105:2-10.

OCFS also holds standing, monthly meetings with representatives from ACS to evaluate and discuss developments in ACS's policies, practices, and programs, including IOC.  Ghartey Decl. ¶ 18; Fuchs Tr. 104:22-25, 105:2.  The purpose of these monthly meetings is to keep OCFS apprised of any significant, new strategies ACS is implementing, to provide OCFS with an up-to-date overview of ACS's performance as it relates to child welfare, and to address specific issues or questions that ACS or OCFS may identify.  Ghartey Decl. ¶ 18.  Every six months, the monthly monitoring meeting is augmented with an additional review of significant data generated by ACS.  Id.; Fuchs Tr. 43:14-25, 44:2-3, 109:7-19; Velez Tr. 81:10-18, 86:22-25, 105:23-25.  More targeted data is also provided by ACS and reviewed by OCFS as necessary.  Ghartey Decl. ¶ 18; Fuchs Tr. 42:2-4.

In addition, OCFS reviews and approves ACS policies.  Ghartey Decl. ¶ 19.  As Plaintiffs admit, OCFS takes this function seriously, often "requir[ing] substantial revisions" to those policies.  Pl. Mem. at 44; accord Ghartey Decl. ¶ 19.  When necessary, OCFS also requires and supervises ACS corrective actions or program improvement plans.  Ghartey Decl. ¶ 20.

Indeed, Plaintiffs contradict their own portrayal of OCFS as a lax supervisory authority.  For example, Plaintiffs claim that "[t]here is nothing in the record that reflects any concern, let alone action, on the part of OCFS upon its receipt of the" 2014 Leadership Transformation Group Report (the "LTG Report"[7]), which made recommendations on Family Team Conferences ("FTCs"), an aspect of IOC.  Pl. Mem. at 41, 41 n.23.  Yet Plaintiffs acknowledge that "[d]uring monthly meetings between 2015 and 2019, OCFS communicated to ACS its concerns about ACS's participation in FTCs, FTC timeliness and participation by children and their families after reviewing ACS facilitator participation data and identifying conferences that ACS should have, but did not, facilitate."  Id. at 15 n.10 (citing Velez Tr. at 98:14-100:22; ECF No. 442-71); see also, e.g., Email dated September 3, 2014 from Raymond Toomer to Ronni Fuchs, Markette Harris, Yvonne McNeil, and Angela Reshard-Player ("Sept. 3, 2014 Email"), Buchalter Decl., Ex. F (email from then-Regional Director of NYCRO regarding IOC workgroup meeting at ACS convened in response to the LTG Report and its recommendations).[8]

---

[7]  It should also be noted that the May 20, 2014 version of the LTG Report filed and relied on by Plaintiffs, ECF No. 442-20, is not the final version of the LTG Report; OCFS produced a report from the Leadership Transformation Group dated July 24, 2014.  See Assessment of Improved Outcomes for Children (July 24, 2014), Buchalter Decl., Ex. G.

[8]  In another attempt to vilify OCFS, Plaintiffs note that at her 2019 deposition, Ms. Fuchs testified that she had not seen the final version of the LTG Report before receiving a 2017 email, which was shown to her at her deposition.  Pl. Mem. at 41.  To the contrary, State Defendant in fact produced to Plaintiffs an email demonstrating that Ms. Fuchs received the LTG Report as early as September 3, 2014.  See Sept. 3, 2014 Email, Buchalter Decl., Ex. F (appending Assessment of Improved Outcomes for Children (July 24, 2014), Buchalter Decl., Ex. G).

### E. Targeted Oversight of Contract Agencies

OCFS oversees Contract Agency practice through Voluntary Agency Reviews ("VARs"). Ghartey Decl. ¶ 21. VARs are comprehensive and require extensive Contract Agency and NYCRO resources. Id. ¶¶ 22-26; see VAR Process Guidelines dated August 4, 2016, ECF No. 442-86. From the start of planning the VAR through the on-site visits to the issuance of the resulting VAR report, a VAR takes nine months out of the year in which it is conducted, not including the time needed for any necessary resulting corrective action. Ghartey Decl. ¶ 22. The on-site review portion can take place over two weeks of full work days, pulling participating NYCRO and Contract Agency staff from their regular duties. Id. ¶ 24. VARs also entail case record reviews. Id. If NYCRO identifies any corrective actions necessary, it will implement and oversee a program improvement plan requiring the Contract Agency to address the issues identified during the VAR. Id. ¶¶ 25-26. For example, Little Flower Children and Family Services of New York, a Contract Agency, was put on a program improvement plan in May 2020 following its 2019 VAR, and NYCRO issued a program improvement plan to Cardinal McCloskey Community Services, another Contract Agency, in March 2020 following its most recent VAR. Id. ¶ 26.

In addition to the VARs, NYCRO conducts Quarterly Site Visits to every Contract Agency. Id. ¶ 27. During these on-site reviews, NYCRO staff follow up on issues identified in the most recent VAR and any outstanding corrective action issues or Program Improvement Plans, interview staff and foster children placed at the Contract Agency, perform additional reviews of safety issues and incident logs, review case files, and discuss new or amended

policies, and then document the findings in a Quarterly Site Visit report.[9]  Ghartey Decl. ¶ 27.

### F.  Maintenance and Improvement of CONNECTIONS

OCFS provides systems and tools that directly improve the foster care process.  See id. ¶¶ 28-33.  OCFS continually modifies CONNECTIONS to meet Federal and State standards and improve foster care case practice.  Id. ¶ 30.  OCFS is currently undertaking the monumental process of converting CONNECTIONS to a Comprehensive Child Welfare Information System ("CCWIS") pursuant to the Federal regulations governing the States' child welfare case management systems.  See 45 C.F.R. §§ 1355.50-59; Ghartey Decl. ¶ 30.

Further, since Plaintiffs' motion was filed, CONNECTIONS was modified to allow for the scanning of hard-copy documents into the system.  Ghartey Decl. ¶ 31, Ex. C (Administrative Directive 19-OCFS-ADM-13, Uploading Documents/Photos to CONNECTIONS).  OCFS has also implemented Phase 3 of the Placement Module in CONNECTIONS, which provides a new searching and matching component designed to assist LDSSs and authorized Contract Agencies in finding appropriate foster care placements efficiently.  Id. ¶ 32, Ex. D (Administrative Directive 19-OCFS-ADM-17, Placement Module Phase 3 – Searching/Matching Function).

Recently, OCFS developed an additional robust process to aid in the oversight of foster and adoptive homes.  Id. ¶ 33.  The Foster and Adoptive Home ("FAD") Monitoring Tool allows OCFS's CWCS to use data collected from CONNECTIONS to conduct bi-monthly case reviews on Foster/Adoptive Homes.  Id.  CWCS uses the FAD Monitoring Tool to review data on a

---

[9]  Plaintiffs' disagreement with the frequency and content of the VARs and extensiveness of OCFS's quarterly site visits, as well as the frequency of unannounced visits and OCFS's monitoring of Contract Agencies that ACS has placed on heightened monitoring or corrective action status, is irrelevant to the question of class certification.  See Pl. Mem. at 43-45.  Indeed, these alleged insufficiencies, as well as the entirety of Plaintiffs' factual allegations with respect to State Defendant, are never mentioned in Plaintiffs' argument.  Id. at 48-59.

random sample of Foster/Adoptive Homes collected from CONNECTIONS, including

demographic information, safety assessments and checks of child abuse and maltreatment

registers, and home study compliance results.  Id.  CWCS then sends the results of the FAD

Monitoring Tool to the respective Regional Office for follow up with the individual LDSS or

Contract Agency to address and correct any identified issues.  Id.  The resolution of these issues

is documented by the Regional Office and returned to CWCS for verification.  Id.

### G.  The CFSR and Program Improvement Plan Process

OCFS works collaboratively with the Unites States Department of Health and Human

Services' Administration of Children and Families ("US ACF") to collect information on the

Statewide child welfare system and identify ways to improve that system.  Id. ¶ 37. The Federal

Child and Family Services Review ("CFSR") identifies strengths and areas needing

improvement in State child welfare programs, focusing on the outcomes of safety, permanency,

and well-being.  Id.  The review is intensive and conducted in partnership with the LDSSs,

Contract Agencies, the St. Regis Mohawk Tribe, and other State agencies such as the New York

State Unified Court System ("UCS").  Id.  It consists of the Data Indicator Performance, the

Statewide Assessment, the On-Site Review, and the Program Improvement Plan.  Id.  Case

reviews are also performed as part of the CFSR.  Id.

The most recent CFSR concluded in 2016, and OCFS's 2018-2020 Program

Improvement Plan ("2018-2020 PIP") was approved by US ACF on April 5, 2018.  Id. ¶ 38.  In

the 2018-2020 PIP, OCFS identified seven goals, strategies to address each goal, and key

activities targeted at implementing those strategies.  Id., Exh. E.  The 2018-2020 PIP was

successfully completed on April 4, 2020, and US ACF verified that OCFS completed all required

PIP goals and achieved all of its PIP measurement goals.[10]  Id. ¶ 38.

## RELEVANT PROCEDURAL HISTORY

Plaintiffs commenced this putative class action on July 8, 2015, seeking injunctive and declaratory relief to remedy alleged deficiencies in the NYC foster care system.  Compl., ECF No. 1.  Notably, Plaintiffs have already unsuccessfully moved for class certification four times in this litigation.  See Order dated July 21, 2015, ECF No. 33; Order dated April 1, 2016, ECF No. 142; Memorandum Opinion & Order dated August 12, 2016, ECF No. 259; Order Denying Class Cert., ECF No. 282.

Judge Swain most recently denied Plaintiffs' Amended Motion for Class Certification on September 27, 2016.  Order Denying Class Cert. at 4.  In so doing, the Court questioned the veracity of the factual allegations in the Amended Complaint and "the consistency of Plaintiffs' broad assertions therein that problems . . . are attributable to faulty management and oversight of the foster care system and thus are central common factual issues that can addressed with the sort of 'one-stroke' determination that is contemplated by the class action mechanism."  Id. at 2-3 (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)).  The Court found that there was "a dearth even of allegations concerning case work and conditions at most of the [Contract Agencies], and thus Plaintiffs have not demonstrated that there are common questions of the

---

[10]  Plaintiffs cite to New York State's performance in the 2016 CFSR, but do not and cannot demonstrate any link between the Statewide, child welfare system-wide CFSR results and this litigation, which relates to only one of the numerous child welfare programs in one of the State's 58 LDSSs.  See Pl. Mem. at 42; Ghartey Decl. ¶ 4; accord City Opp. at 60 n.39.  Similarly, Plaintiffs' highlighting of Commissioner Poole's testimony with respect to the CFSR—that "not one state has ever received a passing score on the CFSR"—demonstrates that Plaintiffs seek to shock, rather than meet their burden for class certification.  See Pl. Mem. at 42.  This statement is irrelevant to any of the Rule 23 requirements.  Moreover, Plaintiffs' implication that OCFS was indifferent to the CFSR is entirely belied by the evidence of OCFS's response to the CFSR and completion of the 2018-2020 PIP with US ACF's approval.  See Ghartey Decl. ¶¶ 37-38, Ex. E.

breadth claimed by Plaintiffs." Id. at 3 (citing Wal-Mart, 564 U.S. at 353). Moreover, "the very breadth of the common questions framed by Plaintiffs . . . undermines Plaintiffs' ability to demonstrate that certification of a broad unitary class of children who are or will be in foster care is appropriate." Id. (citing Wal-Mart, 564 U.S. at 350). Accordingly, Judge Swain denied class certification "without prejudice to renewal on an evidentiary record that demonstrates satisfaction of the requirements of Rules 23(a) and 23(b)(2) as to both the broad class and appropriate subclasses." Id. at 4.

Thereafter, Plaintiffs attempted to utilize Judge Swain's decision faulting them for failing to obtain any information—let alone correct information—about their own clients to engage in a wide-ranging fishing expedition, resulting in extensive discovery, including 24 depositions.[11] See Pl. Mem. at 5.

Plaintiffs now seek certification under Rules 23(a) and 23(b)(2) of the proposed General Class as well as two proposed Subclasses, defined as: (1) "all children who have been in ACS custody for more than two years and whose cases require 'special scrutiny' pursuant to ACS policy" (the "Special Scrutiny Subclass"); and (2) "all children for whom Contract Agencies failed to assess and document compelling reasons every three months to justify the decision not to file a termination of parental rights ('TPR') petition after the children had been in care for 15 of the prior 22 motions, a violation of ACS policy and the law" (the "Compelling Reasons

---

[11]  As discussed above, despite their receipt of extensive discovery Plaintiffs still fail to engage with the reality of the NYC foster care system, and OCFS's supervision of that system. See Relevant Background, supra. Plaintiffs spend a great majority of their brief setting forth unsupported opinions on Defendants' alleged failures. See Pl. Mem. at 5-46. In the five pages directed specifically at State Defendant, Plaintiffs rely on approximately seven documents exchanged in discovery. See id. at 40-45. Moreover, the picture that Plaintiffs paint has no relation to class certification—as evidenced by their paltry Argument section, which contains no tie to the factual allegations. Id. at 48-59. Plaintiffs' alleged statement of facts consists of red herrings by which Plaintiffs seek to misdirect the Court from the burden they fail to carry.

Subclass").  Id. at 4-5.

## STANDARD OF REVIEW

It is axiomatic that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  Wal-Mart, 564 U.S. at 348 (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)).  To that end, "a court may not grant certification unless it is satisfied, after 'rigorous analysis,' that the criteria set forth in Rule 23 [of the Federal Rules of Civil Procedure] are met."  In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("MTBE"), 209 F.R.D. 323, 336 (S.D.N.Y. 2002) (quoting Dodge v. Cnty. of Orange, 208 F.R.D. 79, 87 (S.D.N.Y. 2002)); accord Wal-Mart, 564 U.S. at 350-51.

To prevail on their class certification motion, Plaintiffs must first demonstrate the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Johnson v. Nextel Commc'ns Inc., 780 F.3d 128, 137 (2d Cir. 2015); accord Wal-Mart, 564 U.S. at 345.

A party that meets its burden of fulfilling Rule 23(a)'s requirements must also prove that one of the prongs of Rule 23(b) is applicable.  Fed. R. Civ. P. 23(b).  Rule 23(b)(2) allows for certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Id.; accord Wal-Mart, 564 U.S. at 360.

In addition to the explicit prerequisites of Rule 23, courts recognize an "implied requirement of ascertainability."  In re Petrobras Sec., 862 F.3d 250, 260 (2d Cir. 2017), cert. dismissed, Petroleo Brasileiro S.A. v. Univs. Superannuation, 140 S.Ct. 338 (2019); accord In re

Initial Pub. Offerings Sec. Litig. ("In re IPO"), 471 F.3d 24, 30, 44-45 (2d Cir. 2006). The ascertainability requirement means that "a proposed class must be clearly defined so that it is administratively feasible for a court to determine whether a particular individual is a member." Burley v. City of N.Y., No. 03 Civ. 735, 2005 WL 668789, at *8 (S.D.N.Y. Mar. 23, 2005).

The party seeking certification "bear[s] the burden of establishing each requirement for class certification." MTBE, 209 F.R.D. at 336 (citing Pecere v. Empire Blue Cross & Blue Shield, 194 F.R.D. 66, 69 (E.D.N.Y. 2000)); accord Levitt v. J.P. Morgan Sec. Inc., 710 F.3d 454, 465 (2d Cir. 2013). The court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 251 (2d Cir. 2011) (citing In re IPO, 471 F.3d at 41).

The moving party must also prove that the Rule 23 elements are met with respect to any proposed subclass. See Zivkovic v. Laura Christy LLC, 329 F.R.D. 61, 68 (S.D.N.Y. 2018); Order Denying Class Cert. at 4 (denying Plaintiffs' previous motion for class certification "without prejudice to renewal on an evidentiary record that demonstrates satisfaction of the requirements of Rules 23(a) and 23(b)(2) as to *both* the broad class *and appropriate subclasses*" (emphasis added)).

Ultimately, class certification requires a case-specific inquiry by the Court to determine whether the party seeking certification has met its burden of demonstrating "compliance with the Rule—that is . . . that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart, 564 U.S. at 350.[12] "Failure to prove any of the elements precludes class

---

[12] The five cases to which Plaintiffs cite in the guise of setting forth the "Legal Standard" are not relevant or controlling here. See Pl. Mem. at 47, 47 n.26. In the first instance, three of the cases, including the only Second Circuit case Plaintiffs cite, pre-date the Supreme Court's seminal decision in Wal-Mart: D.G. v. Devaughn, 594 F.3d 1188 (10th Cir. 2010); Marisol A. v. Giuliani,

certification." de Lacour v. Colgate-Palmolive Co., No. 16-CV-8364, 2019 WL 4359554, slip

op. at *1 (S.D.N.Y. Sept. 12, 2019) (Wood, J.) (citing Myers v. Hertz Corp., 624 F.3d 537, 547

(2d Cir. 2010)).

**ARGUMENT**

**POINT I**

**PLAINTIFFS CANNOT SATISFY THEIR BURDEN UNDER
RULE 23(A) WITH RESPECT TO THE PROPOSED GENERAL CLASS**

Because of the proposed General Class's over-breadth, Plaintiffs cannot, and indeed do

not, demonstrate that the Rule 23(a) prerequisites are met.  Specifically, (1) there is no

commonality amongst the thousands of children in the NYC foster care system, particularly as to

the putative claims against the State Defendant; (2) Plaintiffs are not typical of all children in that

---

126 F.3d 372 (2d Cir. 1997); and Baby Neal v. Casey, 43 F.3d 48 (3d Cir. 1994).  Indeed, with
respect to the Circuit's decision in Marisol, the Chief District Judge of the Southern District of
New York has stated that "it is highly doubtful that the class would be certified today." Taylor v.
Zucker, No. 14-CV-5317, 2015 WL 4560739, at *11 (S.D.N.Y. July 27, 2015); accord Order
Denying Class Cert. at 3; City Opp. at 18-19.  The remaining cases cited by Plaintiffs are not only
from other Circuits but are also distinguishable from the instant case.  First, the foster care systems
at issue in three of those cases are State-administered, and children in those systems are placed in
the custody of the respective State agency.  See B.K. v. Snyder, 922 F.3d 957 (9th Cir. 2019)
(Arizona); D.G., 594 F.3d 1188 (Oklahoma); M.D. v. Perry, 294 F.R.D. 7 (S.D. Tex. 2013); see
also Child Welfare Information Gateway, State vs. County Administration of Child Welfare
Services, Childwelfare.gov, https://www.childwelfare.gov/pubs/factsheets/services/ (last visited
Sept. 21, 2020).  Second, the general classes proposed in four of the cases are narrower than the
proposed General Class sought here.  See B.K., 922 F.3d at 968 (certifying a general class of "all
children who are or will be in the legal custody of [the Arizona Department of Child Safety] due
to a report or suspicion of abuse or neglect" and a subclass of those children "in non-kinship foster
homes"); D.G., 594 F.3d at 1192 (defining the class as children in the Oklahoma State agency's
custody "due to a report or suspicion of abuse or neglect or who are or will be adjudicated deprived
due to abuse or neglect"); Baby Neal, 43 F.3d at 54 (involving a class of abused or neglected
children); M.D., 294 F.R.D. at 30 (defining the general class as all children in the Permanent
Managing Conservatorship of the State of Texas, a placement that results from a determination of
maltreatment or risk thereof).  Third, two of the cases included certification of ascertainable,
definite subclasses.  B.K., 922 F.3d at 968 (certifying a subclass of those children in non-kinship
foster homes); M.D., 294 F.R.D. at 30-31 (certifying four subclasses defined by placement type).

system; and (3) Plaintiffs are not adequate representatives of the proposed General Class.

### A. There Is No Commonality Among The Proposed General Class Members

Commonality requires that a plaintiff show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The moving party must show that "the same conduct or practice by the same defendant gives rise to the same kinds of claims from all class members." Johnson, 780 F.3d at 137 (quotation omitted); accord Wal-Mart, 564 U.S. at 349-50. Because "any competently crafted class complaint literally raises common 'questions,'" commonality requires more than "merely [alleging] that they have all suffered a violation of the same provision of law." Wal-Mart, 564 U.S. at 349-50 (citations omitted). Rather, Plaintiffs must show a "common injury . . . 'of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" Taylor, 2015 WL 4560739, at *8 (quoting Wal-Mart, 564 U.S. at 350); see also Wal-Mart, 564 U.S. at 350 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.").

Here, Plaintiffs cannot make the necessary showing that "the *same conduct or practice* by the *same defendant* gives rise to the *same kind of claims* from all class members." Johnson, 780 F.3d 137 (emphasis added). As set forth in greater detail by City Defendant, the foster care system in NYC involves millions of individualized, fact-specific decisions made by numerous stakeholders, some of which are interested and legally-represented, and most of which are not parties to this litigation. See City Opp. at 5, 9, 15, 32, 57-58, 61; City Defendants' Memorandum of Law in Opposition to Named Plaintiff Children's Motion for Class Certification, dated June

30, 2016, ECF No. 205 ("2016 City Opp."), at 2-10.  "Decision-making is not centralized," and certainly not with OCFS.  Taylor, 2015 WL 4560739, at *11.  OCFS generally does not make decisions in any specific child's foster care case, such as where to place a child or whether to terminate parental rights.  In addition, the cases of children in foster care are affected by the policies, procedures, choices, and actions of ACS and the Contract Agencies, as well as other stakeholders such as children's birth, foster, and adoptive parents or guardians, the UCS and the New York State Family Court, attorneys for the children and birth parents, caseworkers, service providers, other State agencies such as the New York State Office of Addiction Services and Supports ("OASAS") and the New York State Office for People With Developmental Disabilities ("OPWDD"), and the children themselves.  See City Opp. at 5, 9, 15, 32, 57-58, 61; 2016 City Opp. at 2-10.  Plaintiffs seek "to sue about literally millions of . . . decisions at once," but they do not point to any "glue holding the alleged *reasons* for all those decisions together," let alone glue that tacks those reasons to OCFS.  Wal-Mart, 564 U.S. at 352; see also Taylor, 2015 WL 4560739, at *9 ("Plaintiffs in the case at bar seek to litigate hundreds of independent decisions regarding different individuals at the same time.  As in Wal-Mart, Plaintiffs at bar fail to provide 'glue' connecting the *reason* for" each class member's alleged injury.).

Furthermore, the putative class members have no "common injury"—and certainly not one capable of single-stroke, classwide resolution.  For example, some putative class members are allegedly injured due to a Contract Agency's failure to terminate parental rights, while others are allegedly injured due to a Contract Agency's failure to return the child to its birth parent.  See City Opp. at 12-17, 66-71.  Moreover, each class member's case arises out of a completely and necessarily individualized course of events, affected by the numerous actors in the foster care system.  See id. at 5, 9, 15, 32, 57-58, 61.  No one injunction can target all of these events or

actors.[13]

Even within the narrow bounds of the 11 Contract Agencies with which the named Plaintiffs have been placed, Plaintiffs fail to evidence commonality.  Despite taking 30(b)(6) depositions of the 11 relevant Contract Agencies, Plaintiffs only cite to a small sample of those depositions for their claims of universal issues across the 26 Contract Agencies.[14]  Plaintiffs try to avert attention from this failure by broadly claiming that OCFS has failed to adequately oversee ACS, Pl. Mem. at 42-45, but even assuming they had provided evidence of such a failure—which they cannot, see generally Ghartey Decl.—they utterly neglect to connect any such failure to the actual issues they claim are present at the Contract Agencies, let alone the entire NYC foster care system.

---

[13]  For substantially the same reason, Plaintiffs cannot meet their burden of demonstrating that Rule 23(b)(2) is met.  See Point II, infra.

[14]  See, e.g., Pl. Mem. at 16 (citing to three Contract Agency depositions for the proposition that "several Contract Agencies were not even aware of the existence of the monthly debriefings"), 19 (citing to two Contract Agency depositions for the statement that "some Contract Agencies testified that ACS imposes no consequences for poor performance"), 21-22 (citing to two Contract Agency depositions for the statement that "[a]t some Contract Agencies, caseworkers can be assigned cases before they have completed their assigned training"), 22 (citing to two Contract Agency depositions for the argument that "[s]ome Contract Agencies do not require the degree be in any particular subject nor do they require that caseworkers have any prior child welfare experience"), 22 (citing to two Contract Agency depositions for the claim that "[m]any Contract Agencies struggle to maintain caseworker caseloads at 12 or fewer"), 24 (citing to two Contract Agency depositions for the allegation that children are placed in inappropriate homes due to ACS not providing sufficient information for placement), 28 (citing to two Contract Agency depositions for the statement that "[a]t the time of placement, Contract Agencies often do not receive information about the location of existing service providers for the birth parents"), 31 (citing to two Contract Agency depositions for the argument that Contract Agencies "largely ignore [the purported] special scrutiny requirement"), 31-32 (citing to two Contract Agency depositions for the allegation that "numerous Contract Agencies were unfamiliar with the" purported special scrutiny requirement), 31 (citing to two Contract Agency depositions for the claim that "[u]niversally, the Contract Agencies testified that their respective Foster Care Directors do not always attend [Family Team Conferences] at regularly quarterly intervals of children in care longer than two years"), 38 (citing to two Contract Agency depositions for the contention that "ACS's failure to impose consequences for poor performance on safety and maltreatment is a recurring theme across Contract Agencies").

The NYC foster care system can be compared to the New York State Medicaid system examined by the Chief District Judge McMahon in Taylor.  In that case, the Court denied certification of a class of "[a]ll current and future Medicaid recipients who receive home care services through Medicaid Managed Care Organizations and who have suffered or will suffer threatened or actual denials, reductions, or terminations of their home care services" without due process.  Taylor, 2015 WL 4560739, at *6.  The Court found that there was no commonality amongst the proposed class members because "[w]hile each named Plaintiff, and presumably each member of the putative class, has been injured by the alleged violation of the same provision of the law, their common injury is not of such a nature that it is capable of classwide resolution."  Id. at *12.  "Neither does each class member's situation arise out of 'the same course of events[,]' . . . because, as was the case in Wal-Mart, the plaintiffs here have been and are being evaluated by numerous medical personnel, working under multiple supervisors, in 68 different decision-making agencies spread across the vast geographic area that is the State of New York."  Id. (quoting In re Drexel Burnham Lambert, 960 F.2d 285, 291 (2d Cir. 1992)).  The Court further found that "[t]he fact that these 68 decision-makers fall under the general supervisory authority of the Commissioner of the State Department of Health is of no more relevance than was the fact that everyone in authority in Wal-Mart ultimately worked for a single corporation governed by a single Board of Directors with a nationwide Chief Executive Officer."  Id.

Similar to the Medicaid system at issue in Taylor, the NYC foster care system involves decisions made by numerous caseworkers and other personnel, working under multiple supervisors, in 26 different, non-party Contract Agencies spread throughout NYC and the surrounding area.  City Opp. at 5, 8, 9, 15, 17, 32, 57-58, 61; 2016 City Opp. at 2-10.  That some

of these innumerable decision-makers fall under the general supervisory authority of the
Commissioner of OCFS is as irrelevant as the actors in Wal-Mart working for one corporation.
Further, the connection between those individual decisions and the State agency is more
attenuated here than in Taylor, because there is another layer of supervision in ACS, which has
the direct contractual relationship with the Contract Agencies.  Even more, most of the actors in
the NYC foster care system—such as the children, their birth parents, service providers,
attorneys, OASAS, OPWDD, UCS and the New York State Family Court—are not under general
supervision of OCFS or ACS.  Like Taylor, "[t]his is precisely the sort of 'class action' that runs
afoul of Wal-Mart."  Taylor, 2015 WL 4560739, at *11.

      Ultimately, Plaintiffs have not corrected the deficiencies in their previous unsuccessful
attempts at class certification.  With respect to State Defendant, it is still true that "the very
breadth of the common questions framed by Plaintiffs . . . undermines Plaintiffs' ability to
demonstrate that certification of a broad unitary class of children who are or will be in foster care
is appropriate."  Order Denying Class Cert. at 3 (citing Wal-Mart, 564 U.S. at 350).  Indeed, the
questions Plaintiffs now pose with respect to State Defendant are substantially similar to the ones
the Court already rejected.  Compare id. (citing as examples the common questions "whether
Defendants operate a foster care system with such significant structural deficiencies that Plaintiff
Children are not protected from physical, psychological and emotional harm" and "whether
Defendants' long-standing and well documented actions and inactions violate Plaintiff
Children's rights under the due process clause of the Fourteenth Amendment") with Pl. Mem. at
53-54 (positing that the common question of fact as to State Defendant is "whether OCFS
effectively exercises adequate and meaningful oversight over ACS and the Contract Agencies,"
and that the common questions of law as to State Defendant "include whether OCFS's failure to

effectively exercise adequate and meaningful oversight over ACS and the Contract Agencies means that children in the [proposed General] Class have been and are at continuing risk of being deprived of: (1) their substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution; (2) a written case plan in violation of [Federal law]; and (3) an appropriate case review system in violation of" Federal law).

Plaintiffs also have not met their burden of demonstrating that the proposed class members have all suffered the same injury as a consequence of any conduct by OCFS.  The decentralized, individualized nature of foster care in NYC undermines any commonality amongst the overly broad proposed General Class.  This is particularly true as to State Defendant, as Plaintiffs have failed to identify any specific oversight failures by OCFS that give rise to any nebulous alleged injury of the putative class members and have thus failed to show any common injury inflicted on them by OCFS.  Accordingly, Plaintiffs do not satisfy the commonality requirement of Rule 23(a) as to State Defendant, and certification must be denied.

### B. There Is Insufficient Typicality Between Plaintiffs And The Proposed General Class Members

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  While "similar considerations animate analysis of Rule 23(a)(2) and (3)," commonality and typicality are two distinct requirements.  Taylor, 2015 WL 4560739, at *8 (quoting Marisol, 126 F.3d at 376).  The typicality prerequisite "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Id. (quoting Drexel, 960 F.2d at 291).  Typicality "focuses on the correspondence between the claims raised by the named parties and those of the class they seek to represent." Ruggles v. WellPoint, Inc., 272 F.R.D. 320, 336-37 (N.D.N.Y. 2011) (citing Caridad v. Metro-

North Commuter R.R., 191 F.3d 283, 293 (2d Cir. 1999); In re Frontier Ins. Grp., Inc. Sec. Litig., 172 F.R.D. 31, 41 (E.D.N.Y. 1997)).

Plaintiffs have failed to show that their "injuries derive from a unitary course of conduct by a single system." Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg, 290 F.R.D. 409, 419 (S.D.N.Y. 2012). As discussed in reference to commonality, the NYC foster care system encompasses a great number of actors, and each child's case contains its own individualized events. See Point I(A), supra; City Opp. at 5, 9, 15, 32, 57-58, 61; 2016 City Opp. at 2-10. There is no "unitary course of conduct" that leads to the alleged injuries of each putative class member.

Further, because the proposed General Class definition is so broad, Plaintiffs are plainly not typical of all putative class members.[15] See City Opp. at 20-25. For example, Plaintiffs have never been placed in congregate care or with 15 of the 26 Contract Agencies with which ACS contracts.[16] See id. at 23. Thus, Plaintiffs are not a representative sample of all children in the custody of the Commissioner of ACS. See id. at 20-25; Taylor, 2015 WL 4560739, at *9 (finding that because the named plaintiffs were served by only some of the contracted agencies, they did not rise to a representative sample of all of the agencies in the State). Moreover, there are significant differences between congregate care and foster boarding homes, including

---

[15]  In addition, 18 of the 19 Plaintiffs are no longer in the custody of the Commissioner of ACS, City Opp. at 17, 42, meaning they are also no longer members of the proposed General Class. See Wal-Mart, 564 U.S. at 348-49 (stating that "a class representative must be part of the class").

[16]  Plaintiffs previously sought discovery regarding congregate care, to which State Defendant objected. Plaintiffs incorrectly claimed that Elisa W. was in congregate care while she received services at the Louis Jackson Crisis Residence operated by The Children's Village. However, those services were respite services for Elisa W.'s then-foster parent. During the provision of those respite services, Elisa W. was never removed from the care of that foster parent, and her foster boarding home placement was never revoked. Accordingly, Magistrate Judge Henry B. Pitman upheld State Defendant's objection to production of documents concerning congregate care. Order dated September 19, 2017, ECF No. 398, at 1.

different Federal, State, and local requirements and policies, see Ghartey Decl. ¶¶ 7, 9 (citing OCFS's policy website), as well as differences amongst the Contract Agencies themselves, see City Opp. at 36-40, 42-45.  Certainly, children in congregate care or children placed with Contract Agencies other than those with which the Plaintiffs were placed are subject to a different course of conduct.  And Plaintiffs wholly fail to evidence that children in congregate care, or those placed with the other 15 Contract Agencies, have suffered the same alleged injury. Shayler v. Midtown Investigations, Ltd., No. 12 Civ. 4685, 2013 WL 772818, at *8 (S.D.N.Y. Feb. 27, 2013) (finding that the plaintiff failed to establish typicality where he "put forth insufficient evidentiary material from which this Court could determine" the similarity of his claims to those of the putative class).

Finally, the ever-evolving nature of the NYC foster care system, and OCFS's constant efforts to improve it, undermine Plaintiffs' typicality.  See generally Ghartey Decl.  For example, OCFS's Placement Module, Phase 3 of which was implemented in October 2019, has enhanced the placement process and obviated the concerns raised by Plaintiffs.  See id. at ¶ 32.  Thus, the course of events with respect to placement is now different for children entering foster care than it was for Plaintiffs.  See Pl. Mem. at 23-26.  Similarly, there have been recent overarching changes in Federal and State law affecting foster care, such as the passage of the FFPSA on February 9, 2018 and conclusion of the Title IV-E waiver demonstration project on September 30, 2019.  See Ghartey Decl. ¶¶ 11-12, 36.  These changes, amongst many others, make Plaintiffs' foster care cases atypical of putative class members entering care more recently.  Cf. City Opp. at 8, 40-42, 60-61.

Plaintiffs cannot, and indeed do not, show that any harms they allege are caused by a "unitary course of conduct," particularly one by State Defendant.  Bloomberg, 290 F.R.D. at 419.

25

Nor can they claim that their alleged injuries are representative of the overly broad proposed General Class, particularly where they have no standing to bring claims on behalf of children in congregate care or placed with 15 of the 26 Contract Agencies.  Class certification must therefore be denied.

### C.  Plaintiffs Do Not Adequately Represent The Proposed General Class

The adequate representation requirement of Rule 23(a)(4) precludes certification of a class unless the moving party demonstrates that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy of representation inquiry requires consideration of whether: "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation."  Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000) (citing Drexel, 960 F.2d at 291); accord Billhofer v. Flamel Techs., S.A., 281 F.R.D. 150, 157 (S.D.N.Y. 2012).  With respect to the first prong, a class cannot be certified if there is "'a showing of a genuine conflict' between the proposed class representative's interests and those of the other putative members of the class" that "'goes to the very subject matter of the litigation.'"  Stinson v. City of N.Y., 282 F.R.D. 360, 371 (S.D.N.Y. 2012) (quoting Drexel, 960 F.2d at 291; Hirschfeld v. Stone, 193 F.R.D. 175, 183 (S.D.N.Y. 2000)).

As discussed previously, Plaintiffs do not adequately represent the putative class members to the extent that none of the Plaintiffs have been in congregate care, as approximately 14 percent of the putative class members have, or placed with 15 of the 26 Contract Agencies.  See Point I(A), (B), supra; accord City Opp. at 23.

Further, as detailed by City Defendant, there are fundamental conflicts of interest among Plaintiffs and the putative class members.  City Opp. at 12-17, 66-71.  Each child's permanency

26

is individualized and fact-specific; where one child's permanency goal may be adoption, which would require that a birth parent's parental rights be terminated, it may be appropriate for another child to be reunified with their birth parent.  See id.  These two inverse outcomes, while both termed "permanency," evidence the conflict of interest inherent in the proposed General Class.  Prioritizing adoption would injure those children for which reunification is appropriate, and prioritizing reunification would injure those children for which adoption is appropriate. Moreover, given that the crux of Plaintiffs' claims is that permanency is not achieved quickly enough, this conflict of interest is fundamental to the subject matter of the litigation.  See Pl. Mem. at 7-10.  Class certification is therefore inappropriate.

Moreover, as City Defendant demonstrates, Plaintiffs' counsel does not adequately represent the proposed General Class.  City Opp. at 12-17; 2016 City Opp. at 31-34.

## POINT II

### PLAINTIFFS CANNOT DEMONSTRATE THAT RULE 23(B)(2) IS APPLICABLE

Because Plaintiffs fail to demonstrate that the Rule 23(a) prerequisites are met, there is no need for this Court to consider Rule 23(b)(2).  Taylor, 2015 WL 4560739, at *13; In re Starbucks Emp. Gratuity Litig., 264 F.R.D. 67, 75 n.9 (S.D.N.Y. 2009).  Even so, Plaintiffs' motion also fails because Plaintiffs do not demonstrate that Rule 23(b)(2) has been met.

A class may only be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "[T]he Supreme Court has counseled that 'Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.'"  Berni v. Barilla S.p.A., 964 F.3d 141, 146 (2d Cir. 2020) (quoting Wal-Mart, 564 U.S. at 360).  "Put

another way, a class may *not* be certified under Rule 23(b)(2) if *any* class member's injury is not remediable by the injunctive or declaratory relief sought." Id.

First, Rule 23(b)(2) is not satisfied in this case because the issues raised by Plaintiffs do not constitute the sort of "pattern of activity" that could be meaningfully enjoined. Welch v. United Parcel Serv., Inc., 871 F. Supp. 2d 164, 199 (E.D.N.Y. 2012); see also Civ. Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr., 867 F.3d 1093, 1103 (9th Cir. 2017) (upholding denial of class certification where "the injunction [plaintiff] sought would have been impermissibly vague, nothing more than 'a bare injunction to follow the law'"). As discussed above, the proposed General Class is so broad, and the foster care system so replete with individualized case decisions, that there is no single injunction that could target, let alone resolve, all of the putative class members' alleged injuries. See Point I, supra; Order Denying Class Cert. at 2-3 (questioning whether there "are central common factual issues that can addressed with the sort of 'one-stroke' determination that is contemplated by the class action mechanism"); City Opp. at 5, 9, 15, 32, 57-58, 61.

Indeed, nowhere in their 60-page brief do Plaintiffs even attempt to explain how the injunctive relief they seek in their Amended Complaint will allegedly ameliorate the imprecise injuries they claim were suffered by every child in the NYC foster care system. See generally Pl. Mem. Further, the injunctions sought in the Amended Complaint with respect to State Defendant cannot address the breadth of Plaintiffs' alleged claims. See Am. Compl., ECF No. 91, at 120-24. Rather, Plaintiffs only seek that State Defendant exercise a different type of oversight over the Contract Agencies than the oversight it already exercises. See id. However, the Court already rejected this approach when it denied Plaintiffs' motion for approval of the proposed Consent Decree. See Mem. Op. & Order, ECF No. 259.

The proposed General Class here is as far-reaching as the one in Marisol, where even pre-Wal-Mart the Second Circuit instructed the district court to refine the class to subclasses because the class was so broad.  See Taylor, 2015 WL 4560739, at *12 (finding that the Circuit's instruction that the class be refined to subclasses in Marisol, and that the district court ensure that each subclass satisfy Rule 23(b)(2), "is eloquent testimony that Marisol was not really a case in which a single injunction (other than an injunction to 'obey the law') could have resolved all the many issues confronting the [district] [c]ourt. Again, it is highly unlikely that Marisol could have proceeded as a class action post-Wal-Mart.").  Here, as more fully discussed below, Plaintiffs' ill-defined and unevidenced Subclasses do not fix this flaw.  See Point III, infra.

Second, no injunction that the Court could issue would bind the numerous non-party actors that affect the putative class members' foster care cases.  See MTBE, 209 F.R.D. at 343, 345-46.  Plaintiffs essentially seek to hold State Defendant liable for the actions and decisions of third parties, including the Contract Agencies and their employees, the putative class members, their families, the children and parents' lawyers, service providers, OASAS, OPWDD, UCS and the New York State Family Court.  However, "[a]ny injunctive order issued by this Court would bind 'only [] the parties to the action, their officers, agents, servants, employees, and attorneys and [] those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.'"  Id. at 346 (quoting Fed. R. Civ. P. 65(d)); see also Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 833 (2d Cir.1930) ("[N]o court can make a decree which will bind any one but a party; a court of equity is as much limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.").  Thus, while the Court may ostensibly order State Defendant to act with respect to the putative class, neither the Court nor State Defendant can control all of the other independent stakeholders'

actions.  Because not all of the actors affecting the class members' claims are before the Court, injunctive relief is therefore inappropriate.  See MTBE, 209 F.R.D. at 345.

Third, injunctive relief as against State Defendant is precluded by Reynolds v. Giuliani. Under Reynolds, a government entity is only liable for inadequate supervision under § 1983 when it "is faced with a pattern of misconduct *and does nothing*," and its "inadequate supervision actually caused or was the moving force behind the alleged violations."  506 F.3d at 192-93 (citations omitted) (emphasis added).  Here, Plaintiffs cannot demonstrate that OCFS has done nothing in the face of the alleged deficiencies in NYC foster care, or that OCFS in any way caused the alleged deficiencies.  As established herein, OCFS exercises ongoing and robust oversight of ACS and the Contract Agencies and institutes corrective actions and improvements whenever necessary.  See Ghartey Decl. ¶¶ 6, 8, 13-20, 21-27, 30-33.  For example, OCFS has developed the FAD Monitoring Tool and begun to perform FAD Monitoring to improve its review of foster and adoptive homes.  See id. ¶ 33.  OCFS also recently updated CONNECTIONS to allow for uploads of hard-copy documents to CONNECTIONS, which was not available when Plaintiffs' motion was filed.  See Ghartey Decl. ¶ 31.

Plaintiffs' own motion evinces State Defendant's initiatives and programmatic improvements related to the very issues Plaintiffs raise.  See, e.g., Pl. Mem. at 12 n.6 (acknowledging that OCFS "met with ACS leadership to work on improving ACS outcomes"), 15 n.10 (stating that during monthly meetings between 2015 and 2019, OCFS communicated to ACS concerns about Family Team Conferences).  For example, Plaintiffs acknowledge that OCFS developed and implemented the Placement Module to improve placement of children.  Id. at 25 n.13; accord Ghartey Decl. ¶ 32.  Plaintiffs note that when OCFS finds a violation of law or regulation, it requires ACS or the responsible Contract Agency to develop and implement a

corrective action plan.  Pl. Mem. at 43.  Further, Plaintiffs admit that "the record reflects frequent interaction between OCFS and ACS at all levels," another means by which OCFS oversees ACS. Id. at 44; accord Ghartey Decl. ¶ 18.  Plaintiffs also allow that OCFS reviews and approves ACS's policies; while they may complain that OCFS takes the time to review those policies, and sometimes "require[s] substantial revisions," those complaints merely evidence OCFS's serious undertaking of its oversight function.  Pl. Mem. at 44.

Plainly, "State [D]efendant[] did not sit on [its] hands in the face of an obvious need to act."  Reynolds, 506 F.3d at 196.  Because OCFS did respond and continues to respond to the needs of the NYC foster care system, "[P]laintiffs face[] a heavy burden of proof in showing that [State Defendant's] response was so patently inadequate to the task as to amount to deliberate indifference."  Id. at 192-93 (citations omitted).  "Further, as [P]laintiffs in the case at hand challenge a many-layered supervisory program spanning several years—rather than an isolated incident of non-supervision—they are required to identify with specificity the inadequacies giving rise to their claim[s.]"  Id. at 193 (citation omitted).  Plaintiffs have not met their burden. They do not provide any evidence that OCFS fails in its oversight duties, let alone that any aspect of its oversight causes the alleged injuries to Plaintiffs or the putative class members. They certainly provide no evidence that any injunction ordering OCFS to change its supervisory practices would remedy any of the alleged injuries Plaintiffs have suffered.

Plaintiffs' mere disagreement with OCFS's policies or method of oversight provides no basis for injunctive relief here.  See Connor B. v. Patrick, 774 F.3d 45, 55 (1st Cir. 2014) ("The plaintiffs have sought to take aspirational statutory, regulatory, and private standards as to a variety of topics within the overall complex of foster child care and convert each of them to constitutional requirements.  The district court correctly rejected that attempt, as do we.").

Because Plaintiffs fail to demonstrate that their claims "can be addressed with the sort of 'one-stroke' determination that is contemplated by the class action mechanism," certification of the proposed General Class should be denied.[17]  See Order Denying Class Cert. at 2-3 (quoting Wal-Mart, 564 U.S. at 350).

### POINT III

### PLAINTIFFS CANNOT SHOW THAT THE PROPOSED SUBCLASSES MEET THE REQUIREMENTS OF RULE 23

When the Court denied Plaintiffs' most recent motion for class certification, it instructed Plaintiffs to "demonstrate[] satisfaction of the requirements of Rules 23(a) and 23(b)(2) as to . . . *appropriate subclasses*."  Order Denying Class Cert. at 4 (emphasis added).  Plaintiffs' attempt to rescue their doomed proposed General Class by positing the proposed Subclasses fails.

### A. Plaintiffs Set Forth No Argument Or Evidence That The Proposed Subclasses Meet The Explicit Requirements Of Rule 23

Plaintiffs' motion is devoid of any attempt to demonstrate that either proposed Subclass meets a single one of the Rule 23 requirements.  See Pl. Mem. at 4-5 (summarizing Plaintiffs' argument).  The proposed Subclasses therefore cannot be certified.  Rambarran v. Dynamic Airways, LLC, No. 14-cv-10138, 2015 WL 4523222, at *4 (S.D.N.Y. July 27, 2015) ("Courts in

---

[17]  Moreover, even if there was some identified global relief that Plaintiffs could obtain from OCFS, certification of a class to obtain such relief is unnecessary and can therefore be denied. Casale v. Kelly, 257 F.R.D. 396, 406 (S.D.N.Y. 2009) ("[C]ertification of a Rule 23(b)(2) class is unnecessary when 'prospective relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment.'"); see also Davis v. Smith, 607 F.2d 535, 540 (2d Cir. 1978) (in case brought against OCFS predecessor the New York State Department of Social Services, upholding the district court's finding that class certification was not appropriate because the sought declaratory and injunctive relief "would inure adequately to the benefit of all proposed class members"); Galvan v. Levin, 490 F.2d 1255, 1261-62 (2d Cir. 1973), cert. denied, 417 U.S. 936 (1974) (holding that class certification is "largely a formality" and therefore "unnecessary" where a plaintiff seeks to certify a class seeking injunctive relief against a State actor).

this Circuit have consistently denied class certification motions where the party seeking

certification failed to present sufficient evidence as to one or more Rule 23 elements.").

       Plaintiffs have not deigned to even discuss numerosity with respect to the proposed

Subclasses, let alone present any evidence or estimate to allow the Court to determine whether

the numerosity requirement is met.  <u>See</u> Pl. Mem. at 48-49 (discussing numerosity only as to the

proposed General Class).  This failure, by itself, defeats certification of both proposed

Subclasses.  <u>Zivkovic</u>, 329 F.R.D. at 69 ("Though plaintiffs are not required to present a precise

calculation of the number of class members, they must show some evidence that provides the

Court with a reasonable estimate."); <u>Levitt</u>, 710 F.3d at 465 ("The burden of proving compliance

with all of the requirements of Rule 23 rests with the party moving for certification."); cf. <u>Flores</u>

<u>v. Anjost Corp.</u>, 284 F.R.D. 112, 123 (S.D.N.Y. 2012) ("Where a plaintiff's assertions of

numerosity are based on pure speculation or bare allegations, the motion for class certification

must fail.").

       Plaintiffs also fail to attempt an argument as to commonality of either proposed Subclass,

specifically as to State Defendant.  <u>See</u> Pl. Mem. at 53-54.  Nor is there any discussion of

typicality with respect to the proposed Subclasses, with the exception of a conclusory footnote

with no evidence cited in support thereof and no relation to State Defendant.  <u>Id.</u> at 54-56, 55

n.29.  Finally, Plaintiffs set forth no evidence regarding whether the adequate representation

requirement is met as to the proposed Subclasses, again simply inserting an unsupported and

conclusory statement that Plaintiffs will adequately represent their respective proposed

Subclasses.  <u>Id.</u> at 56-57, 57 n.30.  These unsupported, offhand declarations do not stand up to

the "rigorous analysis" necessary for the Court to find "actual, not presumed, conformance" with

Rule 23(a).  <u>In re IPO</u>, 471 F.3d at 29 (quoting <u>Gen. Tele. Co. of Southwest v. Falcon</u>, 457 U.S.

147, 160-61 (1982)); see also Shahriar, 659 F.3d at 251 (requiring that the court "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met").

Moreover, Plaintiffs make no attempt to demonstrate that the proposed Subclasses satisfy Rule 23(b)(2).  Pl. Mem. at 57-58.  Plaintiffs set forth no argument or evidence that there exists an injunction that would remedy either proposed Subclass's alleged injuries—because there is no such injunction.  See id.

Plaintiffs cannot remedy this or any other fatal failure in their reply papers; a party cannot raise new arguments, submit new evidence, or resolve other deficiencies in a reply brief.  Corsini v. Nast, 613 Fed. Appx. 1, 3 (2d Cir. 2015) (finding that a claim was waived because the party "does not set forth any argument with respect to that claim until his reply brief"); U.S. v. Yousef, 327 F.3d 56, 115-16 (2d Cir. 2003); Stitsky v. U.S., 15-CV-7889, 2018 WL 10741470, slip op. at *5 n.4 (S.D.N.Y. Oct. 25, 2018) (Wood, J.) ("Because Stitsky raises this argument for the first time in his reply brief, the argument is forfeited.").

This critical oversight precludes certification of the proposed Subclasses.  Oakley v. Verizon Comms. Inc., No. 09 Civ. 9175, 2012 WL 335657, at *13 (S.D.N.Y. Feb. 1, 2012) ("[Plaintiffs] do not analyze independently why those subclasses meet the Rule 23 requirements. For that reason alone, the subclasses cannot be certified.").

### B.  The Proposed Subclasses Are Not Reasonably Ascertainable

The Subclasses also fail because they do not meet the implicit ascertainability requirement for certification.  In re IPO, 471 F.3d at 30.  A class is only ascertainable if it is "readily identifiable, such that the court can determine who is in the class[.]"  Charron v. Pinnacle Grp. N.Y. LLC, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (citation omitted).

Ascertainability requires that the class be "'defined by objective criteria that are administratively feasible,' and identifying class members should not 'require a mini-hearing on the merits of each case.'" Ault v. J.M. Smucker Co., 310 F.R.D. 59, 64 (S.D.N.Y. 2015) (quoting Charron, 269 F.R.D. at 229). "Where any criterion is subjective . . . the class is not ascertainable." Spagnola v. Chubb Corp., 264 F.R.D. 76, 97 (S.D.N.Y. 2010) (citing MTBE, 209 F.R.D. at 337). Further, "[w]hen a proposed class definition links class membership with the merits of the class members' claims, the class is not ascertainable." Eng-Hatcher v. Sprint Nextel Corp., No. 07 Civ 7350, 2009 WL 7311383, at *7 (S.D.N.Y. Nov. 13, 2009) (quotation and inner quotation marks omitted); see also Kiobel v. Royal Dutch Petroleum Co., No. 02 Civ. 7618, 2004 WL 5719589, at *5 (S.D.N.Y. Mar. 31, 2004) (Report and Recommendation to this Court recommending that the motion for class certification be denied, finding that "[t]he principal vice with the proposed definition is that it links class membership with the merits of the class members' claims").

As evidenced by their very labels, both the proposed Special Scrutiny Subclass and the Compelling Reasons Subclass fail to meet the ascertainability requirement. The Special Scrutiny Subclass is broadly defined as "all children who have been in ACS custody for more than two years and whose cases require 'special scrutiny' pursuant to ACS policy." Pl. Mem. at 4. The proposed Special Scrutiny Subclass is, of course, founded on a subjective term: "special scrutiny." Plaintiffs do not elucidate what "special scrutiny" entails. See id. at 4, 31. Nor does the ACS policy from which they crafted the term define "special scrutiny." See ACS Foster Care Quality Assurance Standards 2011, ECF No. 442-31, at NYC_00218484-85. Further, the alleged "special scrutiny" requirement has no relation to either Federal or State law. See City Opp. at 54-55, 65 (noting that "special scrutiny" is a "best practice"). What constitutes "special

scrutiny," and whether a child received it, are inherently subjective.  Thus, the proposed Special

Scrutiny Subclass is completely unascertainable.  Spagnola, 264 F.R.D. at 97; accord City Opp.

at 65.

Moreover, the proposed Special Scrutiny Subclass is tied to the merits of Plaintiffs'

claims.  It is based on an alleged ACS policy that Plaintiffs claim is "ignore[d]" as a basis for

their allegation that City Defendant does not sufficiently oversee the Contract Agencies.  Pl.

Mem. at 31-32; City Opp. at 55 n.36.  The explicit tie between the definition of the proposed

Special Scrutiny Subclass and the merits of Plaintiffs' claims precludes certification of that

Subclass.  See Eng-Hatcher, 2009 WL 7311383, at *7.

In turn, the proposed Compelling Reasons Subclass is defined as "all children for whom

Contract Agencies failed to assess and document compelling reasons every three months to

justify the decision not to file a termination of parent rights ('TPR') petition after the children

had been in care for 15 of the prior 22 months, a violation of ACS policy and the law."  Pl. Mem.

at 4.  This definition consists entirely of subjective criteria.  Whether the Contract Agency

"failed," what constitutes "compelling reasons," whether they were "assess[ed] and

document[ed]", and whether those reasons "justify" the decision not to file a TPR petition are all

subjective queries.[18]  The proposed Compelling Reasons Subclass is devoid of any "objective

criteria that establish a membership with definite boundaries."  In re Petrobras Sec., 862 F.3d at

257.

Further, the proposed Compelling Reasons Subclass is not administratively feasible

---

[18]   Indeed, Federal and New York State law, as well as ACS's Permanency Planning policy,
explicitly state that the list of "compelling reasons" is non-exclusive, because it is necessarily
subjective.  See 42 U.S.C. § 675(5)(E)(ii); N.Y. S.S.L. § 384-b(3)(l)(ii); ACS Permanency
Planning Policy and Procedure dated April 5, 2013, ECF No. 442-29, at NYC_00216484-85;
accord City Opp. at 66-71.

because it is impossible to ascertain whether an individual is a member of the subclass without a

"mini-hearing," entailing numerous fact-intensive and subjective inquiries.  <u>Charron</u>, 269 F.R.D.

at 229.  For each child, the Court would have to examine whether, every three months for the

child's stay in foster care, the respective Contract Agency failed to assess and document

"compelling reasons" to justify not filing a TPR petition.  This would require the Court to

undertake an intensive and entirely fact-specific review of each putative subclass member's case

file.  Such a mini-hearing is not an appropriate method to determine class membership.  <u>Ault</u>,

310 F.R.D. at 64.

Finally, membership in the proposed Compelling Reasons Subclass is inextricably linked

to—indeed, grounded on—the merits of Plaintiffs' claims.  The definition itself encompasses "a

violation of ACS policy and the law."  Membership depends on whether, as Plaintiffs allege, a

Contract Agency failed to assess and document appropriate reasons to not file a TPR petition.

<u>See</u> Pl. Mem. at 34-35.  Because the determination that a child is a member of the proposed

Compelling Reasons Subclass requires a merits finding, that Subclass cannot be certified.

<u>Kiobel</u>, 2004 WL 5719589, at *5.

With respect to both proposed Subclasses, Plaintiffs also fail to set forth any method for

identifying members.  <u>See</u> <u>Leyse v. Lifetime Entm't Servs., LLC</u>, 679 Fed. Appx. 44, 47 (2d Cir.

2017) (upholding the District Court's finding that the movant "had failed to show a sufficiently

reliable method for identifying the proposed class to avoid 'mini-hearing[s] on the merits of each

case'").  This failure further demonstrates that the proposed Subclasses are not "readily

identifiable," and therefore do not meet the ascertainability requirement.  <u>Charron</u>, 269 F.R.D. at

229.

In sum, any attempt by Plaintiffs to salvage their motion with the proposed Subclasses

fails due to Plaintiffs' complete lack of evidence demonstrating that the Subclasses meet Rule

23's requisites.

## <u>CONCLUSION</u>

For the reasons set forth above, and in City Defendant's Opposition as incorporated by

reference herein, the Court should deny Plaintiffs' Renewed Class Certification Motion and grant

such other and further relief as the Court deems just and proper.

Dated: New York, New York                    Respectfully submitted,
       September 21, 2020

                                      NEW YORK STATE OFFICE
                                      OF THE ATTORNEY GENERAL
                                      <u>Attorney for State Defendant</u>

By:    <u>/s/ Samantha L. Buchalter</u>
          Samantha L. Buchalter
          Assistant Attorney General
          28 Liberty Street
          New York, New York 10005
          (212) 416-6587
          Samantha.Buchalter@ag.ny.gov