15-CV-5273 (KMW) (SLC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELISA W., *et al*.,

Plaintiffs,

-against-

CITY OF NEW YORK, *et al*.,

Defendants.

## MEMORANDUM OF LAW IN SPPORT OF CITY DEFENDANT'S *DAUBERT* MOTION

*JAMES E. JOHNSON*
*Corporation Counsel of the City of New York*
*Attorney for City Defendant*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:*
*Sharon Sprayregen*
*Jonathan Pines*
*Ian Forster*
*Tel:  (212) 356-0873*
*Matter No.:  2015-034233*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

PRLEIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 3

LEGAL STANDARD ............................................................................................................ 4

ARGUMENT

      POINT I

             THE LONG REPORT FALLS FAR SHORT OF THE REQUIREMENT OF RELIABLE PRINCIPLES AND METHODS RELIABLY APPLIED ......................................................................... 7

             A.  While Grounded Theory Constitutes a Research Method of Reliable Principles and Methods, the Long Team Not Only Failed to Apply Those Principles and Methods Reliably, They Failed to Apply Them At All .................................................. 7

                  1.  Grounded Theory's Principles and Methods, and the Long Team's Failure to Apply Them .............................................................. 7

                        a.  Sampling ................................................................ 9

                        b.  Coding ................................................................... 9

                        c.  Memoing .............................................................. 15

                  2.  The Long Team did not Take the Proper Measures to Ensure the Findings were Trustworthy .............................................................. 15

                        a.  Dr. Long and her Colleagues did not Maintain an Audit Trail ....................................... 16

                        b.  Dr. Long and her Colleagues did not Ensure Inter-Rater Reliability ............................. 17

**Page**

    B.  As a Result of Dr. Long's Failure to Apply Grounded Theory, She did not Consider an Obvious Alternative Explanation Put Forth By City Defendant .................................................................... 17

POINT II

    DR. LONG'S TESTIMONY AND THE LONG REPORT SHOULD BE EXCLUDED BECAUSE THE LONG TEAM FAILED TO FOLLOW THE METHODOLOGY ON WHICH THEY PURPORT TO RELY AND LACK GOOD GROUNDS FOR THEIR CONCLUSIONS ......................................................... 21

POINT III

    THE IN ADDITION TO NOT BEING THE PRODUCT OF GROUNDED THEORY, THE LONG REPORT'S RELIABILITY AND CONCLUSIONS ARE UNDERMINED BY THE LONG TEAM'S MISUNDERSTANDING OF FACTS AND LAW AND COUNSEL'S INAPPROPRIATE ROLE IN THE DRAFTING AND SUBSEQUENT ALTERATION OF THE REPORT ...................................................................... 25

    A.  The Long Team Members are Strangers to New York Child Welfare Law and Practice, Resulting in a Report Riddled with Critical Errors ...................................................................... 25

    B.  Dr. Long Acted as a Conduit for the Legal Arguments of Plaintiffs' Counsel ...................................... 27

    C.  Counsel Amended the Report without Dr. Long's Ratification of the Changes .................................. 28

CONCLUSION............................................................................ 30

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Pages**

*Amorgianos v. National R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)...................................................................................6, 21, 23

*Argus, Inc. v. Eastman Kodak Co.*,
   612 F. Supp. 904 (S.D.N.Y. 1985),
   *aff'd*, 801 F.2d 38 (2d Cir. 1986) .........................................................................................27

*Arista Records LLC v. Lime Grp. LLC*,
   No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 47416
   (S.D.N.Y. Apr. 29, 2011)....................................................................................................5, 17

*Bourjaily v. United States*,
   483 U.S. 171 (1987)....................................................................................................................5

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*,
   815 F. Supp. 2d 673 (S.D.N.Y. 2011).....................................................................................27

*Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016).....................................................................................18

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...........................................................................................................3, 5, 6

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013).....................................................................................22

*Disabled in Action v. City of New York*,
   360 F. Supp. 3d 240 (S.D.N.Y 2019)......................................................................................21

*In re Fosamax Prods. Liab. Litig.*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009).....................................................................................22

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................................................5, 6

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018).....................................................................................18

*Nimely v. City of New York*,
   414 F. 3d 381 (2d Cir. 2005)....................................................................................................21

**Cases**                                                                                                      **Pages**

*Estate of Puppolo v. Welch*,
    No. 14-cv-95, 2017 U.S. Dist. LEXIS 147312 (D. Vt. Sept. 12, 2017),
    *aff'd Puppolo v. Welch,*
    771 F. App'x 64 (2d Cir. 2019) .............................................................27

*U.S. Info. Sys. v. IBEW Local Union No. 3*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)........................................... 17-18

*United States v. Tuzman*,
    2017 U.S. Dist. LEXIS 208410 (S.D.N.Y. Dec. 18, 2017) ...................22

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007).......................................................................6

**Statutes**

Fed. R. Civ. P. 702 ...........................................................................4, 5, 6, 21

**Other Authorities**

Depoy and Gitlin, *Introduction to Research* (5th Edition) .............................7

Depoy and Gitlin, *Introduction to Research* (2015) ....................................22

Glaser & Strauss, *The discovery of grounded theory:*
    *Strategies for qualitative research.* 1967 ..............................................10

## PRLEIMINARY STATEMENT

In support of Plaintiffs' renewed motion for class certification, Plaintiffs' have retained a team of ten social workers, including and headed by Caroline M. Long, Ph.D. [1] ("Long team"), to review the case files of the 19 Plaintiffs to determine whether they found deviations in the case files from ACS's aspirational agency standards, as compiled in a document titled the "Quality Assurance Standards" ("QAS").[2]   That retention resulted in the production of an expert report authored by Dr. Long, dated July 19, 2019 (DE 442-1) and corrected version bearing the same date but filed March 19, 2020 (DE 478) ("Long Report" or "Report").[3] In the Report, Dr. Long and each contributor whose work appears therein expressly claimed to have reached their conclusions through the application of grounded theory, an extremely rigorous qualitative research method.  Grounded theory requires each researcher to apply conceptual "codes" to nearly every line of original source material, and then to discern, through at least one further level of coding, links between first-level concepts in order to disclose, through that second stage of conceptual coding, possibly unanticipated relationships between those first-level codes and concepts.  Where there is a team of researchers, grounded theory requires extremely close communication and coordination to assure that such coding – the touchstone of grounded theory analysis – is done in a

---

[1] Dr. Long identified herself as Caroline M. Burry at the time of the submission of the Long team's Report.  In addition to Dr. Long, the team consisted of three social work faculty members from the University of Michigan: Kathleen Coulborn Faller, Robert Ortega, Gary Stauffer; and six current or former social work faculty members from the University of Maryland:  Toni A. Cascio, Adrienne K. Ekas-Mueting, Esta Marla Glazer-Semmel, Debra A. Linsenmeyer, Gail N. Reid, Donald E. Vince.

[2] The Long team's error in using ACS's aspirational QAS, rather than legally required standards, to identify what the Long team calls "case practice departures" is discussed fully at City Defendant's Memorandum of Law in Opposition to Plaintiffs' Renewed Motion for Class Certification, dated August 31, 2020 ("City Def's Mem.") (DE 493) at 35, 51, 65.

[3] Henceforth in this memorandum, all references to the Long Report will be to the corrected version of the Long Report (DE 478).  Page references are to the pagination provided by Dr. Long at the bottom of each page, not the ECF-generated page numbers applied to the top of each page.

uniform manner, and that any refinements in coding as the work progresses are agreed upon and adopted by all team members, as well as assiduously documented to assure the trustworthiness and integrity of both data and process.

In this memorandum, City Defendant will demonstrate that Dr. Long and her team not only failed to apply the principles and methods of grounded theory in a reliable fashion; they actually failed to apply them at all.  As a result, the Long Report was built upon a false representation, and bears exactly those analytical flaws – imprecision of method and researcher bias – that grounded theory's methodological rigorousness was devised to avoid.  Moreover, the Long team failed to employ standard quality control mechanisms required in all qualitative research, which are necessary for the findings to be valid and reliable. Additionally, as a result of the Long team's failure to employ grounded theory, they failed to account for an obvious alternative cause of delays to permanency in placement, one of the fundamental issues in this litigation.  Specifically, the Long team failed to even consider City Defendant's claim that delays caused by the New York Family Court system, including delaying litigation strategies pursued by non-ACS stakeholders and the lack of statutorily mandated time-frames in which to complete Family Court proceedings, rather than allegedly culpable ACS's practices, were a significant, indeed sometimes primary, cause of the length of time the Plaintiffs spent in foster care.

The Long team's conclusions are further called into question by (a) their complete lack of knowledge of New York child welfare law and family court practice, and their resultingly erroneous criticisms of ACS in the Report, (b) Plaintiffs' counsel's use of Dr. Long as a conduit for legal arguments clearly supplied by counsel that she neither understood nor was able to explain, and (c) counsel's amendment of the report, including substantive changes, without Dr. Long's review or even knowledge.

As a consequence, consistent with *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, (1993) and its progeny, the Court should exclude the Long Report and any testimony of any member of the Long team proffered by Plaintiffs' counsel.

## BACKGROUND

As explained in the Long Report, Dr. Long and three social workers at the University of Michigan (the "Michigan team") reviewed the case files of 11 Plaintiffs and wrote "case file reports" for each child or sibling group, included as Appendices A-F of the Report. The remaining eight Plaintiffs' files were subsequently reviewed by social workers from the University of Maryland, Baltimore or the University of Maryland, Baltimore County (the "Baltimore team") under the supervision of Dr. Long.  Long Report at 3.  The Baltimore team did not write reports on these eight Plaintiffs' cases; rather, their analyses are included in the Long Report's Executive Summary only (the Executive Summary also includes a summary of the case files of the 11 children for whom there are case file reports).

At her deposition on July 31, 2020, Dr. Long repeatedly testified that she and the other social workers had been retained to determine if the aspirational best practices embodied in the QAS were met. *See, e.g.*, Transcript of the Long Deposition annexed as City Def's Ex. D, herein after "Long Dep.," 39:9-12; 53:1-10; 67:4-10; 67:19-21; 108:17-19; 154:4-7. As the Report indicates, the Long team ultimately determined that these best practices were not met, and, specifically, that there were six common policy and case practice departures among the 19 Plaintiffs' case files.[4]

---

[4] The six alleged common case practice departures are: "Failure To Ensure That the Children's Background, Risk Factors and Characteristics and the Characteristics of Individual Foster Homes Are Taken into Account in Placing a Child"; "Failure To Engage in Concurrent Planning"; "Failure To Adequately Provide and Monitor Services for Birth Parents and Caretakers"; "Failure To Complete

While the Michigan team members' case summaries were appended to the Long Report, the Baltimore team members' final product was more inchoate.  When each of the Baltimore reviewers completed the case review, Dr. Long met with each "individually in person to hear from them the child's life story . . . the concerns or failures, departures or threads." Long Dep. 70:15-18. Each researcher gave Dr. Long "some factual notes, factual dates, number of moves [among foster homes]." *Id.*, 70:22-23.  When asked what the Baltimore team's final product was, Dr. Long testified that "[t]he final product was really the conversation with me. But I also, they also verified, as I said, number of moves, number of foster homes, those data."  (*Id.*, 71:4-6). Dr. Long testified that, with the help of one of the Baltimore reviewers, she then incorporated this information into the Executive Summary. *Id.* 67:12-14; 70: 22-25; 101: 11-19.

Significantly, in identical boilerplate language,[5] the falsity of which will be made clear below, all team members who wrote reports represented that they followed a rigorous social science methodology called grounded theory to derive their conclusions, and the remaining six social workers who did not write reports also purportedly employed this methodology.  Long Dep. 68:3-5; Report at 3.

## **LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

---

Documentation Adequately or Timely";  "Failure To Give Special Scrutiny to Foster Children in Care Longer Than Two Years"; and "Failure To Take Steps To Ensure Permanency." Report at i, 4.

[5] Long Report. at 2-3 (Exec. Summary); *id.*, App. C at 3 (Faller); *id.*, App. D at 2-3 (Ortega); *id.*, App. E at 2-3 (Stauffer); *id.*, App. F at 2 (Stauffer).

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The party proffering an expert report bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987).  Under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), district court judges serve a "gatekeeping role," and must assure, before allowing the testimony of a proffered "expert," that the proponent of such testimony has met the conditions set out in Rule 702.  Specifically, the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). This gatekeeping obligation applies not only to natural sciences, but also to methods in other technical areas of expertise, including the social sciences.  *Id.* at 147; *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 47416, at *5 (S.D.N.Y. Apr. 29, 2011) (Wood, J.).  As gatekeeper, the trial court's role is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

In *Daubert*, the Supreme Court listed several factors for trial courts to consider when deciding whether proposed scientific[6] expert testimony is sufficiently "reliable." These specific factors are: (1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication; (3) "the known or potential rate of error" of the technique; and "the existence and maintenance of standards controlling the

---

[6] While the *Daubert* factors were originally developed to assist in evaluating the reliability of scientific theories, the Supreme Court has held that the *Daubert* factors may be utilized in evaluating non-scientific expert testimony.  *Kumho*, 526 U.S. at 139.

technique's operation"; and (4) "general acceptance" of a technique within the relevant scientific community.  *Daubert*, 509 U.S. at 593-94; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  These enumerated factors are non-exhaustive and are "meant to be helpful, not definitive," *Kumho*, 526 U.S. at 151, and the court's examination must be "tailored to the facts of the particular case."  *Id*. at 150.

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National R.R. Passenger Corp*., 303 F.3d 256, 266 (2d Cir. 2002). Under the *Daubert* inquiry, "*any* step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *Id.* at 267 (internal quotation omitted) (emphasis in original). The role of the court in assessing reliability is to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand," excluding evidence "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id*. (internal quotation marks omitted).

As discussed below, the Long team does not meet the requirements of *Daubert* and its progeny and the Court should exclude the Long Report, and any testimony of any Long team member, as evidence in this litigation.

## ARGUMENT

### POINT I

### THE LONG REPORT FALLS FAR SHORT OF THE REQUIREMENT OF RELIABLE PRINCIPLES AND METHODS RELIABLY APPLIED

**A.** **While Grounded Theory Constitutes a Research Method of Reliable Principles and Methods, the Long Team Not Only Failed to Apply Those Principles and Methods Reliably, They Failed to Apply Them At All**

**1.** **Grounded Theory's Principles and Methods, and the Long Team's Failure to Apply Them**

Grounded theory is a well established, widely recognized, and highly regarded qualitative research method – indeed, as noted by City Defendant's expert, Jeane Anastas, in her report dated January 11, 2021 ("Anastas Report") it is "one of the most common methods of qualitative research in social work and the social sciences." Anastas Report at 2 (citing Denzin, N. K., & Lincoln., Y. S., eds. *Handbook of qualitative research*. Sage Publications: Thousand Oaks, CA, 1994). Among all qualitative research methods, grounded theory is considered "one of the most formal, systematic, and rigorous analytical approaches." *Id.* (citing Depoy and Gitlin, *Introduction to Research* (5th Edition). Mosby, Inc: St. Louis, MO, 2015). It is an inductive research method, meaning that it requires that the researcher "form [] generalized conclusions only from examining data." *Id.* at 3. By way of contrast, deductive research methods "look[] through materials to find data that proves or disproves a working theory." *Id.* at 5.

As Dr. Anastas describes more fully in her Report, this inductive approach is central to grounded theory because the methodology derives its analytical power and value from its requirement that researchers approach source material with an open mind, as free as possible from preconceptions about research outcomes. Grounded theory provides the researcher with methods

for extracting meaning and connections hidden in the source material between seemingly unrelated concepts.

While Dr. Long herself acknowledged that grounded theory requires of its practitioners approach the source material with an "open mind" and without "preconceived notions about expected content" (Long Report at 3, Long Dep. 158:4-5), both her deposition testimony and her Report make clear that she abandoned any pretense of an open-minded inductive process when she accepted her "charge" from Plaintiffs' counsel:  "I was asked to review case records to discern whether standards, the required standards, had been met, and to render an opinion, if they had not, whether the children were harmed."  Long Dep. at 39:9-12.  As Dr. Anastas notes, "[t]he analytical approach of using an agency's quality standards to see if there were 'case practice departures' is a deductive one: looking through texts to see if a pre-defined problem is found there."  Anastas Report at 9.

By looking only for evidence of "case practice departures" – that is, by combing through source material only for evidence corroborative of the practice departures that she and her team were explicitly hired and directed by Plaintiffs' counsel to find— Dr. Long abandoned, from the moment she accepted the terms of her employment, the methods and principles of grounded theory.

Even if the terms of retention had not violated the principles and methods of grounded theory, Dr Long's implementation of her charge most certainly did.  As noted in the Background, *supra*, the first-hired Michigan team reviewed the case files of 11 of the 19 Plaintiffs, whose cases were selected by Plaintiffs' counsel, resulting in case reviews included in the Report at Apps. A-F. The later-hired Baltimore team thereafter conducted case reviews of the remaining eight Plaintiffs. At the introductory meeting with the six Baltimore case reviewers, Dr. Long explicitly identified to

them the six case practice departures that the Michigan team had already identified. Long Dep. 53:3-10; 54:1-16.   This disclosure violated the fundamental tenet of grounded theory that the researchers approach the source material with an open mind and without preconceived views. By identifying these six conclusions before the Baltimore researchers had opened their first case files, Dr. Long invited them to confirm the six previously identified themes, rather than allowing them to reach their own conclusions.

As described at length in the Anastas Report, grounded theory requires that researchers employ the following research methods in order to ensure the greatest possible degree of objectivity, reliability, and analytical rigor:  Sampling (how materials are selected), Coding (how data are analyzed); Memoing (self-reflective writing to identify and address researcher bias). These methods – none of which were followed with anything approaching rigor, if followed at all by the Long team – are discussed below.

### a.    Sampling

As noted by Dr. Anastas, researchers themselves typically determine the how to select data for a given study, based on the needs of the research. Anastas Report at 10.  By contrast, Plaintiffs' counsel fed cases to the reviewers in an order they determined, adding case files when prior write-ups were completed, but without seeking input from the researchers or providing any explanation sufficient to inform Dr. Long as to how or why cases were supplied to them in the order they were. Long Dep. 48:14-19; 49:14-15; 50:12-18.

### b.    Coding

As explained by Dr. Anastas, "Coding means categorizing segments of data with a short name that simultaneously summarizes and accounts for each piece of data."  Anastas Report at 4 (citing Kathy Charmaz. *Constructing grounded theory: A practical guide through qualitative*

*analysis.* Thousand Oaks, CA: Sage, 2006, p. 43).   Coding of data is the *sine qua non* of grounded theory.   It is so definitional of the research method that, as Dr. Anastas observes, any researcher who fails to subject source material to rigorous coding cannot be said to have conducted a grounded theory study. *Id.* at 4.

All grounded theory studies require that a researcher or research team conduct at least two, and sometimes three, levels of coding. [7] *Id.* at 4-5. The first level of coding, called "open coding," "line-by-line coding," or "initial coding," requires that the researcher assign a code – essentially a tag word or phrase keyed to an identified concept – to almost every line of text.   *Id.* at 4 (citing, *inter alia*, Glaser & Strauss, *The discovery of grounded theory: Strategies for qualitative research.* 1967).[8] Additionally, a core requirement of grounded theory is the "constant comparative method," which requires researchers to engage in iterative coding and re-coding as new themes are generated. *Id.* at 5. That is, the researcher or research team compares the "codes generated in one part of a document to other codes generated in that same document, as well as the comparison of these codes to codes generated in the other documents included in the study." *Id.* (citing, Tie, Y. C., Birks, M. & Francis, K.. Grounded theory research: A design framework for novice researchers. *SAGE Open Medicine,* 2019).   When a team of researchers is involved, as in the Long team's work, the use of coding and constant comparative methods requires close collaboration among the researchers and the development and use of a codebook to ensure agreement by all researchers in applying codes to the source material. *Id.* at 6.

---

[7] The third level of coding is not relevant to this motion and is not discussed.  Anastas Report at 4.

[8] For an example of how a rigorous grounded theory researcher codes virtually every line, and sometimes every word, of source text, *see* the excerpt of a transcribed interview with codes applied that Dr. Anastas provides in her Report at 4.

The second level of coding, called "selective," "axial," or "intermediate coding," is the "core" of the grounded theory method. *Id.* at 5 (citing Tie, Y. C., *supra*). In the second level, the codes derived from line-by-line coding are "compared with each other to identify codes with similar meanings, and then are grouped together under more general code names." *Id.* (citing, *inter alia*, Glasser and Straus, *supra*). Researchers employ the "constant comparative method" at the second level, just as they had during the first level of coding. *Id.* at 5. This second level of coding is considered the core of grounded theory because "[t]hrough this process, relationships between concepts may be revealed to the researcher that are unanticipated, even surprising" – one of the key reasons to utilize grounded theory in studying source material. *Id.*

Given how central coding is to all grounded theory research, "any report utilizing grounded theory should give detail on the coding process – including both the line-by-line coding process and the grouping of these codes into broader categories at the intermediate coding stage." *Id.* at 9. The Long Report provided no information about the Long team's use of coding at any level of their work. Indeed, as Dr. Anastas observed, "I find it notable that Dr. Long's report, including the appended reports of her colleagues, not only provides no description of the coding process used by the case reviewers, but, remarkably, does not even contain the words 'coding' or 'code' anywhere in the report." *Id.*

When asked what methodology she employed when evaluating the cases she personally reviewed, Dr. Long admitted, remarkably, that "Coding isn't something that we started with." Long Dep. 83:4. When asked how she and her team identified what she terms "themes" or case practice departures, Dr. Long's response was, once again, tellingly uninformed, and, again, avoided any mention of coding methods:

> If there wasn't a concurrent plan or it wasn't timely, or it was not correct in that it did not give a plan and alternative,[9] I would write in my report, my draft, my ongoing draft, that there was an issue in concurrent planning and where it was, so that citation could be found again

Long Dep. 64: 15-20.

As noted above, line-by-line coding in grounded theory analysis requires the researcher to code nearly every line of source text, sometimes every word. *See, e.g.,* Anastas Report at 4. Dr. Long admitted that "every line was not coded." Long Dep. 85: 20-21. Moreover, it became clear in the course of her testimony that she actually had no understanding of the rigorous coding process required by grounded theory principles and methods; instead she believed that coding was a simple deductive exercise with the sole purpose of finding fault:

> Q:  And was every sentence or paragraph coded.
>
> Ms. Lowry:  Objection
>
> A: What we had been asked to do was to look to see if case practice had been carried -- if case practice met the required standards. And so that was--*every sentence was not coded unless case practice did not meet the expected standards*.

*Id.* 83: 13-19 (emphasis added).

Rather than approaching the Plaintiffs' case files with an open mind as to where the data might lead them, through a process in which no statement was discarded or left uncoded, as grounded theory principles and methods require, the Long team engaged in a simple binary, box-checking exercise – essentially "met practice requirement" (and therefore jettisoned from analysis),

---

[9] "Concurrent planning" is the child welfare term meaning the simultaneous pursuit of different permanency goals for a child, *i.e.*, planning for both adoption and reunification. *See* Report of City Def's Expert Margaret Burt, dated August 31, 2020 (DE 507) ("Burt Report.") at 11. For a discussion of Dr. Long's twin erroneous assertions that concurrent planning is statutorily mandated and that its absence in a case record is a "practice departure," *see* City Def's Mem. (DE 493) at 48-52.

or "didn't meet practice requirement" (and therefore added to the Long team's list or, in Dr. Long's
uninformed usage, "coded") – and nothing more:

> Q:  I just want to go back to line-by-line coding.  Is it your understanding that [] a
> grounded theory study only requires identification of themes, but not line-by-line
> coding?
>
> A:  No.  It was my understanding, as we did, that we did go line by line, *and we
> were specifically, as I have said, looking for departures*.  So, if you will, there was
> coding when there weren't [case practice] departures line by line that wasn't written
> down because it would have been "[m]et practice," "[m]et practice,"  "[m]et
> practice." [10]
>
> Q. You did not write those codes down; is that correct?
>
> Ms. Lowry:  Objection.
>
> A. Not in more than 100,000 pages, no.  And also that wasn't the purpose of this
> research.  *The purpose was to discern if there were practice departures.*

*Id.* 88: 4-19 (emphasis added).[11]  Dr. Long's posited distinction between codes "that are written
down" and those that are not (in other words, codes that affirm the researcher's preconceived
notions and those that do not) has nothing to do with, in fact does tremendous violence to, the
concept coding as practiced by properly trained grounded theory researchers.  Rather than
engaging in line-by-line coding, the Long team merely sifted through the case files "not writing
down" all instances of good practice (or even problems, such as case delays, attributable to non-
ACS sources, *id*. 153:18 – 154:8; *infra*, Point I.B), and collecting any instances of ACS
"departures" from agency best practices as laid out in the QAS.  As her above-cited testimony
establishes, Dr. Long, even with her uninformed use of the term, did not "code" nearly every line,

---

[10] There was a transcription error, and the transcript reads "net practice, net practice, net practice."

[11] In the current era, to systemically and rigorously code many pages it is standard for researchers
employing grounded theory to use qualitative data analysis software. Anastas Report at 11 n.21. Dr. Long
admitted she didn't use any such software (Long Dep. 80:5-8), which is "consistent with other indicators
of the team's non-rigorous approach to and facile understanding of grounded theory's coding
requirements." Anastas Report at 11 n.23.

did not "code" evidence of good caseworker practice, and did not "code" any issues in the thousands of pages she reviewed that were unrelated to caseworker practice departures.  She and her team came up with certain "themes" that satisfied the charge she was given by Plaintiffs' counsel.  But, as Dr. Anastas observed, as compared to the rigorous two-step coding process required by grounded theory, Dr. Long's definition of coding as "just finding themes" (Long Dep. 84:7) is wrong.  Anastas Report at 11.

Given her team's failure to engage in line-by-line first-level coding, it is perhaps unsurprising that Dr. Long also admitted that she did not engage in the second-level coding (Long Dep. 90:12-20), which, as noted earlier, is where the real power of grounded theory analysis is unleashed because it allows the researcher to find unanticipated relationships between concepts. As Dr. Anastas noted, "[w]hile an identification of six themes could have occurred at the second or axial level of grounded theory coding, by definition, the researcher cannot get to the second level of coding if she has failed to do the extremely rigorous work required in first level, line-by-line coding." Anastas Report at 11.  Moreover, Dr. Long conceded that she had not heard of axial coding (Long Dep. 87:16-17), even though that is the term for the second level of coding used by sources the Long Report relied upon. Anastas Report at 11 (citing Glaser and Strauss (1967).[12] Nor had she heard of "selective" or "intermediate" coding, the two other terms used for second-level coding. Long Dep. 87:14-19; Anastas Report at 5.

As simply stated by Dr. Anastas, "[i]f a researcher claiming to use grounded theory does not engage in the rigorous coding process [described in the Anastas Report], the researcher cannot claim to have conducted a grounded theory study."  Anastas Report at 4.

---

[12] Depoy and Gitlin, the other source cited in the Long Report also uses this term.  *See, infra*, Point II.

     c.       **Memoing**

Memoing or "memo writing" in grounded theory means "writing down one's thoughts, ideas, and subjective reactions during the coding process," and also "record[ing] coding dilemmas and [coding] decisions made." Anastas Report at 5. Memoing is considered a fundamental element of grounded theory, and is discussed in the foundational text of Glaser and Straus (1967). *Id.*  As Tie, *supra*, note "[m]emo writing is an analytic process considered essential in ensuring quality in grounded theory" (cited in Anastas Report at 5). More specifically, it is "an essential method of bias control" because, "by being aware of and writing down [] subjective reactions to the material being coded, it is easier to bracket any preconceptions [the researcher] may bring to the process of understanding the text being analyzed."  Anastas Report at 5.

When Dr. Long was asked during her deposition whether she knew about memoing, she testified that she was unfamiliar with the term as it applied to grounded theory. Long Dep. 96:19-97:16.  Even when the term was explained to her, Dr. Long testified that she did not engage in this critically important method of bias control. Long Dep. 99:4-9.

     **2.**      **The Long Team did not Take the Proper Measures to Ensure the Findings were Trustworthy**

High quality qualitative research, including grounded theory, must include methods to ensure the "trustworthiness" of the data and findings, that is, methods that ensure the "findings generated can be considered reliable and valid (giving a credible account of the findings)." Anastas Report at 6. Two such methods that Dr. Long should have employed, but did not, are the creation of an audit trail and the use of processes to ensure inter-rater reliability, since multiple coders were used. *Id.*

### a.    Dr. Long and her Colleagues did not Maintain an Audit Trail

An audit trail consists of "a detailed record of all of the research activities undertaken," including documentation of "discussions of codes and other methodological decisions made while conducting the research."  Anastas Report at 6.  Such an audit trail allows other researchers to "form an opinion about the adequacy of the research methods used." *Id.* This is consistent with "[t]he convention in all empirical research [] that the study methods be described in some detail in the final product, to allow another researcher to replicate the study." *Id.*  Though Glaser and Strauss (1967), the foundational text of grounded theory and one of two sources relied upon in the Long report, do not use the term "audit trail," they recommend maintaining written records of meetings among researchers to preserve a record of decisions reached. *Id.*

Dr. Long's definition of an audit trail was "checking and rechecking your data [a]nd making sure that your citations as to where data were located were found." Long Dep. 97:20-23. This is far from the detailed documentation of all discussions of codes and other methodological decisions made. There is no evidence Dr. Long maintained an audit trail, or any procedures that would allow other researchers to replicate her work.[13]  The Long Report did not mention any efforts directed at maintaining an audit trail.  Anastas Report at 9. When pressed at her deposition, Dr. Long admitted she did not keep a journal of activities, which is a basic element of an audit trail. Long Dep. 60:24-61:1. She also admitted that she did not maintain a codebook (111: 15-16), though Dr. Anastas emphasizes it is essential that a grounded theory researcher maintain a

---

[13] While Dr. Long may not have been producing her Report for the academy, she nonetheless knew or should have known that her team's work would be subject to scrutiny, not only by Defendants' counsel but ultimately by this Court in its *Daubert* gate-keeper role; and she therefore owed it to both counsel and Court to provide reasonable assurances that her team reliably applied grounded theory principles and methods in arriving at the conclusions they present.

codebook that "enumerates and defines every code applied," and that all significant decisions regarding coding should be documented in as part of the audit trail.  Anastas Report at 5,6.

### b.   Dr. Long and her Colleagues did not Ensure Inter-Rater Reliability

"When multiple researchers are engaged in coding, there must be procedures to ensure inter-rater reliability."  Anastas Report at 5.  The coders must confer, in order to come to an agreement on a standard label used by all researchers for all codes.  *Id.* Indeed, when more than one researcher codes data, methods to ensure inter-rater reliability are indispensable.  *Id.*  While Glaser and Strauss (1967) do not use the term "inter-rater reliability," they describe having multiple meetings among researchers (coders) to discuss the nature of the codes and ensure that all are using the same working definitions when applying the codes. *Id.* at 5.

Dr. Anastas noted that the Long Report contained "no mention of discussions . . .  to ensure the multiple readers of the cases were defining the codes (if indeed codes were used at all) in a consistent manner across all team members and all case files." *Id.* at 10. Similarly, at her deposition, when asked about the communications among the multiple researchers, Dr. Long did not indicate that the communications related to any discussion of or agreement on specific coding terms among the team at any level of coding—a fundamental deficiency in any grounded theory study involving multiple coders. Long Dep. 56:20-57:23; 59:1-24; 62: 4-6; 66:25-70:24.

### B.   As a Result of Dr. Long's Failure to Apply Grounded Theory, She did not Consider an Obvious Alternative Explanation Put Forth By City Defendant

As part of the *Daubert* analysis, when an expert "[a]ttempt[s] to reach any kind of scientific conclusion  . . .  '[a]n expert must demonstrate that he has adequately accounted for obvious alternative explanations in order for his testimony to be reliable.'" *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 47416, at *53 (S.D.N.Y. Apr. 29, 2011) (quoting *U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 238 (S.D.N.Y.

2004))   Although the expert is not required to exclude "every possible alternative cause[,]" "[b]efore a conclusion on causation can be reliably drawn, the expert must make some reasonable attempt to eliminate some of the most obvious [alternate] causes." *U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004). In determining this *Daubert* consideration, courts often look to whether the expert considered the theory put forth by the opposing party, or considered evidence that did not support the expert's opinion. *See In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 257 (S.D.N.Y. 2018); *Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*, 169 F. Supp. 3d 396, 437 (S.D.N.Y. 2016)

Here the "obvious alternative explanation" is that the New York Family Court system is a significant cause of the delays in permanency--an explanation maintained by City Defendant as well as Intervenor Children's advocates since the inception of this litigation five years ago. *See, e.g.*, City Def's Mem. (DE 493) at 22-23; Children's Advocates' Objections (DE 187) at 5-6. Significantly, Dr. Long's failure to consider this explanation is a direct result of her failure to employ grounded theory.

In her report, Margaret Burt, a formidably qualified expert in New York State child welfare law,[14] discussed the ways in which the New York Family Court system delays permanency.  Ms. Burt  discussed, *inter alia*,  delays caused by (1) the adversarial nature of the proceedings, including motions filed and hearing sought by aggressive parents' and children's attorneys who (in their clients' interests) seek to delay the court proceedings (Burt Report at 6-9); (2) due process

---

[14] Ms. Burt, both a practicing attorney in child welfare matters and a nationally recognized expert in child welfare law, has trained New York State Family Court Judges, court attorneys, attorneys who represent birth parents and child welfare agencies, as well as thousands of caseworkers on legal issues in New York State.  Burt Report at 1-2. Her extensive experience consulting and training in 49 states, including hundreds of presentations on state and federal child welfare law, qualifies her to compare the New York's Family Court system and practice with those of other jurisdictions.  *Id.* at 2.

rights accorded to parents in New York to a degree unmatched in virtually any other state (*id.* at 4-6); and (3) the "degree and intensity of court involvement in all the details of the cases, and the courts' encouragement of aggressive litigation over virtually every aspect of the children's care" (*id.* at10).

Ms. Burt noted that New York is unusual among state court systems in not having statutorily manded timeframes within which Family Court Act Article 10 neglect proceedings and termination of parental rights ("TPR") proceedings[15] must be concluded.   *Id*. at 15-16. Proceedings that take 60 or 90 days in other states can take years in New York State courts. *Id*. Ms. Burt emphasized that this lack of mandated time frames is "[t]he single most significant issue" in delaying cases' progress to disposition.  *See* Burt Report at 15.  Remarkably, at her deposition, Dr. Long testified that neither she nor her team members had bothered to track the duration of either the Article 10 proceeding (Long Dep. 155:10-12) or TPR proceeding (*id*. 155:14-156:3) for each Plaintiff – effectively admitting that they failed to consider this "single most significant issue," in Ms. Burt's assessment, in delays to permanency in New York Family Court practice.[16]

---

[15] For a detailed description of New York City's Foster Care System and Family Court practice relevant to this litigation, City Defendant refers the Court to its Memorandum of Law in Opposition to Named Plaintiff Children's Motion for Class Certification, dated June 30, 2016 (DE 205), re-submitted as an appendix (DE 493-1) to City Def's Mem., at 2-10.  This memorandum discusses Article 10 neglect proceedings at 3-5, and TPR proceedings at 8-10.

[16] Ms. Burt reviewed the files of the two named plaintiffs that Dr. Long reviewed herself, Thierry E., and Ayanna J, and found numerous delays due to the Family Court system that Dr. Long completely failed to acknowledge, let alone consider. For example, in Thierry E.'s case, the birth mother changed lawyers at least five times; and four judges heard the neglect and TPR matters, with one of the four retiring and granting a mistrial. *See* Burt Report, Appendix 2 at 5-6. In Ayanna J.'s case, the mother fired her attorney in the middle of a hearing, and a judge retired in the middle of a hearing, leading to a mistrial. *See id.,* Appendix 3 at 7.  In contrast, Dr. Long admitted that she did not note (a) birth parents' switching of attorneys; (b) judges declaring mistrials;  or (c) birth parents' requests for adjournments; though she did note one of the several instances of a judge transferring a case to another judge, she did failed to consider this as a cause for delays in permanency because it did not constitute the "case practice departures" she was looking for. Long Dep. 152:3-154:8; Long Report, App. B at 24; 38-41.

More generally, Dr. Long admitted she did not make "any comparison about the percent of delays that were caused by ACS and [delays] that were caused by the courts." Long Dep. 95:12-17. When asked to comment on the variety of non-ACS-related delays in permanency (*id.* 152:3–154:8) and to explain why her team did not give court-related delays the same weight given to ACS-related delays, Dr. Long admitted, "what I was asked to do was to look at case practice, and, as I've said out a couple of times, my charge is to see if it met the required standards. And that wasn't case practice, that was the court." *Id.* 154:4-8. Similarly, when asked why "[she] did not attribute any delays to the family court in [her] report," Dr. Long admitted "I wasn't asked to review the work of the court . . . . It was not what I was asked to do"; rather she was "asked to review. . . [whether] there [were] failures in the case practice that contributed to the length of time in care". *Id.* 157:5-11. Thus, Dr. Long admitted that she and her team did not even consider the most obvious alternative explanation for the delays in the children's permanency.

Dr. Long's failure to account for the obvious alternative explanation that the delays in permanency were due to the New York Family Court system is a direct result of her failure to actually apply the grounded theory method, particularly her failure to approach the text "with an open mind" and "without preconceived notions," and her failure to code almost every line of text. Had Dr. Long conducted a proper grounded theory analysis, in which she coded all delays in permanency, she might have been able to make comparisons between the percentage of delays due to ACS and the percentage due to the Family Court system – possibly arriving at the "unanticipated," "surprising" (though, perhaps, unwelcome and litigation-unfriendly) findings that constitute the strength, and reward, of grounded theory analysis. Instead, the Long team overlooked the fundamental alternative explanation put forth throughout this litigation, and, in Ms. Burt's opinion, the single most significant factor in delays to permanency in New York.

## POINT II

**DR. LONG'S TESTIMONY AND THE LONG REPORT
SHOULD BE EXCLUDED BECAUSE THE LONG TEAM
FAILED TO FOLLOW THE METHODOLOGY ON WHICH
THEY PURPORT TO RELY AND LACK GOOD GROUNDS
FOR THEIR CONCLUSIONS**

The Second Circuit has made clear that, in order for an expert's opinion to be admissible, "[i]t is critical that the expert's analysis be reliable at every step." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002). While the Circuit has held that a "minor flaw in an expert's reasoning" can be tested in cross-examination and will not operate as a bar to admissibility, *id.* at 267, "[t]here must be a sufficiently rigorous analytical connection between [an expert's chosen methodology] and the expert's conclusions." *Nimely v. City of New York*, 414 F. 3d 381, 396 (2d Cir. 2005).

Courts find expert testimony properly excludable as unreliable and lacking good grounds when, as here, the experts fail to follow the methodology on which they purport to rely. For example, in *Amorgianos v. Amtrak*, 303 F.3d 256, 268-69 (2d Cir. 2002), the Second Circuit upheld the exclusion of testimony of an expert who "failed to apply his own methodology reliably." After admitting that a proper assessment would take certain identified variables into consideration, *id.* at 268, the expert in *Amorgianos* "inexplicably 'did not find it necessary'" to include these variables in his own calculations. *Id.* The court found that the expert's opinion "rested on a faulty assumption due to his failure to apply his own stated methodology 'reliably to the facts of the case'" *Id.* at 269 (citing Fed. R. Evid. 702). Accordingly, the Circuit concluded that the expert's opinion "was not based on good ground," and had been appropriately excluded. *Id.; see also Disabled in Action v. City of New York*, 360 F. Supp. 3d 240, 244 (S.D.N.Y 2019) (excluding testimony of expert who claimed to "provide exact measurements" of buildings to determine their compliance with the ADA, but in reality, "did not actually measure various

building features" and used "what he called an 'eye test'"); *Davis v. Carroll*, 937 F. Supp. 2d 390, 416 (S.D.N.Y. 2013) ("The tension between [an expert's] insistence on adherence to established methodologies and his repeated admission of departures from those methodologies undercuts his credibility as a proponent of his method's reliability").

An expert's failure to follow the methods of texts or research papers on which she purports to rely, or which she acknowledges are authoritative in the field, indicates that the testimony is unreliable. *See, e.g., In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 187-88 (S.D.N.Y. 2009). In *Fosamax*, the court excluded the proffered expert testimony where the expert referred to a certain textbook as the "holy grail" of epidemiology textbooks, but the manner by which he purported to analyze the facts in *Fosamax* directly contravened the principles and methods set forth in that textbook. *Id; see also United States v. Tuzman*, 2017 U.S. Dist. LEXIS 208410, at *52 (S.D.N.Y. Dec. 18, 2017) (holding that expert's "failure to follow the methodology set forth in the two research papers on which he purports to rely renders his testimony unreliable").

Notably, like the experts in *Fosamax* and *Tuzman*, Dr. Long's methodology contradicts the texts she admits are accepted in the field as authoritative, and on which the Long team expressly relies in the Long Report. Long Report at 2-3 (Exec. Summary); *id.*, App. C at 3; *id.*, App. D at 2-3; *id.*, App. E at 2-3; *id.*, App. F at 2.

The requirement of at least two levels of coding is not merely the opinion of Dr. Anastas. It is grounded in the two texts cited in the Long Report: Glaser & Straus, *The Discovery of Grounded Theory* (1967), and Depoy and Gitlin, *Introduction to Research* (2015).[17] According to

---

[17] Dr. Long testified that the Glaser and Straus text is a foundational text on grounded theory and is accepted in the field as authoritative. Long Dep 80:11-81:3. She also testified that the Depoy and Gitlin textbook provides an introduction to grounded theory and an explanation of how to conduct the Grounded Theory study. *Id.* 81: 16-22.

both texts—and contrary to the Long team's methodology—a grounded theory study requires at least two levels of coding, with the researcher (1) coding almost every line of text at the first level; and (2) grouping the codes identified at the first level into broader categories at the second level. Depoy and Gitlin (2020, at 319) Glasser and Strauss at 111.[18]  Further, when characterizing grounded theory as extremely rigorous in its analytical requirements, Dr. Anastas is not merely offering her own opinion.  Depoy and Gitlin emphasize that grounded theory requires rigorous, systematic procedures, stating that grounded theory is "[o]ne of the most formal and systematic analytical approaches" applicable in the field of qualitative social science research." Depoy and Gitlin, 2020 at 319.

As discussed above, the Long team, having failed to follow the rigorous requirements of grounded theory – the analytical method of their own choosing –should not be permitted to offer opinions to the Court based upon self-coined research methods completely at odds with grounded theory's "formal and systematic" principles and methods.

*Tuzman* is particularly analogous to the instant action.  In *Tuzman*, both parties agreed that the analysis the expert, Dr Lyter, claimed to perform (a method for ink-dating), was generally accepted.  However, the court held that the expert's failure to use quality controls, or to justify deviations from the methodology he purported to follow, compelled the conclusion that his analysis "was not reliable at every step."  *Id.* at *44, *46 (citing *Amorgianos,* 303 F.3d at 267). The court held that more is required of an expert than the unearned invocation of a respected analytical method:

---

[18] The 2015 edition of Depoy and Gitlin, which is cited in the Long Report, is available as an unpaginated e-book, and contains the same language as the cited 2020 edition.  The citation is from the 2017 reprint of Glasser and Strauss, which, since it is a reprint all text is identical to the 1967 print.

> [A]n expert must do more than just state that []he is applying a respected methodology; []he must follow through with it.
>
> Dr. Lyter has not provided any justification for [] substantial deviations from the methodology he claims to have followed, other than his subjective belief that these quality control protocols are unnecessary. Precedent makes clear, however, that an expert is not free to deviate — without justification — from the requirements of a methodology he claims to have followed.

*Tuzman, id*. at *46-47.  As a result, the court concluded that "Dr. Lyter's failure to follow the methodology set forth in the two research papers on which he purports to rely renders his testimony unreliable," *id*. at *52; and held that his testimony was inadmissible.  *Id*. at *53. Moreover, the court in *Tuzman* held, as a relevant factor, that the expert's "failure to maintain written records of his standard operating procedure and internal validation weigh against admissibility." *Id*. at *48.

Like the expert in *Tuzman,* the Long team failed to follow the requirements of the methodology they chose to invoke, failed to undertake the most elementary quality controls, and failed to maintain written records of what should have been a rigorous and systematic research process.  As a consequence, the Long team has failed in its fundamental responsibility of assuring this Court that its analysis was "reliable at every step," compelling this Court's exclusion of the Long Report as evidence in this action, consistent with the *Daubert-Kumho* line of cases.

## POINT III

**THE IN ADDITION TO NOT BEING THE PRODUCT OF GROUNDED THEORY, THE LONG REPORT'S RELIABILITY AND CONCLUSIONS ARE UNDERMINED BY THE LONG TEAM'S MISUNDERSTANDING OF FACTS AND LAW AND COUNSEL'S INAPPROPRIATE ROLE IN THE DRAFTING AND SUBSEQUENT ALTERATION OF THE REPORT**

**A.     The Long Team Members are Strangers to New York Child Welfare Law and Practice, Resulting in a Report Riddled with Critical Errors**

None of the Long team members have a background in New York child welfare law or practice. Long Dep. 22:12-18; 23:7-24:11; 46:13-18. As a result of either this lack of knowledge or the manifested bias against ACS for which they were retained, the Long team made numerous findings against ACS based on the unique characteristics of Family Court practice in New York, about which they were completely uninformed. Regarding Plaintiffs' permanency, in addition to failing to recognize the role of the New York Family Court system, *see, supra*, Point I.B, the Long team lodged other erroneous criticisms of ACS, for example:

- Contrary to the Long Report's findings (App. A at 32; App. F at 28, 29) there is no legal need to change a child's permanency goal from reunification to adoption before the filing or disposition of the TPR. It is the TPR process that frees the child for adoption, not the goal change, and many New York courts (unlike those in most other states) will not formally change a child's permanency goal to adoption until the child is actually legally freed. Burt Report, App. 1 at 6-7.

- The Long team erroneously blame delays in the Plaintiffs' permanency on delays in permanency hearings caused by, for example, a caseworker's or other witnesses' failure to appear. *See, e.g.*, Long Report, App. F at 15.  However, in doing so, they fail to recognize that the TPR proceeding and the permanency hearings are *separate proceedings* that can proceed at the same time before *different judge*s, and the TPR proceeding, not the permanency hearings, determines the child's permanency.  Burt Report, App. 1 at 7-8. Accordingly, in many instances, including the cases of the two Plaintiffs discussed in App. F, delays or adjournments of the permanency hearings have no impact on the children's time in foster care. *Id.*

- The Long team found a failure to timely file TPRs, based upon their rigid, but erroneous belief that TPRs must be filed whenever a child has been in care for 15 of the last 22

months, even when a Plaintiff was placed with a relative. Long Report, App. F at 4, 29. This is simply wrong:  In New York, there is no requirement for the agency to file a TPR when the child has been in care for 15 of 22 months if the child is placed with a relative. Burt Report, Appendix 1 at 4-5.

- Similarly, the Long team failed to acknowledge in the Report that an agency is generally excused from filing a TPR when the child has been in care for 15 of 22 months if the Article 10 Proceeding is ongoing. Burt Report, App. 2 at 6-7.

- The Long Report faulted ACS for alleged delays in providing services to a birth parents, betraying the Long team's ignorance of the fact that an agency cannot require the birth parent to engage in services or sign release forms before there is a determination on the Article 10 Petition against the parent – a delay that, in New York, unlike other states, can extend without statutory limit. Burt Report, App. 2 at 8; *supra*, Point I.B

Moreover, as discussed extensively in City Def's Mem. and the Burt Report, the

Long team's criticism of ACS regarding the other five alleged common "case practice departures,"

*see, supra*, n. 4, are also wrong, including:

- The Long Report's repeated and erroneous assertions that concurrent planning (simultaneously considering multiple permanency goals for a child) is statutorily mandated from a child's first day in care, rather than simply an aspirational best practice *Compare* Long Report at 8 n.13 *with* City Def's Mem. at 48-51 and Burt Report at 11.

- The Long Report's incorrect claims that caseworkers' failure to timely complete documentation is a violation of federal and state law, when there is no such requirement *Compare* Long Report, p.15, n.40 *with* City Def's Mem. at 53-54 and Burt Report at 27.

- The Long Report's failure to mention excellent placements, or characterization of such placements as a "fortunate accident" rather than as exemplary practice. *Compare* Long Report, App. B at 8 *with* City Def's Mem. at 47-48, and Burt Report App. 3 at 8-9; *compare* Long Report, App. F at 21 *with* Burt Report, App. 1 at 8-9.

- The Long Report's erroneous claim that ACS fails to adequately provide and monitor services to birth parents.  *See, e.g.*, Long Report at 11-14. This assertion is belied by the fact that, at statutorily mandated permanency hearings, which occur every six months, Family Court judges must make a determination as to whether "reasonable efforts" have been made by ACS and the provider agency to implement the child's permanency plan, including through the provision of services to the child's family— and at every permanency hearing in each of the 19 Plaintiff's cases, Family Court judges found that such "reasonable efforts" were made. City Def's Mem. at 52. *See also id.*  at 53 n.34.[19]

---

[19] Moreover, ACS and its agencies received Reasonable Efforts findings in 99.1% of all foster care permanency proceedings during the same time period. *Id.* at 53.

- The Long Report's claim that failure to provide "special scrutiny" to foster children in care more than two years is a violation of federal and state law is wrong. Long Report at 17 n.46. Rather special scrutiny is based exclusively upon the aspirational goals set by ACS in the QAS, which as discussed, is not legally required. *See* City Def's Mem. at 54-55 and ,*supra*, n.2.[20]

**B.      Dr. Long Acted as a Conduit for the Legal Arguments of Plaintiffs' Counsel**

"Courts have excluded expert testimony when it is based 'on the conclusory statements of [the expert's client], and not on his independent evaluation of the facts.'" *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (quoting *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986)); *see also, e.g., Estate of Puppolo v. Welch*, No. 14-cv-95, 2017 U.S. Dist. LEXIS 147312 (D. Vt. Sept. 12, 2017) at *47-48, *aff'd Puppolo v. Welch,* 771 F. App'x 64 (2d Cir. 2019) (court rejects expert opinion where expert "merely made minor revisions to the expert witness opinion prepared for him by Plaintiff's counsel" and therefore acted "as merely a conduit for the opinions of Plaintiff and her counsel").

Dr. Long's testimony made it abundantly clear that she neither wrote nor understood the Long Report's legal conclusions that each of the alleged practice departures violated the US constitution, state and federal law and New York State regulations. *See* Long Report at 5 n.4; 8 n.13; 11 n.27; 15 n.40; 17 n.46, 18 n.50. [21] At her deposition, Dr. Long could not explain the rights and laws cited, nor the connection between those rights and laws and any of the alleged case practice departures, offering, by way of explanation, only that the citations were provided by

---

[20] Even though such special scrutiny is not required, as a factual matter, Plaintiffs' counsel's depositions of provider agency representatives established that many agencies did, in fact, provide special scrutiny to children in care more than two years (and, in some cases, after less time in care), including some of the Plaintiffs' cases, even if not so labeled.  See City Def's Mem. at 55 n. 36.

[21] In these footnotes to the Report, the Long team claims that each alleged case practice departure is a violation of specific provisions of the United States Constitution, federal law, state law, and NY regulations.

Plaintiffs' counsel.  Long Dep. 167:14-169:21. For example, when asked to explain how lack of concurrent planning violated those constitutional provisions, Dr. Long offered, vaguely, that the First Amendment was implicated because "my understanding … was that the children had a right to receive concurrent planning as one of their rights as citizens."  *Id*. At another point she admitted that she simply did not know how the First, Ninth and Fourteenth Amendments were applicable. *Id.* 163:21-164:5. *See also,* 160:1-190:9.

## C.     Counsel Amended the Report without Dr. Long's Ratification of the Changes

As noted above, Plaintiffs' counsel filed two versions of Dr. Long's Report—the first dated July 19, 2019 (DE 442-1) and a second corrected version bearing the same date but filed March 19, 2020 (DE 478) ("Corrected Long Report").  In a transmittal letter to this Court dated March 17, 2020 (DE 476), a copy of which is annexed as City Def's Ex. A to the Declaration of Jonathan Pines, dated January 11, 2021 ("Pines Decl."), Plaintiffs' counsel represented to the Court that the changes were mere corrections of "some minor citation errors," with no other changes described. *Id*.

City Defendant's counsel Jonathan Pines matched a redlined version of the Corrected Long Report provided by Plaintiffs' counsel, Pines Decl., City Def's. Ex. B, with the original Long Report and found that, contrary to Plaintiffs' counsel's representation, the corrected version contained numerous non-trivial changes to the text of the Report having nothing to do with mis-citation.  *See* Pines Decl. at ¶ 5, City Defs.' Ex. C:  Spreadsheet listing all non-citation-related alterations in the text of corrected Long Report derived from redlined corrected Long Rept. (Ex. B).

While some of these alterations were relatively minor – for example, changing "April" to "May" – others suggested surprising sloppiness – for example, changing "ACS had investigated

both the foster mother and her *daughter* for child maltreatment *before* Thierry moved into the home" to "ACS had investigated both the foster mother and her *son* for child maltreatment *after* Thierry moved into the home."  Pines Decl., City Defs.' Ex. C (citing Long Report, App. A at 16) (emphasis added).  Another "citation correction" was the deletion of an entire sentence:  "The court held a subsequent hearing to ensure that the petition had been filed"; and still another changed "The court directed CHFS to provide weekly visits, but also required Lakiesha to meet with the therapist for Myls and Malik each week before visiting with the boys" to "The court directed CHFS to provide weekly supervised visits with the therapist."  *Id*., (citing Long Report, App. E at 18).

While Plaintiffs' counsel will likely argue that none of these changes affected the conclusions reached by the Long team, which may well be so, City Defendant submits that such an argument misses three different and important points that Plaintiffs' counsel cannot rebut:  (1) Had the Long team engaged in rigorous coding of the text, as they clearly did not, it is highly unlikely that these errors would have been made; (2) to the extent such errors might have been made, they would have been uncovered in a mandatory quality control process that properly trained researchers would have employed but that the Long team never did; and (3) to the extent the work ever went through a quality control process, it occurred months after the Long Report was completed and filed with this Court.

And, most disturbingly, these textual corrections – whether characterized quality control or not – were not even the work of Dr. Long or her team, but of Plaintiffs' counsel, months after the fact, without Dr. Long's ratification, indeed, without her knowledge.  Astonishingly, Dr. Long testified that she did not amend the report (112:12, 15-17), and the only change she knew of was to the pagination.  *See* Long Dep. 111:23-25 ("it was my understanding that it was the same report.

-29-

Obviously there is a bit of a page difference, but to my knowledge, that's the only difference"); *see also id.*, 112: 13-14.   City Defendant fully recognizes counsel's right to propose changes to an expert that become part of a corrected report if ratified and adopted by the expert.   City Defendant does not recognize Plaintiffs' counsel's right to alter text of an expert report of which the expert has absolutely no knowledge, or to represent to this Court that the alterations made were mere "citation errors" when, clearly, they were not.   Combined with the Dr. Long's knowing acquiescence in acting as a conduit for Plaintiffs' counsel's legal arguments that she was incapable of adopting because she lacked personal knowledge of their meaning, Plaintiffs' counsel's further liberties with the text of the Long Report, made without even the knowledge of Dr. Long, let alone her adoption of same, further erodes the reliability and admissibility of the Long Report and any testimony by Dr. Long that may be proffered by Plaintiffs' counsel.

## CONCLUSION

For the foregoing reasons, City Defendant respectfully requests that the Court grant its *Daubert* motion in its entirety, together with such other relief as it deems appropriate.

Dated:          New York, New York
                January 11, 2021


                                    JAMES E. JOHNSON
                                    Corporation Counsel of the
                                        City of New York
                                    *Attorney for City Defendant*
                                    100 Church Street
                                    New York, NY 10007
                                    Tel: (212) 356-0873
                                    ssprayre@law.nyc.gov

                                    By:      /s/ *Sharon Sprayregen*
                                             Sharon Sprayregen
                                             Jonathan Pines
                                             Ian Forster
                                             Assistant Corporation Counsel