**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELISA W., *et al.*,

                                                    Plaintiffs,

                    -against-

THE CITY OF NEW YORK, *et al.*,

                                                    Defendants.

15 Civ. 5273 (KMW) (SLC)

MEMORANDUM OF LAW IN
OPPOSITION TO CITY
DEFENDANT'S *DAUBERT* MOTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 2

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT .................................................................................................................... 9

I.      Dr. Long's Report Is Admissible Under FRE 702. ............................................... 9

        A.      Dr. Long's Methodology Is Reliable. ........................................................ 9

        B.      Dr. Long's Methodology Is Reliably Applied in the Context of this
                Litigation. ................................................................................................ 14

        C.      The City's Criticisms of Dr. Long's Application of Grounded Theory Are
                Incorrect and, If Anything, Go to Weight, Not Admissibility................. 20

II.     The City's Remaining Criticisms Are Without Merit and Irrelevant to a Rule 702
        Analysis. .............................................................................................................. 24

        A.      There is No Requirement that an Expert Be Licensed To Practice in a
                Certain State To Opine on Casework Practice ......................................... 24

        B.      The City Mischaracterizes the Role of the QAS ...................................... 25

        C.      The City Mischaracterizes Dr. Long's Opinion ...................................... 27

        D.      The City Mischaracterizes the Involvement of Plaintiffs' Attorneys........ 29

CONCLUSION .............................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09–cv–7199 (AJN),
  2014 WL 4184691 (S.D.N.Y. Aug. 22, 2014) ............................................................. 8

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F. 3d 256 (2d Cir. 2002) ...................................................................... passim

*Arista Group LLC v. Lime Group*,
  No. 06 CV 5936 (KMW), 2011 WL 1674496 (S.D.N.Y. May 2, 2011) .............. 25, 27

*B.K. v. Faust*,
  No. CV-15-00185-PHX-ROS, 2020 WL 2616033 (D. Ariz. May 22,
  2020) ........................................................................................................ 12, 24

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
  No. 09 CIV 3020 SAS, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ...................... 10

*Blanchard v. Eli Lilly & Co.*,
  207 F. Supp. 2d 308 (D. Vt. 2002) .............................................................. 16

*Chill v. Calamos Advisors LLC*,
  15 Civ. 1014 (ER), 2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018) ................................ 8

*Connor B. v. Patrick*,
  985 F. Supp. 2d 129 (D. Mass. 2013) ..................................................... 12, 26

*Cullen v. Vill. of Pelham Manor*,
  No. 03-CV-2168 (CS), 2008 WL 615593 (S.D.N.Y. Nov. 25, 2008) ........................ 29

*Cullen v. Village of Pelham Manor*,
  No. 03-CV-2168 (CS), 2009 WL 1507686 (S.D.N.Y. May 28, 2009) ................ 23, 29

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ..................................................................................... 7

*Deutsch v. Novartis Pharm. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ...................................................... 28

*E.E.O.C. v. Bloomberg L.P.*,
  No. 07 Civ. 8383 (LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) .................... 7

*Faulkner v. Arista Records LLC*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014) ......................................................... 10

*Ge Dandong v. Pinnacle Performance Ltd.*,
  No. 10 Civ. 8086 (JMF), 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ...................... 8

*Joseph S. v. Hogan*,
  No. 06 Civ. 1042 (BMC) (SMG), 2011 WL 2848330 (E.D.N.Y.
  July 15, 2011) .............................................................................................................. 8

*Kenny A. v. Perdue*,
  No. 1:02-cv-1686-MHS, 2004 WL 5503780 (N.D. Ga.
  Dec. 13, 2004) ..........................................................................................9, 11, 24, 26

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................................................... 7

*In re Lake States Commodities, Inc.*,
  272 B.R. 233 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Fisher v. Page*,
  No. 01 C 1698, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002) .................................... 10

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ..................................................................... 8, 9

*M.D. v. Abbott*,
  152 F. Supp. 3d 684 (S.D. Tex. 2015) ............................................................. 9, 12, 24

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995) ........................................................................... 11, 24, 25

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
  341 F. Supp. 3d (S.D.N.Y. 2018) .............................................................................. 27

*In re Mirena Prods. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016) ....................................................................... 28

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ........................................................................................ 7

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017) ........................................................................................ 7

*Richards v. New York*,
  433 F. Supp. 2d 404 (S.D.N.Y. 2006) ....................................................................... 25

*In re Scotts EZ Seeds Litig.*,
  12 CV 4727 (VB), 2017 WL 3396433 (S.D.N.Y. Aug. 8, 2017) ............................7, 22

*Strauss v. Credit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................. 16, 22

*U.S. Info Sys., Inc. v. Int'l Broth. Of Elec. Workers Union No. 3*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) .................................................................... 11, 27

*United States. v. Johnson*,
   319 U.S. 302 (1943) ........................................................................................................ 23

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ........................................................................................... 8

*In re Zyprexa Prods Liab. Litig.*,
   489 F. Supp. 230 (E.D.N.Y. 2007) ............................................................................... 28

**Statutes & Rules**

Fed. R. Civ. P. 26 ............................................................................................................. 22

Fed. R. Evid. 702 ........................................................................................................... 6, 7

Fed. R. Evid. 703 ............................................................................................................. 10

**Other Authorities**

A.M. McLaughlin et al., *Child Welfare Workers and Social Justice:*
   *Mending the Disconnect*, 59 CHILD. & YOUTH SERVS. REV. 177 (2015) .............. 14, 17

Barney G. Glaser & Anselm L. Strauss, THE DISCOVERY OF GROUNDED
   THEORY: STRATEGIES FOR QUALITATIVE RESEARCH (1967) ................................. 14, 16

Elizabeth DePoy & Laura N. Gitlin, INTRODUCTION TO RESEARCH:
   UNDERSTANDING AND APPLYING MULTIPLE STRATEGIES (5th ed. 2016).................... 16

Lynn Parker, *Disrupting Power and Privilege in Couples Therapy*, 37
   CLINICAL SOC. WORK J. 248 (2009)............................................................... 14, 19, 21

Melanie Birks & Jane Mills, GROUNDED THEORY: A PRACTICAL GUIDE
   (2015) ............................................................................................................................ 16

Michele Rountree, *HIV AIDS Risk Reduction Intervention for Women Who*
   *Have Experienced Intimate Partner Violence*, 38 CLINICAL SOC.
   WORK J. 207 (2010) ................................................................................................. 19, 21

Timonen et al., *Challenges When Using Grounded Theory:  A Pragmatic*
   *Introduction to Doing GT Research*, 17 INT. J. QUALITATIVE METHODS
   1 (2018) ..................................................................................................................passim

Named Plaintiff Children[1] ("Plaintiffs") respectfully submit this memorandum of law in opposition to City Defendant's ("Defendant" or "the City") Motion to Exclude the July 19, 2019 Expert Report of Dr. Caroline Long, as amended on March 17, 2020 (the "Motion").[2]

## PRELIMINARY STATEMENT

The fundamental question presented in this litigation is simple:  Does ACS[3] operate (and OCFS[4] supervise) a structurally deficient foster care system in New York City that places the proposed class of children entrusted to its care at risk of various harms to their safety, permanency and well-being?  In the context of Plaintiffs' renewed motion for class certification, Dr. Caroline Long (and the team of experts working with her) was tasked with answering a narrow question:  How does social work case practice as reflected in the 19 Named Plaintiff Children's files compare to accepted professional standards based on their experience and as set forth in ACS's written policies?  Am. Expert Report of Dr. Caroline Long Burry, ECF No. 476-1, at 4-5 ["Long Rep."].  Notably, the City's Motion does not—because it cannot—argue that Dr. Long, an Associate Professor at the University of Maryland School of Social Work with over 40 years of experience in social work focused on child welfare, is not qualified to render her opinions or that they are irrelevant.  Instead, the City argues that Dr. Long's methods were not reliable or reliably applied because she mischaracterized those methods as an application of Grounded Theory and asks this Court to exclude Dr. Long's report in its entirety—without giving any consideration to its substance or conclusions.  The City's request is not only at odds with the case law in this Circuit, but it departs from the holdings of other courts assessing *Daubert* motions against social work experts in child welfare civil rights actions.

---

[1] Named Plaintiff Children refers to the 19 Named Plaintiffs in this matter.:  Elisa W., Alexandria R., Thierry E., Lucas T., Ximena T., Jose T.C. and Valentina T.C., Ayanna J., Olivia and Ana-Maria R., Xavion M., Dameon C., Tyrone M., Britney W., Mikayla G., Myls J. and Malik M., and Emmanuel S. and Matthew V.

[2] Named Plaintiff Children file herewith the Declaration of Julie A. North ("North Decl.") and accompanying exhibits in support of this opposition.

[3] "ACS" is an acronym which refers to the New York City Administration of Children's Services.

[4] "OCFS" is an acronym which refers to the New York State Office of Children and Family Services.

The record evidence is clear that Dr. Long's methodology—which included thousands of hours of review of 66,451 pages of case records from the files of all 19 Named Plaintiff Children by Dr. Long and a team of nine experienced social workers[5]—was reliable and of the type that courts routinely adopt in cases like this one alleging systemic failures in foster care systems.  *See* Section I.A.  Moreover, as Dr. Long explained in her 330-page report and deposition, she applied the key tenets of Grounded Theory as appropriate and feasible in an adversarial litigation with its associated limitations.  *See* Section 1.B.  As a result, the City's criticisms of Dr. Long's methodology—including those of its rebuttal expert, Dr. Jeane W. Anastas (who did not even read the entirety of the report she purports to critique)[6]—are incorrect, misplaced or go to the weight, not the admissibility of Dr. Long's opinions.  *See* Section 1.C.  The City's remaining criticisms of Dr. Long's report are similarly without merit. *See* Section 2.

## BACKGROUND[7]

Plaintiffs filed an amended motion for class certification on December 28, 2015. *See* ECF No. 87.  That motion was denied on September 27, 2016, "without prejudice to renewal on an evidentiary record that demonstrates satisfaction of the requirements of Rules 23(a) and 23(b)(2)".  ECF No. 282.

Plaintiffs have since engaged in extensive fact and expert discovery and retained Dr. Caroline Long who, along with a team of experienced social workers affiliated with the University of Michigan and the University of Maryland, reviewed the over 66,000 pages of case

---

[5] North Decl., Exs. 11, 12.

[6] North Decl., Ex. 5, Transcript of Deposition of Dr. Jeane W. Anastas at 105:21-106:21; 107:15-116:8, *Elisa W., et al v. The City of New York, et al.*, No. 15 Civ. 5273 (KMW) (SLC) (testifying that she only reviewed "the report of one of the colleagues, one of the colleagues Dr. Long worked with from the University of Maryland and another of one of her colleagues based in Michigan") ["Anastas Dep."].

[7] For additional background regarding the foster care system in New York City, Plaintiffs' claims and the extensive evidentiary record supporting Plaintiffs' renewed motion for class certification, please see Plaintiffs' Memorandum of Law in Support of Plaintiffs' Renewed Motion for Class Certification [ECF No. 440] ("Class Cert. Br.") and Plaintiffs' forthcoming reply brief.

records contained in the 19 Named Plaintiff Children's files.[8]  Dr. Long has been a professor at the University of Maryland, School of Social Work since 1997 and currently serves as the Chair of the Families and Children Specialization and the Director of Global Initiatives.  *See* Long Rep., at G-1.  Dr. Long regularly teaches social work students the federal laws governing foster care, including the Adoption and Safe Families Act ("ASFA"), a landmark federal legislation adopted in 1997 to reform the child welfare system nationwide.  North Decl., Ex. 4, Transcript of Deposition of Dr. Caroline Long at 24:3-20, *Elisa W., et al v. The City of New York, et al.*, No. 15 Civ. 5273 (KMW) (SLC) ["Long Dep."].  She was also a member of the team that developed the original ASFA training for states after it passed.  *Id.*  She has a B.A. from the Furman University in Sociology, a Master of Social Work from the University of Georgia and a Ph.D. in Social Work from the University of South Carolina.  *See* Long Rep. at G-1.  She has worked as a social worker and founded and co-directed a licensed private adoption agency.  *Id.* at G-5.  She is licensed at the highest level for social work in South Carolina and Maryland.  *Id.* at G-21.  She has testified in nearly 100 foster care cases and has never had her opinion excluded.  Long Dep. at 20:12-21.  The team working with Dr. Long is similarly well-qualified.  Each is knowledgeable about appropriate case work practice for children in foster care; each holds at least a Master of Social Work and many hold doctoral degrees in social work.[9]  Several members of the team are also educators with extensive publications, speaking engagements, research and professional experience in the fields of social work and child welfare.[10]

As detailed below, over the course of two and a half years, these experts spent over 2,356 hours reviewing a total of 66,451 pages from the 19 Named Plaintiff Children's case

---

[8] At this pre-certification stage, discovery has been limited, over Plaintiffs' objections, to documents and policies related to only the Named Plaintiff Children's experiences in foster care.  *See* ECF No. 379.

[9] *See* Long Rep. at G-25 (Dr. Toni A. Cascio, Ph.D, Social Work); G-36 (Dr. Adrienne K. Ekas-Mueting, MSW); G-42 (Dr. Kathleen May Lawton Coulborn Faller, Ph.D., Social Work); G-96 (Esta Marla Glazer-Semmel, MSW); G-102 (Debra A. Linsenmeyer, MSW); G-105 (Dr. Robert M. Ortega, Ph.D., Social Work); G-130 (Gail N. Reid, MSW); G-135 (Gary A. Stauffer, MSW); G-139 (Donald E. Vince, MSW).

[10] *See generally id.*

files.[11,12]  Dr. Long, Dr. Cascio and a team of three social work experts from the University of Michigan were retained by Plaintiffs' counsel in the early fall of 2016 to assess the quality of the case practice detailed in the children's case files.  *See* Long Dep. 34:20-35:6; 39:4-16; 39:25-40:2.  Plaintiffs' counsel provided them with a copy of the ACS's 2011 Foster Care Quality Assurance Standards ("QAS")[13] and the complaint filed in this action.  Long Dep. 40:16-41:1.  During the fall of 2016, Drs. Long and Cascio and the experts affiliated with the University of Michigan had a series of at least six conference calls and in-person meetings with each other and Plaintiffs' counsel.  *See, e.g.*, North Decl., Ex. 7, at -216, 221-222, 229-331; Long Dep. 36:19-38:3, 56:15-59:4.

During this time, Dr. Long and her then-team also met in-person without Plaintiffs' counsel to:  (i) discuss and decide on the methodology to guide their assessment of the case files; (ii) develop a "checklist" to document both compliance and non-compliance with the QAS,[14] which, as explained in Plaintiffs' Motion for Class Certification, the private agencies with which ACS contracts to provide foster services ("Contact Agencies") are required to follow.  North Decl., Ex. 7; Long Dep. 56:15-59:4; Ex. 7, at -221, 250.[15]  During this meeting, Dr. Long and team agreed to use an inductive methodology derived from the tenets of Grounded Theory.  Long Dep. 58:9-16.  As Dr. Long explained during her deposition, the reviewers "didn't start with any preconceptions at all, any themes, any threads, any failure, any departures [from

---

[11] *See* North Decl., Exs. 7, 11, 12.

[12] Counsel for the City made the strategic decision not to request documents relating to Dr. Long's report until after her July 20, 2020 deposition.  The work done by the experts is reflected in those documents.

[13] For a further discussion of the QAS, *see infra* Section II. B. and Class Cert. Br. 12-13.

[14] The QAS incorporates by reference federal, state, and city law.  *See* Class Cert. Br., Ex. 31, ECF. No, 440-31; North Decl., Ex. 3, Transcript of Deposition of Julie Farber (Deputy Commissioner of Family Permanency Services, ACS) at 92:8-92:12, *Elisa W., et al v. The City Of New York, et al.*, No. 15 Civ. 5273 (KMW) (SLC) (Q: "[T]he quality assurance standards . . . incorporate ACS policies as well as existing federal, state and city laws. Is that right?  A: That's correct.") ["Farber Dep"].

[15] Notably, shortly after the experts were retained, in August and September 2016, the City filed a motion for partial summary judgment, seeking to exclude six of the 19 Named Plaintiff Children on grounds of mootness.  *See* ECF Nos. 297-298.  An order was not issued for almost a year after the motion was initially filed.  ECF. No. 392.

standards]. [They] started with . . . the record" and remained open to finding no departures. Long Dep. 58:9-16; 61:25-62:3; 72:14-18; 99:14-17.

After these initial meetings, Plaintiffs' counsel provided Dr. Long and the then-team with the case files that had been produced by the City for the Named Plaintiff Children whose files they were reviewing, providing updates[16] following new productions made by the City. Long Dep. 69:10-18.[17] Plaintiffs' counsel also provided Dr. Long and the team with ACS policies and standards and copies of the federal and state laws explicitly cited in the QAS. *See* North Decl., Ex. 8; Long Dep. 41:10-17.

In early 2017, the experts and Plaintiffs' counsel met twice in person and had three conference calls to discuss their review of the children's case files, including difficulties they were encountering (given the disorganized state of the files), the departures from standards they were observing, and the structure and language of the reports. North Decl., Ex. 7, at -232-236, 238-239; Long Dep. 56:15-62:16; 64:4-8. Dr. Long and the team continued to discuss their review of the case files and the case practice observed in the children's files throughout 2017; they met in person four times between April 2017 and July 2017 and had over 20 conference calls, some with Plaintiffs' counsel, some without. North Decl., Ex. 7, at -248, 255, 261. In the spring and summer of 2017, common themes began to emerge from the team's review of the 11 Named Plaintiff Children's files then under review. Long Dep. 84:2-13; 98:15-99:3.

In the fall of 2017, it became apparent that additional reviewers would need to be retained in order to complete the reviews of all 19 Named Plaintiff Children's case files in a timely manner. Long Dep. 49:22-56:2; 66:9-72:10. Accordingly, Plaintiffs' counsel retained five additional reviewers affiliated with the University of Maryland at the recommendation of Dr. Long. *Id.* Dr. Long assigned the remaining cases to the newly retained experts, and she and

---

[16] *See, e.g.*, North Decl., Ex. 9.

[17] Plaintiffs first served discovery requests on the City on May 6, 2016, and the City made its first production on June 6, 2016. The City technically completed its production on June 29, 2016, but it continued to refresh the production of Named Plaintiff Children's case files as late as June 5, 2019. As noted, Plaintiffs were limited to discovery relating to the 19 Named Plaintiff Children. *See* ECF Nos. 379, 394.

Dr. Cascio supervised their work by conducting training sessions on the background of this litigation, the agreed-upon methodology and the difficulties involved in reviewing the children's case files given their disorganized state. *Id*. Drs. Long and Cascio also made themselves available to the Maryland team to discuss any questions encountered during their review. *Id.*

Dr. Long and the expanded expert team continued their review of the case files and the drafting of their reports in 2018 and 2019. During this time, Dr. Long spoke with the experts affiliated with the University of Maryland and the University of Michigan and Plaintiffs' counsel at least eight more times, including during two-in person meetings. *See generally* North Decl., Ex. 7, at -287, 301. Prior to the submission of her final report, Dr. Long had a final meeting with the University of Maryland team in which she discussed their observations of the case work reflected in the files. Long Dep. 70:20-71:6.

Plaintiffs served Dr. Long's report with its class certification motion on July 30, 2019. Following this submission, the City noticed Dr. Long's deposition for March 19, 2020. *See* City's Notice of Expert Deposition of Caroline Long (formerly Caroline Long Burry). In preparation for Dr. Long's deposition in March, Plaintiffs' counsel conducted a supplemental cite check of Dr. Long's report and noticed minor typographical and citation errors, none of which affected the substance of the report. *See* Aug 26.2020 Pls.' Resps. & Objs. to City Def.'s Requests for Produc. Plaintiffs' counsel discussed these citation errors with Dr. Long and promptly served a corrected version of her report on March 17, 2020. *See* Letter from J. North to Judge Swain, ECF No. 476; Long Dep. 111:22-25; 114:1-4.

## LEGAL STANDARD

Federal Rule of Evidence 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to give opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case". Fed. R. Evid. 702; *see also Daubert*

*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (recognizing a "gatekeeping role" for trial judges to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").  The inquiry under Rule 702 is "a flexible one", *Daubert*, 509 U.S. at 594, that "must be tied to the facts of a particular case", *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotation marks omitted).  "[R]ejection of expert testimony is the exception rather than the rule".  Fed. R. Evid. 702 Advisory Committee Notes (2000) (reviewing post-*Daubert* caselaw).

In the Second Circuit, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions".  *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).  "[I]n analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case."  *Amorgianos v. Nat'l R.R. Passenger Corp*, 303 F.3d 256, 265 (2d Cir. 2002).  "That discretion is particularly broad where the area of expertise in question is not a so-called 'hard science.'"  *See In re Scotts EZ Seeds Litig.*, 12 CV 4727 (VB), 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017) (internal citations omitted); *E.E.O.C. v. Bloomberg L.P.*, No. 07 Civ. 8383 (LAP), 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case." (internal quotation marks omitted)).

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible.  The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions."  *Amorgianos*, 303 F.3d at 267 (internal quotation marks and citations omitted).  The Second Circuit has held that expert testimony should be excluded "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison".  *Restivo v. Hessemann*, 846 F.3d

547, 577 (2d Cir. 2017) (citing *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)).  In contrast, other contentions, like unfounded assumptions or gaps or inconsistencies in the reasoning, "go to the weight, not the admissibility, of the testimony".  *Id.*  (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) and *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)).

When, as here, a motion to exclude expert testimony is made at the class certification stage,[18] the inquiry is "limited to whether or not the [expert reports] are admissible to establish the requirements of Rule 23".  *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (quoting *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009)).  "[T]he question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met".  *Id.* (alterations incorporated) (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (E.D.N.Y. 2000)).  Moreover, the rationale supporting the wholesale exclusion of expert testimony under *Daubert* is attenuated when, as here, a court rather than a jury of lay-persons will be the ultimate decisionmaker on class certification and at trial.  *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09–cv–7199 (AJN), 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014) ("*Daubert* and its progeny . . . do not apply straightforwardly in the context of bench trials" (internal citations omitted)); *Joseph S. v. Hogan*, No. 06 Civ. 1042 (BMC) (SMG), 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011) (characterizing a *Daubert* motion in a bench trial as "essentially asking [the Court] to gate-keep expert testimony from [itself]"); *Chill v. Calamos Advisors LLC*, 15 Civ. 1014 (ER), 2018 WL 4778912, at *6 (S.D.N.Y. Oct. 3, 2018) ("[T]here is

---

[18]  "Neither the Supreme Court nor the Second Circuit has definitely decided whether the *Daubert* standard governs the admissibility of expert evidence submitted at the class certification stage."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466, 470 (S.D.N.Y. 2018) (citation omitted) (collecting cases and noting that "the issue remains unsettled nationally and in this district"); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony.  That interest is not implicated at the class certification stage where the judge is the decision maker.").  This Court need not decide this issue, as Dr. Long's Report is admissible under Rule 702.

no possibility of prejudice[ ] and no need to protect the factfinder from being overawed by 'expert' analysis" (citation omitted)).

## ARGUMENT

I.  **Dr. Long's Report Is Admissible Under FRE 702.**

"The Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 466 (citing *Nimely*, 414 F.3d at 396–97).  The Motion does not—and cannot—argue that Dr. Long is not qualified in the field of social work,[19] or that her opinions would not assist the Court.[20]  Instead, the Motion rests on the argument that Dr. Long did not reliably apply reliable principles and methods.  This argument is baseless.

A.  <u>Dr. Long's Methodology Is Reliable.</u>

As described in detail above, Dr. Long was "asked to review the case records of several of the Named Plaintiff Children" to evaluate (1) whether the care provided "met legal and professional standards for case practice for children in foster care"; and (2) "if those standards were not met, whether the children suffered any physical or psychological harm".  Long Rep. 1-2.  As she makes clear in her Report (and contrary to what the City insists, Motion at 19n.16, 20), Dr. Long was "not asked to evaluate individual custodial decisions" (*e.g.*, whether

---

[19] There can be no question that Dr. Long is an expert in the field of social work.  *See supra* note 9; s*ee also*, *M.D. v. Abbott*, 152 F. Supp. 3d 684, 712-13 (S.D. Tex. 2015) (recounting Dr. Long's (then-Burry) "extensive experience" in social work and child welfare and admitting Dr. Long's report reviewing the case files of three named plaintiffs as "relevant, reliable and admissible").

[20] There can be no question that Dr. Long's report is relevant and will assist the Court in evaluating Plaintiffs' renewed motion for class certification.  Dr. Long's report finds, evaluates and details several case practice departures that are *common* to the Named Plaintiff Children.  Her opinions are "sufficiently rooted in [her] knowledge and experience" in the field of social work as to assist the Court in understanding the case practice exhibited in the records of the Named Plaintiff Children.  *See Kenny A. v. Perdue*, No. 1:02-cv-1686-MHS, 2004 WL 5503780, at * 11 (N.D. Ga. Dec. 13, 2004).  And, as noted below, courts have routinely admitted reports and testimony of the type Dr. Long provides in cases alleging systemic problems in foster care systems.  *See infra* note 29; *see also Amorgianos*, 303 F.3d 256, 265 (2d Cir. 2002) ("In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (internal quotations omitted)).

an individual Named Plaintiff Child should have been removed, returned to her parent or freed for adoption), which are the province of the New York Family Court judge overseeing each child's case.  Long Rep. at 2.  Rather, Dr. Long was asked to "evaluate whether there were *case practice departures*"; in other words, whether the care provided met or departed from the "legal and professional standards for case practice for children in foster care".  *Id.*

Dr. Long's report does not seek to establish ACS's *liability* as to Plaintiffs' allegations, but rather to evaluate whether any case practice departures existed that were *common* among the Named Plaintiff Children's files.  As noted in her Report, her opinions are based on her extensive "education, training and professional experience" in the field of social work[21] in addition to her review of the information set forth in her Report.  Long Rep. at 2.

To conduct this evaluation, Dr. Long worked with a team of reviewers from the University of Maryland and University of Michigan—all of whom have ample experience in the field of social work and child welfare[22]—to conduct a "systematic analysis of the case records" of each of the 19 Named Plaintiff Children.  *Id.* at 3-4.  As Dr. Long explains, this "systematic analysis" involved "review[ing] the entirety of [each] case file" and "observ[ing] failures to comply with the QAS and legal and profession standards by staff at both the Contract Agencies and at ACS".  *Id.*  In total, Dr. Long's team spent thousands of hours over the course of thirty-five months reviewing 66,451 pages comprising the complete case files of the 19 Named

---

[21] *See also* Long Rep., at G-1.

[22] Courts have recognized that there is nothing improper with using assistants or relying on the work of other experts.  *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 CIV 686 (SAS), 2011 WL 6288415, at *10 (S.D.N.Y. Dec. 15, 2011) (admitting the testimony of an expert who relied on data and research gathered by a third-party consulting firm and finding that "[t]here is nothing improper about an expert relying on third-parties for data collection"); *see also* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014) ("Indeed, an expert may rely on assistants or the opinions of other experts in formulating their own expert opinions."); *see also In re Lake States Commodities, Inc.*, 272 B.R. 233, 242 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Fisher v. Page*, No. 02 C 1588, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002).  We do not understand the City to be arguing that the team who assisted Dr. Long in her review were not sufficiently qualified to do so.  Nor could they.  *See supra* notes 10-11 and accompanying text.

Plaintiff Children.[23]  North Decl., Exs. 11, 12.  Dr. Long and her team were also provided with ACS's policies, including copies of its annual permanency policies.[24]  *See* North Decl., Ex. 8.

As Dr. Long explains, she and her team "began by reviewing [Named Plaintiff Children's] case records, with ACS's Quality Assurance Standards ('QAS') as the primary reference for expected standards".  Long Rep. at 2.  They also derived expected standards from their "education, training and professional experience".  *Id.*  In conducting the "systematic analysis" of Named Plaintiff Children's case records to determine whether or not case practice standards were met, Dr. Long and her team used inductive reasoning as supported by Grounded Theory, "a general method of comparative analysis"[25] in which "the researcher begins with a broad query in a particular topic area",[26] data is "reviewed, compared, and contrasted with other

---

[23] Plaintiffs do not understand the City to be arguing that Dr. Long's Report was not "based upon sufficient facts or data" as required by Rule 702(b).  Nor could they.  The volume of materials and exhaustive review undertaken by Dr. Long and her team was more than enough to form a reliable basis for evaluating case practice as reflected in the Named Plaintiff Children's files.  *See, e.g., Kenny A.*, 2004 WL 5503780, at *10-13 (finding the experts' reliance on a variety of sources, including the internal agency policies were a "reliable basis for evaluating the performance of [the] child welfare system"); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995) (holding that the opinion of expert with training and experience who reviewed plaintiff's medical reports and consulted scientific and medical treatises was admissible under *Daubert*).

[24] Dr. Long also considered the relevant state and federal child welfare laws based on her understanding of them, not as a lawyer but as an expert in the field of social work for the last 40 years, to form her opinions about the "legal and professional standards for case practice for children in foster care".  (Long Rep. at 3, 5n.4, 9n.13, 12n.27, 16n.40, 19n.46, 20-21nn.49-50.)  The Motion criticizes "the Long Report's legal conclusions that each of the alleged practice departures violated the US constitution (*sic.*), state and federal law and New York State regulations."  Motion at 27.  To the extent the Court is concerned that Dr. Long is not qualified to give such legal conclusions or that these few footnotes in her voluminous report impermissibly "give testimony stating ultimate legal conclusions", these footnotes and the associated testimony can be excluded without excluding the entirety of Dr. Long's Report.  *See U.S. Info Sys., Inc. v. Int'l Broth. Of Elec. Workers Union No. 3*, 313 F. Supp. 2d 213, at 240-41 (S.D.N.Y. 2004) (denying motion to exclude and allowing economist testimony that market was not competitive, but disallowing testimony that the defendants' conduct was anticompetitive or unlawful).  Moreover, to the extent the Motion claims or tries to insinuate that Dr. Long and her team did not conduct an "independent evaluation of the facts" or that Dr. Long's report was prepared by Plaintiffs' counsel, Motion at 27-28, those claims are baseless and bordering on frivolous in the face of Plaintiffs' production of 95 pages of invoices from Dr. Long and her team documenting their over 2,356 hours of work over two and half years.  *See* North Decl., Ex. 7.

[25] *See* Long Rep. at 3 (citing Barney G. Glaser & Anselm L. Strauss, The Discovery of Grounded Theory: Strategies for Qualitative Research (1967)).

[26] *Id.* (quoting Elizabeth DePoy & Laura N. Gitlin, Introduction to Research: Understanding and Applying Multiple Strategies 107 (5th ed. 2016)).

information",[27] and "a theory that explains observations is inductively developed".[28]  Put simply, Grounded Theory prescribes that the reviewer develop conclusions that are "grounded in the data" rather than a hypothesis at the outset of the review.  Long Dep. 61:11-62:16.

The City concedes—as it must—that Grounded Theory is "a Research Method of Reliable Principles and Methods".  Motion at 7 ("Grounded theory is a well established, widely recognized and high regarded qualitative research method . . . .").  The City argues that Dr. Long (and her team) did not apply Grounded Theory at all, let alone reliably.  *Id.*  As explained in further detail below (*see infra* Section I.B), the City is incorrect; Dr. Long and her team adhered to the key tenets of Grounded Theory as appropriate (and feasible) in the context of a litigation expert report—as distinct from an academic research study.

More fundamentally, the City's Motion misses the forest for the trees.  In actions like this challenging systemic failures by child welfare agencies, courts routinely admit similar opinions on case practice failures by social work experts after conducting a methodologically similar review of named plaintiffs' case records—regardless of whether or not that review is conducted pursuant to Grounded Theory.  *See, e.g.*, *Abbott*, 152 F. Supp. 3d at 712-13 (S.D. Tex. 2015) (admitting, over defendants' Rule 702 objection, report and testimony by Dr. Caroline Long Burry who "reviewed the case files of three Named Plaintiffs . . . , evaluating each child's casework"); *see also B.K. v. Faust*, No. CV-15-00185-PHX-ROS, 2020 WL 2616033, at *5-6 (D. Ariz. May 22, 2020) (denying defendants' *Daubert* motion seeking to exclude report and testimony of social work expert's review of named plaintiff who "will testify that they are appropriate class representatives"); *Kenny A.*, 2004 WL 5503780, at *10-13 (admitting, over state defendants' Rule 702 objection, report by former Assistant Commissioner of Tennessee's child welfare agency who "reviewed the case files of five named plaintiffs to assess the quality of casework practice provided to these children"); *Connor B. v. Patrick*, 985 F. Supp. 2d 129,

---

[27] *Id.*

[28] *Id.*

136 (D. Mass. 2013) (admitting, over defendants' Rule 702 objection, report by tenured associate professor of social work who conducted a review of five of the named plaintiffs' case files to "assess" the agency's "effectiveness" in providing the children with "safety, permanency and well-being").  While it is true that in none of these cases did the expert characterize their review of named plaintiff children's case files as an application of Grounded Theory, that is beside the point.  In many of these cases, the experts did not specify *any* particular qualitative research method employed to review the children's case files.[29]  The critical point is that in each of these cases, the social work experts employed methodologies virtually identical to the methodology employed by Dr. Long and her team in this case (*i.e.*, reviewing children's case files and comparing them to accepted standards of case practice),[30] and those methodologies were deemed reliable (and reliably applied) for the purpose of offering expert opinion testimony on whether acceptable case practice standards were met.[31]

---

[29] *See, e.g.*, North Decl., Ex. 6, Expert Report of Dr. Caroline Burry (now Dr. Caroline Long) at 4, *M.D. v. Perry*, 152 F. Supp. 3d 684, 712-13 (S.D. Tex. 2015) (produced at ELISAW_00000039); Expert Report of Dr. Lenette Azzi-Lessing at 1, 5-6, *B.K. v. Faust*, No. 15-00185-PHX-ROS, ECF No. 392-2 (D. Ariz. Dec. 5, 2017) ("I reviewed all documents that Defendants, DCS and AHCCCS, produced prior to the close of discovery on September 29, 2017 and identified as pertaining to the named plaintiff children, BK and BT. In reviewing these files, I assessed whether the performance and case practices indicated in the files conformed to reasonable standards of care and child welfare practice. In completing this review, I relied on my more than 35 years of experience, education, and teaching in the child welfare and social work field, as well as my review of relevant professional literature, standards set by professional organizations, department policy, and state and federal laws and regulations."); Expert Report of Dr. Lenette Azzi-Lessing at 12-13, *Connor B. v. Patrick*, 1:10-cv-30073, (D. Mass. Aug. 22, 2012) (ECF No. 230-1) ("The author of this report undertook review of the five children's files and accompanying and federal law and policy and reasonable standards of care and child welfare practice."); *see also id.* at 12 ("In addition, this report includes a 'Systemic Issues' section, in which the author discusses common findings from the review of all five of these cases that reveal flaws in DCF's exercise of its responsibility for protecting children and ensuring that each child it serves has a safe, stable and nurturing home.  This author has not conducted a review of a statistically significant number of DCF case records in order to determine, on a quantitative level, systemic deficiencies in DCF's exercise of its responsibility for protecting children.  Rather, the 'Systemic Issues' section discusses themes that were common across the five case files reviewed for this report.").

[30] *Id.*

[31] It is similarly of no consequence that these cases arose in the context of admitting expert testimony for trial, rather than class certification.  If anything, it is less clear that Rule 702 is applicable at class certification.  *See supra* note 19 (noting split nationally and within this district on whether Rule 702 applies at class certification).

B.     Dr. Long's Methodology Is Reliably Applied in the Context of this Litigation.

As explained in further detail below, Dr. Long and her team reliably applied the key tenets underlying Grounded Theory to guide their systematic review of the 66,451 pages of Named Plaintiff Children's case records.  But in analyzing whether Grounded Theory was reliably applied, it is important first to take a step back to understand the purpose of Grounded Theory and the academic research context in which Grounded Theory is typically applied, in contrast to the purpose of Dr. Long's report and the context in which she was preparing it.

Grounded Theory was originally developed in the 1960s by Barney G. Glaser and Anselm L. Strauss,[32] whose seminal book on sociological method was focused on "the discovery of theory from data" (*i.e.*, "generating theory") as distinct from "how accurate facts can be obtained and how theory can thereby be more rigorously tested" (*i.e.*, "verifying theory").[33]  This is reflected in the academic research conducted using Grounded Theory, like that apparently done by the City's rebuttal expert, Dr. Anastas, which is typically much broader in scope than what Dr. Long and her team purported to do here.[34]

In this adversarial proceeding, Dr. Long and her team were not required to—and did not claim to—conduct an academic, publishable Grounded Theory research study articulating

---

[32] Dr. Anastas states that Grounded Theory was developed by sociologists "Anselm and Strauss", not Anselm L. Strauss and Barney G. Glaser.  *See* Am. Report of Jeane W. Anastas, ECF No. 515, at 2 ["Anastas Rep."].

[33] Barney G. Glaser & Anselm L. Strauss, THE DISCOVERY OF GROUNDED THEORY: STRATEGIES FOR QUALITATIVE RESEARCH 1, 2 (1967) (noting an "overemphasis in current sociology on the verification of theory, and a resultant de-emphasis on the prior step of discovery what concepts and hypotheses are relevant for the area that one wishes to research") ["Glaser & Strauss"]; *see also* Timonen et al., *Challenges When Using Grounded Theory:  A Pragmatic Introduction to Doing GT Research*, 17 INT'L J. QUALITATIVE METHODS 1, 2 (2018) (noting that the founders of Grounded Theory "were strongly motivated by their reaction against what they saw as undue emphasis on verification and neglect of theorizing, among social scientists in the post-Second World War period") ["Timonen"].

[34] *See, e.g.*, A.M. McLaughlin et al., *Child Welfare Workers and Social Justice: Mending the Disconnect*, 59 CHILD. & YOUTH SERVS. REV. 177, 177 (2015) (attached as Ex. A to Anastas Rep., ECF No. 414) ("[T]he objective of this grounded theory study was to *examine the concept of social justice* from within the context of child welfare practice" (emphasis added)); *id.* at 179-80 (detailing findings, including that "[s]ocial justice was conceived in terms of institutional, systemic and aspirational goals, such as equality, fairness and rights; and also in terms of as the relational processes involved with empowerment, respect or how we treat others, and our obligations to assist others to achieve"); North Decl., Ex. 1, Lynn Parker, *Disrupting Power and Privilege in Couples Therapy*, 37 CLINICAL SOC. WORK J. 248, 253 (finding "[s]ocial workers must structure sessions so that power disparities in the couples who seek held are raised for conversation and analysis").

a sociological theory concerning case worker practice.  Rather, Dr. Long was a retained litigation expert tasked with answering a narrow question to assist the trier of fact in this litigation:  How does the case practice reflected in the 19 Named Plaintiff Children's files meet or depart from accepted standards?  In answering that question, Dr. Long and her team adhered to the essential tenets of Grounded Theory and adapted them for use in the non-academic context of a litigation (with the associated scheduling, resource and documentary limitations imposed by the very nature of discovery in an adversarial proceeding).[35]  Thus, when Dr. Long states that she and her team "applied Grounded Theory", it is important to understand what that means in this context, which Dr. Long explained in her report and at her deposition.  *See* Long Rep. at 3 ("I did not conduct the record review with preconceived notions about expected content; instead, I reviewed the records with an open mind as to what they would contain and reflect.  As I conducted a systematic analysis of the case records, I observed failures to comply with the QAS and legal and professional standards by the staff at both the Contract Agencies and at ACS; these failures relate to both what was done and what was not done in the cases that I reviewed."); Long Dep. 72:22-73:2 ("So [Grounded Theory] is in contrast to research in which you begin with a hypothesis. I believe that kind of research would be, I hypothesize that the data will show A, B or C.  We didn't start with an A, B or C.  Not among ourselves.  Not from counsel.  We started with the records and used Grounded Theory."); *id.* at 99:14-17 ("I would have been happy if I had not found departures.  The idea was I would just—each of us just started with the data, with the records.").

While Dr. Long and her team did adapt Grounded Theory as necessary to fit the context of a litigation expert report (as distinct from an academic research study)—a distinction which the City's Motion and rebuttal expert, Dr. Anastas wholly fail to acknowledge (often to

---

[35] Indeed, Dr. Anastas' criticism that Dr. Long's report only contained "a brief quotation from the work of Glaser and Strauss" and a description "from an introductory research methods text" and did not reference "the work of methodological experts in grounded theory", Anastas Rep. at 8, further proves this point.  Dr. Long did not purport to conduct a grounded theory *study*; she sought to apply the key principles of Grounded Theory to the narrow question she was tasked with answering.

absurd result, *see infra* Section I.C.)—that does not render Dr. Long's 330-page report *inadmissible. See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 441 (E.D.N.Y. 2013) (holding that a methodology developed by an expert for a specific litigation was sufficiently reliable to be admissible because the test was based on factors used by experts in the field); *Blanchard v. Eli Lilly & Co*., 207 F. Supp. 2d 308, 317- 318 (D. Vt. 2002) (holding that an inductive methodology developed by a social sciences expert for the specific case could be reliable). When considered in a litigation context, the key tenets of Grounded Theory reliably applied by Dr. Long and her team include: (1) the use of inductive reasoning; (2) a detailed review of the available data/information; and (3) development of themes using a comparative process.[36] We address each of these in turn.

      i.      Inductive Reasoning

In Grounded Theory, researchers begin with the data rather than a hypothesis or preconceived notion about what the data will show—*i.e.* inductive rather than deductive processes. *See* Melanie Birks & Jane Mills, GROUNDED THEORY: A PRACTICAL GUIDE 11 (2015) (explaining that "Grounded theory methods are referred to as inductive in that they are a process of building theory up from the data itself".); *see also* Glaser & Strauss at 114 (describing Grounded Theory as an "inductive method of theory development" where "[i]f the analyst starts with raw data, he will end up initially with a substantive theory: a theory for the substantive area on which he has done research . . . ."). At its core, Grounded Theory requires researchers to review collected data with an open mind, without pre-conceived notions or hypotheses regarding whether a particular phenomenon did *or did not* occur. Although Grounded Theory requires an open mind, it does not require the researcher to be a "blank slate" or completely ignorant about the subject matter they are using to develop a theory. *See* Timonen at 4 ("The misleading idea of

---

[36] Discussions of the requirements of Grounded Theory generally arise only in academic context. While some discussions recognize that it can be applied pragmatically, *see generally, e.g.*, Timonen, these methodological discussions do not explain how Grounded Theory can be applied by an expert retained in a litigation. Dr. Long, who has a doctoral degree in social work and is well-versed in qualitative methods, was able to distill the aspects of Grounded Theory that she deemed appropriate to apply for the task she was asked to accomplish.

the researcher as a 'blank slate' continues to plague GT and to create confusion and suspicion toward GT").[37]  Rather, "[t]he key premise of GT is *remaining open* to the portrayals of the world as encountered and not forcing data into theoretical accounts".  *Id*.

Contrary to the Motion's incorrect and baseless claims, there is no evidence in the record that Dr. Long and her team "comb[ed] through source material only for evidence corroborative of [case] practice departures" or that "she and her team were explicitly hired and directed by Plaintiffs' counsel to find [case practice departures]".  Motion at 8.  And indeed, the City cites *no* record evidence in support of those claims.  Here, Dr. Long was clear in both her report and her deposition that she and her team remained open to the possibility that the case practice met acceptable standards, including those reflected in the QAS.  Long Dep. at 62:8; 68:4-11; 72: 17; 99:14-17.  Dr. Long and her team did not come up with any possible case departures in advance nor did they search for any specific departures or categories of departures in the records.  *Id*. at 61:11-13, 62:9-16, 64:6-8.  Once she and each of the other experts identified the case departures, they discussed their findings to determine whether or not there were case departures that were common across the Named Plaintiff Children's case records.  *Id*. at 62:4-8; 64:6-8; 64:23-65:4; 98:15-99:3.  This was an inductive process,[38] and Dr. Long's conclusions were thus "grounded in the data" she and her team reviewed.  Long Dep. at 76:5-6; 158:2-7.[39]

---

[37] Indeed, such a proposition would be impossible given that Grounded Theory, as a theory of naturalistic inquiry, focuses on "understanding and interpreting human experience within the context in which experience occurs."  DePoy & Gitlin, *supra* at 3 (5th ed. 2016).

[38] Dr. Anastas' claim that Dr. Long and her team's reliance upon the QAS rendered their inquiry deductive is baseless.  The QAS (which Dr. Anastas does not appear to have reviewed) defines required case practice standards in the New York City foster care system and thus allowed the experts to develop a uniform understanding of what case practice departures in this system are.  Grounded Theory studies regularly rely on authoritative texts for definitional purposes.  *See, e.g.*, McLaughlin et al., *supra* at 177, 178 (2015) (attached as Ex. A to Anastas Rep.) (relying on texts for various definitions of "social justice").  Moreover, as previously explained, Dr. Long and her team were answering a narrow question using inductive reasoning, not developing a theory to explain behavior.

[39] The Motion also criticizes the fact that the "Dr. Long explicitly identified to [the later-hired University of Maryland team] the six case practice departures that the Michigan team had already identified".  Motion at 8-9.  This is not grounds for exclusion of Dr. Long's testimony or the testimony based on the reviews conducted by the University of Maryland team.  *Amorgianos*, 303 F.3d at 267 (instructing that modifications or variations to an accepted methodology "will not render an expert's opinion *per se* inadmissible" and that any challenges are best left

ii.     Detailed Review of Data / Information

Grounded Theory also involves the detailed review of, and taking detailed notes on, the collected data and information, which is typically referred to by academics performing Grounded Theory research studies as "coding".  *See* Timonen at 5.  "Different schools of GT have developed different coding procedures", but at its most foundational level, coding is a method that allows researchers to review data while identifying "categories (codes that cohere together) in the data".  *Id.*  Grounded Theory scholars have recognized that "GT coding has a reputation for being painstakingly slow to do," but have noted that, even in the academic context, there is "plenty of support within the GT tradition" indicating that it "may not be necessary to open code *all* data".  *Id.* (emphasis added).  Instead, "open (initial) coding [can be] used more pragmatically to 'break open' a topic", after which researchers can "look for the same code arising elsewhere in the data set".  *Id.*

While Dr. Long did state that "[c]oding isn't something that we started with", Long Dep. 83:4, this is not a ground for excluding her report.  Dr. Long and her team did not highlight each line of text with a different color or use qualitative data analysis software—Dr. Anastas's examples of acceptable coding for a grounded theory research study.  Anastas Rep. at 4 & 11n.23.  But, the record is clear that, as in Grounded Theory, Dr. Long and her team reviewed line-by-line, every page of the Named Plaintiff Child's file for which they had primary responsibility.  While doing so, they noted every single case practice departure found in the records in the form of case chronologies, drafts of their reports or notes.  *See* Long Dep. 64:15-20, 83:15-19.  In so doing, Dr. Long and her team did engage in the type of detailed data/document review necessary to "break open" the data to identify themes/case practice departures.  In the context of litigation, where, as here, there is a precise question to be answered, a narrow set of disputed facts and a limited universe of available data—not to mention

---

to the adversarial system of litigation).  And Dr. Long made clear that, in spite of this, she still instructed the Maryland reviewers "to look for anything—any other case failures or departures", stating that she "didn't know whether those six would be there or any others".  Long Dep. 54:1-16.

scheduling and resource limitations—it simply is not realistic or pragmatic to suggest that literally every line of over 66,000 pages of records need to be affirmatively categorized to accomplish what Dr. Long set out to do—*i.e.*, evaluate whether or not accepted standards of case practice were met.  But Dr. Long's review and detailed note-taking clearly constitute "good grounds" for the opinions expressed in her report.  *Amorgianos*, 303 F.3d at 267 (instructing that a "judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions" (internal quotation marks and citations omitted)).

         iii.      Comparative Method To Develop and Group Themes

        Grounded Theory asks researchers to engage in a process of "constant comparison", *i.e.*, "the analytical process of comparing data against data in order to identify similarities and differences between pieces of data."  Timonen at 5.  As explained by Dr. Long in her deposition, this comparative process involved the reviewer "constantly go[ing] back to the data" here, the Named Plaintiff Children's case files, "to see what the data say" and to determine "if any themes [or] threads" appear.  Long Dep. at 73:3-6 (explaining that part of the Social Work Expert's process comprised of "the constant comparative method"); *id*. at 72:19-22 (explaining that in this process "you review the data and [] look for themes . . . and look across the data to see if those [themes and threads] appear again").[40]

        In order to determine whether case departures occurred and whether those case departures were common across the Named Plaintiff Children's case files, Dr. Long and her team noted each of the departures and then reviewed those notes to determine what, if any, relationships existed between the identified departures.  *See id*. at 82:2-9; 84:2-13, 89:14-90:11, 90:16-20.  For example, during the course of the review, Dr. Long and the reviewers each noted specific departures such as failures to provide visitation.  *See id*. 84:2-13 (explaining that Dr.

---

[40] Some texts advise that memoing is an essential element of the constant comparative process of Grounded Theory.  *See, e.g.*, Timonen at 7. Memoing, while helpful, is not necessary or essential to the application of Grounded Theory.  *See, e.g.*, North Decl., Ex. 1, Lynn Parker, *supra* at 248-49 (describing methodology which does not including memoing); North Decl., Ex. 2, Michele Rountree, *HIV AIDS Risk Reduction Intervention for Women Who Have Experienced Intimate Partner Violence*, 38 CLINICAL SOC. WORK J. 207 (2010)) (describing methodology which does not include memoing).

Long identified, among other things, failures to provide visitation, failures to support visitation with meaningful planning and failures to review the visitation and create follow-up plans). Consistent with their comparative process, the experts reviewed and discussed their noted observations and were able to identify the connection between the individual departures and grouped them together as one "theme":  failure to adequately provide and monitor services for birth parents and caretakers.  *Id.*  This review process also contradicts the City's claims that the reviewers failed to ensure "interrater reliability" as the record clearly shows that experts met and discussed the children's case files several times.  Long Dep. 62:4-8; 64:6-8; 64:23-65:4; 98:15-99:3; North Decl., Ex. 7.

        C.      <u>The City's Criticisms of Dr. Long's Application of Grounded Theory Are Incorrect and, If Anything, Go to Weight, Not Admissibility</u>

        The City and its expert, Dr. Anastas, argue that Dr. Long did not apply the requirements of Grounded Theory research as the term is used in academia.  *See, e.g.*, Anastas Rep. at 8 (comparing the expert's process to that described in an article published by an academic journal); Motion at 7, 9-10; Anastas Dep. 83:18-93:11.  The City's challenge to Dr. Long's methodology is without merit.  As described in detail above, Dr. Long and her team adapted Grounded Theory to the context of a litigation, adhered to the tenets of Grounded Theory, conducted their reviews and analyses in a consistent manner and produced a report that employs the same essential methodology as numerous other social work experts in child welfare cases, *see supra* Sections 1.A-1.B.  The City and Dr. Anastas fundamentally misunderstand and mischaracterize the reviewers' task[41]—they were retained to conduct a *review* and assessment of

---

[41] Indeed, the City's expert Dr. Anastas made several unfounded and incorrect assumptions about the Dr. Long and her teams' methodology and process.  For example, Dr. Anastas assumed that the assignment of cases to the reviewers was biased because it was facilitated by Plaintiffs' counsel, even though counsel provided the reviewers with *all* of the children's case files that had been produced by the City.  Anastas Dep. 91:14-93:11.  Furthermore, Dr. Anastas repeatedly concluded that the experts did not meet a standard for Grounded Theory because there was "no indication" they had done so, *see, e.g.*, Anastas Rep. at 9-10, based on her review of an extremely limited set of materials.  Anastas Dep. 106:2-116:8; 134:25-136:3.  Dr. Anastas and the City are not entitled to every single document created by the experts during their review (many of which are protected by Federal Rule of Civil Procedure 26) in forming their own opinions and theories of the case.

case practice, not a *research* project to develop a theory for publication.  This misunderstanding is perhaps not surprising given Dr. Anastas's admission that she did not even review the entirety of the report that she criticized.  Anastas Dep. 106:2- 116:8.  Dr. Anastas only reviewed limited parts of Dr. Long's report and the testimony from the July 20, 2020 deposition of Dr. Long to formulate her opinion about the experts' methodology.  She did not consider the entirety of Dr. Long's report or any of the 1,228 pages of documents that Plaintiffs' produced in response to certain of the City's requests for production regarding the reviewers' methodology.  *Id.* at 134:25-136:3.  She also did not consider or was unaware of:  (i) the number of Named Plaintiff Children; (ii) how the Named Plaintiff Children were identified or chosen; (ii) the case files that were made available to Plaintiffs' counsel; and (iii) the case files that were made available to the experts.  *Id.* at 86:25-87:3; 87:5-24; 90:24-91:4; 92:8-93:8.  Furthermore, Dr. Anastas's evaluation of Dr. Long's report was apparently without regard to the fact that it was not a research study and she consistently appeared unaware of the constraints inherent to litigation.[42] *Id.* at 88:8-11, 92:20-93:6.

Notably, the Grounded Theory requirements detailed by the City and Dr. Anastas are not always followed even in the academic context.  Peer-reviewed journals, including the Clinical Social Work Journal for which Dr. Anastas has served on the editorial board and has regularly reviewed articles since 2006, have published articles applying Grounded Theory that do not adhere to the requirements detailed by either the City or Dr. Anastas.  *See, e.g.*, Anastas Dep. 138:9-140:17; North Decl., Ex. 1, Parker, *supra* at 248-49 (not documenting adherence to the City's alleged requirements of the constant comparative method, memoing, audit trails, or

---

[42] Anastas has never served as a litigation expert prior to this case. Anastas Dep. 67:25-68-9.  She had no understanding of the discovery process and at best, a rudimentary understanding of the *Daubert* standard that was provided to her by counsel for the City.  Anastas Dep. 69:2-74:1; 88:8-11**.**  Yet, she appeared to believe that the *Daubert* standard rendered the opinions of Dr. Long's review team—who considered all relevant records produced during discovery (including 66,451 pages of case files)—"garbage science" since the reviewers did not select the Named Plaintiffs themselves or review the records of non-Named Plaintiff Children—a limit imposed by the City itself.  Anastas Dep. 92:20-93:6.

inter-rater reliability); North Decl., Ex. 2, Rountree, *supra* at 209-10 (not documenting adherence to the City's alleged requirements of second level coding, audit trail and memoing).

Simply put, it is not possible—let alone practical—to conduct the type of Grounded Theory research detailed in the City's *Daubert* motion or Dr. Anastas's report in a litigation. For one, formal Grounded Theory studies take years to complete—even more than the 2.5 years Dr. Long and her team spent here. Anastas Dep. 55:24-58:5 (testifying that a previous study took between one and five years to complete). Indeed, Dr. Anastas testified that she had not ever personally applied Grounded Theory in a non-academic context, opting for other qualitative methodologies instead. Anastas Dep. 58:2-5. The extensive time and resources required for a formal Grounded Theory research study are neither proportionate to the needs of the case, Fed. R. Civ. P. 26(b), nor necessary survive a *Daubert* challenge. *Strauss*, 925 F. Supp. 2d at 441 (holding that an expert's omission of certain considerations was acceptable given informational constraints in the litigation); *In re Scotts EZ Seed Litig.,* 2017 WL 3396433, at *7-8 (explaining that, under the flexible *Daubert* inquiry, the court has "broad discretion" in analyzing whether a particular methodology is reliable, particularly "where the area of expertise in question is not a so-called hard science" (internal quotation marks omitted)).

Further, strict adherence to each of the rote requirements of Grounded Theory listed in Dr. Anastas's report would result in absurd outcomes. For example, as Dr. Anastas repeatedly testified during her deposition and stated in her report, fidelity to the sampling requirements of academic Grounded Theory would demand that Dr. Long and her team choose the named plaintiffs in this litigation. Anastas Dep. 86:12-93:11. When advised that Dr. Long and the experts had reviewed *all* of the case files that had been produced in discovery for *all* 19 Named Plaintiff Children, arguably a 100% purposive sample, Dr. Anastas remained steadfast in her opinion that the experts sampling methodology was improper because "the selection of cases was not done by the researchers". *Id*. at 90:21-23; 92:17-19. The fact that the City had *denied* Plaintiffs' requests for discovery beyond the Named Plaintiff Children, *see* ECF Nos. 379, also did not affect Dr. Anastas's opinion because "the cases were not selected by the researchers."

Anastas Dep. 90:21-23; 92:17-19.  A rule requiring experts to wield complete authority over the selection of named plaintiffs for the purposes of sampling is completely at odds with our adversarial system of litigation, which demands the "honest and actual antagonistic assertion of rights" to "safeguard . . . the integrity of the judicial process."  *See, e.g.*, *United States. v. Johnson*, 319 U.S. 302, 304 (1943) (per curiam).  Practically speaking, Dr. Anastas's opinion would necessarily mean that every case in which a social work expert's report on case practice was accepted as reliable were wrongly decided.  This simply cannot be true.

Similarly, Dr. Anastas's requirement that the reviewers highlight each line of text using a software program to satisfy coding is unnecessary to ensure that the experts thoroughly considered the data.  Rather, it is sufficient that experts "went through the entire case record" and "looked for anything" while focusing on departures from expected standards.  Long Dep. 85:16-21.  As explained above, Dr. Long and the reviewers remained true to the key tenets of Grounded Theory and adapted them as necessary to the context of this litigation.

At most, the City's critiques go to the weight, and not the admissibility, of Dr. Long's report.  A dispute as to the "faults in [an expert's] use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Cullen v. Vill. of Pelham Manor*, No. 03-CV-2168 (CS), 2009 WL 1507686, at *18 (S.D.N.Y. May 28, 2009) (quoting *McCullock*, 61 F.3d at 1044 (2d Cir. 1995)) (alterations in original). Indeed, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. . . "  *Amorgianos*, 303 F.3d at 268 (instructing that a "judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." (internal quotation marks omitted)). None of the critiques of Dr. Long's methodology in the Motion or Dr. Anastas's report are grounds for exclusion.

II.     **The City's Remaining Criticisms Are Without Merit and Irrelevant to a Rule 702 Analysis.**

The City's remaining challenges to Dr. Long's report are similarly without merit and largely irrelevant to the Court's "gatekeeping role" for a *Daubert* motion.  These haphazard, "everything but the kitchen sink" arguments are factually unsupported and legally erroneous.  As discussed below, if at all relevant, the City's arguments go to the weight, and not the admissibility, of Dr. Long's report.

A.     There Is No Requirement that an Expert be Licensed To Practice in a Certain State To Opine on Casework Practice

The City invents a completely new legal principle that social work experts must be licensed in or have experience within a certain state in order for expert testimony on casework practice in that state to be admissible.  *See* Motion at 25.  No such requirement exists.  Indeed, courts have routinely admitted the testimony of social work experts who practiced outside of the state that was the subject of their opinion.  *See e.g.*, *Abbott*, 152 F. Supp. 3d at 712-13 (admitting Dr. Long's opinion, formerly Dr. Burry, in a Texas child welfare class action litigation); *Kenny A.*, 2004 WL 5503780, at *10 (admitting in a Georgia child welfare class action the opinions of experts based in South Carolina, Iowa, Nebraska and Tennessee); *Faust*, 2020 WL 2616033, at *7 (admitting in an Arizona child welfare class action the opinion of an expert based in Massachusetts).

Moreover, although the City and its expert, Margaret A. Burt, devote several pages to argue that Dr. Long cannot opine on *social work* practice in New York because the practice of *family law* in the state differs from other states, the City fails to explain why an opinion evaluating social work practice based on the City's own published standards requires an expert to have practiced law before New York Family Court or social work in the State of New York.[43]  There is nothing so unique about New York that prevents an expert, who has extensive knowledge about child welfare and experience interpreting state's policies on case practice, from

---

[43] Indeed, the City itself hires out-of-state experts and organizations, such as Chapin Hall (based in Chicago, Illinois) to assess its foster care system.

evaluating whether the case practice met the City's own standards and policies. In any event, this type of critique of an expert's qualifications presents an issue of weight, not admissibility. *See, e.g.*, *McCullock*, 61 F.3d at 1044 ("Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony."); *Arista Records LLC v. Lime Grp.*, No. 06 CV 5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) ("Quibble[s] with an expert's academic training go to the testimony's weight . . . not admissibility." (internal citations and quotations omitted)).

B. The City Mischaracterizes the Role of the QAS[44]

The City asserts that the QAS, the source that Dr. Long and the experts used to guide their review of the case files, is an "aspirational" standard and is therefore an inappropriate source for the experts to rely upon to evaluate casework practice. Motion at 3, 26-27. This is plainly incorrect. The QAS is expressly incorporated under Part II, Article 2 and attached as an addendum to each contract between ACS and the Contract Agencies. *See, e.g.*, Class Cert. Br., Ex. 27, ECF No. 442-27, at 10, 78 (contract between the City and a Contract Agency (Catholic Guardian Services) for the provision of foster care services). The QAS sets out the policies and laws with which the Contract Agencies are required to comply. The QAS is a mandatory standard for casework practice and the reviewers' reliance on the QAS as the source for their analysis of the case records was proper.[45] The City fails to support its argument to the contrary. It does not provide any evidence to establish that the QAS is not binding on the case workers under its jurisdiction. Rather, it summarily claims that the QAS is not statutorily mandated and

---

[44] Plaintiffs intend to more fully respond to the City's arguments regarding the authority of the QAS in their class certification reply brief, which will be submitted on March 22. The limited arguments included herein are solely for the purpose of rebutting the City's claims relating to the reliability of Dr. Long's report.

[45] Since 2009, New York City's Administration for Children's Services ("ACS") has contracted with private agencies ("Contract Agencies") to provide the day-to-day care of, and case management and decision-making responsibilities for, children in its care under the "Improved Outcomes for Children" ("IOC") program. Each contract incorporates the 2011 Foster Care Quality Assurance Standards ("QAS"), which sets out the policies and laws with which the Contract Agencies are required to comply. *See, e.g.*, Class Cert. Br, Ex. No. 27, ECF No. 442-27, at -699, 701. Children in ACS's care are third-party beneficiaries of these contracts. *Richards v. New York*, 433 F. Supp. 2d 404, 430 (S.D.N.Y. 2006).

points to federal and state-level publications which provide that governments may choose to mandate certain "best practices". *See, e.g.*, ECF No. 493, at 50-51, 54. While this might be a more convenient strategy in this litigation, it is not consistent with the fact that ACS has made these so-called "best practices" mandatory by expressly binding the Contract Agencies to apply them. Farber Dep. 91:5-92:7 (Q: "[F]oster care agencies with which ACCS has contracted are required to follow the quality assurance standards. Is that right?" A: "They are, yeah.").

Further, the QAS is in no way framed as "aspirational". The QAS lays out unambiguously what the contract agencies are expected to do as part of their contractual duties, mandating throughout what the provider "shall" and "will" do. *See, e.g.*, Class Cert Br., Ex. 31, ECF No. 442-31 ("Provider staff shall assess the permanency needs of every child individually to determine if a plan is in the child's best interest"); *id*. at -483 ("Providers shall create and maintain written service plans for each child(dren)/youth in care . . ."); *id*. at -485 ("The Provider will engage in concurrent planning . . . in which planning for adoption or other custodial arrangements begins at intake"). Indeed, it is the City of New York itself that has set up the QAS as the governing standard of child welfare practice in New York City.[46]

To be proper source material from which to evaluate casework practice, the source must serve as a "reliable basis for evaluating the performance of a state's child welfare system." *Kenny A*., 2004 WL 5503780, at *12. Under this standard, the QAS is the precisely correct bar to measure whether or not the caseworker practices in the Named Plaintiff Children's case files met accepted professional standards. A practice standard that ACS itself has incorporated into the contractual obligations of the Contract Agencies certainly fits the bill of a reliable basis for evaluating New York's child welfare system. *Id.*; *see also Connor B.*, 985 F. Supp. 2d at 136 (noting that the expert relied, in addition to her own experience, on the internal agency policies).

---

[46] If the City is not holding the agencies to which delegates the day-to-day care of the children in its custody to the standards set forth in the QAS, then one must wonder to what, if any, standard it holds the Contract Agencies, or how it manages to fulfill its duty to oversee and monitor the Contract Agencies.

C.      The City Mischaracterizes Dr. Long's Opinion

The City's argument that Dr. Long's report is inadmissible because it failed to "recognize the role of the New York Family Court System", Motion at 25, is simply unfounded and not relevant to the *Daubert* standard.  While Dr. Long's report did identify case practice departures that may have contributed to delays in certain Named Plaintiff Children achieving permanency, *see, e.g.*, Long Dep. 153:18-154:13; 155:1-156:11 (explaining that while the experts noted delays caused by legal proceedings, their task was to "look at case practice. . . to see if it met the required standards"), the purpose of Dr. Long's report was not—contrary to the City's suggestions, *see* Motion at 18—to offer an opinion as to the sole or primary *cause* of such delays.  Rather, she and the other experts "evaluate[d] whether the care provided by the Contract Agencies, to whom ACS has delegated the day-to-day care of the children in its custody, met legal and professional standards for case practice for children in foster care and, if those standards were not met, whether the children suffered any physical or psychological harm."  *See* Long Rep. at 4-5.  Whether the New York Family Court proceedings also contributed to delays in permanency holds limited relevance to the quality of case practice recorded in the Named Plaintiff Children's files.

The opinion of its expert, Margaret Burt, is entirely irrelevant to the reliability analysis of Dr. Long's report because it rests on the flawed premise that she and the other experts were looking for "delays".  *See generally* ECF No. 494.  The reviewers were not looking for the exclusive cause for delays in achieving permanency, but rather departures from accepted case practice.  Indeed, the authorities cited by the City support this point; experts need not exhaustively rule out all alternative explanations when their opinion is that "there is credible evidence that supports a particular conclusion."  *See, e.g.*, *Arista Records LLC*, 2011 WL 1674796, at *17 (denying the plaintiffs' *Daubert* motion to exclude the opinion of an expert who did not consider contrary opinions that were beyond the scope of his modest opinion).  The other cases cited by the City are largely inapposite as the experts in those cases were opining on the sole, or primary, cause for a certain phenomenon.  *See, e.g.*, *U.S. Info. Sys.*, 313 F. Supp. 2d at

27

218-39 (holding that even a causation expert need not "categorically exclude each and every possible alternative cause . . . the possibility of some un-eliminated causes does not render [the expert's] testimony unreliable."); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d, 213, 262 (S.D.N.Y. 2018) (holding the opinion of a causation expert unreliable when the expert relied on a single source for his opinion which did not consider other common risk factors); *In re Mirena Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 437 (S.D.N.Y. 2016) (holding that a causation expert's opinion that a plaintiff became pregnant due to uterine perforation was unreliable because he did not consider if the plaintiff's sexual activity or use of other contraceptives were contributing causes).

The City's main point appears to be that it simply disagrees with the conclusions of Plaintiffs' experts. Several of the purported inaccuracies it cites to are merely differences of opinion. *See e.g.*, Motion at 26 (citing "[t]he Long Report's failure to mention excellent placements, or characterization of such placements as a 'fortunate accident' rather than as exemplary practice" as an inaccuracy). Other alleged faults with the Dr. Long's report were present in the reports offered by the City's own experts. *See, e.g.*, *id*. at 25 (faulting Dr. Long for not comparing the percentage of delays caused by ACS and delays caused by courts in the Named Plaintiff Children's case files while the report of Margaret A. Burt similarly fails to include such an analysis for the Named Plaintiff Children's files). Thus, the fact that she or the other experts did not analyze the role of the New York Family Court in their Report is completely beside the point.

The City's grievances with the conclusions reached by Dr. Long and her team are thus irrelevant to the admissibility of their report. "The mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility." *In re Zyprexa Prods Liab. Litig.*, 489 F. Supp. 230, 285 (E.D.N.Y. 2007); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 434 (E.D.N.Y. 2011) (holding that "[i]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence . . ."); *see also Amorgianos*, 303 F.3d 256, at 266 (instructing the district court to

"focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions").  In the end, "vigorous cross-examination, presentation of contrary evidence and careful instruction the traditional and appropriate means of attacking [allegedly] shaky but admissible evidence".  *Cullen*, 2009 WL 1507686, at *19.

      D.      <u>The City Mischaracterizes the Involvement of Plaintiffs' Attorneys</u>

      As a final matter, the City also faults the Dr. Long's report due to Plaintiffs' counsel limited involvement with certain footnotes and citations.  However, "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports".  *Cullen v. Vill. of Pelham Manor*, No. 03-CV-2168 (CS), 2008 WL 615593, at *34 (S.D.N.Y.  Nov. 25, 2008).[47]  The fact that there were a handful of citation and typographical corrections in a 330-page report does not call the reliability of Dr. Long's report into question.  Similarly, the fact that Dr. Long could not recall detail about these corrections at her deposition four months later does not indicate that she "did not ratify" the changes.  Indeed, she recalled that there were minor corrections to citations and typographical errors.  Long Dep. 111:22-25; 114:1-4.  These corrections did not affect the conclusions or opinions reached by the experts and should not affect the admissibility of the experts' report.

## CONCLUSION

      For the foregoing reasons, Defendant's motion to exclude the July 19, 2019 Expert Report of Dr. Caroline Long, as amended on March 17, 2020, should be denied.

---

[47] Indeed, the City highlighted this language to Dr. Anastas.  North Decl., Ex. 10; Anastas Dep. 77:23-78:4.

Dated:  February 22, 2021
New York, NY

Respectfully submitted,

A BETTER CHILDHOOD,
By

_Marcia Robinson Lowry_

Marcia Robinson-Lowry

A Better Childhood, Inc.
355 Lexington Avenue, Floor 16
New York, NY 10017
(646) 975-4456
mlowry@abetterchildhood.org


CRAVATH, SWAINE & MOORE LLP,

By

/s/ Julie A. North

Julie A. North
Justin C. Clarke

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
jnorth@cravath.com
jcclarke@cravath.com

*Attorneys for Plaintiffs Elisa W., Alexandria R., by her next friend,
Alison Max Rothschild; Thierry E., by his next friend, Michael B.
Mushlin; Lucas T., Ximena T., Jose T.C. and Valentina T.C., by their
next friend, Rachel Friedman; Ayanna J., by her next friend,
Meyghan McCrea; Olivia and Ana-Maria R., by their next friend,
Dawn Cardi; Xavion M., by his next friend, Michael B. Mushlin;
Dameon C., by his next friend,  Reverend Doctor Gwendolyn Hadley-
Hall; Tyrone M., by his next friend, Bishop Lillian Robinson-
Wiltshire; Brittney W., by her next friend, Shamara Mills; Mikayla
G., by her next friend, Michael B. Mushlin; Myls J. and Malik M., by
their next friend, Elizabeth Hendrix; and Emmanuel S. and Matthew
V., by their next friend, Samuel D. Perry, individually and on behalf
of a class of all others similarly situated.*