**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ELISA W., *et al.*, |
| Plaintiffs, |
| -against- |
| THE CITY OF NEW YORK, *et al.*, |
| Defendants. |

No. 15 Civ. 5273 (KMW) (SLC)

**BRIEF OF AMICI CURIAE BROOKLYN DEFENDER SERVICES, THE BRONX DEFENDERS, CENTER FOR FAMILY REPRESENTATION INC., AND NEIGHBORHOOD DEFENDER SERVICE OF HARLEM IN OPPOSITION TO <u>PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION</u>**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212.373.3000

# **TABLE OF CONTENTS**

**Page**

INTEREST OF AMICI ...................................................................................................1

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ............................................................................................................3

ARGUMENT .................................................................................................................5

I.     PLAINTIFFS DISREGARD NEW YORK'S ESTABLISHED PREFERENCE
FOR FAMILY REUNIFICATION AND THE SUBSTANTIAL
IMPROVEMENTS TO NEW YORK CITY'S FOSTER SYSTEM IN RECENT
YEARS ...........................................................................................................5

     A.    The Stated and Established Policy of Both New York State and New York
City Is to Promote Family Reunification Wherever Possible ................................6

     B.    Plaintiffs Disregard the Substantial Progress Made by New York City and
ACS to Promote Reunification and Reduce Foster System Rates .........................8

     C.    Many Extended Foster System Stays Result from Unavailability of
Services and Length of Time Required to Complete Services and Not
Lack of Family Participation or Impossibility of Reunification .........................10

II.    THE PROPOSED CLASS CERTIFICATION WILL PROMOTE THE
UNNECESSARY DESTRUCTION OF FAMILIES AND IS NOT IN THE BEST
INTEREST OF PROPOSED CLASS MEMBERS .......................................13

     A.    The End Goal of this Litigation Is Not Targeted Reform but a Policy Shift
Toward TPR and Adoption and Away from New York's Longstanding
Preference for Family Reunification ...............................................................13

     B.    Shifting Focus and Resources Away from Family Reunification and
Toward TPR and Adoption Is Not in Proposed Class Members' Best
Interests .......................................................................................................17

          1.    *Termination of Parental Rights Causes Lifelong Harm to a Child* ..........18

          2.    *Shifting Resources Will Undercut Substantial Progress That Has
Been Made in Reducing Foster System Rates and Increasing
Kinship Care* .........................................................................................21

          3.    *An Increased Rate of Termination of Parental Rights Will
Exacerbate the Existing Racial Inequities of the Foster System* ...............23

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Lassiter* v. *Department of Social Services,*
    452 U.S. 18 (1981)...........................................................................................7

*Matter of Jamie M.,*
    63 N.Y.2d 388 (1984) ...................................................................................7

*Matter of Leon RR,*
    48 N.Y.2d 117 (1979) ...................................................................................6

*Matter of Sheila G.,*
    61 N.Y.2d 368 (1984) ...................................................................................6

*Santosky* v. *Kramer,*
    455 U.S. 745 (1982)...................................................................................6, 7

STATUTES

N.Y. Fam. Ct. Act § 614 ....................................................................................6

N.Y. Fam. Ct. Act § 1055(b)(iii)(C) ..................................................................6

N.Y. Soc. Serv. Law § 384-b(1)(a)(ii) ...............................................................6

N.Y. Soc. Serv. Law § 384-b (1)(a)(iii) ...........................................................11

N.Y. Soc. Serv. Law § 384-b(7)(f) .....................................................................7

OTHER AUTHORITIES

*ACS Report on Youth in Foster Care,* NYC.gov (2018),
    www1.nyc.gov/assets/acs/pdf/data-
    analysis/2018/ReportOnYouthInFC2018.pdf. ..........................................18

Center for New York City Affairs, *CNYCA's Six-Year Statistical Survey*
    *Monitoring New York City's Child Welfare System* (Mar. 2019),
    http://www.centernyc.org/watching-the-numbers-2018 ...............................9

Children's Bureau, an Office of the Administration for Children and Families,
    *General Information and Overview of the CFSR Process,*
    https://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews/round3 ...................16

Children's Rights, Class Actions, https://www.childrensrights.org/our-
    campaigns/class-actions/, (last visited Mar. 11, 2011) ......................................17

Cynthia Godsoe, *Permanency Puzzle*, 2013 Mich. St. L. Rev. 1113 (2013) ......................... 19, 20

Dawn J. Post & Brian Zimmerman, *The Revolving Doors of Family Court: Confronting Broken Adoptions*, 40 Cap. U. L. Rev. 437 (2012) .................................... 19, 20

Dep't of Human Servs., Division of Family & Children Servs., *The Kenny A. vs. Sonny Perdue Consent Decree*, https://dfcs.georgia.gov/federal-regulations-and-data/kenny-vs-sonny-perdue-consent-decree ............................................................... 17

Donaldson Adoption Institute, *Keeping the Promise: The Case For Adoption Support and Preservation* (2014), https://www.celcis.org/files/4515/7407/7582/Keeping-the-Promise-Case-for-ASAP-Brief.pdf .................................................................................................................. 19

Dorothy Roberts, *Shattered Bonds: The Color of Child Welfare* (2002) ..................................... 23

Erin Cloud et al., *Family Defense in the Age of Black Lives Matter*, 20 CUNY L. Rev. 68 (2017) ................................................................................................................ 24

Eun Kohn & Mark F. Testa, *Propensity Score Matching of Children in Kinship and Nonkinship Foster Care: Do Permanency Outcomes Still Differ?*, 32 Soc. Work Research 105 (2008) ............................................................................................... 22

Gina Miranda Samuels, *Ambiguous loss of home: the experience of familial (im)permanence among young adults with foster care backgrounds*, 31 Child. & Youth Serv. Rev. 1229 (2009) ..................................................................................... 18

Gina Miranda Samuels, *A Reason, a Season, or a Lifetime: Relational Permanence Among Young Adults with Foster Care Backgrounds* (2008) ........................... 19

Jessica Horan-Block, *A Child Bumps Her Head. What Happens Next Depends on Race*, N.Y. Times (Aug. 24, 2019), https://www.nytimes.com/2019/08/24/opinion/sunday/child-injuries-race.html ................... 23

Jessica Pryce, et al., *A Case Study in Public Child Welfare: County-Level Practices That Address Racial Disparity in Foster Care Placement*, 13 J. Pub. Child Welfare 1 (2019) ...................................................................................................... 24

Josh Gupta-Kagan, *The New Permanency*, 19 U.C. Davis J. Juv. L. & Pol'y 1 (2015) ................................................................................................................... 15, 20, 23

Kent P. Hymel et al., *Racial and Ethnic Disparities and Bias in the Evaluation and Reporting of Abusive Head Trauma*, 198 J. Pediatrics 137 (2018) ............................... 24

Keyna Franklin, Shakira Paige, and Melissa Landrau, *Rise Community Conversations: 'A Space of Reimagining,'* RISE Magazine (Sept. 16, 2020), https://www.risemagazine.org/2020/09/rise-community-conversations/ ............................... 5

Lucas A. Gerber et al., *Effects of an Interdisciplinary Approach to Parental Representation in Child Welfare*, 102 Child. & Youth Servs. Rev. 42 (2019) ......................10

Marcia Lowry, *Foster Care & Adoption Reform Legislation: Implementing the Adoption & Safe Families Act of 1997*, 14 J. of Civ. Rights & Econ. Dev. 447 (2000) .......................................................................................................................16

Martin Guggenheim, *Parental Rights in Child Welfare Cases in New York City Family Courts*, 40 Colum. J.L. & Soc. Probs. 507 (2007) .....................................12

Matthew B. Johnson, *Examining Risks to Children in the Context of Parental Rights Termination Proceedings*, 22 N.Y.U. Rev. L. & Soc. Change 397 (1996) .......................................................................................................... 18, 20

Mike Householder, *Snyder Swears in Hundreds of Child Welfare Workers to Help Michigan Kids*, LegalNews (May 25, 2011),  www.legalnews.com/ oakland/957228 .....................................................................................................21

New York State Office of Children and Families, *New York State Child Welfare Workload Study* (2006), http://www.ocfs.state.ny.us/main/reports/WorkloadStudy.pdf.............................22

NYC. Admin. Child. Servs., *Children Served in Preventive Services* (2019), https://www1.nyc.gov/assets/acs/pdf/child_welfare/2020/ChildrenReceivingPr eventiveServicesByCDCY2019.............................................................................9

NYC. Admin. Child. Servs., *ACS Foster Care Strategic Blueprint Fy 2019-Fy 2023 & Findings From The Rapid Permanency Reviews* (2018), https://www1.nyc.gov/assets/acs/pdf/about/2018/StandAloneReportFosterCar eStrategicBlueprintFinalMay152018.pdf ...........................................................8, 9

NYC. Admin. Child. Servs., *Permanency Planning* (2013), https://www1.nyc.gov/assets/acs/policies/init/2013/B.pdf....................................7

Randi Mandelbaum, *Re-Examining and Re-Defining Permanency From a Youth's Perspective*, 43 Cap. U. L. Rev. 259 (2015) .......................................................19

Robert E. Lee & Jason B. Whiting, *Foster Children's Expressions of Ambiguous Loss*, 35 Am. J. Fam. Therapy 417 (2007)...........................................................18

Samantha Shapiro, *The Children in the Shadows: New York City's Homeless Students* (Sept. 9, 2020), https://www.nytimes.com/interactive/2020/09/09/magazine/homeless-students.html ..........................................................................................................12

U.S. Dep't of Health & Human Servs., *National Study of Protective, Preventive, and Reunification Services Delivered to Children and Their Families: Final Report* (1994), https://www.ndacan.acf.hhs.gov/datasets/pdfs_user_guides/Dataset071UsersGuide.pdf .......................................................................................................... 23

U.S. Dep't of Health and Human Servs., Children's Bureau, *Adoption disruption and dissolution* (2012), www.childwelfare.gov/pubPDFs/s_disrup.pdf ............................. 19

U.S. Dep't of Health and Human Servs., Children's Bureau, *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* (2011), www.acf.hhs.gov/sites/default/files/documents/cb/subsidized_0.pdf. ..................... 23

Vajeera Dorabawila, *Racial and Ethnic Disparities in the Child Welfare System: New York City Compared to Rest of State (Outside of NYC), 2009 Compared to 2010 and Comparison of Selected Counties*, NYS Office of Children & Family Services (2011), https://ocfs.ny.gov/main/recc/Exec%20Staff%20DMC%20presentation%20child%20welfare%20color%20070911.pdf ........................................................................... 24

Winokur et al., *Kinship Care for the Safety, Permanency, and Well-Being of Children Removed from the Home for Maltreatment*, Cochrane Database of Systematic Rev. 23 (2014) ................................................................................................. 22

## INTEREST OF AMICI

The Brooklyn Defender Services, The Bronx Defenders, Center for Family Representation Inc., and Neighborhood Defender Service of Harlem (collectively, the "Parent Advocates") are four public interest organizations that, collectively, provide legal representation to, and protect the rights of, the vast majority of parents with children in the New York City foster system. [1] The Parent Advocates are on the front lines of the city's foster system; employ hundreds of attorneys, social workers, and support staff; and represent thousands of parents each year in New York State Family Court. The Parent Advocates also routinely work to improve the functioning of various aspects of the foster system, including by participating in the Administration for Children's Services ("ACS") Commissioner's Task Force—a collaborative effort to address emergency removals, case conferencing, and reunification. In addition, the Parent Advocates make important contributions to the New York City foster system by designing and delivering numerous trainings for parent and child advocates, working with case workers and judges in cooperative efforts to reform Family Court in New York City and beyond, and seeking to vindicate parents' rights through collective litigation where appropriate. The Parent Advocates represent the interests of thousands of parents and families whose fundamental rights are at stake in this litigation.

## PRELIMINARY STATEMENT

The Parent Advocates submit this memorandum to share their unique perspectives on New York City's foster system, to rebut certain assertions made by Plaintiffs regarding that

---

[1] All mentions of the "Gottlieb Declaration" refer to the Declaration of Professor Christine Gottlieb in Support of the Parent Advocates' Motion to Intervene and Objection to the Proposed Settlement, filed June 21, 2016, included in the accompanying appendix. All mentions of the "Shapiro Declaration" refer to the Declaration of Lauren Shapiro in Support of the Parent Advocates' Brief of Amici Curiae in the accompanying Appendix. All mentions of the "Ketteringham Declaration" refer to the Declaration of Emma Ketteringham in Support of the Parent Advocates' Brief of Amici Curiae in the accompanying Appendix.

system, and to raise their grave concerns that Plaintiffs' ultimate ends in this class litigation—as reflected in the class certification motion—are not in the best interests of either the children in the city's foster system or their parents.

*First*, Plaintiffs' depiction of the extended length of foster system stays—which they correlate with a broken foster system—is woefully incomplete. It is the settled policy in New York State and City—consistent with a wealth of social science research—that ***reunifying*** parents and children is in the children's best interests and should remain the chief object of the foster system until determined impossible. Indeed, overwhelming research demonstrates that termination of parental rights ("TPR") causes lifelong harm to children, even in cases where adoption is achieved. In ignoring this settled policy, Plaintiffs also ignore the substantial progress the foster system has made in the past many years: the total number of children in the foster system is down (without any attendant increase in abuse or neglect), early interventions have been increasingly successful at avoiding the need for removals in the first instance, and an increased emphasis on temporary foster placement with relatives, known as "kinship placement," has improved the foster system experience for many children and families. Moreover, in many instances of extended foster system stays, the underlying cause is out of parents' hands, resulting instead from the unavailability of required social services needed to support reunification—a shortcoming that Plaintiffs' lawsuit does not purport to address. The Parent Advocates respectfully submit that Plaintiffs' motion for class certification—which focuses repeatedly on duration of time in the foster system—ignores the important policy choice to prioritize reunifying families.

*Second*, the Parent Advocates believe that rather than explaining how class certification would support a targeted, surgical effort to remedy particular shortcomings that Plaintiffs believe they have identified through discovery, the Motion represents an effort by

Plaintiffs to shift the foster system's focus (and its limited resources) away from family reunification and toward adoption. As evidenced by Plaintiffs' class definitions, their briefing, the adoption targets they would have ACS set, and by their counsel's long history of intervening in state foster systems, Plaintiffs posit that extended foster system stays are *always* wrong, that family reunification should *never* trump an early exit from the foster system, and that increased efforts to terminate parental rights and promote adoption are *the solution* to the harms they believe they have identified in the system. But class certification is not an appropriate vehicle for Plaintiffs to substitute their policy judgments for the considered judgments of the State of New York—a gambit that should be rejected as outside the province of the courts. And by shifting resources away from preventative interventions and kinship care, and towards documentation requirements and legal proceedings, Plaintiffs' remedies threaten to undo much of the progress New York City's foster system has achieved in reducing the number of children in the foster system.

*Third*, the Parent Advocates respectfully submit that, on the particular facts at issue in this case, proposed class members' best interests are best served not through class litigation and resolution, but through continued individualized review and determination. Each foster child's case—and the attendant issues relating to duration of time in the foster system, whether TPR is appropriate, and whether adoption is the appropriate goal—is subject to oversight by a New York State court judge. Focusing support on the process of individualized reviews and determinations—not short-sighted or blunt change through class litigation—is and should remain the vehicle through which the best interests of members of Plaintiffs' proposed class are protected. *See* City Def. Mem. in Opposition to Renewed Mot. for Class Certf., ECF No. 493.

## BACKGROUND

On July 8, 2015, the next friends of ten children in the New York City foster system and the New York City Public Advocate filed an action against the City and State of New York

on behalf of a putative class of "children who are now or will be in the foster care custody of [ACS]." (Compl., ECF No.1.) Plaintiffs alleged claims under the United States Constitution, the Adoption Assistance and Child Welfare Act of 1980, and the New York State Social Services Law, stemming from purported deficiencies in New York City's foster system. (*Id*.) Plaintiffs filed an amended complaint on December 29, 2015. (Am. Compl., ECF No. 91.)

On July 15, 2016, Plaintiffs moved for approval of a proposed class action settlement between the putative class and the State of New York. The City of New York—as well as two separate groups of intervenors, including the Parent Advocates—opposed the class settlement. On August 12 and September 27, 2016, this Court issued orders agreeing with the City and intervenors, and denying Plaintiffs' motion. (Mem. Op. & Or. at 1-2, ECF No. 259; Mem. Or. at 1, ECF No. 282.) The Court first found that the proposed settlement was patently unfair and unreasonable, and then, denying class certification, held that Plaintiffs had not shown that "certification of broad unitary class of children who are or will be in foster care is appropriate," especially given the "breadth of the common questions framed by Plaintiffs." (*Id*.) The parties then engaged in years of discovery.

On July 30, 2019, Plaintiffs submitted a renewed motion for class certification. (Mem. in Support of Mot. for Class Cert., ECF No. 440 (the "Motion").) The Motion again seeks certification of the *same* "broad unitary class of children"—namely, children "who are now or will be in the foster care custody of [ACS]," (*id*. at 4), that this Court previously found was not appropriate. (ECF Nos. 259, 282.) In addition, Plaintiffs seek to certify two subclasses consisting of: (1) all children who have been in ACS custody for more than two years and whose cases therefore require "special scrutiny" pursuant to ACS policy (the "Special Scrutiny Subclass"); and (2) all children for whom Contract Agencies failed to assess and document compelling reasons

every three months to justify the decision not to file a termination of parental rights petition after the children had been in care for at least 15 of the prior 22 months (the "Compelling Reasons Subclass").  (Mot. 4–5.)

## ARGUMENT

## I.   PLAINTIFFS DISREGARD NEW YORK'S ESTABLISHED PREFERENCE FOR FAMILY REUNIFICATION AND THE SUBSTANTIAL IMPROVEMENTS TO NEW YORK CITY'S FOSTER SYSTEM IN RECENT YEARS

Plaintiffs' Motion presents a narrative of a broken foster system, and attempts to leverage that narrative into support for class certification that, Plaintiffs hope, will prompt drastic shifts in policies and practices for children in New York City's foster system. Plaintiffs' narrative, however, is woefully incomplete, and should not be viewed in isolation. To properly assess the Motion, the Court should also take account of the following indisputable facts: *First*, it is the settled policy of New York State and New York City to attempt to reunify families wherever possible, which is directly contrary to Plaintiffs' emphasis on TPR and achieving "permanency" through adoption. *Second*, as a direct result of strong commitments to this policy, New York City's foster system has improved tremendously over the past decade: the total number of children in the foster system has reached historic lows, preventive services that keep families together and children out of the foster system altogether have increased,[2] and rates of kinship placement are up. *Third*, contrary to Plaintiffs' narrative, the most common reason for extended stays by a child in the foster system is not due to a lack of desired reunification by parents but rather numerous

---

[2] While a crucial tool for avoiding family separation, it is important to recognize that preventive services are not without issues. Parents in the communities most affected by the child welfare system frequently raise the important point that preventive services are not beneficial if experienced as involuntary government intrusions that are unresponsive to parents' articulated needs. *See, e.g.,* Keyna Franklin, Shakira Paige, and Melissa Landrau, *Rise Community Conversations: 'A Space of Reimagining,'* RISE Magazine (Sept. 16, 2020), https://www.risemagazine.org/2020/09/rise-community-conversations/ (explaining that, from the perspective of parents involved with the child welfare system, preventive services are "not a solution that takes out the harmful pieces of child welfare that punish and surveil families and burden families with responding to a system that does not truly provide the support they need.").

systemic barriers to achieving reunification including: the inability of a child's parent to access the social services needed to support reunification; lack of access to housing and social services; poverty; and not having the support of an agency in addressing these systemic barriers.

### A.   The Stated and Established Policy of Both New York State and New York City Is to Promote Family Reunification Wherever Possible

The express policy of the City and State of New York is to reunify families where possible, even if that means keeping children in the foster system for an extended period of time. (*See* Gottlieb Declaration ("Gottlieb Decl.") at ¶¶ 25–28.) New York's Social Services Law states that "it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home of its birth parent, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered" and further provides that "the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home." N.Y. Soc. Serv. Law § 384-b(1)(a)(ii).[3]   New York's Family Court Act similarly provides that it is the legal responsibility of the agency to "reunite and reconcile families whenever possible and to offer services and assistance for that purpose." N.Y. Fam. Ct. Act § 1055(b)(iii)(C).   Further, it mandates that agencies make "diligent efforts" to encourage and strengthen parental relationships before attempting TPR. N.Y. Fam. Ct. Act § 614.[4]   The "diligent efforts" to be made

---

[3]  *See Santosky* v. *Kramer*, 455 U.S. 745, 780–81 (Rehnquist, J., dissenting) ("As this description of New York's termination procedures demonstrates, the State seeks not only to protect the interests of parents in rearing their own children, but also to assist and encourage parents who have lost custody of their children to reassume their rightful role. Fully understood, the New York system is a comprehensive program to aid parents such as petitioners. Only as a last resort, when 'diligent efforts' to reunite the family have failed, does New York authorize the termination of parental rights.").

[4]  *See Matter of Sheila G.*, 61 N.Y.2d 368, 373 (1984) (explaining that when TPR is sought, the agency "must affirmatively plead in detail and prove by clear and convincing evidence that it has fulfilled its statutory duty to exercise diligent efforts to strengthen the parent-child relationship and to reunite the family. Only when this duty has been deemed satisfied may a court consider and determine whether the parent has fulfilled his or her duties to maintain contact with and plan for the future of the child."); *Matter of Leon RR*, 48 N.Y.2d 117, 126 ("An agency such as petitioner is vested with a unique and, to be sure, most difficult responsibility. It must at once serve as the guardian of

include "consulting and cooperating with the parents to develop a plan for appropriate services to the child and his or her family," "making suitable arrangements for the parents to visit the child," and "providing services and other assistance so that problems preventing the child's discharge from care can be resolved or ameliorated."[5]  N.Y. Soc. Serv. Law § 384-b(7)(f)(2–3).   And the state further requires that when termination of parental rights is ultimately sought, the petition to terminate must specifically identify the efforts that were made to reunify the family or, at the very least, demonstrate that such efforts would have been detrimental to the best interests of the child. *Id.* These settled policy preferences are reflected in ACS permanency planning materials, which require that "foster care providers must make diligent efforts to reunify the family." NYC. Admin. Child. Servs., *Permanency Planning*, NYC.gov, https://www1.nyc.gov/assets/acs/policies/init/2013/B.pdf.

New York's public policy is set on the firmest of foundations: the United States Constitution.   The Supreme Court has expressly recognized that the state's interest in a child's welfare "*favors preservation, not severance, of natural familial bonds*." *Santosky* v. *Kramer*, 455 U.S. 745, 766–67 (1982) (emphasis added).   It is also well recognized that "a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." *Lassiter* v. *Department of Social Services*, 452 U.S. 18, 27 (1981)(citing *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972).   Plaintiffs' briefing gives short shrift to these

---

the best interests of the child . . . and yet, render diligent efforts to strengthen the very relationship which, in some cases, it has circumscribed . . . . One of the fundamental values in our society is that which respects and fosters the relationship between parent and child. Thus, our permanent neglect statute reflects a cultural judgment that society should not terminate the parent-child relationship unless it has first attempted to strengthen it.").

[5] *See Matter of Jamie M.*, 63 N.Y.2d 388, 394 (1984) (Finding that an agency had failed to make diligent efforts because it failed to assist parents with poverty and unemployment issues and the agency could not "simply impose on impoverished parents the usual plan, including the requirement, for return of their child, that they have a means of support and suitable home.").

monumental interests—indeed, a simple word count reveals that adoption is referred to by Plaintiffs *four times as often* as reunification in the Motion.

**B.    Plaintiffs Disregard the Substantial Progress Made by New York City and ACS to Promote Reunification and Reduce Foster System Rates**

Just as Plaintiffs' Motion ignores established policy preferences, it also glosses over substantial improvements that New York City's foster system has achieved over the past few decades—all without Plaintiffs' interventions.    The Motion depicts New York's system as irreparably broken, relying heavily on isolated statements in documents and *ad hoc* examples of departures from standard procedure in a few cases. And while the Parent Advocates agree that the system is imperfect, the reality is far different than the picture presented by Plaintiffs.    Unlike Plaintiffs' counsel in this litigation, the Parent Advocates litigate to address these imperfections in individual cases in New York every day and are in constant dialogue with ACS and OCFS pressing for even more comprehensive reforms.    While progress can be frustratingly slow, there is no question that considerable progress has been made.

As an initial matter, the past few decades have seen an unprecedented decline in children in the foster system in New York City generally.   *See* NYC Admin. Child. Serv., *Foster Care Strategic Blueprint FY 2019-FY 2023*, NYC.gov, www1.nyc.gov/assets/acs/pdf/about/2018/StandAloneReportFosterCareStrategicBlueprintFinalMay152018.pdf.   Indeed, from 1992 to 2016, the number of children in the foster system in New York City declined by nearly 80%. (Gottlieb Decl. ¶ 21.) And a substantial increase in preventive services designed to avoid the need for foster care altogether ensured that this decline was one of the greatest decreases in foster system usage that was not accompanied by any corresponding increase in child-abuse-related fatalities.   (*Id.*) Notably, experts have opined that the drastic decline in children in foster care in New York City has highlighted the fact that only the most challenging cases remain in the foster system for any

extended period of time.   (*Id*. at ¶ 28.) These multifaceted and significantly complex cases understandably often require more time for resolution.

This substantial progress has continued apace since briefing on Plaintiffs' prior attempt to certify a class for purposes of settlement.  For example, in June 2017, the number of children in the New York City foster system reached a historic low of fewer than 9,000, and continued to decline in 2018.  *See Foster Care Strategic Blueprint FY 2019-2023*, *supra*, at 4; Center for New York City Affairs, *CNYCA's Six-Year Statistical Survey Monitoring New York City's Child Welfare System* (Mar. 2019), http://www.centernyc.org/watching-the-numbers-2018. Much of this progress is the result of New York City's investments in up-front interventions, which has paralleled the sharp decline in the number of children placed in the foster system.  Indeed, in 2019, 45,273 New York City children received preventive services compared to only 13,586 in 1996.  *See* Administration for Children's Services, *Children Served in Preventive Services* (2019), NYC.gov,          https://www1.nyc.gov/assets/acs/pdf/child_welfare/2020/ChildrenReceiving PreventiveServicesByCDCY2019.

Another positive trend is the increase in kinship foster care, i.e. placement of separated children with a relative instead of strangers.  The benefits of kinship foster care are well established.  *See infra* Section II.B.2.  Indeed, while from 2013 to 2017 there were 2,400 fewer New York City children in the foster system, during a similar period the total number of children in kinship placement rates increased by 25%.  *See Foster Care Strategic Blueprint FY 2019-FY2023*, *supra*, at 8.

Moreover, in the Parent Advocates' experience, the majority of children with parents represented by the Parent Advocates are eventually able to return safely to their families. (Shapiro Decl. ¶ 7; Ketteringham Decl. ¶ 3.).  The return of children to their parents is enhanced

and can be hastened by an interdisciplinary approach, where parents are assisted by lawyers, social workers, and parent advocates. *See* Lucas A. Gerber et al., *Effects of an Interdisciplinary Approach to Parental Representation in Child Welfare*, 102 Child. & Youth Servs. Rev. 42, 45, 53 (2019) (reporting that the Center for Family Representation's, the Family Defense Practice of Brooklyn Defender Services', and the Bronx Defenders' interdisciplinary law office approach "significantly reduces the length of time children spend in foster care; increases rates of timely permanency, reunification, and guardianship; and does so without increasing repeat maltreatment.").[6]

### C.   Many Extended Foster System Stays Result from Unavailability of Services and Length of Time Required to Complete Services and Not Lack of Family Participation or Impossibility of Reunification

In the Parent Advocates' experience, the two most critical factors that contribute to the length of separation are (1) access to services that address the root cause of separation and (2) the amount of time that it takes to complete required services necessary for reunification. Those services that often impede timely family reunifications because they are either unavailable or take a long time to complete include, but are not limited to: housing, mental health services, and supports for parents and children with disabilities. To those ends, the Parent Advocates continue to work closely in partnership with ACS on numerous reforms to the current system, including implementing requirements for foster system agencies to hire and train housing specialists to serve families, reforming policy, and front-line practice to better accommodate parents and children

---

[6] In fact, in 2019, a multiyear study of child welfare cases in New York City compared outcomes between parents represented by appointed solo practitioners (panel lawyers) to parents represented by lawyers from a multidisciplinary law office that included lawyers, social workers, and parent advocates. *See id.*, at 42–55. The study found that quality legal representation is one of the most important factors in dependency cases. *Id.* Parents provided multidisciplinary representation, such as those services provided by Parent Advocates, secured the safe return of their child to their family approximately 43% more often in the first year and 25% more often in the second year than parents represented by panel lawyers. *Id.* at 52. The multidisciplinary legal representation also allowed children to be permanently released to relatives more than twice as often in the first year and 67% more often in the second year. *Id.*

suffering from mental illness, and improving training and staff equipped to serve families and children with disabilities. (ECF. 183-3, at ¶ 11.) Reunification of families will be enhanced by greater focus on these reforms—not, as Plaintiffs advocate, by increased pressures on the state to speed filings for termination of parental rights and adoption.

Typically, a child's path through the foster system follows a common route. It starts when ACS removes the child, placing the child in the foster system. ACS then directs the parents to complete certain "assigned services"—drug treatment, anger management, family therapy, obtaining suitable housing, etc.—before the agency will agree for the child to return home. If the parents do not complete the assigned services, the child remains in the foster system, and the agency may eventually file a TPR, which (if granted) ends the child's legal relationship with her parents and makes her eligible for adoption. In the overwhelming number of removal cases, family reunification is readily achievable if the family receives appropriate social services, such as housing assistance, mental health treatment, or counseling. (Gottlieb Decl. ¶ 16.)

Unfortunately, the services necessary for family reunification are often unavailable due to resource constraints, with parents having to wait on long waitlists or resolve complicated Medicaid eligibility issues before being able to begin the services that will allow them to work toward family reunification. Where New York has failed parents and children is in its inability to: provide adequate casework and support services regarding housing and therapy, ensure communication among case workers which results in delayed services and service plan reviews, and adequately train case workers on services, support, and benefits for families and children that could lead to reunification. (ECF. 183-3, at ¶ 12); *see also* N.Y. Soc. Serv. Law § 384-b (1)(a)(iii)("the state's first obligation is to help the family with services . . . ."). For example, if a child is removed from a parent's care due to the parent's homelessness or unsafe housing, a parent

may have to wait a very long time to receive public housing assistance.[7] (Gottlieb Decl. ¶ 37.) The state's routine failure to make these necessary services available to parents in a timely manner regularly thwarts speedy reunification, a fact ignored by Plaintiffs.[8]

In connection with these complex obstacles, the Parent Advocates are familiar with many examples of children who are reunited with their parents years after the initial removal— and well after the time period in which the children become part of Plaintiffs' proposed subclasses. For example, in one case, a mother whose children were removed needed more than five years of mental health therapy before she was able to establish to a family court that reunification was in the best interests of her children and reunification was achieved. (Ketteringham Decl. ¶ 7.) In another example, after a parent completed necessary mental health and drug addiction treatments, it took more than two years, during which time multiple family court judges were assigned to the case, before reunification occurred. (*Id.* at ¶ 6.) These are but a few of the dozens of examples the Parent Advocates could point to. (*Id.* at ¶¶ 5, 8–9; *see* Shapiro Decl. ¶¶ 9–12.) Any move toward reform or resolution through this class litigation must account for cases such as these.

As these cases demonstrate, parents are often reunited with their children after extremely lengthy separations. There is universal agreement that family separations should be kept as short as possible. The critical point missed by Plaintiffs is that given the value of keeping families together, it is well worth taking the time to allow family reunification whenever safely possible, rather than increasing adoptions by inflexibly imposing timelines. Further, in many of

---

[7] While entering New York's homeless shelter system is an option for some families with children in the foster system, at times parents make the sacrifice of delaying reunification because they believe it is counter to their children's best interests to undergo the well-documented harms that system inflicts on children, including disrupting their ability to attend school. *See* Samantha Shapiro, *The Children in the Shadows: New York City's Homeless Students*, N.Y.T. Magazine (Sept. 9, 2020), https://www.nytimes.com/interactive/2020/09/09/magazine/homeless-students.html.

[8] Martin Guggenheim, *Parental Rights in Child Welfare Cases in New York City Family Courts*, 40 Colum. J.L. & Soc. Probs. 507, 521 (2007) ("When agencies are left to this task themselves, they commonly employ 'cookie cutter,' boilerplate plans which rarely are designed with the actual needs of the family in mind.")

these cases, the children know their parents as their parents, communicate with them regularly, and want to be returned to their families. (Shapiro Decl. ¶¶ 10–11.) New York has purposely—albeit imperfectly—adopted policies that reflect its commitment to protecting family integrity.

Significantly, Plaintiffs also ignore another substantial contributor to lengthy family separations: Family Court delays. The lengthy foster system stays resulting from Family Court delays cannot be addressed through this litigation; and instead highlight another reason why the more appropriate way to achieve the necessary systemic reform is through the legislative process as opposed to circumventing the Family Court judicial processes and judges' considered decision-making.

## II. THE PROPOSED CLASS CERTIFICATION WILL PROMOTE THE UNNECESSARY DESTRUCTION OF FAMILIES AND IS NOT IN THE BEST INTEREST OF PROPOSED CLASS MEMBERS

This motion to certify a class reflects a push for systemic policy changes that would cause lifelong trauma for children, undercut improvements to the city's foster system, and disproportionately harm communities of color.

### A. The End Goal of this Litigation Is Not Targeted Reform but a Policy Shift Toward TPR and Adoption and Away from New York's Longstanding Preference for Family Reunification

Plaintiffs do not propose targeted solutions, achieved through litigation, to address the challenges faced by children in New York's foster system, much less solutions that are consistent with New York's considered policies. Rather, Plaintiffs' class definitions, which seek to sweep in *every child* in the foster system, and particularly Plaintiffs' proposed subclasses, which capture *every child* with an extended stay in that system regardless of the reason, are a vehicle to impose radical shifts on New York City's foster system policies and practices toward termination of parental rights and adoption. And Plaintiffs' subclass definitions, moving papers, and reliance on counsel with a history of emphasizing an increased adoption rate all point in one direction: a

13

desire to shift New York City's foster system practices away from promotion of reunification and toward TPR.

*First*, Plaintiffs' proposed subclasses—the Significant Scrutiny Subclass and the Compelling Reasons Subclass—reflect their desire to effect systemic policy change rather than to address issues related to implementation of the existing statutory scheme. The entire purpose of a subclass is to identify and attempt to remedy wrongs specific to that subclass that *cannot* be addressed through class resolution. Yet the proposed "common questions" identified by Plaintiffs—namely, oversight failures, training failures, placement processes, case plan development, permanency planning, and maltreatment (Mot. at 50–52)—are not actually tailored to the proposed Subclasses, defeating the very purpose of the Subclasses. This of course begs the question: why were these two subclasses selected by Plaintiffs?

While not clearly articulated in the Motion, Plaintiffs' identification of these specific subclasses plainly evidences their view that the subclass members require a remedy that is *different* in nature from the class at large. The focus on duration of time in the foster system reflects Plaintiffs' view that, at a certain point, the only remedy for an extended stay in the foster system is TPR and adoption. And the only class-wide resolution that could purportedly benefit the proposed subclasses *but not* children with shorter stays is one that alters the goals for those with longer stays by prioritizing TPR and adoption, rather than family reunification. Indeed, Plaintiffs' preferred remedy is clearly demonstrated by the Compelling Reasons Subclass—which is expressly tied to a class of children for whom, because of a lack of documentation, Plaintiffs believe that ACS should already have initiated the TPR process.

*Second*, other aspects of Plaintiffs' papers reflect clear preferences for adoption as the panacea for extended foster system stays. For one, the Motion is replete with references to

seeking "permanency" (Mot. at 3, 5–11, 13, 15, 17, 18, 23, 26, 27, 32–37, 41–42, 52, 59)—a term that is understood among practitioners to be the antithesis of "reunification." In other words, "permanency" usually means permanency through adoption. (Gottlieb Decl. ¶ 41 ("It is broadly understood in the field of child welfare that "permanency" is a watchword for those who believe child welfare policy should be aimed more aggressively at adoption.")); *see also* Josh Gupta-Kagan, *The New Permanency*, 19 U.C. Davis J. Juv. L. & Pol'y 1, 12 (2015) (discussing the term "being code for terminating parental rights and adoption"). Indeed, though technically permanency includes any of family reunification, guardianship or adoption, the Motion refers to adoption *four times* as often as reunification, and mentions guardianship in passing only once. Plaintiffs' papers likewise frequently conflate permanency with adoption. For example, in discussing New York City's struggles to meet the time frames set by AFSA regarding permanency, Plaintiffs specifically state "the average time to *adoption* in New York City is five years." (Mot. at 36 (emphasis added).) And similarly, Plaintiffs criticize concurrent planning as follows: "Failure to engage in concurrent planning contributes to delays in permanency. Simultaneous concurrent planning is important for timely permanency because if a child's primary goal becomes unobtainable, the Contract agency can pivot to the concurrent plan without delay." (*Id.* at 27.) But under the law, ACS must first make reasonable efforts towards reunification, and thus efforts to speed up pivots in planning are by definition efforts to move more quickly to alternatives such as TPR and adoption.

Third, Plaintiffs conflate adoption and permanency *targets*. Specifically, when discussing ACS permanency targets, Plaintiffs argue that ACS's failure to adequately oversee contract agencies resulted in "abysmally low *permanency* rates" because ACS "sets *adoption* targets" below the federal permanency targets and "fails to ensure contract agencies file TPR

petitions timely. . . ." (Mot. at 32 (emphasis added).)  Plaintiffs' grievance is that when setting its adoption targets, ACS only provides Contract Agencies with a target population of children who are *already eligible* for adoption because a TPR has occurred, rather than a target percentage based on what Plaintiffs describe as the federal standard of every child in the foster system for more than eight days.  (*See id.* at 33 ("ACS's adoption targets therefore are lower than the federal government's permanency targets, . . .").)  But federal targets are not targets for achieving adoption, but for achieving permanency—which could take several forms, including family reunification and guardianship.  *See* Children's Bureau, *General Information and Overview of the CFSR Process*, ACF.HHS.gov, https://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews/round3 (describing *permanency* data).  And were ACS to set targets based on the entire universe of children in the foster system rather than the universe of children already eligible for adoption by virtue of a preexisting TPR, the total number of children for whom the Contract Agencies target to arrange adoptions would increase dramatically.  Not only is this contrary to the clear language of the statutes, but it would directly contravene New York's policy preference for family reunification over adoption.

Finally, even if the court were to grant class certification (which it should not), Plaintiffs' lead counsel and the driving force behind this litigation, Marcia Lowry (formerly of Children's Rights, Inc.), should not be assumed to fairly and adequately protect the best interests of the proposed classes.  Ms. Lowry has consistently advocated in favor of quick conclusions to foster system stays through increased adoption, with a focus on policy and systems rather than the interests or needs of individual children or families.  *See* Marcia Lowry, *Foster Care & Adoption Reform Legislation: Implementing the Adoption & Safe Families Act of 1997*, 14 J. of Civ. Rights & Econ. Dev. 447, 453 (2000) (regarding her testimony in a Congressional Legislative hearing

relating to the Adoption & Safe Families Act, Lowry notes, "Now, I am a big proponent of early and timely adoption. Nevertheless, I think we have to fear that this statute will not accomplish that aim. The benefits of the statute are that people who run child welfare systems cannot be left to their own devices. They will not use reasonable standards, they do have to be told 'first, you put your left foot in front of your right foot, then you put your right foot in front of your left foot, then you do it again.'"). This proposed class action should not provide a vehicle to elevate Ms. Lowry's preferred policy agenda ahead of the considered policies of New York favoring reunification, much less the individualized needs of children in the putative class.[9]

For these reasons, it is plain that Plaintiffs' goal in this litigation is not to promote targeted improvements to New York City's foster system that are consistent with its policy favoring reunification, but a systemic shift in priorities of this system, away from existing preferences for family reunification wherever possible and towards TPR and adoption for all children in extended stays.

## B. Shifting Focus and Resources Away from Family Reunification and Toward TPR and Adoption Is Not in Proposed Class Members' Best Interests

Any class- or subclass-wide resolution that shifts policies, preferences, or resources away from current efforts at early prevention and family reunification, and towards increased rates of TPR proceedings, is not in the proposed class members' best interests, for several reasons. Such

---

[9] The website for Children's Rights lists various class action lawsuits filed by Ms. Lowry in numerous states, which have resulted in decades of sweeping oversight through court orders and settlement agreements. *See* Children's Rights, Class Actions, https://www.childrensrights.org/our-campaigns/class-actions/ (last visited Mar. 11, 2011). An illustrative example is the Georgia case of *Kenny A.* in which Ms. Lowry obtained a consent decree in 2005 that required the state to achieve and sustain thirty-one wide-ranging outcomes. *See* Dep't of Human Servs., Division of Family & Children Servs., *The Kenny A. vs. Sonny Perdue Consent Decree*, https://dfcs.georgia.gov/federal-regulations-and-data/kenny-vs-sonny-perdue-consent-decree. As of January 15, 2021—16 years later—monitoring is ongoing. *Kenny A. ex rel. Winn* v. *Barnes*, No. 1:02-cv-01686 (N.D. Ga.), ECF. No. 769. Plaintiffs' counsel have been paid over $8 million in attorneys' fees and expenses by State Defendants. *See* Order, ECF. No. 710, *Kenny A. ex rel. Winn* v. *Barnes*, No. 1:02-cv-01686 (N.D. Ga.). In a Connecticut case, a class action settlement was reached in January 1991, requiring widespread improvements and monitoring. *See Juan F. v. Rell*, No. 2:89-cv-00859 (D. Conn). And despite the fact that three decades have passed, monitoring is still ongoing. *Id.*, ECF. No 807.

an outcome risks substantial emotional harm to children, threatens to undo many improvements made to the state's and city's systems, will disproportionately harm communities of color, and ignores the role of Family Court judges.

### 1. Termination of Parental Rights Causes Lifelong Harm to a Child

Removing a child from family and legally terminating the child's relationship with the child's parents is a catastrophic event that leaves lasting psychological scars on a child. Increasing the frequency of such events, even if some children are ultimately placed with adoptive parents, is detrimental to the interests of Plaintiffs' proposed class as a whole.

Mental health experts refer to the loss of the parent-child relationship resulting from a TPR as "ambiguous loss." *See* Robert E. Lee & Jason B. Whiting, *Foster Children's Expressions of Ambiguous Loss*, 35 Am. J. Fam. Therapy 417 (2007). The loss is "ambiguous" because it occurs without the clear finality of death, and children therefore struggle to make sense of, and come to terms with, it. *Id.* The ambiguous loss associated with "being physically removed from one's parents and nuclear family system . . . can raise a lifetime of questions for children about their identities as members of their families of origin and the degree to which they can ever become 'real' members within a foster or adoptive family system." Gina Miranda Samuels, *Ambiguous loss of home: the experience of familial (im)permanence among young adults with foster care backgrounds*, 31 Child. & Youth Serv. Rev. 1229, 1230 (2009); *see also* Matthew B. Johnson, *Examining Risks to Children in the Context of Parental Rights Termination Proceedings*, 22 N.Y.U. Rev. L. & Soc. Change 397, 414 (1996).

In addition, many children suffer the trauma of losing the relationship with their parents without ever finding another successful permanent home. ACS records reflect that many children whose parents' rights are terminated remain in the foster system until they reach adulthood, never finding an adoptive home. *See ACS Report on Youth in Foster Care, 2018,*

NYC.gov, www1.nyc.gov/assets/acs/pdf/data-analysis/2018/ReportOnYouthInFC2018.pdf.   And frequently for those who do find a home, adoptions that don't work out (for many reasons) are both more common than appreciated and can be equally traumatic as the original TPR.  Dawn J. Post & Brian Zimmerman, *The Revolving Doors of Family Court: Confronting Broken Adoptions*, 40 Cap. U. L. Rev. 437, 441 (2012) ("[B]roken adoptions are a significant and unspoken issue, not only for the children whose lives are disrupted time and again but also for the system as a whole."); *see* U.S. Dep't of Health and Human Servs., Children's Bureau, Child Welfare Information Gateway, *Adoption disruption and dissolution* (June 2012) (explaining that states consistently report rates of adoption disruption, which describe an adoption process that ends after the child is placed in an adoptive home and before the adoption is legally finalized, as between 10 to 25 percent), www.childwelfare.gov/pubPDFs/s_disrup.pdf; *see also* The Donaldson Adoption Institute, *Keeping the Promise: The Case For Adoption Support and Preservation* (2014) (finding disruption rates of large child welfare populations from 9 to 15 percent), https://www.celcis.org/files/4515/7407/7582/Keeping-the-Promise-Case-for-ASAP-Brief.pdf.

Moreover, even for those children who find a permanent home, social science research shows that the adoption rarely erases the prior harm.  Removed from her home and adopted by a "replacement" family, a child is often deeply affected by the experience and grows up with a strong desire for "relational permanency"—*i.e.*, "the youth's emotional connections and the need for there to be a 'caring adult' in the life of the youth."  Randi Mandelbaum, *Re-Examining and Re-Defining Permanency From a Youth's Perspective*, 43 Cap. U. L. Rev. 259, 278 (2015); *see also* Cynthia Godsoe, *Permanency Puzzle*, 2013 Mich. St. L. Rev. 1113, 1123-29 (2013); *see also* Mandelbaum, *supra* at 297-301; *see also* Gina Miranda Samuels, *A Reason, a Season, or a Lifetime: Relational Permanence Among Young Adults with Foster Care Backgrounds* 83 (2008)

("In thinking about relational permanence, the role of biological family must be extended beyond that family's official or legal status in a child's permanency plan. Biological family remains psychologically present for participants despite their physical separation."). Further, in cases of involuntary TPR, a child may face an excruciating conflict between "either disconnect[ing] psychologically from the family of origin, with the resultant loyalty conflict, or accept some injury to [her] self-esteem for maintaining some identification with the 'defective' family." Johnson, *supra*, at 415; *see also* Post & Zimmerman, *supra*, at 504 ("[A]doptions are often finalized without taking pause to consider the psychological impact on the child, including those emotional ties that cannot be severed by the legal process.").

Furthermore, even in cases where reunification is not possible, a laser-focus on speedy adoptions ignores alternative solutions that can lessen the trauma that children experience that is associated with family separations. Indeed, solutions such as subsidized guardianship can bring the same feelings of permanency as adoption. Studies have shown that offering alternative permanency options, such as guardianship, has led to better outcomes by "helping more children leave foster care to permanent families, and in creating families that are just as permanent as adoption. It suggests that not offering guardianship pushes families into a legal status that they view as less desirable than guardianship." Josh Gupta-Kagan, *supra*, at 13–14; *see also* Cynthia Godsoe, *supra*, at 1135 (adoption should not "be deemed preferable to guardianship in all circumstances, particularly as the permanency outcomes have been demonstrated to be the same.").

In short, although adoption may be in some children's best interests, it is not a panacea, and the psychological trauma associated with TPR must be weighed heavily in favor of New York's chosen policy of seeking the benefits of family reunification before anything else.

>   **2.      *Shifting Resources Will Undercut Substantial Progress That Has Been
>            Made in Reducing Foster System Rates and Increasing Kinship Care***

Though glossed over by Plaintiffs, New York City's foster system has undergone dramatic improvements over the past several decades.  Chief among these are an emphasis on preventive services designed to avoid the need for removal proceedings in the first place, and increased use of kinship placement to lessen the trauma of necessary removals.  *See supra* Section I.B.  But Plaintiffs' emphasis on claims related to staffing levels, documentation, and training threaten to cause shifts in resources that would undermine the strides the city's system has made.  For instance, Plaintiffs' counsel achieved a settlement in *Dwayne B.* requiring, among other things, reduced caseloads.  *See* Order Entering Consent Decree, ECF. No. 148, *Dwayne B. by Stempfle* v. *Snyder*, No. 2:06-cv-13548 (E.D. Mich.).  Michigan, in complying with the settlement, did so by aggressively hiring additional case workers and child abuse investigators.  *See* Mike Householder, *Snyder Swears in Hundreds of Child Welfare Workers to Help Michigan Kids*, LegalNews, May 25, 2011, www.legalnews.com/oakland/957228 ("The aggressive hiring reflects what the Snyder administration says is its commitment to comply with a 2008 consent decree aimed at improving child welfare programs.").  Of course, the diversion of resources in favor of one policy objective necessarily leaves fewer already scarce resources for objectives such as preventative services and reunification services.

The costs of the increased documentation and other administrative requirements sought by Plaintiffs' counsel should not be underestimated.  For example, even requiring ACS to review the case records for all children in the foster system in order to compile the documentation of compelling reasons every three months would be a significant administrative burden that would absorb resources that could be better spent on helping families obtain necessary services for reunifications to happen.  Caseworkers for children in the foster system "already spend far too

great a percentage of their time meeting requirements to document their case activities."[10] (Gottlieb Decl. ¶ 53.)

Moreover, the benefits of kinship placement are well established. Social science research shows that placement with a relative can be a critical factor for success in the foster system. (Gottlieb Decl. ¶ 47.) "Children in kinship foster care have more positive outcomes in the domain of feelings of belongingness and other indicators of bonding social capital, which may contribute to their emotional and social well-being." Eun Kohn & Mark F. Testa, *Propensity Score Matching of Children in Kinship and Nonkinship Foster Care: Do Permanency Outcomes Still Differ?*, 32 Soc. Work Research 105, 115 (2008). Studies have shown that such placements result in fewer behavioral problems for the placed children years down the road (Gottlieb Decl. ¶ 49), including that such children are more likely to remain in, and stably perform at, school. (*Id.*); *see also* Winokur et al.*, Kinship Care for the Safety, Permanency, and Well-Being of Children Removed from the Home for Maltreatment,* Cochrane Database of Systematic Rev. 23 (2014). And where family reunification becomes impossible, kinship care substantially increases the likelihood that the child will report liking the foster placement and wanting that placement to become permanent. (Gottlieb Decl. ¶ 49.) Plaintiffs' class and subclass definitions fail to account for any such benefits, and Plaintiffs' end goal of increasing the pace at which children exit the foster system would undermine those benefits.

This is particularly troubling as kinship care promotes permanency goals too. For one, children placed in kinship care generally have fewer placement moves than children in non-relative care. (*Id.* at ¶ 50.) And kinship care more frequently leads to guardianship arrangements in which

---

[10] New York State Office of Children and Families, *New York State Child Welfare Workload Study* 4-8 (2006), http://www.ocfs.state.ny.us/main/reports/WorkloadStudy.pdf (reporting that case workers spend over 30% of their case-related time on documentation).

the foster parent becomes the permanent guardian for the child. Gupta-Kagan, *supra*, at 5. Such guardianship has several benefits, including increasing permanency while avoiding TPR, which has been found to "induce biological parents to consent to a guardianship petition, and thus lead to a faster and less contentious legal process" that ultimately results in "faster permanency." *Id.* at 16. Indeed, one study found that kinship care increases permanency "by broadening the array of options available to children to exit foster care for a stable and long-term home," that guardianship does not "impede reunifications although it may supplant some adoptions," and that guardianship "saves money, primarily through reductions in foster care placement days and the subsequent decrease in administrative expenses associated with managing and supervising foster care cases." *See* U.S. Dep't of Health and Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* (2011), www.acf.hhs.gov/sites/default/files/documents/cb/subsidized_0.pdf.

### 3. An Increased Rate of Termination of Parental Rights Will Exacerbate the Existing Racial Inequities of the Foster System

The disproportionate effect that the foster system has had and continues to have on communities of color, and black families in particular, cannot be overstated. But Plaintiffs' proposed sub-classes do nothing to address this pervasive issue, and in fact, appear to be pursuing reforms that would exacerbate the inequities facing communities of color in the foster system in New York. Numerous scholars and child welfare professionals have catalogued the shocking racial disparities within the foster system and explained the damage it has inflicted on black families in particular. Dorothy Roberts, *Shattered Bonds: The Color of Child Welfare*, 48 (2002); *see* Jessica Horan-Block, *A Child Bumps Her Head. What Happens Next Depends on Race*, N.Y. Times (Aug. 24, 2019), https:// www.nytimes.com/2019/08/24/opinion/sunday/child-injuries-race.html; *see generally* U.S. Dep't of Health & Human Servs., *National Study of Protective,*

23

*Preventive, and Reunification Services Delivered to Children and Their Families: Final Report* (1994), https://www.ndacan.acf.hhs.gov/datasets/pdfs_user_guides/Dataset071UsersGuide.pdf. Many of these experts have lamented the historical tendency to justify the destruction of families of color by claims that severing parent-child bonds is in the children's best interests. Dorothy Roberts, *supra*, at 48; *see* Kent P. Hymel et al., *Racial and Ethnic Disparities and Bias in the Evaluation and Reporting of Abusive Head Trauma*, 198 J. Pediatrics 137, 137-143 (2018); *see also* Erin Cloud et al., *Family Defense in the Age of Black Lives Matter*, 20 CUNY L. Rev. 68, 69–70 (2017). Notably, these critiques do not suggest that state intervention is never warranted, but instead sound an important warning that any calls to increase the number of terminations of parental rights of black parents should be particularly scrutinized. Cloud, *supra*, at 74–78. Therefore, given the extreme racial disparities that exist within the New York City foster system, any proposed systemic change—such as Plaintiffs' thinly veiled push for more terminations of parent-child relationships—will necessarily disproportionally impact families of color.

The racial disparities are particularly extreme in New York City, where "Black children are fourteen times more likely to be placed in foster care than white children." (Gottlieb Decl. ¶ 19.); *see also* Vajeera Dorabawila, Racial and Ethnic Disparities in the Child Welfare System: New York City Compared to Rest of State (Outside of NYC), 2009 Compared to 2010 and Comparison of Selected Counties, NYS Office of Children & Family Services (2011), https://ocfs.ny.gov/main/recc/Exec%20Staff%20DMC%20presentation%20child%20welfare%20color%20070911.pdf. "[B]lack children [generally] experience a longer stay in foster care, wait for longer periods of time to reunify with their families, and endure slower exit rates." Jessica Pryce, et al., *A Case Study in Public Child Welfare: County-Level Practices That Address Racial Disparity in Foster Care Placement*, 13 J. Pub. Child Welfare 1, 35-59 (2019).

Plaintiffs' efforts to construct a broad class without careful attention to existing racial inequities, as well as their undue emphasis on adoption and TPR, risk exacerbating these inequities and disproportionately breaking up families of color and those with lesser resources.

## CONCLUSION

For the reasons set forth above, among others, the Parent Advocates respectfully request that the Court deny Plaintiffs' Motion.

Dated:  New York, New York
        March 12, 2020

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By:   */s/ Audra J. Soloway*_____
      Audra J. Soloway
      Christopher L. Filburn
      Harley W. Ferguson

1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
asoloway@paulweiss.com

*Counsel for the Parent Advocates*

# Appendix

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELISA W., *et al.*,

                                   Plaintiffs,

                    -against-

THE CITY OF NEW YORK, *et al.*
                                   Defendants.

No. 15 Civ. 5273 (KMW) (SLC)

## DECLARATION OF LAUREN SHAPIRO
## IN SUPPORT OF PARENT ADVOCATES' AMICI CURIAE BRIEF

Lauren Shapiro hereby declares, pursuant to 28 U.S.C. § 1746:

1.      I am the Managing Director of the Family Defense Practice at Brooklyn Defender Services ("the BDS Family Defense Practice" or "the Family Defense Practice"), one of four organizations (hereafter, the "Parent Advocates") that represent the vast majority of parents with children in New York City foster care.  I respectfully submit this declaration in support of the Parent Advocates' brief of Amici Curiae in opposition to Plaintiffs' renewed motion for class certification.

2.      I previously submitted a declaration in this matter, which was dated June 20, 2016. ECF No. 183-3.

3.      BDS contracts with the New York City Mayor's Office of Criminal Justice to represent over 1,200 new respondents each year.  We currently have an active pending case load of over 2,300 clients, in part because child welfare cases last an average of approximately two years.  Our work involves representing respondents in Family Court and managing the collateral issues, including housing, benefits, criminal, immigration, and educational issues that are integral to successful outcomes for our clients.  Our attorneys make numerous court

appearances during the life of the case (an average of 16 court appearances per case over the last five years), including settlement negotiations or fact-finding trials when there is no settlement of the fact finding hearing.  During the pendency of the case, attorneys file a variety of written motions; represent clients at conferences and at emergency hearings, permanency hearings, fact finding hearings, dispositional hearings and TPR hearings; review and analyze document production; work with experts who we call as witnesses in our cases; and otherwise affirmatively pursue the due process and statutory rights of respondents facing abuse or neglect charges in Family Court.

4.     In addition, our social work team advocates for clients at conferences held throughout the life of a case at either an ACS office or the foster care agency; we participate in as many as 100 conferences per month. The social workers refer clients for services, help clients access benefits, conduct family assessments, perform crisis management services, and provide support to clients in court. Our administrative team, including paralegals, provides the critical support necessary in a high-volume and litigation-focused practice involving aggressive motion practice and pre-trial discovery.

5.     BDS has a staff of approximately 450 employees, including 281 attorneys. In addition to representing respondents in cases filed under Article 10 of the Family Court Act (cases involving allegations of child abuse or neglect), BDS represents indigent Brooklyn residents in criminal, immigration, housing, benefits, education, employment and other civil cases.  In my current capacity, I manage the work of the staff dedicated to Article 10 cases along with related matters.  The Family Defense Practice at BDS has 55 attorneys in total, 11 social workers, 4 paralegals, and an administrative staff of 8 people.  I coordinate all of the litigation work of the Family Defense Practice, including appellate work.

6.      I have directed the Family Defense Practice since 2007 when New York City first began to fund institutional providers to represent parents in child welfare cases in Family Court.  Initially, the Family Defense Practice was part of Legal Services for New York City where I had worked since 1986.  In 2013, the office moved to become part of Brooklyn Defender Services where I currently work.  The statements in this declaration are based on my experience practicing family defense for 30 years, and ongoing and regular supervision of my team, including case conferences, trainings, and consultations.

7.      In my experience, the majority of children with parents represented by the Parent Advocates are able to return safely to their families.

8.      Additionally, in my experience, delays in reunification of families are often caused by circumstances outside of a parent's control and unrelated to any real or perceived risk the parent poses to children; not by the parent's refusal to complete services required by New York City Administration for Children's Services ("ACS") or the authorized contract agency for reunification.

9.      A number of cases that my team has worked on are illustrative.  For example, in October 2016, a mother's one-year old daughter was removed from her.  The daughter was placed in non-kinship foster care.  The daughter was returned to her mother's care in August 2018, after the mother completed a drug treatment program required by ACS, on the condition that she continue to test negative for all illicit substances and continue to engage in individual counseling.  In June, 2019, the case was closed due to the mother's continued compliance, and her daughter has remained in her care ever since.

10.      Similarly, in December 2017, ACS filed a petition against a mother alleging that she neglected her newborn son.  At the time of this removal, her older children were

in the care of their maternal grandmother pursuant to a guardianship order.  When her son was removed from her in 2017, however, he was initially placed in non-kinship foster care.  A year later, he was moved to the home of his maternal grandmother where his two older siblings resided.  The mother engaged in mental health treatment as requested by ACS because she had admitted herself to the hospital for depression during her pregnancy in 2017.  It was not until approximately April 2019, when the Director of Clinical Services at the organization where she had been receiving treatment for over a year became her regular therapist, that she finally began to benefit from her treatment.  Her new therapist was able to ensure that her treatment addressed her mental health needs and get her on medication that truly helped alleviate her symptoms.  In December 2019, the mother was granted unsupervised overnight weekend visits with her son. He enjoyed the visits and cried when he had to leave his mother at the end of the weekend visits. In May, 2020, her son came home on an extended visit with his mother and has remained in her care since then.

11.     Likewise, in February 2018, ACS removed a mother's newborn son solely based on allegations stemming from drug tests in 2014 and 2015 and that the mother had not completed a drug treatment program since then.  Her son who was removed from her care in February of 2018, did not test positive for drugs at birth.  But he was still removed from his mother's care.  After the removal, the mother immediately engaged in and subsequently completed her ACS-required service plan which included testing negative for drugs, completing a parenting class, and enrolling in counseling.  Despite her completion of these requirements, the agency increased the number and length of her visits very slowly before trial discharging her son to his mother's care in February 2020.  During his time in foster care, the son was in three

different foster homes. His mother was the only constant in his young life. Her son was discharged to her care in July 2020, over two years after his initial removal.

12.    Finally, in January 2018, ACS removed a mother's daughter. The mother immediately engaged in services requested by ACS: drug and mental health treatment. By August 2019, the mother had completed her service plan but despite her progress, the Family Court was very cautious in expanding her visitation with her daughter out of unsupported fear that the mother might relapse. Additionally, the daughter's return to her mother's care was further delayed because the agency wanted to first make sure that there were extensive services in place at home since the daughter has autism spectrum disorder. In January 2020, the daughter was returned to her mother's care.

13.    These examples are consistent with other clients whom we represent.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
    March 10, 2020

Lauren Shapiro

5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELISA W., *et al.*,

                Plaintiffs,

         -against-

THE CITY OF NEW YORK, *et al*.

                Defendants.

No. 15 Civ. 5273 (KMW) (SLC)

---

**DECLARATION OF EMMA S. KETTERINGHAM**
**IN SUPPORT OF PARENT ADVOCATES' AMICI CURIAE BRIEF**

Emma S. Ketteringham hereby declares, pursuant to 28 U.S.C. § 1746:

1.      I am the Managing Director of the Family Defense Practice at The Bronx Defenders ("BXD" or "the Family Defense Practice") one of four organizations (hereafter "Parent Advocates") that represent the vast majority of New York City parents with children under the supervision or in the custody of ACS.  I respectfully submit this declaration in support of the Parent Advocates' brief of Amici Curiae in opposition to Plaintiffs' renewed motion for class certification.

2.      I previously submitted a declaration in this matter, which was dated June 21, 2016. ECF No. 183-4.

3.      In my experience, the majority of children with parents represented by the Parent Advocates are eventually able to return safely to their families.

4.      My organization has worked on numerous cases in family court where clients—otherwise parents—have been successfully reunited with their children after years of foster system separation.  In one such case, a mother was reunited with her children after six

1

years of separation.  In another case, a mother was reunited with her children over 10 years after the case began.

5.      Frequently, delays in reunification of families are caused not by the parent's refusal to complete the required steps necessary for reunification, but instead by other circumstances outside of a parent's control and unrelated to any real or perceived risk the parent poses to children.  For instance, one parent had her two sons removed from her in March 2010.  Over the next six years, the mother attempted to engage in services required by ACS, including drug treatment and mental health services.  However, she suffered from poverty, and her inability to obtain permanent housing and needing to work became barriers to her ability to complete the services required by ACS.  In November 2016, the foster agency petitioned to terminate the mother's rights to her sons, but the Family Court dismissed that petition in June 2017.  By December 2018, she was reunited with both of her boys and was no longer required to engage in any services.

6.      Another example is a mother who was separated from her children in May 2017, when she was 19 years-old and legally a ward of ACS.  The allegations against her were that she used marijuana and had physically destroyed items after a resident in her group home stole from her.  Over the next two years, the mother engaged in services that ACS required, including mental health services, drug treatment, and anger management and parenting classes.  In October of 2019, after completing all required services and after three different judges had overseen the case, the mother was reunited with her children.

7.      Similarly, in another case, a child was removed from his mother a mere ten days after he was born due to unsubstantiated claims of the mother having a cognitive delay.  The child was placed in a foster home for the next five years with a paternal relative who was not

friendly to the child's mother and wanted to adopt the child. During that five-year period, the mother completed numerous required mental health evaluations, none of which satisfied ACS. Years later the mother had another daughter, and after observing how she appropriately cared for her daughter, ACS discharged the son to her within a year—five years after her son's initial removal.

8.      Likewise, in another case, a mother's children were removed from her after she was arrested in 2014. While she was incarcerated for three years, her children were living with strangers in foster care. During her incarceration she received visits as often as was allowed from her three children, and engaged in numerous required services. The foster agency that placed her children acknowledged the loving connection between her and her children in multiple court reports, describing the children's affirmation of love for their mother and vice versa. However, despite this connection, the agency filed to terminate her rights to her children in March 2017 due to her incarceration. Upon her release from custody, she immediately began regular visitations with her children in October 2017. By October 2018, all of her children were returned to her and the foster care agency withdrew the petition for the termination of her parental rights.

9.      Lastly, in another case, ACS removed a child from her mother at birth in December 2013, based on a previous case involving the mother's older children. At that time of removal in December 2013, the mother was using drugs and experiencing depression because of the loss of custody of her two older children. ACS required the mother to receive drug treatment but since she did not have legal status in the United States, it was very difficult for her to qualify for programs that would cover the cost of her drug treatment. For years, she attempted to engage in services, but she never had insurance and ACS did not help her to find other means to obtain

3

such services.  In February 2016, she was able to enter a mother-child inpatient drug treatment program due to a new pregnancy.  When she gave birth to another daughter in April 2016, the Court agreed that both her children could remain with her in the inpatient program.  By June 2017, the mother completed her required services and her children were returned to her care.

10.     These cases are just a few examples of many where a quicker termination of parental rights and adoption would not have been in the best interest of the children and would have resulted in children being needlessly forever separated from their families of origin.  And where parents were doing everything possible to get their children back but because of circumstances outside of their control, they were unable to reunify with their children immediately.   As my experience with these cases and numerous others show, successful reunification frequently happens after a lengthy period of time.   Often our clients have an additional child who remains safely in their care, even while older children remain in the foster system. Plaintiffs' seeking to shorten the time before children are adopted is essentially an attempt at quickening the pace of the death knell for family reunifications.  And if that were to become the policy, reunifications like the ones I described would not be possible.

11.     I reserve the right to make additional observations.


In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        March 11, 2020.


Emma S. Ketteringham

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELISA W., by her next friend, Elizabeth
Barricelli, *et al.*,

Plaintiffs,

-against-

THE CITY OF NEW YORK, *et al.*

Defendants.

No. 15-cv-5273 (LTS) (HBP)

**EXPERT DECLARATION OF PROFESSOR CHRISTINE GOTTTLIEB**
**IN SUPPORT OF BROOKLYN DEFENDER SERVICES, THE BRONX DEFENDERS,**
**CENTER FOR FAMILY REPRESENTATION INC., AND NEIGHBORHOOD**
**DEFENDER SERVICE OF HARLEM'S MOTION TO INTERVENE AND**
**OBJECTION TO THE PROPOSED SETTLEMENT**

Christine Gottlieb hereby declares, pursuant to 28 U.S.C. § 1746:

1.      I am an Adjunct Professor at the New York University School of Law and

the Co-Director of the New York University School of Law Family Defense Clinic.  I have been

retained as an expert on behalf of the Bronx Defenders, the Brooklyn Defender Services, the

Center for Family Representation, and the Neighborhood Defender Service of Harlem

(collectively, the "Parent Advocates").  I respectfully submit this Expert Declaration in support

of the Parent Advocates' Motion to Intervene and Objection to the Proposed Settlement.

2.      I am familiar with the Complaint and Consent Decree filed in this action.[1]

If called to testify as a witness regarding the following, I could and would do so under oath.

---

[1]    All references in this declaration to the "Complaint" or "Consent Decree" are intended to refer to the Amended
Complaint (ECF No. 91) and Amended Consent Decree (ECF No. 151).

## EDUCATION & PROFESSIONAL BACKGROUND

3.      I attended and graduated from the University of Chicago in 1994, where I earned a Bachelor of Arts in Philosophy.  Following graduation, I enrolled in the New York University School of Law, and I graduated *cum laude* with a Juris Doctor in 1997.

4.      Following my graduation from the New York University School of Law, and a clerkship with the United States Court of Appeals for the Fifth Circuit, I joined The Legal Aid Society's Juvenile Rights Division, where I represented children of all ages and specialized in child protection cases.  During my time at The Legal Aid Society, I represented over 500 children and teens who were in, at or at risk of placement in, foster care in New York City.

5.      I began teaching at the New York University School of Law in 2002, first as a Fellow and then as an Adjunct Professor.  I have taught the New York University School of Law's Family Defense Clinic, the Advanced Family Defense Clinic, and a clinic focused on New York's Statewide Central Register of Child Abuse and Maltreatment.  Presently, I serve as the Co-Director, with Martin Guggenheim, of the New York University School of Law Family Defense Clinic.  In 2015, I received the New York University Dr. Martin Luther King, Jr. Faculty Award.

6.      Established in 1990, the New York University School of Law Family Defense Clinic ("the Clinic") was the first law school clinic in the country to train students to represent parents in child welfare proceedings.  The Clinic pioneered a model of representation in which lawyers and social workers collaborate on interdisciplinary teams to protect family integrity and help families access services that keep children safe and out of foster care.

7.      The Clinic offers a year-long course that provides law and graduate-level social work students with the opportunity to learn about the New York City child welfare

2

system,[2] and work alongside practitioners who advocate for parental rights in New York Family Courts. I supervise students on child abuse and neglect cases, termination of parental rights proceedings, and cases involving records in the New York Statewide Central Register of Child Abuse and Maltreatment. In addition to supervising student cases, I also directly represent parents and foster parents in these proceedings.

8. In my role as Clinic Co-Director, I regularly draft and consult on appeals of child abuse and neglect matters and amicus briefs in cases with the potential to significantly affect children's and parents' rights. I also regularly train lawyers in New York City and at national conferences on child welfare law and practice. I consult with and provide litigation support to public interest organizations and law firms providing pro bono counsel to families involved with the child welfare system.

9. Additionally, I write in the field of child welfare law. My law review articles in the field include, "Reflections on Judging Mothering," 39 University of Baltimore Law Review 371 (2010); "Family Values: How Children's Lawyers Can Help Their Clients by Advocating for Parents," 58 Juvenile and Family Court Journal 17 (2007) (with Erik S. Pitchal); "Children's Attorneys' Obligation to Turn to Parents to Assess Best Interests," 6 Nev. L. J. 1263 (2006); and "Justice Denied: Delay in Resolving Child Protection Cases in New York," 12 Virginia Journal of Social Policy and the Law 546 (2005) (with Martin Guggenheim).

10. My writing on issues related to child welfare also has been published by *The New York Times* website, the *New York Law Journal*, and *USA Today*.

---

[2] I define the New York City child welfare system as the group of services, managed by the New York City Administration for Children's Services ("ACS") and overseen by the Office of Children and Family Services ("OCFS"), designed to promote the well-being of children by ensuring their safety, securing permanent homes, and strengthening families to care for their children successfully. *See* Child Welfare Information Gateway, Factsheet (February 2013), *available at* https://www.childwelfare.gov/pubpdfs/cpswork.pdf.

11.     I currently serve on the New York City Bar Association Council on Children and the Steering Committee of the American Bar Association National Project to Improve Representation for Parents, and I have served on numerous interagency committees and task forces that work collaboratively to improve child welfare practice in New York City.

12.     My seventeen years as a practitioner representing parents and children involved in the child welfare system, and my ten years as a professor and Co-Director of the Family Defense Clinic at New York University School of Law, have provided me with an extensive opportunity to study the New York City child welfare system.

13.     In this declaration, I will address relevant child welfare demographics; the New York City child welfare system; and my concerns with the Consent Decree.

## RELEVANT DEMOGRAPHICS OF CHILD WELFARE

14.     A commonly held misconception perpetuated over the past several decades is that most children who are placed in foster care are removed from their families because of allegations of abuse.  However, during this same time period, numerous studies have concluded, contrary to this widely held misconception, that the primary reason children are removed from their parents and placed in foster care is not abuse, but rather poverty.[3]

15.     At least one study found that during the 1980s and early 1990s, "inadequacy of income" increased the odds for foster care placement "more than 120 times."[4]  In other words, children living in poverty are many times more likely to be placed in foster care

---

[3]     *See* Leroy H. Pelton, The Continuing Role of Material Factors in Child Maltreatment and Placement, Child Abuse & Neglect, August 2014 (noting that "[c]hildren in foster care have been and continue to be placed there from predominantly impoverished families."); *see also,* Dorothy Roberts, Shattered Bonds: The Color of Child Welfare, 27 (2002) (noting that "[p]overty—not the type or severity of maltreatment—is the single most important predictor of placement in foster care and the amount of time spent there."); Martin Guggenheim, What's Wrong With Children's Rights, 192-93 (2005) (noting that "a very small percentage of children in foster have suffered serious forms of maltreatment.").

than children from middle class or affluent backgrounds. Based on my own observations, I believe that poverty is presently one of the most significant factors that determine a child's likelihood of being placed in foster care.

16.    Furthermore, in the overwhelming majority of cases in which children are removed from their parents, the children can be safely returned if the family receives social services such as housing assistance, mental health treatment, substance abuse counseling, and other supportive services.

17.    Race is also a key factor in determining which children are removed from their families and placed in foster care. It is well-documented that minority children enter foster care at vastly disproportionate rates compared to white children, and also remain in foster care longer – even though data does not show that minority children are abused or neglected at greater rates.[5]

18.    Recent research has shown that black children who are removed from their homes stay in foster care, on average, nine months longer than do white children.[6] Relatedly, black families are less likely to receive family preservation services and their children are more likely to be removed than white children in similar situations.[7]

---

[4]    Duncan Lindsey, The Welfare of Children, 151-53 (2d ed. 1994) (finding "an unstable income source represented the highest predictor of removal.").

[5]    *See* Roberts, Shattered Bonds: The Color of Child Welfare, 16-20, 49 (noting that "[o]nce Black children enter the foster care system, they remain there longer, are moved more often, and receive less desirable placement than white children.").

[6]    United States Government Accountability Office, African American Children in Foster Care: Additional HHS Assistance Needed to Help States Reduce the Proportion in Care, 4 (July 2007) *available at* http://www.gao.gov/new.items/d07816.pdf.

[7]    *Id.* at 20-22.

19.     Racial disproportionality is seen in foster care nationally,[8] but is particularly extreme in New York City, where at least 27% of children are white, but only about 4% of children in foster care are reported to be white.[9]  Black children are fourteen times more likely to be placed in foster care in New York City than white children.[10]

## THE NEW YORK CITY CHILD WELFARE SYSTEM

20.     New York City's child welfare agency, the Bureau of Child Welfare, was established in the late 1960s under the administration of Mayor John Lindsay, with a mandate to manage the City's child welfare services.  Over the next thirty years, the organization's name changed several times, until 1995 when it was given its present name, the Administration for Children's Services ("ACS").  In 1998, New York State merged several agencies to create the Office of Children and Family Services ("OCFS"), which has a mandate to supervise ACS and other city child welfare systems throughout the state.

21.     In 1992, there were approximately 49,000 children in foster care in New York City.[11]  Today, there are fewer than 10,000—a nearly 80% decline.[12]  This reduction represents one of the greatest decreases a foster care population has ever seen without a

---

[8]   *See* The AFCARS Report, 2 (July 2015) (indicating that, "Black or African American" comprise 24% percent of the national foster care population); *available at* http://www.acf.hhs.gov/sites/default/files/cb/afcarsreport22.pdf.

[9]   NYS Office of Children & Family Services, Race and Ethnicity: Path Through the Child Welfare System, 3 (2007) (containing bar charts indicating the racial composition of New York City foster care); *see also*, Roberts, The Color of Child Welfare, at 9 (remarking that "[t]he racial imbalance in New York City's foster care population is truly mind-boggling").

[10]   *Id.*

[11]   New York City Commission for the Foster Care of Children, Report, 94 *available at* http://www.nyc.gov/html/rabrc/downloads/pdf/acs_report.pdf.

[12]   New York City Administration for Children's Services, Website, *available at* http://www1.nyc.gov/site/acs/about/data-policy.page.

corresponding increase in the rate of child-abuse-related fatalities.[13] The significant reduction in the number of children in New York City foster care is the result of a number of factors, including a commitment to provide families with preventive services to avoid the need for foster care altogether.[14] By aspiring to offer preventive services when possible, rather than summarily and unnecessarily separating children from their families, New York City has set its policy objective as avoiding the trauma of separation whenever possible.

22.     For perspective, it is important to understand that family preservation and reunification was not always the prevailing goal in New York, and it is presently not the prevailing goal in other jurisdictions.

23.     In 1979, New York passed the groundbreaking Child Welfare Reform Act of 1979, which required that preventive services be used to keep children from entering foster care whenever possible and to speed family reunification when foster care was necessary. This was New York's deliberate legislative response to widely discussed recognition at the time that too many children were entering foster care and then were staying in foster care too long (this was often referred to as "foster care limbo" or "foster care drift"). New York put significant resources into funding these mandates. New York's efforts became the model for the federal Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), which also attempted to shift funding from foster care to preventive and reunification services.

24.     Many experts have noted that historically child welfare policy in the United States moves back and forth on a pendulum from more to less supportive of families. The

---

[13]  *See* Rachel Blustain, The Limits of Protection: Can Mayor's Push Reduce Child Abuse Deaths?, Dec. 16, 2014, http://citylimits.org/2014/12/16/limits-of-protection-can-mayors-push-reduce-child-abuse-deaths/ (noting New York City's "historic trend of reducing the number of children placed in foster care each year.").

[14]  Vera Institute of Justice, Innovations in NYC Health and Human Services Policy, 4 (Jan. 2014), *available at* http://www.nyc.gov/html/ceo/downloads/pdf/policybriefs/child-welfare-brief.pdf.

passage of the Adoption and Safe Families Act of 1997 ("ASFA") represented a swing of the

pendulum away from emphasizing family preservation at the federal level, establishing for the

first time mandates that agencies consider terminating parental rights when a child has been in

foster care for 15 out of 22 months.  Following passage of ASFA, many jurisdictions increased

their rate of parental terminations.  However, New York has remained committed to family

reunification as the primary goal for children in foster care.

        25.     Indeed, New York City has made a considered policy choice to prefer to

keep children in foster care longer where that allows them to safely return home.  This policy

choice is explicitly incorporated in New York law, which states:

> it is generally desirable for the child to remain with or be returned
> to the birth parent because the child's need for a normal family life
> will usually best be met in the home of its birth parent, and that
> parents are entitled to bring up their own children unless the best
> interests of the child would be thereby endangered . . . [T]he state's
> first obligation is to help the family with services to prevent its
> break-up or to reunite it if the child has already left home.

SSL 384-b(1)(a)(ii-iii)(Statement of legislative findings and intent for New York's termination

of parental rights statute).

        26.     Additionally, this policy choice is clearly reflected in the fact that New

York City has rejected the trend seen in other jurisdictions of establishing causes of action to

terminate parental rights based solely on length of stay in foster care.  As New York's highest

court has explained, New York has deliberately chosen a different substantive path than many

states with regard to the preferred course for children who need to enter the foster care system.

Writing at a time when model laws were proposed to accelerate the termination of rights of

parents whose children were in foster care, the Court of Appeals explained:

> Several model statutes would authorize termination of parental rights based on a
> child's absence from the biological home for a substantial period, with the period

depending on the child's age. Such provisions were based on the notion, in circulation prior to and during the formulation of our current parental termination statute, that once a child under the age of three has been in the continuous care of the same adult for a year, it is unreasonable to presume that the child's ties with biological parents are more significant than ties with long-term caretakers (*See*, Taub, Assessing the Impact of Goldstein, Freud and Solnit's Proposals: An Introductory Overview, 12 NYU Rev.L. & Soc. Change 485, 490). Our Legislature did not recognize prolonged separation as an additional ground for termination of parental rights.

*Matter of Michael B.*, 80 N.Y.2d 299, 310 n. 2 (1992).

As Judge Kaye wrote for the Court: in New York "[p]arental rights may be terminated only upon clear and convincing proof of abandonment, inability to care for the child due to mental illness or retardation, permanent neglect, or severe or repeated child abuse." *Id.* at 310.

27.     This policy choice has been actively pursued by the last three mayoral administrations.

28.     As a result of this considered policy choice, the families whose children enter foster care in New York City present more challenging casework needs, on average, than those in jurisdictions that have made different policy choices. Simply put, New York avoids putting children in foster care who might go into foster care briefly in other jurisdictions. This results in making New York City's average length of stay in foster care higher because it is generally more successful at preventing foster care placement in the first place. The children who are in foster care in New York City are more often those whose families require time, resources, and support in order for their children to be able to return home safely.

29.     In implementing its child welfare system, however, New York City continues to struggle in certain areas. I have read the Declaration of Lauren Shapiro in support of Parent Advocates' Motion to Intervene and Objection to the Proposed Settlement (the "Shapiro Declaration"). I believe that paragraphs 12 and 13 of the Shapiro Declaration

9

accurately describe many ways that the New York City child welfare system fails parents and their children.

30. Many child welfare experts would agree that the next steps for continued progress in the New York City child welfare system will require sophisticated improvements in the management and frontline work of the agencies responsible for administering foster care, as well as additional material resources.

## THE PROBLEMS WITH THE CONSENT DECREE

31. I also share Ms. Shapiro's concerns about the detrimental impact of the Consent Decree (*see* Shapiro Declaration, ¶ 15), and believe it will not result in the necessary improvements to the New York City child welfare system.

32. The Consent Decree contains few specific provisions and is devoid of a specific mandate as to what the appointed Monitor and Research Expert will focus their work on. As a result, as an advocate for children and families and a professor with expertise in family law, it is difficult (if not impossible) to predict how the proposed settlement will be implemented and what policies it will seek to promote.

33. The Consent Decree does not contain specific provisions relating to a number of issues that many experts view as the most important to the New York City child welfare system.

34. First, the Consent Decree does not prioritize family reunification as the preferable outcome for children. New York, with good reason, has determined as a matter of law and policy that family reunification is better for children, whenever safely possible, than adoption. The most important issue facing ACS is the number of children currently in foster care who do not need to be there and the obstacles and unnecessary delays associated with reuniting

10

them with their families.  The Consent Decree does not address how these issues will be managed.

36. The pleadings filed by Plaintiffs in the lawsuit raise concerns on this subject as well.  The metrics highlighted in the Complaint suggest a preference for adoption even where family reunification could be safely achieved.  For example, ¶¶ 313 - 340 of the Complaint discuss ACS's obligation under state and federal law to consider termination of parental rights when a child has been in foster care for 15 of the last 22 months.  In condemnation of ACS's efforts, the Complaint notes that "[f]or FY 2010. . . ACS reported that 94.9% of children who had been in ACS custody for the past 18 months did not have a TPR petition filed.  ACS's failure to file TPR petitions in accordance with the time periods set by federal and state law is not a new problem."  ¶¶ 313-314.

36. Contrary to the language in the Complaint, the statute requires that ACS *either* file a TPR or indicate why it has not made such a filing.  There are numerous compelling reasons why an agency would not—and should not—file a TPR despite the fact that a child has been in foster care for 15 out of 22 months.

37. One such reason would be that a parent has not received a referral for services that are required for reunification with his or her child.  For example, where a parent's homelessness is cited as the reason for a child's separation from his or her family, a parent may have to wait a long time to obtain housing to be in a position to be reunited with his or her child.  This is a problem that should be addressed by providing better services to parents, not by terminating their rights.

38. Another reason a TPR may not be appropriate is that parents who could safely reunify with their children if provided appropriate mental health or drug treatment

11

programs, may not have been referred to such programs until many months (or years) after their children went into foster care. These parents may be successfully engaging in treatment programs, but need more time to progress in treatment to be ready to reunify with their children.

39.     Notably, some children who are technically counted as part of the foster care population in New York City are already home with and being cared for by their parents on a "trial discharge" status, which allows ACS to continue to supervise the families while the parents complete services. In other jurisdictions, these children would not be counted as part of the foster care population. It is difficult to imagine any expert would suggest ACS should be moving to terminate these parents' rights.

40.     Additionally, the Consent Decree's emphasis on "permanency" can be understood as prioritizing adoption over family reunification. The Consent Decree references permanency in several places. For example, in section 6.1.1, addressing the "Hiring of a Monitor," the Consent Decree reads, "[t]he Commissioner of OCFS will retain . . . an individual to review and evaluate alleged systemic issues within the foster care system in New York City that reflect widespread and/or ongoing substantial noncompliance with . . . policies relating to the safety, permanency and well-being of foster children (the Monitor)." This same language appears in section 6.2.1 addressing the Monitor's Duties: "[t]he Monitor will observe, review, report findings, and make recommendations regarding the safety, permanency and well-being of foster children in the foster care system in New York City."[15]

41.     It is broadly understood in the field of child welfare that "permanency" is a watchword for those who believe child welfare policy should be aimed more aggressively at adoption. This view can be contrasted with New York City's policy, which focuses on keeping

children with their families and working hard to reunify children who have been removed from their families. Emphasizing permanency as one of the few specific metrics in the Consent Decree would appear to promote a policy preference New York has purposely rejected. (*See supra* ¶¶ 24-28.)

42. The Consent Decree also fails to prioritize any individual policies that would help to facilitate family reunification or reduce the trauma to children of family separation. Most notably, the Consent Decree is silent on family visitation for children in foster care.

43. Recent research has shown that children who have regular, frequent contact with their families while in foster care are more likely to eventually be reunited with their family and tend to require shorter stays in out-of-home care.[16] Visitation also reduces the trauma of children in foster care and improves child wellbeing.[17]

44. In addition to failing to explicitly prioritize family reunification consistent with New York City's considered policy decision over the past two decades, the Consent Decree fails to include any provision that would involve parents in decisions related to their children. Section 7.4.6 of the Consent Decree provides that where the appointed Research Expert concludes as part of its review of a particular child's case that ACS is in "substantial non-

---

[15] Similar references are made to the Research Expert's appointment and duties (*e.g.*, § 7.1.1.).

[16] *See* Weintraub, Amber, Information Packet: Parent-Child Visiting, 3 (National Resource Center for Family-Centered Practice and Permanency Planning, 2008), *available at* http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/information_packets/Parent-Child_Visiting.pdf; *See also* Sonya J. Leathers, Parental Visiting and Family Reunification: Could Inclusive Practice Make a Difference?, Child Welfare 81(4), 606-609 (June 2002) (finding a correlation between visitation and the duration of time spent in foster care).

[17] *See, e.g.*, National Resource Center for Family-Centered Practice and Permanency Planning, Programs that Provide Services to Support Family Visiting of Children in Foster Care, 1, *available at* http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/PHProgramsvisiting.pdf (noting that "[v]isiting is essential to maintaining parent-child and other family attachments as well as to reducing the sense of abandonment that children experience at placement").

compliance" with the law, ACS, overseen by OCFS, will develop a corrective action plan for the child. There is no accompanying provision acknowledging any role for the child's parents in that planning.

45. By requiring ACS and OCFS to develop corrective action plans for individual families based on an expert's report, the Consent Decree will circumvent the right of parents to be at the table when decisions are made about their children. Exclusion from this decision-making, where, among other things, the parties decide whether to attempt to reunify the child with his or her parents, or, alternatively, to pursue adoption or other permanency goals, significantly limits a parent's ability to protect his or her right to custody of his or her child.

46. Furthermore, this approach is directly at odds with New York City's development over the last decade of a case conferencing model that prioritizes engaging families in case decision-making. New York's conferencing model is based on broadly accepted best practices in the field of child welfare.

47. The Consent Decree also fails to recognize the importance of relative placement (*i.e.* kinship foster care) when a child must be removed from his or her immediate family, even though research shows that relative placement is of critical importance.[18] This raises concerns that relative placement will not be a focus of the Monitor or Research Expert's mandate—which remains undefined.

48. While the primary goal of foster care should be the eventual reunification of a child with his or her parents, in the interim it is much better for children, both in the short and long term, to be with relatives, as opposed to non-relatives.

---

[18] *See, e.g.,* Center for Law and Policy, Is Kinship Care Good for Kids?, *available at,* http://www.clasp.org/resources-and-publications/files/0347.pdf (noting, *inter alia,* that "[c]hildren in kinship care experience greater stability.").

49. At least one recent study found that children who leave their homes because of maltreatment have fewer behavioral problems three years later if they are placed with relatives than if they are placed in non-kinship foster care.[19]  Research has also shown that children in relative care are more likely to remain stable in school, report liking who they live with, and (where reunification is not possible) wanting their placement to become permanent.[20]

50. Crucially, research also shows that children in relative foster care have fewer placement moves than children in non-relative foster care.[21]

51. For all these reasons, the Consent Decree, which contains little if any information about how the Monitor or Research Expert will carry out their roles, does not address some of the key issues with foster care in New York City.

52. In addition the Consent Decree contains provisions that may well be harmful to foster children and their families.

53. The Consent Decree will necessarily divert substantial resources from a severely-resource strapped system.  It has been widely noted that caseworkers—unquestionably the most important players to any systemic improvement of foster care—already spend far too great a percentage of their time meeting requirements to document their case activities.  A report commissioned by the Office of Children and Family Services estimated that caseworkers in New York State spend approximately 31% of their time on documentation requirements, substantially more time than they spend with the children and families they serve.[22]

---

[19] Rubin, D.M., Impact of Kinship Care on Behavioral Well-Being for Children in Out-of-Home Care,  550-556 (2008).

[20] Center for Law and Policy, Is Kinship Care Good for Kids?, 1, *available at*, http://www.clasp.org/resources-and publications/files/0347.pdf.

[21] *Id.*

[22] New York State Office of Children & Family Services, New York State Child Welfare Workload Study, xiii, 4-21, *available at* http://www.ocfs.state.ny.us/main/reports/WorkloadStudy.pdf.

15

54. To require additional documentation for the proposed Monitor and Research Expert, and to require ACS management and staff to coordinate the collection of information for the expert and then respond to the unspecified requirements of the Monitor and Research Expert will divert limited resources from current reform priorities.

55. I reserve the right to make additional observations about the adequacy of the Consent Decree after the settling parties file their motion for approval.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      June 20, 2016

Christine Gottlieb