**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELISA W., *et al.*,

Plaintiffs,

-against-

THE CITY OF NEW YORK, *et al.*,

Defendants.

15 Civ. 5273 (KMW) (SLC)

REPLY IN SUPPORT OF
PLAINTIFFS' RENEWED MOTION
FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ................................................................................... 1

NATURE OF THE CLAIMS ........................................................................................ 3

ARGUMENT .................................................................................................................. 6

I.   The Proposed Class and Subclasses Satisfy Rule 23(a)'s Requirements. ........................... 7

     A.   The Class (and Subclasses) Are Sufficiently Numerous and Ascertainable. .......... 7

     B.   Defendants' Common Practices Are the "Glue" Holding the Class (and
          Subclasses) Together. ........................................................................................ 9

          1.   Plaintiffs' Substantive Due Process Claims. ........................................... 10

          2.   Plaintiffs' Statutory Claims. ..................................................................... 15

          3.   Defendants' Attacks on Plaintiffs' Common Questions Are
               Unavailing. .............................................................................................. 18

     C.   Plaintiffs Are Typical of the Class and Subclasses. .............................................. 23

     D.   There Are No "Conflicts" Precluding Representation of the Class or
          Subclasses ......................................................................................................... 29

II.  Counsel Is Qualified To Represent the Class Under Rule 23(g). ....................................... 31

III. The Proposed Class and Subclasses Satisfy Rule 23(b)(2). ............................................... 39

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013)............................................7

*Andersen v. Leavitt*, No. 03-cv-6115 (DRH)(ARL), 2007 WL 2343672 (E.D.N.Y.
    Aug. 13, 2007)....................................................................................................................34

*B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957 (9th Cir. 2019)..................................................passim

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994).......................................................................25

*Braiman v. Braiman*, 44 N.Y.2d 584 (1978)...........................................................................37

*Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994) .....................................................................25

*Connor B. ex rel Vigurs v. Patrick*, 272 F.R.D. 288 (D. Mass. 2011)...............................7, 10, 25

*Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30 (D. Mass. 2011).......................................7, 11

*Connor ex rel. Patrick v. Vigurs*, 985 F. Supp. 2d 129 (D. Mass. 2013), *aff'd*, 774
    F.3d 45 (1st Cir. 2014) ...................................................................................................17

*Crisci v. Shalala*, 169 F.R.D. 563 (S.D.N.Y. 1996) .................................................................25

*D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635 (N.D. Okla. 2011)......................................7

*Doe v. N.Y. Dep't of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981) .......................................................11

*Duran v. U.S. Bank Nat'l Ass'n*, 325 P.3d 916 (Cal. 2014) .........................................................26

*Floyd v. City of New York*, 283 F.R.D. 153 ........................................................................24, 39

*Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176 (S.D.N.Y. 2005) ..............................................29, 31

*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006) .......................................................29

*Gucciardo v. Titanium Constr. Servs., Inc.*, 16 Civ. 1113 (LGS), 2017 WL
    3738777 (S.D.N.Y. Aug. 30, 2017)....................................................................................26

*Hill v. City of New York*, 136 F. Supp. 3d 304 (E.D.N.Y. 2015) ..................................................24

*In re Denise J.*, 32 N.Y.S. 876 (Fam. Ct. 2016) .........................................................................37

*Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012) ...................................14, 15

*Jin v. Shanghai Original, Inc.*, Docket No. 19-3782, 2021 WL 864711 (2d Cir. 2021)..................................................................................................31, 36

*Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128 (2d Cir. 2015)..................................10

*K.A. v. City of New York*, 413 F. Supp. 3d 282 (S.D.N.Y. 2019)..................................11

*LaShawn A. ex rel. Moore v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993) ..........................25

*Lashawn A. v. Dixon*, 762 F. Supp. 959 (D.D.C. 1991), *aff'd in relevant part*, 990 F.2d 1319 (D.C. Cir. 1993)..............................................................................22

*Lassiter v. Dep't of Social Servs.*, 452 U.S. 18 (1981)..........................................34, 35

*Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, No. 12 Civ. 7935(ALC)(HBP), 2014 WL 265784 (S.D.N.Y. Jan, 23, 2014) ....................34

*Linder v. Thrifty Oil Co.*, 2 P.3d 27 (Cal. 2000)........................................................26

*M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015) ...........................................4, 12

*M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013) ...........................................7, 25, 27, 35

*M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216 (S.D.N.Y. 2016) .............7, 8, 23, 27

*Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997) ..................................................................................4, 40

*Mental Disability L. Clinic v. Hogan*, No. 06-CV-6320, 2008 WL 4104460 (E.D.N.Y. Aug. 28, 2008)........................................................................................25

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)............................................................27

*Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007) .....................................................39

*Santosky v. Kramer*, 455 U.S. 745 (1982)....................................................................34

*Schult v. Schult*, 699 A.2d 134 (Conn. 1997) ..............................................................37

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016)........................22

*Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012), *aff'd sub nom. Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015)..................28, 29, 39

*Taylor v. Zucker*, No. 14-cv-5317, 2015 WL 4560739 (S.D.N.Y July 27, 2015)........................15

*Toney-Dick v. Doar*, No. 12 Civ. 9162 (KBF), 2013 WL 5295221 (S.D.N.Y. Sept. 16, 2013)........................................................................................7, 8, 39

*V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554 (N.D.N.Y. 2017)......................................11

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).............................................................passim

*Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*, 331
    F.R.D. 279 (S.D.N.Y. 2019)............................................................................11, 16, 24, 25

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ...............................................................................37

**Statutes & Rules**

42 U.S.C. § 671(a)(15) ...............................................................................................................34

42 U.S.C. § 675(1).........................................................................................................................4

42 U.S.C. § 675(5)(E)..................................................................................................................33

Adoption and Safe Families Act, Pub. L. No. 105-89, 111 Stat. 2115 ..............................2, 16, 34

Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq. ...................2, 4, 32

Cal. Civ. P. Code § 382 ...............................................................................................................26

Charter of the City of New York, Ch. 24-B § 615 .......................................................................14

Charter of the City of New York, Ch. 24-B § 617 .......................................................................14

Fed. R. Civ. P. 17 ..................................................................................................................36, 37

Fed. R. Civ. P. 23 ..................................................................................................................passim

N.Y. Soc. Servs. L. § 20 ..............................................................................................................14

N.Y. Soc. Servs. L. § 34 ..............................................................................................................14

N.Y. Soc. Servs. L. § 371 ............................................................................................................14

N.Y. Soc. Servs. L. § 383-c .........................................................................................................14

N.Y. Soc. Servs. L. § 384 ............................................................................................................14

N.Y. Soc. Servs. L. § 384-b .........................................................................................................34

N.Y. Soc. Servs. L. § 406 ............................................................................................................14

N.Y. Soc. Servs. L. § 407 ............................................................................................................14

U.S. Const. amend. XIV ...............................................................................................................32

**Other Authorities**

*Data/Policy:  Snapshot of Children Receiving ACS Services*, NYC Admin. for
    Child.'s Servs., https://www1.nyc .gov/site/acs/about/data-policy.page ..................................7

Ethics for Attys. for Child. 3, https://www.nycourts.gov/courts/ad4/afc/afc-
    ethics.pdf ..........................................................................................................................37

H.R. Rep. 105-77 (1997), *reprinted in* 1997 U.S.C.C.A.N. 2739 ..................................34

Lessons Learned from Child Welfare Class Action Litigation: A Case Study of
    Tennessee's Reform, Ctr. for the Study of Soc. Pol'y, https://cssp.org/wp-
    content/uploads/2019/02/Tennessee-Case-Study-FINAL.pdf.................................36

Madelyn Freundlich et al., *Care or Scare: The Safety of Youth in Congregate
    Care in New York City*, 31 Child Abuse & Neglect 173 (2007) .............................29

*Outcomes 1 & 2:  Safety*, U.S. Dep't of Health and Human Servs.  Admin. for
    Child. & Fam., https://cwoutcomes.acf.hhs.gov/cwodatasite/recurrence/index.....................21

William B. Rubenstein, 1 Newberg on Class Actions § 3:7 (5th ed. 2020)...................8

## PRELIMINARY STATEMENT[1]

This case is *not* about the individual custodial decisions made in any foster child's case.  The Court has already rejected that characterization of Plaintiffs' claims and explicitly recognized that "plaintiffs do not seek to alter the custodial status of any of the Named Plaintiff Children."  R. & R. 2, ECF No. 416, *adopted by* Order, ECF No. 418.  Nor is this a case in New York Family Court, which, as discussed further below, is governed by an entirely different set of ethical and policy considerations that simply do not apply to a federal civil rights class action brought by "next friends" acting in the best interests of Named Plaintiff Children.[2]

What this case *is* about are ACS's and OCFS's system-wide practices, which have resulted in a dysfunctional child welfare system in New York City and the continuing violation of New York City foster children's constitutional and statutory rights.  Plaintiffs seek "systemic injunctive and declaratory relief" to remedy that dysfunction, and to enforce Plaintiff Children's legal rights.[3]  Class certification is appropriate under Rule 23 because these claims challenge system-wide practices and are therefore common to the entire class.

Defendants' briefs advance a revisionist history of this case that bears no relation to what has actually taken place.  Nothing in the Court's early decisions supports City

---

[1] Citations to:  (1) "Mot." refer to Memorandum of Law in Support of Plaintiffs' Renewed Motion for Class Certification, ECF No. 440 (the "Motion"); (2) "Ex." refer to Exhibits to the Declaration of Julie A. North in Support of Named Plaintiff Children's Renewed Motion for Class Certification, ECF No. 442; (3) "City Opp." refer to City Defendant's Memorandum of Law in Opposition to Plaintiffs' Renewed Motion for Class Certification, ECF No. 493; (4) "State Opp." refer to State Defendant's Memorandum of Law in Opposition to Plaintiffs' Renewed Motion for Class Certification, ECF No. 497; (5) "Amici Br." refer to Brief of Amici Curiae Brooklyn Defender Services, the Bronx Defenders, Center for Family Representation Inc., and Neighborhood Defender Service of Harlem in Opposition to Plaintiffs' Renewed Motion For Class Certification, ECF No. 531; and (6) "Reply Ex." refer to Exhibits to the Declaration of Julie A. North in Support of Named Plaintiff Children's Reply to their Renewed Motion for Class Certification.  Terms not otherwise defined have the same meaning as set forth in the Motion.

[2] *See* R. & R. 38, ECF No. 416, *adopted by* Order, ECF No. 418.

[3] *See* R. & R. 38, ECF No. 416, *adopted by* Order, ECF No. 418.

Defendant's assertion that Plaintiffs' Counsel "stumbled" into this lawsuit or have litigated in "ignorance". Through vigorous advocacy, Plaintiffs' Counsel have substantially defeated three motions to dismiss and one partial summary judgment motion.[4] Those rulings have established several important legal principles, including the existence of several private causes of action under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq. ("AACWA"), as amended by the Adoption and Safe Families Act ("ASFA"). Moreover, through their efforts and in response to Judge Swain's direction to develop an "evidentiary record" to support class certification, Plaintiffs' Counsel have obtained well over one million pages of discovery material, served 25 subpoenas, conducted 33 fact and three expert witness depositions, and supported the preparation of two expert reports, including a 330-page expert report by a team of nine social work experts who collectively spent thousands of hours reviewing over 66,000 pages of Named Plaintiff Children's case files. Indeed, Judge Pitman has commended the advocacy in this action as "thoughtful" and "exceptional". R. & R. 41, ECF No. 416, *adopted by* Order, ECF No. 418.

This litigation was not brought "in error"; it is the product of a joint effort by Plaintiffs' Counsel and Letitia James—then Public Advocate for the City of New York—to conduct, over a six-month period, an in-depth investigation of New York City's child welfare system, which included, *inter alia*, speaking with the biological parents, foster parents and/or other adult stakeholders, including some attorneys, in each of the Named Plaintiff Children's lives. *See* Lowry Decl., ECF No. 370; Elisa W. Decl., ECF No. 371. City Defendant knows

---

[4] *See* ECF Nos. 278, 397 (granting in part and denying in part Defendants' motions to dismiss); ECF No. 392 (denying Defendants' motion for partial summary judgment on mootness grounds); ECF No. 416 (granting in part and denying in part Defendants' Motion To Dismiss Next Friends of Additional Plaintiff Children).

these things to be true; it raised these same arguments previously in this case, and the Court rejected them.[5]

Defendants' and Amici's *ad hominem* attacks against Plaintiffs' Counsel are an apparent effort to distract from the evidentiary record that Plaintiffs have developed after extensive discovery.  In addressing Plaintiffs' pre-discovery motion for class certification in September 2016, Judge Swain noted that the record was not fully developed and therefore denied the motion "without prejudice to renewal on an evidentiary record that demonstrates satisfaction of the requirements of Rules 23(a) and 23(b)(2) as to both the broad class and appropriate subclasses."  Order 4, ECF No. 282.  Plaintiffs' Counsel have now returned with that evidentiary record, demonstrating by a preponderance of evidence that (i) common factual and legal issues exist that are apt to drive the resolution of the Plaintiffs' claims, and (ii) the claims of the Named Plaintiff Children are typical of those of the proposed class.  Defendants' arguments to the contrary go to the merits of Plaintiffs' claims, not to the existence of common issues amenable to class-wide adjudication, and thus are inappropriate at this stage of litigation.  Accordingly, Plaintiffs have satisfied their burden under Rule 23, and the Court should certify the putative class and subclasses.

## NATURE OF THE CLAIMS

Plaintiffs assert substantive due process claims under the Fourteenth Amendment on behalf of a class of children who are now or will be in the foster care custody of the Commissioner of ACS (collectively, "Plaintiff Children" or the "Class").  The Complaint alleges that the system-wide practices of ACS and OCFS deprive the Class of its fundamental rights to

---

[5] *See* ECF No. 264, at 1 ("[T]he City Defendants' attempt to contort [Judge Swain's] words into a finding of a Rule 11 violation divorces the words from the context in which they were made . . . . The fact that the City Defendants never commenced the procedures set forth in Rule 11(c) that must precede a motion for Rule 11 sanctions casts doubt on the veracity of their newly asserted arguments.").

safety, permanency and well-being (First Cause of Action).[6]  The Complaint also alleges that these systemic practices deprive the Class of its constitutional right to a permanent home and family in violation of the First, Ninth and Fourteenth Amendments (Second Cause of Action).[7]

Plaintiffs also assert statutory claims under AACWA, as amended by ASFA (Third Cause of Action).[8]  On September 12, 2016, Judge Swain held that Plaintiffs enjoy privately enforceable rights to:  (1) the preparation of a written case plan meeting the specifications set forth in 42 U.S.C. § 675(1); (2) a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements; (3) a case review system in which the case status of each child is reviewed at least every six months; and (4) a case review system that ensures that, with enumerated exceptions—including the documentation of compelling reasons not to do so—the State will file a petition to terminate parental rights ("TPR") for each child who has been in foster care for 15 of the most recent 22 months and will concurrently identify, recruit, process and approve adoption families.[9]  Plaintiffs assert on behalf of the Class that ACS's and OCFS's system-wide practices violate these statutory requirements.

---

[6] *See* Am. Compl. ¶¶ 341-344.  More specifically, Plaintiffs allege that the practices of ACS and OCFS deprive members of the Class of the following substantive due process rights:  "a. the right to freedom from maltreatment while in foster care; b. the right to protection from unnecessary intrusions into the child's emotional well-being while in government custody; c. the right to services necessary to prevent unreasonable and unnecessary intrusions into the child's emotional well-being while in government custody; d. the right to conditions and duration of foster care reasonably related to the purpose of government custody; e. the right to treatment and care consistent with the purpose and assumptions of government custody; and f. the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody".  *See id.* ¶ 344.

[7] *See* Am. Compl. ¶¶ 345-346.  *See Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997) (recognizing foster children have constitutional right to be free from "physical injury" and "unreasonable and unnecessary intrusions into their emotional well-being" as well as to "appropriate conditions and duration of foster care" and "family integrity"); *M.D. v. Abbott*, 152 F. Supp. 3d 684, 696 (S.D. Tex. 2015) (collecting cases holding that "states owe a duty of care to their foster children" and foster children's "right to be free from an unreasonable risk of harm 'encompasses a right to protection from psychological as well as physical abuse'").

[8] *See* Am. Compl. ¶¶ 347-349.

[9] *See* Am. Compl. ¶ 348(b), (g), (h), (i); Order on City Def.'s Mot. to Dismiss 11-17, ECF No. 278 ("Order on City MTD").

Plaintiffs also assert statutory claims on behalf of a "Compelling Reasons Subclass"—all children for whom the Contract Agencies failed to assess and document compelling reasons every three months to justify the decision not to file a TPR petition after the children had been in care for 15 of the prior 22 months, a violation of ACS policy and law.

Plaintiffs also assert on behalf of the Class that ACS's and OCFS's practices violate several provisions of New York State Social Services law (Fourth Cause of Action).[10] Finally, Plaintiffs assert that, through its practices, ACS has breached and failed to enforce its agreements with the Contract Agencies for the procurement of foster care services, of which the Class members are intended third-party beneficiaries (Fifth Cause of Action).[11]  Plaintiffs assert these claims on behalf of the Class as well as on behalf of the Special Scrutiny Subclass consisting of all children who have been in ACS custody for more than two years and whose cases require "special scrutiny" pursuant to ACS policy (Ex. 31 (NYC_00218423, -484-485)).

Plaintiffs identified, and presented detailed record evidence of, the following *city-wide practices* affecting the proposed Class:

1. ACS's delegation of the day-to-day care of, and case management responsibilities for foster children, to Contract Agencies, through the Improved Outcomes for Children system ("IOC"), without adequate and meaningful oversight mechanisms (Mot. 13-20, 50);

2. ACS's failure to ensure that caseworkers receive adequate and appropriate training (Mot. 20-23, 50);

3. ACS's failure to consider the child's background, risk factors and characteristics in evaluating a foster home, matching and making a placement (Mot. 23-26, 51);

4. ACS's failure to ensure case plans are timely developed and implemented (Mot. 51-52), including ACS's failure to (i) ensure Contract Agencies engage in concurrent planning (Mot. 27-28); (ii) adequately monitor services for birth

---

[10] *See* Am. Compl. ¶¶ 350-351.

[11] *See* Am. Compl. ¶¶ 352-358.

parents and caretakers to support reunification (Mot. 28-29); and (iii) ensure adequate and complete documentation of case records (Mot. 29-31);

5.  ACS's failure to take steps to ensure timely permanency (including failures to ensure Contract Agencies submit permanency hearing reports, attend permanency hearings on time and timely file TPR petitions in the absence of a statutory exemption, including the documentation of compelling reasons not to do so) (Mot. 32-37, 52);

6.  ACS's failure to protect children from an increased risk of maltreatment (including its failure to ensure Contract Agencies address safety concerns and to impose consequences on Agencies with high maltreatment-in-care rates) (Mot. 37-40, 52-53); and

7.  OCFS's failure to exercise meaningful oversight over ACS and the Contract Agencies (Mot. 40-45, 53-54).

Plaintiffs also identified ACS's failure to ensure that foster children in care for two years or more receive "special scrutiny", as required by ACS policy (Mot. 31-32), as a city-wide practice affecting the Special Scrutiny Subclass, and ACS's failure to ensure documentation of a compelling reason for not filing a TPR petition when a child has been in care for 15 of the past 22 months, consistent with ACS policy and federal law (Mot. 34-35), as a city-wide practice affecting the Compelling Reasons Subclass.  The record evidence demonstrating the existence of these city-wide practices includes two expert reports, excerpts from 21 depositions of ACS, OCFS and Contract Agency witnesses, and numerous internal and public documents.

## ARGUMENT

A party seeking class certification must show by a preponderance of evidence that it meets the requirements of Federal Rule of Civil Procedure 23(a) and at least one of the subsections of Rule 23(b).  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 346 (2011).  Contrary to Defendants' assertions, *Wal-Mart* does not preclude class certification.  Indeed, following

*Wal-Mart*, courts nationwide have certified classes in lawsuits that, like this one, challenge structural deficiencies and systemic violations of foster children's rights.[12]

While the Court must conduct a "rigorous analysis" under Rule 23, *Wal-Mart*, 564 U.S. at 350-51, "a motion for class certification should not . . . become a mini-trial on the merits" and "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216, 231 (S.D.N.Y. 2016); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

## I.    THE PROPOSED CLASS AND SUBCLASSES SATISFY RULE 23(A)'S REQUIREMENTS.

### A.    The Class (and Subclasses) Are Sufficiently Numerous and Ascertainable.

Defendants and Amici do not dispute that the Proposed Class meets Rule 23(a)'s numerosity requirement.[13]  Contrary to State Defendant's assertions (State Opp. 33), the Proposed Subclasses also meet Rule 23(a)'s numerosity requirement.  As cited in the Motion,

---

[12] *See, e.g.*, *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 968 (9th Cir. 2019) (affirming certification of class of "all children who are or will be in the legal custody of [the Arizona Department of Child Safety]" and a subclass of children in non-kinship foster homes); *M.D. v. Perry*, 294 F.R.D. 7, 30, 66 (S.D. Tex. 2013) (certifying general class of "all children now, or in the future," in the custody of the Texas Department of Family and Protective Services); *Connor B. ex rel Vigurs v. Patrick*, 272 F.R.D. 288, 298 (D. Mass. 2011) (certifying class of "all children who were or would be in the foster care custody of the Massachusetts Department of Children and Families (DCF)"); *Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 36 (D. Mass. 2011) (denying defendants' motion to decertify class in light of *Wal-Mart*); *D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635 (N.D. Okla. 2011) (denying defendants' motion to decertify class of all children who are or will be in the legal custody of the Oklahoma Department of Human Services after *Wal-Mart*).

[13] At around 7,600 members, the Proposed Class is well above the 40-member numerosity presumption in the Second Circuit.  *See Toney-Dick v. Doar*, No. 12 Civ. 9162 (KBF), 2013 WL 5295221, at *4 (S.D.N.Y. Sept. 16, 2013).  *See* Reply Ex. 14, *Data/Policy:  Snapshot of Children Receiving ACS Services*, NYC Admin. for Child.'s Servs., https://www1.nyc.gov/site/acs/about/data-policy.page (estimating 7,625 children in NYC foster care in December 2020).

ACS documents estimate the Special Scrutiny Subclass, which includes all children in foster care for two or more years, to consist of approximately 5,000 children as of FY 2018.[14]  Likewise, a 2016 Department of Investigations Report estimates the Compelling Reasons Subclass to consist of over 3,700 children.[15]  Because "[p]laintiffs need not set forth an exact class size to establish numerosity", *see Toney-Dick*, 2013 WL 5295221, at *4, evidence estimating the Proposed Subclasses consist of thousands of children is more than sufficient.

   Contrary to State Defendant's assertion (State Opp. 34-38), the Subclasses are also sufficiently ascertainable.  Courts in this District have recognized that classes certified under Rule 23(b)(2) require less precise definition than those seeking money damages under Rule 23(b)(3).  *See, e.g.*, *M.G.*, 162 F. Supp. 3d at 237 (S.D.N.Y. 2016) ("[P]recise ascertainability is unnecessary, as this is a Rule 23(b)(2) action and no class damages are sought."); *see also* William B. Rubenstein, 1 Newberg on Class Actions § 3:7 (5th ed. 2020) (collecting cases) ("[I]t is not clear that the implied requirement of definiteness should apply to Rule 23(b)(2) class actions at all.").  Moreover, because both Proposed Subclasses are based on objective, administrable criteria, they are readily ascertainable.[16]

---

[14] *See, e.g.*, Mot. 31 (citing Ex. 114 (estimating number of children in foster care for two years or more at 5,003)); White Tr., 282:25-283:9 (Ex. 22) (estimating same at "somewhere in the high 4,000"); Mot. 36-37 n.19 (citing Ex. 117 (estimating same at around 5,036)).

[15] *See* Mot. 35-36 (citing Ex. 108 ("[F]or the 4,510 children and youth for whom there was no documented compelling reason to file, petitions were not timely filed for 3,732 children and youth.").  The City's own estimates of the Compelling Reason Subclass, while lower, would still satisfy the numerosity requirement.  *See* Yaroni Decl., ECF No. 492 ¶ 5 (estimating, for calendar year 2017, 396 children who had been in care for 15 of the last 22 months and for whom "there was no TPR filed and for whom there was no exception and/or 'compelling reason'").

[16] The Special Scrutiny Subclass includes *all* children who have been in foster care for two or more years (and who are thus entitled to "special scrutiny" under ACS policy), *see* Mot. 4.  This number is publicly reported by ACS.  *See supra* note 14.  The Compelling Reasons Subclass is also readily ascertainable; indeed, Dr. Yaroni, an Associate Commissioner at ACS, purports to ascertain it.  *See* Yaroni Decl., ECF No. 492 ¶ 5.  The City contends (City Opp. 66-68) that the Compelling Reasons Subclass is not ascertainable because it would be too difficult to second-guess whether a given compelling reason is justified.  The City's contention mischaracterizes Plaintiffs' claim on behalf of this Subclass, which is simply whether or not a compelling reason was timely documented, *not* whether the documented reason was justified.

## B.    Defendants' Common Practices Are the "Glue" Holding the Class (and Subclasses) Together.

As Plaintiffs have made clear since the inception of this action,[17] and as the Court has recognized,[18] their claims are systemic, not individual, in nature.  This lawsuit is about whether and how ACS (and OCFS) fulfill their constitutional and statutory obligations to *all* children in foster care in New York City, *not* about the individualized decisions litigated in any foster child's Family Court proceeding.[19]  Plaintiffs challenge city-wide policies and practices— specifically, ACS's deficient management of the IOC system and OCFS's deficient oversight of ACS—which expose *all* foster children in New York City to a substantial risk of harm.  These city-wide policies and practices are the "glue that holds the class together" here.  *See B.K.*, 922 F.3d at 969 (identifying the question of the constitutionality of nine statewide practices as the "glue" that held together a class of all children in Arizona's foster care system).

While Rule 23(a)(2) requires "questions of law or fact common to the class", "[w]hat matters to class certification is not the raising of common questions—even in droves— but rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350.  "[W]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists."  *B.K.*, 922 F.3d at 968.  Put differently, "[t]he claims for relief need not be identical for them to be common; rather, Rule 23(a)(2) simply requires that there be

---

[17] *See, e.g.*, Compl., ECF No. 1, ¶¶ 169-282 ("systemic deficiencies plaguing New York City's foster care system and resulting harm to Plaintiff Children"); Am. Compl. ¶¶ 227-340 (same).

[18] Order on City MTD 3-4 ("Plaintiffs present harrowing allegations regarding mistreatment of the individual plaintiffs while in foster care, and allege that the entire New York City foster care system suffers from crippling and dangerous systemic defects.").

[19] R. & R. 39-40, ECF No. 416 ("[T]his action does not seek to change the placement of any plaintiff child. Rather, it seeks to compel compliance with pre-existing constitutional and statutory requirements.").

issues whose resolution will affect all or a significant number of the putative class members."
*Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 138 (2d Cir. 2015).  Because commonality
requires an understanding of the nature of the underlying claims, *B.K.*, 922 F.3d at 968, we
address Plaintiffs' constitutional and statutory claims in turn.

### 1.    Plaintiffs' Substantive Due Process Claims.

Plaintiffs bring substantive due process claims under the Fourteenth Amendment,
alleging that the seven system-wide practices listed above subject *all* children within ACS's
custody to a substantial risk of harm, including physical injury (maltreatment) and harm to their
emotional and mental well-being due to prolonged stays in foster care (lack of permanency).
The record is replete with evidence of Plaintiffs' exposure to the substantial risk of these
harms.[20,21]

In *B.K.*, the Ninth Circuit upheld certification of a class, nearly identical to the
putative class here, consisting of "[a]ll children who are or will be in the legal custody of
[Arizona's foster care agency] due to a report or suspicion of abuse or neglect".  922 F.3d at 966,
968.  The Ninth Circuit held that "a state's policies and practices can expose *all* persons within
its custody to a substantial risk of harm, which is the legal standard required by this due process
claim".  *Id.* (relying on *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014)).[22]  As a result, each

---

[20] *See, e.g.*, Mot. 37-40 (detailing evidence that New York City's high rate of maltreatment in care is pervasive across all contract agencies); Ex. 19 (21 of 22 family foster care programs, which account for approximately 75% of children in care, had maltreatment-in-care rates that were above federal guidelines); Mot. 38 n.20 (detailing maltreatment in care suffered by four Named Plaintiff Children).

[21] *See, e.g.*, Mot. 32-37 (detailing evidence of New York City's poor permanency outcomes); Ex. 102 (using the most recent data available, New York City has been well below the national average for achieving permanency for children in care for fewer than 12 months, between 12 and 23 months and over 24 months every year from 2013 to 2017); Expert Report of David Brodzinsky, Ex. 2 (detailing the mental and emotional harm caused by prolonged stays in foster care); Burry Exec. Summary, ECF No. 476-1, at 20-23 (detailing ACS's failure to take steps to ensure permanency in all 19 Named Plaintiff Children's case files).

[22] *See also Connor B.*, 272 F.R.D. at 293-95 ("[T]he unreasonable *risk* of harm created by these alleged systemic failures within DCF and applicable to the entire Plaintiff class is sufficient to satisfy the requirement of

class member suffered "exactly the same constitutional injury". *Id.* at 969.  Notably, the Ninth

Circuit rejected the same argument advanced by Defendants here—that plaintiffs' claims were

merely "a conglomeration of many [] individual claims"—since what mattered was whether

every child, solely by virtue of being in the foster care system, "was at *substantial risk* of future

harm". *Id.* at 968-69.  Thus, the Ninth Circuit held that "the constitutionality of statewide

policies and practices . . . is a 'common question of law or fact' that can be litigated in 'one

stroke'." *Id.* at 969 (quoting *Wal-Mart*, 564 U.S. at 350).[23]

That same reasoning governs here.  As noted above and in their Motion, Plaintiffs

identified—and detailed record evidence of—seven system-wide practices affecting the Class

(six against City Defendant and one against State Defendant).  Plaintiffs also identified one

system-wide practice affecting the Special Scrutiny Subclass, and one system-wide practice

affecting the Compelling Reasons Subclass.  *See supra* at 5-6.  The constitutionality of these

practices is the "glue" that holds the Class (and Subclasses) together—"either each of the

policies and practices is unlawful" as to every child in the Class or Subclass "or it is not".  *Id.*

Indeed, "when the plaintiff class seeks to enjoin a practice or policy, rather than individualized

relief, commonality is assumed."  *Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y.,*

*Purchase Coll.*, 331 F.R.D. 279, 292 (S.D.N.Y. 2019).

---

commonality."); *Connor B.*, 278 F.R.D. at 36 (denying defendants' motion to decertify class after *Wal-Mart*).  In the Second Circuit, establishing a substantive due process claim in the foster care context requires a showing that officials exhibited "deliberate indifference to a known injury, a known *risk*, or a specific duty".  *See Doe v. N.Y. Dep't of Soc. Servs.*, 649 F.2d 134, 144–45 (2d Cir. 1981) (emphasis added) (gross negligence creates strong presumption of deliberate indifference).

[23] District courts in this Circuit have applied similar reasoning in similar contexts.  *See K.A. v. City of New York*, 413 F. Supp. 3d 282, 303 (S.D.N.Y. 2019) (female prisoners' claim for relief based on, *inter alia,* "substantial and unreasonable risk" of sexual abuse and harm); *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 575 (N.D.N.Y. 2017) (claim by juveniles in county jail for class-wide injunctive relief based on "common course of conduct" giving rise to "substantial risk of serious harm").

The State (State Opp. 18-20) misconstrues the common injury alleged. Again, because Plaintiffs' claims are systemic rather than individual in nature, they do not concern what caseworkers or Family Court Judges determine in individual cases. Rather, Plaintiffs' claims concern the substantial risk of harm to which *all* New York City foster children are exposed, as a result of ACS and OCFS policies to which *all* New York City foster children are subject. As the district court found in *B.K.*, "[t]he inquiry here does not require the Court to determine the effect of the policies and practices upon any individual class member (or class members) or to undertake an individualized determination. Even if health issues may differ, every child in DSC custody is subject to the same medical, mental health and dental policies and practices of the DSC." Order, *Tinsley v. Flanagan*, No. CV-15-00185-PHX-ROS, ECF No. 293, at 16. Put differently, "[i]n the foster care context, a structural deficiency that puts foster children at an unreasonable risk of harm *is* the legal injury." *M.D.*, 152 F. Supp. 3d at 696-97. Similarly here, all children in ACS custody are subject to the same system-wide structural deficiencies that put them all at a substantial risk of harm.

The City's argument (City Opp. 32) that Plaintiffs' claims are based on case-specific "departures from policy" fundamentally misunderstands Plaintiffs' underlying claims. To be sure, as set forth in the Motion, Plaintiffs' claims are based on ACS's and OCFS's failures to meet legal obligations. But Plaintiffs do not allege individual, case-specific failures on the part of ACS and OCFS to meet their legal obligations. Again, Plaintiffs allege—and the voluminous factual record developed by Plaintiffs since their initial class certification motion

demonstrates—that ACS's and OCFS's failures are systemic, applicable to the entire class of

New York City foster children[24], and therefore suitable for class-wide resolution.[25]

       For these reasons, the legal claims and factual record in this case are unlike those

in *Wal-Mart*.  As the Supreme Court recognized, Wal-Mart is a multi-national corporation that

employs more than 1 million people dispersed at over 3,400 stores across the country.  *Wal-*

*Mart*, 564 U.S. at 342-43.  Wal-Mart had *no* system-wide hiring and compensation practices and

left pay and promotion decisions to the discretion of individual store managers.  *Id.*  Here, while

ACS has adopted a system (IOC) that delegates the day-to-day care and case management to

voluntary agencies, ACS remains legally responsible for ensuring the safety, timely permanency

and well-being of the children—those responsibilities are not "left" to the discretion of voluntary

---

[24] The common practices identified here—including the failure to provide a given service (*e.g.*, concurrent planning) despite a stated policy to do so—are exactly the type of practices upheld as capable of class-wide resolution by the Ninth Circuit in *B.K.  See B.K.*, 922 F.3d at 969 (listing nine systemic practices).

[25] Notably, this argument—that foster care inherently involves individualized decisions that are incapable of class-wide adjudication—is a common refrain from defendants in foster care civil rights litigation, and has been rejected by numerous courts when certifying classes of foster children.  *See, e.g.*, Defs.' Opp. 4, *B.K. ex rel. Tinsley v. McKay*, No. 2:15-cv-00185-PHX-ROS (ECF No. 245) (D. Ariz. 2016) (arguing that "the diversity of needs of children in care require an individual determination whether a particular policy manifests deliberate indifference to a specific need"), *argument rejected by* Order 15-17, *B.K. ex rel. Tinsley v. McKay*, No. 2:15-cv-00185-PHX-ROS (ECF No. 363) (D. Ariz. 2017); Defs.' Opp. 18, 31, *Connor B. v. Patrick*, No. 1:10-cv-30073-WGY (ECF No. 32) (D. Mass. 2010) (arguing that Plaintiffs failed to show that "the other 8,000+ proposed class members sustained similar harm" or that "all putative class members have similar claims"), *arguments rejected by* Order 15-16, *Connor B. v. Patrick*, No. 1:10-cv-30073-WGY (ECF No. 49) (D. Mass. 2011) ("Plaintiffs need not prove how each policy or failure has harmed each member of the class at this stage."); Defs.' Opp. 58, 84, *M.D. v. Perry*, No. 2:11-cv-00084 (ECF No. 163) (S.D. Tex. 2012) ("individualized inquiries generate different answers and establish dissimilarities that defeat certification"), *argument rejected by* Order 58, *M.D. v. Perry*, No. 2:11-cv-00084 (ECF No. 213) (S.D. Tex. 2012) ("Defendants' argument . . . mistakes the legal harm that is the basis of the General Class claim. Plaintiffs allege that these policies lead to an unreasonable risk of harm. As explained above, that risk alone is the legal injury."); Defs.' Opp. 9, *Dwayne B. v. Granholm*, No. 2:06-cv-13548-NGE-DAS (ECF No. 17) (E.D. Mich. 2007) ("the reasons any particular child may have stayed in foster care vary from child to child"), *argument rejected by* Order 9, *Dwayne B. v. Granholm*, No. 2:06-cv-13548-NGE-DAS (ECF No. 27) (E.D. Mich. 2007) ("Factual and legal commonality is inherent in cases such as this which present a class challenge to a common course of conduct by a unitary executive agency."); Defs.' Opp. 8, *Olivia Y. v. Barbour*, No. 3:04-cv-00251-HSO-FKB (ECF No. 69) (S.D. Miss. 2005) ("most of the putative class members will probably never suffer from any of the defendants' alleged violations, because the defendants will not act uniformly towards the class"), *argument rejected by* Order 7, *Olivia Y. v. Barbour*, No. 3:04-cv-00251-HSO-FKB, ECF No. 84 (S.D. Miss. 2005) ("[E]ven though each plaintiff and each proposed class member may not yet have suffered the same type or degree of harm (though some surely have), because it appears that defendants' alleged acts and omissions pose a significant risk of similar harm to all . . . the requirements of commonality and typicality are satisfied").

agencies but instead are legal duties owed to children *separate* from those owed by the voluntary agencies.  *See* N.Y. Soc. Servs. L. §§ 383-c, 384, 371(10)(a); Charter of the City of New York, Ch. 24-B §§ 615, 617.  As a result, ACS is responsible for overseeing and monitoring the voluntary agencies to ensure that the children entrusted to their custody receive care that is consistent with constitutional, federal and state law.  This oversight duty extends over the 26 agencies, which are geographically restricted to New York City.  As Plaintiffs have shown, ACS's system-wide failures to oversee the Contract Agencies are a common issue (Mot. 13-20), and unlike *Wal-Mart*, that failure is the result of a system-wide policy or practice.[26]

The principal cases relied on by the City and State are inapposite.  The plaintiffs in *Jamie S. v. Milwaukee Public Schools* (City Opp. 26-29) had identified one common issue: "[A]ll potential class members have suffered as a result of MPS' failure to ensure their Child Find rights under IDEA and Wisconsin law."  668 F.3d 481, 497 (7th Cir. 2012) (alteration in original).  As the Seventh Circuit observed, "[t]hat all the class members have 'suffered' as a result of *disparate individual IDEA child-find violations* is not enough; it does not establish that the individual claims have any question of law or fact in common."  *Id.* (emphasis added).  Here, Plaintiffs' claims are not based on alleged common suffering as a result of disparate, individual foster care decisions.  Rather, Plaintiffs allege—and in their Motion present record evidence supporting the existence of—system-wide policies and practices applicable to all members of the Class (or Subclasses) that give rise to a substantial risk of harm for each class member.  As the Seventh Circuit noted in *Jamie S.*, had plaintiffs adequately alleged "a 'systemic' failure" in the

---

[26] Similarly, OCFS is responsible for overseeing local departments' (like ACS's) administration of foster care. This duty is separate from, and additional to, the duty ACS owes the children.  *See, e.g.*, N.Y. Soc. Servs. L. §§ 17(a), (b), 20(2)-(4), 34(3)-(6), 406, 407.  Plaintiffs have shown OCFS's system-wide failures of oversight are a system-wide, common issue.  Mot. 40-45.

form of "child-find *policies* that violated the IDEA", the commonality requirement would have

been easily satisfied, *id.* at 498—as it is here.

State Defendant's reliance on *Taylor v. Zucker*, No. 14-cv-5317, 2015 WL

4560739 (S.D.N.Y July 27, 2015) (State Opp. 21-22) is similarly misplaced. In *Taylor*, plaintiffs

sought to certify a class of Medicaid recipients whose home care services had been wrongfully

terminated. *Id.* at *6. The court characterized plaintiffs' argument as follows: "since the state is

ultimately responsible for ensuring that the 68 mainstream [managed care providers] comply

with federal law, the state is responsible for any wrongful adverse *terminations* of a patient's

care . . . ." *Id.* at *11 (emphasis added). Thus, the court denied class certification not, as the

State asserts, because the New York State Medicaid system had many decision-makers, but

rather because the *Taylor* plaintiffs sought to litigate *each of the hundreds of decisions* regarding

their individual home care services, each of which was affected by the patients' insurance type,

the localities' own rules and the policies and rules of 68 private agencies. *Id.* at *9-12; *see also*

*id.* at *11 ("The state may have oversight responsible[*sic.*], but the state is neither making

decisions to reduce or terminate care for individual patients [n]or sending out notice of those

decisions."). Plaintiffs here do not challenge any individual decisions made by caseworkers,

private agencies or Family Court Judges. Rather, Plaintiffs' claims against State Defendant

challenge OCFS's system-wide practice of failing to oversee ACS. This practice is applicable to

the Class as a whole, and the question whether it exposes Plaintiff Children to a substantial risk

of harm giving rise to a due process claim can be answered in a single stroke.

### 2.    Plaintiffs' Statutory Claims.

Plaintiffs' statutory claims also give rise to common questions capable of

single-stroke adjudication. These common questions are:

15

- ACS's failure to ensure a written case plan to provide safe, appropriate and stable foster care placements, as required by federal and state law;[27]

- ACS's failure to ensure adequate case plans, as required by federal and state law;[28] and

- ACS's failure to ensure the filing of a TPR petition absent the documentation of compelling reasons (or a statutory exemption) for each child who has been in foster care for 15 of the last 22 months, as required under ASFA and state law.[29]

The statutory claims plainly meet the commonality test under *Wal-Mart*, as the common issue—whether Defendants by policy or practice have failed to ensure adequate placements, case planning or documentation of compelling reasons justifying the failure to file a TPR, in violation of Plaintiffs' statutory rights—is capable of a single-stroke, class-wide determination and will drive the resolution of the litigation.  *See, e.g.*, *Westchester Indep. Living Ctr., Inc.*, 331 F.R.D. at 292-93 (commonality met by question of "whether Defendants by policy or practice deprive individuals with mobility disabilities meaningful access to the Campus" in violation of the ADA).

The same is true of the common questions arising out of ACS's Quality Assurance Standards ("QAS"), which—contrary to the City's repeated assertions (City Opp. 35, 54)—are far more than mere "best practices" or "aspirational goals".  The QAS, which incorporates ACS policy, state and federal law, is expressly incorporated into every contract between ACS and Contract Agencies under Part II, Article 2 and attached as an addendum.  *See, e.g.*, Ex. 27, at 10, Attachment III.  These contracts do not frame the QAS as aspirational; they

---

[27] *See* Am. Compl. ¶ 348(b) (citing 42 U.S.C. §§ 671(a)(16), 675(1)(A)); ¶ 351(g) (citing 18 N.Y.C.R.R. § 430.11).

[28] *See* Am. Compl. ¶ 348(g) (citing 42 U.S.C. §§ 671(a)(16), 675(5)(A)); ¶ 348(h) (citing 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C)); ¶ 351(f) (citing N.Y. Soc. Servs. L. § 409-e; 18 N.Y.C.R.R. §§ 428.6 and 428.7); ¶ 351(h) (citing 18 N.Y.C.R.R. § 430.12).

[29] *See* Am. Compl. ¶ 348(i) (citing 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(E)); ¶ 351(d) (citing N.Y. Soc. Servs. L. § 384-b).

refer to its contents as "standards and expectations". *Id.* at 10. The language in the QAS itself also is mandatory, not permissive, stating throughout that the provider "shall" and "will" perform certain actions. *See, e.g.*, Ex. 31, at 48 ("Provider staff shall assess the permanency needs of every child individually to determine if a plan is in the child's best interest"); *id.* at 63 ("The Provider will engage in concurrent planning . . . in which planning for adoption or other custodial arrangements begins at intake").[30] ACS's own Deputy Commissioner has testified that the QAS is mandatory for Contract Agencies.[31] Deposition testimony from Contract Agency witnesses is in accord.[32] The City fails to support its claim that the QAS represents unenforceable "best practices" with any evidence other than its own unfounded assertion.[33] While that assertion may be a convenient litigation position, it is inconsistent with the facts adduced during discovery. Perhaps most importantly, the issue of whether the QAS is "aspirational" or "mandatory" policy that can be enforced by Plaintiffs *is* a common question that will drive the resolution of this case. It need not be decided on the merits now; the critical point is that it is a common question.

---

[30] This is in marked contrast to aspirational standards, like those promulgated by the Child Welfare League of America, which refer to themselves as "standards for excellence" that represent "practices considered most desirable". *Cf. Connor ex rel. Patrick v. Vigurs*, 985 F. Supp. 2d 129, 136 (D. Mass. 2013) (noting that CWLA standards are meant to be aspirational and do not impose legal obligations), *aff'd*, 774 F.3d 45 (1st Cir. 2014).

[31] *See* Decl. of Julie A. North in Supp. of Named Pl. Child.'s Opp'n to City Def.'s Daubert Mot., Ex. 3, ECF No. 523-3, Transcript of Deposition of Julie Farber (Deputy Commissioner of Family Permanency Services, ACS) at 92:4-7, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC (Q: "[F]oster care agencies with which ACS has contracted are required to follow the quality assurance standards. Is that right?" A: "They are, yeah.") ["Farber Dep."].

[32] *See, e.g.*, Reply Ex. 4, Transcript of 30(b)(6) Deposition of Cardinal McCloskey at 41:11-21, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC. Notably, none of the 11 Contract Agencies that Plaintiffs deposed ever testified that the QAS were not binding or represented aspirational best practices.

[33] None of the declarations submitted by ACS officials in opposition to Plaintiffs' Motion states that the QAS is merely "aspirational".

3.      **Defendants' Attacks on Plaintiffs' Common Questions Are Unavailing.**

Defendants' arguments against Plaintiffs' seven common questions of fact and law are unavailing as they relate to the merits of Plaintiffs' underlying case, not to the propriety of class certification. Plaintiffs address each of these in turn.[34]

- *ACS's Failure To Adequately Oversee Contract Agencies.* The City does not dispute that a set of policies and practices govern what it describes as "an extremely rigorous and intensive oversight process". City Opp. 36-37. Instead, the City's arguments go to the underlying merits of Plaintiffs' claim, not to whether there is a common policy or practice capable of class-wide adjudication. *See* City Opp. 40 ("[T]he question, for purposes of this litigation, is whether Plaintiffs' counsel have credibly demonstrated, by a preponderance of the evidence, that ACS's monitoring and oversight of its provider agencies is so deficient as to constitute deliberate indifference causing identifiable harms common to the entire Plaintiff Class."). While that may be a question for resolution at trial, it is not the relevant inquiry for purposes of evaluating the requirements of Rule 23.

- *ACS's Failure To Ensure Caseworkers Receive Adequate Training.* The City's arguments (City Opp. 42-45) are based on a misunderstanding—deliberate or otherwise—of Plaintiffs' claim. Plaintiffs' claim is not that ACS "fail[ed] to supervise training that itself may be sufficient" (City Opp. 42); Plaintiffs' claim is that ACS delegates care and case planning responsibility to contract agencies through IOC without imposing any robust training requirements for caseworkers or maintaining any oversight mechanism to ensure caseworkers are adequately trained. Mot. 20-23. This common practice places all members of the Class at a substantial risk of harm, and whether this practice gives rise to a constitutional claim is a question capable of class-wide resolution.[35]

---

[34] The City asserts (City Opp. 34) that there is a "lack of commonality" between Plaintiffs' Motion and Dr. Long's report. The City misunderstands Dr. Long's report. After reviewing the Named Plaintiff Children's files, Dr. Long identified six "themes" that were common to all the files. Am. Report of Dr. Caroline Long, ECF No. 476-1, at 4- 21. These are all represented in the common questions in Plaintiffs' Motion. Themes i (placements) and vi (permanency) directly correlate to common questions raised in the Motion. Themes ii (concurrent planning), iii (services) and iv (documentation) are all case planning failures and are addressed under the common question of whether ACS "fails to ensure adequate case plans are timely developed and implemented". Mot. 51. Theme v (special scrutiny) is a common question for the Special Scrutiny Subclass. That Plaintiffs identify two additional common questions of fact not studied by Dr. Long is unsurprising. Those questions—*i.e.*, whether ACS exercises adequate and meaningful oversight of the contract agencies and whether ACS fails to protect children in its custody from an increased risk of maltreatment—largely derive from evidence outside the case files Dr. Long reviewed.

[35] The City's list of "available" training (City Opp. 43-44) is beside the point; ACS does nothing to ensure caseworkers are *actually* adequately trained. *Compare* Mot. 20-23 (detailing evidence that ACS has "no standard of training for foster care agencies" and that caseworkers were "overwhelmed" and "need more training") *with* Farber Decl. ¶ 25, ECF No. 490 (describing Workforce Institute, which "offers critical training and professional

18

- ***ACS's Failure To Make Safe and Appropriate Placements.*** The City (City Opp. 45-48) does not dispute that, at the time Plaintiffs filed their Motion, ACS did not have "a process for matching a child's needs with a particular Contract Agency, nor [did] ACS ensure that its Contract Agencies have a process for matching children with appropriate families". Mot. 24. Instead, the City relies on the Declaration of Julie Farber, ACS's Deputy Commissioner for Family Permanency Services, which describes (1) an aspirational process of placement matching that ACS "seeks" and "works" to accomplish (Farber Decl. ¶ 28, ECF No. 490) that is in marked contrast to both her testimony that ACS's placement process is "glitchy" (Mot. 25) and the testimony of voluntary agency representatives (Mot. 24-25) (collecting and describing testimony), and (2) a "new Placement Module" launched in October 2019. Whether this new module is sufficient to cure the constitutional and statutory violations is a "merits" question that can be determined at trial, after additional discovery.[36] The critical point for Rule 23 is that the new module is "a statewide system" (Farber Decl. ¶ 33, ECF No. 490); thus, whether it meets constitutional and statutory standards is capable of determination in a single stroke.

- ***ACS's Failure To Ensure Adequate and Timely Case Plans.*** The City asserts (City Opp. 48) that there is "no specific requirement for case plan documentation under federal or State law". That is incorrect. Judge Swain already recognized that federal law prescribes "extensive specific content requirements for the plan". Order on City MTD 12. Thus, whether ACS has a practice of failing to ensure statutorily sufficient case plans *is* a common question capable of class-wide resolution that will drive the resolution of Plaintiffs' statutory claims. The City's remaining arguments also fail. *First*, as noted above, since the QAS is mandatory and enforceable by Plaintiffs, so too are Plaintiffs' claims based on ACS's failure

---

development opportunities"). As described in Plaintiffs' Motion, there is no uniform standard of training across the Contract Agencies, leaving caseworkers "overwhelmed" and requiring more training. Mot. 20-23. Indeed, although ACS's own Deputy Commissioner has testified that caseworkers at foster care agencies should be trained prior to taking on any cases (Reply Ex. 6, Farber Dep. at 73:6-9), testimony from Contract Agency witnesses consistently shows that ACS does not require foster care case workers to complete any mandatory training before being assigned to cases. *See, e.g.*, Ex. 3, Transcript of 30(b)(6) Deposition of SCO Family of Services at 164:5-11, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC (Q: "[S]o while a new caseworker is waiting that month for that training, do they receive a full caseload?"; A: "Yes. Depending on the caseload they are inheriting, depending on how they are being hired, but I would say generally, yes."); Ex. 14, Transcript of 30(b)(6) Deposition of Edwin Gould at 29:21-23, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC (Q: "So we wouldn't stop staff from starting because they didn't receive that particular training."); Reply Ex. 3, Transcript of 30(b)(6) Deposition of New Alternatives for Children at 194:2-18, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC (Q: "Are any of the mandatory trainings required to be performed before a case planner is assigned to a case?"; A: "Not to my knowledge."); Reply Ex. 5, Transcript of 30(b)(6) Deposition of HeartShare St. Vincent's at 287:12-288:12, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC (Q: "Is it possible for a caseworker to be assigned a case without having completed any trainings?"; A: "For foster care, yes.").

[36] Both the City and the State refused to provide any discovery into the effectiveness of this new Placement Module, despite Plaintiffs' requests for updated discovery. Reply Ex. 10 (11.25.2020 Letter from S. Buchalter to N. Peles); Reply Ex. 11 (12.9.2020 Letter from I. Forster to N. Peles).

to ensure compliance with its requirements (*i.e.*, concurrent planning and, for children in care two years or longer, special scrutiny). And regardless, the question of whether the QAS is mandatory and enforceable is itself a common question capable of class-wide resolution. *Second*, the City's assertion that Family Court Judges have made "reasonable efforts" determinations under the Family Court Act raises a "merits" question (whether Plaintiffs will ultimately prevail on their claim that ACS fails to monitor services for birth parents and caretakers to support reunification)—not a *commonality* question.[37] *Finally*, with respect to adequate and timely documentation, the City wholly ignores Plaintiffs' assertion of a common question as to whether documentation is *adequate* in addition to *timely*; indeed, Dr. Long and her team documented pervasive instances of incomplete documentation in Named Plaintiff Children's files.

- ***ACS's Failure To Take Steps To Ensure Timely Permanency.*** The City asserts that this common question is "so broad and generalized as to be utterly useless to a court". City Opp. 55. Again the City misreads Plaintiffs' claims. Plaintiffs identify specific, systemic failures that place all foster children in New York City at a substantial risk of failing to achieve timely permanency. These include (1) setting adoption targets that are well below federal permanency targets and imposing no consequences on Contract Agencies that fail to meet those targets; (2) failing to ensure that Contract Agencies attend permanency hearings and submit permanency hearing reports on time (thus impeding children's ability to be timely reunified with their biological families or placed with suitable kin); and (3) failing to ensure that, absent a statutory exemption, Contract Agencies timely file TPR petitions or document compelling reasons for not doing so when a child has been in care for 15 of the past 22 months, as required by law and ACS policy (on behalf of the Compelling Reasons Subclass). *See* Mot. 32-37. The City's response—(1) that it is the Family Courts, not ACS, who are ultimately responsible for delays in permanency; (2) that New York City's permanency rates should not be compared to other states; and (3) that ACS has made "tremendous strides . . . in reducing time to permanency"—all go to the merits of whether Plaintiffs will be able to prove their claims at trial, not to the existence of common questions capable of class-wide resolution.

- ***ACS's Failure To Protect Children from Increased Risk of Maltreatment.*** The City (City Opp. 63-64) calls Plaintiffs' reliance on national data compiled by the Administration for Children & Families of the U.S. Department of Health & Human Services "at the very least, ill-informed, and, at worst, a cynical ploy effectively using New York's most-lenient-in-the-nation evidentiary standard

---

[37] Moreover, the City's argument is belied by Amici, who identify "the two most critical factors that contribute to the length of separation [as] (1) access to services that address the root cause of separation and (2) the amount of time that it takes to complete required services necessary for reunification". Amici Br., at 10. Amici assert that the "state's routine failure to make these necessary services [for reunification] to parents in a timely manner regularly thwarts speedy reunification, a fact ignored by Plaintiffs". *Id.* at 12. But rather than being a "fact ignored by Plaintiffs", this is a common practice identified by Plaintiffs and upon which Plaintiffs are pursuing claims in this case. *See* Mot. 28-29.

against the City Defendant in this litigation".  Relying on the declaration of Mr. White, the City asserts that (1) as of 2018, New York was one of six states to adopt the most lenient "some credible evidence" standard for "indicating" child abuse and neglect reports; and that (2) "not surprisingly", if this "apples-to-oranges" problem of different standard for indication is ignored, New York City is "pushed to the bottom", effectively "penaliz[ing] New York for employing a standard that resolved all doubts in favor of child protection".  White Decl., ECF No. 491 ¶¶ 33-35.  Mr. White does not offer any data analysis for his assertion that a more lenient evidentiary standard necessarily leads to higher maltreatment rates.  Looking at the most recent data available for 2018,[38] it is not the case that the seven jurisdictions (with D.C.) that employed the most lenient evidentiary standard were the worst in terms of maltreatment-in-care rates.  New Mexico, for example, employed the same standard as New York in 2018 but had maltreatment-in-care rates in the top half of states.  Nor does this rationale account for the evidence Plaintiffs detailed in the Motion, showing that maltreatment-in-care rates in New York *City* are higher than in New York *State*, where the same evidentiary standards apply.  Most importantly, these are "merits questions" that go to whether Plaintiffs can prove their claims at trial, not to whether Plaintiffs have adduced evidence of a common practice giving rise to a substantial risk of harm that is capable of class-wide resolution.

- ***OCFS's Failure To Oversee ACS.***  In the Motion, Plaintiffs detailed record evidence to support the existence of a common practice that OCFS fails to adequately monitor ACS and the voluntary agencies.  *See* Mot. 40-45.  The State does not respond to that evidence.  Instead, the State relies on the conclusory declaration of Lisa Ghartey Ogundimu, Deputy Commissioner of the Division of Child Welfare and Community Services at OCFS, who supplies a high-level description of OCFS's oversight mechanisms, but neither responds to nor addresses a single piece of evidence raised in Plaintiffs' Motion demonstrating that OCFS's purported oversight mechanisms are not actually leading to any effective oversight.  *See* Ghartey Decl., ECF No. 498 ¶¶ 18-27.  Plaintiffs have identified a common practice of ineffective oversight, which Plaintiffs assert gives rise to substantial risk of harm to the Class.  This is sufficient to satisfy commonality.

Defendants' and Amici's arguments that Plaintiffs do not satisfy commonality

because a handful of policies have changed over the course of this lawsuit fails.  It is the

*existence* of generally applicable policies and practices that establishes common questions

---

[38] *See* Reply Ex. 13, *Outcomes 1 & 2:  Safety*, U.S. Dep't of Health and Human Servs. Admin. for Child. & Fam., https://cwoutcomes.acf.hhs.gov/cwodatasite/recurrence/index/; Reply Ex. 15, Child Maltreatment 2018, U.S. Dep't of Health and Human Servs. Admin. for Child. & Fam., https://www.acf.hhs.gov/sites/default/files/documents /cb/cm2018.pdf.

capable of class-wide resolution.  Neither the City nor the State articulate why their arguments as to the *sufficiency* of those policies and practices cannot be adjudicated on a class-wide basis. The City's erroneous assertion that declarations from ACS witnesses purporting to show system-wide improvements in certain metrics "stand[] as an insurmountable barrier" to class certification (City Opp. 7) betrays a fundamental misunderstanding of commonality under Rule 23. Moreover, as Plaintiffs have shown in the Motion, ACS's and OCFS's more recent initiatives still fail to improve on any of the metrics at the core of Plaintiffs' claims.[39]  *See, e.g.*, Mot. 17-19 (describing the short comings of the CoQI program, which was implemented in 2015).  Indeed, as former ACS Commissioner Gladys Carrión admitted, "ACS goes from initiative to initiative without paying attention to the fundamentals or deepening the work."  ECF No. 442-94.  The effect, if any, on Plaintiffs' claims of ACS's and OCFS's recent initiatives is an issue for trial. *See, e.g.*, *Lashawn A. v. Dixon*, 762 F. Supp. 959, 981-82 (D.D.C. 1991) (considering Defendants' alleged improvements to the foster care system at trial), *aff'd in relevant part*, 990 F.2d 1319 (D.C. Cir. 1993).  At trial, Plaintiffs will establish that Defendants' system-wide practices continue to fall well short of constitutional and statutory requirements.

Finally, the opinions of the City's expert, Margaret Burt, should be afforded no weight in the Court's consideration of Plaintiffs' motion for class certification.  Ms. Burt is a lawyer, whose opinions on the law are inadmissible.[40]  Her remaining opinions are unreliable.

---

[39] For example, as noted in Plaintiffs' Motion, ACS has previously represented in public announcements and deposition testimony that it is taking immediate steps to change safety standards through mandated safety and risk training.  *See, e.g.*, Mot. 40 n.22. However, in deposition errata, the City changed its position, noting that safety and risk training is not actually mandated for foster care caseworkers.  *Id.*

[40] Approximately half of Ms. Burt's report (pp. 3-12) opines on legal conclusions, such as the interpretation of federal and state child welfare statutes, which are impermissible expert testimony.  *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (courts must exclude expert testimony that "provide[s] legal opinions, legal conclusions, or interpret[s] legal terms") (alterations in original).

*First*, despite offering an opinion on the quality of case practice, Ms. Burt admitted a total lack of expertise with social work in her deposition, which renders her evaluation of the children's case files unreliable.[41]  *Second*, Ms. Burt admitted that she did not approach her review with any methodology.[42]  She only considered the cases of five of the 19 Named Plaintiff Children that counsel for the City directed her to review.  *Id*. at 100:2-16; 107:25:108-19.  She did not review any ACS policies, or contracts between ACS and voluntary agencies while reviewing the children's files, claiming that these were not relevant to her opinion.[43]  Based on this review, her testimony that, "[t]o a certain extent, I found no significant deviation from policy that resulted in some sort of harm to these children" is unreliable.  *Id.* at 151:24-152:3.  *Finally*, Ms. Burt has an evident bias in favor of Defendants, as she testified that 70-80% of her income over the last 20 years is attributable to ACS and OCFS.  *Id.* at 42:18-43:8.

### C.     Plaintiffs Are Typical of the Class and Subclasses.

"Under Rule 23(a)(3), [t]ypicality . . . is satisfied when each member's claims arise[] from the same course of events[] and each member makes similar legal arguments to prove the defendant's liability."  *M.G.*, 162 F. Supp. 3d at 232 (proposed class of autistic students challenging certain City and State special education policies satisfied typicality)

---

[41] *See* Reply Ex. 8, Transcript of Deposition of Margaret A. Burt at 25:4-9; 148:24-149:2, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC ("No, I'm not an expert on social work practice, social worker requirements, no.") ["Burt Dep."].

[42] *Id*. at 124:18-23. ("Methodology makes it sound like there was maybe more of a method than there was. I read the notes, I thought through what happened and I used my opinion. It's not more than that.").  Ms. Burt also admitted that she did not consider any statistics or class-wide data in forming her opinion about whether there were any patterns and policies which affected Plaintiffs' proposed classes.  *Id*. at 85:2-16.  When pressed, Ms. Burt could only name one such set of statistics relating to permanency:  that New York is "one of the worst in the country. Our State is, I believe, second from the bottom the last time I looked."  *Id.* at 92:5-12.

[43] See *id*., 149:4-10: ("Did you review any policies that are promulgated by ACS when you were preparing your report?" A: "In preparation of the report, no."; Q: "Why not?" A: "I don't think I need to to [sic.] formulate the opinion."); 181:2-5 ("As I indicated I don't know what's in their contracts and I don't know what's legally mandated in the context of a contract.").

(internal quotation marks omitted) (first alteration in original).  Courts in the Second Circuit,

likewise, have found typicality met where plaintiffs' "claims arise out of Defendants' alleged

general practices and course of conduct", noting specifically that plaintiffs need not "establish[]

the existence of unitary policy" or "definable policy or practice" if "Defendants engaged in

'general practices,' which, taken together, can be construed as a single course of conduct giving

rise to the claims of all class members." *Westchester Indep. Living Ctr., Inc.*, 331 F.R.D. at 294;

*see also Hill v. City of New York*, 136 F. Supp. 3d 304, 356 (E.D.N.Y. 2015) ("That each named

Plaintiff may not yet have been affected by each alleged policy does not destroy typicality.").

Courts have found typicality (and commonality) satisfied even where the class representatives do

not collectively match every possible factual permutation exhibited by the entire class.  *See, e.g.*,

*Westchester Indep. Living Ctr., Inc.* 331 F.R.D. at 294 (holding that plaintiffs who suffered

different mobility disabilities who were prevented from accessing different buildings still

satisfied commonality and typicality); *Floyd v. City of New York*, 283 F.R.D. 153, 175-76

(certifying class of Latino and Black persons who have been or will be subject to unlawful stop

and frisks despite the fact that none of the four named plaintiffs was Latino).  "[T]ypicality may

be assumed where the nature of the relief sought is injunctive and declaratory." *Westchester*

*Indep. Living Ctr., Inc.*, 331 F.R.D. at 293.

Named Plaintiff Children satisfy the requirement of typicality because, as

described in detail above, they assert that they, like all New York City foster children, are subject

to system-wide policies and practices that apply equally to every member of the Class (or

Subclass) and thus place each member of the Class (or Subclass) at a substantial risk of harm.[44]

---

[44] The City and State note that as of the filing of their Oppositions, 18 of the 19 Named Plaintiff Children were no longer in the care and custody of ACS.  *See* City Opp. 17 n.17; State Opp. 24 n.15.  The 19th Named Plaintiff, Ayanna J., was adopted by her foster mother in February 2021, after over seven years in care.  Judge Swain previously denied City Defendant's motion for partial summary judgment on mootness grounds, holding that "the

These system-wide policies and practices constitute a "single course of conduct giving rise to the claims of all class members", which suffices to show typicality. *Westchester Indep. Living Ctr.*, 331 F.R.D. at 294.  Courts across the country have consistently found typicality met in analogous class actions brought on behalf of foster children alleging constitutional and legal harms arising from deficient child welfare agency policies and practices. *See, e.g.*, *M.D.*, 294 F.R.D. at 46 (concluding that "[t]he named plaintiffs' claims are thus typical"); *B.K.*, 922 F.3d at 970 (certifying a class of children in foster care where a single named plaintiff showed that she was at risk of harm from statewide policies and practices); *Connor B.*, 272 F.R.D. at 296 (plaintiffs satisfied typicality because they identified specific systemic failures that exposed entire class to an unreasonable risk of harm).[45]

   Here, Defendants' typicality arguments are based on a series of supposed typicality "requirements" that have no basis in law. *First*, the City (City Opp. 20-25) invents, out

---

putative class of children in ACS's custody has every hallmark of an inherently transitory population", such that class certification should relate back to the filing of the complaint.  ECF No. 392, at 4.  The Second Circuit has held that relation-back is appropriate when named plaintiffs' claims became moot, as here, after plaintiffs filed their complaint but before the class was certified. *See Comer v. Cisneros*, 37 F.3d 775, 798-99 (2d Cir. 1994); *Crisci v. Shalala*, 169 F.R.D. 563, 567 (S.D.N.Y. 1996) ("Relation back is also appropriate where, as here, the claims of the named plaintiff have become moot before a motion for class certification is *filed* so long as a justiciable controversy existed some time prior to class certification." (emphasis added) (internal quotation marks omitted).  While one of the Named Plaintiffs' claims was live at the time that Plaintiffs' opening brief was filed in July 2019, "[t]here is no requirement in the Second Circuit that a representative's claim must be live at the time that the motion to certify is filed". *See Mental Disability L. Clinic v. Hogan*, No. 06-CV-6320, 2008 WL 4104460, at *10 (E.D.N.Y. Aug. 28, 2008) (relation back appropriate where Plaintiffs did not unduly delay their motion for class certification).  Here, there were many factors that delayed the filing of (and the full briefing of) Plaintiffs' Motion, including Defendants' delays in completing discovery (ECF Nos. 105, 175, 264, 265, 284, 304, 425, 432) the parties' settlement efforts (ECF No. 468) the COVID-19 pandemic (ECF Nos. 475, 479, 480), and Defendants' strategy of filing "surprise" expert reports with its briefs, prompting the need for additional discovery (ECF Nos. 500, 516, 517).  There is no evidence that Plaintiffs unduly delayed filing their motion for class certification, and relation-back is appropriate here given the "inherently transitory" nature of the Class.

 [45] State Defendant's argument (State Opp. 16 n.12) that these cases are not analogous because they involve State-administered foster care is unavailing.  If anything, courts have suggested that typicality is easier to establish where it is not a statewide system but "a much more localized service" such as "the provision of child welfare services in Philadelphia". *Baby Neal v. Casey*, 43 F.3d 48, 62 (3d Cir. 1994) (certifying class of children in Philadelphia's foster care system); *cf. LaShawn A. ex rel. Moore v. Kelly*, 990 F.2d 1319, 1326 (D.C. Cir. 1993) (affirming certification of class of children in D.C. foster care system).

of whole cloth, a new legal requirement for plaintiffs seeking to certify a class, *i.e.*, that named

plaintiffs must constitute a random sample that corrects for "selection bias" and is capable of

giving rise to statistically significant conclusions about the putative class as a whole.  The City

does not cite a single federal case to support this remarkable assertion.  The sole case the City

cites, *Duran v. U.S. Bank Nat'l Ass'n*, 325 P.3d 916 (Cal. 2014), concerned the use of statistical

evidence to prove class-wide liability and damages at trial, where individualized facts about

whether each loan officer spent more than 50% of the work day outside the office determined

whether that loan officer was a class member.  The California Supreme Court did not consider

the class action typicality requirement[46] or make any ruling relevant to certification of a Rule

23(b)(2) class action.  The City relies on the report of Dr. Wulczyn, who opines that "Plaintiffs'

counsel cannot reach the conclusions they do concerning typicality, because the 19 Plaintiff

Children were not randomly selected, using a rigorous sampling methodology, and in fact

represent a statistically insufficient percentage of children in ACS's care during the relevant time

period."  ECF No. 508, at 2.  That testimony is irrelevant at class certification; Dr. Wulcyzn

testified that he was using "typicality" to mean "statistically representative" and not any

definition under applicable law.[47,48]

---

[46] California courts consider typicality as part of the "community of interest" requirement of Cal. Civ. P. Code § 382.  *See Linder v. Thrifty Oil Co.*, 2 P.3d 27, 31 (Cal. 2000).

[47] Reply Ex. 7, Transcript of Deposition of Dr. Fred Wulczyn at 110:2-110:9; 111:23-113:1, *Elisa W., et al v. The City of New York, et al.*, No. 15-cv-5273-KMW-SLC (Q:  "[A]re you aware of what the definition of typicality is in a legal context?"; A:  "Not specifically."; Q:  "[T]o be clear, when you use the term 'typicality,' you're using it to mean representative in a statistical way and not in any other legal meaning that it might have?"; A:  "That's correct.").

[48] The City's novel "typicality" requirement would lead to absurd results.  Dr. Wulcyzn estimates an appropriate sample size from which one *could* draw certain conclusions about "typicality" would be 369 named plaintiffs, ECF No. 508 at 5.  But courts have found that even a single named plaintiff was sufficient to satisfy typicality.  *See, e.g.*, *Gucciardo v. Titanium Constr. Servs., Inc.*, 16 Civ. 1113 (LGS), 2017 WL 3738777, at *4 (S.D.N.Y. Aug. 30, 2017).  And Dr. Wulcyzn's proposed "sample size" is more than nine times what is required even to satisfy numerosity in the Second Circuit.  To be sure, statistical evidence may sometimes be used to prove class-wide liability and damages at trial, but is often unnecessary for claims for injunctive or declaratory relief, as

*Second*, the City appears to assert (City Opp. 22) that, to satisfy typicality, "Plaintiffs' counsel must *prove* that the supposedly class-uniting 'policy' is, in fact, unconstitutional".  That is not the law.  The constitutionality "in fact" of Defendants' policies and practices will be determined later at the merits stage—not now, at class certification.  *See, e.g.*, *M.G.*, 162 F. Supp. 3d at 231 ("a motion for class certification should not . . . become a mini-trial on the merits"); *see also B.K.*, 922 F.3d at 967 ("The manner and degree of evidence required at the preliminary class certification stage is not the same as at the successive stages of the litigation—i.e., at trial."); *M.D.*, 294 F.R.D. at 44 ("At class certification…[plaintiffs] do not need to prove that they are entitled to relief based on their claims; they need only make out a claim on behalf of the class.").  That the City cites only to an individual damages action in support of its assertion, *Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985), furthers the point that proof of liability is not a Rule 23 typicality requirement.

*Finally*, the City and State (City Opp. 23; State Opp. 2-3) argue that Named Plaintiffs are not typical of the Class because they: (i) received care from only 11 of 26 Contract Agencies; (ii) were never placed in congregate care; and (iii) entered the foster-care system in only eight of the last nineteen entry years.  Each of these arguments fails.

The fact that Named Plaintiffs do not represent all 26 possible Contract Agencies does not defeat typicality.  As described above, Plaintiffs' claims on behalf of the proposed Class and Subclasses derive from common ACS and OCFS practices that place all class (or subclass) members at a substantial risk of harm, regardless of agency.  In their Motion, Plaintiffs detailed record evidence satisfying their burden at class certification to show by a preponderance of the

---

here.  Moreover, both the City and State have denied Plaintiffs class-wide discovery prior to a class being certified. *See, e.g.*, ECF Nos. 175, 253, 265, 279, 287, 290, 296, 379, 394, 398.

evidence the existence of such system-wide practices.  This included not only evidence from

Named Plaintiff Children's case files, as analyzed by Dr. Long, but also included documents and

data applicable to all 26 agencies, including evidence of high maltreatment in care rates and poor

permanency outcomes for New York City's foster care system as a whole.[49]  Defendants provide

no evidence that the 11 agencies that provided the day-to-day care of the Named Plaintiffs were

in any way anomalous or aberrant from the remaining 15 agencies.  More importantly, Plaintiffs

provided ample evidence that ACS's common practices apply across all 26 agencies, making any

differences among the agencies irrelevant to Plaintiffs' claims.

       State Defendant contends (State Opp. 2) that Plaintiffs fail to satisfy typicality

because not a single Named Plaintiff Child was placed in congregate care.  That is incorrect.

Named Plaintiff Child Elisa W. was in a congregate care facility from the ages 19 to 20.  *See*

Reply Ex. 9 (NYC_01128783-4) (describing Hollis Court as a "Congregate Care Facility").[50]

Moreover, neither ACS nor OCFS puts forth any evidence to suggest that the common practices

identified by Plaintiffs do not also apply to children in congregate care.  "'[M]inor variations' in

the facts underlying plaintiffs' individual claims [] do not preclude a finding of typicality."

*Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 291 (S.D.N.Y. 2012), *aff'd sub nom. Sykes*

---

[49] *See, e.g.*, Ex. 110 (New York State ranked last among all reporting states for maltreatment of children in foster care); Ex. 40 (explaining that "[Contract Agency] staff do not pay consistent attention to the child protective monitoring role"); Ex. 119 (stating that "while ACS' evaluation process uncovered and documented serious safety concerns for children in foster care, ACS frequently failed to then ensure that [Contract Agencies] addressed those concerns"); Ex. 100 (showing that New York City's rate of maltreatment-in-care was even higher than that of New York State, and has substantially surpassed the federal benchmark in every year from FY2013 through FY2016); Ex. 70 (showing that, in FY2017, Contract Agencies collectively only achieved 76% of their ACS-issued adoption targets and nearly half of the agencies failed to meet their ACS-issued adoption targets); Exs. 6, 21, 47, 89 (New York ranks 48th on permanency outcomes after two years); Ex. 102 (showing that New York City has been well below the national average for achieving permanency for children every year from 2013 to 2017).

[50] In September 2017, Judge Pitman found that Elisa W.'s stay at the Louis Jackson Crisis Residence was not a stay in congregate care when he denied Plaintiffs' request for discovery into OCFS' oversight over residential facilities.  *See* ECF No. 398.  However, Elisa W.'s stay at Hollis Court—a different facility—occurred *after* this ruling, and is therefore not precluded by it.

*v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015).  This is particularly true given that children in foster care can move between family foster homes and congregate care.  Moreover, if anything, the substantial risk of harm due to Defendants' common practices is likely even more acute in congregate care settings.[51]

Finally, the City (City Opp. 6, 23) and its expert, Dr. Fred Wulczyn (ECF No. 508, at 3-4), argue that Plaintiffs are not typical of the proposed class because they only represent 8 of the 19 cohort years of admission into foster care.  Again, Plaintiffs need not represent every possible year of entry into foster care where the alleged injuries of the class all derive from a unitary course of conduct or policy that places each class member at the same risk of substantial harm.  *See, e.g.*, *Sykes*, 285 F.R.D. at 291 ("minor variations in the facts underlying plaintiffs' individual claims [] do not preclude a finding of typicality").

### D.      There Are No "Conflicts" Precluding Representation of the Class or Subclasses

In order to satisfy the requirements of Rule 23(a)(4), Named Plaintiff Children must "fairly and adequately protect the interests of the class".  Fed. R. Civ. P. 23(a)(4).  "[N]ot every potential conflict will preclude a finding of adequacy"; a conflict "must be fundamental, and speculative conflicts should be disregarded at the class certification stage."  *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 141 (S.D.N.Y. 2006).  Moreover, even a conflict alleged to be fundamental must be "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation" to warrant denial of class certification.  *Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 180 n.33 (S.D.N.Y. 2005).

---

[51] *See, e.g.*, Reply Ex. 1 (Madelyn Freundlich et al., *Care or Scare: The Safety of Youth in Congregate Care in New York City*, 31 Child Abuse & Neglect 173 (2007) (identifying issues with violence, maltreatment, inadequate staffing and oversight in congregate care)).

Defendants and Amici assert (City Opp. 12-17, 66-71; State Opp. 3, 26, 27; Amici Br. 14-15, 18-20) a variety of specious "conflicts", which at bottom, reflect their continued misunderstanding of Plaintiffs' claims. This case is not about "faster TPR filings" (City Opp. 14); "TPR at the earliest opportunity" (City Opp. 14); "speed for speed's sake" (City Opp. 15-16, 17); "speedy adoptions" (Amici Br. 20); "[p]rioritizing adoption" versus "prioritizing reunification" (State Opp. 27, 34); or "demand[ing]" certain permanency outcomes to the exclusion of all else (City Opp. 14). Plaintiffs do not advance those claims or seek that relief. Any assertions of purported "conflicts" between Named Plaintiff Children and the Class on these bases lacks merit. Indeed, as Magistrate Judge Pitman recognized, "this [case] does not seek to change the placement of any plaintiff child. Rather, it seeks to compel compliance with pre-existing constitutional and statutory requirements. The City does not explain how compliance with these requirements could be contrary to the interests of the Named Plaintiff Children." R. & R. 40, ECF No. 416, *adopted by* Order, ECF No. 418.

For example, the claim asserted on behalf of the Compelling Reasons subclass, consisting of all children who have been in foster care for 15 of the past 22 months, is that ACS has failed to ensure timely documentation of compelling reasons justifying the failure to file a TPR (absent another applicable statutory exemption). For some children, compliance with federal law will mean a statutory exemption applies. For others, a compelling reason will be documented. And for others, a TPR petition will be timely filed. *How* federal law is complied with will depend on the individual child's case. But *whether* it is complied with cannot—as it is now—be essentially left to chance. No child should be at risk of languishing in limbo, in violation of his or her legally enforceable rights. *See* Order on City MTD 15-17 (citing 42 U.S.C. § 675(5)(E)). Defendants' compliance with this legal requirement is in the best interest

of *all* subclass members, and City Defendant's overheated claims of a conflict within the

subclass based on Named Children representatives who ultimately reunited with birth parents

(City Opp. 13-15, 69-71) are baseless.  City Defendant's opposition likewise fails to explain how

Named Plaintiff Children's "interests" could pose *any* conflict with those of the putative Class

(or Subclasses), let alone one "so palpable as to outweigh the substantial interest of every class

member in proceeding with the litigation".  *Fogarazzo*, 232 F.R.D. at 180 n.33.

## II.    COUNSEL IS QUALIFIED TO REPRESENT THE CLASS UNDER RULE 23(G).

Rule 23(g) enumerates four factors the court must consider when determining

whether proposed class counsel is adequate, namely:  "(i) the work counsel has done in

identifying or investigating potential claims in the action; (ii) counsel's experience in handling

class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit

to representing the class".  Fed. R. Civ. P. 23(g)(1)(A).  Class counsel's "obligation . . . may be

different from the customary obligations of counsel to individual clients" because "the primary

responsibility of class counsel . . . is to represent the best interests of the class."  *Jin v. Shanghai

Original, Inc.*, Docket No. 19-3782, 2021 WL 864711, at *9 (2d Cir. Mar. 9, 2021) (internal

citations and quotations omitted).

Plaintiffs' counsel exceed the requirements of Rule 23(g).  Plaintiffs' counsel are

highly experienced class action and child welfare litigators who have capably and aggressively

represented the interests of the Named Plaintiff Children and the proposed class for nearly six

years.  *See supra* at 1-3 (listing the work accomplished by putative class counsel to date).  Here,

Plaintiffs' counsel have decades of combined class action litigation experience.  Marcia Lowry

of A Better Childhood has litigated some of the most important and groundbreaking foster care

class action cases in the past 40 years.[52]  Cravath, Swaine & Moore LLP ("Cravath") is a

respected firm of more than 400 attorneys with a nationally respected pro bono practice.[53]  City

Defendant and Amici do not dispute any of this.  Rather, they challenge the adequacy of

Plaintiffs' Counsel on three primary grounds.  Each is meritless.

> *First*, City Defendant and Amici assert that Plaintiffs' Counsel wish "to substitute

their personal policy preferences for those of ACS Commissioner David Hansell" (City Opp. 6,

9, 12, 14; *see* Amici Br. 13-14).  These attacks on Plaintiffs' Counsel's motivations are

unfounded and ignore the actual nature of the claims asserted in this case.  As noted above, the

Amended Complaint alleges violations of the Named Plaintiff Children's substantive due process

rights under the Fourteenth Amendment of the U.S. Constitution, including the rights to safety

and basic services, and the right not to be maintained in government custody longer than

necessary.  Am. Compl. ¶ 344.  It also alleges violations of the Named Plaintiff Children's

statutory rights to an adequate written case plan and case review system under AACWA.  *Id.*

¶ 348.  These are legally enforceable rights that have been recognized by numerous courts across

the country, including this one.[54]  City Defendant's claim that Plaintiffs' counsel are seeking to

impose an "aggressive, earliest-possible TPR-and-adoption regime" (City Opp. 12) is also

unfounded; nothing in this litigation seeks to alter any permanency goal (or any other custodial

---

[52] Lowry Decl. ¶ 4, ECF No. 441.  *See Marisol A. v. Giuliani,* No. 95-10533 (S.D.N.Y.); *see, e.g.*, New Jersey (*Charlie H. v. Christie*, No. 99-3678 (D.N.J. filed Aug. 4, 1999)); Tennessee (*Brian A. v. Haslam*, No. 00-445 (M.D. Tenn. filed May 10, 2000)); Atlanta, Georgia (*Kenny A. v. Deal*, No. 02-1686 (N.D. Ga. filed June 19, 2002)); Mississippi (*Olivia Y. v. Barbour*, No. 04-251 (S.D. Miss. filed Mar. 30, 2004)); Michigan (*Dwayne B. v. Snyder*, No. 06-13548 (E.D. Mich. filed Aug. 8, 2006)); Oklahoma (*D.G. v. Yarbrough*, No. 08-074 (N.D. Okla. filed Feb. 13, 2008)); District of Columbia (*LaShawn A. v. Gray*, No. 89-1754 (D. D.C. filed June 20, 1989; Texas (*M.D. v. Perry*, No. 11-084 (S.D. Tex. filed Mar. 29, 2011); New York City (*Marisol A. v. Giuliani*, No. 95-10533 (S.D.N.Y. filed Dec. 13, 1995); New York City (*Wilder v. Bernstein*, No. 78-957 (S.D.N.Y. filed Mar. 3, 1978).

[53] North Decl. ¶¶ 4-8, ECF No. 442.

[54] *See supra* note 7.

decision) for any child in the foster care system.  Moreover, the Court has already rejected this purported "conflict" (R. & R. 40, ECF No. 416, *adopted by* Order, ECF No. 418), and City Defendant does not identify anything that has changed since that ruling.

In a similar vein, Amici argue (Amici Br. 5-8) that "Plaintiffs' emphasis on TPR and achieving 'permanency' through adoption" is "directly contrary" to "the settled policy of New York State and New York City to attempt to reunify families wherever possible".  Amici's argument both mischaracterizes Plaintiffs' claims and misstates New York law.  Plaintiffs claim that ACS's and OCFS's systemic policies place all foster children at a substantial risk of failing to achieve *any* permanency—reunifications as well as adoptions.[55]  Only one of Plaintiffs' many claims concerns the filing of TPR petitions—namely Plaintiffs' claims (on behalf of the Compelling Reasons Subclass) that ACS fails to ensure that, for children who have been in foster care for 15 of the last 22 months, either a TPR petition is filed or else a compelling reason is timely documented, as required by federal and state law and ACS policy.[56]  New York law is entirely consistent with federal law on this point.[57]  Indeed, the New York state legislature expressly found that "many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians," which "may deprive these children of positive, nurturing family relationships

---

[55] *See* Mot. 8 (defining three components of permanency); *id.* at 9 n.3 (listing five permanency goals, including return to parent); *id.* 28-29 (identifying the failure of ACS to monitor services provided to birth parents and caretakers to support reunification as common practice).

[56] *See* Am. Compl. ¶ 348(i) (citing 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(E)); ¶ 351(d) (citing N.Y. Soc. Servs. L. § 384-b); *see also* Ex. 29, at NYC_00216484-85.  Other exceptions to this requirement include situations where the child is being cared for by a relative or where there has been a failure to timely provide services to the family of the child in accordance with the case plan.  *See, e.g.*, 42 U.S.C. § 675(5)(E)(i), (iii).

[57] *Compare* 42 U.S.C. § 675(5)(E), *with* N.Y. Soc. Servs. L. § 384-b(3)(l)(i).  New York State law goes beyond federal law in providing a non-exhaustive list of "compelling reason[s]" justifying the non-filing of a TPR petition. *See* N.Y. Soc. Servs. L. § 384(b)(3)(l)(ii).

and have deleterious effects on their development into responsible, productive citizens", and that "provision of a timely procedure for the termination, in appropriate cases, of the rights of the birth parents could reduce such unnecessary stays."[58]  ACS's stated policy is also consistent with federal and state law.[59]

   Moreover, to the extent Amici assert that the relevant provisions of ASFA (and New York state law) are unconstitutional (Amici Br. 7-8), that is incorrect and beyond the scope of the issues raised by the parties.[60]  Both ASFA and New York law are directed toward permanency (whether adoption or reunification) and recognize the importance of reunifying foster children with their parents and caregivers where possible.[61]  No provision of the Constitution prohibits measures to achieve permanency for children who have been in foster care for 15 of the past 22 months.  The cases on which Amici rely instead discuss the level of procedural due process owed to parents during proceedings to terminate their parental rights.[62]  The procedures of the New York Family Court satisfy those requirements.  Indeed, in one of

---

[58] N.Y. Soc. Servs. L. § 384-b(1)(b).

[59] *See* Ex. 29, at NYC_00216484-85.  For additional detail regarding the required timeframes for achieving permanency under federal and state law and ACS policy, *see* Mot. 8-10.

[60] It is inappropriate for amici to "initiate, create, extend or enlarge issues" presented by the parties.  *Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, No. 12 Civ. 7935(ALC)(HBP), 2014 WL 265784, at *2 (S.D.N.Y. Jan, 23,  2014) (internal citations and quotations omitted); *Andersen v. Leavitt*, No. 03-cv-6115 (DRH)(ARL), 2007 WL 2343672, at *2 (E.D.N.Y. Aug. 13, 2007) ("[A]n *amicus curiae* brief should not be used to address wholly new issues not raised by the parties.").

[61] For example, ASFA amended 42 U.S.C. § 671(a)(15) to require that "reasonable efforts shall be made to preserve and reunify families . . . to make it possible for a child to safely return to the child's home."  *See* Pub. L. No. 105-89, § 101(a), 111 Stat. 2115, 2116 (1997) (amending 42 U.S.C. § 671(a)(15)).  *See also* H.R. Rep. 105-77, at 8 (1997), *reprinted in* 1997 U.S.C.C.A.N. 2739 ("Rather than abandoning the Federal policy of helping troubled families" ASFA represented "a measured response to allow States to adjust their statutes and practices so that in some circumstances States will be able to move more efficiently toward terminating parental rights and placing children for adoption".).

[62] *See Santosky v. Kramer*, 455 U.S. 745 (1982); *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18 (1981).

Amici's cited cases, the Supreme Court expressly advised that "child-custody litigation must be concluded as rapidly as is consistent with fairness."[63]

Amici moreover mischaracterize the prior work of Marcia Lowry as class counsel representing children in foster care nationwide and the reforms she has secured through her advocacy. Amici Br. 16-17. Ms. Lowry has served as class counsel in numerous class actions across the country on behalf of children in foster care, and no court has ever found her unfit to serve as class counsel. Courts have lauded Ms. Lowry's "extensive experience . . . in complex and class action litigation" and unquestioned "competence and zeal". *M.D.*, 294 F.R.D. at 46. Amici assert that Marcia Lowry "should not be assumed to fairly and adequately protect the best interests of the proposed class", because she "has consistently advocated in favor of quick conclusions to foster system stays through increased adoption, with a focus on policy and systems rather than the interests or needs of individual children or families". *See* Amici Br., at 16-17. But, past settlements achieved on behalf of foster children by Marcia Lowry have consistently included provisions aimed at improving services and support not only for children but also for their families. The agreement Ms. Lowry reached on behalf of New Jersey foster children, for example, explicitly acknowledged that "[f]amilies should be provided with the services they need to keep them together whenever possible", *see* Modified Settlement Agreement 2, *H., et al. v. Murphy, et al.*, No. 2:99-cv-03678 (D.N.J. July 27, 2006), and included provisions specifically addressing services for families. Even independent reviews of the settlements achieved on behalf of foster children by Ms. Lowry confirm that those settlements are not merely "quick conclusions" to the systemic issues identified by the class action

---

[63] *Lassiter*, 452 U.S. at 32.

complaints, but in fact produce meaningful and long-lasting positive changes to child welfare systems.[64]

*Second*, although City Defendant acknowledges that Family Court rules do not apply in this case (City Opp. at 12), it argues that Plaintiffs' Counsel would have been precluded from "advocat[ing] positions affecting those same clients in New York's Family Courts without consulting them" (City Opp. 11).  But as counsel for the putative class, counsel seek not to challenge the individual decisions made in the Family Court cases of any Named Plaintiff Child or child in the putative class, but rather "to compel compliance with pre-existing constitutional and statutory requirements" (ECF No. 416, at 40) in fulfilment of their "primary responsibility . . . to represent the best interests of the class".  *Jin*, 2021 WL 864711, at *9 (2d Cir. Mar. 9, 2021) (internal citations and quotations omitted).  Further, there is no reason to believe that any child would object to the enforcement of his or her basic constitutional and statutory rights:  the right to constitutionally adequate safety and care, the right not to be held in governmental custody longer than needed to achieve the custody's purpose, and the right to a foster care system that maintains, for each child, a statutorily adequate written case plan and a case review system.

Moreover, Plaintiffs' Counsel here consult with the Named Plaintiff Children's next friends and act in the best interests of the class, a role fundamentally different from a child's attorney in Family Court.  In this case—where claims of minor children have been brought by the next friend mechanism under Rule 17(c)(2)—the Federal Rules of Civil Procedure apply, not

---

[64] *See, e.g.*, Reply Ex. 2, Lessons Learned from Child Welfare Class Action Litigation: A Case Study of Tennessee's Reform, Ctr. for the Study of Soc. Pol'y, https://cssp.org/wp-content/uploads/2019/02/Tennessee-Case-Study-FINAL.pdf (review of settlement Ms. Lowry secured on behalf of Tennessee foster children, finding the class action "resulted in transformational reforms", "durably improv[ing] the ways the Department serves children and families and achieves outcomes").

the rules of the New York Family Courts.  To be a next friend, an individual must show that he is "truly dedicated to the best interests of the person on whose behalf he seeks to litigate". *Whitmore v. Arkansas*, 495 U.S. 149, 163-64 (1990).  Thus, a "next friend" under Rule 17 is more akin to a guardian ad litem (who advocates for the best interests of a child) than to a child's attorney in New York State Family Court, who, absent certain circumstances, must advocate for a child's personal wishes (even if the lawyer does not believe they are in the child's best interest).[65]  City Defendant's rhetoric about how the Named Plaintiff Children have been "involuntarily drafted" or "dragooned" into this lawsuit (City Opp. 13, 70 n.50) flies in the face of this Court's previous ruling upholding the next friends' role in bringing this action.  Children in foster care, such as Named Plaintiff Children, are in an even more delicate position than other minors because their legal guardian (ACS) is the very entity against which they wish to assert claims in federal court.  Accordingly, as Judge Pitman explained, "the common-law concept of Next Friend is capacious enough to include individuals who pursue a suit in good faith on behalf of a minor or incompetent" even where the next friend had "little or no contact or history with the [foster] children each sought to represent" because "[f]oster children likely have no 'significant relationship' with any adult who can or will litigate on their behalf."  *See* ECF No. 416, at 34, 37, 39-41 (internal citations and quotations omitted) (citing *Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77 (1st Cir. 2010)).

---

[65] *See* Reply Ex. 12, Ethics for Attys. for Child. 3, https://www.nycourts.gov/courts/ad4/afc/afc-ethics.pdf). Much like the next friends in this case, "a guardian ad litem is charged with the responsibility of close investigation and exploration of the truth on the issues and perhaps even of recommending by way of report alternative resolutions for the court to consider."  *Braiman v. Braiman*, 44 N.Y.2d 584, 591 (1978) (internal citations and quotations omitted).  Guardians ad litem and attorneys for children may disagree on the appropriate course of conduct for the child they represent.  *See, e.g.*, *In re Denise J.*, 32 N.Y.S. 876, 877-78 (Fam. Ct. 2016) (noting that the attorney for the child and guardian ad litem representing a child in foster care took different position on the appropriateness of the child's attendance at permanency hearings); *Schult v. Schult*, 699 A.2d 134, 140 (Conn. 1997) ("[W]here the court has appointed both an attorney and a guardian ad litem to represent a child in a dissolution action, the attorney for the child may advocate a position different from that of the guardian ad litem so long as the trial court determines that it is in the best interests of the child to permit such dual, conflicting advocacy.").

*Third*, City Defendant argues that Plaintiffs' Counsel has "failed to meet with their putative clients, learn their case facts, and ascertain their true interests" (City Opp. 9, 10, 16 n. 15).  These assertions are also false.  As the Court has already recognized, "[p]rior to the commencement of this action, counsel for the Named Plaintiff Children met with the Named Plaintiff Children's biological parents, foster parents or other adult family members".[66]  Moreover, Plaintiffs' Counsel has been in frequent contact with Named Plaintiff Child Elisa W., who is now over 18 years old.[67]  City Defendant's unsupported assertion that "none of the next friends . . . have ever met with or heard from the children in whose behalf they appear" (City Opp. 16 n.15) is also false.  Alison Max Rothschild, Meyghan McCrea and Shamara Mills know and have personal relationships with the foster children they represent.  Am. Compl. ¶¶ 21, 64, ECF No. 466.  And, Elizabeth Barricelli, a former teacher of Elisa W., originally served as her next friend in this litigation, but was dismissed from the case following Elisa W.'s 18th birthday. *See* Am. Compl. ¶ 10; R. & R., ECF No. 416.  Moreover, many of the Named Plaintiff Children are quite young and several suffer from emotional, behavioral or developmental challenges. Lowry Decl. ¶ 2, ECF No. 370.  Appropriately, rather than meeting with these young children directly, Plaintiffs' Counsel and the children's next friends who bring these claims informed themselves about the children's circumstances through a review of their voluminous case files (including by engaging a team of nine social work experts to review them page by page).

---

[66] R. & R. 40, ECF No. 416, *adopted by* Order, ECF No. 418.  Plaintiffs' Counsel also reached out to lawyers for each of the Named Plaintiff Children.  Lowry Decl. ¶ 2, ECF No. 370.

[67] Indeed, contrary to the City Defendant's assertion that "Plaintiffs' counsel have never filed a declaration from even one of the nineteen Plaintiff children evidencing even an awareness, let alone support, of this litigation's goals" (*id*. at 16), Plaintiffs' Counsel filed precisely such a document on May 11, 2017.  *See* Elisa W. Decl., ECF No. 371.  In that declaration, Elisa W. stated that she had been placed in a total of at least 14 foster homes during her time in care, and she described some of the conditions that she faced, including abuse and neglect, in those placements.  *See id*. at ¶ 17.

## III.   THE PROPOSED CLASS AND SUBCLASSES SATISFY RULE 23(B)(2).

"A class may be certified under Rule 23(b)(2) if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class." *Sykes*, 285 F.R.D. at 287-88 (internal citations omitted).  "[C]ivil rights cases alleging class-wide" conduct, such as this one, "are prime examples of what Rule 23(b)(2) was intended to cover".  *See Toney-Dick v. Doar*, 2013 WL 5295221, at *10 (citing *Amchem Prods., Inc.*, 521 U.S. 591).  Predominance and superiority need not be shown, as in a Rule 23(b)(3) class action, as they are "self-evident" in actions for injunctive relief.  *See Floyd*, 283 F.R.D. at 177.  For the reasons stated in Plaintiffs' Motion, Plaintiffs' proposed classes for injunctive and declaratory relief are exactly the kind envisioned as certifiable under Rule 23(b)(2).

State Defendant attempts to challenge Plaintiffs' satisfaction of Rule 23(b)(2) on three bases, none of which is persuasive.  According to State Defendant, (i) Plaintiffs are challenging a series of individual decisions that cannot be remedied by a single injunction; (ii) an injunction would not bind the third-party actors involved in the administration of foster care services; and (iii) injunctive relief against the State Defendant is precluded by *Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007).  But as explained in Plaintiffs' discussion of commonality (Section I.B.), Plaintiffs' suit challenges not a series of individual-level decisions by third parties, but rather the systemic practices and policies of ACS and OCFS, which apply to all children in the Class (or Subclasses) and give rise to a substantial risk of harm for each child in the Class (or Subclass).  *See also B.K.*, 922 F.3d, at 971 ("[P]laintiffs have not brought a concatenation of individual claims that must be redressed through individual injunctions; they have brought unified claims . . . A single, indivisible injunction ordering state officials to abate those policies and practices 'would provide relief to each member of the class,' thus satisfying

39

Rule 23(b)(2)." (internal citations and quotations omitted)); *Marisol*, 126 F.3d at 378 (denying defendants' argument that "no injunction will be appropriate" because of the "unique circumstances of each plaintiff's experience with the child welfare system").  The fact that State Defendant cannot "imagine" a specific injunction at this pre-merits stage should not bar certification of Plaintiffs' class. *See, e.g.*, *B.K.*, 922 F.3d at 971-72 ("Plaintiffs do not need to specify the precise injunctive relief they will ultimately seek at the class certification stage"; an argument that "ha[d] no basis in existing law, whether in the text of the Federal Rules or in our precedent".).  Plaintiffs should not be denied the opportunity to prove their claims against the State at this juncture.

The State's remaining argument, suggesting that this class cannot be certified because it is beyond the injunctive powers of this Court, is equally meritless.  The sole case the State relies on for this proposition, *Reynolds v. Giuliani*, was decided after a bench trial and holds only that the State cannot be found liable under § 1983 under a theory of respondeat superior.  As detailed above, Plaintiffs are not pursuing claims against the State under a theory of respondeat superior; Plaintiffs' claims are that OCFS's own common practices and deliberate indifference contribute causally to the substantial risk of harm the Class (and Subclasses) face while in foster care in New York City.

## CONCLUSION

Because Plaintiffs have shown by a preponderance of the evidence that the putative Class and Subclasses meet the requirements of Rules 23(a) and (b)(2), Plaintiffs' Motion should be granted.  If the Court certifies the proposed Class (or Subclasses), Plaintiffs' Counsel respectfully requests appointment as class counsel under Rule 23(g).

40

Dated:  April 1, 2021
       New York, NY

                             Respectfully submitted,

A BETTER CHILDHOOD, INC.
    By

    Marcia Robinson-Lowry

    355 Lexington Avenue, Floor 16
    New York, NY 10017
    (646) 975-4456
    mlowry@abetterchildhood.org

CRAVATH, SWAINE & MOORE LLP,
    By

    /s/ Julie A. North

    Julie A. North
    Justin C. Clarke

    Worldwide Plaza
    825 Eighth Avenue
    New York, NY 10019
    (212) 474-1000
    jnorth@cravath.com
    jcclarke@cravath.com

*Attorneys for Plaintiffs Elisa W., Alexandria R., by her next friend, Alison Max Rothschild; Thierry E., by his next friend, Michael B. Mushlin; Lucas T., Ximena T., Jose T.C. and Valentina T.C., by their next friend, Rachel Friedman; Ayanna J., by her next friend, Meyghan McCrea; Olivia and Ana-Maria R., by their next friend, Dawn Cardi; Xavion M., by his next friend, Michael B. Mushlin; Dameon C., by his next friend,  Reverend Doctor Gwendolyn Hadley-Hall; Tyrone M., by his next friend, Bishop Lillian Robinson-Wiltshire; Brittney W., by her next friend, Shamara Mills; Mikayla G., by her next friend, Michael B. Mushlin; Myls J. and Malik M., by their next friend, Elizabeth Hendrix; and Emmanuel S. and Matthew V., by their next friend, Samuel D. Perry, individually and on behalf of a class of all others similarly situated.*

41