UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

ELISA W., *et al.*,

                          Plaintiffs,

         -against-

THE CITY OF NEW YORK, *et al.*,

                         Defendants.

--------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: ____9/3/21_____

15-CV-5273 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

       This action was brought in 2015 on behalf of nineteen children in foster care in New York City.   Plaintiffs assert a range of constitutional and statutory claims against both New York City and the State of New York, based on alleged systemic failures in the New York City foster care system, including a failure to exercise proper oversight over the agencies responsible for the day-to-day care of children.   Two motions are pending before the Court: a *Daubert* motion filed by the City Defendants seeking to exclude the testimony of Plaintiffs' expert witness, and a renewed motion by Plaintiffs for class certification.   For the reasons set forth below, both motions are DENIED.

## BACKGROUND

       The Court assumes the parties' familiarity with both the factual background concerning New York City's foster care system and the lengthy procedural history in this litigation.   As such, these issues will be addressed only as necessary for purposes of this Opinion.

### I.     Factual Background

#### A.  Permanency

The mission of the New York City Administration for Children's Service ("ACS") is to

"protect and promote the safety and well-being of New York City's children, young people, families, and communities by providing excellent child welfare, juvenile justice, and early care and education services."   N.Y.C. Admin. of Children's Servs., *Mission and Organization*, available at https://www1.nyc.gov/site/acs/about/mission-organization.page.   ACS receives reports of maltreatment or suspected abuse from a statewide reporting system and is required to investigate whether a child may safely remain in the care of their parents.   *See* N.Y. Soc. Serv. L. § 415; City Defs.' 2016 Opp'n at 1, ECF No. 205.   In conducting this safety assessment, ACS balances the risks posed to the child by their parents against the harm of being removed from the home.   (*See* City Defs.' 2016 Opp'n at 2-3 (citing *Nicholson v. Scoppetta*, 3 N.Y.3d 357, 378 (N.Y. 2004)).)

One of the central principles in child welfare generally, which animates ACS's work, is to achieve "permanency."   (*See* Ren. Mem. at 9, ECF No. 440.)   Permanency refers to the provision of a safe, permanent home with a child's birth parent(s), or, where necessary, with a relative, adoptive parents, or a legal guardian.[1]   (*See* Ren. Mem. at 9.)   As a last resort, children in foster care may be placed in what is known as "another planned permanent living arrangement."   (*See* Ren. Mem. at 9 n.3; North Decl. Ex. 29 at 3.)   New York law makes clear

---

[1]  The term "permanency" is somewhat controversial.   Plaintiffs explain that the term encompasses three components—legal permanence, residential permanence, and psychological permanence—and assert that long-term foster care fails to establish permanency and adversely affects children.   (*See* Ren. Mem. at 8; Brodzinsky Report at 6-8, North Decl. Ex. 2, ECF No. 442.)   Parent advocacy organizations, however, have cautioned that permanency is understood by child welfare practitioners to be "a watchword for those who believe that child welfare policy should be aimed more aggressively at adoption," as opposed to family reunification.   (Parent Advocates' Br. at 14-15, ECF No. 531; Gottlieb Decl. ¶ 41, ECF No. 531.)   Similarly, the City Defendants assert that the positions advanced by Plaintiffs in this action demonstrate a strong policy preference in favor of adoption.   (See City Defs.' Opp'n at 12, ECF No. 493.)   Notwithstanding this disagreement about the implications of the term, there is little dispute about the general meaning and import of permanency, *i.e.*, providing children with a safe, permanent home.   *See* N.Y. Soc. Serv. L. § 384-b(1) ("[I]t is desirable for children to grow up with a normal family life in a permanent home and that such circumstance offers the best opportunity for children to develop and thrive.")

that "it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home of its birth parent, . . . ."   N.Y. Soc .Serv. L. § 384-b(1)(a)(ii).   For this reason, New York is considered a "parents' rights" state in the context of child welfare law and practice.   (*See* Burt Report at 4-6, ECF No. 507.[2])

### B.  The New York City Foster Care System

New York City's foster care system is a complex operation involving state, city, and private actors.   Broadly speaking, the New York State foster care system is supervised by the State but run locally.   At the state level, the Division of Child Welfare and Community Services at the New York State Office of Children and Family Services ("OCFS") is responsible for the oversight of child welfare services.   At the local level, services are administered by departments of social services.   (Ghartey Decl. ¶ 4, ECF No. 498.)   In New York City, that local department is ACS.   Children in New York City foster care are thus placed in the custody of the Commissioner of ACS.   (*See* Ghartey Decl. ¶ 7; *see also, e.g.*, N.Y. Soc. Serv. L. § 383-c.)

In 2009, ACS received approval from OCFS to implement an initiative known as Improved Outcomes for Children ("IOC").   (White Decl. ¶ 2, ECF No. 491.)   Pursuant to IOC, ACS delegates case management functions to voluntary agencies, or "Contract Agencies." (Ghartey Decl. ¶ 7.)   These are non-profit entities that operate independently and employ their own caseworkers, or "case planners."   (*See* City Defs.' 2016 Opp'n at 5.)   The Contract Agencies deliver services to meet the needs of children and families, including finding an appropriate placement for each child; monitoring children in their foster care settings; ensuring

---

[2]  An initial version of this report was filed at ECF No. 494.

that children receive necessary medical, mental health, and educational services; recruiting foster parents; referring birth parents for services to address the issues that led to removal of a child from the home; and developing alternative permanency plans for adoption or guardianship when reunification is not attainable.   (*See* City Defs.' 2016 Opp'n at 5-6; Farber Decl. ¶¶ 4-5, ECF No. 490.)   IOC is premised on the belief that case planners and supervisors from Contract Agencies, who work with foster children and families every day, are best placed to understand the particular needs of a given child or family.   (White Decl. ¶¶ 2, 8.)   ACS currently contracts with twenty-six Contract Agencies.   (Ghartey Decl. ¶ 7.)

Although Contract Agencies thus assume the responsibility of primary case manager, ACS exercises an oversight role, monitoring the agencies to ensure that sound, timely decisions are being made with respect to the safety, permanency, and well-being of children.   (*See* White Decl. ¶ 8.)   ACS has several specific roles in this regard.   For example, ACS has authority to assess each child to the determine the appropriate level of care required and to match children to foster care agencies.   (White Decl. ¶ 8.)   ACS also facilities family team conferences; conducts safety checks of Contract Agencies; and reviews permanency reports.   ACS's monitoring and oversight system is complex: it includes tools such as a monthly indicator report on trends in intake, placements, and permanency outcomes; a "dashboard" that provides ACS staff with daily updates on casework and deadlines; a "scorecard" that evaluates Contract Agencies' programs; and monthly and quarterly reports to the agencies themselves to show their performance.   (*See* White Decl. ¶¶ 8, 13-25.)

ACS, in turn, is overseen by OCFS.   Among other functions, OCFS issues regulations, policies, and procedures that apply statewide.   (*See* Ghartey Decl. ¶¶ 9-12.)   In addition, ACS must apply to OCFS for approval of IOC.   OCFS approved IOC as a pilot program in 2007 and for full implementation in 2009, and has re-authorized IOC several times at the request of ACS,

which must submit a detailed report in support of its request for re-authorization.   (*See* Ghartey Decl. ¶¶ 13-17.)   OCFS staff communicate with ACS representatives through frequent phone calls and meetings, meet on a monthly basis to discuss developments in ACS policies and practices, and review ACS policies.   (*See* Ghartey Decl. ¶¶ 18-19.)   OCFS also maintains a computer system called CONNECTIONS, in which users, including caseworkers and OCFS or ACS staff, upload or access case files or other documentation regarding, for example, a child's education and health.   (*See* Ghartey Decl. ¶¶ 28-30.)

In addition to its oversight of ACS, OCFS also performs more targeted oversight of Contract Agencies.   The New York Regional Office of OCFS ("NYCRO") performs Voluntary Agency Reviews ("VARs") to review whether each agency is complying with statutory and regulatory standards.   (*See* Ghartey Decl. ¶ 21.)   VARs involve on-site visits by NYCRO to the Contract Agency, collecting and reviewing personnel records, agency policies, and child case records, and interviewing youth, family, and staff members.   (*See* Ghartey Decl. ¶ 23-24.) Because VARs demand significant resources, they are conducted every three years.   (*See* Ghartey Decl. ¶ 22.)

### C.  Improvements in the Foster Care System

There is little dispute that the foster care system faces challenges, which include delays in achieving permanency.   In recent years, however, the New York City foster care system has improved greatly.   Between 1992 and 2016, the number of children in the foster care system declined by nearly 80%.   (Gottlieb Decl. ¶ 21.)   In June 2017, the number of children in the system reached a historic low and has continued to decline.   (*See* Parent Advocates' Br. at 9.) In addition, New York City has invested substantially in preventive services that are designed to avoid the need for foster care, such that over 45,000 children received these services in 2019, as

compared to fewer than 14,000 in 1996.   (*See* Parent Advocates' Br. at 9; Gottlieb Decl. ¶ 21.)

OCFS and ACS, in search of further improvements, also continue to develop new initiatives and programs.   In 2019, for example, OCFS developed a Placement Module, which provides a "searching and matching component" designed to assist ACS and other local departments of social services with finding foster care placements for children more efficiently. (*See* Ghartey Decl. ¶ 32.)   The module facilitates more case-specific placements by allowing case workers to match "placement-related child characteristics"—such as education and mental health—with the characteristics of a Contract Agency.   (*See* Ghartey Decl. ¶ 32.)   And in 2016, ACS launched a collaboration with the City University of New York to provide critical training for the staff of Contract Agencies.   (*See* Farber Decl. ¶ 25.)   Such initiatives are wide-ranging, covering additional areas including the recruitment of foster parents and expanding visitation resources when a child has parents who are incarcerated.   (*See* Farber Decl. ¶¶ 39-60.)

### D.  The New York State Family Court System

In understanding the structure of the New York City foster care system, it is also critical to be aware of the pivotal role played by the New York State Family Court system.   When ACS determines that intervention is necessary to protect a child, it initiates a child protective proceeding in New York State Family Court.   That court has original jurisdiction over abuse and neglect proceedings.   (*See* City Defs.' 2016 Opp'n at 3.)   At a preliminary hearing, the family court determines whether removal of a child is necessary; if such a determination is made, the child may be placed in the custody of ACS or in the care of a relative or other suitable person. (*See* City Defs.' 2016 Opp'n at 3.)

Irrespective of whether a child enters foster care or the care of a relative, the child remains under the family court's jurisdiction.   (*See* City Defs.' 2016 Opp'n at 3.)   Within eight

months from the date of a child's removal, and approximately every six months thereafter, the

family court is required to hold permanency hearings.   *See* N.Y. Fam. Ct. Act §§ 1089(a)(2),

(3).   Before such hearings, ACS prepares a permanency report that sets forth the child's

permanency goal, their health and progress, the services offered to the parents, and the

recommended permanency plan.   (*See* City Defs.' 2016 Opp'n at 7.)   The family court then

issues an order directing that the child be returned to their parents or, if they remain in foster

care, the court issues findings as to whether the permanency goal should be approved or

modified, whether ACS and the relevant Contract Agency have made reasonable efforts to

implement the child's permanency plan, and whether the child should remain in their current

placement or reside with a relative.   (*See* City Defs.' 2016 Opp'n at 7-8.)   The family court is

thus intimately involved in the details of each child's case, exercising control over the pacing of

permanency outcomes and making major decisions about their foster care circumstances.   (*See*

Burt Report at 9-10.)   Proceedings in family court tend to be highly contested and, because each

order in a child abuse or neglect matter is appealable, the litigation may be active and time-

consuming at both the family court and appellate levels.   (*See* Burt Report at 5-6; N.Y. Fam. Ct.

Act § 1112.)

## II.   Procedural History

The named Plaintiffs in this case are nineteen children, who were selected by counsel

after a public outreach program to those "who have faced problems with the NYC foster care

system."   (City Defs.' Opp'n at 1; *see* Pines Decl. Ex. 1, ECF No. 208.)   Plaintiffs entered the

foster care system between 2002 and 2015 and were cared for by eleven of the twenty-six

agencies under contract with ACS.

Plaintiffs filed the initial Complaint on July 8, 2015, and the Amended Complaint on

December 29, 2015.   (ECF Nos. 1, 91.)   The Amended Complaint asserts several causes of

action against the City of New York, ACS, and the Commissioner of ACS, in her official

capacity (collectively, the "City Defendants"), as well as against the State of New York, OCFS,

and the Commissioner of OCFS, in her official capacity (collectively, the "State Defendants").

Specifically, the Amended Complaint alleges that Plaintiffs have been, and are at risk of being

deprived of constitutional rights protected by the First, Ninth, and Fourteenth Amendments to the

United States Constitution; that City Defendants' actions constitute a pattern or practice of

depriving Plaintiffs of various rights conferred upon them by the Adoption Assistance and Child

Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997; that City

Defendants' actions constitute a deprivation of rights conferred on Plaintiffs by various

provisions of the New York State Social Services Law and regulations adopted thereto; and that

City Defendants have breached and failed to enforce contracts between ACS and Contract

Agencies.   (*See* Am. Compl. ¶¶ 341-58.)   At bottom, Plaintiffs assert that children in foster

care in New York City are harmed by systemic deficiencies, including failures by OCFS and

ACS to perform their respective oversight functions, and to enforce the terms of the agreements

between ACS and the Contract Agencies.

Plaintiffs first moved for class certification toward the end of 2015, seeking to certify a

class consisting of "children who are now or will be in the foster care custody of the

Commissioner of New York City's Administration for Children's Services."   (*See* Mots. at ECF

Nos. 75, 87; Pls.' 2015 Mem. at 17, ECF No. 88.)   On September 27, 2016, the motion was

denied by Chief Judge Swain, who held that Plaintiffs had not met their burden to demonstrate

that each of the requirements of Rule 23 had been satisfied.[3]   (Sept. 27, 2016 Order at 3-4, ECF

No. 282.)   Accordingly, class certification was denied, "without prejudice to renewal on an

evidentiary record that demonstrates satisfaction of the requirements of Rules 23(a) and 23(b)(2)

as to both the broad class and appropriate subclasses."   (Sept. 27, 2016 Order at 4.)

Following the September 27, 2016 Order, the parties engaged in fact and expert discovery

for approximately two and a half years.   On July 30, 2019, Plaintiffs filed a renewed motion for

class certification, seeking to certify a class of "children who are now will be in the foster care

custody of the Commissioner of ACS," as well as two subclasses consisting of (1) "all children

who have been in ACS custody for more than two years and whose cases require 'special

scrutiny' pursuant to ACS policy," and (2) "all children for whom Contract Agencies failed to

assess and document compelling reasons every three months to justify the decision not to file a

termination of parental rights ('TPR') petition after the children had been in care for 15 of the

prior 22 months."   (Ren. Mot., ECF No. 439; Ren. Mem. at 4-5.)   After further discovery, City

and State Defendants filed opposition briefs on August 31, 2020 and September 21, respectively.

(City Defs.' Opp'n, ECF No. 493; State Defs.' Opp'n, ECF No. 497.)

On March 21, 2021, leave was granted for Brooklyn Defender Services, The Bronx

Defenders, Center for Family Representation Inc., and Neighborhood Defender Service of

Harlem (collectively, the "Parent Advocates"), to file an *amicus curiae* brief in opposition to

Plaintiffs' renewed motion for class certification.   (ECF No. 530.)   The Parent Advocates'

brief was filed on March 22, 2021.   (ECF No. 531.)   Plaintiffs then filed a reply in support of

class certification on April 1, 2021 (ECF No. 533), and City and State Defendants each filed a

---

[3] The case was transferred to this Court on July 22, 2020.

surreply on April 8, 2021 (ECF Nos. 539, 541).

In tandem with the briefing on class certification, the City Defendants brought a challenge to the admissibility of an expert report by Plaintiffs' expert, Dr. Caroline Long (the "Long Report").   Dr. Long evaluated the case files of the nineteen named Plaintiffs and concluded that each was subjected to the same six "policy and practice departures"—namely, (1) failure to consider the child's and agency's respective characteristics during placement; (2) failure to engage in "concurrent planning" (which refers to a case worker developing a secondary permanency plan while advancing the child's primary permanency goal); (3) failure to ensure that Contract Agencies provide and monitor services for birth parents and caretakers; (4) failure to provide adequate and timely case documentation; (5) failure to give "special scrutiny" to foster in children in care for more than two years; and (6) failure to ensure that Contract Agencies comply with ACS's policies regarding permanency.   (*See* Long Report at 4-20, ECF No. 478.[4])

On January 11, 2021, City Defendants filed a motion, pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to exclude the Long Report.   (*Daubert* Mot., ECF No. 511.)   On February 23, 2021, Plaintiffs filed an opposition.   (ECF No. 520.)   On March 3, 2021, City Defendants filed a reply.   (ECF No. 526.)

**ADMISSIBILITY OF EXPERT TESTIMONY**

## I.      Legal Standard

Federal Rule of Evidence 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

---

[4]  An initial version of the report was filed at ECF No. 442, Ex. 1; references to the Long Report herein refer to the corrected version filed at ECF No. 478.

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."   Fed. R. Evid. 702.   In the Second Circuit, it is well accepted that Rule 702 "embodies a liberal standard of admissibility for expert opinions."   *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005); *see also* Fed. R. Evid. 702, Advisory Comm. Notes ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.").

District courts have a "gatekeeping role" to ensure that expert testimony is both reliable and relevant.   *See Daubert*, 509 U.S. at 597; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).   With respect to determining reliability, courts may consider four non-exhaustive factors: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community.   *See Daubert*, 509 U.S. at 593-94.   These factors, however, "neither necessarily nor exclusively appl[y] to all experts or in every case."   *Kumho Tire*, 526 U.S. at 141.   Rather, courts conduct a "flexible" inquiry, tied to the facts of the particular case.   *See id.* District courts have broad discretion to determine the appropriate method for evaluating reliability.   *See id.* at 150; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

Expert testimony should be excluded if it is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (citing *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 214 (2d Cir. 2009)).   Flaws, gaps, or inconsistencies in an expert's reasoning, however, "go to the weight of the evidence, not to its

admissibility."   *Restivo*, 846 F.3d at 577 (citing *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)).   In the context of class certification, such flaws may be considered in determining whether the requirements of Rule 23 have been met. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466, 471 (S.D.N.Y. 2018) (Buchwald, J.).[5]

## II.    City Defendants' Motion

In their *Daubert* motion, City Defendants seek the exclusion of the Long Report and of any testimony by Dr. Long and her team.   (*Daubert* Mem. at 3, ECF No. 512.)   City Defendants do not argue that Dr. Long is not qualified in the field of social work, nor do they contend that her opinions would not be relevant or would not assist the Court.   Rather, City Defendants argue that the Long Report is not reliable, because it failed to adhere to the principles of the research methodology that Dr. Long chose to use—Grounded Theory.   (*See Daubert* Mem. at 2.)   These arguments, however, are unavailing.

As an initial matter, Dr. Long was retained by Plaintiffs' counsel to evaluate "whether the care provided by the Contract Agencies . . . met legal and professional standards for case practice for children in foster care and, if those standards were not met, whether the children suffered any physical or psychological harm."   (*See* Long Report at 1-3.)

In conducting her evaluation, Dr. Long applied Grounded Theory, which is a well-accepted qualitive research method that entails comparing large volumes of data and developing conclusions that are "grounded in data" as opposed to being driven by a predetermined

---

[5]  Neither the Supreme Court nor the Second Circuit has definitively decided whether the *Daubert* standard governs the admissibility of expert evidence submitted at the class certification stage.   *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 470.   Because the Court finds, as set forth below, that the Long Report is admissible pursuant to Rule 702 and *Daubert*, it need not decide this issue.

hypothesis.   (Long Report at 2; *see* Pls.' *Daubert* Opp'n at 11-12; *Daubert* Mem. at 7.)   A researcher applying this methodology begins with a broad query on a particular topic and collects relevant information about it.   (Long Report at 2.)   As the data collection process goes on, each piece of information is reviewed, compared, and contrasted with the other information gathered. (Long Report at 2.[6])   This process of "constant comparison" is critical to the application of Grounded Theory.   Ultimately, as they compare and contrast the data received, the researchers observe "commonalities and dissimilarities" and "inductively develop[]" conclusions that explain them.   (Long Report at 3; Long Dep. at 61:11-62:16, North Decl. Ex. 4, ECF No. 521; *see* Pls.' *Daubert* Opp'n at 11-12.)   Here, Dr. Long's conclusion—after comparing data from the case files of the named Plaintiffs—was that these children all were subjected to six "policy and practice departures."   (*See* Long Report at 4.)

The City Defendants argue broadly that Dr. Long's approach failed from the start, because she was retained to discern whether the Plaintiffs' case records reflected "case practice departures," *i.e.*, a pre-defined problem.   (*Daubert* Mem. at 8; Anastas Report at 9, ECF No. 515.[7])   This argument is overstated.   The fact that Dr. Long was retained to explore a question—whether or not there were case practice departures—does not suggest that she embarked on her evaluation simply to confirm a hypothesis.   There is no evidence that Dr. Long did not conduct her evaluation, as Grounded Theory demands, with an open-minded approach that does not "forc[e] data into theoretical accounts."   (Pls.' *Daubert* Opp'n at 16-17 (citing Timonen et al., *Challenges When Using Grounded Theory: A Pragmatic Approach to Doing GT*

---

[6]  In developing the Long Report, Dr. Long worked with a team of reviewers from the Universities of Maryland and Michigan, all of whom have "extensive experience in the child welfare field and hold advanced degrees in social work."   (*See* Long Report at 1-3.)   Dr. Long's team logged more than 2,000 hours over two and a half years and reviewed more than 65,000 documents.   (*See* Pls.' *Daubert* Opp'n at 11 n. 24.)

[7]  An initial version of this report was filed at ECF No. 413, Ex. E.

*Research*, 17 Int'l J. Qualitative Methods 1, 4 (2018)).)

The City Defendants also make several specific critiques of Dr. Long's implementation of Grounded Theory.   These criticisms, however, raise only flaws or gaps that go to the weight of the Long Report, not to its admissibility.   *See Restivo*, 846 F.3d at 577; *Amorgianos*, 303 F.3d at 267 (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994)) ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.").   In short, Dr. Long and her team went "line by line" through the case files, took written notes as to instances that they considered to be case practice departures, reviewed and discussed their notes collectively, and identified "themes" that, in Dr. Long's opinion, connected the individual case departures.   (Pls.' *Daubert* Opp'n at 19-20; Long Dep. at 84:2-13, 88:4-19.)   The Long Report thus adhered to the central tenets of Grounded Theory, reflects an exercise of the "constant comparative method" that the theory calls for, and should not be excluded pursuant to Rule 702 and *Daubert*.   (*See* Long Dep. at 72:19-22; 73:3-6; *see also* Pls.' *Daubert* Opp'n at 19.)

One of the City Defendants' critiques, however, does warrant attention.   City Defendants argue that the Long Report does not account for alternative explanations for why case practice departures may have occurred in a given child's case.   Specifically, Dr. Long did not consider the major role occupied by the New York State Family Court system with respect to each child's case, and the fact that this system is often the cause for delays in permanency.   (*See Daubert* Mem. at 17-20; *see* Burt Report at 6-10.)   This flaw does not render the Long Report *inadmissible*.   It does, however, detract significantly from the weight to be given to the Long Report.   Because the Report ignored a key aspect of the foster care system, it does not constitute strong evidence that there are common factors that result in delays to permanency or departures from ACS policy or practice.

## CLASS CERTIFICATION

### I.      Legal Standard

To qualify for class certification, plaintiffs must demonstrate by a preponderance of the evidence that the requirements of Rule 23 have been met.   *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).   Rule 23(a) imposes four prerequisites to certification: numerosity, commonality, typicality, and adequacy.   Fed. R. Civ. P. 23(a).   In addition, for a class that meets the requirements of Rule 23(a) to be "maintained," it also must fall into one of the categories of Rule 23(b).   Rule 23(b)(2) authorizes class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   Fed. R. Civ. P. 23(b)(2).

Rule 23 "does not set forth a mere pleading standard."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).   Rather, the party seeking certification must "affirmatively demonstrate" compliance with Rule 23; a class may be certified only if the district court is satisfied, after a "rigorous analysis," that the requirements of the rule have been met.   *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237-38 (2d Cir. 2012).   This inquiry, in which the court must "probe behind the pleadings," may "overlap with the merits" of plaintiffs' substantive claims.   *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013).

In addition, the Second Circuit has held that Rule 23 contains "an implied requirement" that a class be "ascertainable."   *In re Petrobras Securities*, 862 F.3d 250, 260 (2d Cir. 2017). To satisfy this requirement, a class must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member," and must be "defined by objective criteria that are administratively feasible," such that "identifying its

members would not require a mini-hearing on the merits of each case."   *Id.* (citing *Brecher v. Republic of Argentina*, 806 F.3d 22, 24-25 (2d Cir. 2015)).

## II.      Renewed Motion for Class Certification

Plaintiffs seek to certify a class of "children who are now will be in the foster care custody of the Commissioner of ACS."   As explained below, however, Plaintiffs have not met their burden to demonstrate that there are questions of law or fact common to the class, nor have they made an adequate showing that the claims of the named Plaintiffs are typical of the claims of the class.   *See* Fed. R. Civ. P. 23(a)(2), (3).   Accordingly, the Court finds that the commonality and typicality requirements of Rule 23(a) have not been met.   Consequently, the Court need not decide whether Plaintiffs have satisfied the remaining requirements of Rule 23(a) and the requirements of Rule 23(b)(2).

### A.  Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).   Commonality requires the plaintiffs "to demonstrate that the class members have suffered the same injury."   *Wal-Mart*, 564 U.S. at 349-50 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)).   In addition, any common questions must be of "such a nature that [they are] capable of classwide resolution," such that determination of their "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."   *Id.*   Put differently, the common questions must be able to "generate common *answers* apt to drive the resolution of the litigation."   *Id.* at 351 (citing Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

Plaintiffs argue that there are six common questions of fact as to the City Defendants and one common question as to the State Defendants.   With respect to the City, these questions are

(1) whether ACS exercises meaningful oversight over the Contract Agencies; (2) whether ACS fails to ensure that case workers receive adequate training; (3) whether ACS fails to ensure that a child's background, risk factors, and characteristics are considered during the placement process; (4) whether ACS fails ensure that adequate case plans are timely developed; (5) whether ACS fails to take steps to ensure timely permanency; and (6) whether ACS fails to protect children in its custody from an increased risk of maltreatment.   (*See* Ren. Mem. at 50-53.)   Plaintiffs further argue that there are questions of law common to the class, including whether any of these six alleged failures result in children being deprived of their constitutional or statutory rights. (*See* Ren. Mem. at 53.)   With respect to the State, Plaintiffs assert one question of fact, namely, whether OCFS effectively exercises adequate oversight over ACS and the Contract Agencies. (*See* Ren. Mem. at 53.)   As with the questions of law presented in connection with the City Defendants, Plaintiffs assert that questions of law common to the class include whether such a failure by OCFS results in children being at risk of being deprived of their constitutional or statutory rights.   (*See* Ren. Mem. at 54.)   For several reasons, the Court finds that these questions are not amenable to classwide treatment and do not generate common answers apt to drive the resolution of this litigation.

First, the questions presented by Plaintiffs are too broad and generalized.   In *Wal-Mart*, the Supreme Court highlighted examples of the types of "common question" that can be raised in any class action complaint but that are unhelpful to a court evaluating evidence in support of class certification.   In *Wal-Mart*, those questions included, for example, whether store managers had discretion over employees' pay; whether that was an unlawful employment practice; and what remedies the class should get.   *See Wal-Mart*, 564 U.S. at 349.   The court noted that commonality requires plaintiffs to demonstrate that they have "suffered the same injury," but that "[t]his does not mean merely that they have all suffered a violation of the same provision of law."

*Id.* at 350.   In *Wal-Mart*, the mere claim that employees of the same company had suffered an injury pursuant to Title VII did not mean that all of those claims could be "productively litigated at once." *Id.*

So too here.   City Defendants do not dispute that there are many delays in foster children's paths to permanency.   (*See* City Defs.' Opp'n at 56.)   They rightly point out, however, that there are myriad reasons—some beyond the control of ACS or OCFS—why such delays may occur.   That children may suffer an injury relating to a delay in permanency, an instance of inadequate case worker training, or an ill-conceived placement, does not mean that all foster care children's claims can be resolved in one stroke.   It also should be noted that several of Plaintiffs' grievances revolve around whether ACS and Contract Agencies compile adequate, timely documentation.   But, according to a report commissioned by OCFS, case workers already spend nearly *one third* of their time meeting requirements to document case activities.   (*See* Parent Advocates' Br. at 21-22; Gottlieb Decl. ¶ 53.)   Any remedy that required additional resources or time spent on that documentation would necessarily detract from other key activities and priorities, such as helping families to obtain the services necessary to achieve reunification. (*See* Parent Advocates' Br. at 21-22.)   The remaining questions that Plaintiffs raise are plagued by the same defect: they do not generate common *answers* that would drive the resolution of this case.

Second, Plaintiffs' allegations do not flow from unitary, non-discretionary policies that violate the rights of all class members or cause them all injury.   *See Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 171-72 (S.D.N.Y. 2011) (McMahon, J.) (distinguishing a non-discretionary policy applicable to every class member from the discretionary decision-making that precluded class certification in *Wal-Mart*).   Instead, Plaintiffs allege that there have been *departures* from ACS policy, such as not developing a case plan in a timely manner.   These departures, however,

are case-specific, stemming from the actions of individual case workers, individual Contract Agencies, or external factors (such as the New York State Family Court system) that are not within the control of ACS, OCFS, or any Contract Agency.   (*See* City Defs.' Opp'n at 32.)

Third, the role played in each child's case by the New York State Family Court system is a critical factor that creates "dissimilarities within the proposed class" that "impede the generation of common answers."   *Wal-Mart*, 564 U.S. at 350.   As the City Defendants' expert, Margaret Burt, explains, the child welfare system in New York, unlike in other states, is characterized by "the profound involvement and control that the courts exercise in making and pacing critical permanency decisions for the child."   (Burt Report at 9-10.[8])   Matters such as visitation or the appointment of counsel, which in other jurisdictions may be resolved with "a simple ruling from the bench," often involve formal written motions, responses, arguments, and hearings.   (*See* Burt Report at 5.)   In addition, frequent appeals stymy the progress of some cases.   In the cases of at least four of the named Plaintiffs, delays in permanency stemmed from such litigation—all the product of different families, attorneys, and judges making individualized decisions tailored to one child's case.   (*See* Burt Report at 5-6, 17-19.)

Parents have the right to an attorney in all aspects of child welfare cases and may be assigned one if they cannot afford counsel.   (*See* Burt Report at 4; N.Y. Fam. Ct. Act §§ 261, 262.)   Courts in New York "allow parents a great deal of freedom in choosing an attorney or rejecting one assigned to them."   (Burt Report at 4-5.)   In the cases of at least three named

---

[8]  Plaintiffs argue that Burt's opinion "should be afforded no weight" in the Court's analysis, because she is not experience in social work, did not approach her review with a clear methodology, and did not review ACS policies or the contracts with Contract Agencies.   (Reply at 22-23.)   The Court relies on the Burt Report, however, not for any legal conclusions, but only to the extent that it sets forth observations about the role played by courts and lawyers in the child welfare system—an issue on which Burt is well qualified to opine. (*See* Burt Report at 1-5.)

Plaintiffs, this process of parents selecting an attorney—or rejecting a lawyer assigned to represent them—resulted in significant, case-specific delays.   (*See* Burt Report at 4-5.)   As for the attorneys who represent children, they advocate for a child's position "based on what the child may articulate," as opposed to advocating what counsel may believe are the "best interests of the child."   (*See* Burt Report at 7.)   As a particular case develops, its trajectory may change substantially if the child seeks a different outcome or position from that which was originally argued.   In the case of least one named Plaintiff, who took different positions over time regarding contact with his mother, such shifts in position had a crucial impact of the course of the case.   (*See* Burt Report at 9.)

A 2019 study found that quality legal representation also was a critical factor in child welfare cases, and that "multidisciplinary representation," in which parents are assisted by lawyers, social workers, and public interest organizations, are significantly more likely to secure the return of their children than those parents represented by solo legal practitioners.   (*See* Parent Advocates Br. at 10 n.6 (citing Lucas A. Gerber et al., *Effects of an Interdisciplinary Approach to Parental Representation in Child Welfare*, 102 Child. & Youth Servs. Rev. 42, 45, 53 (2019).) Such individualized complexities in the nature of a child's representation create further dissimilarities in the class and preclude a finding of commonality.

The Long Report does little to change the above analysis.   As discussed, the Long Report is based on a review of the case files of the nineteen named Plaintiffs.   In *Wal-Mart*, the Supreme Court discussed the connection between such anecdotal evidence and class certification. In that decision, the court noted that the plaintiffs had filed 120 affidavits reporting experiences of discrimination, or "about 1 for every 12,500 class members," relating to "235 out of Wal-Mart's 3,400 stores."   *Wal-Mart*, 564 U.S. at 358.   Half of the U.S. states were represented by only one or two anecdotes, and some states by none at all.   *See id.*   In that context, even if every

anecdote were true, it would not demonstrate that the whole company operated under "a general policy of discrimination." *Id.*   The court noted further that, although "[a] discrimination claimant is free to supply as few anecdotes as he wishes," when the claim is that a company operates pursuant to "a general policy of discrimination, a few anecdotes selected from literally millions of employment decisions prove nothing at all."   *See id.* at 358 n.9.

Here, the Long Report suffers from similar infirmities.   The case files of the named Plaintiffs present information about fewer than half of the Contract Agencies, and the Plaintiffs themselves represent only a small fraction of the children in foster care at a given time.   (*See* Wulczyn Report at 3, ECF No. 508.[9])   In addition, the Long Report makes no attempt to engage with the role that the New York State Family Court system plays, and how countless decisions by numerous stakeholders—children, parents, advocates, and judges, to name a few—make each child's case unique.   Because of these shortcomings, the Long Report is entitled to little weight and offers only weak evidence with respect to commonality.

In light of the above, the Court finds that Plaintiffs have not met their burden to demonstrate, by a preponderance of the evidence, that the commonality requirement of Rule 23(a) has been satisfied.

### B.  Typicality

Rule 23(a) requires that, for a class to be certified, the claims or defenses of the representative parties are typical of the claims or defenses of the class."   Fed. R. Civ. P. 23(a)(3).   The typicality requirement is satisfied when each class member's claim "arises from the same course of events, and each class member makes similar legal arguments to prove the

---

[9] An initial version of this report was filed at ECF No. 495.

defendant's liability." *Taylor v. Zucker*, 2015 WL 4560739, at *9 (S.D.N.Y. July 27, 2015) (McMahon, J.) (citing *In re Drexel Burnham Lambert*, 960 F.2d 285, 291 (2d Cir. 1992)).

Typicality and commonality "tend[s] to merge." *Wal-Mart*, 564 U.S. at 349 n.5 (citing *Falcon*, 457 U.S. at 157-58). Although, as discussed, the highly individualized nature of any child's case is relevant to commonality, it also is particularly salient to the typicality requirement, highlighting the inability of the named Plaintiffs to be typical representatives of all children in foster care now or in the future.

First, the very nature of which children remain in the foster care system for extended lengths of time does not yield ready comparison between the named Plaintiffs and other individuals. According to Professor Christine Gottlieb, New York policy and law reflect a considered choice "to prefer to keep children in foster care longer where that allows them to safely return home"—a choice that is distinctive from other jurisdictions, which may favor the termination of parental rights at an earlier stage in a child's case. (*See* Gottlieb Decl. ¶¶ 25-26; N.Y. Soc. Serv. L. §§ 384-b(1)(a)(ii), (iii).) As a result of this choice, "the families whose children enter foster care in New York present more challenging casework needs, on average, that those in jurisdictions that have made different policy choices." (Gottlieb Decl. ¶ 28.) Children in foster care for lengthier periods of time tend to be those "whose families require time, resources, and support in order for their children to be able to return home safely." (Gottlieb Decl. ¶ 28.) As the Parent Advocates put it, "only the most challenging cases remain in the foster system for any extended period of time," and these are "multifaceted and significantly complex cases." (Parent Advocates Br. at 9-10.)

Second, the named Plaintiffs' claims cannot be said to "arise[] from the same course of events" as those of other children, because it is not possible to determine what caused a permanency delay, a specific placement, an untimely or poorly-conceived case plan, or an

instance of maltreatment, without evaluating all of the other contributing facts and influences. To give just one example, a key purpose of foster care is to remedy the root cause of a child's separation from family by providing parents with services such as housing assistance, mental health treatment, and substance abuse counseling.   Many delays in returning a child to their parents, however, flow from delays in parents receiving those services—it can take months, or even years, to obtain housing or to be admitted to mental health or drug treatment programs. (*See* Parent Advocates' Br. at 11-12; Gottlieb Decl. ¶ 37; Ketteringham Decl. ¶¶ 5-9, ECF No. 531; Shapiro Decl. ¶¶ 9-12, ECF No. 531.)   These delays and complications are particular to each child and their respective family members.

In light of the above, there is no basis to conclude that each member's claim arises from the same course of events, or arises from system-wide policies and practices that apply to all other members of the class.   Accordingly, the Court finds that Plaintiffs have not met their burden to demonstrate, by a preponderance of the evidence, that the typicality requirement of Rule 23(a) has been satisfied.[10]

## CONCLUSION

It goes without saying that any allegations regarding potential harm to children in foster

---

[10]  It is worth noting that some courts have certified classes of children in foster care.   *See B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957 (9th Cir. 2019); *D.G. v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010); *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997); *Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994); *M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013).   These decisions, however, are distinguishable.   First, *Marisol A.*, *Baby Neal*, and *D.G.* predate the Supreme Court's seminal decision in *Wal-Mart*.   Indeed, in 2015, then-Chief Judge McMahon noted that, in light of *Wal-Mart*, "it is highly doubtful that the class [certified in *Marisol A.*] would be certified today."   *Taylor*, 2015 WL 4560739, at *11; *see also* Sept. 27, 2016 Order at 3.   Second, the classes in *B.K.*, *D.G.*, *Baby Neal*, and *M.D.* encompass a subset of the foster care system—such as children in foster care due to a report or suspicion or abuse or neglect—and thus are narrower than the class that Plaintiffs seek to certify here.   Third, as discussed above, there is significant evidence demonstrating the uniqueness of the New York City foster care system with respect to the complex interplay of state, city, and private actors; the policies expressed by the New York legislature and expressed in the state law governing the foster care system; and the powerful role occupied by the New York State Family Court system.   As a factual matter, cross-jurisdictional comparisons to other foster care systems are thus of limited value.

care are of grave concern.   The question here, however, is whether the named Plaintiffs have met their burden to demonstrate (among other things) that there are questions of law or fact common to a class of all children who are or will be in the foster care system of New York City, and that the named Plaintiffs are typical representatives of such a broad class.   Because the Court finds that Plaintiffs have not offered sufficient evidence to satisfy that burden, the motion for class certification is denied.

By September 13, 2021, the parties must file a joint letter addressing the next steps in this litigation.   The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 504, 511, and 515.


SO ORDERED.

Dated: New York, New York
       September 3, 2021                           _____/s/ Kimba M. Wood_____
                                                      KIMBA M. WOOD
                                                   United States District Judge