```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 23, 2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

ELISA W., *et al.,*

                        Plaintiffs,

    -against-

THE CITY OF NEW YORK, *et al.*,

                        Defendants.

--------------------------------------------------------X

15-CV-5273 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

    Named Plaintiffs, who entered the New York City Foster Care System ("NYCFCS") between 2002 and 2015, bring this putative class action alleging constitutional and statutory claims against both the City and the State of New York. They assert five causes of action based on alleged "systemic deficiencies." Plaintiffs seek injunctive relief.

    Plaintiffs' renewed motion for class certification is pending before the Court. For the reasons set forth below, Plaintiffs' motion is GRANTED in part, and DENIED in part.

## BACKGROUND

    The Court assumes the parties' familiarity with the factual and procedural background of this case, which is outlined in the Court's and Second Circuit's prior decisions. (*See* Sept. 3, 2021 Op. & Order, ECF No. 542; *Elisa W. v City of New York,* 82 F.4th 115 (2d Cir. 2023)). This background will be addressed only as necessary for purposes of the opinion.

1

## I. Factual Background

The NYCFCS is implemented by city, private and state agencies. The New York City Administration for Children's Services ("ACS") is the agency primarily responsible for protecting the safety and welfare of children in New York City, including children in foster care. (*See* Ghartey Decl. ¶ 7, ECF No. 498; *see also* N.Y. Soc. Serv. Law §§ 371(10)(a), 383-c, 384; N.Y. City Charter ch. 24-B, §§ 615–17.) ACS performs principally two kinds of work: it decides where to place a child initially, and it monitors the subsequent case management performed by others. (*See* White Decl. ¶ 8–10, ECF No. 491.) In 2009, ACS delegated day-to-day case management functions to "Contract Agencies." (*Id.* ¶ 8.) This contracting practice is referred to as Improved Outcomes for Children ("IOC"). (*Id.* ¶¶ 2–4.) ACS remains, however, responsible for each child's welfare and it monitors how well each Contract Agency is performing important aspects of its work, including giving each child appropriate day-to-day care, and working toward placing each child in a permanent home. (*Id.* ¶¶ 8–9.)

The Contract Agencies are non-profit entities that employ their own caseworkers, who are responsible for the day-to-day care of each child. (*See* Farber Decl. ¶ 4, ECF No. 490; City Defs.' 2016 Opp'n at 5–6, ECF No. 205.) Their work includes: recruiting foster parents; finding an appropriate foster home for each child; monitoring children in their foster care settings; ensuring that children receive necessary medical, mental health, recreational and educational services; referring parents for services to address the issues that led to the removal of children from their homes; and developing plans for a permanent home for each child, either adoption or

guardianship[1] when reunification with a family member is not attainable. (*See* Farber Decl. ¶¶ 4–5; City Defs.' 2016 Opp'n at 5.)

ACS's work in this regard is overseen by the New York State Office of Children and Family Services ("OCFS"). (Ghartey Decl. ¶ 4.) OCFS conducts its own oversight of ACS and the Contract Agencies, which includes reviewing and approving ACS policies and ACS's oversight of Contract Agencies. (*Id.* ¶¶ 13–15, 17, 19–21.) As a condition of ACS receiving federal funding, OCFS is required to ensure that the Contract Agencies and ACS are in compliance with federal and state law and regulatory standards. (*Id.* ¶¶ 21, 34–36; *see* 42 U.S.C. § 671(a)(3); N.Y. Soc. Serv. Law § 153-k.)

The New York Family Court system also plays an important role within the NYCFCS. That court becomes involved with a child's care in the event that ACS seeks to remove a child from the child's current home. (*See* City Defs.' 2016 Opp'n at 3–5.) For each child removed from home, the Family Court is required to hold permanency hearings within eight months from removal. N.Y. Fam. Ct. Act § 1089(a)(2).

## II.     Procedural History

Named Plaintiffs commenced this action in 2015 against the City of New York, ACS and the Commissioner of ACS (collectively, "City Defendants"), as well as the State of New York, OCFS and the Commissioner of OCFS (collectively, "State Defendants") (when referring to all of the Defendants collectively, the following uses "Defendants"). (Am. Compl. ¶ 3, ECF No. 91.) Plaintiffs allege that "systemic deficiencies" have existed in the NYCFCS for years as a result of Defendants' actions and inactions. (*See id.* ¶¶ 227–340.) In their Amended Complaint,

---

[1] Unlike adoption, guardianship does not terminate a child's legal relationship with the child's parents. *See Kinship Guardianship Assistance Program (KinGAP) Guide*, Office of Children and Family Services (Sept. 2023), https://ocfs.ny.gov/programs/kinship/assets/docs/KinGAP-Practice-Guide.pdf.

3

Plaintiffs assert five causes of action: the first and second causes of action allege that Plaintiffs have been, and are at risk of being, deprived of constitutional rights protected by the First, Ninth and Fourteenth Amendments to the United States Constitution; the third cause of action alleges that Defendants are violating the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997; the fourth cause of action alleges that City Defendants are depriving Plaintiffs of their rights pursuant to regulations adopted by New York State Social Services Law; and the fifth cause of action alleges that City Defendants are breaching, and failing to enforce, contracts between ACS and the Contract Agencies.  (*See id.* ¶¶ 341–58.)

Chief Judge Swain denied Plaintiffs' initial motion for class certification without prejudice to renew the motion if an evidentiary record is developed that satisfies the requirements of Rules 23(a) and 23(b)(2) as to both the broad class and appropriate subclasses. (Sept. 27, 2016 Mem. Order at 3–4, ECF No. 282.)  Plaintiffs filed a renewed motion for class certification in 2019, proposing a Class of "children who are now or will be in the foster care custody of the Commissioner of [ACS]" (a "General" Class), in addition to two new subclasses: (1) "all children who have been in ACS custody for more than two years and whose cases require 'special scrutiny' pursuant to ACS policy" (a "Special Scrutiny" Subclass); and (2) "all children for whom Contract Agencies failed to assess and document compelling reasons every three months to justify the decision not to file a termination of parental rights [("TPR")] petition after the children had been in care for 15 of the prior 22 months" (a "Compelling Reasons" Subclass). (Pls.' Ren. Mot. at 1–2, ECF No. 439; Pls.' 2019 Mem. at 4–5, ECF No. 440.)

On September 3, 2021, the Court denied Plaintiffs' motion for class certification, as well as City Defendants' *Daubert* motion to exclude Plaintiffs' expert report.  (Sept. 3, 2021 Op. &

4

Order at 1.) Plaintiffs appealed. On September 19, 2023, the Second Circuit vacated and remanded the order denying class certification. *Elisa W.*, 82 F.4th at 119. The Second Circuit directed the Court to determine whether each of Plaintiffs' allegations satisfies Rule 23's requirements. *Id*. at 128.

## LEGAL STANDARD

To qualify for class certification, Plaintiffs must demonstrate by a preponderance of the evidence that the requirements of Rule 23 have been met. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Rule 23(a) imposes four prerequisites to certification: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). In addition, in order for a class that meets the requirements of Rule 23(a) to be "maintained," it must fall into one of the categories of Rule 23(b). Fed. R. Civ. P. 23(b)(2). Plaintiffs here seek certification pursuant to Rule 23(b)(2), which authorizes class certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.*

Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, the party seeking certification must "affirmatively demonstrate" compliance with Rule 23. A class may be certified only if the district court is satisfied, after a "rigorous analysis," that the requirements of the rule have been met. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012). This inquiry, in which the court must probe behind the pleadings, may overlap with the merits of Plaintiffs' substantive claims, but it does not require Plaintiffs to demonstrate that they will prevail on the merits. *Johnson*, 780 F.3d at 138 (internal quotations and citations omitted).

The Second Circuit has also recognized that Rule 23 contains "an implied requirement" that a class be "ascertainable." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017). In this Circuit, ascertainability requires only that "a proposed class is defined using objective criteria that establish membership within definite boundaries." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 (2d Cir. 2023) (quoting *In re Petrobras Sec.*, 862 F.3d at 269)).

## DISCUSSION

Plaintiffs seek to certify a General Class, a Special Scrutiny Subclass, and a Compelling Reasons Subclass. The following discussion analyzes the requirements separately for the proposed General Class and subclasses followed by an analysis of the Rule 23(b)(2) requirements and the implied requirement of ascertainability for the proposed General Class.

### I. Rule 23(a) Requirements: General Class

#### A. Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To satisfy this requirement, Plaintiffs need not produce evidence of the "exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). City Defendants represent that as of July 2023 there were 6,487 children in 24-hour foster care. (City Defs.' Opp'n. at 18, ECF No. 563.) A class of this size easily satisfies Rule 23(a)(1)'s numerosity requirements.

#### B. Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, Plaintiffs must demonstrate that the class members have all suffered the same injury. *Wal-Mart*, 564 U.S. at 349–50 (citing

6

*General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). In addition, any common questions must be of "such a nature that [they are] capable of classwide resolution." *Id.* at 350.

Plaintiffs allege that the General Class members were all injured by Defendants' failure to perform their duties. Plaintiffs allege that those failures violated the childrens' statutory rights and a constitutional right to protection while in state custody.[2] (Pls.' Mem. at 3, ECF No. 568.)

1. **Common Questions With Respect to City Defendants**

Plaintiffs allege that ACS's practices pose a risk of harm to every member of the General Class, thereby satisfying Rule 23(a)(2)'s commonality requirements as to City Defendants. (*Id.*) The Court reviews the four alleged common questions related to ACS's practices remanded by the Second Circuit.[3] The opinion first addresses alleged common questions related to ACS's placement practices, followed by an analysis of ACS's practices in ensuring that systemwide training, case management and permanency planning practices are adequate across the NYCFCS.

a. **Plaintiffs Have Demonstrated that There Exist Common Questions Related to ACS's Placement Practices**

When children enter the NYCFCS, ACS is responsible for referring them to Contract Agencies, who in turn are responsible for placing children in appropriate homes. (Pls.' 2019 Mem. at 23–24; *see* 42 U.S.C. § 671(a)(10); N.Y. Comp. Codes R. & Regs. tit. 18, § 430.11(d)(1).) At that point, it is ACS's responsibility to provide the Contract Agencies with important information, including: the language the child speaks; the child's medical background,

---

[2] Courts have recognized that children in foster care have a substantive due process right to protection from harm while in state custody. *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 674–75 (S.D.N.Y. 1996) (Ward, J.) (collecting cases), *aff'd*, 126 F.3d 372 (2d Cir. 1997). Plaintiffs' claims turn on whether Defendants' practices violate this right, placing all children in the NYCFCS at an unreasonable risk of harm, which is a question that is capable of classwide resolution.

[3] On appeal, Plaintiffs did not re-assert two alleged common questions that were previously before this Court, which the Second Circuit deemed waived. *Elisa W.*, 82 F.4th at 124 n.4. The two questions were (1) whether ACS exercises adequate oversight of the Contract Agencies, and (2) whether ACS's practices protect children from an increased risk of maltreatment. The Court is barred from reviewing the two waived common questions on remand.

behavioral needs and current service providers; the birth parents' location(s); and visitation orders.  (*See* Pls.' Mem at 5.)  ACS internal reports demonstrate that ACS officials have been aware of flaws with its placement practices; for example, a 2012 Office of Placement Administration report found that "blanket referrals are made without accurate and up-to-date information on the availability and compatibility of the placement[s]."  (Office of Placement Admin. Update, North Decl. Ex. 57, ECF No. 442.)  In addition, a 2016 internal review assessing ACS's placement practices stated that "[t]he term 'Dial and Smile' has been used [ ] to describe the current placement process, whereby calls are made to provider agencies to provide any available bed for a child."  (Placement Module Report at 2, North Decl. Ex. 51.)  One Contract Agency reported approximately five instances where ACS did not know what language the child spoke upon referral.  (Harry Tr. at 53:13–54:8, North Decl. Ex. 12.)

This evidence is sufficient to raise a common question as to whether ACS's placement practices fulfill its responsibility to place Plaintiffs in appropriate homes, which is a common question that can be answered on a classwide basis.

> **b. Plaintiffs Have Demonstrated that There Exist Common Questions Related to ACS's Practices in Ensuring that Systemwide Training, Case Management, and Permanency Planning Practices are Adequate**

Plaintiffs contend that ACS delegates case management responsibilities without ensuring that caseworkers receive adequate training.  (Pls.' Mem. at 6–8.)  ACS requires that caseworkers be trained on an ongoing basis, but ACS provides insufficient guidance regarding the content or extent of training that should be given by Contract Agencies.  (*See id.* at 7–8.)  ACS leadership, including the Associate Commissioner of Training and Workforce Development, has acknowledged inadequacies in caseworker training, and that in some instances caseworkers have

8

received full caseloads after only two weeks of limited training.[4] (*See* Nish Tr. at 24:19–22, North Decl. Ex. 16; McCabe Tr. at 35:25–36:11, North Decl. Ex. 13.) ACS internal reports, including that of a 2015 IOC workgroup meeting, found that there is "[n]o standard of training for foster care agencies" (*see* Strengthening Reunification Notes at 11, North Decl. Ex. 67), and that caseworkers were "overwhelmed" and "need more training." (IOC Workgroup Meeting Minutes at 3, North Decl. Ex. 46.) In addition, caseworkers are often assigned more than 12 cases, which is the maximum allowable by ACS. (*See* 2019 Caseload Tracker at 2, North Decl. Ex. 83.) Several courts have held that inadequate training exacerbated by excessive caseloads supports a finding of commonality. *See, e.g., D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635, 646 (N.D. Okla. 2011) ("It is fairly easy to 'connect the dots' between . . . excessive caseloads . . . [and] resulting harm or risk of harm to children.").

Plaintiffs also contend that ACS fails to ensure that Contract Agency caseworkers adequately perform their delegated day-to-day case management duties. This includes an alleged failure by ACS to ensure that caseworkers make and keep timely and adequate documentation. (Pls.' Mem. at 8–9.) Plaintiffs point to a New York State Comptroller Report concluding that ACS was unable to monitor case documentation; that ACS staff were unable to identify when caseworkers' notes were entered timely; and that ACS had not implemented a standard for how notes should be entered in CONNECTIONS, which is the primary software used for systemwide case documentation. (2018 State Comptroller Report at 1–2, 12, North Decl. Ex. 115.) The report also found that because caseworkers' notes frequently were not timely, their late documentation led to an increased risk of inaccuracy in case plans. (*Id.* at 12.) The report found

---

[4] Statements from ACS leadership, including the Associate Commissioner of Training and Workforce Development, have acknowledged that "people should be trained adequately before they even pick up a case . . . [but] that is not necessarily how the system has worked for . . . a variety of reasons." (Nish Tr. at 68:8–13.)

9

that, without improvements in the systems used for recording and tracking caseworkers' notes, ACS has limited assurance that the Contract Agencies are making appropriate decisions, and that these case documentation failures may place foster care children at an increased risk of mental or physical harm. (*Id.*)

Plaintiffs also allege that ACS fails to ensure that caseworkers adequately plan for permanent placement of children, which results in children remaining in the NYCFCS for longer than they otherwise might have remained. (Pls.' Mem. at 10–11.) Pursuant to federal and state law, New York Family Courts are required to hold permanency hearings every six months. 42 U.S.C. § 675(5)(B); N.Y. Fam. Ct. Act § 1089(a)(3). These hearings are frequently not held in a timely fashion, due in part to caseworkers' failures to submit timely reports or attend hearings. (*See* 2015 Timeliness Report at 6, North Decl. Ex. 43.) Those failures result in frequently adjourned permanency hearings.[5] (Pls.' Mem at 10.)

City Defendants respond that Plaintiffs have failed to demonstrate that ACS's practices related to training, case management and permanency planning are common questions that can yield common answers. (*See* City Defs.' Opp'n 7–10, 14–16.) With respect to permanency planning, City Defendants contend that delays are driven by external factors. (*See id.* at 16–18.) But Defendants' arguments are undermined by internal ACS reports and statements, which point to specific failures in ACS practices that contribute to permanency delays. A 2016 presentation on permanency reviews reported that "New York City has long failed to meet federal permanency standards in part because of due process laws protecting parents, but also because of practice[s] at ACS and its [Contract A]gencies." (March 2016 Report at 4, North Decl. Ex. 50.)

---

[5] The record reveals that Named Plaintiffs' case files all had a permanency hearing where caseworkers failed to attend, and in a sample of 298 permanency hearings, caseworkers failed to attend 21.1% of the reviewed permanency hearings. (Pls.' 2019 Mem. at 34.)

Internal ACS emails from 2016 reveal that ACS officials were aware that adoptions in New York City take two years longer than the federal median, and that "this needs to change." (Roth Email at 2, North Decl. Ex. 66.)[6]

For the reasons set forth above, Plaintiffs have submitted sufficient evidence to establish a plausible connection between ACS's training, case management and permanency practices and Plaintiffs' asserted injuries. The Court is satisfied that whether ACS ensures that training, case management and permanency planning practices utilized in the NYCFCS lessen the risk of injury for children in its custody are common questions capable of classwide resolution. Accordingly, Rule 23(a)(2)'s commonality requirement is satisfied for the General Class with respect to City Defendants.

2. **Common Question With Respect to State Defendants**

Plaintiffs identify one common question as to State Defendants: whether OCFS effectively exercises adequate oversight over ACS and the Contract Agencies. Plaintiffs contend that OCFS has not adequately considered whether to reauthorize ACS's use of IOC, despite knowing that ACS and the Contract Agencies were performing poorly.[7] (Pls.' Mem. at 17.) Plaintiffs allege that the evidence reveals that despite having knowledge, or a belief, that "IOC is broken" (*see* Carrión Email, North Decl. Ex. 88), OCFS leadership continued to reauthorize IOC

---

[6] The Court also notes that City Defendants allege that there have been improvements in case planning practices, and that, as of July 2023, the NYCFCS began operating under a set of new foster care provider contracts. (City Defs.' Opp'n at 6.) But class certification may relate back to the filing of the complaint where, as here, the putative class of children in ACS's custody are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Elisa W.*, 82 F.4th at 128 n.3 (quoting *Comer v. Cisneros*, 37 F.3d 775, 799 (2d Cir. 1994)).

[7] Plaintiffs also claim that when OCFS performed targeted oversight through Voluntary Agency Reviews ("VARs"), this oversight was superficial. Plaintiffs contend that VARs were not effective because they were conducted only once every three years, they reviewed only the previous year of case practice, and they reviewed only a "tiny sample" of material in the case files. (McCabe Tr. at 166:20–167:2.)

11

without mechanisms for holding underperforming Contract Agencies accountable.[8]  (Pls.' Mem. at 17.)  State Defendants respond that commonality cannot be satisfied because, among other reasons, the proposed common question is too vague, and Plaintiffs' evidence fails to demonstrate the existence of a common OCFS practice related to inadequate oversight.  (*See* State Defs.' Opp'n at 4–16, ECF No. 562.)

Whether OCFS fulfills its statutory responsibility to oversee ACS and the Contract Agencies, including its role in reauthorizing IOC, is not an overly vague question.  OCFS is responsible for monitoring whether ACS is complying with the laws and regulations applicable to ACS, and bringing to the attention of ACS and other authorities which of its actions need to be remedied.  Where City and State Agencies both maintain oversight responsibilities, they may both be held liable for practices that expose class members to alleged common harms.  *See Wilder v. Bernstein,* 499 F. Supp. 980, 994 (S.D.N.Y. 1980) (Ward, J.) (granting class certification where, among other reasons, plaintiffs alleged that City and State agencies together created an overall discriminatory child-care system); s*ee also M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216, 225–227, 234–236 (S.D.N.Y. 2016) (Scheindlin, J.) (granting class certification as to City and State Defendants when State Defendants were responsible for supervising the City's administration of special education procedures.)  Supervising entities that do not directly administer foster care services can be held liable for their own failure to adequately oversee agencies administering direct care.

State Defendants also contend that OCFS cannot be held vicariously liable for deficiencies caused by the City.  (State Defs.' Opp'n at 8.)  This argument misconstrues

---

[8] In addition, Plaintiffs allege that OCFS's NYC Regional Director testified that State Defendants had knowledge of IOC's poor performance, and that he did not know whether OCFS had ever considered declining the reauthorization of IOC. (Fuchs Tr. at 44: 9–13, North Decl. Ex. 7.)

12

Plaintiffs' contentions—Plaintiffs are not attempting to hold the state vicariously liable. Instead, Plaintiffs allege that OCFS's inadequate oversight practices contribute to the harm to which Plaintiffs are exposed while in state custody. (Pls.' Mem. at 18.)

For the reasons set forth above, Plaintiffs have offered sufficient evidence at this stage of the case to demonstrate that whether OCFS exercises adequate oversight of ACS is a common question capable of classwide resolution. Rule 23(a)(2) is satisfied for the General Class as to State Defendants.

### C. Typicality

Rule 23(a) requires that, for a class to be certified, the claims or defenses of the representative parties be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality . . . is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)). Rule 23(a)'s commonality and typicality requirements "tend to merge." *Wal-Mart*, 564 U.S. at 349 n.5 (quoting *General Tel. Co.*, 457 U.S. at 157–58 n.13). Named Plaintiffs are typical of the class members because their claims arise out of the same course of conduct as the claims of other class members.

Defendants argue that Plaintiffs' claims cannot be typical of class members' claims because each child's individualized experience in the NYCFCS results in factual distinctions among them.[9] (*See* State Defs.' 2020 Opp'n at 24, ECF No. 497.) This is not fatal, because

---

[9] Defendants also claim that changes in the NYCFCS make Named Plaintiffs' cases atypical of children who have recently entered the NYCFCS, and that Named Plaintiffs constitute a biased sample. (State Defs.' 2020 Opp'n at 24–25; City Defs.' 2020 Opp'n at 20–25, ECF No. 493.) These arguments are meritless. Arguments about recent changes have no merit, *see* n. 6, *supra*; and, if class certification is granted, Plaintiffs intend to substitute new Named Plaintiffs. (Pls.' Mem. at 15–16.) City Defendants also argue that Named Plaintiffs constitute a biased sample because Named Plaintiffs were selected when they responded to the Public Advocate's outreach for children who were dissatisfied with their experience in ACS's custody. (City Defs.' 2020 Opp'n at 20.) City Defendants cite

Plaintiffs' allegations are focused on the harm to which all class members have been similarly exposed as a result of Defendants' systemwide policies and practices. State Defendants' argument that Named Plaintiffs experienced care in only 11 out of the 26 foster care agencies (*see id.* at 24–26), does not preclude a finding of typicality. Plaintiffs' claims do not hinge on particular facts about one Contract Agency. Their claim is that care in all Contract Agencies is deficient. The members of the General Class are subject to the same ACS and OCFS policies and practices.[10]

For the reasons stated above, Rule 23(a)(3)'s typicality requirement is satisfied for the General Class.

**D. Adequacy**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts must inquire whether the Named Plaintiffs' interests "are antagonistic to the interest of other members of the class" and whether Plaintiffs' counsel are qualified. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The Named Plaintiffs will be adequate representatives of the class. For reasons that overlap with the Court's typicality analysis, Named Plaintiffs and the absent class members' injuries both arise from the same alleged exposure to harm as a result of Defendants' alleged

---

no case law to support their position that the method for selecting the Named Plaintiffs defeats typicality. The only decision they cite is irrelevant; it deals with statistical sampling in a wage and hour case. *See Duran v. U.S. Bank Nat'l Ass'n,* 325 P.3d 916 (Cal. 2014).

[10] The Court also notes that the proposed General Class of children is consistent with proposed classes certified in other foster care litigation. *See Jonathan R. v Justice*, 344 F.R.D. 294, 318 (S.D.W. Va. 2023) (certifying a class of all children who are or will be in foster care custody of the West Virginia Department of Health and Human Resources or its successor agency); *Wyatt B. v. Kate Brown*, No. 19-CV-0556, 2022 WL 3445767, at *33 (D. Or. Aug. 17, 2022) (certifying a General Class of all children who are or will be in the legal or physical custody of the Oregon Department of Human Services).

practices; thus, their interests are not antagonistic to one another.[11]  To address this alleged harm, Plaintiffs' counsel seek broad injunctive based relief intended to improve the quality of Defendants' case management practices.

Plaintiffs' counsel are qualified.  Defendants contend that Plaintiffs' counsel have attempted to advance their own personal policy preferences of favoring TPRs and adoption over reunification.  (*See* City Defs.' 2020 Opp'n at 12–14, 66.)  The argument that Plaintiffs' counsel are prioritizing their policy preferences is unavailing.  As Magistrate Judge Pitman stated earlier in the litigation, Plaintiffs' counsel are not "seek[ing] to change the placement of any child.  Rather, [they] seek[] to compel compliance with pre-existing constitutional and statutory requirements."  (R. & R. at 39–40, ECF No. 416; Order, ECF No. 418.)  The Court agrees.  Plaintiffs' counsel have used their experience as qualified class action and child welfare litigators to capably represent the interests of the Named Plaintiff children and the proposed General Class for approximately nine years.  Whether they are pursuing one permanency goal over another has not been established at this point in the litigation.  The Court is satisfied that Plaintiffs' counsel will continue to capably represent Plaintiffs' interests.

Rule 23(a)(4) is satisfied for the General Class.[12]

---

[11] The analysis of Rule 23's adequacy requirement "tend[s] to merge" with commonality and typicality.  *Wal-Mart,* 564 U.S. at 349 n.5.

[12] To the extent that Defendants challenge Plaintiffs' counsel's qualifications pursuant to Fed. R. Civ. P. 23(g), these allegations also fail.  When determining whether Plaintiffs' counsel is adequate pursuant to Rule 23(g), courts must evaluate: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  Plaintiffs' counsel easily satisfy these requirements.

## II. Rule 23 Requirements: Subclasses

Plaintiffs propose two subclasses: a Special Scrutiny Subclass and a Compelling Reasons Subclass. Fed. R. Civ. P. 23(c)(5) states: "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."

Plaintiffs contend that a Special Scrutiny Subclass is needed to adequately represent those who were in care for over two years. (Pls.' Mem. at 19–20.) The Court is not persuaded that a Special Scrutiny Subclass is warranted, however, because the interests of members of the Special Scrutiny Subclass do not diverge from the interests of members of the General Class. *See Jonathan R.,* 344 F.R.D. at 313–14 (denying subclass certification because the interests of the subclass did not diverge from the interests of the General Class where plaintiffs contended that inadequacies were riskier for subclass members).

Plaintiffs contend that a Compelling Reasons Subclass is needed to adequately represent those who were in ACS's custody for 15 of the most recent 22 months. (Pls.' Mem. at 20.) Plaintiffs allege that this subclass is needed because ACS fails to comply with federal and state laws, which require adequate and timely documentation of compelling reasons if ACS does not file a TPR petition for children who have been in its custody for 15 of the most recent 22 months, unless a statutory exception relieves them of this requirement. (*Id.*) Here, too, the Court is not persuaded that a Compelling Reasons Subclass is warranted. As discussed, *supra* Section I.B.1.a, a common question for the General Class alleged inadequate case planning practices, including untimely case documentation practices. There is thus no need for a Compelling Reasons Subclass.

16

For the reasons set forth above, the Court denies class certification as to both the Special Scrutiny Subclass and the Compelling Reasons Subclass.[13]

### III. Certification Pursuant to Rule 23(b)(2)

Rule 23(b)(2) authorizes class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In this case, Plaintiffs seek an injunction to address alleged systemic deficiencies and common practices that affect all children in the General Class. (Pls.' Mem. at 24.) Plaintiffs are not challenging a series of individual decisions. An injunction ordering City and State officials to abate those practices would provide relief to all members of the class.

The requirements of Rule 23(b)(2) are thus satisfied for the General Class.

### IV. Ascertainability

The Second Circuit recognizes an "implied requirement" in Rule 23 that a proposed class be "ascertainable." *In re Petrobras Securities,* 862 F.3d at 260. A class is ascertainable when it is "defined by objective criteria" that "establish a membership with definite boundaries." *Id*. at 264. The Second Circuit has described ascertainability as a "modest threshold requirement." *Id.* at 269.

Here, the General Class is composed of foster care children who are now, or will be, in the foster care custody of the Commissioner of ACS. Defendants do not dispute that the General

---

[13] As the litigation progresses, the Court will continue to consider whether subclasses are warranted. *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) (noting that district courts have "the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted"); *see also Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41, 44 (D. Conn. 2011) ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation.") (quoting *General Tel. Co.*, 457 U.S. at 160)).

Class meets the Second Circuit's ascertainability requirement. The Court is satisfied that the General Class meets that requirement.

## CONCLUSION

For the reasons set forth above, Plaintiffs' renewed motion for class certification is GRANTED in part and DENIED in part.

The Court hereby certifies the following class:

> A Class of children who are now, or will be, in the foster care custody of the Commissioner of ACS.

It is FURTHER ORDERED that:

Attorneys from A Better Childhood, Inc., and Cravath, Swaine & Moore LLP are appointed as co-counsel for the certified General Class.

The Court orders Counsel to send to the Court, no later than September 23, 2024, a joint letter setting forth in detail the current status of the litigation. The Court is aware that agreement among the parties may not be possible. In any respect in which agreement is not possible, the parties are ordered to specify the issues as to which they can agree, and their reasons for not agreeing to the remainder.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 439.

SO ORDERED.

Dated: New York, New York
August 23, 2024

                                                  */s/ Kimba M. Wood*
                                                  KIMBA M. WOOD
                                                  United States District Judge